Avi Wagner
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310.491.7949
avi@thewagnerfirm.com

*Attorneys for Plaintiff Lighthouse Healthcare Center, LLC*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Lighthouse Healthcare Center, LLC, a California Limited Liability Company,

Plaintiff,

v.

National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-110,

Defendants.

Case No. 2:25-cv-01651-ODW-AYP

**PLAINTIFF'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Complaint Filed: February 26, 2025

Assigned to: Hon. Otis D. Wright

Hearing Date: November 23, 2026

Time: 1: 30 p.m.

Trial Date: January 27, 2026

| Plaintiff's Appendix of Evidence in Support of Motion for Summary Judgment | | |
|---|---|---|
| **Exhibit Number (If Marked at Deposition, it Retains the Same Numbering Here)** | **Document Description** | **Document Authentication** |
| 2 | MedPro Group, Inc. Claims Processes & Procedures (To Be Filed Under Seal) | Joint Stipulation of Authenticity |
| 3 | 03/01/2017 Notice of Intent to Commence Action | Joint Stipulation of Authenticity |
| 4 | 3/30/17 E-Mail from L. Press to C. Ballester | Joint Stipulation of Authenticity |
| 5 | OASIS Case Summary Report | Joint Stipulation of Authenticity |
| 6 | 5/16/17 Email from C. Ballester to D. Strother | Joint Stipulation of Authenticity |
| 9 | 6/15/18 E-Mail from S. Riss to C. Ballester | Joint Stipulation of Authenticity |
| 10 | 6/19/18 email from S. Riss to C. Ballester | Joint Stipulation of Authenticity |
| 11 | 10/11/19 E-Mail from S. Riss to C. Ballester | Joint Stipulation of Authenticity |
| 12 | Declaration of Dean Donnell filed in Donnell Suit | Joint Stipulation of Authenticity |
| 13 | Declaration of Sebastian Medvei filed in Donnell Suit | Joint Stipulation of Authenticity |
| 14 | Form CIV-100 filed in Donnell Suit | Joint Stipulation of Authenticity |
| 15 | Form CIV-100 filed in Donnell Suit | Joint Stipulation of Authenticity |
| 16 | Declaration of Sebastian Medvei filed in Donnell Suit | Joint Stipulation of Authenticity |
| 17 | 10/11/19 Email from S. Riss to C. Ballester | Joint Stipulation of Authenticity |

| Plaintiff's Appendix of Evidence in Support of Motion for Summary Judgment | | |
|---|---|---|
| **Exhibit Number (If Marked at Deposition, it Retains the Same Numbering Here)** | **Document Description** | **Document Authentication** |
| 18 | Form CIV-050 filed in Donnell Suit | Joint Stipulation of Authenticity |
| 19 | 10/11/19 E-mail from C. Ballester to S. Riss | Joint Stipulation of Authenticity |
| 20 | 10/11/19 Email from S. Riss to C. Ballester | Joint Stipulation of Authenticity |
| 31 | Policy | Joint Stipulation of Authenticity |
| 32 | MedPro Claims Diary | Joint Stipulation of Authenticity |
| 34 | 9/11/23 Letter from A. Alikin to L. Greenspoon | Joint Stipulation of Authenticity |
| 35 | 7/31/24 Letter from A. Alikin to L. Greenspoon | Joint Stipulation of Authenticity |
| 36 | 1/15/25 Letter from A. Alikin to L. Greenspoon | Joint Stipulation of Authenticity |
| 39 | 03/08/2017 email from D. Strother to L. Greenspoon | Joint Stipulation of Authenticity |
| 86 | 01/17/2023 Default Judgment in *Donnell* Suit | Joint Stipulation of Authenticity |
| 119 | Risk Management Assessment Report (To Be Filed Under Seal) | Joint Stipulation of Authenticity |
| 120 | Risk Assessment Tool (To Be Filed Under Seal) | Joint Stipulation of Authenticity |
| 131 | 03/02/2017 email from J. Hopping to S. Riss & E. Fogel with Policy Binder | Joint Stipulation of Authenticity |
| 139 | 04/03/2017 email from A. Aboufadel to E. Fogel with Policy | Joint Stipulation of Authenticity |

| Plaintiff's Appendix of Evidence in Support of Motion for Summary Judgment | | |
|---|---|---|
| **Exhibit Number (If Marked at Deposition, it Retains the Same Numbering Here)** | **Document Description** | **Document Authentication** |
| 140 | Excerpt of Transcript of Deposition of MedPro Rule 30(b)(6) Deponent Leah Nollenberger | Declaration of Avi Wagner |
| 141 | Excerpt of Transcript of Deposition of Christina Ballester | Declaration of Avi Wagner |
| 142 | Excerpt of Transcript of Deposition of Steven Riss | Declaration of Avi Wagner |
| 143 | Excerpt of Transcript of Deposition of Barry Zalma | Declaration of Avi Wagner |
| 144 | Excerpt of Transcript of Deposition of Robert Anderson | Declaration of Avi Wagner |
| 145 | Excerpt of Plaintiff's Amended Responses and Objections to Defendants' First Set of Interrogatories | Declaration of Avi Wagner |
| 146 | Anupam, Chandra M.D. et al., Prediction Model for 6-Month Mortality for Patients Discharged to Skilled Nursing Facilities, Journal of American Medical Directors Association (August 2022), pp. 1403-08 | Declaration of Avi Wagner |

| Plaintiff's Appendix of Evidence in Support of Motion for Summary Judgment | | |
|---|---|---|
| **Exhibit Number (If Marked at Deposition, it Retains the Same Numbering Here)** | **Document Description** | **Document Authentication** |
| 147 | Vossius C. et al., (2018) Mortality in nursing home residents: A longitudinal study over three years. PLoS ONE 13(9): e0203480; https://doi.org/10.1371/journal.pone.0203480 | Declaration of Avi Wagner |
| 148 | 8/21/23 E-Mail re: Default Judgment | Declaration of Laib Greenspoon |
| 149 | 1/30/24 E-Mail Thread re: Defense Counsel | Declaration of Laib Greenspoon |
| 150 | 12/2023 E-Mail Thread | Declaration of Laib Greenspoon |
| 151 | 01/2024 E-Mail Thread | Declaration of Laib Greenspoon |
| 152 | 2024 E-Mail Thread Re: MedPro and Settlement | Declaration of Laib Greenspoon |
| 153 | 8/2/2024 Letter to L. Greenspoon | Declaration of Laib Greenspoon |

# Exhibit 2

**Exhibit To Be Filed Under Seal**

# Exhibit 3

EXHIBIT

No. 3

MEDVEI LAW GROUP, APC
Sebastian M. Medvei (SBN 285604)
3055 Wilshire Blvd, Ste 900
Los Angeles, CA 90010
Telephone: (213) 984-4013
Facsimile: (213) 386-9074
Email: smedvei@medveilaw.com

Attorney for Plaintiffs DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| DEAN DONNELL, an individual; DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL,<br><br>Plaintiff,<br><br>vs.<br><br>HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, a business organization of unknown type; HOLLYWOOD PRESBYTERIAN MEDICAL GROUP, INC., a California corporation; HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC., a California corporation; HOLLYWOOD PRESBYTERIAN MEDICAL BUILDING LLC, a California limited liability company; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation; FOUR SEASONS | **NOTICE OF INTENT TO COMMENCE ACTION AGAINST HEALTH CARE PROVIDER**<br>**(California Code of Civil Procedure § 364)** |

HEALTHCARE & WELLNESS CENTER, a business organization of unknown type; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, a business organization of unknown type; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive,

Defendants.

TO:

HOLLYWOOD PRESBYERIAN MEDICAL CENTER
1300 North Vermont Avenue
Los Angeles, CA 90027

HOLLYWOOD PRESBYERIAN MEDICAL GROUP, INC.
Agent: Benjamin Behroozan
660 W Broadway Blvd
Glendale, CA 91204

HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC.
Agent: Mark R. Bell
111 N Sepulveda Blvd, #210
Manhattan Beach, CA 90266

HOLLYWOOD PRESBYERIAN MEDICAL BUILDING, LLC
Agent: Barbara B. Hines
950 S Grand Ave, 2nd Floor South
Los Angeles, CA 90015

FOUR SEASONS HEALTHCARE &
WELLNESS CENTER, LP
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

FOUR SEASONS HEALTHCARE &
WELLNESS CENTER
5335 Laurel Canyon Blvd
Los Angeles, CA 91607

SHERMAN OAKS HOSPITAL
4929 Van Nuys Blvd
Sherman Oaks, CA 91403

PRIME HEALTHCARE SERVICES, INC.
Agent: Troy Schell
3300 E Gausti Rd, 3rd Floor
Ontario, CA 91761

LIGHTHOUSE HEALTHCARE CENTER
2222 Santa Ana S
Los Angeles, CA 90059

ROCKPORT HEALTHCARE SUPPORT
SERVICES, LLC
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

YOU ARE HEREBY NOTIFIED that DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL, intend to commence a legal action against you.

The legal basis for the action, without limitation, is that HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, a business organization of unknown type; HOLLYWOOD PRESBYTERIAN MEDICAL GROUP, INC., a California corporation; HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC., a California corporation; HOLLYWOOD PRESBYTERIAN MEDICAL BUILDING LLC, a California limited liability company; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, a business organization of unknown type; SHERMAN OAKS HOSPITAL, a business

organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, a business organization of unknown type; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive (collectively "Defendants"), were negligent, reckless, and/or engaged in intentional malfeasance, or other wrongful conduct, in the diagnosis, care and/or treatment of VALERIE DONNELL, and that DEAN DONNELL, VALERIE DONNELL, and DEAN DONNELL, as the personal representative of the ESTATE OF VALERIE DONNELL (collectively, "Plaintiffs"), suffered injury and damages as a result of diagnosis, treatment, surgery and/or care that occurred on or about, without limitation, May 1, 2016 to June 24, 2016, at the various offices and facilities of Defendants.

As a result of such negligence, Plaintiffs sustained injuries, damages and losses, to the extent presently known, including but not limited to the following: death, physical injuries, medical and related expenses, pain, suffering, inconvenience, grief, and inconvenience, emotional distress, impaired enjoyment of life, loss of consortium, loss of society and companionship, funeral expenses, future contributions, and the value of personal service, advice, or training. Plaintiffs intend to seek, without limitation, general damages, special damages, statutory damages, as well as punitive damages, attorneys' fees, and costs as appropriate.

This notice is based upon the facts as presently known. There may be other or additional injuries, damages and expenses still to be ascertained, which may be included in the complaint for professional negligence. To the extent any individual DOE that is subsequently identified through discovery is a medical provider, this notice shall serve as notice to said DOE.

Dated: March 1, 2017

Respectfully Submitted,

**MEDVEI LAW GROUP, APC**

By: ______________________

Sebastian M. Medvei

Attorney for Plaintiffs

## PROOF OF SERVICE

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 3055 Wilshire Blvd., Suite 900, Los Angeles, CA 90010. On August 4, 2015, I served on the interested parties in this action, the foregoing documents described as:

**NOTICE OF INTENT TO COMMENCE ACTION AGAINST HEALTH CARE PROVIDER (Code of Civil Procedure § 364)**

[X] by placing a true copy thereof enclosed in a sealed envelope, with postage prepaid, addressed as follows:

HOLLYWOOD PRESBYERIAN MEDICAL CENTER
1300 North Vermont Avenue
Los Angeles, CA 90027

HOLLYWOOD PRESBYERIAN MEDICAL GROUP, INC.
Agent: Benjamin Behroozan
660 W Broadway Blvd
Glendale, CA 91204

HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC.
Agent: Mark R. Bell
111 N Sepulveda Blvd, #210
Manhattan Beach, CA 90266

HOLLYWOOD PRESBYERIAN MEDICAL BUILDING, LLC
Agent: Barbara B. Hines
950 S Grand Ave, 2nd Floor South
Los Angeles, CA 90015

FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600

FOUR SEASONS HEALTHCARE & WELLNESS CENTER
5335 Laurel Canyon Blvd
Los Angeles, CA 91607

Los Angeles, CA 90036

SHERMAN OAKS HOSPITAL
4929 Van Nuys Blvd
Sherman Oaks, CA 91403

PRIME HEALTHCARE SERVICES, INC.
Agent: Troy Schell
3300 E Gausti Rd, 3rd Floor
Ontario, CA 91761

LIGHTHOUSE HEALTHCARE CENTER
2222 Santa Ana S
Los Angeles, CA 90059

ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

[X] (BY MAIL) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party of service, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit.

[ ] (PERSONAL SERVICE) I delivered such envelope by hand to the office of the addressee

[ ] (BY FACSIMILE TRANSMISSION) I caused such document to be sent by Facsimile Transmission to the addressee

[X] I declare that I am employed in the office of a member of the board of this Court at whose direction service was made.

[X] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 1, 2017, at Los Angeles, California

Ali Zamora

# Exhibit 4

EXHIBIT
No. 4

Message

**From**: Press, Leticia [Leticia.Press@medpro.com]
on behalf of Press, Leticia <Leticia.Press@medpro.com> [Leticia.Press@medpro.com]
**Sent**: 3/30/2017 8:29:35 AM
**To**: Ballester, Christina [Christina.Ballester@medpro.com]
**Subject**: FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
**Attachments**: Legal Intent to Commence Action - Valerie Donnell.pdf; ATT00001.htm; FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276; FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276; RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

I will forward a Set Up Sheet to Pam. However, a file cannot be set up until the policy is issued. In order to avoid any confusion with the insured and broker, I think it is best that you respond and let them know you are handling this matter. Personally, I would handle as an incident only. However, the management company routinely sends out to defense counsel.
Lety

-----Original Message-----
From: Prudlow, Pamela
Sent: Wednesday, March 29, 2017 3:13 PM
To: Press, Leticia <Leticia.Press@medpro.com>
Cc: Ballester, Christina <Christina.Ballester@medpro.com>
Subject: FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
Importance: High

Lety, please handle in Christina's absence. Thanks.

Policy is not issued yet. Binder is included in the first email attachment.

Pamela A. Prudlow
Claims Analyst
5814 Reed Road
Ft. Wayne, IN 46835
Office: 800-463-3776 Ext. 6370
Office Direct (260) 486-0370
pamela.prudlow@medpro.com
www.medpro.com

-----Original Message-----
From: Olsen, Alysha
Sent: Wednesday, March 29, 2017 2:18 PM
To: Prudlow, Pamela <Pamela.Prudlow@medpro.com>
Subject: FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

Pam,
This was sent on March 7th but we don't have the policy issued yet, only the binder. I honestly don't recall if we can open the file with only the binder.

Alysha A. Olsen
Claims Specialist
MedPro Group
direct (559) 578-3328
mobile (559) 326-6658
Email: Alysha.Olsen@medpro.com
www.medpro.com

-----Original Message-----
From: Steven Riss [mailto:Steven.Riss@amwins.com]
Sent: Tuesday, March 07, 2017 6:35 PM
To: Olsen, Alysha <Alysha.Olsen@medpro.com>
Cc: Eli Fogel <Eli.Fogel@amwins.com>
Subject: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

This message originated from outside your organization

Hi alysha. Pl process attached. The point of contact is

David Strother
Administrator2@lighthousehealthcenter.com<mailto:Administrator2@lighthousehealthcenter.com>

323) 564-4461

Mailing address: 2222 Santa Ana Blvd South Los Angeles CA 90059

Please send acknowledgment.

Thanks

Steven Riss
Senior Vice President | AmWINS Insurance Brokerage of California, LLC T 818.772.3819 F 818.773.6000
steven.riss@amwins.com<mailto:steven.riss@amwins.com>
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367 An AmWINS Group Company License #0C01319
03/07/17 Steven.Riss@amwins.com

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you

# Exhibit 5

EXHIBIT
No. 5
exhibitsticker.com

## Case Summary Report

| Name | Donnell v. Lighthouse Healthcare Center, | File Manager | Regional Claim Manager | Status | Type |
|---|---|---|---|---|---|
| Case # | 1042085 | Nollenberger, Leah | | Closed | Suit |

| Patient | Name | Age | Sex | Reinsurance Date |
|---|---|---|---|---|
| | Donnell, Valerie | | F | |

| | |
|---|---|
| Description of Main Deft Claim | |
| Condition of Main Deft Claim | Post-hospitalization |
| Treatment of Main Deft Claim | Rehabilitation |
| Allegation of Main Deft Claim | Failure to provide care |
| Result of Main Deft Claim | Death 6/24/2016 due to cardiopulmonary arrest. |

| | | | |
|---|---|---|---|
| Plaintiff Atty | Medvei, Sebastian M | Docket # | BC664101 |
| Venue | Los Angeles | Date Filed | 08/22/2018 |
| Court | State Superior | Trial Date | |

| Claim No | Insured Name | Insured Policy # | Policy Limits | Ind Res | Ind Paid | Exp Res | Exp Paid | Open Date | Type | Status Date | Disposition |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1042085-01 | Lighthouse Healthcare Center, LLC | NSC100276 | 1M/3M | $0.00 | $0.00 | $57,831.69 | $57,831.69 | 04/07/2017 | Suit | 05/07/2025 | No Coverage for Loss |
| | Agent of Insured | | Defense Atty | | Treatment Date | Rpt to Insured | Rpt. to MP | Inception | Status | Excess Limit | Reservation of Rights Sent |
| | Lighthouse Healthcare Center | | Wax, Gary | | 05/01/2016 | 03/07/2017 | 03/08/2017 | | Closed | | N |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals for Case #: 1042085 | $0.00 | $0.00 | $57,831.69 | $57,831.69 | Loss Reserve Code | Reserve adequate |

All notes for Case

| Mode | Created By | Created Date/Time | Note |
|---|---|---|---|
| Official | Nollenberger, Leah | 01/24/2025 11:02:17 AM | CLOSING NOTE After back and forth with insured's personal counsel, agreement was reached that we would not be pursuing a motion to open the default judgment based on the recommendation of Gary Wax. A final DOC was issued to the insured advising them that we would not be making any indemnity payments due to the default judgment exclusion in the policy. We have advised DC to close their file and advised insured that we are closing ours. |
| Official | Nollenberger, Leah | 12/17/2024 04:06:51 PM | UPDATED APPELLATE COUNSEL RECOMMENDATION Since meeting with counsel and the insured on 12/9, DC Gary Wax had a call with Avi Wagner and Derek Cheung, the individual who received service of the complaint per the return of service. In that meeting, Gary learned that Cheung was, in fact, served with the complaint and in turn forwarded it to his employer's GC, who emailed same to the insured Laib Greenspoon that day. As such, there is now confirmation that the insured received actual notice of the complaint in April 2019. Although Cheung was not Lighthouse's agent for service at the time, its registered agent was not living in the country and Cheung later became their registered agent. Given this development and evidence of actual notice, Gary recommends we do NOT move to open the default judgment as he believes it has essentially no chance of being granted. We discussed same with Avi and coverage counsel on 12/13; Avi asked some questions about substituted service, and Gary provided an updated memo on 12/15 re same. We are waiting for written confirmation from Avi that the insured agrees not to pursue the motion. Diary one week for f/u. |
| Official | Hubert, Sarah | 12/10/2024 01:30:16 PM | Update DC per email from CDM: From: Nollenberger, Leah <Leah.Nollenberger@medpro.com> Sent: Tuesday, December 10, 2024 1:22 PM To: Hubert, Sarah <Sarah.Hubert@medpro.com> Subject: Add DC- 1042085 Donnell v. Lighthouse Healthcare Center Hi Sarah, Please add Gary Wax from Greines Martin Stein and Richland to claim 1042085 as DC effective 11/1/24 (info below). Please expire Stephen Fraser and Fraser Watson & Croutch as DC effective 12/1/24. Thanks, Leah Leah M. Nollenberger, J.D., LL.M Claims Division Manager- Senior Care MedPro Group Phone: 912.223.5898 Fax: 866.552.9906 leah.nollenberger@medpro.com medpro.com |
| Official | Nollenberger, Leah | 12/09/2024 09:57:29 AM | UPDATE/PHONE CONFERENCE WITH INSURED, COUNSEL Appellate counsel Gary Wax provided his memo regarding the options for setting aside the default judgment, a copy of which is saved in OnBase. At my request, he also provided a bullet point list of the questions that still need to be answered to include in affidavits on behalf of the insured and Derek Cheung, the person who purportedly received service of filings. Many of these are the same questions that prior DC was asking and never got answers to, which is why she did not provide a CTW a motion to set aside. Following receipt of the memo and list of questions, I met with the insured's personal/coverage counsel (Avi Wagner and Charissa Morningstar), appellate counsel (Gary Wax and Kent Toland), and MPG's outside coverage counsel (Albert Alikin and Betty Su) on 12/3 to discuss next steps. During this call, Avi advised that Cheung is not a Lighthouse employee, but has made himself available to discuss the circumstances of service, and Avi and Gary will meet with him to try and get some of the questions answered. The insured still needs to answer the questions directed to them, which Avi is also working on. Gary has advised that this information is needed by 12/16 in order for him to start drafting a motion to set aside (if that is what we do) given the mid-January deadline and the intervening holidays. I advised Avi that MPG is willing to proceed with the motion to set aside if the questions can be answered and affidavits provided to Gary. Gary did advise that his firm, as a rule, doesn't appear at the trial court level, but he would instead ghost write the motion for nursing home DC. We are meeting again on 12/13 to determine if the necessary information has been received from Cheung and the insured, and to get the final determination from Gary as to the viability of the motion to set aside. At that time, if we are going to proceed with the motion, we will also discuss DC assignment. |
| Official | Nollenberger, Leah | 11/22/2024 06:16:05 PM | APPELLATE COUNSEL REVIEW Former DC Marijana Kral provided her entire file to appellate counsel Gary Wax, who has now completed his review. He is providing a written memo, but advised today via telephone call that we may be able to set aside the default, but it depends on what information the insured is able to provide about whether their agent for service received the variety of documents allegedly served by PC during the life of the case, and when they actually received notice of suit, etc. Although the insured's personal counsel, Avi Wagner, was able to provide some information, there is other pertinent information still outstanding. Gary is going to provide a detailed written memo to me and Avi that includes the information we would have to be able to provide in order to potentially be successful in vacating the judgment of default. Upon receipt of same I will further note the file. In any event, the deadline to file the motion would be in January, so the insured will have to move quickly in their ongoing investigation regarding the service and notice issues. Diary set for f/u. |
| Official | Nollenberger, Leah | 10/23/2024 05:57:22 PM | UPDATE I had a call with DC Marijana Kral regarding this matter on 10/14 to determine her opinion on the likelihood of prevailing in a motion to set aside the default judgment. She advised that she couldn't provide a CTW the motion because she doesn't have sufficient information about the agent for service and whether the person in his office who was served had authority to accept service in his absence (the actual agent was out of the country). She acknowledged that she had not provided a written opinion on the options for the default judgment, but advised that they would be: 1. moving to set aside the judgment; 2. do nothing and see if PC pursues the default; 3. talk to PC to see if they would set aside the judgment voluntarily and prosecute the case on the merits; and 4. negotiate a settlement with PC in order to get a satisfaction of judgment filed. In light of Kral's inability to provide an analysis and CTW on the motion to set aside the default, and after discussion with coverage and D. Zielinski, we elected to retain appellate counsel to review since this is a purely legal issue. I contacted Gary Wax at Greines Martin in Los Angeles and after he cleared conflicts I advised that we were looking for a legal analysis of the statute/practice book and case law as applied to the facts in this case in order to get an opinion on CTW a motion to open. He asked whether we would want just an analysis at the trial court level, or if we also wanted an evaluation of chances at an appellate level. I advised both would be helpful. I spoke with M. Kral and advised her of the plan to get a second look and put her and G. Wax in touch so she can send him her file, which she agreed to do. I asked M. Kral to provide her |

| | | | |
|---|---|---|---|
| | | | file to G. Wax by 10/30 as we are looking at a January 2025 deadline to file the motion to set aside. Diary set for f/u. |
| Official | Nollenberger, Leah | 09/26/2024 05:39:11 PM | TRANSFER NOTE I am taking over handling of this matter from prior FM. As previously noted, coverage is complicated by the entry of judgment against the insured in January 2023, which was not reported until August 2023. Prior filing of suit was not reported. Coverage letters have been sent to the insured regarding default judgment exclusion. Insured's coverage counsel Avi Wagner recently sent a letter requesting reconsideration of our position, which is being reviewed with coverage for a response. I have left a VM for DC Marijana Kral advising her that I am taking over handling and asked for more information about the viability of opening the judgment as discussions with prior FM were verbal and not reduced to writing, though notes reflect likelihood that such a motion is not viable because everything from the insured indicates proper service. To date, PC has not made any attempts to execute the judgment. Diary set for f/u with DC. |
| Official | Bevans, Sandra | 07/10/2024 01:04:49 PM | To date, it appears that PC has not made efforts to collect on the default judgment. The insured is unaware of any such efforts. After consulting with coverage counsel, we have decided to wait to determine if PC attempts to collect on the judgment before taking further action. |
| Official | Bevans, Sandra | 06/17/2024 11:39:13 AM | After discussing options internally, we have requested more information from the insured via DC regarding any efforts to collect the outstanding judgment by PC and how Lighthouse relates to the LLC that owns the property the facility sits on. I will diary 30 days. |
| Official | Bevans, Sandra | 03/19/2024 02:33:35 PM | CALL WITH DC: I spoke with Marijana Krol today regarding the status of this matter. She indicated that she spoke with Avi Wagner last week, but that no real progress has been made. Wagner confirmed that the address served was correct but has been unable to produce any further information with which we may be able to open the judgment. Apparently the agent for service himself lived outside the country at the time service was made, but his office assistant was served and the certificates of service indicate as such. DC noted that PC has not attempted to execute the judgment yet. She also noted that Wagner told her that the facility has reported that it has no records from this patient because the patient was never actually admitted to the facility. |
| Official | Bevans, Sandra | 02/14/2024 09:26:21 AM | DCM REVIEW: I am monitoring this matter as the prior FM is no longer handling the case. I have f/u with DC to determine whether Laib Greenspoon and/or Avi Wagner have agreed to provide a declaration attesting that the documents described below were not in fact served on Lighthouse. Once we have that answer, I will raise this to the coverage unit for further consideration. |
| Official | Hanson, Thomas | 01/17/2024 07:11:25 PM | DC recently provided a summary of the Superior Court's records to MPG and the Insured, Laib Greenspoon, and his personal counsel, Avi Wagner, and requested a conference call with the Insured to determine if they believe any information contained in the Court's file [particularly as to proof of service] is inaccurate. DC is awaiting their response and will advise on her opinion about opening the default judgment |
| Official | Mains, Matt | 01/16/2024 10:41:21 AM | UPDATE: DC provided a lengthy summary of service issues, DC advises that the judgment may be reopened but the insured needs to sign an affidavit that they were never served. To date, the insured has drugged their heels on answering DC's request. A summary of the email's important points is below: 1. Service of Documents: There were multiple instances of service of documents to Lighthouse, primarily through an agent, Steven Stroll. This includes a summons, complaint, and notices of case assignments and rulings, with dates ranging from June 2017 to April 2019. 2.Case Developments: - A second amended complaint filed in August 2018 wasn't served on Lighthouse. - In January 2019, Lighthouse was identified as an unserved defendant, and the court ordered its service by March 2019. - Default judgment against Lighthouse was entered in August 2019 but was later set aside in May 2021. - Trial was scheduled for December 2022. 3.Statements and Orders: - A proof of personal service on Lighthouse and a request for entry of default were noted in 2019. - In January 2020, a default prove up hearing took place, where Dean Donnell testified about his wife's treatment at Lighthouse. - The court found insufficient basis for damages in January 2020 due to procedural issues with the service of the statement of damages. 4. Damages and Settlements: - The plaintiffs sought damages for wrongful death and estate-related claims. - Settlements with other defendants were noted, leaving Lighthouse as the remaining defendant in default. - In January 2023, the court found evidence sufficient to establish Lighthouse's liability for Mrs. Donnell's death due to substandard care and awarded $2,000,885. 5. Affiliation Allegations: - Plaintiff Dean Donnell alleged in an interrogatory that Lighthouse is affiliated with Rockport Healthcare Services and Four Seasons, all potentially owned by Shlomo Rechnitz and Brius Healthcare Services. I have requested DC push the insured to make a decision as timeliness is important for the subject motion to reopen the judgment. |
| Official | Mains, Matt | 12/20/2023 09:40:31 AM | UPDATE: DC has been unresponsive to providing updates and DCM is aware. To date, DC advises that they've obtained copies of some records but need additional records. I have expressed, repeatedly that time is of the essence in this matter. |
| Official | Mains, Matt | 10/17/2023 03:36:50 PM | OPENING NOTE: In March 2017, the broker for Lighthouse tendered notice of intent to file a lawsuit, which MedPro accepted as an incident. MedPro did not receive any lawsuit so they closed the matter in May 2017.In 2019, the broker sent MedPro a default judgment for another defendant. MedPro did not receive plaintiff's Complaint and did not receive any notice of intent to seek default judgment. On 8/24/2023, MedPro received a copy of the 1/2023 default judgment from Lighthouse. MedPro has issued a contigent DOC based on the default judgment exclusion. MedPro has retained attorney Marijana Kral and Stephen Fraser to investigate and determine whether the judgment can be set aside. DC reports that, to date, it has not found proof of service, but intends to get the actual court records to review. Attempts to contact PC has been unsuccessful. I will continue to follow up on 15 day intervals as to the status of the investigation. |
| Official | Ballester, Christina | 05/09/2017 01:12:43 PM | No further activity, matter will be closed. |

Printed Date: 08/12/2025 02:02 PM

# Exhibit 6

EXHIBIT
No. 6
exhibitsticker.com

**From:** Ballester, Christina[Christina.Ballester@medpro.com]
**Sent:** Tue 5/16/2017 4:50:18 PM (UTC)
**To:** David Strother[david@lhcarecenter.com]
**Cc:** 'Steven Riss'[Steven.Riss@amwins.com]
**Subject:** NEW LOSS - FW: Lighthouse Healthcare Center, LLC - Petra Garcia - Policy# NSC100276

Hello David:
I am Claims Counsel assigned to this matter from the insurance carrier MedPro Group. Please accept this email as an acknowledgement of receipt of the incident.As a follow up to the reported loss below, please let me know the date the incident occurred, whether you have any information if the visitor sustained a head injury after her visit to the ER, and if you have seen her at the facility since the occurrence.
Thank you.

**Christina S. Ballester**

**Christina S. Ballester, J.D.**
Senior Care Claims Counsel
Cell: 847.404.4180
Direct: 847.728.0482
Christina.Ballester@medpro.com
www.medpro.com

MedPro Group
*a Berkshire Hathaway company*

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Friday, May 12, 2017 7:11 PM
**To:** Fax - MP Claims Operations <Fax-MPClaimsOperations@medpro.com>; Eli Fogel <Eli.Fogel@amwins.com>
**Subject:** Lighthouse Healthcare Center, LLC - Petra Garcia - Policy# NSC100276
**This message originated from outside your organization**

---

Please process the below incident
1st point of contact:
David Strother
david@lhcarecenter.com
Per the insured:
We had a visitor state that she fell in a Resident's room and hit her head. She states that she feels ok; but, got dizzy – prior to the reported fall. Her name is Petra Garcia.She is the mother of one of our Residents. She minimized the issue and stated that she is ok; but, she is going to be checked out at the ER – to be safe.She is elderly and she hit her head during the course of the fall…
Please send acknowledgement email to David & CC me on everything. Thanks
**Steven Riss**
Senior Vice President |AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street|Suite 1100|Woodland Hills, CA 91367
*An AmWINS Group Company*

License #0C01319
05/12/17 Steven.Riss@amwins.com

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed.If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same.If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer.Thank you

# Exhibit 9

EXHIBIT

No. 9

Message

**From:** Steven Riss [Steven.Riss@amwins.com]
on behalf of Steven Riss <Steven.Riss@amwins.com> [Steven.Riss@amwins.com]
**Sent:** 6/15/2018 9:46:49 AM
**To:** 'Ballester, Christina' [Christina.Ballester@medpro.com]
**Subject:** RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

Thanks!

**Steven Riss**
Senior Vice President | AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367
*An AmWINS Group Company*
License #0C01319

---

**From:** Ballester, Christina [mailto:Christina.Ballester@medpro.com]
**Sent:** Friday, June 15, 2018 9:26 AM
**To:** Steven Riss <Steven.Riss@amwins.com>
**Cc:** ari@shomerinsurance.com
**Subject:** RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

Hi Steve and Ari:

1042085 was set up by Lety in March and closed last May with no further activity by plaintiff's attorney. The name is Valerie Donnell, I do not have anything further that was sent to me.

---

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Wednesday, June 13, 2018 5:53 PM
**To:** Ballester, Christina <Christina.Ballester@medpro.com>
**Subject:** Re: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

**This message originated from outside your organization**

---

Hi Christina. Can we please get an update on this claim

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer.
Thank you
This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the

author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you

# Exhibit 10

EXHIBIT
No. 10
exhibitsticker.com

**From:** Ballester, Christina[Christina.Ballester@medpro.com]
**Sent:** Tue 6/19/2018 4:32:25 PM (UTC)
**To:** David Strother[david@lhcarecenter.com]
**Cc:** Myer, Bridget[Bridget.Myer@medpro.com]; Steven Riss[Steven.Riss@amwins.com]
**Subject:** How to proceed re: 2nd Request for Information :Lighthouse Healthcare Center, LLC - Veronica Hall - Policy# NSC100276
**Attachment:** Legal Request for Records - Veronica Hall.pdf

Hi David:
Bridget Myer has requested additional documentation on 6/6 and 6/12 regarding what event you are reporting that you believe is the basis for a potential claim.A medical records request can be for multiple purposes other than litigation. To date, we have not received additional information. If there is no event or information to provide than we will not be setting this up as a potential claim. Please respond as soon as possible so we can make that determination. This will be MedPro’s last request for the information.

**From:** Myer, Bridget
**Sent:** Tuesday, June 12, 2018 11:04 AM
**To:** 'david@lhcarecenter.com' <david@lhcarecenter.com>
**Subject:** 2nd Request for Information :Lighthouse Healthcare Center, LLC - Veronica Hall - Policy# NSC100276

This will acknowledge receipt of this new matter which will be assigned to and reviewed by our Claims Consultant Christina Ballester.Her contact information is Christina.Ballester@medpro.com or 847-404-4180.

Upon review of the materials submitted, there is insufficient information to determine what event occurred that you believe is the basis for this attorney’s letter (medical records request). Please provide ***the residency period***, and details from the residency regarding ***an event which occurred*** forming the basis of why you reasonably believe this attorney’s letter (medical records request) may result in a claim. Please submit that detailed information to my attention by using the attached form and send it to reportaclaim@medpro.com. This should not go to the assigned Claims Consultant.Without the necessary information referenced above, MedPro cannot determine what event occurred and will not accept this as a reportable matter.

Thanks,
**Bridget Myer**
Claims Intake Analyst
5814 Reed Road
Fort Wayne, IN46835
Ph: 1-800-463-3776 Ext 111097
Fax: 1-866-552-9906
www.reportaclaim@medpro.com

MedPro Group
a Berkshire Hathaway company

CONFIDENTIALITY NOTICE:The materials in this electronic mail transmission (including all attachments) are private and confidential and are the property of the sender.The information contained in the material is privileged and is intended only for the use of the named addressee(s).If you are not the intended addressee, be advised that any unauthorized disclosure, copying, distribution or the taking of any action in reliance on the contents of this material is strictly prohibited.If you have received this electronic mail transmission in error, please

immediately notify the sender by telephone or electronic message at the number or address indicated above, and thereafter, destroy it immediat

**From:** Myer, Bridget
**Sent:** Wednesday, June 06, 2018 8:02 AM
**To:** 'david@lhcarecenter.com' <david@lhcarecenter.com>
**Cc:** 'steven.riss@amwins.com' <steven.riss@amwins.com>
**Subject:** FW: Lighthouse Healthcare Center, LLC - Veronica Hall - Policy# NSC100276

This will acknowledge receipt of this new matter which will be assigned to and reviewed by our Claims Consultant Christina Ballester.Her contact information is Christina.Ballester@medpro.com or 847-404-4180.

Upon review of the materials submitted, there is insufficient information to determine what event occurred that you believe is the basis for this attorney's letter (medical records request). Please provide ***the residency period*****,** and details from the residency regarding ***an event which occurred*** forming the basis of why you reasonably believe this attorney's letter (medical records request) may result in a claim. Please submit that detailed information to my attention by using the attached form and send it to reportaclaim@medpro.com. This should not go to the assigned Claims Consultant.Without the necessary information referenced above, MedPro cannot determine what event occurred and will not accept this as a reportable matter.

Thank you,

**Bridget Myer**
Claims Intake Analyst
5814 Reed Road
Fort Wayne, IN46835
Ph: 1-800-463-3776 Ext 111097
Fax: 1-866-552-9906
www.reportaclaim@medpro.com

MedPro Group
a Berkshire Hathaway company

CONFIDENTIALITY NOTICE:The materials in this electronic mail transmission (including all attachments) are private and confidential and are the property of the sender.The information contained in the material is privileged and is intended only for the use of the named addressee(s).If you are not the intended addressee, be advised that any unauthorized disclosure, copying, distribution or the taking of any action in reliance on the contents of this material is strictly prohibited.If you have received this electronic mail transmission in error, please immediately notify the sender by telephone or electronic message at the number or address indicated above, and thereafter, destroy it immediately.

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Tuesday, June 05, 2018 4:58 PM
**To:** Fax - MP Claims Operations <Fax-MPClaimsOperations@medpro.com>; Eli Fogel <Eli.Fogel@amwins.com>
**Subject:** Lighthouse Healthcare Center, LLC - Veronica Hall - Policy# NSC100276
**This message originated from outside your organization**

---

Please process the attached
1st point of contact:
David Strother
david@lhcarecenter.com

Choice of Counsel: Bill Wilson of Wilson Getty LP
Please send acknowledgement email to Davidand CC me on everything.
Thank you,

**Steven Riss**
Senior Vice President |AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street|Suite 1100|Woodland Hills, CA 91367
*An AmWINS Group Company*
License #0C01319

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you

# Exhibit 11

EXHIBIT
No. 11

Message

**From:** Steven Riss [Steven.Riss@amwins.com]
on behalf of Steven Riss <Steven.Riss@amwins.com>
**Sent:** 10/11/2019 11:52:21 AM
**To:** 'Ballester, Christina' [Christina.Ballester@medpro.com]
**Subject:** RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
**Attachments:** Donnell v. Four Seasons - Dec ISO Default Judgment (Dean Donnell).pdf; Donnell v. Four Seasons - Dec ISO Default Judgment (Estate of Valerie Do....pdf; Donnell v. Four Seasons - Judgment (Dean Donnell).pdf; Donnell v. Four Seasons - Reqest for Court Judgment (Estate of Valerie D....pdf; Donnell v. Four Seasons - Request for Court Judgment (Dean Donnell).pdf; Donnell v. Four Seasons - Dec ISO Default Judgment (Attorney).pdf; Donnell v. Four Seasons - Stmt of Damages (Dean Donnell).pdf; Donnell v Four Seasons - Stmt of Damages (Estate of Valerie Donnell).pdf

Hi Christina – can I please get an update on this claim? Looks like there was a default judgment, please see enclosed, thanks

**Steven Riss**
Senior Vice President | AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367
*An AmWINS Group Company*
License #0C01319

---

**From:** Steven Riss
**Sent:** Friday, June 15, 2018 9:47 AM
**To:** 'Ballester, Christina' <Christina.Ballester@medpro.com>
**Subject:** RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

Thanks!

**Steven Riss**
Senior Vice President | AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367
*An AmWINS Group Company*
License #0C01319

---

**From:** Ballester, Christina [mailto:Christina.Ballester@medpro.com]
**Sent:** Friday, June 15, 2018 9:26 AM
**To:** Steven Riss <Steven.Riss@amwins.com>
**Cc:** ari@shomerinsurance.com
**Subject:** RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

Hi Steve and Ari:

1042085 was set up by Lety in March and closed last May with no further activity by plaintiff's attorney. The name is Valerie Donnell, I do not have anything further that was sent to me.

**From:** Steven Riss [mailto:Steven.Riss@amwins.com]
**Sent:** Wednesday, June 13, 2018 5:53 PM
**To:** Ballester, Christina <Christina.Ballester@medpro.com>
**Subject:** Re: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

**This message originated from outside your organization**

---

Hi Christina. Can we please get an update on this claim

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you
This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you amwins.com

# Exhibit 12

EXHIBIT
No. 12

Sebastian M. Medvei (SBN 285604)
MEDVEI LAW GROUP, APC
3055 Wilshire Blvd, Ste 900
Los Angeles, CA 90010
Telephone: (213) 984-4013
Facsimile: (213) 386-9074
Email: smedvei@medveilaw.com

Attorney for Plaintiffs DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF DEAN DONNELL

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, VAN NUYS COURTHOUSE**

| | |
|---|---|
| DEAN DONNELL, *et al.*,<br>Plaintiffs,<br>vs.<br>FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, *et al.*,<br>Defendants. | Case No.: BC664101<br>Assigned: Hon. Virginia Keeny<br>Dept: NW-W<br>FSC: Not set<br>Trial: Not set<br><br>**DECLARATION OF DEAN DONNELL IN SUPPORT OF REQUEST FOR DEFAULT JUDGMENT OF DEAN DONNELL, AN INDIVIDUAL** |

I, Dean Donnell, hereby declare:

1. I am over the age of eighteen.

2. I have personal knowledge of the facts set forth herein, and if requested, could and would competently testify to the matters set forth below.

3. The allegations of the Second Amended Complaint pertaining to Defendant LIGHTHOUSE HEALTHCARE CENTER, LLC ("Defendant Lighthouse"), paragraphs 11-41, deemed admitted for purposes of default judgment, are based on my own personal knowledge and incorporated by reference herein. *See* SAC, ¶¶ 11-41. The funeral expenses were $20,000. My wife was receiving social security retirement and disability benefits of about $2,000 a month when she passed away, which we both relied on to pay our joint bills.

4. On June 24, 2016, at about 9:00 a.m., I spoke to my wife, Valerie Donnell. I didn't know this phone call, just less than a week before our 37th anniversary of our marriage on June 30, 1979, was going to be the last time I *ever* talked to her. She was at Defendant Lighthouse. She told me she was feeling hot and that she wasn't being given food or water or being checked on by anybody working at Defendant Lighthouse. So I called Defendant Lighthouse. After about 30 minutes of trying to get a hold of someone at Defendant Lighthouse who can help my wife, I gave up and went on my own to go pick up a fan and bring it to her.

5. The whole time I was thinking to myself that I shouldn't have let them transfer her to this facility from the hospital. I kept thinking, I should go pick her up and take her somewhere else, where she was happy and they took care of her. You see, Valerie was transferred to Defendant Lighthouse from Sherman Oaks Hospital without even consulting with me and I don't know why. I tried to find out and I was just told that this was where she needed to go and where her care would be best. I was told that Valerie was in good shape and that she would be fine at Defendant Lighthouse.

6. Defendant Lighthouse was located far away (31 miles) from our house in the San Fernando Valley, and on that particular day, a Friday, there was a lot of traffic. I started heading down to Defendant Lighthouse with my fan after I was not able to talk to anyone about Valerie's care on the phone. Because it was so far away and there was traffic, it was taking a really long time to get down there. Something just didn't feel right on my way driving down there with my fan.

7. On my way to Defendant Lighthouse, I got a call from someone who worked there, I don't remember the person's name. All I remember is that they told me wife was dead. And that was it. There was no explanation of how hard they fought to bring her back. No statement as to why she died, or even when it happened. I later found out from the coroner that she died of a heart attack.

8. I can't really put to words the impact Valerie's death has had on me. I can't explain what it feels like to lose *the only living family and friend* I had left in this world. There's nothing else. We don't have kids. I've had other people pass away. My father passed away when I was 2 years

old. My mother never remarried and she also passed away many years ago. There's nothing else I can do now because there is no one left, no one that I can fully trust and talk to, the way I did with Valerie.

9. The first thing that came to my mind when it happened was the argument I had with the social worker at Sherman Oaks Hospital before Valerie was sent to Defendant Lighthouse. The social worker who refused to listen to my requests to have her placed in her usual facility or some other facility in the San Fernando Valley, and told me, point blank, that if I didn't like it, I could talk to the staff at Defendant Lighthouse when Valerie got there for a transfer. Valerie got to Defendant Lighthouse at 8 pm on June 23, by 1 pm the next day, she was dead. I didn't have time to talk to anyone. It makes me feel angry, sad, and hopeless when I think of all of the little moments where, if I had stood up to my wife's healthcare providers, I could have saved her life. I think, if Valerie and I had made a big enough fuss we could have gotten her somewhere where there was someone around who knew CPR, or knew how to use a defibrillator, both of which would have prevented her from dying. I feel like I let Valerie down as much as Defendant Lighthouse did. I feel responsible for her death, even though the few people who I have to talk to about this, my lawyer, my therapist, tell me it isn't my fault.

10. Every day I think about what happened with my wife. I remember seeing her in the nursing home bed. There's nothing I can do about it. Every morning the first thing that I think of is how my wife is dead. It's always the same. There's a lot of stuff that reminds me of that. When I see certain things, it is what I think of. When I drive by places that we used to go to, it reminds me of her. When I see the access shuttles that used to drive her around and stuff like that. I don't really talk about it. I might talk about it to a few people. I pray to God to please let me die. You don't know what it's like to feel dead inside. After you have been married with someone for 37 years and they're gone; it's a big difference. It's not just the loss but it's also why they didn't do their job and how they caused her to die. I feel like I'm not even here anymore and I'm just existing. Things are going around me. I can't take this suffering anymore. There's nothing that is going to fix anything. I don't want to do anything anymore. I want everything to end. I don't care about anything anymore. I'm just waiting to die.

11. My therapist has diagnosed me with severe major depressive disorder with severe psychological dysfunction. My therapist tells me that I need to get better or I can die from it; my therapist says that this disorder is shaving years off of my life. I tell her: Great! My life is through; I'm done. They are worried I am going to commit suicide. I always think to kill myself every day, but I'm not going to do it. I'm not going to act on anything so it doesn't matter what they think. If you're gonna kill yourself you're gonna go to hell and that's the bottom line. That's all there is. I'm hoping that I can stay alive long enough to go to trial and get some justice for my wife.

12. I feel depressed 100 percent of the time. There's nothing to make me feel any better because my only friend and companion is gone. You try to make life better and there's nothing to do. Nothing ever improves and it's the way that it's going to be forever. Nothing can make me feel the way she made me feel when she provided her emotional support to me, even during the times we got on each other's nerves. I will be this way until I'm dead. There's no hope anymore. You're a senior and you have to suffer until you die because nobody gives a damn.

13. I'm always in a bad mood because I got nothing to be happy about. It's just one miserable day after another. There's nothing to look forward to or to say that something is going to be better tomorrow. There's nothing that I can do about it. I just feel bad. I don't care about nothing anymore.

14. I don't know anybody and I don't care to go to a senior center for any of that stuff because these people don't know me and they'll never know me the way my wife did. I live alone. There's nothing that will ever make feel better or okay again. I always sleep more because I have no life anymore. I have nobody that cares if I'm alive or dead. I have nobody to share the events of my day with, or to ask for advice. There's no life and nothing to do. I might be sleeping about 20 hours a day.

15. When Valerie was alive, we used to go to dinner together, which Valerie really liked, or watch a move together, or just sit and talk. Talking about these activities seems almost banal, but it's really painful now that she's gone and we can't do them anymore. Valerie always knew what

to tell me when I was feeling unsure of myself. She knew how to make me feel like I was doing things right in my life. That I was a good and loving husband. That everything would be okay.

16. I need some kind of closure. Valerie died at a place where she was supposed to be safe, of a condition she would never have died of if someone was just checking on her to make sure she is okay, and I'm never going to forget that. I can't cope with this situation. After it happened, I didn't even decide on what headstone I wanted for Valerie for years. It's just going to make me feel more miserable than I already do. It doesn't matter who I talk to, nothing is going to change.

17. There is no moving forward. I'm where I'm at and it's where I'm going to be until I die. Some people can bounce back and come back, but there's no coming back for me. I'm angry at the way that it went. I'm just very angry that they sent my wife to a place to die. I tried to stop the paramedics to take her over there because I didn't know what kind of care she would get at Defendant Lighthouse. But most of all, I am sad that my only friend and companion, Valerie, is gone.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

Executed September 24, 2019, at Los Angeles, California.

/s/ Dean Donnell

Dean Donnell

# Exhibit 13

EXHIBIT
No. 13

Sebastian M. Medvei (SBN 285604)
MEDVEI LAW GROUP, APC
3055 Wilshire Blvd, Ste 900
Los Angeles, CA 90010
Telephone: (213) 984-4013
Facsimile: (213) 386-9074
Email: smedvei@medveilaw.com

Attorney for Plaintiffs DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF DEAN DONNELL

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, VAN NUYS COURTHOUSE**

| | |
|---|---|
| DEAN DONNELL, *et al.*,<br>Plaintiffs,<br>vs.<br>FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, *et al.*,<br>Defendants. | Case No.: BC664101<br>Assigned: Hon. Virginia Keeny<br>Dept: NW-W<br>FSC: Not set<br>Trial: Not set<br><br>**DECLARATION OF SEBASTIAN M. MEDVEI WITH BRIEF CASE SUMMARY IN SUPPORT OF REQUEST FOR DEFAULT JUDGMENT OF DEAN DONNELL, AS SOLE HEIR AND PERSONAL REPRESENTATIVE, ON BEHALF OF THE ESTATE OF VALERIE DONNELL** |

I, Sebastian M. Medvei, hereby declare:

1. I am an attorney duly licensed to practice in the State of California since 2012.

2. I have personal knowledge of the facts set forth herein, and if requested, could and would competently testify to the matters set forth below.

3. I am a shareholder of Medvei Law Group, APC, attorney of record for the plaintiffs in this action.

///

4. **Case Summary:**

5. Plaintiffs DEAN DONNELL ("Mr. Donnell") and the ESTATE OF VALERIE DONNELL, by and through her sole heir and personal representative, Mr. Donnell (the "Estate of Valerie Donnell") (collectively, "Plaintiffs") sued, *inter alia*, Defendant LIGHTHOUSE HEALTHCARE CENTER, LLC ("Defendant Lighthouse") in connection with the death of Mr. Donnell's wife, Ms. Valerie Donnell ("Mrs. Donnell"). Mrs. Donnell died on June 24, 2016, at approximately 12:59 p.m., due to cardiac arrest while she was staying at and under the supervision of Defendant Lighthouse. Her death would have been prevented had Mrs. Donnell not been intentionally and abusively ignored while staying at Defendant Lighthouse's facility. Mrs. Donnell's death was a direct result of the conduct alleged in the complaint against Defendant Lighthouse, including, without limitation, the reckless abandonment she suffered t Defendant Lighthouse, and the intentional abuse she suffered at the facility in the form of intentional isolation and total administrative indifference to her deteriorating condition, culminating in her having a heart attack at Defendant Lighthouse without anyone at Defendant Lighthouse even noticing until fifteen minutes after the last of her life had utterly escaped her.

6. Mrs. Donnell died alone in her room, with no one, not even her husband, by her side, or even checking on her, as she suffered the excruciating pain of her heart failing, the flow of blood in her blood vessels stopping, and the wave of death passing over her.

7. **Damages Claims:**

8. On behalf of his deceased wife's estate, Mr. Donnell as the sole heir and personal representative, has brought *survivor* causes of action for negligence, professional negligence, and dependent elder abuse, claiming damages suffered by Mr. Donnell's wife, Valerie Donnell, in the run up to her death. The damages claimed by the Estate of Valerie Donnell are noneconomic general damages for Mrs. Donnell's pain, suffering, and inconvenience ($80,000,000) and emotional distress ($20,000,000), which are recoverable post-death in an elder abuse cause of action.

9. The determination of the pecuniary value of the noneconomic general damages being suffered by a person on the precipice of death (as well as the value of these damages for dying itself) not subject to easy determination because the pecuniary value of such is simply limitless.

10. However, in the end, we assigned a value of $20,000,000 to emotional distress and $80,000,000 for the pain, based on a number of factors, the primary factor being that Mrs. Donnell was subjected to the excruciating conditions described in the Second Amended Complaint, including an untreated heart attack (which is itself excruciatingly painfuly) that she ultimately perished from, without anyone even being by her side (including, and especially, her sole living family member, Dean Donnell). We also used comparable jury verdicts for elder abuse leading to death and other verdicts involving abusive and painful deaths, most of which verdicts were higher than the total damages sought here. The value is not excessive or inflated and is premised on a very simple question that would be tackled by a jury: what is the monetary value of suffering the feeling of dehydration and malnutrition for the days preceding before your death, and then suffering ten to twenty minutes of the feeling of total cardiac arrest until your death, without anyone around to share your pain, hold your hand, not even your last surviving family member and husband? *See e.g.* SAC, ¶¶ 11-19. Put another way, if the factfinder had all of the money in the world to give, which it most certainly does, what would be a reasonable compensation for Mrs. Donnell's estate for the painfully excruciating death described in the complaint? We argue and claim that for the loss of one's life in an excruciatingly painful fashion, $100,000,000 is an understatement of the loss.

11. Because Mrs. Donnell's death was caused by dependent elder abuse in the form of reckless disregard and intentional isolation and indifference for Mrs. Donnell on the part of Defendant Lighthouse's employees and administration when Mrs. Donnell was having a heart attack while at Defendant Lighthouse and under the care and supervision of its employees, as opposed to mere negligence of a health care provider (as defined in the Act), MICRA does not apply. *See e.g. Covenant Care, Inc. v. Sup. Ct.* (2004) 32 Cal. 4th 771, 782; *see also Kotler v. Alma Lodge* (1999) 63 Cal. App. 4th 1381, 1391.

12. In addition, the Estate of Valerie Donnell is entitled to its attorney's fees. On default, attorney's fees are provided by LASC Rule 3.214. The total damages are $100,000,000, yielding attorney's fees of $2,890 plus $990,000 (1% of 99,000,000), for a total of $992,890. *See* LASC Rule 3.214.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

Executed September 24, 2019, at Los Angeles, California.

/s/ Sebastian M. Medvei

Sebastian M. Medvei

# Exhibit 14

EXHIBIT
No. 14

CIV-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 285604 | FOR COURT USE ONLY |
|---|---|
| NAME: Sebastian M. Medvei<br>FIRM NAME: Medvei Law Group, APC<br>STREET ADDRESS: 3055 Wilshire Blvd, Ste 900<br>CITY: Los Angeles STATE: CA ZIP CODE: 90010<br>TELEPHONE NO.: 213-984-4013 FAX NO.: 213-386-9074<br>E-MAIL ADDRESS: smedvei@medveilaw.com<br>ATTORNEY FOR *(name)*: Dean Donnell; Dean Donnell on behalf of Estate of Valerie Donnell | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 6230 Sylmar Ave<br>MAILING ADDRESS: Same<br>CITY AND ZIP CODE: Van Nuys, CA 91401<br>BRANCH NAME: Van Nuys Courthouse East | |
| Plaintiff/Petitioner: Dean Donnell, et al.<br>Defendant/Respondent: Four Seasons Healthcare, et al. | |
| **REQUEST FOR (Application)** ☐ **Entry of Default** ☐ **Clerk's Judgment** ☒ **Court Judgment** | CASE NUMBER: BC664101 |

**Not for use in actions under the Fair Debt Buying Practices Act (Civ. Code, § 1788.50 et seq.)** *(see CIV-105)*

1. TO THE CLERK: On the complaint or cross-complaint filed
   a. on *(date)*: 8/22/2018
   b. by *(name)*: Dean Donnell, as personal representative of Estate of Valerie Donnell
   c. ☐ Enter default of defendant *(names)*:

   d. ☒ I request a court judgment under Code of Civil Procedure sections 585(b), 585(c), 989, etc., against defendant *(names)*:
   Lighthouse Healthcare Center, LLC, a California limited liability company
   *(Testimony required. Apply to the clerk for a hearing date, unless the court will enter a judgment on an affidavit under Code Civ. Proc., § 585(d).)*
   e. ☐ Enter clerk's judgment
      (1) ☐ for restitution of the premises only and issue a writ of execution on the judgment. Code of Civil Procedure section 1174(c) does not apply. (Code Civ. Proc., § 1169.)
      ☐ Include in the judgment all tenants, subtenants, named claimants, and other occupants of the premises. The *Prejudgment Claim of Right to Possession* was served in compliance with Code of Civil Procedure section 415.46.
      (2) ☐ under Code of Civil Procedure section 585(a). *(Complete the declaration under Code Civ. Proc., § 585.5 on the reverse (item 5).)*
      (3) ☐ for default previously entered on *(date)*:

2. **Judgment to be entered.**

| | Amount | Credits acknowledged | Balance |
|---|---|---|---|
| a. Demand of complaint | $ | $ | $ |
| b. Statement of damages* | | | |
| (1) Special | $ | $ | $ |
| (2) General | $ 100,000,000 | $ | $ |
| c. Interest | $ | $ | $ |
| d. Costs *(see reverse)* | $ 885 | $ | $ |
| e. Attorney fees | $ 992,890 | $ | $ |
| f. TOTALS | $ 100,993,775 | $ | $ |

   g. **Daily damages** were demanded in complaint at the rate of: $ per day beginning *(date)*:
   *(* Personal injury or wrongful death actions; Code Civ. Proc., § 425.11.)*

3. ☐ *(Check if filed in an unlawful detainer case.)* **Legal document assistant or unlawful detainer assistant** information is on the reverse *(complete item 4)*.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

[signature]
(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

| FOR COURT USE ONLY | (1) ☐ Default entered as requested on *(date)*:<br>(2) ☐ Default NOT entered as requested *(state reason)*:<br>Clerk, by ______________________, Deputy |
|---|---|



Form Adopted for Mandatory Use
Judicial Council of California
CIV-100 [Rev. January 1, 2018]

**REQUEST FOR ENTRY OF DEFAULT**
**(Application to Enter Default)**

Code of Civil Procedure, §§ 585-587, 1169
www.courts.ca.gov

CIV-100

| Plaintiff/Petitioner: Defendant/Respondent: | CASE NUMBER: |
|---|---|

4. **Legal document assistant or unlawful detainer assistant (Bus. & Prof. Code, § 6400 et seq.).** A legal document assistant or unlawful detainer assistant [ ] did [X] did not for compensation give advice or assistance with this form. If declarant has received any help or advice for pay from a legal document assistant or unlawful detainer assistant, state:
   a. Assistant's name:
   b. Street address, city, and zip code:
   c. Telephone no.:
   d. County of registration:
   e. Registration no.:
   f. Expires on *(date)*:

5. [X] **Declaration under Code Civ. Proc., § 585.5** *(for entry of default under Code Civ. Proc., § 585(a)).* This action
   a. [ ] is [X] is not on a contract or installment sale for goods or services subject to Civ. Code, § 1801 et seq. (Unruh Act).
   b. [ ] is [X] is not on a conditional sales contract subject to Civ. Code, § 2981 et seq. (Rees-Levering Motor Vehicle Sales and Finance Act).
   c. [ ] is [X] is not on an obligation for goods, services, loans, or extensions of credit subject to Code Civ. Proc., § 395(b).

6. **Declaration of mailing (Code Civ. Proc., § 587).** A copy of this *Request for Entry of Default* was
   a. [ ] **not mailed** to the following defendants, whose addresses are unknown to plaintiff or plaintiff's attorney *(names)*:
   b. [X] **mailed** first-class, postage prepaid, in a sealed envelope addressed to each defendant's attorney of record or, if none, to each defendant's last known address as follows:
      (1) Mailed on *(date)*: 09/24/2019
      (2) To *(specify names and addresses shown on the envelopes)*: Lighthouse Healthcare LLC (Agent: Derek Cheung) 3699 Wilshire Blvd, Ste 1000 Los Angeles, CA 90010

I declare under penalty of perjury under the laws of the State of California that the foregoing items 4, 5, and 6 are true and correct.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

7. **Memorandum of costs** *(required if money judgment requested).* Costs and disbursements are as follows (Code Civ. Proc., § 1033.5):
   a. Clerk's filing fees .................... $ 435
   b. Process server's fees .................... $ 450
   c. Other *(specify)*: $
   d. $
   e. **TOTAL** .................... $ 885
   f. [ ] Costs and disbursements are waived.
   g. I am the attorney, agent, or party who claims these costs. To the best of my knowledge and belief this memorandum of costs is correct and these costs were necessarily incurred in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

8. **Declaration of nonmilitary status** *(required for a judgment).* No defendant named in item 1c of the application is in the military service as that term is defined by either the Servicemembers Civil Relief Act, 50 U.S.C. App. § 3911(2), or California Military and Veterans Code section 400(b).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

# Exhibit 15

EXHIBIT

No. 15

CIV-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 285604 | FOR COURT USE ONLY |
|---|---|
| NAME: Sebastian M. Medvei<br>FIRM NAME: Medvei Law Group, APC<br>STREET ADDRESS: 3055 Wilshire Blvd, Ste 900<br>CITY: Los Angeles STATE: CA ZIP CODE: 90010<br>TELEPHONE NO.: 213-984-4013 FAX NO.: 213-386-9074<br>E-MAIL ADDRESS: smedvei@medveilaw.com<br>ATTORNEY FOR (name): Dean Donnell; Dean Donnell on behalf of Estate of Valerie Donnell | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 6230 Sylmar Ave<br>MAILING ADDRESS: Same<br>CITY AND ZIP CODE: Van Nuys, CA 91401<br>BRANCH NAME: Van Nuys Courthouse East | |
| Plaintiff/Petitioner: Dean Donnell, et al.<br>Defendant/Respondent: Four Seasons Healthcare, et al. | |
| **REQUEST FOR (Application)** ☐ **Entry of Default** ☐ **Clerk's Judgment** ☒ **Court Judgment** | CASE NUMBER: BC664101 |

**Not for use in actions under the Fair Debt Buying Practices Act (Civ. Code, § 1788.50 et seq.)** *(see CIV-105)*

1. TO THE CLERK: On the complaint or cross-complaint filed
   a. on *(date)*: 8/22/2018
   b. by *(name)*: Dean Donnell, an individual
   c. ☐ Enter default of defendant *(names)*:

   d. ☒ I request a court judgment under Code of Civil Procedure sections 585(b), 585(c), 989, etc., against defendant *(names)*:
   Lighthouse Healthcare Center, LLC, a California limited liability company
   *(Testimony required. Apply to the clerk for a hearing date, unless the court will enter a judgment on an affidavit under Code Civ. Proc., § 585(d).)*
   e. ☐ Enter clerk's judgment
      (1) ☐ for restitution of the premises only and issue a writ of execution on the judgment. Code of Civil Procedure section 1174(c) does not apply. (Code Civ. Proc., § 1169.)
      ☐ Include in the judgment all tenants, subtenants, named claimants, and other occupants of the premises. The *Prejudgment Claim of Right to Possession* was served in compliance with Code of Civil Procedure section 415.46.
      (2) ☐ under Code of Civil Procedure section 585(a). *(Complete the declaration under Code Civ. Proc., § 585.5 on the reverse (item 5).)*
      (3) ☐ for default previously entered on *(date)*:

2. **Judgment to be entered.**

| | Amount | Credits acknowledged | Balance |
|---|---|---|---|
| a. Demand of complaint | $ | $ | $ |
| b. Statement of damages* | | | |
| (1) Special | $ 260,000.00 | $ 0 | $ 260,000 |
| (2) General | $ 20,000,000.00 | $ 0 | $ 20,000,000 |
| c. Interest | $ | $ | $ |
| d. Costs *(see reverse)* | $ 885 | $ 0 | $ 885 |
| e. Attorney fees | $ | $ | $ |
| f. **TOTALS** | $ 20,260,885 | $ 0 | $ 20,260,885 |

   g. **Daily damages** were demanded in complaint at the rate of: $ per day beginning *(date)*:
   *(* Personal injury or wrongful death actions; Code Civ. Proc., § 425.11.)*

3. ☐ *(Check if filed in an unlawful detainer case.)* **Legal document assistant or unlawful detainer assistant** information is on the reverse *(complete item 4)*.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

[signature]
(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

| | |
|---|---|
| ***FOR COURT USE ONLY*** | (1) ☐ Default entered as requested on *(date)*:<br>(2) ☐ Default NOT entered as requested *(state reason)*:<br>Clerk, by ______________, Deputy |



Form Adopted for Mandatory Use
Judicial Council of California
CIV-100 [Rev. January 1, 2018]

**REQUEST FOR ENTRY OF DEFAULT**
**(Application to Enter Default)**

Code of Civil Procedure, §§ 585–587, 1169
www.courts.ca.gov

CIV-100

| Plaintiff/Petitioner: <br> Defendant/Respondent: | CASE NUMBER: |
|---|---|

4. **Legal document assistant or unlawful detainer assistant (Bus. & Prof. Code, § 6400 et seq.).** A legal document assistant or unlawful detainer assistant ☐ did ☒ **did not** for compensation give advice or assistance with this form. If declarant has received **any** help or advice for pay from a legal document assistant or unlawful detainer assistant, state:
   a. Assistant's name:
   b. Street address, city, and zip code:
   c. Telephone no.:
   d. County of registration:
   e. Registration no.:
   f. Expires on *(date)*:

5. ☒ **Declaration under Code Civ. Proc., § 585.5** *(for entry of default under Code Civ. Proc., § 585(a)).* This action
   a. ☐ is ☒ is not on a contract or installment sale for goods or services subject to Civ. Code, § 1801 et seq. (Unruh Act).
   b. ☐ is ☒ is not on a conditional sales contract subject to Civ. Code, § 2981 et seq. (Rees-Levering Motor Vehicle Sales and Finance Act).
   c. ☐ is ☒ is not on an obligation for goods, services, loans, or extensions of credit subject to Code Civ. Proc., § 395(b).

6. **Declaration of mailing (Code Civ. Proc., § 587).** A copy of this *Request for Entry of Default* was
   a. ☐ **not mailed** to the following defendants, whose addresses are unknown to plaintiff or plaintiff's attorney *(names)*:
   b. ☒ **mailed** first-class, postage prepaid, in a sealed envelope addressed to each defendant's attorney of record or, if none, to each defendant's last known address as follows:
      (1) Mailed on *(date)*: 09/24/2019
      (2) To *(specify names and addresses shown on the envelopes)*:
      Lighthouse Healthcare LLC (Agent: Derek Cheung)
      3699 Wilshire Blvd, Ste 1000
      Los Angeles, CA 90010

I declare under penalty of perjury under the laws of the State of California that the foregoing items 4, 5, and 6 are true and correct.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

7. **Memorandum of costs** *(required if money judgment requested).* Costs and disbursements are as follows (Code Civ. Proc., § 1033.5):
   a. Clerk's filing fees ...................... $ 435
   b. Process server's fees .................. $ 450
   c. Other *(specify)*: $
   d. $
   e. **TOTAL** .............................. $ 885
   f. ☐ Costs and disbursements are waived.
   g. I am the attorney, agent, or party who claims these costs. To the best of my knowledge and belief this memorandum of costs is correct and these costs were necessarily incurred in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 09/24/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

8. **Declaration of nonmilitary status** *(required for a judgment).* No defendant named in item 1c of the application is in the military service as that term is defined by either the Servicemembers Civil Relief Act, 50 U.S.C. App. § 3911(2), or California Military and Veterans Code section 400(b).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 08/05/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF DECLARANT)

# Exhibit 16

EXHIBIT

No. 16

Sebastian M. Medvei (SBN 285604)
MEDVEI LAW GROUP, APC
3055 Wilshire Blvd, Ste 900
Los Angeles, CA 90010
Telephone: (213) 984-4013
Facsimile: (213) 386-9074
Email: smedvei@medveilaw.com

Attorney for Plaintiffs DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF DEAN DONNELL

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, VAN NUYS COURTHOUSE**

DEAN DONNELL, *et al.*,

Plaintiffs,

vs.

FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, *et al.*,

Defendants.

Case No.: BC664101
Assigned: Hon. Virginia Keeny
Dept: NW-W
FSC: Not set
Trial: Not set

**DECLARATION OF SEBASTIAN M. MEDVEI WITH BRIEF CASE SUMMARY IN SUPPORT OF REQUEST FOR DEFAULT JUDGMENT OF DEAN DONNELL, AN INDIVIDUAL**

I, Sebastian M. Medvei, hereby declare:

1. I am an attorney duly licensed to practice in the State of California since 2012.

2. I have personal knowledge of the facts set forth herein, and if requested, could and would competently testify to the matters set forth below.

3. I am a shareholder of Medvei Law Group, APC, attorney of record for the plaintiffs in this action.

4. **<u>Case Summary:</u>**

5. Plaintiffs DEAN DONNELL ("Mr. Donnell") and the ESTATE OF VALERIE DONNELL, by and through her sole heir and personal representative, Mr. Donnell (the "Estate

of Valerie Donnell") (collectively, "Plaintiffs") sued, *inter alia*, Defendant LIGHTHOUSE HEALTHCARE CENTER, LLC ("Defendant Lighthouse") in connection with the death of Mr. Donnell's wife, Ms. Valerie Donnell ("Mrs. Donnell"). Mrs. Donnell died on June 24, 2016, at approximately 12:59 p.m., due to cardiac arrest while she was staying at and under the supervision of Defendant Lighthouse. Her death would have been prevented had Mrs. Donnell not been intentionally and abusively ignored while staying at Defendant Lighthouse's facility. Mrs. Donnell's death was a direct result of the conduct alleged in the complaint against Defendant Lighthouse, including, without limitation, the reckless abandonment she suffered t Defendant Lighthouse, and the intentional abuse she suffered at the facility in the form of intentional isolation and total administrative indifference to her deteriorating condition, culminating in her having a heart attack at Defendant Lighthouse without anyone at Defendant Lighthouse even noticing until fifteen minutes after the last of her life had utterly escaped her.

6. Mrs. Donnell died alone in her room, with no one, not even her husband, by her side, or even checking on her, as she suffered the excruciating pain of her heart failing, the flow of blood in her blood vessels stopping, and the wave of death passing over her.

7. **Damages Claims:**

8. In his individual capacity, Mr. Donnell has brought a single cause of action for wrongful death, CCP § 377.60, claiming damages related to the death of his wife, Mrs. Donnell. The damages claimed are noneconomic general damages for loss of society and companionship ($20,000,000), and economic special damages for funeral expenses ($20,000), and the value of Mrs. Donnell's contributions in income to the family ($240,000). The $240,000 represents the $2,000 in benefits the family received on the part of Mrs. Donnell per month, for a round figure of ten years commencing from her death in 2016 to 2026..

9. In addition to direct financial benefits, a wrongful death plaintiff may recover "less tangible and not so immediate, but nevertheless real, pecuniary benefit which often may reasonable be expected from a continuance of the 'society, comfort and protection; of the deceased." *Corder v. Corder* (2007) 41 Cal. 4th 644, 661. "The pecuniary value of the society-comfort, and protection that is lost through the wrongful death of a spouse, parent, or child may

be considerable in cases where, for instance, the decedent had demonstrated a 'kindly demeanor' toward the statutory beneficiary and rendered assistance or 'kindly offices' to that person." *Id.* Of course, the determination of the pecuniary value of the "kindly offices" of a loved one are not subject to easy determination because the "kindly offices" of one's beloved spouse at the twilight of life is simply priceless.

10. However, in the end, we assigned a value of $20,000,000 based on a number of factors, the primary factor being that Mr. Donnell states that he has/had no other compatible companions in his life apart from the decedent, and that he was entirely dependent on her for the kind of support described above in *Corder*, as well as, based on consultation of published wrongful death verdicts for loss of society and companionship with similar facts that we were able to obtain from Westlaw's databases. The value is not excessive or inflated and is premised on a very simple question that would be tackled by a jury: what is the monetary value of the society, comfort, and companionship of a person's only living family member, friend, and spouse? Put another way, if the factfinder had all of the money in the world to give, which it most certainly does, what would be a reasonable compensation for Mr. Donnell's loss of the "kindly offices" of his beloved wife? We argue that, based on the void that has been left in Mr. Donnell's life by the loss of the companionship of his wife, Valerie, as set forth in his concurrently filed declaration, $20,000,000 is an understatement of the loss.

11. Because Mrs. Donnell's death was caused by dependent elder abuse in the form of reckless disregard and intentional isolation and indifference for Mrs. Donnell on the part of Defendant Lighthouse's employees and administration when Mrs. Donnell was having a heart attack while at Defendant Lighthouse and under the care and supervision of its employees, as opposed to mere negligence of a health care provider (as defined in the Act), MICRA does not apply. *See e.g. Covenant Care, Inc. v. Sup. Ct.* (2004) 32 Cal. 4th 771, 782; *see also Kotler v. Alma Lodge* (1999) 63 Cal. App. 4th 1381, 1391.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.

Executed September 24, 2019, at Los Angeles, California.

/s/ Sebastian M. Medvei

Sebastian M. Medvei

# Exhibit 17

EXHIBIT
No. 17

CIV-050

**- DO NOT FILE WITH THE COURT-**
**-UNLESS YOU ARE APPLYING FOR A DEFAULT JUDGMENT UNDER CODE OF CIVIL PROCEDURE § 585 -**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): Sebastian M. Medvei (SBN 285604)<br>Medvei Law Group, APC<br>3055 Wilshire Blvd, Ste 900<br>Los Angeles, CA 90010<br>TELEPHONE NO.: 213-984-4013<br>ATTORNEY FOR (name): Dean Donnell; Donnell for Estate of Valerie Donnell | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles<br>STREET ADDRESS: 6230 Sylmar Ave<br>MAILING ADDRESS: Same<br>CITY AND ZIP CODE: Van Nuys, CA 91401<br>BRANCH NAME: Van Nuys Courthouse East | |
| PLAINTIFF: Dean Donnell, et al.<br>DEFENDANT: Four Seasons Healthcare, et al. | |
| **STATEMENT OF DAMAGES**<br>**(Personal Injury or Wrongful Death)** | CASE NUMBER:<br>BC664101 |

To *(name of one defendant only)*: Lighthouse Healthcare Center, LLC
Plaintiff *(name of one plaintiff only)*: Dean Donnell
seeks damages in the above-entitled action, as follows:

| | AMOUNT |
|---|---|
| 1. **General damages** | |
| a. ☐ Pain, suffering, and inconvenience | $ |
| b. ☐ Emotional distress | $ |
| c. ☐ Loss of consortium | $ |
| d. ☑ Loss of sociey and companionship *(wrongful death actions only)* | $ 20,000,000 |
| e. ☐ Other *(specify)* | $ |
| f. ☐ Other *(specify)* | $ |
| g. ☐ Continued on Attachment 1.g. | |
| 2. **Special damages** | |
| a. ☐ Medical expenses *(to date)* | $ |
| b. ☐ Future medical expenses *(present value)* | $ |
| c. ☐ Loss of earnings *(to date)* | $ |
| d. ☐ Loss of future earning capacity *(present value)* | $ |
| e. ☐ Property damage | $ |
| f. ☑ Funeral expenses *(wrongful death actions only)* | $ 20,000 |
| g. ☑ Future contributions *(present value) (wrongful death actions only)* | $ 240,000 |
| h. ☑ Value of personal service, advice, or training *(wrongful death actions only)* | $ 400,000 |
| i. ☐ Other *(specify)* | $ |
| j. ☐ Other *(specify)* | $ |
| k. ☐ Continued on Attachment 2.k. | |

3. ☑ **Punitive damages:** Plaintiff reserves the right to seek punitive damages in the amount of *(specify)*.. $ 100,000,000 when pursuing a judgment in the suit filed against you.

Date: 08/07/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

(Proof of service on reverse)

CIV-050

| PLAINTIFF: Dean Donnell, et al. | CASE NUMBER: BC664101 |
|---|---|
| DEFENDANT: Four Seasons Healthcare, et al. | |

## PROOF OF SERVICE

*(After having the other party served as described below, with any of the documents identified in item 1, have the person who served the documents complete this Proof of Service. Plaintiff cannot serve these papers.)*

1. I served the
   a. ☐ Statement of Damages ☐ Other *(specify)*:
   b. on *(name)*:
   c. by serving ☐ defendant ☐ other *(name and title or relationship to person served)*:
   d. ☐ by delivery ☐ at home ☐ at business
      (1) date:
      (2) time:
      (3) address:
   e. ☐ by mailing
      (1) date:
      (2) place:
2. Manner of service *(check proper box)*:
   a. ☐ **Personal service.** By personally delivering copies. (CCP § 415.10)
   b. ☐ **Substituted service on corporation, unincorporated association (including partnership), or public entity.** By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(a))
   c. ☐ **Substituted service on natural person, minor, conservatee, or candidate.** By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of the office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(b)) **(Attach separate declaration or affidavit stating acts relied on to establish reasonable diligence in first attempting personal service.)**
   d. ☐ **Mail and acknowledgment service.** By mailing (by first- class mail or airmail, postage prepaid) copies to the person served, together with two copies of the form of notice and acknowledgment and a return envelope, postage prepaid, addressed to the sender. (CCP § 415.30) **(Attach completed acknowledgment of receipt.)**
   e. ☐ **Certified or registered mail service.** By mailing to an address outside California (by first-class mail, postage prepaid, requiring a return receipt) copies to the person served. (CCP § 415.40) **(Attach signed return receipt or other evidence of actual delivery to the person served.)**
   f. ☐ Other *(specify code section)*:
      ☐ additional page is attached.
3. At the time of service I was at least 18 years of age and not a party to this action.
4. Fee for service: $
5. Person serving:
   a. ☐ California sheriff, marshal, or constable
   b. ☐ Registered California process server
   c. ☐ Employee or independent contractor of a registered California process server
   d. ☐ Not a registered California process server
   e. ☐ Exempt from registration under Bus. & Prof. Code § 22350(b)
   f. Name, address and telephone number and, if applicable, county of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ ______________________________
(SIGNATURE)

*(For California sheriff, marshal, or constable use only)*
I certify that the foregoing is true and correct.

Date:

▶ ______________________________
(SIGNATURE)

POS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | FOR COURT USE ONLY |
|---|---|
| Sebastian Medvei (285604)<br>MEDVEI LAW GROUP, APC<br>3055 Wilshire Blvd, Ste 900<br>Los Angeles, CA 90010<br>TELEPHONE NO.: (213) 984-4013 FAX NO.: (213) 386-9074<br>EMAIL ADDRESS: smedvei@medveilaw.com<br>ATTORNEY FOR: Plaintiff | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br>STREET ADDRESS: 6230 Sylmar Ave<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Van Nuys, 91401<br>BRANCH NAME: VAN NUYS COURTHOUSE EAST | |
| PLAINTIFF: DEAN DONNELL, AN INDIVIDUAL; DEAN DONNELL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VALERIE DONNELL<br>DEFENDANT: FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation d/b/a FOUR SEASONS HEALTHCARE & WELLNESS CENTER; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, LLC, a California limited liability company; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive | CASE NUMBER:<br>BC664101 |
| **PROOF OF PERSONAL SERVICE--CIVIL** | Ref. No. or File No.: |

1. I am over 18 years of age and **not a party to this action.**
2. I served the following **documents:**
   STATEMENT OF DAMAGES

3. I personally served the following **persons** at the address, date, and time stated:
   a. Name: LIGHTHOUSE HEALTHCARE CENTER, LLC C/O DEREK CHEUNG / Agent for Service
   b. Address: 3699 Wilshire Blvd, Ste 1000, Los Angeles, CA 90010
   c. Date: 8/8/2019
   d. Time: 1:25 pm

   Description: Age: 32, Sex: M, Race/Skin Color: Asian, Height: 5'11", Weight: 185, Hair: Black, Glasses: N

4. I am
   c. an employee or independent contractor of a registered California process server.

5. My name, address, telephone number, and, if applicable, county of registration and number are:
   Michael Wadlington
   EServe
   9450 Mira Mesa Blvd., C-208, San Diego, CA 92126
   Telephone number: (954) 818-6555
   Registration Number: 2014111689
   County: LOS ANGELES
   The fee for the service was: $75.00

| | |
|---|---|
| PLAINTIFF: DEAN DONNELL, AN INDIVIDUAL; DEAN DONNELL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VALERIE DONNELL<br>DEFENDANT: FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation d/b/a FOUR SEASONS HEALTHCARE & WELLNESS CENTER; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, LLC, a California limited liability company; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive | CASE NUMBER:<br>BC664101 |

6. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 08/08/2019

Michael Wadlington
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

Michael Wadlington
(SIGNATURE OF PERSON WHO SERVED THE PAPERS)

# Exhibit 18

EXHIBIT
No. 18

CIV-050

- DO NOT FILE WITH THE COURT-
-UNLESS YOU ARE APPLYING FOR A DEFAULT JUDGMENT UNDER CODE OF CIVIL PROCEDURE § 585 -

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address): Sebastian M. Medvei (SBN 285604) Medvei Law Group, APC 3055 Wilshire Blvd, Ste 900 Los Angeles, CA 90010 TELEPHONE NO.: 213-984-4013 ATTORNEY FOR (name): Dean Donnell; Donnell for Estate of Valerie Donnell | FOR COURT USE ONLY |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles STREET ADDRESS: 6230 Sylmar Ave MAILING ADDRESS: Same CITY AND ZIP CODE: Van Nuys, CA 91401 BRANCH NAME: Van Nuys Courthouse East | |
| PLAINTIFF: Dean Donnell, et al. DEFENDANT: Four Seasons Healthcare, et al. | |
| STATEMENT OF DAMAGES (Personal Injury or Wrongful Death) | CASE NUMBER: BC664101 |

To *(name of one defendant only)*: Lighthouse Healthcare Center, LLC
Plaintiff *(name of one plaintiff only)*: Dean Donnell, as personal representative of the Estate of Valerie Donnell
seeks damages in the above-entitled action, as follows:

| | AMOUNT |
|---|---|
| **1. General damages** | |
| a. ☑ Pain, suffering, and inconvenience | $ 80,000,000 |
| b. ☑ Emotional distress | $ 20,000,000 |
| c. ☐ Loss of consortium | $ |
| d. ☐ Loss of sociey and companionship *(wrongful death actions only)* | $ |
| e. ☐ Other *(specify)* | $ |
| f. ☐ Other *(specify)* | $ |
| g. ☐ Continued on Attachment 1.g. | |
| **2. Special damages** | |
| a. ☐ Medical expenses *(to date)* | $ |
| b. ☐ Future medical expenses *(present value)* | $ |
| c. ☐ Loss of earnings *(to date)* | $ |
| d. ☐ Loss of future earning capacity *(present value)* | $ |
| e. ☐ Property damage | $ |
| f. ☐ Funeral expenses *(wrongful death actions only)* | $ |
| g. ☐ Future contributions *(present value)* *(wrongful death actions only)* | $ |
| h. ☐ Value of personal service, advice, or training *(wrongful death actions only)* | $ |
| i. ☐ Other *(specify)* | $ |
| j. ☐ Other *(specify)* | $ |
| k. ☐ Continued on Attachment 2.k. | |

3. ☑ **Punitive damages:** Plaintiff reserves the right to seek punitive damages in the amount of *(specify)*.. $ 100,000,000 when pursuing a judgment in the suit filed against you.

Date: 08/07/2019

Sebastian M. Medvei
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

(Proof of service on reverse)

CIV-050

| PLAINTIFF: Dean Donnell, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT: Four Seasons Healthcare, et al. | BC664101 |

## PROOF OF SERVICE

*(After having the other party served as described below, with any of the documents identified in item 1, have the person who served the documents complete this Proof of Service. Plaintiff cannot serve these papers.)*

1. I served the
   a. ☐ Statement of Damages ☐ Other *(specify)*:
   b. on *(name)*:
   c. by serving ☐ defendant ☐ other *(name and title or relationship to person served)*:
   d. ☐ by delivery ☐ at home ☐ at business
      (1) date:
      (2) time:
      (3) address:
   e. ☐ by mailing
      (1) date:
      (2) place:
2. Manner of service *(check proper box)*:
   a. ☐ **Personal service.** By personally delivering copies. (CCP § 415.10)
   b. ☐ **Substituted service on corporation, unincorporated association (including partnership), or public entity.** By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(a))
   c. ☐ **Substituted service on natural person, minor, conservatee, or candidate.** By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of the office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left. (CCP § 415.20(b)) **(Attach separate declaration or affidavit stating acts relied on to establish reasonable diligence in first attempting personal service.)**
   d. ☐ **Mail and acknowledgment service.** By mailing (by first- class mail or airmail, postage prepaid) copies to the person served, together with two copies of the form of notice and acknowledgment and a return envelope, postage prepaid, addressed to the sender. (CCP § 415.30) **(Attach completed acknowledgment of receipt.)**
   e. ☐ **Certified or registered mail service.** By mailing to an address outside California (by first-class mail, postage prepaid, requiring a return receipt) copies to the person served. (CCP § 415.40) **(Attach signed return receipt or other evidence of actual delivery to the person served.)**
   f. ☐ Other *(specify code section)*:
      ☐ additional page is attached.
3. At the time of service I was at least 18 years of age and not a party to this action.
4. Fee for service: $
5. Person serving:
   a. ☐ California sheriff, marshal, or constable
   b. ☐ Registered California process server
   c. ☐ Employee or independent contractor of a registered California process server
   d. ☐ Not a registered California process server
   e. ☐ Exempt from registration under Bus. & Prof. Code § 22350(b)
   f. Name, address and telephone number and, if applicable, county of registration and number:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

▶ ______________________________
(SIGNATURE)

*(For California sheriff, marshal, or constable use only)*
I certify that the foregoing is true and correct.

Date:

▶ ______________________________
(SIGNATURE)

POS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | FOR COURT USE ONLY |
|---|---|
| Sebastian Medvei (285604)<br>MEDVEI LAW GROUP, APC<br>3055 Wilshire Blvd, Ste 900<br>Los Angeles, CA 90010<br>TELEPHONE NO.: (213) 984-4013 FAX NO.: (213) 386-9074<br>EMAIL ADDRESS: smedvei@medveilaw.com<br>ATTORNEY FOR: Plaintiff | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>STREET ADDRESS: 6230 Sylmar Ave<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Van Nuys, 91401<br>BRANCH NAME: VAN NUYS COURTHOUSE EAST | |
| PLAINTIFF: DEAN DONNELL, AN INDIVIDUAL; DEAN DONNELL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VALERIE DONNELL<br>DEFENDANT: FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation d/b/a FOUR SEASONS HEALTHCARE & WELLNESS CENTER; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, LLC, a California limited liability company; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive | CASE NUMBER:<br>BC664101 |
| **PROOF OF PERSONAL SERVICE--CIVIL** | Ref. No. or File No.: |

1. I am over 18 years of age and **not a party to this action.**
2. I served the following **documents:**
   STATEMENT OF DAMAGES

3. I personally served the following **persons** at the address, date, and time stated:
   a. Name: LIGHTHOUSE HEALTHCARE CENTER, LLC C/O DEREK CHEUNG / Agent for Service
   b. Address: 3699 Wilshire Blvd, Ste 1000, Los Angeles, CA 90010
   c. Date: 8/8/2019
   d. Time: 1:25 pm

   Description: Age: 32, Sex: M, Race/Skin Color: Asian, Height: 5'11", Weight: 185, Hair: Black, Glasses: N

4. I am
   c. an employee or independent contractor of a registered California process server.

5. My name, address, telephone number, and, if applicable, county of registration and number are:
   Michael Wadlington
   EServe
   9450 Mira Mesa Blvd., C-208, San Diego, CA 92126
   Telephone number: (954) 818-6555
   Registration Number: 2014111689
   County: LOS ANGELES
   The fee for the service was: $75.00

| PLAINTIFF: DEAN DONNELL, AN INDIVIDUAL; DEAN DONNELL, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF VALERIE DONNELL<br>DEFENDANT: FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation d/b/a FOUR SEASONS HEALTHCARE & WELLNESS CENTER; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, LLC, a California limited liability company; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive | CASE NUMBER:<br>BC664101 |
|---|---|

6. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 08/08/2019

Michael Wadlington
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE PAPERS)

Michael Wadlington
(SIGNATURE OF PERSON WHO SERVED THE PAPERS)

# Exhibit 19

EXHIBIT
No. 19

Message

**From**: Steven Riss [Steven.Riss@amwins.com]
**Sent**: 10/11/2019 3:09:34 PM
**To**: Ballester, Christina [Christina.Ballester@medpro.com]
**Subject**: Re: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

*** MedPro Cyber Warning *** Someone outside of MedPro Group sent this message. Please be careful when opening attachments or clicking links.

Confirmed

> On Oct 11, 2019, at 3:08 PM, Ballester, Christina <Christina.Ballester@medpro.com> wrote:
>
> Hi Steve -
>
> Please confirm that per our phone conversation the default judgement you forwarded earlier this afternoon is not after all directed against former MedPro insured Lighthouse Healthcare Center, but rather another unrelated entity Defendant Four Seasons.
>
> Thank You,
>
> Christina S. Ballester
>
> Christina S. Ballester, J.D.
> Division Claim Manager, Senior Care
> Cell: 847.404.4180
> Direct: 847.728.0482
> Facsimile: 866.552.9906
> Email: Christina.Ballester@Medpro.com
> CONFIDENTIALITY NOTICE: The materials in this electronic mail transmission (including all attachments) are private and confidential and are the property of the sender. The information contained in the material is privileged and is intended only for the use of the named addressee(s). If you are not the intended addressee, be advised that any unauthorized disclosure, copying, distribution or the taking of any action in reliance on the contents of this material is strictly prohibited. If you have received this electronic mail transmission in error, please immediately notify the sender by telephone or electronic message at the number or address indicated above, and thereafter, destroy it immediately.
>
>
> -----Original Message-----
> From: Steven Riss [mailto:Steven.Riss@amwins.com]
> Sent: Friday, October 11, 2019 5:07 PM
> To: Ballester, Christina <Christina.Ballester@medpro.com>
> Subject: Re: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
>
> *** MedPro Cyber Warning *** Someone outside of MedPro Group sent this message. Please be careful when opening attachments or clicking links.
>
> As disc. Pl disregard
>
>> On Oct 11, 2019, at 11:51 AM, Steven Riss <Steven.Riss@amwins.com> wrote:
>>
> This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you
https://nam04.safelinks.protection.outlook.com/?url=http%3A%2F%2Famwins.com&data=02%7C01%7Csteven.riss%40amwins.com%7Ccf0016977e554b7d5f2008d74e97978b%7Cadf1e1f55c6e450ea1688f4de1d6740b%7C0%7C0%7C637064285305820267&sdata=erYX28BQpFCOnHRIjbBJU6f1iUXsGI53szfQxzXdi%2BA%3D&reserved=0
>
This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you http://amwins.com

# Exhibit 31

EXHIBIT
No. 31
exhibitsticker.com

# California Surplus Lines Warning Statement

**Notice:**

**1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the state of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the following toll-free telephone number (800) 927-4357, or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also contact the NAIC's internet web site at www.naic.org.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a list of approved surplus line insurers. Ask your agent or broker if the insurer is on that list, or view that list at the internet web site of the California Department of Insurance:** www.insurance.ca.gov.

**8. If you, as the applicant, required that the insurance policy you have purchased be bound immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

This insurance is issued pursuant to the CA INS § 1760 through CA. INS § 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY DECLARATIONS*

**NOTICE:**
**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

**ISSUING COMPANY:** National Fire & Marine Insurance Company, as administered by The Medical Protective Company Omaha, Nebraska

| | |
|---|---|
| **POLICY NUMBER:** | NSC100276 |

| | | |
|---|---|---|
| ITEM 1 | **FIRST NAMED INSURED:**<br>**ADDRESS:** | Lighthouse Healthcare Center, LLC<br>5900 Wilshire Blvd Ste 1600<br>Los Angeles, CA 90036<br>☐ Administrative First Named Insured |
| ITEM 2 | **POLICY PERIOD:** | From 03/01/2017 to 03/01/2018 both days at 12:01 a.m. at the address of the First Named Insured stated herein. |
| ITEM 3 | **COVERAGE PARTS SELECTED:**<br>(please refer to the applicable Schedule of Named Insureds for detailed Retroactive Dates, Limits of Liability, Retentions, etc.) | |
| | **Professional Liability:** | Claims-Made and Reported |
| | **General Liability:** | Claims-Made and Reported |
| | **Employee Benefits Liability:** | Claims-Made and Reported |
| | **Cyber Liability and Breach Response:** | Claims-Made and Reported |
| ITEM 4 | **RETROACTIVE DATE:** | |
| | **Professional Liability:** | 03/01/2007 |
| | **General Liability:** | 03/01/2007 |
| | **Employee Benefits Liability:** | 03/01/2007 |
| | **Cyber Liability and Breach Response:** | 03/01/2017 |
| | All days at 12:01 a.m. at the address of the First Named Insured stated herein. | |
| ITEM 5 | **LIMITS OF LIABILITY:** | |
| | **Professional Liability:** | |
| | Per Event Limit | $1,000,000 |
| | Aggregate Limit | $3,000,000 |
| | Claims Expenses | Defense Outside Limits |
| | **General Liability:** | |
| | Per Event Limit | $1,000,000 |
| | General Aggregate Limit | $3,000,000 |
| | Products Completed Operations Hazard Aggregate Limit | $3,000,000 |
| | Personal and Advertising Injury Limit | $1,000,000 Each Person |
| | Damage to Premises Rented to an Insured | $200,000 Each Fire |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | | |
|---|---|---|
| | Medical Expense Limit | $5,000 Each Person |
| | Claims Expenses | Defense Outside Limits |
| | **Employee Benefits Liability:** | |
| | Employee Benefits Liability Per Event Limit | $1,000,000 |
| | Employee Benefits Liability Aggregate Limit | $1,000,000 |
| | Claims Expenses | Defense Outside Limits |
| | **Cyber Liability and Breach Response:** | |
| | Coverage A - Multimedia Liability | $100,000 each claim/aggregate |
| | Coverage B - Security and Privacy Liability | $100,000 each claim/aggregate |
| | Coverage C - Privacy Regulatory Defense and Penalties | $100,000 each claim/aggregate |
| | Coverage D - Privacy Breach Response Costs, Customer Notification Expenses, and Customer Support and Credit Monitoring Expenses | $100,000 each claim/aggregate |
| | Coverage E - Network Asset Protection | $100,000 each claim/aggregate |
| | Coverage F - Cyber Extortion | $100,000 each claim/aggregate |
| | Coverage G - Cyber Terrorism | $100,000 each claim/aggregate |
| | Coverage H - Regulatory Proceeding | $100,000 each claim/aggregate |
| | Coverage I - Evacuation Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage J - Disinfection Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage K - Public Relations Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage L - E-Discovery Claim Expenses and E-Discovery Regulatory Investigation Expenses | $100,000 each claim/aggregate |
| | Coverage M - Data Protection Reputational Harm | $100,000 each claim/aggregate |
| | Annual Aggregate Limit | $100,000 |
| | Claims Expenses | Defense Within Limits |
| ITEM 6 | **RETENTION:** | |
| | **Professional Liability:** | $25,000 Per Event / $Nil Aggregate<br>Deductible - Loss and Claims Expense |
| | **General Liability:** | $25,000 Per Event / $Nil Aggregate<br>Deductible - Loss and Claims Expense |
| | **Employee Benefits Liability:** | $1,000 Per Event / $Nil Aggregate<br>Deductible - Loss Only |
| | **Cyber Liability and Breach Response:** | $Nil Each Claim Self-Insured Retention<br>8 hours Time Retention (Coverages E.2. and G)<br>180 consecutive days Period of Indemnity (Coverage M) |
| ITEM 7 | **PREMIUM:** | |
| | Policy Premium | $159,544 |
| | Terrorism Premium (TRIA) | $ 167 |
| | Total Premium | $159,711 |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | | |
|---|---|---|
| | **(May be subject to audit. Does not include any applicable surplus lines taxes, which must be collected by the producer.)** | |
| ITEM 8 | **FORMS & ENDORSEMENTS:** | Refer to attached Schedule of Forms and Endorsements |
| ITEM 9 | **PRODUCER:**<br>**ADDRESS:** | AmWins Brokerage of California LLC<br>21550 Oxnard St Ste 1100<br>Woodland Hills, CA 91367 |

IN WITNESS WHEREOF, National Fire & Marine Insurance Company has caused this policy to be signed by its President (and countersigned by its duly Authorized Representative, where necessary).

President

Countersigned By: ______________________ Date: ______________________

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements attached to this Policy:

| FORM NAME | FORM NUMBER | ENDORSEMENT NUMBER |
|---|---|---|
| Senior Care Liability Policy - Declarations | NFM-SC-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 | |
| Schedule of Forms and Endorsements | NFM-SC-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 | |
| Trade, Fictitious and/or Business Names Endorsement | NFM-SC-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 | 1 |
| Schedule of Named Insureds - Insured Locations | NFM-SC-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 | |
| Service of Suit Clause | NFM-SC-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 | |
| Senior Care Liability Policy - Common Policy Provisions and Conditions | NFM-SC-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 | |
| Senior Care Liability Policy - Professional Liability Coverage Part | NFM-SC-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 | |
| Senior Care Liability Policy - General Liability Coverage Part | NFM-SC-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 | |
| Senior Care Liability Policy - Cyber Liability, Regulatory Proceeding, Crisis Management, Data Protection and Reputational Harm Coverage Part | NFM-SC-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 | |
| Blanket Additional Insured Endorsement (Professional Liability) | NFM-SC-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 | 2 |
| Crisis Response Costs Endorsement (General Liability) | NFM-SC-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 | 3 |
| Disease Contamination Clean-Up Expenses Endorsement (General Liability) | NFM-SC-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 | 4 |
| Emergency Evacuation Expenses Endorsement (General Liability) | NFM-SC-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 | 5 |
| Employee Benefits Liability Endorsement (Claims-Made and Reported) | NFM-SC-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 | 6 |
| Media Expenses Endorsement (General Liability) | NFM-SC-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 | 7 |
| Patient's Personal Property Endorsement (General Liability) | NFM-SC-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 | 8 |
| Blanket Additional Insured Endorsement (General Liability) | NFM-SC-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 | 9 |
| Cap on Losses From Certified Acts of Terrorism Endorsement (Purchased) | NFM-SC-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 | 10 |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 1 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## TRADE, FICTITIOUS AND/OR BUSINESS NAMES ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

Subject to all terms and conditions of the policy, any trade, fictitious, and/or business name listed in the Schedule of Trade, Fictitious and/or Business Names below and any other trade, fictitious and/or business name by which any **named insured** operates or trades as are by reference included in the coverage afforded to the associated **named insured**.

This endorsement shall not, however, in any way cause the **company's** total liability to exceed the applicable Limits of Liability for any Coverage Part, regardless of the number of **named insured(s)** scheduled below or on the policy.

| **SCHEDULE OF TRADE, FICTITIOUS AND/OR BUSINESS NAMES** | | |
|---|---|---|
| NAMED INSURED | ID NUMBER | TRADE, FICTITIOUS OR BUSINESS (D/B/A) NAME |
| Lighthouse Healthcare Center, LLC | 1267813 | Lighthouse Healthcare Center |

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF NAMED INSUREDS – INSURED LOCATIONS

In consideration of the premium due, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree the **locations** listed below are provided coverage subject to their Retroactive Dates also listed below, notwithstanding any Retroactive Date listed elsewhere in the policy.

| **SCHEDULE OF NAMED INSUREDS - INSURED LOCATIONS** | | | | | |
|---|---|---|---|---|---|
| LOCATION | ID NUMBER | RETROACTIVE DATE: PROFESSIONAL LIABILITY | RETROACTIVE DATE: GENERAL LIABILITY | RETROACTIVE DATE: CYBER LIABILITY | TERMINATION DATE |
| 2222 Santa Ana S, Los Angeles, CA 90059 | | 03/01/2007 | 03/01/2007 | 03/01/2017 | |

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SERVICE OF SUIT CLAUSE

Service of process in any lawsuit, or mandated alternative dispute resolution (ADR) proceeding instituted against the **company** shall be made upon:

**General Counsel**
**National Fire & Marine Insurance Company**
**1314 Douglas Street**
**Omaha, Nebraska 68102-1944**

The General Counsel is authorized and directed to accept service of process on behalf of the **company** in any suit or ADR proceeding and, upon the request of the **insured**, agrees to give a written acknowledgement to the **insured** that the **company** will retain counsel to enter an appearance upon the **company's** behalf should a lawsuit or ADR proceeding be instituted.

Further, pursuant to any law of any state, the District of Columbia, territory, or protectorate of the United States which makes provision therefore, the **company** hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding, in the law, instituted by or on behalf of the **insured** or any beneficiary within this contract, the General Counsel is hereby authorized as the **company's** designee upon whom the service of process may be served.

Nothing contained herein shall limit or abridge the right to serve any process, notice or demand upon the **company** in any other manner permitted or required by law.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*
# *COMMON POLICY PROVISIONS AND CONDITIONS*

**NOTICE:**

**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

In consideration of the payment of the premium due, and in reliance upon the representations of all **insureds**, the **company** and all **insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable Limits of Liability:

## I. DEFINITIONS

These definitions apply to all Coverage Parts:

A. **Additional insured** means any person or organization listed on a Schedule of Additional Insureds.

B. **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about any **named insured's** goods, products, or services for the purpose of attracting customers or supporters. For the purposes of this definition:

1. notices that are published include material placed on the internet or on similar electronic means of communication; and

2. regarding websites, only that part of a website that is about any **named insured's** goods, products, or services for the purposes of attracting customers or supporters is considered an **advertisement**.

C. **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company**.

D. **Automobile** or **auto** means:

1. any land motor vehicle, trailer or semi-trailer, including any attached machinery and equipment, designed for use on public roads; or

2. any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, **automobile** or **auto** does not include **mobile equipment**.

E. **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, shock, emotional distress, or death arising therefrom. In addition, it includes damages claimed for the cost of any care, loss of services, or loss of consortium arising therefrom.

F. **Case management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G. **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies, are alleged. Suit also includes an arbitration proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent, and any other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** submits with the **company's** consent. However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim** or **potential claim**. Such costs and expenses:

1. shall only include:

   a. attorneys' fees paid to the law firm selected to defend an **insured**;

 © 2015 MedPro Group. All rights reserved.

b. court costs;

c. expert fees;

d. reporter fees;

e. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **company**;

f. post-judgment interest on that portion of the judgment that does not exceed the Limit of Liability available under the particular coverage provided; and

g. such other costs and expenses that the **company** determines to be reasonably related to the defense of a **claim** or **potential claim**.

2. shall not include:

a. **loss**;

b. attorneys' fees awarded to a claimant;

c. the salary of any **employee** of an **insured**; or

d. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

I. **Company** means the Issuing Company shown on the Declarations.

J. **Employee** means any person who is or was paid under a regular payroll schedule, whether hourly or salaried, including part-time and full-time employment, and has or had federal and state (if applicable) taxes withheld, and receives, received or will receive, a W-2 IRS tax form from any **named insured** that is an organization, and who was acting within the scope of his or her duties on behalf of that **named insured** at the time of the **event**, offense, **health care event** or any other act or omission that results in a **claim** or **potential claim** that is otherwise covered under this policy. **Employee** also includes any leased worker, volunteer or temporary worker so long as such person is or was acting within the scope of his or her duties on behalf of a **named insured** that is an organization.

As used in this definition:

1. "leased worker" means a person leased to, or used by, a **named insured** that is an organization through a labor leasing firm or a locum tenens or staffing organization under an agreement between a **named insured** and the labor leasing firm, or locum tenens or staffing organization, to perform duties related to the conduct of that **named insured's** business. Leased worker does not include a temporary worker;

2. "temporary worker" means a person who is furnished to a **named insured** that is an organization to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions. A temporary worker does not include a leased worker; and

3. "volunteer" means a person who provides his or her services or labor to a **named insured** that is an organization, without being paid by that **named insured**, under the supervision or direction of the **named insured**. Volunteer does not include any independent contractor or staff physician.

However, only with respect to the coverage provided under the Professional Liability Coverage Part, **employee** does not mean any physician, surgeon, podiatrist, chiropractor, dentist, certified registered nurse anesthetist, midwife, resident or intern. Additionally, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

K. **Event** means an accident. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or

2. the continuous or repeated exposure to substantially the same harmful conditions;

will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from

 © 2015 MedPro Group. All rights reserved.

conception through delivery shall constitute one **event**.

L. **Extended reporting period** means the period of time after the cancellation or nonrenewal of any Coverage Part shown on the Declarations or any endorsement as "Claims-Made and Reported" during which an **insured** may report a **claim** or **potential claim**.

M. **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**.

O. **Impaired property** means tangible property, other than the **insured's product** or the **insured's work**, which cannot be used or becomes less useful because:

1. it incorporates the **insured's product** or **insured's work** that is known or thought to be defective, deficient, inadequate, or dangerous; or
2. an **insured** has failed to fulfill the terms of a contract or agreement if such property can be restored to use by:
   a. the repair, replacement, adjustment, or removal of the **insured's product** or **insured's work**; or
   b. an **insured's** fulfillment of the terms of the contract.

P. **Insured** means:

1. the **first named insured**;
2. any **named insured**;
3. any **employee**;
4. any administrator, partner, superintendent, director, officer, member, trustee, stockholder, medical director, department head or head of the medical staff, student, board or committee member or staff member, but only to the extent that he or she is acting within the scope of his or her duties on behalf of any **named insured**. As used to define **insured**, student means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by any **named insured** that is an organization relative to the delivery of **professional services**;
5. any spouse or domestic partner of any individual **insured**, but only with respect to the conduct of the business of a **named insured** that is an organization. As used in this definition, "domestic partner" means any person qualifying as such under any federal, state or local laws or under a **named insured's** employee benefit plans or employee benefits program;
6. any organization formed or acquired by a **named insured** that is an organization during the **policy period**, over which that **named insured** maintains at least majority ownership; however, coverage under this subparagraph is afforded only:
   a. after the **company** has received an application, and has agreed in writing to add the newly formed or acquired organization to the policy as an **insured**;
   b. for a **loss**, **event**, offense, **health care event**, **bodily injury**, **property damage** or **personal and advertising injury** or other **claim** or **potential claim** otherwise covered by this policy that occurred after the organization was formed or acquired by the **named insured**; and
   c. unless otherwise stated on a Schedule of Named Insureds, the newly formed or acquired organization will share Limits of Liability with the **named insured** that formed or acquired that newly formed or acquired organization;
7. the estate, heirs, executors, administrators, assigns and legal representatives of an **insured** in the event of such **insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **insured** would have been provided coverage under this policy; or
8. any organization, or any person other than an **employee**, while acting as a **named insured's** real estate

 © 2015 MedPro Group. All rights reserved.

manager.

Q. **Insured contract** means:

1. a contract for a lease of premises; however, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with permission of the owner is not an **insured contract**;
2. any easement or license agreement, except in connection with construction or demolition operations on, or within 50 feet of, a railroad;
3. an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or
4. an elevator maintenance agreement.

R. **Insured's product**

1. means:
   a. any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:
      (1) a **named insured**;
      (2) others trading under a **named insured's** name; or
      (3) a person or organization whose business or assets a **named insured** has acquired.
   b. containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.
2. includes:
   a. warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the goods or the **insured's products**; or
   b. the providing of, or the failure to provide, warnings or instructions.
3. does not include:
   a. vending machines; or
   b. other property rented to, or located for, the use of others, but not sold to others by a **named insured**.

S. **Insured's work**

1. means:
   a. work or operations performed by, or on behalf of, a **named insured**; or
   b. materials, parts, or equipment furnished in connection with such work or operations.
2. includes:
   a. warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the work or operations; or
   b. the providing of, or the failure to provide, warnings or instructions.

T. **Loading or unloading** means the handling of property:

1. after it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft, or **auto**;
2. while it is in or on an aircraft, watercraft, or **auto**; or
3. while it is being moved from an aircraft, watercraft, or **auto** to the place where it is finally delivered.

It does not include the movement of property by means of a mechanical device, other than a hand truck, which is not attached to the aircraft, watercraft, or **auto**.

 © 2015 MedPro Group. All rights reserved.

U. **Location** means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

V. **Loss**

1. Means civil damages, including prejudgment interest, which an **insured** becomes legally obligated to pay through adjudication or settlement.
2. Does not include:
   a. any damages that are greater than any applicable Limit of Liability;
   b. any injunctive or other equitable relief;
   c. **claims expense**;
   d. attorneys' fees awarded to a claimant as a fine, penalty, or sanction based upon any **insured's** misconduct; however, attorneys' fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;
   e. the salary of any **employee**; or
   f. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

W. **Managed care services** means services provided to manage and/or administer a health care plan. Health care plan means a medical benefits plan administered by a health maintenance organization, preferred provider organization, or other similar managed care organization or self-insured managed care organization. These services can include any of the following acts provided on behalf of the health care plan:

1. the creation, sale, and marketing of a health care plan;
2. the selection, credentialing, and contracting of health care providers;
3. the evaluation of the cost, quality and proper utilization of **treatment** options available or being provided to participants;
4. the adjustment, investigation, and processing of claims for benefits; or
5. **case management**.

However, **managed care services** do not include **treatment** rendered, or which should have been rendered, to a patient.

X. **Medical expenses** means the reasonable cost of necessary:

1. first aid administered at the time of the accident;
2. medical, surgical, diagnostic, and dental services;
3. prosthetic devices; and
4. ambulance, hospital, professional nursing, and funeral services.

Y. **Mobile equipment**

1. Means any of the following types of land vehicles, including any attached machinery or equipment:
   a. bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;
   b. vehicles maintained for use only on, or next to, premises owned or rented by a **named insured**;
   c. vehicles that travel on crawler treads;
   d. vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:
      (1) power cranes, shovels, loaders, diggers, or drills; or
      (2) road construction or resurfacing equipment, such as graders, scrapers, or rollers;

 © 2015 MedPro Group. All rights reserved.

e. vehicles not described in subparagraphs 1.a, b, c, or d above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) air compressors, pumps, and generators, including spraying welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or

(2) cherry pickers and similar devices used to raise or lower workers; or

f. vehicles not described in subparagraphs 1.a, b, c, or d above, maintained primarily for purposes other than the transportation of persons or cargo.

2. Does not include self-propelled vehicles with the following types of permanently attached equipment, but will be considered **autos**:

a. equipment designed primarily for:

(1) snow removal,

(2) road maintenance (but not construction or resurfacing); or

(3) street cleaning;

b. cherry pickers and similar devices mounted on car or truck chassis and used to raise or lower workers; and

c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. Does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos**.

Z. **Named insured** means any of the following, but only if listed by name on a Schedule of Named Insureds:

1. any organization, including any corporations, partnerships or joint ventures;

2. any individual person, but only to the extent that such person was acting in the course and scope of his or her duties of employment with the **first named insured** or another **named insured**; or

3. a **location**.

AA. **Personal and advertising injury** means injury, including consequential **bodily injury**, arising from one or more of the following offenses:

1. false arrest, detention, or imprisonment;

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

4. oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

5. oral or written publication, in any manner, of material that violates a person's right of privacy; or the use of another's advertising idea in the **insured's advertisement**.

BB. **Pollutants** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleum, chemicals or waste. As used in this definition, "waste" means medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

CC. **Policy period** means the period of time shown on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates shown on the Declarations, **policy period** means the period between the first date shown on the Declarations and the date the policy was terminated.

DD. **Potential claim** means an incident arising from, or in connection with, an **event** an **insured** knows or reasonably

 © 2015 MedPro Group. All rights reserved.

should know is likely to result in a **claim**.

EE. **Products completed operations hazard**

1. Means all **bodily injury** and **property damage** occurring away from any premises an **insured** owns or rents, and arising out of the **insured's product** or **insured's work** except:

   a. products that are still in the physical possession of an **insured**; or

   b. work that has not yet been completed or has been abandoned. However, the **insured's work** will be deemed completed at the earliest of the following times:

      (1) when all of the work called for in the **insured's** contract has been completed;

      (2) when all of the work to be done at the job site has been completed if the contract calls for work at more than one job site; or

      (3) when that part of the work at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be deemed completed.

2. Does not include **bodily injury** or **property damage** arising out of, or in connection with:

   a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by an **insured** and that condition was created by the **loading or unloading** of the vehicle by an **insured**;

   b. the existence of tools, uninstalled equipment, or abandoned or unused materials; or

   c. products or operations for which the classification, shown on the Declarations or in a policy schedule, states that **products completed operations hazard** is subject to the General Aggregate Limit.

FF. **Professional services** means **treatment**, administrative services, beautician's and barber's services, pastoral counseling services, peer review and utilization management not involving **managed care services**. As used in this definition:

1. "administrative services" means the planning, organizing, controlling or directing of the operations of an **insured**;

2. "beautician's and barber's services" means the provision of grooming services to a **resident** by a licensed beautician or barber in his or her capacity as such, who is not employed by the **insured**, but who is invited to perform such services by the **insured** at a location operated by an **insured**;

3. "pastoral counseling services" means the provision of advice, guidance or other counseling sessions, without compensation, by an ordained member of the clergy;

4. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and which results in a patient alleging damages arising from a **health care event**; and

5. "utilization management" means the process of evaluating **treatment** to a patient for its appropriateness or necessity which results in a patient alleging damages arising from a **health care event**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

GG. **Property damage** means:

1. physical injury to tangible property, including any resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the

 © 2015 MedPro Group. All rights reserved.

time of the **event** that caused it.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

HH. **Resident** means a person who lives or resides at a long-term care facility or other residential healthcare facility listed by name on a Schedule of Named Insureds.

II. **Residents' rights** means any right granted to a **resident** under the Nursing Home Quality Reform Act of 1987, any federal regulations promulgated pursuant to such law, including 42 C.F.R. 483.10, or any similar state law or regulation regulating long-term care facilities or residential healthcare facilities.

JJ. **Superbug contamination** means the actual contamination of an **insured's** location with methicillin-resistant staphylococcus aureus, vancomycin intermediate sensitive staphylococcus aureus or vancomycin-resistant enterococcus. **Superbug contamination** does not include any contamination as a result of **pollutants**, war, an act of terrorism or a certified act of terrorism.

KK. **Treatment** means:

1. the rendering of medical, surgical, dental, mental health, or nursing services. This shall include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises;
2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider;
3. the provision of home health, hospice, rehabilitation or social services and adult day care and home-based community operations, including a Program of All-inclusive Care for the Elderly (PACE), or any services related to the provision, or protection of **residents' rights**, provided such **insured** is licensed, trained and qualified to perform such services in the jurisdiction in which such **professional services** were rendered.
4. the handling of dead bodies, including autopsies, organ donation or harvesting or other procedures;
5. services in connection with a clinical trial; or
6. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, or nursing services:
   a. food and beverages;
   b. blood, blood products, medications, supplies, equipment, or appliances; or
   c. counseling or other social services.
   d. As used in this definition, "clinical trial" means a structured study with predetermined protocols approved by an institutional review board, an independent ethics committee, an ethical review board or a research ethics board which has been formally designated to approve, monitor, and review research involving humans in order to develop effectiveness or safety data or treatment plans, pharmaceutical products or medical devices.

## II. DEFENSE AND SUPPLEMENTAL PAYMENTS

These provisions apply to all Coverage Parts:

A. DEFENSE

The **company** will have the exclusive right and duty to defend any **claim** or **potential claim** against an **insured** to which this policy applies, subject to the timely payment of any applicable Deductible or Self-Insured Retention. However, the **company** has no duty to:

1. defend an **insured** after the applicable Limits of Liability have been exhausted by the payment of **loss** or **claims expense**;
2. appeal any judgment; however, the **company** may appeal any judgment as it deems expedient; or
3. pay any **claims expense** incurred by an attorney not retained or approved by the **company**, in writing, to

 © 2015 MedPro Group. All rights reserved.

represent the **insured**.

Upon the exhaustion of the applicable Limit of Liability provided under this policy, the **insured** shall become responsible for all further **claims expense** arising from any **claim** or **potential claim** and the **company** has the right to withdraw from the further defense of such **claim** or **potential claim** by tendering such defense to the **insured**. If the **insured** cannot come to an agreement with the attorney assigned by the **company** regarding the payment of future fees and costs, the **insured** shall take all steps necessary to allow the attorney to withdraw from the matter.

B. SUPPLEMENTAL PAYMENTS

The **company's** duty to defend shall include a duty to pay:

1. all **claims expense** directly related to the defense of the **claim** or **potential claim**;
2. the premium on any bond required to proceed with an appeal approved by the **company** or to release attachments to an **insured's** property; however, the face value of the bond may not exceed the applicable Limit of Liability or the total **loss** payable under the policy, whichever is less; in addition, the **company** has no duty to apply for or furnish any such bond; and
3. reimbursement of reasonable expenses incurred by an **insured** at the **company's** request to assist in the investigation and defense of a **claim** or **potential claim**; payment for actual loss of earnings shall not exceed $500 for each day an individual **insured** is required to attend hearings, trials, or an **insured's** own deposition.

C. DEFENSE OUTSIDE THE LIMITS/WITHIN THE LIMITS SHOWN ON DECLARATIONS

The **company** will pay **claims expenses** and other supplemental payments either:

1. in addition to the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments will not reduce or exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Outside Limits;" or
2. as part of the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments reduce and can exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Within Limits."

However, the **company** has no duty to pay any **claims expense**, premium, or other expense incurred after the **insured's** applicable Limit of Liability is exhausted.

## III. EXCLUSIONS

The coverage provided under any Coverage Part of this policy does not apply to:

A. ADA

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA). This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law.

B. ANTITRUST ACTIVITY

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** antitrust activity, except to the extent such **claim** or **potential claim** arises out of any **insured's** alleged rendering of or failure to render **professional services**. As used in this exclusion, "antitrust activity" means any actual or alleged price fixing, restraint of trade, price discrimination, predatory pricing, monopolization, unfair business practices, or violation of the Federal Trade Commission Act of 1914, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, any similar state, federal, or local antitrust statute or law, or any rule or regulation promulgated under the Act, statute, or law.

C. BUSINESS PRACTICES

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** billing practices or advertising activities. However, this exclusion does not apply to the coverage provided under the Personal and Advertising Injury Liability Insuring Clause.

 © 2015 MedPro Group. All rights reserved.

D. CLAIM OR POTENTIAL CLAIM REPORTED OR WHICH SHOULD HAVE BEEN REPORTED TO OTHER INSURER

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **claim** or **potential claim** which has or which should have been reported to, or has or should have been accepted by any insurer, including through any self-insured or captive program, prior to the **policy period**.

E. CRIMINAL ACTS

Any **claim** or **potential claim** arising out of, or in connection with, any criminal act committed by, or at the direction of, an **insured**.

F. CYBER AND PRIVACY

Any **claim** or **potential claim** arising out of, or in connection with, a cyber or privacy breach **loss** or **claims expense**, including, but not limited to, security and privacy liability, privacy regulatory defense and penalties, privacy breach response costs, customer notification expenses, customer support and credit monitoring expenses, network asset protection, cyber extortion, cyber terrorism, and data protection reputational harm.

This exclusion however does not apply to:

1. oral or written publication, in any manner, of material that violates a person's confidence, doctor-patient privilege or right of privacy, including, but not limited to, appropriation, intrusion, public disclosure of private facts, or false light; and
2. coverage provided under the Cyber Liability and Breach Response Coverage Part.

G. DEFAULT JUDGMENT

Damages that an **insured** becomes legally obligated to pay resulting from a default judgment or other **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**.

H. DISCRIMINATION BECAUSE OF RACE AND OTHER SIMILAR LAWS

Any **claim** or **potential claim** arising out of, or in connection with, the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, religion, age, gender or any other protected class as defined by statute, law, ordinance or regulation.

I. ELECTRONIC DATA

Any **claim** or **potential claim** arising out of, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data. As used in this exclusion, "electronic data" means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment.

J. EMPLOYEE BENEFITS LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, any group benefits administered on behalf of a **named insured's employees**, including:

1. group insurance plans or programs, such as life, health, accident, dental, or legal advice;
2. Individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;
3. travel or vacation plans; or
4. workers' compensation, occupational disease, unemployment, Social Security, or disability benefits insurance.

K. EMPLOYER'S LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, **bodily injury** to:

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

Issuing Company:
National Fire & Marine Insurance Company
Omaha, Nebraska

1. an **employee** of a **named insured** arising out of, or in connection with, and in the course of:
   a. employment by that **named insured**; or
   b. performing duties related to the conduct of that **named insured's** business; or
2. the spouse, child, parent, brother, or sister of that **employee** as a consequence of subparagraph 1 above.

This exclusion shall apply whether a **named insured** may be held liable as an employer, or in any other capacity, and to any obligation to share damages with, or repay someone else who must pay damages, because of the injury. This exclusion does not apply to liability assumed by an **insured** under an **insured contract**.

L. EMPLOYMENT PRACTICES

Any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges an **insured**:

1. breached an actual or implied contract of employment;
2. violated an anti-discrimination statute;
3. engaged in any form of harassment;
4. engaged in libel or slander related to an employment relationship;
5. retaliated for the exercise of a public right or duty;
6. engaged in intentional or negligent infliction of emotional distress arising out of, or in connection with, an employment relationship;
7. wrongfully failed to hire, promote, or grant tenure;
8. wrongfully demoted; or
9. wrongfully terminated employment.

M. ERISA

Any **claim** or **potential claim** seeking to impose liability under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.

N. FINANCIAL SERVICES / VIOLATION OF SECURITIES LAWS

Any **claim** or **potential claim** arising out of, or in connection with, the failure of any stock or other form of investment to perform, or from the rendering of or the failure to render financial services by any **insured** to others. As used in this exclusion, "financial services" means:

1. planning, administering or advising on:
   a. any:
      (1) investment;
      (2) pension;
      (3) annuity;
      (4) savings;
      (5) checking; or
      (6) individual retirement account, plan, fund or account;
   b. the issuance or withdrawal of any bond, debenture, stock or other securities;
   c. the trading of securities, commodities, or currencies; or
   d. any acquisitions or mergers;
2. acting as a dividend disbursing agent, exchange agent, redemption or subscription agent, warrant or scrip agent, fiscal or paying agent, tax withholding agent, escrow agent, clearing agent, or electronic funds transfer agent;

 © 2015 MedPro Group. All rights reserved.

3. lending, or arranging for the lending of, money, including credit card, debit card, leasing or mortgage operations or activities or interbank transfers;
4. repossessing of real or personal property from a borrower or acting as an assignee for the benefit of creditors;
5. checking or reporting of credit;
6. maintaining of financial accounts or records;
7. tax planning, tax advising or the preparation of tax returns; or
8. selling or issuing travelers checks, letters of credit, certified checks, bank checks or money orders.

This exclusion includes any **claim** or **potential claim** arising out of, or in connection with, an **insured's** violation of any federal, state, or local securities law or regulation.

O. FRAUDULENT CLAIMS

Any **claim** or **potential claim** made by or against an **insured** who or that knows that the **claim** or **potential claim** is false or fraudulent, as regards to amount or otherwise; additionally, this policy shall become void and all **claims** and **potential claims** hereunder shall be forfeited.

P. GOVERNMENTAL IMMUNITY AND OTHER PROTECTIONS

Any **claim** or **potential claim**:

1. for which the **insured** has complete immunity as a volunteer or as an employee or contractor of a federal, state, or local government; or
2. involving an **insured** who has immunity, insurance, indemnity, or any other protection pursuant to any federal, state, or local laws, including but not limited to the Federal Tort Claims Act.

Q. INJUNCTIVE RELIEF, TAXES, FINES AND PENALTIES

Any **claim** or **potential claim** or other matter seeking:

1. injunctive relief;
2. any relief other than **loss**; or
3. the award of taxes, fines, penalties, or sanctions, including those imposed under the Internal Revenue Code, or any similar state or local law.

R. INSURED VERSUS INSURED

Any **claim** or **potential claim** arising out of, or in connection with, any **loss** or **claims expense** which is initiated, alleged, or caused to be brought about, by any **insured** covered by this policy against any other **insured** covered by this policy. This exclusion does not apply to the Professional Liability Coverage Part if the **claim** or **potential claim** arises out of an **insured** providing **professional services** to another **insured**.

S. MANAGED CARE SERVICES

Any **claim** or **potential claim** arising out of, or in connection with, any **managed care services**.

T. MEDICARE OR MEDICAID

Any **claim** or **potential claim** arising out of, or in connection with, any Medicare/Medicaid Claim. As used in this exclusion, a "Medicare/Medicaid Claim" means a claim based on or arising out of, or in connection with, any actual or alleged violation of law, regulation or rule with respect to Medicare, Medicaid, Tricare or any similar federal, state or local governmental program.

U. MULTI-POLICY AND ANTI-STACKING

If more than one policy, Coverage Part or Insuring Clause applies, the following multi-policy and anti-stacking exclusions apply:

1. if more than one policy issued by the **company** applies to the liability of an **insured**, the **company's** duty to pay

 © 2015 MedPro Group. All rights reserved.

for a **loss** will be confined to the policy containing the largest applicable Limit of Liability; or

2. if more than one Coverage Part or Insuring Clause under this policy applies to the liability of an **insured**, the **company's** duty to pay **loss** will be confined to the Coverage Part or Insuring Clause containing the largest applicable Limit of Liability.

V. NUCLEAR ENERGY LIABILITY

Any damages:

1. for which an **insured** has coverage under a nuclear energy liability policy issued by the:
   a. Nuclear Energy Liability Insurance Association;
   b. Mutual Atomic Energy Liability Underwriters;
   c. Nuclear Insurance Association of Canada; or
   d. any successor or assign of the entities set forth in the subparagraphs above.

   Additionally, this policy does not apply if such coverage did exist, but was terminated by the exhaustion of the **insured's** limit of liability under such coverage.
2. resulting from the hazardous properties of nuclear material for which an **insured**:
   a. was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or
   b. was entitled to indemnity by the United States government or any agency thereof or would have been entitled to had this policy not been issued.

W. OWNERSHIP OR MANAGEMENT OF NON-INSURED ENTITIES

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of any organization, partnership, joint venture, or other business enterprise that is not a **named insured**, but which is owned, managed or supervised by an **insured**.

X. POTENTIAL CLAIM FIRST DISCOVERED PRIOR TO POLICY PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured**, or was reported to, or should have been reported to, a prior insurer, self-insurance program or captive insurer prior to the **policy period**.

Y. RICO

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** violation of the Racketeer Influenced Corrupt Organizations Act (RICO), or any comparable federal, state or local laws or any amendment or regulation that applies thereto.

Z. WAR

Any **claim** or **potential claim** arising out of, or in connection with:

1. war, including undeclared or civil war;
2. warlike action by a military force, including action in hindering or defending against an actual or expected attack by any governmental, sovereign, or other authority using military personnel or other agents; or
3. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

AA. Workers' COMPENSATION AND OTHER SIMILAR LAWS

Any **claim** or **potential claim** arising out of, or in connection with, any obligation or damages arising under any law related to:

 © 2015 MedPro Group. All rights reserved.

1. workers' compensation;
2. occupational disease;
3. unemployment compensation;
4. disability benefits; or
5. other similar law that provides for scheduled benefits as a result of an injury or disease.

The exclusions for "EMPLOYMENT PRACTICES," "EMPLOYER'S LIABILITY," "WAR" and "WORKER'S COMPENSATION AND OTHER SIMILAR LAWS" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. Only with respect to the coverage provided under the General Liability Coverage Part, a separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

## IV. DEDUCTIBLES AND RETENTIONS

These provisions apply to all Coverage Parts:

A. LOSS AND CLAIMS EXPENSE

If a Deductible or Self-Insured Retention is shown on the Declarations, and is designated as "Loss and Claims Expense," it is agreed and understood that the **company's** duty to pay **loss** and **claims expense** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. the **company** shall have a duty to pay **loss** and **claims expense** only in excess of the Deductible or Self-Insured Retention. The Deductible or Self-Insured Retention shall be applied to **claims expense** first, then to **loss**;
2. the **first named insured** shall have a duty to pay all **loss** and **claims expense** up to the amount of the Deductible or Self-Insured Retention, payment of which shall not be unreasonably withheld;
3. unless otherwise required by law, the **company** has complete discretion to pay the entire **loss** and **claims expense** and seek reimbursement from the **first named insured** for the Deductible or Self-Insured Retention. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible or Self-Insured Retention amount;
4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** and **claims expense** for such **claims** or **potential claims**. The applicable Limits of Liability shall not be reduced by the amount of the Self-Insured Retention;
5. if a Deductible or Self-Insured Retention is shown on the Declarations, the Deductible or Self-Insured Retention shall apply to all **loss** and **claims expense** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss** and/or **claims expense**; and
6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

B. LOSS ONLY

If a Deductible is shown on the Declarations, and is designated as "Loss Only," it is agreed and understood that the **company's** duty to pay **loss** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. the **company** shall have a duty to pay only **loss** in excess of the Deductible;
2. the **first named insured** shall have a duty to pay all **loss** up to the amount of the applicable Deductible, payment of which shall not be unreasonably withheld;
3. unless otherwise required by law, the **company** has complete discretion to pay the entire **loss** and seek reimbursement from the **first named insured** for the Deductible. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible amount;
4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** for such **claims** or **potential claims**;

 © 2015 MedPro Group. All rights reserved.

5. if a Deductible is shown on the Declarations, the Deductible shall apply to all **loss** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss**; and

6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

## V. CONDITIONS

These conditions apply to all Coverage Parts:

A. ACTION AGAINST THE COMPANY

1. No action shall lie against the **company** unless each **insured** is in full compliance with all of the terms of this policy.

2. No person shall have the right to join the **company** as a party to a **claim** to determine an **insured's** liability under this policy. Further, an **insured** shall not interplead the **company** into a **claim**.

3. No action shall lie against the **company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **insured**, the claimant, and the **company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

B. ARBITRATION

1. The **company** and the **insureds** agree that in any dispute, **claim**, **potential claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of an **insured**, the **company**, or any other party, the **company** may elect to submit any such dispute, **claim**, **potential claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq. (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

2. The arbitration shall be presided over by three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as shown on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

3. The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

4. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim**, **potential claim** or controversy arising out of, relating to or in connection with this policy.

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.

2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses;

   d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

 © 2015 MedPro Group. All rights reserved.

e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **insured** shall promptly give notice to such other insurers. The **insured** shall also provide the **company** with copies of the applicable policies. The **insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

D. BANKRUPTCY OR INSOLVENCY

The bankruptcy or insolvency of an **insured** or an **insured's** estate, or the non-payment by an **insured** or by any other organization responsible for a Deductible or Self-Insured Retention, shall not act to modify any duty owed by an **insured** or the **company** under the policy. Under no circumstances will such bankruptcy, insolvency or non-payment require the **company** to assume or in any way be responsible for any Deductible or Self-Insured Retention, or otherwise assume any obligation owed by any **insured** under this policy. The **company** will have no duty to pay **loss** or **claims expense** for any **claim** or **potential claim** unless the **insured** or any other organization responsible for the Self-Insured Retention timely pays the Self-Insured Retention in full.

E. CANCELLATION, NONRENEWAL AND/OR TERMINATION OF COVERAGE

1. This policy may be canceled by the **first named insured**. The **first named insured** shall mail written notice to the **company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall mail written notice to the **company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

3. This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **company**. The **company** will send notice to the **first named insured** at the last address on record with the **company**.

4. If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed in accordance with the standard short rate tables and procedure. If the **company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

5. If the **company** cancels or nonrenews this policy for any reason other than non-payment of premium, the **company** shall provide written notice to the **first named insured** not less than 30 days prior to the effective date of such cancellation or nonrenewal. If the **company** cancels this policy for nonpayment of premium, the **company** shall provide written notice to the **first named insured** not less than 10 days prior to the effective date of such cancellation or nonrenewal.

6. If the **company** cancels or nonrenews this policy, coverage under the policy shall terminate on the earlier of:

   a. the date stated on the cancellation or nonrenewal notice; or

   b. the date an **insured** procures replacement coverage.

F. COVERAGE TERRITORY

1. This policy applies to **claims** or **potential claims** arising from acts or omissions, occurrences and offenses (including offenses that take place through the Internet or similar electronic means of communication) occurring anywhere in the world, with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America, provided that the **claim** or **potential claim** is made and any legal proceedings are pursued within the United States, its territories and possessions, including Puerto Rico.

 © 2015 MedPro Group. All rights reserved.

2. Payments under this policy shall be made only in full compliance with all United States economic or trade sanction laws or regulations including, but not limited to, sanctions, laws and regulations administered and enforced by the United States Treasury Department's Office of Foreign Assets Control.

G. EXTENDED REPORTING PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," the following provisions apply:

1. Automatic Limited Extended Reporting Period

   a. In the event that coverage under this policy is terminated for any reason, the **company** will provide an automatic limited **extended reporting period** of 30 days, starting with the end of the **policy period**, during which **claims** and **potential claims** arising out of any specific coverage(s) may be reported to the **company** in writing. However, the **claim** must have been first made against an **insured** during the **policy period**, or the **potential claim** must have been first discovered by an **insured** during the **policy period**.

   b. This automatic limited **extended reporting period** shall not extend the **policy period** or change the scope of the coverage provided. Any **claim** or **potential claim** first reported to the **company** during the automatic limited **extended reporting period** will be deemed to have been made on the last date on which this policy is in effect. The Limits of Liability that apply at the end of the **policy period** are not renewed or increased for **claims** or **potential claims** first reported during the automatic limited **extended reporting period**.

2. Optional Extended Reporting Period

   a. The **company** shall, upon written request by or on behalf of the **first named insured**, make an offer for an **extended reporting period** to the **first named insured** if coverage is or will be canceled or nonrenewed, subject to the following:

      (1) any such written request by or on behalf of the **first named insured** must be received by the **company** not later than 30 days after the cancellation or nonrenewal of the coverage;

      (2) the **company** shall be required to send the offer for an **extended reporting period** only to the **first named insured** or its authorized representative; and

      (3) the coverage has been or will be canceled or nonrenewed with respect to:

         a) the entire policy;

         b) a Coverage Part; or

         c) a **named insured** who:

            i) has Limits of Liability listed in the Limits of Liability column of a Schedule of Named Insureds – Professional Liability;

            ii) does not share Limits of Liability with another **named insured** with respect to the General Liability Coverage Part or the Cyber Liability and Breach Response Coverage Part; or

            iii) shares Limits of Liability with another **named insured**, but only when all coverage available under that shared limit is terminated.

   b. The **first named insured** may accept the **company's** offer of an **extended reporting period** by paying the premium due within 30 days from either the date on which the policy expires or the date on which the **company** receives the request for an **extended reporting period**, whichever is later. Failure to pay the full premium within this 30-day period will be deemed a rejection of the offer.

   c. In the event of the purchase of an **extended reporting period**, the entire premium for such **extended reporting period** shall be deemed earned at its commencement.

   d. If an **extended reporting period** is purchased, a **claim** or **potential claim** otherwise covered by this policy may be reported for the period of time set forth in the applicable **extended reporting period** endorsement issued after termination of the **policy period**. The **extended reporting period** will begin at the end of the **policy period**. However, the **extended reporting period** shall not:

 © 2015 MedPro Group. All rights reserved.

(1) extend the **policy period**;

(2) apply to any **claim** or **potential claim** arising from a **health care event**, **event**, offense, **bodily injury**, **property damage**, or **personal and advertising injury** that took place after the **policy period**; or

(3) otherwise expand the coverage provided under this policy.

H. FIRST NAMED INSURED

1. The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds**. The **first named insured's** authority shall include, but is not limited to, the following actions:

   a. receipt of notices of cancellation or nonrenewal;

   b. requesting or receiving endorsements issued to form a part of this policy;

   c. payment of premiums due;

   d. receiving return premium; and

   e. receiving and/or responding to an offer for an **extended reporting period** for any **insured**.

2. The **first named insured** shall notify the **company** in writing of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

I. FRAUD WARNING

Any person, who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, which may include voiding of the policy if allowed by law.

J. GOVERNMENTAL ACCESS TO RECORDS

If required by section 952 of the Omnibus Reconciliation Act of 1980, and after receipt of written request from the **first named insured**, the **company** will allow the U.S. Secretary of Health and Human Services or the U.S. Comptroller General access to this policy as well as all books, documents and records necessary to verify the cost of this policy. The **company** will also allow access to subcontracts between the **company** and any of its related organizations, and to such organization's books, documents and other records to the extent required by law, and to the extent that the **company** has possession, custody or control of such books, documents and records. Access will be provided for up to 4 years after the services provided pursuant to this policy cease.

K. INSPECTION AND AUDIT

The **company** shall be permitted, at its own discretion and for its own benefit, to audit an **insured's** property, operations, and any business records. The **company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **company** as a result of an audit shall inure only to the **company's** benefit. As a result, they may not be used as evidence of the **insured's** compliance with any safety regulations or other industry standards.

L. MODIFICATIONS

Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

M. NON-ASSIGNABILITY

No interest of an **insured** under this policy shall be assignable without the prior written consent of the **company**.

 © 2015 MedPro Group. All rights reserved.

However, if the **insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **insured's** estate.

N. OTHER INSURANCE

Unless otherwise noted in a Coverage Part:

1. if any other valid and collectible insurance is available to any **insured** with respect to a liability covered by this policy, and such insurance is afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then the maximum limits of liability under all policies shall not exceed the highest remaining applicable limit of liability under any one policy;
2. if any other valid and collectible insurance is available to any **insured** with respect to any liability arising from a **claim** or **potential claim** which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **company** will pay only the **company's** share of the **loss**, if any, that exceeds the sum of:
   a. the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and
   b. the total of all deductible and self-insured amounts under all such other insurance; and
3. this condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

O. PREMIUMS

1. The **company's** obligation to perform any duty under the policy is strictly conditioned upon the payment of the premium when due. Similarly, the **company's** obligation to perform any duty pursuant to a renewal of the coverage provided under the policy shall be strictly conditioned upon the payment of the renewal premium when due. Therefore, this policy shall not be deemed to have been issued, delivered, or renewed and shall not be applicable to any matter which would otherwise be covered herein, until:
   a. the premium has been paid in full; or
   b. if the **company** has agreed to finance the policy, the first installment has been paid in full.

   If payment is made by check, electronic transfer or money order, it shall not be considered "paid in full" until honored by the payor's bank.
2. Premiums for this policy shall be computed in accordance with the **company's** rules, rates, and rating plans.
3. Any premium designated as deposit premium is merely a deposit on the actual amount owed. At the close of the **policy period**, the **company** will compute the earned premium for that period. The deposit premium will then be credited to that amount. If the deposit premium exceeds the earned premium, the **company** will refund the difference to the **first named insured**. If the earned premium exceeds the deposit premium, the **company** will bill the **first named insured** for the difference.
4. The **first named insured** shall maintain records of the information necessary for premium computation. The **first named insured** shall send copies of these records to the **company** at the end of the **policy period** as directed by the **company**. Such information shall be subject to audit and verification by the **company**.

P. REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.
2. If the Retention shown on the Declarations is a:
   a. Deductible, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim**;
   b. Self-Insured Retention, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential**

 © 2015 MedPro Group. All rights reserved.

**claim** that:

(1) an **authorized insured** believes will results in damages that exceed the applicable Self-Insured Retention;

(2) has a loss reserve exceeding 50% of the applicable Self-Insured Retention;

(3) involves a claimant's demand which exceeds the applicable Self-Insured Retention;

(4) contains allegations of unfair claim practices or bad faith;

(5) involves a suit naming the **company** or its affiliates as defendants; or

(6) that caused:

a) neurological injury, such as brain injury, spinal cord injury or nerve injury resulting in paralysis;

b) injury during pregnancy or delivery;

c) significant limitation of daily activities, such as feeding, continence or sexual function;

d) loss of sight or hearing;

e) elopement;

f) decubitus ulcers;

g) severe disfigurement, such as burns, amputation or scarring;

h) loss of any organ; or

i) death.

3. All such reports and documents shall be:

a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

b. in writing; and

c. include the following information:

(1) the identity of all **insureds** implicated;

(2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

(3) the nature and extent of the injury;

(4) the names and addresses of any injured persons;

(5) the names and addresses of available witnesses; and

(6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.

4. A **health care event**, **event**, offense, accident or other matter reported to the **company** as part of risk management or loss control services shall not constitute the report of a **claim** or **potential claim** for purposes of coverage under this policy.

Q. REPRESENTATIONS AND CHANGE

1. By acceptance of this policy, each **insured** agrees, represents, and warrants that the statements and particulars made in all applications, including any statements and particulars made in any and all documents, supplemental pages or other attachments for the purposes of any application, are true and correct. It is further understood and agreed that any application and attachments are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements hereto, and all applications and attachments, embody all agreements between the **company** and any of its authorized representatives, and all **insureds** relating to this insurance.

2. In the event any application was executed or endorsed by an **insured's** insurance producer, the **insured**

 © 2015 MedPro Group. All rights reserved.

acknowledges that the insurance producer has acted under the **insured's** express authority and that the **insured** has thoroughly reviewed the information contained on any application. The representations made by an **insured** in the applications and attachments are the basis for the coverage provided, as well as the **company**'s calculation of the applicable premium. Therefore, it is understood and agreed that, to the extent permitted by law, the **company** reserves the right to rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon any material misrepresentation made by any **insured**. As used in this condition, "material misrepresentation" means concealment, misrepresentation, omission or fraud which, if known by the **company**, would have led to refusal by the **company** to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions.

3. No knowledge or information possessed by any **insured** shall be imputed to any other **insured**, except for material facts or information known to the person or persons who signed the application. In the event of any material misrepresentation in connection with any of the particulars or statements in the application, this policy shall be void with respect to any **insured** who knew of such material misrepresentation or to whom such knowledge is imputed.

4. The **company** reserves all rights based upon any material misrepresentation by the **insured**.

R. SEPARATION OF INSUREDS

Except for any duties specifically assigned to the **first named insured** and Limits of Liability applicable to any **insured**, this policy applies:

1. separately to each **insured** against whom a **claim** or **potential claim** is made; and

2. as if each **insured** were the only **insured** under this policy.

S. SETTLEMENT

The **company** may only settle a **claim**, **potential claim** or other matter brought against an **insured** with the consent of the **first named insured**.

T. SUBROGATION

The **company** shall be subrogated to the rights of any **insured** to the extent of any payments made, or as allowed by law. **Insureds** shall do nothing to prejudice those rights. At the **company's** request, an **insured** shall bring suit or transfer those rights to the **company**. **Insureds** shall also help the **company** enforce its rights.

U. TERMS CONFORM TO STATUTE OR REGULATION

If any term of this policy, or any duty arising therefrom, would cause the **company** to violate any federal, state or local law or regulation, the policy is amended to bring the **company** into compliance with such statute or regulation.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

Issuing Company:
National Fire & Marine Insurance Company
Omaha, Nebraska

# *SENIOR CARE LIABILITY POLICY*
## *PROFESSIONAL LIABILITY COVERAGE PART*

**NOTICE:**

**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

**I. INSURING CLAUSES**

A. PROFESSIONAL LIABILITY

1. Claims-Made and Reported:

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence:

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that occurred during the **policy period**.

b. A **health care event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **health care event**. Additionally, if, prior to the **policy period**, an **authorized insured** knew that the **health care event** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **health care event** occurred, then any continuation, change, or resumption of such **health care event** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

B. DISCIPLINARY, LICENSING AND CREDENTIALING ACTIONS

The **company's** obligation to defend a **claim** includes the defense of any disciplinary, licensing, or credentialing action brought against an **insured** by (1) a state board of medical examiners or state dental board responsible for investigating and disciplining licensees, (2) a hospital or facility professional review board or committee through formally adopted, written procedures, or (3) the United States Drug Enforcement Administration, subject to the following:

1. If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:
   a. the action must arise from the **insured's** rendering of, or failure to render, **professional services**, after the Retroactive Date, but before the end of the **policy period**, and for which there is no other insurance available; and
   b. the action must be first initiated against the **insured** during the **policy period**.
2. If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the action must arise from the **insured's** rendering, or failure to render, **professional services** during the **policy period,** and for which there is no other insurance available.
3. The payment of **claims expense** for such actions will be in addition to the applicable limit of liability. However, the **company** will not pay more than $25,000 in **claims expense** on behalf of an **insured** for any single action. Furthermore, the **company** will not pay more than $100,000 for **claims expense** on behalf of all **insureds** for all such actions covered under the policy.
4. If there is a deductible that is applicable to this Coverage Part, the deductible does not apply to the coverage provided herein.
5. The **company** has no duty to pay any fines, penalties, or other costs assessed against the **insured** as a result of any such action.

## II. EXCLUSIONS

The coverage provided under this Coverage Part does not apply to:

A. CONTRACTUAL LIABILITY

Liability for the acts of another assumed by an **insured** under any contract or agreement, whether written or oral, except as otherwise noted in this policy. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

B. INTENTIONAL ACTS

Any **claim** or **potential claim** arising out of, or in connection with, any act listed in the subparagraphs below:

1. any criminal conduct or intentional tort;
2. any romantic relationship with a current, former or prospective patient or any actual or threatened sexual conduct;
3. any willful violation of any law, statute, or regulation; or
4. any dishonest or fraudulent act.

Under this exclusion, the **company's** duty to defend an **insured** for such a **claim** or **potential claim** will cease when it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission that the **insured** engaged in any act listed in the above subparagraphs.

This exclusion does not apply to any **claim** or **potential claim** arising from a **health care event** brought against any **insured** who did not direct or act in concert to commit, directly participate in, or direct another, in connection with any of the actions excluded from coverage under this exclusion.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

C. RESIDENTS' RIGHTS BROUGHT BY ANOTHER PERSON

Any **claim** or **potential claim** arising out of, or in connection with, any violation of any law relating to **residents' rights** brought by any person other than a **resident** or a **resident's** legal representative.

D. RESIDENTS' RIGHTS BROUGHT BY MULTIPLE RESIDENTS

Any **claim** or **potential claim** arising out of, or in connection with, any violation of any law relating to **residents' rights** laws brought by multiple claimants, groups of claimants, multi-party actions, potential class actions or certified classes that allege the same or similar violations.

E. TREATMENT BY AN ADMINISTRATOR OR COMMITTEE MEMBER

Any **claim** or **potential claim** arising out of, or in connection with, the rendering of, or failure to render, **treatment** by an administrator or committee member, unless it was provided in an emergency without an expectation of compensation. As used in this exclusion:

1. "administrator" means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head, or faculty member of a **named insured**; and
2. "committee member" means a person serving as a member of a committee or board formed or controlled by a **named insured**. It also includes any person executing the directives of such a committee or board.

## III. LIMITS OF LIABILITY

A. PER EVENT LIMIT

The Per Event Limit shown on the Declarations is the most the **company** will pay for any **health care event** regardless of the number of:

1. **insureds**;
2. **claims** made or **potential claims** first discovered;
3. persons or organizations making **claims** or **potential claims**; or
4. policies issued by the **company**.

B. AGGREGATE LIMIT

The Aggregate Limit shown on the Declarations is the most the **company** will pay for all **health care events** regardless of the number of:

1. **health care events**;
2. **insureds**;
3. **claims** made or **potential claims** first discovered;
4. persons or organizations making **claims** or **potential claims**; or
5. policies issued by the **company**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*
# *GENERAL LIABILITY COVERAGE PART*

**NOTICE:**
**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

## I. <u>INSURING CLAUSES</u>

A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. <u>Claims-Made and Reported</u>

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with, **bodily injury** to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from **bodily injury**, will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Additionally, all **claims** and **potential claims** for damages because of **property damage** causing **loss** to the same person or organization will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of the **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. <u>Occurrence</u>

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that occurred during the **policy period**.

b. An **event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **event**. Additionally, if, prior to the **policy period**, an **authorized insured** knew

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

that the **bodily injury** or **property damage** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **bodily injury** or **property damage** occurred, then any continuation, change, or resumption of such **bodily injury** or **property damage** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Claims-Made and Reported

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **personal and advertising injury** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that occurred during the **policy period**.

b. An offense will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the offense. Additionally, if, prior to the **policy period**, an **authorized insured** knew that an offense resulting in **personal and advertising injury** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that an offense resulting in **personal and advertising injury** occurred, then any continuation, change, or resumption of such as offense resulting in **personal and advertising injury** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

C. MEDICAL PAYMENTS

1. Claims-Made and Reported

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

 © 2015 MedPro Group. All rights reserved.

a. The **company** will pay on behalf of any **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must have been caused by an accident that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **medical expenses** must:

(1) arise from a **claim** that was first made against, and received by, a **named insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period**;

(2) arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3) result from the operations of a **named insured**.

b. for damages arising out of, or in connection with the same accident will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. the **company** will pay on behalf of a **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must be caused by an accident that occurred during the **policy period**. Moreover, to be covered under this policy, the **medical expenses** must:

(1) be submitted to the **company**, in writing, within one year of the accident;

(2) arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3) result from the operations of a **named insured**.

b. An accident will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the accident. Additionally, if, prior to the **policy period**, an **authorized insured** knew that the **medical expenses** had been incurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **medical expenses** had been incurred, then any additional **medical expenses** incurred during or after the **policy period** will be deemed to have been known prior to the **policy period**.

However, payments for **medical expenses** shall not be subject to any Deductible or Self-Insured Retention.

## II. EXCLUSIONS

A. EXCLUSIONS APPLICABLE TO THIS COVERAGE PART

The coverage provided under this Coverage Part does not apply to:

1. Contractual Liability

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** obligation to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

a. that the **insured** would have in the absence of the contract or agreement; or

b. assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury**, **property**

 © 2015 MedPro Group. All rights reserved.

**damage**, **personal and advertising injury** or **medical expenses** occurred subsequent to the execution of the contract or agreement. Only for the purposes of liability assumed in an **insured contract**, reasonable attorneys' fees and necessary litigation expenses incurred by or for a party, other than an **insured**, are deemed to be damages because of **bodily injury**, **property damage**, **personal and advertising injury** or **medical expenses**, provided:

(1) liability to or for that party's defense has also been assumed in the same **insured contract**; and

(2) attorneys' fees and litigation expenses are for the defense against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

2. Contamination

Any **claim** or **potential claim** arising out of, or in connection with, a **superbug contamination**.

3. Employees

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of an **employee**, involving:

a. **bodily injury**, **personal and advertising injury** or **medical expenses**:

(1) to another **employee** or agent of a **named insured**;

(2) to the spouse, relative or dependent as a consequence of subparagraph a.(1), above; or

(3) for which there is any duty to share damages or loss with, or repay, another party liable for the loss as a consequence of subparagraphs a.(1) and a.(2), above.

b. **property damage** to property:

(1) owned, occupied, or used by an **insured**;

(2) rented to an **insured**; or

(3) in the care, custody, or control of an **insured**.

4. Professional Liability

Any **claim** or **potential claim** arising out of, or in connection with, a **health care event**.

5. Recording And Distribution Of Material Or Information In Violation Of Law

Any **claim** or **potential claim** arising out of, or in connection with, any action or omission that violates or is alleged to violate:

a. the Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b. the CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. the Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act; or

d. any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

6. Residents Rights

Any **claim** or **potential claim** arising out of, or in connection with, a violation of any law relating to **residents' rights**.

7. Sexual Acts

Any **claim** or **potential claim** arising from, or in connection with, any actual or threatened sexual act, behavior or conduct, including, but not limited to, assault, exploitation, harassment or molestation, by any person of another person while in the care, custody, or control of any **insured**.

 © 2015 MedPro Group. All rights reserved.

Under this exclusion, the **company's** duty to defend an **insured** for such **claim** or **potential claim** will cease when it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission that an **insured** engaged in any act excluded in this exclusion.

This exclusion does not apply to any **claim** or **potential claim** arising from an **event** or offense brought against any **insured** who did not direct or act in concert to commit, directly participate in, or direct another, in connection with any of the actions excluded from coverage under this exclusion.

B. EXCLUSIONS APPLICABLE TO THE BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURING CLAUSE AND THE MEDICAL PAYMENTS INSURING CLAUSE

The coverage provided under the Bodily Injury and Property Damage Liability Insuring Clause and the Medical Payments Insuring Clause does not apply to:

1. <u>Aircraft, Auto Or Watercraft</u>

   **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented to or loaned to any **insured**. Use includes operation and **loading or unloading**.

   a. This exclusion applies even if the **claims** or **potential claims** against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that **insured** if the **event** or accident which caused the **bodily injury**, **property damage** or **medical expenses** involved the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft that is owned or operated by or rented or loaned to any **insured**.

   b. This exclusion does not apply to:

      (1) **loading or unloading**;

      (2) a watercraft while on shore on premises owned or rented by the **insured**;

      (3) a watercraft that is:

         a) not owned by an **insured**;

         b) less than 26 feet long; and

         c) not being used to carry persons or property for a charge.

      (4) parking an **auto** on or next to a site owned or occupied by an **insured**, but only if the **auto** is not owned, rented, or being used by an **insured**;

      (5) liability assumed under an **insured contract** for the ownership, maintenance, or use of an aircraft or watercraft; or

      (6) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

         a) the operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

         b) the operation of any of the machinery or equipment listed in subparagraph 2.a or 2.b of the definition of **mobile equipment**.

2. <u>Asbestos</u>

   Any **claim** or **potential claim** arising out of, or in connection with, asbestos, or any materials containing asbestos in whatever form or quantity.

3. <u>Damage To Impaired Property Or Property Not Physically Injured</u>

   **Property damage** to **impaired property** or property that has not been physically injured arising out of, or in connection with:

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

a. a defect, deficiency, inadequacy, or dangerous condition in the **insured's product** or **insured's work**; or

b. a delay or failure by an **insured** to perform under the terms of a contract or agreement.

This exclusion does not apply to the loss of use of other property arising out of, or in connection with, sudden and accidental physical injury to the **insured's product** or the **insured's work** after it has been put to its intended use.

4. Damage To The Insured's Product

**Property damage** to the **insured's product** arising out of, or in connection with, it or any part of it.

5. Damage To The Insured's Work

**Property damage** to the **insured's work** arising out of, or in connection with, the **insured's work** or any part of it, and included in the **products completed operations hazard**. This exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed by a subcontractor on behalf of the **insured**.

6. Damage To Property

**Property damage** to:

a. property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. premises an **insured** sells, gives away, or abandons if the **property damage** arises out of, or in connection with, any part of those premises;

c. property loaned to an **insured**;

d. personal property in the care, custody, or control of an **insured**;

e. that particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of an **insured**, are performing operations if the **property damage** arises out of those operations; or

f. that particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a, c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an Insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the **insured's work** and were never occupied, rented, or held for rental by an **insured**.

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard**.

7. Expected Or Intended Injury

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any act expected or intended by an **insured** to cause **bodily injury**, **property damage** or **medical expenses**. This exclusion applies even if an **insured's** act causes **bodily injury**, **property damage** or **medical expenses**:

a. of a different type or degree than expected or intended; or

b. to a different person or organization than expected or intended.

However, this exclusion does not apply to **bodily injury** or **medical expenses** arising out of, or in connection with, an **insured's** use of reasonable force to protect persons or property.

 © 2015 MedPro Group. All rights reserved.

8. Fungi And Bacteria

   a. **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged or threatened inhalation of, injection of, contact with, exposure to, existence of, or presence of any fungi or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   b. Any **loss**, cost or expense arising out of, or in connection with, the abating, testing, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to, or assessing the effects of, fungi or bacteria, by any **insured** or by any other person or organization.

   This exclusion shall not apply to any fungi or bacteria contained in a good or product intended for bodily consumption. For the purposes of this exclusion, the term fungi includes any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi.

9. Liquor Liability

   **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any **insured's** liability by reason of:

   a. causing or contributing to the intoxication of any person;

   b. the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

   c. any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

   This exclusion applies only if the **insured** is in the business of manufacturing, distributing or selling alcoholic beverages.

10. Mobile Equipment

    **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

    a. the transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to an **insured**; or

    b. the use of **mobile equipment** in, while in practice for, or while being prepared for any prearranged racing, speed, demolition, or stunting activity.

11. Personal And Advertising Injury

    **Bodily injury** arising out of, or in connection with, **personal and advertising injury**.

12. Pollution

    a. Any **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:

       (1) at or from any premises, site, or location that is or was at any time owned or occupied by or rented or loaned to any **insured**. However, this does not apply to:

          a) **bodily injury** if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originated from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use by the building's occupants or guests;

          b) **bodily injury**, **property damage** or **medical expenses** for which an **insured** may be held liable, if it is a contractor, and the owner or lessee of such premises, site, or location has been added to the policy as an **additional insured** with respect to an **insured's** ongoing operations performed for that **additional insured** at that premises, site, or location, and such premises, site, or location is not or never was owned or occupied by or rented or loaned to any **insured**, other than that **additional insured**; or

          c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat,

 © 2015 MedPro Group. All rights reserved.

smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(2) at or from any premises, site, or location that is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing, or treatment of waste.

(3) which are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for any **insured** or any other person or organization for whom an **insured** may be legally responsible.

(4) at or from any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if the **pollutants** were brought on or to the premises, site, or location in connection with such operations by such **insured**, contractor, or subcontractor. However, this subparagraph does not apply to:

a) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the escape of fuels, lubricants, or other operating fluids, which are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them. This exception does not apply if the **bodily injury**, **property damage** or **medical expenses** arises out of the intentional discharge, dispersal, or release of fuels, lubricants, or other operating fluids or if such fuels, lubricants, or other operating fluids are brought on or to the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by such **insured**, contractor, or subcontractor;

b) **bodily injury**, **property damage** and **medical expenses** sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into the building in connection with operations being performed by an **insured**, or on its behalf by a contractor or subcontractor; or

c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(5) arising out of, or in connection with, any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if such operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any other way respond to or assess the effects of, **pollutants**.

Subparagraphs (a)(1) and (a)(4) do not apply with respect to the application or storage of fertilizers, fungicides, herbicides, or pesticides in the normal maintenance of an **insured's** location, but only if:

i. the storage and application of such fertilizers, fungicides, herbicides, or pesticides complies with all applicable federal, state or local government laws;

ii. the **insured** meets all license or certification requirements under any federal, state or local laws in order to perform the application of any such fertilizers, fungicides, herbicides, or pesticides;

iii. the fertilizers, fungicides, herbicides, or pesticides does not include mercury or any mercury compounds; and

iv. the **pollutants** related to such fertilizers, fungicides, herbicides, or pesticides emanate from the **insured's** location.

b. Any damages, **loss**, cost, or expense arising out of, or in connection with, any:

(1) request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize , or in any way respond to or assess the effects of, **pollutants**; or

(2) **claim** or **potential claim** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **pollutants**.

 © 2015 MedPro Group. All rights reserved.

However, this subparagraph does not apply to liability for damages because of **property damage** that an **insured** would have in the absence of such request, demand, order, or statutory or regulatory requirement, or such **claim** or **potential claim** by or on behalf of a governmental authority.

13. Recall Of Products, Work, Or Impaired Property

Any **claim** or **potential claim** arising out of, or in connection with, any **loss**, cost, or expense incurred by an **insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a. the **insured's product**;

b. the **insured's work**; or

c. **impaired property**

if such product, work, or property is withdrawn or recalled from the market or from use due to a known or suspected defect, deficiency, inadequacy, or dangerous condition to it.

14. Silica

Any **claim** or **potential claim** arising out of, or in connection with, silica, including, but not limited to:

a. inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

b. the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

c. the use or presence of silica in any good, product, structure, real estate or land, or any component part of any good, product, structure, real estate or land; or

d. the manufacture, sale, transportation, handling, storage or disposal of silica or any goods, products, structures, real estate or land containing silica;

e. any disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis, cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

f. any costs of medical or other testing, monitoring or diagnosis arising out of, or in connection with, any actual, alleged, threatened or feared **bodily injury** arising in whole or in part, directly or indirectly, out of silica; or

g. any costs of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products structures, real estate or land.

As used in this exclusion, "silica" means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide ($SiO_2$), crystalline silica, quartz, or non-crystalline (amorphous) silica.

The exclusions for "AIRCRAFT, AUTO OR WATERCRAFT," "DAMAGE TO IMPAIRED PROPERTY OR PROPERTY NOT PHYSICALLY INJURED," "DAMAGE TO THE INSURED'S PRODUCT," "DAMAGE TO THE INSURED'S WORK," "DAMAGE TO PROPERTY," "LIQUOR LIABILITY," "MOBILE EQUIPMENT," "POLLUTION," and "RECALL OF PRODUCTS, WORK, OR IMPAIRED PROPERTY" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. A separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

C. EXCLUSIONS APPLICABLE TO PERSONAL AND ADVERTISING INJURY LIABILITY INSURING CLAUSE

The coverage provided under the Personal and Advertising Injury Liability Insuring Clause does not apply to:

1. Breach Of Contract

**Personal and advertising injury** arising out of, or in connection with, a breach of contract, except an implied contract to use another's advertising idea in an **insured's advertisement**.

 © 2015 MedPro Group. All rights reserved.

2. Electronic Chatrooms Or Bulletin Boards

   **Personal and advertising injury** arising out of, or in connection with, an electronic chatroom or bulletin board an **insured** hosts, owns, or over which an **insured** exercises control.

3. Infringement Of Copyright, Patent, Trademark, Or Trade Secret

   **Personal and advertising injury** arising out of, or in connection with, the infringement of copyright, patent, trademark, trade secret, or other intellectual property rights. However, this exclusion shall not apply to the infringement of copyright, trade, dress, or slogan in an **insured's advertisement**.

4. Insureds In Media And Internet Type Businesses

   **Personal and advertising injury** committed by an **insured** whose business is:

   a. advertising, broadcasting, publishing, or telecasting;

   b. designing or determining content for the websites of others; or

   c. an internet search, access, content, or service provider.

   However, this exclusion does not apply to **claims** arising from false arrest, detention or imprisonment, malicious prosecution, or the wrongful eviction from, or wrongful entry into, or invasion of the private occupancy of a room dwelling or premises occupied by, or on behalf of, its owner, landlord, or lessor.

   For the purposes of this exclusion, the placing of frames, borders, or links, or advertising for an **insured** or others is not considered, by itself, to be the business of advertising, broadcasting, publishing, or telecasting.

5. Knowing Violation Of Rights Of Others

   **Personal and advertising injury** caused by, or at the direction of, an **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

6. Material Published Prior To Policy – Claims-Made and Reported Only

   Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took place before the applicable retroactive date shown on the Declarations.

7. Material Published Prior To Policy – Occurrence Only

   Only with respect to any Coverage Part shown on the Declarations as "Occurrence," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took prior to the **policy period**.

8. Material Published With Knowledge Of Falsity

   **Personal and advertising injury** arising out of, or in connection with, oral or written publication of material if done by, or at the direction of, an **insured** with knowledge of its falsity.

9. Quality Or Performance Of Goods – Failure To Conform To Statements

   **Personal and advertising injury** arising out of, or in connection with, the failure of goods, products, or services to conform to any statement of quality or performance in an **insured's advertisement**.

10. Unauthorized Use Of Another's Name Or Product

    **Personal and advertising injury** arising out of, or in connection with, the unauthorized use of another's name or product in an **insured's** email address, domain name, or metatag, or other similar tactics to mislead another's potential customers.

11. Wrong Description Of Prices

    **Personal and advertising injury** arising out of, or in connection with, the wrong description of the price of the goods, products, or services in an **insured's advertisement**.

 © 2015 MedPro Group. All rights reserved.

D. EXCLUSIONS APPLICABLE TO MEDICAL PAYMENTS INSURING CLAUSE

1. Medical Expenses

The coverage provided under Medical Payments Insuring Clause does not apply to **medical expenses** arising out of, or in connection with, **bodily injury**:

a. to an **insured**, except volunteers;

b. to a person hired to do work for, or on behalf of, an **insured** or tenant of an **insured**;

c. to a person injured on that part of a premises owned or rented by an **insured** that the injured person normally occupies;

d. to any person, whether or not an **employee**, who is eligible for benefits under a workers' compensation, occupational disease, disability benefits, or similar law;

e. to a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests;

f. covered as a **products completed operations hazard**; or

g. to any inmate, patient, or prisoner, who is being treated, cared for, detained, or imprisoned by any **insured** or in any **insured business**.

## III. LIMITS OF LIABILITY

A. GENERAL RESTRICTIONS

The Limits of Liability shown on the Declarations is the most the **company** will pay regardless of the number of:

1. **insureds**;
2. **claims** made or **potential claims** first discovered;
3. persons or organizations making **claims** or **potential claims**; or
4. policies issued by the **company**.

B. GENERAL AGGREGATE LIMIT

The General Aggregate Limit shown on the Declarations is the most the **company** will pay for **loss**, **claims expense**, and **medical expenses** under this Coverage Part except for **loss** and **claims expense** included in the **products completed operations hazard**.

C. PRODUCTS COMPLETED OPERATIONS HAZARD AGGREGATE LIMIT

The Products Completed Operations Hazard Aggregate Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** and **claims expense** because of **bodily injury** and **property damage** included in the **products completed operations hazard**.

D. PERSONAL AND ADVERTISING INJURY LIABILITY LIMIT

Subject to subparagraph B. above, the Personal and Advertising Injury Liability Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expense** under the Personal and Advertising Injury Liability Insuring Clause because of **personal and advertising injury** sustained by any one person or organization.

E. PER EVENT LIMIT

Subject to subparagraphs B. or C. above, whichever applies, the Per Event Limit shown on the Declarations is the most the **company** will pay for:

1. **loss** and **claims expense** under the Bodily Injury and Property Damage Liability Insuring Clause; and
2. **medical expenses** under the Medical Payments Insuring Clause;

because of all **bodily injury** and **property damage** arising out of any one **event**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

F. DAMAGE TO PREMISES RENTED TO AN INSURED LIMIT

Subject to subparagraph E. above, the Damage to Premises Rented to an Insured Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** or **claims expense** because of **property damage** to any one premises, while rented to a **named insured** or temporarily occupied by a **named insured** with permission of the owner.

G. MEDICAL EXPENSE LIMIT

Subject to subparagraph E. above, the Medical Expense Limit shown on the Declarations is the most the **company** will pay under the Medical Payments Insuring Clause for **medical expenses** because of **bodily injury** sustained by any one person.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*

# *CYBER LIABILITY AND BREACH RESPONSE COVERAGE PART*

**NOTICE:**

**This Coverage Part contains Claims-Made and Reported coverage. If designated as "Claims-Made" in the title of the particular Insuring Clause, the coverages provided by that Insuring Clause will only cover claims first made against an insured during the policy period, and reported to the company during the policy period or during any applicable extended reporting period. All claims are subject to the applicable Limits of Liability and the applicable Retention(s) as set forth in the Declarations. Note that the Limits of Liability for Coverages A, B, C and H include claim expenses. Please read this Coverage Part carefully.**

## I. INSURING CLAUSES

A. COVERAGE A - MULTIMEDIA LIABILITY - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages**, including liability **assumed under contract,** and related **claim expenses**, resulting from a **claim** for a **multimedia peril** committed by an **insured**, provided that:

1. the **multimedia peril** is committed on or after the **retroactive date**;
2. the **claim** is first made against an **insured** during the **policy period**; and
3. the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

B. COVERAGE B - SECURITY AND PRIVACY LIABILITY - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages** and related **claim expenses**, resulting from a **claim** for a **security and privacy wrongful act** committed by an **insured** resulting from a **security breach, privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** and the resulting **security and privacy wrongful act** takes place on or after the **retroactive date**;
2. the **claim** is first made against an **insured** during the **policy period**; and
3. the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

C. COVERAGE C - PRIVACY REGULATORY DEFENSE AND PENALTIES - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as a **regulatory compensatory award** or **regulatory fines and penalties** (to the extent insurable by law), and related **claim expenses**, resulting from a **privacy regulatory proceeding** instituted against an **insured** for a **security breach**, **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** takes place on or after the **retroactive date**;
2. the **privacy regulatory proceeding** is first instituted against an **insured** during the **policy period**; and
3. the **privacy regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

 © 2015 MedPro Group. All rights reserved.

D. COVERAGE D - PRIVACY BREACH RESPONSE COSTS, CUSTOMER NOTIFICATION EXPENSES, AND CUSTOMER SUPPORT AND CREDIT MONITORING EXPENSES

The **company** will indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs during the **policy period** as **privacy breach response costs**, **customer notification expenses** and/or **customer support and credit monitoring expenses** resulting from a **security breach**, a **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** takes place during the **policy period**;
2. the **security breach**, **privacy breach** or **breach of privacy regulations** is reported to the **company**, in writing, no later than 60 days after the date the **security breach**, **privacy breach** or **breach of privacy regulations** is discovered; and
3. the **privacy breach response costs**, **customer notification expenses** and/or **customer support and credit monitoring expenses** are incurred with the **company's** consent.

E. COVERAGE E - NETWORK ASSET PROTECTION

1. Loss of Digital Assets

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **digital assets loss** and **special expenses** due to damage, alteration, corruption, distortion, theft, misuse or destruction of an **insured business's digital assets** directly caused by a **covered cause of loss**, provided that:

a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and

b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered.

**Digital assets loss** and **special expenses** will be reimbursed for a period of up to 12 months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of **digital assets**, unless specified otherwise by endorsement. **Digital assets loss** and **special expenses** will only be paid where there is clear evidence provided by an **insured business** that such **digital assets loss** and **special expenses** resulted from a **covered cause of loss**.

2. Non-Physical Business Interruption and Extra Expense

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss**, **interruption expenses**, and **special expenses** resulting from the total or partial interruption, degradation in service or failure of the **insured business's computer system** directly caused by a **covered cause of loss**, provided that:

a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**;

b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered;

c. the **income loss**, **interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and

d. the total or partial interruption, degradation in service or failure of the **insured business's computer system** exceeds the **time retention**.

 © 2015 MedPro Group. All rights reserved.

F. COVERAGE F - CYBER EXTORTION

The **company** will indemnify an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** pays as **cyber extortion expenses** and/or **cyber extortion monies** directly caused by a **cyber extortion threat** or series of **cyber extortion threats**, including a demand for **cyber extortion monies**, provided that:

1. the **cyber extortion threat** is first made against an **insured business** during the **policy period**; and
2. the **cyber extortion threat** is reported to the **company**, in writing, no later than 60 days after the date the **cyber extortion threat** is received by an **insured**.

**Cyber extortion expenses** and **cyber extortion monies** shall not be paid without prior consultation with the **company** and the **company's** express agreement. An **insured business** must make every reasonable effort to notify the local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

G. COVERAGE G - CYBER TERRORISM

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss**, **interruption expenses** and **special expenses** resulting from the total or partial interruption, degradation in service or failure of an **insured business's computer system** directly caused by an **act of terrorism**, provided that:

1. the **act of terrorism** takes place during the **policy period**;
2. the **act of terrorism** is reported to the **company**, in writing, no later than 60 days after the date the **act of terrorism** is discovered;
3. the **income loss**, **interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and
4. the total or partial interruption, degradation in service or failure of an **insured business's computer system** exceeds the **time retention**.

H. COVERAGE H - REGULATORY PROCEEDING - CLAIMS-MADE

The **company** will reimburse an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **regulatory fines and penalties** (to the extent insurable by law) and **claims expenses** and/or **shadow audit expenses** (where applicable) resulting from a **regulatory proceeding**, provided that:

1. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;
2. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and
3. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

The **company** shall have no duty to defend an **insured** under Coverage H, but only to reimburse an **insured** for covered **claim expenses**, **shadow audit expenses**, and/or **regulatory fines and penalties**. An **insured** shall have complete freedom of choice with respect to the selection of the licensed attorney who provides legal services in connection with any **regulatory proceeding** triggering coverage under Coverage H. Upon receiving notice from an **insured** of a **regulatory proceeding**, the **company** or its authorized agent will provide the **insured** with the name(s) of panel counsel. If an **insured** retains panel counsel, the **company** will, subject to all other provisions of this Coverage Part, pay 100% of covered **claim expenses**, **shadow audit expenses**, and/or **regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H. If an **insured** retains non-panel counsel, the **insured** must pay a co-payment of 25%, and the **company** will pay the remaining 75% of covered **claim expenses**, **shadow audit expenses**, and/or

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

**regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H.

I. COVERAGE I - EVACUATION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **evacuation expense** directly caused by an **evacuation**, provided that:

1. the **evacuation** occurs during the **policy period**;
2. the **evacuation** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. written notice to the **company** includes details regarding the time, date and place of the **evacuation**; description of the **evacuation expense** incurred by an **insured business**; and documented proof of such **evacuation expense**; and
4. no other valid and collectible insurance providing **evacuation expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

J. COVERAGE J - DISINFECTION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **disinfection expense** directly caused by a **disinfection event**, provided that:

1. the **disinfection event** occurs during the **policy period**;
2. the **disinfection event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. written notice to the **company** includes details regarding the time, date and place of the **disinfection event**; description of the **disinfection expense** incurred by an **insured business**; and documented proof of such **disinfection expense**; and
4. no other valid and collectible insurance providing **disinfection expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

K. COVERAGE K - PUBLIC RELATIONS EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **public relations expenses** directly caused by a **public relations event**, provided that:

1. the **public relations event** occurs during the **policy period**;
2. the **public relations event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. the **public relations expenses** are incurred with the **company's** consent;
4. written notice to the **company** includes details regarding the time, date and place of the **public relations event**; description of the **public relations expenses** incurred by an **insured business**; and documented proof of such **public relations expenses**; and
5. no other valid and collectible insurance providing **public relations expenses** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

L. COVERAGE L - E-DISCOVERY CLAIM EXPENSES AND E-DISCOVERY REGULATORY INVESTIGATION EXPENSES - CLAIMS-MADE

The **company** will:

1. indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs as **e-discovery claim expenses** and/or **e-discovery regulatory investigation expenses** resulting from a **regulatory proceeding**; and
2. provide **e-discovery consulting services** to an **insured** during the **policy period**, provided that:
   a. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;
   b. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and
   c. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

M. COVERAGE M - DATA PROTECTION REPUTATIONAL HARM

The **company** will reimburse an **insured business**, in excess of the **retention** and within the applicable Limits of Liability, for the net ascertained loss of value to such **insured business's reputation**, being the loss of **net profit** suffered by the **insured business** during the **period of indemnity** and/or any **recoverable costs** and/or any **increase in cost of working** incurred by the **insured business** during the **period of indemnity**, solely and directly caused by a **data protection breach**, provided, that:

1. the **data protection breach** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and
2. the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** reports the **data protection breach** to the **company**, in writing, within 60 days of any **adverse media report**.

## II. ADDITIONAL EXCLUSIONS

This insurance does not apply to:

A. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;
2. any **security and privacy wrongful act** under Coverage B;
3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;
4. any **covered cause of loss** under Coverage E;
5. any **cyber extortion threat** under Coverage F;
6. any **act of terrorism** under Coverage G;
7. any acts, errors or omissions under Coverages H and L;
8. any **evacuation** under Coverage I;
9. any **disinfection event** under Coverage J;
10. any **public relations event** under Coverage K; or
11. any **data protection breach** under Coverage M;

committed, allegedly committed or that occurred, in whole or in part, prior to the applicable retroactive date.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

B. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;
2. any **security and privacy wrongful act** under Coverage B;
3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverages C or D;
4. any **covered cause of loss** under Coverage E;
5. any **cyber extortion threat** under Coverage F;
6. any **act of terrorism** under Coverage G;
7. any acts, errors or omissions under Coverages H and L;
8. any **evacuation** under Coverage I;
9. any **disinfection event** under Coverage J;
10. any **public relations event** under Coverage K; or
11. any **data protection breach** under Coverage M;

that any **insured** knew, or could have reasonably foreseen, prior to the effective date of this Coverage Part, could be the basis of a **claim**.

C. any **claim** or circumstance involving the Coverages available under this Coverage Part notified to a previous insurer prior to the effective date of this Coverage Part.

D. any **claim** made by or on behalf of an **insured** against another **insured**; however, this exclusion shall not apply to:

1. an otherwise covered **claim** under Coverage B made by any past, present or future **employee** for a **security and privacy wrongful act**, but only if such **employee** did not commit, participate in or contribute to such **security and privacy wrongful act** or a **security breach**, **privacy breach**, or **breach of privacy regulations**; or
2. any **billing errors proceeding** instituted by an **insured** against an **insured** as a **qui tam plaintiff** or brought by an **insured** under the United States False Claims Act.

E. any **claim** alleging or arising out of any willful, deliberate, malicious, fraudulent, dishonest or criminal act, error or omission, or any intentional violation of the law or of an **insured business's** privacy policy, or the gaining of any profit or advantage to which any **insured** is not legally entitled, if any of the aforementioned is committed by an **insured**, whether acting alone or in collusion with other persons. However, the insurance afforded by this Coverage Part shall apply to **claims expenses** incurred in defending any such **claim**, but shall not apply to any **damages**, **regulatory fines and penalties** or other loss that an **insured** might become legally obligated to pay. The **company** will have the right to recover those **claims expenses** incurred from those parties found to have committed criminal, dishonest, fraudulent or malicious acts, errors or omissions by a court, jury or arbitrator. This exclusion shall not apply to a **claim** under Coverage E for **employee** sabotage.

F. any **claim** arising out of any **insured's** activities as a trustee, partner, officer, director, or employee of any employee trust, charitable organization, corporation, company, or business other than that of an **insured business**.

G. any **claim** arising out of an **insured's** insolvency or bankruptcy or the insolvency or bankruptcy of any other entity including, but not limited to, the failure, inability, or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

H. **bodily injury**, except that this exclusion shall not apply to negligent infliction of emotional distress or mental anguish arising out of any actual or alleged **multimedia peril**, **security and privacy wrongful act**, **privacy breach**, **security breach** or **breach of privacy regulations**.

 © 2015 MedPro Group. All rights reserved.

I. any **claim** for **property damage**.

J. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. satellite failures;
2. electrical or mechanical failures and/or interruption, including, but not limited to, electrical disturbance, spike, brownout, or blackout; or
3. outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under an **insured business's** operational control and unless such **claim** otherwise triggers coverage under Coverage E or G.

K. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the wear and tear, drop in performance, progressive deterioration or aging of electronic equipment and other property or **computer hardware** used by an **insured**.

L. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to failure of overhead transmission and distribution lines.

M. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gradual deterioration of subterranean insulation.

N. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure, or any other physical event however caused, unless such **claim** otherwise triggers coverage under Coverages E or G.

O. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to coupons, prize discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

P. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products, or services.

Q. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** cost guarantees, cost representations, contract price or cost estimates being exceeded.

R. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any economic or trade sanctions by the United States government including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ('OFAC').

S. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise. This exclusion shall not apply to:

1. any liability or obligation that any **insured** would have in the absence of such contract or agreement;
2. unintentional breach of contract; or
3. a breach of an **insured business's** privacy policy.

T. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the liability of others assumed by an **insured** under any contract or agreement, either oral or written. This exclusion shall not apply:

1. to the extent such **insured** would have been liable in the absence of such contract or agreement; or
2. with respect to any **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

**breach** or **breach of privacy regulations**, to the extent an **insured business** has assumed such liability in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy breach** or **breach of privacy regulations**.

U. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any presence of pollutants or contamination of any kind;
2. any actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants or contamination of any kind including, but not limited to, solid, liquid, gaseous, or thermal irritants or contaminants including asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (waste includes materials to be recycled, reconditioned, or reclaimed), wherever such occurs, whether or not such results from an **insured's** activities or the activities of others, is sudden or gradual, and is accidental, intended, foreseeable, expected, fortuitous, or inevitable;
3. any governmental or regulatory directive or request that an **insured business** or anyone acting under an **insured business's** direction or control test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize said 'pollutants'; or
4. any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants or in any way respond to or assess the effects of pollutants or contamination of any kind.

V. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged loss of value of any securities.

W. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to caused by or resulting from unauthorized trading. "Unauthorized trading" means trading by an **insured**, which at the time of the trade is:

1. in excess of permitted financial limits; or
2. outside of permitted product lines.

X. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged purchase, sale, offer of, or solicitation of an offer to purchase or sell securities, or violation of any securities law including, but not limited to, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including 'Blue Sky' laws, whether such law is statutory, regulatory, or common law.

Y. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged government enforcement of any state or federal regulation including, but not limited to, regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Exchange Commission. This exclusion does not apply to any **claim** triggering coverage under Coverage C.

Z. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any employer-**employee** relations, policies, practices, acts or omissions; any actual or alleged refusal to employ any person; or any misconduct with respect to **employees**.

AA. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged harassment or discrimination of any kind including, but not limited to, age, color, race, gender, creed, national origin, marital status, sexual preferences, disability or pregnancy.

BB. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any pension, healthcare, welfare, profit sharing, mutual, or investment plans, funds, or trusts; or any violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling, or order issued

 © 2015 MedPro Group. All rights reserved.

pursuant thereto.

CC. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. strikes or similar labor actions;
2. war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of, or amounting to, a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;
3. confiscation or nationalization or requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or
4. any action taken in controlling, preventing, suppressing or in any way relating to any of 1. through 3. Above.

This exclusion shall not apply to an **act of terrorism**.

DD. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** commercial decision to cease providing a particular product or service, but only if the **insured** is contractually obligated to continue providing such products or services.

EE. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gambling or pornography or the sale or provision of prohibited, restricted or regulated items including, but not limited to, alcoholic beverages, tobacco or drugs.

FF. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any fine or penalty arising out of any agreement by an **insured** to comply with or follow the Payment Card Industry Standard or any Payment Card Company Rules; or
2. the implementation, maintenance, or compliance with any security measures or standards relating to any payment card data including, but not limited to, any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an **insured** has paid or agreed to reimburse or indemnify.

This exclusion shall not apply to civil penalties and fines to the extent insurable by law arising out of an otherwise covered **claim** under Coverage C.

GG. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged unfair competition, price fixing, antitrust violations, deceptive trade practices, or restraint of trade or antitrust statute, legislation, or regulation.

HH. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged infringement of any patent or the misappropriation, theft, copying, display or publication of any trade secret by, or with the active cooperation, participation or assistance of any **insured**.

II. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any wear or tear, latent or time-delayed damage arising from services an **insured** provided prior to the **policy period**;
2. gradual deterioration of an **insured business's computer system**; or
3. an **insured business's** failure, or the failure of those acting on an **insured business's** behalf, to maintain any **computer system** or network, computer software or any other equipment.

JJ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the manufacturing, mining, use, sale, installation, removal, distribution of, or exposure to, asbestos, materials or products containing asbestos or asbestos fibers or dust or any **claim** alleging **bodily injury** or **property damage** arising out of asbestos or asbestos containing materials including, but not limited to:

1. inhaling, ingesting, or being physically exposed to asbestos or goods or products containing asbestos;

 © 2015 MedPro Group. All rights reserved.

2. the use of asbestos in constructing or manufacturing any goods, products, or structures;
3. the removal of asbestos from any goods, products or structures;
4. the manufacture, encapsulation, transportation, storage, handling, distribution, sale, application, mining, consumption, or disposal of asbestos or goods or products containing asbestos;
5. any governmental direction or request that the **insured** or any other party, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize asbestos or asbestos containing products; or
6. manufacturing or mining or the use, sale, installation, removal, distribution of or exposure to asbestos, materials, or products containing asbestos, asbestos fibers or dust.

KK. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **operational programs**.

LL. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **delivered programs**.

MM. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any **insured's** intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

NN. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the confiscation, commandeering, requisition, destruction of, or damage to, **computer hardware** by order of a government de jure or de facto, or by any public authority for whatever reason.

OO. any **claim** alleging **bodily injury** or **property damage** resulting from exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description, including:

1. any cost, expense, or charge to test, monitor, clean up, remediate, remove contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to or assess the effects of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description; or
2. any resulting cost, expense, charge, fine or penalty, incurred, sustained, or imposed by order, direction, request, or agreement of any court, governmental agency, or any civil, public, or military authority.

With respect to this exclusion, 'organic pathogens' means any organic irritant or contaminant including, but not limited to, mold, fungus, bacteria, virus, or their byproducts such as mycotoxins, mildew, or biogenic aerosol. 'Organic pathogens' include, but are not limited to, Aspergillus, Penicillium, Stachybotrys Chartarum, Stachybotrys Atra, Trichodema, and Fusarium Memnoniella.

PP. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the existence, emission or discharge of any electromagnetic field, electromagnetic radiation, or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

QQ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any legal liability directly or indirectly caused by, involving, attributed to, arising from:

1. ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel; or
2. the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

RR. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any criminal prosecution against an **insured**. For purposes of this exclusion, "criminal prosecution" shall mean any governmental action for enforcement of criminal laws, including those offenses for which conviction could

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

result in imprisonment and/or criminal fine.

SS. with respect to Coverage E.1. Loss of Digital Assets:

1. any amount incurred in restoring, updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
2. physical damage to the **computer hardware** or data center, other than that covered under **covered cause of loss**, under paragraph E.1.a.;
3. contractual penalties or consequential damages;
4. any liability to third parties for whatever reason, including legal costs and expenses of any type;
5. fines or penalties imposed by law;
6. the economic or market value of **digital assets**, unless the **company** has agreed by endorsement to reimburse an **insured business** based upon an agreed value amount for defined categories or specific **digital assets**;
7. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. any losses paid under Coverage E.2. Non-Physical Business Interruption and Extra Expense.

TT. with respect to Coverage E.2. Non-Physical Business Interruption and Extra Expense:

1. any loss arising out of a physical cause or natural peril, including, but not limited to fire, wind, water, flood, subsidence or earthquake, which results in physical damage to **computer hardware** and/or any **data** center;
2. any loss expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
3. contractual penalties or consequential damages;
4. any liability to third parties for whatever reason, including legal costs and expenses of any type;
5. fines or penalties imposed by law;
6. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
7. loss of goodwill and reputational harm;
8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. any losses paid under Coverage E.1. Loss of Digital Assets.

UU. with respect to Coverage H:

1. any amounts incurred in connection with a **shadow audit** not previously approved by the **company**;
2. **restitution** or repayment of monies received by an **insured**, to which the **insured** was not entitled as a result of billing errors made by such **insured**;
3. any amounts incurred by a consulting professional whose services were not previously approved by the **company**; or
4. billing errors for medical services or items which are not provided or prescribed by the **First Named**

 © 2015 MedPro Group. All rights reserved.

**Insured** or any subsidiary.

VV. with respect to Coverage M:

1. any loss, cost, liability or expense incurred by the **insured business** in an effort to re-establish the **reputation** of the **insured business**, other than **public relations expenses**;
2. any loss, cost, liability or expense incurred in any **claim** that is insured by any other insurance, except excess insurance;
3. any loss, cost, liability or expense incurred in connection with an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry or specific competitors of an **insured business**, without any specific allegations regarding an **insured business's** breach of data protection of its customers;
4. any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;
5. contractual penalties or consequential damages;
6. **customer notification expenses**;
7. fines or penalties imposed by law or regulation; or
8. any losses paid under Coverage D.

## III. LIMITS OF LIABILITY AND RETENTIONS

A. The Limits of Liability applicable to each Coverage of this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for each **claim** first made during the **policy period** under each Coverage and in the aggregate for all **claims** first made during the **policy period** under each Coverage, regardless of the number of:

1. claimants;
2. **claims**; or
3. **insureds** involved.

B. The Annual Aggregate Limit for this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for all **claims** first made during the **policy period** under this Coverage Part, regardless of the number of:

1. claimants;
2. **claims**;
3. **insureds** involved; or
4. Coverages under this Coverage Part.

C. All payments made under this Coverage Part will reduce the Annual Aggregate Limit for this Coverage Part. In no event will the **company** pay more than the Annual Aggregate Limit for this Coverage Part.

D. All **claims** made under any one Coverage, which arise out of the same, related or continuing acts, facts, events or circumstances, without regard to the number of **insureds**, **claims**, or claimants, shall be considered a single **claim** and only one Limit of Liability and **retention** will apply to such **claim**. Such **claim** shall be deemed to be first made at the earliest of the following times:

1. the time at which the earliest **claim** arising out of the same, related or continuing acts, facts, events or circumstances is first made; or
2. the time at which the **claim** arising out of the same, related or continuing acts, facts, events or

 © 2015 MedPro Group. All rights reserved.

circumstances shall be deemed to have been made pursuant to Section IV., A.2. of this Coverage Part.

E. In the event that any **claim** shall be covered, in whole or in part, under two or more Coverages of this Coverage Part, the total applicable Limit of Liability shall not exceed the single largest applicable Limit of Liability. Such largest applicable Limit of Liability shall apply only once to such **claim**. The **company** has the sole discretion to allocate **claims** paid, if any, against the appropriate Limit of Liability.

F. The Limits of Liability for the **extended reporting period**, if exercised, shall be part of, and not in addition to, the Limits of Liability applicable to this Coverage Part. The exercise of the **extended reporting period** shall not in any way increase or reinstate the Limits of Liability applicable to this Coverage Part.

G. The applicable **retention** amount for each Coverage of this Coverage Part shall apply separately to each **claim**. The **retention** shall be satisfied by an **insured's** monetary payments of any amounts covered under this Coverage Part, including **claim expenses** where applicable. If a **claim** attaches to more than one Coverage of this Coverage Part, only the highest **retention** applies.

H. An **insured's** payment of the applicable **retention** is a condition precedent to payment by the **company** of any amounts covered under this Coverage Part, and the **company** shall only be liable for the amount in excess of such **retention**, not to exceed the total applicable Limit of Liability. The **insured** shall make direct payments within the **retention** to the appropriate parties designated by the **company**.

I. With respect to Coverages E.1. and G, the **time retention** shall apply to each **period of restoration**. Once the **time retention** is met, the **insured** will be responsible to pay any co-insurance percentage or **retention** applicable to Coverages E.1. and G.

## IV. ADDITIONAL CONDITIONS

In addition to the terms contained in the Conditions section of the Common Policy Provisions and Conditions, the following conditions apply to this Coverage Part:

A. NOTICE PROVISIONS

1. Notice of Claim.

   Except as otherwise provided in any Coverage of this Coverage Part, the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** shall give to the **company** written notice of any **claim** during the **policy period**, but in no event later than 30 days after expiration of the **policy period**.

2. Notice of Potential Claim.

   If, during the **policy period**, an **insured** first becomes aware of any acts, facts or circumstances that could reasonably be the basis for a **claim**, and if the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** gives the **company** written notice during the **policy period**, of:

   a. specific details of the acts, facts or circumstances that could reasonably be the basis for a **claim**;

   b. possible **damages**, penalties or other amounts potentially covered under this Coverage Part that may result or that have resulted from the acts, facts or circumstances; and

   c. details regarding how the **insured** first became aware of the acts, facts or circumstances,

   then any **claim** made subsequently arising out of such acts, facts or circumstances shall be deemed to have been made at the date the written notice complying with the above requirements was first given to the **company**.

B. LOSS DETERMINATION UNDER COVERAGE E

1. Loss Determination under Coverage E.1.

 © 2015 MedPro Group. All rights reserved.

For any and all coverage(s) provided under Coverage E.1., **digital assets loss** will be determined as follows:

a. if the impacted **digital asset** was purchased from a third party, the **company** will pay only the lesser of the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**; or

b. if it is determined that the **digital assets** cannot be replaced, restored or recreated, then the **company** will only reimburse the actual and necessary **digital assets loss** incurred up to such determination.

2. Loss Determination under Coverage E.2.

For any and all coverage(s) provided under Coverage E.2., **income loss** will be determined as the reduction of the **insured business's income** during the **period of restoration**, which is:

a. an **insured business's** net **income** (**net profit** or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of total or partial interruption, degradation in service or failure of the **insured business's computer system** caused directly by a **covered cause of loss**. The revenue projection will take into account the prior experience of the **insured business's** business during the previous 12 months immediately before the date of the **covered cause of loss** and the probable experience had no **covered cause of loss** occurred. Revenues include the amount of money paid or payable to the **insured business** for goods, products or services sold, delivered or rendered in the normal course of the **insured business's** business. Revenue projection will be reduced by the extent to which the **insured business** uses substitute methods, facilities or personnel to maintain its revenue stream. The **company** will take into consideration the **insured business's** documentation of the trends in the business and for variations in or other circumstances affecting the business before or after the **covered cause of loss**, which would have affected the **insured business's** business had no **covered cause of loss** occurred; and

b. any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

C. LOSS DETERMINATION UNDER COVERAGE M

For any and all coverage(s) provided under Coverage M, the net loss of value suffered by the **insured business** during a **period of indemnity** shall be assessed and ascertained by auditors or adjusters appointed by the **company**. Their assessment in respect of the loss of **net profit** shall be based upon the difference between the anticipated **net profit** for the **period of indemnity**, as established during the pre-bind underwriting process, and the actual **net profit** for the **period of indemnity**. An **insured business** will provide accounting information to identify the potential loss of the **insured business's reputation** insured hereunder following an **adverse media report**.

D. EXTENDED REPORTING PERIOD

1. If this Coverage Part is cancelled or non-renewed by the **First Named Insured** or if the **company** refuses to renew the policy for reasons other than non-payment of premium or noncompliance with the terms and conditions of this Coverage Part, then the **First Named Insured** shall have the right, upon payment of an additional premium, to an extension of the coverage granted by this Coverage Part with respect to any **Claim** first made during the period of time elected after the effective date of such cancellation or, in the event of such refusal to renew, after the policy's expiration date, but only with respect to:

a. any **multimedia peril** under Coverage A;

b. any **security and privacy wrongful act** under Coverage B;

c. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;

d. any **covered cause of loss** under Coverage E;

e. any **cyber extortion threat** under Coverage F;

f. any **act of terrorism** under Coverage G;

 © 2015 MedPro Group. All rights reserved.

g. any acts, errors or omissions under Coverages H and L;

h. any **evacuation** under Coverage I;

i. any **disinfection event** under Coverage J;

j. any **public relations event** under Coverage K; or

k. any **data protection breach** under Coverage M;

committed before the effective date of cancellation or, in the event of a refusal to renew, before the policy's expiration date.

2. The quotation of a different premium, **retention** or Limits of Liability for renewal does not constitute a cancellation or refusal to renew.

3. As a condition precedent to the right to purchase the **extended reporting period**, the total premium for the policy must have been paid. The right to purchase the **extended reporting period** shall terminate unless written notice, together with full payment of the premium for the **extended reporting period**, is received by the **company** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to the **company**, there shall be no right to purchase the **extended reporting period**.

4. In the event of the purchase of the **extended reporting period**, the entire premium therefore shall be deemed earned at its commencement.

5. The exercise of the **extended reporting period** shall not in any way increase the **company's** Limits of Liability under this Coverage Part.

## V. ADDITIONAL DEFINITIONS

Only with respect to coverage provided under this Coverage Part, the following additional definitions apply:

A. **Act of terrorism** means an act, including but not limited to, the use of force or violence and/or the threat thereof, by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with any organization(s) or government(s), which is committed for political, religious, ideological, or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

B. **Administrator** means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head or faculty member of an **insured business**.

C. **Adverse media report** means:

1. with respect to Coverage D, any unpredictable report or communication of an actual or potential **security breach**, **privacy breach** or **breach of privacy regulations**, which has been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that threatens material damage to an **insured business's reputation** and which results in the incurring of **privacy breach response costs**;

2. with respect to Coverage M, extracts or completed versions of communications, which have been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that cause negative perception or harm to an **insured business's reputation**, leading to **income loss**.

D. **Assumed under contract** means liability for **damages** resulting from a **multimedia peril** where such liability has been assumed by an **insured** in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**.

E. **Billing errors proceeding** means:

1. civil or administrative investigations or other civil or administrative proceedings instituted against an **insured**

 © 2015 MedPro Group. All rights reserved.

by a **qui tam plaintiff**, **government entity** or **commercial payer** alleging the presentation of, causing or allowing to be presented, or being liable for the presentation of any actual or alleged erroneous billings by an **insured** to a government health benefit payer or **commercial payer** from which the **insured** seeks and/or has received payment or reimbursement for medical services or items provided or prescribed by the **insured**; or

2. any of 1. above instituted against an **insured** as a result of **voluntary self disclosure**.

F. **BPO service provider** means any third party independent contractor that provides business process outsourcing services for the benefit of an **insured business** under a written contract with the **insured business**, including, but not limited to, call center services, fulfillment services, and logistical support.

G. **Breach of privacy regulations** means a breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of any of the following regulations as well as similar statutes and regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191), known as HIPAA, and related state medical privacy laws;
2. Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999;
3. state and Federal statutes and regulations regarding the security and privacy of consumer information;
4. governmental privacy protection regulations or laws associated with the control and use of personal information;
5. privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;
6. Children's Online Privacy Protection Act or similar laws; and
7. the EU Data Protection Act or other similar privacy laws worldwide.

H. **Claim** means:

1. with respect to Coverages A or B:
   a. a written demand received by an **insured** for monetary damages or non-monetary relief against any **insured**;
   b. a written request to toll or waive a statute of limitations relating to a potential **claim** against an **insured**;
   c. the service of a civil suit or the institution of arbitration proceedings against an **insured** seeking **damages** or a temporary restraining order or a preliminary or permanent injunction against an **insured**

   A **claim** under Coverages A or B will be deemed to be first made when notice of any of the foregoing is first received by an **insured**.
2. with respect to Coverage C, a **privacy regulatory proceeding** instituted against an **insured**. A **claim** under Coverage C will be deemed to be first made when it is first received by an **insured**.
3. with respect to Coverage D, a written report by an **insured** to the **company** of an **adverse media report**, **security breach, privacy breach** or **breach of privacy regulations**. A **claim** under Coverage D will be deemed to be first made when such written report is received by the **company**;
4. with respect to Coverage E, a written report by an **insured** to the **company** of the occurrence of a **covered cause of loss**. A **claim** under Coverage E will be deemed to be first made when such written report is received by the **company**.
5. with respect to Coverage F, a written report by an **insured** to the **company** of a **cyber extortion threat**. A **claim** under Coverage F will be deemed to be first made when such written report is received by the

 © 2015 MedPro Group. All rights reserved.

**company**.

6. with respect to Coverage G, a written report by an **insured** to the **company** of an **act of terrorism**. A **claim** under Coverage G will be deemed to be first made when such written report is received by the **company**.
7. with respect to Coverages H and L, a **regulatory proceeding** instituted against an **insured**. A **claim** under Coverage H will be deemed to be first made when it is first received by an **insured**.
8. with respect to Coverages I, J, K and M, a written report by an **insured** to the **company** of an **evacuation**, a **disinfection event**, a **public relations event** or **data protection breach**. A **claim** under Coverages I, J, K and M will be deemed to be first made when such written report is received by the **company**.

I. **Claims expenses** means:

1. reasonable and necessary fees incurred with the **company's** consent and charged by an attorney(s) designated by the **company** to defend a **claim**; and
2. all other reasonable and necessary fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a **claim**, if incurred by the **company**, or by an **insured** with the **company's** prior written consent.

**Claims expenses** do not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any **insured** for any time spent in cooperating in the defense and investigation of any **claim** or any circumstance which might lead to a **claim** notified under this Coverage Part. With respect to Coverage H, **claim expenses** do not include the costs associated with the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of an **insured's** business, negotiated as part of a settlement with or by order of a **government entity**.

J. **Commercial payer** means ay private health insurance company.

K. **Committee member** means a person serving as a member of a committee or board formed or controlled by an **insured business**. **Committee member** also includes any person executing the directives of such a committee or board.

L. **Computer hardware** means the physical components of any computer system including CPU's, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cable, connectors, fiber optics, wire, power supply units, keyboards, display monitors and audio speakers.

M. **Computer program(s)** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. **Computer program(s)** include, but are not limited to, communications, networking, operating system and related **computer programs** used to create, maintain, process, retrieve, store and/or transmit electronic **data**.

N. **Computer system(s)** means interconnected electronic, wireless, web or similar systems (including all **computer hardware** and software) used to process and store **data** or information in an analogue, digital, electronic or wireless format including, but not limited to, computer programs, electronic data, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

O. **Computer virus** means a program that possesses the ability to create replicas of its self (commonly known as 'auto-reproduction' program) within other programs or operating system areas or which is capable of spreading copies of its self wholly or partly to other **computer systems**.

P. **Counseling** means formal therapy rendered to a patient by a licensed professional approved and credentialed by the **insured** to provide such therapy.

 © 2015 MedPro Group. All rights reserved.

Q. **Covered causes of loss** means:

1. Accidental Damage or Destruction

   a. accidental physical damage or destruction of **electronic media**, so that stored **digital assets** are no longer machine-readable;

   b. accidental damage or destruction of **computer hardware**, so that stored **data** is no longer machine-read-able;

   c. failure in power supply or under/over voltage only if such power supply is under the direct operational control of an **insured business**. Direct operational control includes back-up generators;

   d. **programming error** of **delivered programs**; or

   e. electrostatic build-up and static electricity.

2. Administrative or Operational Mistakes

   An accidental, unintentional or negligent act, mistake, error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in:

   a. the entry, or modification of an **insured business's** electronic **data**, which causes damage to such **data**;

   b. the creation, handling, development, modification or maintenance of an **insured business's digital assets**; or

   c. on-going operation or maintenance of an **insured business's computer system**, excluding the design, architecture, or configuration of an **insured business's computer system**;

3. Computer Crime and Computer Attacks

   An act, mistake, negligent error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in the operation of an **insured business's computer system** or in the handling of an **insured business's digital assets**, which fails to prevent or hinder any of the following attacks intended to maliciously cause harm to an **insured business's computer system**:

   a. a **denial of service attack**;

   b. **malicious code**;

   c. **unauthorized access**; or

   d. **unauthorized use**.

R. **Customer notification expenses** means those reasonable and necessary legal expenses, forensic and investigation fees, **public relations expenses**, postage expenses, and related advertising expenses an **insured** incurs, with the **company's** prior written consent, to comply with governmental privacy legislation mandating customer notification in the event of a **security breach**, **privacy breach**, or **breach of privacy regulations**.

S. **Customer support and credit monitoring expenses** means those reasonable and necessary expenses an **insured** incurs, with the **company's** prior written consent, for the provision of customer support activity, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of 12 months from the date of enrollment in such credit file monitoring services, in the event of a **privacy breach**.

T. **Cyber extortion expenses** means all reasonable and necessary costs and expenses an **insured business** incurs, with the **company's** prior written consent, as a direct result of a **cyber extortion threat**, other than **cyber extortion monies**.

U. **Cyber extortion monies** means any funds or property paid by an **insured business**, with the **company's**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat**, for the purpose of terminating such a **cyber extortion threat**.

V. **Cyber extortion threat** means a credible threat or series of related credible threats, including, but not limited to, a demand for **cyber extortion monies**, directed at an **insured business** to:

1. release, divulge, disseminate, destroy or use the confidential information of a third party taken from an **insured** as a result of **unauthorized access** to, or **unauthorized use** of, an **insured business's computer system**;
2. introduce **malicious code** into an **insured business's computer system**;
3. corrupt, damage or destroy an **insured business's computer system**;
4. restrict or hinder access to an **insured business's computer system**, including, but not limited to, the threat of a **denial of service attack**; or
5. electronically communicate with an **insured business's** customers and falsely claim to be the **insured business** or to be acting under the **insured business's** direction in order to falsely obtain personal confidential information of the **insured business's** customers (also known as "pharming," "phishing," or other types of false communications).

W. **Damages** mean a monetary judgment, award or settlement, including prejudgment and post judgment interest and punitive **damages** to the extent insurable under the law pursuant to which this Coverage Part is construed.

**Damages** do not include:

1. any **insured's** future profits or royalties, restitution or disgorgement of any **insured's** profits;
2. the costs to comply with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;
3. loss of any **insured's** fees or profits, return or offset of any **insured's** fees or charges or any **insured's** commissions or royalties provided or contracted to be provided;
4. taxes, fines or penalties or sanctions;
5. the multiple portion of any multiplied **damages**;
6. liquidated **damages**;
7. any amount which an **insured** is not financially or legally obligated to pay;
8. disgorgement of any remuneration or financial advantage to which an **insured** was not legally entitled;
9. settlements negotiated without the **company's** consent; or
10. monetary judgments, awards, settlements or any other amounts which are uninsurable under the law pursuant to which this Coverage Part is construed or any legal fees and costs awarded pursuant to such judgments, awards or settlements.

X. **Data** means any machine readable information, including ready for use programs, applications, account, customer, health and medical information or electronic information subject to back up procedures, irrespective of the way it is used and rendered including, but not limited to, text or digital media.

Y. **Data protection breach** means the appearance of any **adverse media report** that there has been a failure, error, omission, neglect or breach of duty by an **insured**, a **BPO service provider** or **outsourced IT service provider** to protect the security and confidentiality of non-public proprietary corporate information, personally identifiable non-public information of customers or other personal or confidential paper records of customers.

Z. **Delivered programs** means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

AA. **Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a **computer system** by sending an excessive volume of electronic **data** to such **computer system** in order to prevent authorized access to such **computer system**.

BB. **Digital assets** mean **data** and **computer programs** that exist in a **computer system**. **Digital assets** do not include **computer hardware**.

CC. **Digital assets loss** means reasonable and necessary expenses and costs an **insured business** incurs to replace, recreate or restore **digital assets** to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused or stolen, including expenses for materials and machine time as well as costs associated with restoration, recreation and replacement. **Digital Assets Loss** also includes amounts representing **employee** work time to replace, recreate or restore **digital assets** which shall be determined on a predefined billable hours or per hour basis as based upon the **first named insured's** schedule of **employee** billable hours.

DD. **Disinfection event** means any case or series of cases of hospital-borne infectious bacteria, virus or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

EE. **Disinfection expense** means reasonable fees and costs incurred by an **insured business** to clean and disinfect such **insured business** as a result of any **disinfection event**. **Disinfection expense** includes costs to:

1. engage third party providers of cleaning/disinfection services; and
2. notify patients, visitors or other potentially affected persons.

**Disinfection expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured** or the cost of cleaning and/or disinfecting supplies or products.

FF. **E-Discovery claim expenses** means **claim expenses** relating to the collection, processing, converting, reviewing and producing electronically stored information, which is performed solely by an e-discovery service provider designated by the **company** in connection with the investigation and defense of any **regulatory proceeding**.

GG. **E-Discovery consulting services** means e-discovery readiness assessment and consulting services rendered solely by an e-discovery service provider designated by the **company** in connection with the investigation and defense of any **regulatory proceeding**.

HH. **E-Discovery regulatory investigation expenses** means **claim expenses** incurred by an **insured business** for services rendered solely by an e-discovery service provider designated by the **company** in the collection, processing, converting, reviewing and producing electronically stored information in connection with any **regulatory proceeding**.

II. **Electronic media** means floppy disks, CD ROMs, hard drives, magnetic tapes, magnetic discs, or any other media on which electronic **data** is recorded or stored.

JJ. **Employee(s)** means any person employed by, or under contract with, an **insured business** at the time of a **claim**. **Employees** include:

1. any authorized volunteer worker;
2. any physician or dentist, including residents; and
3. any certified registered nurse anesthetist, nurse midwife, nurse practitioner, physician's assistant, podiatrist or surgical assistant.

**Employees** do not include any **administrator**, **committee member** or **student**.

 © 2015 MedPro Group. All rights reserved.

KK. **EMTALA proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA).

LL. **Evacuation** means:

1. the removal of 25% or more of an **insured business's** patients away from the **insured business's** premises to any other premises as a result of any natural or man-made occurrence that, in the reasonable judgment of the **insured business's** management staff, causes or could potentially cause such **insured business** to be unsafe for such patients; and

2. solely with respect to an **insured business's** patients as described in 1. above, the return of such patients to the **insured business's** premises when such premises are deemed safe for occupancy.

MM. **Evacuation expense** means reasonable costs incurred in connection with an **evacuation**, including the costs of transporting and lodging patients. **Evacuation expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured**.

NN. **Firmware** means the fixed programs that internally control basic low-level operations in a device.

OO. **Government entity** means:

1. any department, agency, task force or other organization created by any U.S. federal or state law, regulation, rule or executive order;

2. any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the U.S. federal government or any state government; or

3. any organization operating as a Medicare Integrity Program Contractor.

PP. **Income** means all income of an **insured business** within any given period which is derived from the exploitation of the **insured business's reputation** and/or from the **insured business's** business activities, products or services.

QQ. **Income loss** means financial loss sustained by an **insured business**, as determined in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra Expense.

RR. **Increase in cost of working** means the additional expenditure (other than any advertising or marketing costs or the like undertaken to rehabilitate an **insured business's reputation** and/or any legal costs or expenses) necessarily and reasonably incurred by an **insured business** for the sole purpose of avoiding or minimizing a net trading loss or a reduction in **net profit** which would otherwise have occurred during the **policy period** as a consequence of a **data protection breach**. The amount of such additional expenditure recoverable hereunder shall in no case exceed the amount of the net trading loss or reduction in **net profit** thereby avoided.

SS. **Insured business** means any corporation, entity, partnership or professional association listed as an Insured Business in the Declarations or on a Schedule of Named Insureds.

TT. **Insured business's computer system** means:

1. a **computer system** operated by and either owned by, or leased to an **insured business**;

2. with respect to Coverage B only, a **computer system** operated by a **BPO service provider** or **outsourced IT service provider** and used for the purpose of providing hosted computer application services to an **insured business** or for processing, maintaining, hosting or storing an **insured business's** electronic **data**, pursuant to a written contract with the **insured business** for such services.

UU. **Internet** means the worldwide public network of computers which enables the transmission of electronic **data** between different users, including a private communications network existing within a shared or public network platform.

VV. **Interruption expenses** means those expenses, excluding **special expenses**, incurred by an **insured business**, in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra

 © 2015 MedPro Group. All rights reserved.

Expense, to:

1. avoid or minimize the suspension of business as a result of the total or partial interruption, degradation in service or failure of an **insured business's computer system** caused directly by a **covered cause of loss**, which the **insured business** would not have incurred had no **covered cause of loss** occurred. **Interruption expenses** include, but are not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services or additional staff expenditures or labor costs; and/or

2. minimize or avoid a **covered cause of loss** and continue an **insured business's** business.

The amount of **interruption expenses** recoverable under subparagraph 1 above shall in no case exceed the amount by which the covered **income loss** is reduced by such incurred **interruption expenses**.

WW. **Malicious code** means software intentionally designed to insert itself and damage a **computer system** without the owner's informed consent by a variety of forms including, but not limited to, virus, worm, Trojan horses, spyware, dishonest adware, and crime-ware.

XX. **Multimedia perils** means the release of, or display of, any electronic media on an **insured business's internet** site or **print media** for which an **insured business** is solely responsible, which directly results in any of the following:

1. any form of defamation or other tort related to the disparagement or harm to the **reputation** or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;

2. invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;

3. plagiarism, piracy or misappropriation of ideas under an implied contract;

4. infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or

5. domain name infringement or improper deep-linking or framing.

YY. **Net profit** means an **insured business's** net trading profit (exclusive of all capital receipts and accretions and all outlay improperly chargeable to capital) within any given period generated from an **insured business's income** after due provision has been made for all standing and other charges including depreciation, but before the deduction of any taxation chargeable on profits.

ZZ. **Operational programs** means programs and software which are ready for operational use, having been fully developed, tested, and accepted by an **insured business**.

AAA. **Outsourced IT service provider** means a third party independent contractor that provides information technology services for the benefit of an **insured business** under a written contract with the **insured business**. Outsourced services include, but are not limited to, hosting, security management, co-location, and **data** storage.

BBB. **Period of indemnity** means the period of time elected by an **insured business** which both begins and ends within the period commencing with the date of the first **adverse media report** of a **data protection breach** and continuing thereafter for the time period specified in the policy schedule and not limited by the expiration date of the policy. During the **period of indemnity**, coverage against any further occurrence of any **data protection breach** shall continue only until the expiration date of this policy.

CCC. **Period of restoration** means the period of time that commences on the date when the interruption, degradation or failure of an **insured business's computer system** began and ends on the later of:

1. the date when an **insured business's computer system** is restored or could have been repaired or

 © 2015 MedPro Group. All rights reserved.

restored with reasonable speed to the same condition, functionality and level of service that existed prior to a **covered cause of loss** plus no more than 30 consecutive days after the restoration of an **insured business's computer system** to allow for restoration of the business; or

2. 120 consecutive days after notice of a **covered cause of loss** is received by the **company**.

DDD. **Print media** means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials, including packaging, photographs, and digital images.

EEE. **Privacy breach** means a common law breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of confidentiality, infringement or violation of any right to privacy including, but not limited to, a breach of an **insured business's** privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion or public disclosure of a person's private information. A series of continuing **privacy breaches** or related or repeated **privacy breaches** shall be considered a single **privacy breach** and shall be deemed to have occurred at the time of the first such **privacy breach**.

FFF. **Privacy breach response costs** means those reasonable and necessary fees an **insured** incurs, with the **company's** prior written consent, for the employment of a public relations consultant if an **insured** reasonably considers that action is needed in order to avert or mitigate any material damage to an **insured business's reputation** that results or reasonably will result from an **adverse media report** that has been notified to the **company**.

GGG. **Privacy regulatory proceeding** means a formal civil administrative proceeding or regulatory action instituted against an **insured** by a federal, state or local governmental regulatory body for a **security breach**, **privacy breach** or **breach of privacy regulations**.

HHH. **Programming error** means an error which occurs during the development or encoding of a computer program, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

III. **Property damage** means physical injury to, impairment, destruction, or corruption of any tangible property, including the loss thereof. **Data** is not considered tangible property.

JJJ. **Public relations event** means:

1. any event in which an **insured business** has paid any:
   a. **evacuation expense**; or
   b. **disinfection expense**;
2. any event that results in the publication or broadcast of information which can reasonably be expected to damage an **insured business's reputation**, if such event is caused by:
   a. an actual or alleged act, error or omission in the furnishing or failure to furnish **treatment**;
   b. an abusive act; or
   c. workplace violence or threat of workplace violence.

KKK. **Public relations expenses** means:

1. with respect to Coverage D, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of an **adverse media report**.
2. with respect to Coverage K, reasonable fees and costs incurred by an **insured business** in the investigation and mitigation of a **public relations event** including the costs:
   a. of attorneys, experts and consultants, including third-party media consultants and security consultants;
   b. to notify third parties directly affected by such **public relations event**;

 © 2015 MedPro Group. All rights reserved.

c. incurred in the management of public relations with respect to such **public relations event**; and

d. employee counseling expenses.

3. with respect to Coverage M, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of a **data protection breach**.

However, **public relations expenses** do not include:

1. any salaries, overhead, fees, loss of earnings, or benefit expenses incurred by, or paid to, any **insured**; or

2. **disinfection expense** or **evacuation expense**.

LLL. **Qui tam plaintiff** means a private plaintiff under the U.S. False Claims Act.

MMM. **Recoverable costs** mean, within any period in which an **insured business's net profit** is nil, any standing and other charges incurred by an **insured business** in excess of its **income**, up to, but not exceeding, 20% of its anticipated **net profit** for such period.

NNN. **Regulatory compensatory award** means a sum of money which an **insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party due to an adverse judgment or settlement arising out of a **privacy regulatory proceeding**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

OOO. **Regulatory fines and penalties** mean civil fines or penalties imposed against an **insured** by a **government entity** as a result of a **privacy regulatory proceeding** triggering coverage under Coverage C or a **regulatory proceeding** triggering coverage under Coverage H.

PPP. **Regulatory proceeding** means:

1. With respect to Coverage H, any of the following instituted against an **insured** during the **policy period**:

a. **billing errors proceeding**;

b. **EMTALA proceeding**; or

c. **Stark proceeding**.

2. With respect to Coverage L, any of the following instituted against an **insured** during the **policy period**:

a. any investigation or request for information by the Office for Human Research Protection (OHRP) under Title 45, Part 46, Code of Federal Regulations (45 CFR part 46);

b. any request for information by the Office of Inspector General (OIG) as part of its audits, investigations, inspections and evaluations; or

c. any request for information by the Food and Drug Administration (FDA) as part of its audits, investigations, inspections and evaluations.

QQQ. **Reputation** means the estimation of trust that patients, customers or clients have in doing business with an **insured business** or in purchasing the products or services of an **insured business**.

RRR. **Restitution** means repayment of fees, reimbursement, profits, charges or other benefit payments:

1. received by an **insured** from:

a. a governmental health benefit payer or program, carrier or intermediary making payments as part of, or in connection with, any such program;

b. a **commercial payer**; or

c. any patient.

 © 2015 MedPro Group. All rights reserved.

2. to which such **insured** was not legally entitled by reason of a billing error or errors, the return of which is sought in a **billing errors proceeding**.

SSS. **Retention** means the amount stated in the Declarations applicable to this Coverage Part, which must be borne by the **insureds** uninsured and at their own risk in respect to **damages**, **claim expenses** and any other amounts covered under this Coverage Part. The **company** has no liability to pay **damages**, **claim expenses** or any other amounts covered under this Coverage Part until the **retention** has been fully paid and satisfied by the **insureds**, unless otherwise provided in this Coverage Part. The **retention** shall apply separately to each **claim** under each of the Coverages of this Coverage Part. If a **claim** attaches to more than one of the Coverages of this Coverage Part, only the highest **retention** applies.

TTT. **Retroactive date** means the date stated in the Declarations applicable to this Coverage Part that an **insured** has no coverage under Coverages A, B, C, H or L.

UUU. **Security and privacy wrongful act** mean any of the below, whether actual or alleged, but only if committed or alleged committed by an **insured** in their capacity as such:

1. the failure to prevent or hinder **unauthorized access** to or **unauthorized use** of an **insured business's computer system**; security failures; or social engineering techniques devised to trick the user into surrendering personal information ('phishing' or 'pharming') that in turn results in:
   a. the alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on an **insured business's computer system**;
   b. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of an **insured business**;
   c. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a **BPO service provider** or **outsourced IT service provider** that is holding, processing or transferring such information on behalf of an **insured business**; provided, however, that the theft, loss or unauthorized disclosure occurs while an **insured business's** written contract with such **BPO service provider** or **outsourced IT service provider** is still in effect; or
   d. **unauthorized use** of or **unauthorized access** to a **computer system** other than an **insured business's computer system**.
2. an **insured business's** failure to timely disclose a **security breach** affecting personally identifiable, non-public information, or the failure to dispose of personally identifiable information within the required time period, in **breach of privacy regulations** in effect now or in the future;
3. the failure to prevent the transmission of **malicious code** or **computer virus** from an **insured business's computer system** to the **computer system** of a third party;
4. a **privacy breach** or **breach of privacy regulations**;
5. the failure to prevent or hinder participation by an **insured business's computer system** in a **denial of service attack** directed against **internet** sites or the **computer system** of any third party; or
6. loss of **employee** information.

VVV. **Security breach** means:

1. **unauthorized access** to or **unauthorized use** of an **insured business's computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from an **insured business's computer system** or from any **insured**;
2. a **denial of service attack** against an **insured business's computer system**; or

 © 2015 MedPro Group. All rights reserved.

3. infection of an **insured business's computer system** by **malicious code** or the transmission of **malicious code** from an **insured business's computer system**,

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security, shall be considered a single **security breach** and be deemed to have occurred at the time of the first such **security breach**.

WWW. **Shadow audit** means an audit performed by a qualified professional, which examines the same billing records and related documents as those subject to an ongoing **billing errors proceeding**, with the intent of providing an **insured** with a private expert opinion. Such **shadow audits** are subject to the **company's** prior approval.

XXX. **Shadow audit expenses** means the fees for the services of a qualified audit professional and associated expenses incurred by an **insured** in the course of a **shadow audit**.

YYY. **Social services** means programs provided by an **insured** to help maintain or improve the quality of life for the patient, including family counseling and educational programs. These programs do not include therapy for the direct benefit of anyone other than the patient.

ZZZ. **Special expenses** means reasonable and necessary costs and expenses an **insured business** incurs to:

1. prevent, preserve, minimize, or mitigate any further damage to an **insured business's digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts an **insured business** retains;
2. preserve critical evidence of any criminal or malicious wrongdoing;
3. purchase replacement licenses for **computer programs** because the copy protection system and/or access control software was damaged or destroyed by a **covered cause of loss**; or
4. notify customers of a total or partial interruption, degradation in service or failure of an **insured business's computer system** resulting from a **covered cause of loss**.

AAAA. **Stark proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violation of any federal, state or local anti-kickback or self-referral laws.

BBBB. **Student** means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by an **insured business** relative to the delivery of **treatment**.

CCCC. **Time retention** means the number of hours that must elapse, as provided in the Declarations applicable to this Coverage Part before the recovery of loss under Coverage E.2., Non-Physical Business Interruption and Extra Expense, or Coverage G, can be considered.

DDDD. **Unauthorized access** means the gaining of access to a **computer system** by an unauthorized person or persons.

EEEE. **Unauthorized use** means the use of a **computer system** by an unauthorized person or persons or an authorized person in an unauthorized manner.

FFFF. **Voluntary self disclosure** means an **insured** discloses information, without inquiry, to any **government entity** or **commercial payer**, which may serve as grounds for a **billing errors proceeding** against an **insured**. Such information must have become known to the **insured** fortuitously and subsequent to the initial effective date of this insurance.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 2 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET ADDITIONAL INSURED ENDORSEMENT (PROFESSIONAL LIABILITY)

Only with respect to coverage provided under this endorsement and under the Professional Liability Coverage Part, and in consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The definition of **additional insured** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

**Additional insured** means any person or organization with which the **insured** has entered into a written contract or agreement prior to the **loss** agreeing:

a. to add the person or organization as an **additional insured**; or

b. to hold harmless or indemnify such person or organization.

However, such person or organization is not an **additional insured** with respect to **losses** arising from, or in connection with, any acts or omissions alleged to have been committed by that **additional insured**.

The following subparagraph is added to all Insuring Clauses of the Professional Liability Coverage Part:

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an **insured** is required by written contract or agreement to provide to that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured**.

The following provision is added to the Limits of Liability section of the Professional Liability Coverage Part:

ADDITIONAL INSUREDS

All **additional insureds** share the Limits of Liability applicable to any **claim** with any **insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 3 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CRISIS RESPONSE COSTS ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

CRISIS RESPONSE COSTS LIMIT

The Crisis Response Costs Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Crisis Response Costs Insuring Clause for **crisis response costs** because of a **crisis event**:

Crisis Response Costs Aggregate Limit: $25,000

The Crisis Response Costs Aggregate Limit shown above is the most the **company** will reimburse for all **crisis response costs** for all **crisis events** regardless of the number of **insureds** or **crisis events**. The Crisis Response Costs Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

CRISIS RESPONSE COSTS

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **crisis response costs** paid by the **named insured** in connection with a single **crisis event** that occurs during this **policy period**, subject to the Crisis Response Costs Aggregate Limit. The **crisis response costs** must be incurred by a **named insured** within 30 days after the commencement of the **crisis event**. The end of the policy will not cut short this 30 day period.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR CRISIS EVENTS

The **company's** duty to reimburse a **named insured** for any **crisis response costs** is conditioned upon:

1. an **authorized insured** providing notice of a **crisis event** to the **company** via telephone call to (800) 463-3776 or electronic message no later than 24 hours after the **crisis event**;
2. an **authorized insured** notifying the **company** in writing as soon as possible:
   a. how, when and where the **crisis event** took place;
   b. the names and addresses of any witnesses or **affected persons**; and,

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

c. the nature and location of any injury or damage arising out of the **crisis event**.

3. the **insured** taking all reasonable steps to prevent a **crisis event** and to mitigate any **crisis response costs**; and,
4. a request for reimbursement of **crisis event costs**, along with all invoices or receipts support such **crisis response costs** in excess of $50, must be submitted to the **company** within 90 days after incurring such **crisis response costs**.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Affected persons** means those individuals who suffer direct **bodily injury** or **property damage**, or directly experience **imminent injury**.

**Crisis event** means a man-made emergency situation, including but not limited to, arson, bombing, the taking of hostages, a mass shooting, terrorism, intentional contamination of food, drink or pharmaceuticals that results in **bodily injury**, **property damage**, or **imminent injury** to multiple persons and significant adverse regional or national news media coverage. A **crisis event** does not include a certified act of terrorism.

**Crisis response costs** means:

1. reasonable and necessary fees and expenses incurred by a **crisis management firm** or by an **named insured** in order to provide public relations and media management services for the purposes of maintaining an **insured's** reputation;
2. printing, advertising, or mailing costs incurred in order to manage the reputational risk of an **insured**;
3. reasonable and necessary **emergency psychology expenses**, **emergency travel expenses**, funeral expenses, travel expenses, and temporary living expenses for **affected persons**;
4. reasonable and necessary travel expenses and hotel accommodations for immediate family members of **affected persons**; or,
5. expenses to secure the scene of a **crisis event**.

**Crisis response costs** do not include **claims expense** or salaries paid by an **insured**.

**Crisis management firm** means a public relations firm assigned or approved by the **company** in writing that is hired by a **named insured** to perform services to protect and maintain the reputation of an **insured**.

**Emergency psychology expenses** means reasonable and necessary expenses for psychological or counseling services provided to **affected persons** and incurred within the first 14 days after a **crisis event**. This does not include the costs of any medications or hospitalizations. Such **emergency psychology expenses** must be approved by the **crisis management firm**, if hired, or in the alternative, by the **company**.

**Emergency travel expenses** means reasonable and necessary expenses occurring within 24 hours after a **crisis event** to transport an **affected person** sustaining **bodily injury** in a **crisis event** to a medical treatment facility.

**Imminent injury** means the actual and immediate threat of **bodily injury** or **property damage**.

Only with respect to coverage provided under this endorsement, the definitions of **event** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced by the following:

**Event** means an accident and a **crisis event**. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or,
2. the continuous or repeated exposure to substantially the same harmful conditions;

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event.**

Only with respect to coverage provided under this endorsement, the following exclusions are added to the Exclusions Applicable To This Coverage Part section of the General Liability Coverage Part:

Infections Disease Or Illness

Any request for reimbursement of **crisis response costs** related to a **crisis event** that was caused by any infectious disease or illness caused by any bacterium, virus or fungus.

Crisis Response Costs

Any element of damages that have been paid by the **company** as **crisis response costs** under this endorsement which arises in any other **claim** or **potential claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 4 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## DISEASE CONTAMINATION CLEAN-UP EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

DISEASE CONTAMINATION CLEAN-UP EXPENSE LIMIT

The Disease Contamination Clean-up Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Disease Contamination Clean-Up Expenses Insuring Clause for **clean-up expenses** because of **a superbug contamination**:

Disease Contamination Clean-up Expense Aggregate Limit: $25,000

The Disease Contamination Clean-up Expense Aggregate Limit shown above is the most the **company** will reimburse for all **clean-up expenses** for all **superbug contaminations** regardless of the number of **insureds** or **superbug contaminations**. The Disease Contamination Clean-up Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

DISEASE CONTAMINATION CLEAN-UP EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **clean-up expenses** paid by the **named insured** in connection with a **superbug contamination** that occurs during this **policy period**, subject to the Disease Contamination Clean-up Expense Aggregate Limit.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Clean-up expenses** means reasonable costs and expenses incurred by a **named insured** to hire a third party to disinfect an **insured's** location as a result of a **superbug contamination**. **Clean-up expenses** shall not include any salaries, benefits, remuneration or overhead of a **named insured**.

Only with respect to coverage provided under this endorsement, the Contaminations exclusion in the Exclusions Applicable to this Coverage Part section of the General Liability Coverage Part is deleted.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 5 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## EMERGENCY EVACUATION EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

EMERGENCY EVACUATION EXPENSE LIMIT

The Emergency Evacuation Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Emergency Evacuation Expenses Insuring Clause for **emergency evacuation expenses** because of an **emergency evacuation**:

Emergency Evacuation Expense Aggregate Limit: $50,000

The Emergency Evacuation Expense Aggregate Limit shown above is the most the **company** will reimburse for all **emergency evacuation expenses** for all **emergency evacuations** regardless of the number of **insureds** or **emergency evacuations**. The Emergency Evacuation Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

EMERGENCY EVACUATION EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **emergency evacuation expenses** paid by the **named insured** in connection with an **emergency evacuation** that occurs during this **policy period**, subject to the Emergency Evacuation Expense Aggregate Limit.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR EMERGENCY EVACUATIONS

The **company's** duty to reimburse a **named insured** for any **emergency evacuation expense** is conditioned upon:

1. an **authorized insured** forwarding notice of an **emergency evacuation** to the **company** no later than 60 days after the **emergency evacuation**;
2. an **authorized insured** notifying the **company** of any other insurance policy, prepaid legal service contract or legal practitioner retainer agreement available with respect to such **emergency evacuation**;
3. the **insured** taking all reasonable steps to prevent an **emergency evacuation** and to mitigate any **emergency evacuation expenses**; and,

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

4. an **insured** not taking any action, or failing to take any action, without the written consent of the **company**, which would otherwise prejudice the **company's** rights under this policy.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Emergency evacuation** means an evacuation of a **named insured's** location because a determination is made by the **named insured** that imminent danger exists arising from an external event or a condition in the **named insured's** location which would cause loss of life or harm to patients or **residents**. **Emergency evacuation** does not include an evacuation arising from:

1. a strike, bomb threat or false fire alarm, unless vacating is ordered by a civil authority;
2. a planned vacating drill;
3. the vacating of one or more patients or **residents** that is due to, and confined to, an individual's medical condition;
4. a governmental action;
5. a nuclear hazard; or,
6. war or military action.

**Emergency evacuation expenses** means reasonable costs and expenses incurred by a **named insured** to perform an **emergency evacuation**. **Emergency evacuation expenses** do not include:

1. **claims expense**;
2. any other expenses incurred by an **employee**, volunteer, or other person providing assistance with, in any part of, or included in, the **emergency evacuation**; or,
3. the remuneration, salaries, overhead or benefit expenses of an **insured**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 6 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## EMPLOYEE BENEFITS LIABILITY ENDORSEMENT (GENERAL LIABILITY) (CLAIMS-MADE AND REPORTED COVERAGE)

**NOTICE:**

**This endorsement contains claims-made and reported coverage. Please read this endorsement carefully.**

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Insuring Clauses section of the General Liability Coverage Part:

EMPLOYEE BENEFITS LIABILITY

1. Claims-Made and Reported

   If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

   a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** related to the **administration** of **employee benefits** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

      (1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or,

      (2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

   b. All **claims** and **potential claims** for damages arising out of, or in connection with, the same **event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

**extended reporting period**.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Administration** means:

1. providing information to **employees**, including their dependents and beneficiaries, with respect to eligibility for or scope of an **employee benefits** program;
2. handling records in connection with an **employee benefits** program; or,
3. effecting, continuing, or terminating any **employee's** participation in any **employee benefits** program.

**Administration** does not include handling payroll deductions.

**Employee benefits** means any group benefits administered on behalf of a **named insured's employees**, including:

1. group insurance plans or programs, such as life, health, accident, dental, or legal advice;
2. Individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;
3. travel or vacation plans; or,
4. workers' compensation, occupational disease, unemployment, Social Security, or disability benefits insurance.

Only with respect to coverage provided under this endorsement, the following exclusion is deleted from the Exclusions section of the Common Policy Provisions and Conditions:

EMPLOYEE BENEFITS LIABILITY

The following provisions are added to the Exclusions section of the General Liability Coverage Part:

EXCLUSIONS APPLICABLE TO THE EMPLOYEE BENEFITS LIABILITY INSURING CLAUSE

The coverage provided under the Employee Benefits Liability Insuring Clause does not apply to:

1. BODILY INJURY, PROPERTY DAMAGE AND PERSONAL AND ADVERTISING INJURY

   Any **claim** arising from, or in connection with, **bodily injury**, **property damage**, or **personal and advertising injury**.

2. CLAIM FOR BENEFITS WHERE FUNDS AVAILABLE WITH REASONABLE COOPERATION

   Any **claim** for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the **insured**, from the applicable funds accrued or other collectible insurance.

3. COLLECTIVE BARGAINING

   Any **claim** arising from, or in connection with, the breach of any collective bargaining agreement.

4. ERISA

   Any **claim** arising from, or in connection with, an **insured's** duty as a sponsor of an employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto. However, this exclusion is limited to:

   a. an **insured's** failure or inability to fund the plan in accordance with the plan document or any applicable law

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

or regulation; and

b. liability for the payment of benefits owed to a participant or beneficiary of the plan that have been paid or may lawfully be paid from the plan's funds or those of other employee programs.

5. FAILURE TO PERFORM UNDER A CONTRACT

Damages arising out of the failure of an insurer to perform under a contract.

6. HEALTH CARE EVENT

Any **claim** arising from, or in connection with, any **health care event**.

7. PERFORMANCE OF INVESTMENTS AND ADVICE GIVEN REGARDING EMPLOYEE BENEFITS

Any **claim** arising from, or in connection with:

a. errors in providing information on past performance of investment vehicles; or

b. advice given to any person with respect to that person's decision to participate or not to participate in any **employee benefits** plan.

8. UNPAID OBLIGATIONS UNDER EMPLOYEE BENEFIT PLAN

Any **claim** arising from, or in connection with, damages arising out of an insufficiency of funds to meet any obligations under any plan included as an **employee benefit**.

The following provisions are added to the Limits of Liability Section of the General Liability Coverage Part:

EMPLOYEE BENEFITS LIABILITY PER EVENT LIMIT

The Employee Benefits Liability Per Event Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expenses** under the Employee Benefits Liability Insuring Clause because of **bodily injury** arising out of any one **event**.

EMPLOYEE BENEFITS LIABILITY AGGREGATE LIMIT

The Employee Benefits Liability Aggregate Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expenses** because of **bodily injury** included in the Employee Benefits Liability Insuring Clause.

Only with respect to the Employee Benefits Liability Insuring Clause, the Settlement condition in the Conditions section of the Common Policy Provisions and Conditions is deleted and replaced by the following:

SETTLEMENT

The **company** may settle any **claim**, **potential claim,** or other matter brought against an **insured** as the **company** deems expedient. However, the **company** shall first provide written notice to the **first named insured**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 7 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## MEDIA EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following new provision is added to the Limits of Liability section of the General Liability Coverage Part:

MEDIA EXPENSE LIMIT

The Media Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Media Expenses Insuring Clause for all **formal proceedings**:

Media Expense Aggregate Limit: $50,000

The Media Expense Aggregate Limit shown above is the most the **company** will reimburse for all **media expenses** for all **formal proceedings** regardless of the number of **insureds** or **formal proceedings.** The Media Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

MEDIA EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **media expenses** paid by the **named insured** in connection with a **formal proceeding** that occurs during this **policy period**, subject to the Aggregate Medial Expense Limit. The **media expense** must be incurred by a **named insured** within 6 months following the discovery of a **formal proceeding**.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR FORMAL PROCEEDINGS

The **company's** duty to reimburse a **named insured** for **media expenses** is conditioned upon:

1. an **authorized insured** forwarding notice of a **formal proceeding** to the **company** no later than 60 days after the first discovery of the **formal proceeding**;
2. an **authorized insured** notifying the **company** of any other insurance policy, prepaid legal service contract or legal practitioner retainer agreement available with respect to such **formal proceeding**;
3. the **insured** taking all reasonable steps to prevent a **formal proceeding** and to mitigate any **media expenses**; and,
4. an **insured** not taking any action, or failing to take any action, without the written consent of the **company**, which would otherwise prejudice the **company's** rights under this policy.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Media expenses** means reasonable costs and expenses incurred by a **named insured** to manage a **formal proceeding** or other public relations expenses incurred to hire public relations experts and consultants. **Media expenses** do not include any reimbursement of salaries, overhead, fees, loss of earnings, or reimbursement of benefit expenses of an **insured**.

**Formal proceeding** means a criminal or civil investigation, complaint or formal administrative proceeding initiated against an **insured** relating to an actual or alleged violation or infringement if any federal, state or local law designed to protect **resident's rights**.

The following exclusion is added to the Exclusions Applicable To This Coverage Part section of the General Liability Coverage Part:

Prior Known Formal Proceedings

Any request for reimbursement of **media expenses** related to a **formal proceeding** of which any **authorized insured** knew or should have known of prior to the occurrence of such **formal proceeding.**

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 8 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## PATIENT'S PERSONAL PROPERTY ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

PATIENTS PERSONAL PROPERTY

| | |
|---|---|
| Patient's Property Per Person Per Event Limit: | $5,000 |
| Patient's Property Aggregate Limit: | $25,000 |
| Patient's Property Deductible: | $250 |

Subject to the General Aggregate Limit and the Per Event Limit, the Patient's Property Per Person Per Event Limit shown above is the most the **company** will pay, subject to the Patient's Property Deductible set forth above, under the Bodily Injury and Property Damage Insuring Clause for **loss** and **claims expense** because of **property damage** to a **patient's** personal property sustained by any one person or arising out of one **event**.

Subject to the General Aggregate Limit, the Patient's Property Aggregate Limit shown above is the most the **company** will pay under the Bodily Injury and Property Damage Insuring Clause for **loss** and **claims expense** because of **property damage** to a **patient's** personal property.

Only with respect to coverage provided under this endorsement, the Damage to Property exclusion in the Exclusions section of the General Liability Coverage Part is deleted and replaced with the following:

Damage to Property

**Property damage** to:

a. property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. premises an **insured** sells, gives away, or abandons if the **property damage** arises out of, or in connection with, any part of those premises;

c. property loaned to an **insured**;

d. personal property in the care, custody, or control of an **insured**, except that the **company** agrees to reimburse the **insured** for damages they become legally obligated to pay to a **patient** for **property damage** to the **patient's** personal property, which occurred while such property was in the care, custody, or control of the **insured**. The reimbursement for each such **patient** shall not exceed the Patient's Property Per Person Limit, minus the Patient's Property Deductible;

 © 2015 MedPro Group. All rights reserved.

e. that particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of the **insured**, are performing operations if the **property damage** arises out of those operations; or

f. that particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a, c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an Insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the **insured's work** and were never occupied, rented, or held for rental by the **insured**.

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard**.

Only with respect to coverage provided under this endorsement, the following definition applies:

**Patient** means a person receiving **treatment** at an **insured's** facility.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 9 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET ADDITIONAL INSURED ENDORSEMENT (GENERAL LIABILITY)

Only with respect to coverage provided under this endorsement and under the General Liability Coverage Part, and in consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The definition of **additional insured** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

**Additional insured** means any person or organization with which the **insured** has entered into a written contract or agreement prior to the **loss** agreeing:

a. to add the person or organization as an **additional insured**; or

b. to hold harmless or indemnify such person or organization.

However, such person or organization is not an **additional insured** with respect to **losses** arising from, or in connection with, any acts or omissions alleged to have been committed by that **additional insured**.

The following subparagraph is added to all Insuring Clauses of the General Liability Coverage Part:

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an **insured** is required by written contract or agreement to provide to that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured**.

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

ADDITIONAL INSUREDS

All **additional insureds** share the Limits of Liability applicable to any **claim** with any **insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 10 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

CERTIFIED ACTS OF TERRORISM

If losses covered by insurance that are attributable to **certified acts of terrorism** in a calendar year exceed $100 billion in the aggregate, and the **company** has met its deductible amount under the **TRIA Act** for that calendar year, the **company** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, the losses are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

Only with respect to coverage provided under the General Liability Coverage Part, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the **TRIA Act**, to be an act of terrorism pursuant to the **TRIA Act**. The **TRIA Act** sets forth the following criteria for a **certified act of terrorism**:

1. The act resulted in losses covered by insurance in excess of $5,000,000 in the aggregate, attributable to all types of insurance subject to the **TRIA Act**;
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The act must have resulted in damage within the United States including its territories and possessions and Puerto Rico, or outside the United States in cases of an air carrier or vessel meeting the definitions of such as provided in the **TRIA Act**, or the premises of a United States mission; and
3. No act of terrorism shall be certified if the act is committed as a part of the course of a war declared by Congress.

**TRIA Act** means the federal Terrorism Risk Insurance Act of 2002, as extended on December 22, 2005, and amended on December 31, 2007 and January 12, 2015.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

# Exhibit 32

1042085 Diary

| Select | View | Notes | Assignee | Assignor | Source No | Type | Activity | Import Level | Orig Sched | Current Sched | Completed Date | Completed/Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085-01 | Suit | Claim Closed | 1 | 5/7/2025 | 5/7/2025 | 5/7/2025 | COMPLETE |
| off | View | No | Hubert, Sarah | Nollenberger, Leah | 1042085 | Suit | Request Close Claim | 1 | 5/7/2025 | 5/7/2025 | 5/7/2025 | COMPLETE |
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085 | Suit | Closing Statutory Report - NR | | 5/7/2025 | 5/7/2025 | 5/7/2025 | COMPLETE |
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085 | Suit | NPDB Report - NR | | 5/7/2025 | 5/7/2025 | 5/7/2025 | COMPLETE |
| off | View | No | Nollenberger, Leah | Nollenberger, Leah | 1042085 | Suit | Follow-up | | 12/23/2024 | 12/23/2024 | 1/24/2025 | COMPLETE |
| off | View | No | Nollenberger, Leah | Nollenberger, Leah | 1042085 | Suit | Follow-up | | 12/13/2024 | 12/13/2024 | 12/17/2024 | COMPLETE |
| off | View | No | Nollenberger, Leah | Nollenberger, Leah | 1042085 | Suit | Follow-up | | 12/2/2024 | 12/2/2024 | 12/9/2024 | COMPLETE |
| off | View | No | Nollenberger, Leah | Nollenberger, Leah | 1042085 | Suit | Follow-up | | 10/31/2024 | 10/31/2024 | 11/22/2024 | COMPLETE |
| off | View | No | Nollenberger, Leah | Nollenberger, Leah | 1042085 | Suit | Follow-up | | 9/30/2024 | 9/30/2024 | 10/23/2024 | COMPLETE |
| off | View | No | Nollenberger, Leah | Hubert, Sarah | 1042085 | Suit | FM New Assignment | 1 | 9/26/2024 | 9/26/2024 | 9/26/2024 | COMPLETE |
| off | View | No | Bevans, Sandra | Bevans, Sandra | 1042085 | Suit | 30 Day Review | 1 | 3/27/2024 | 10/31/2024 | 9/26/2024 | COMPLETE |
| off | View | No | Mains, Matt | Mains, Matt | 1042085 | Suit | Res Code Insufficient Info to Post Res | 1 | 3/19/2024 | 3/19/2024 | 1/17/2024 | COMPLETE |
| off | View | No | Bevans, Sandra | Mains, Matt | 1042085 | Suit | Follow-up | | 1/22/2024 | 3/26/2024 | 3/19/2024 | COMPLETE |
| off | View | No | Mains, Matt | Mains, Matt | 1042085 | Suit | Res Code Insufficient Info to Post Res | 1 | 12/19/2023 | 12/19/2023 | 12/20/2023 | COMPLETE |
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085-01 | Suit | Claim Reopened | 1 | 9/19/2023 | 9/19/2023 | 9/19/2023 | COMPLETE |
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085-01 | Suit | Claim Reopened | 1 | 9/19/2023 | 9/19/2023 | 9/19/2023 | COMPLETE |
| off | View | No | Mains, Matt | Hubert, Sarah | 1042085 | Suit | Reserve Review | | 9/19/2023 | 9/19/2023 | 9/20/2023 | COMPLETE |
| off | View | No | Hubert, Sarah | Hubert, Sarah | 1042085 | Suit | Open Statutory Report - NR | | 9/19/2023 | 9/19/2023 | 9/19/2023 | COMPLETE |
| off | View | No | Mains, Matt | Hubert, Sarah | 1042085 | Suit | Claim Reopened | 1 | 9/19/2023 | 9/19/2023 | 9/20/2023 | COMPLETE |
| off | View | No | Prudlow, Pamela | Prudlow, Pamela | 1042085-01 | Suit | Claim Closed | 1 | 5/23/2017 | 5/23/2017 | 5/23/2017 | COMPLETE |
| off | View | No | Prudlow, Pamela | Ballester, Christina | 1042085 | Suit | Request Close Claim | 1 | 5/9/2017 | 5/10/2017 | 5/23/2017 | COMPLETE |
| off | View | No | Prudlow, Pamela | Prudlow, Pamela | 1042085-01 | Suit | Induction | 1 | 4/7/2017 | 4/7/2017 | 4/7/2017 | COMPLETE |
| off | View | No | Ballester, Christina | Prudlow, Pamela | 1042085-01 | Suit | FM New Assignment | 1 | 4/7/2017 | 4/7/2017 | 4/24/2017 | COMPLETE |
| | | | | | | | | | | | | |

EXHIBIT

No. 32

exhibitsticker.com

# Exhibit 34

EXHIBIT
No. 34

FMG LAW
Freeman Mathis & Gary LLP

550 South Hope Street
Suite 2200
Los Angeles, CA 90071-2631

Tel: 213.615.7000

www.fmglaw.com

**Albert K. Alikin**

D: 213.615.7029
C: 626.215.1537

Albert.Alikin@fmglaw.com

September 11, 2023

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Lighthouse Healthcare Center, LLC
C/O Avi Wagner
The Wagner Firm
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Email: avi@thewagnerfirm.com

| | | |
|---|---|---|
| **RE:** | **Case Name:** | *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.* |
| | **Case No.:** | BC664101 |
| | **Venue:** | California Superior Court, County of Los Angeles |
| | **Claim No.:** | 1042085 |
| | **Insured:** | Lighthouse Healthcare Center, LLC |
| | **Policy No.:** | NSC100276 |
| | **Policy Period:** | 03/01/2017 to 03/01/2018 |

Dear Mr. Wagner:

We are coverage counsel for MedPro Group on behalf of National Fire & Marine Insurance Company, as administered by the Medical Protective Company Omaha, Nebraska ("MedPro") in connection with the above-referenced lawsuit against Lighthouse Healthcare Center, LLC ("Insured") and other defendants, entitled *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.*, that was filed in California Superior Court, County of Los Angeles, Case No. BC664101 ("Claim"). This correspondence is directed to you in your capacity as an authorized representative of the Insured for insurance coverage purposes. To the extent that you are not acting on behalf of the Insured with respect to insurance matters, we request that you direct a copy of this letter to the appropriate representative and advise the undersigned accordingly.

MedPro is currently investigating whether there is coverage for the Claim under the above-referenced policy issued to the Insured under a full reservation of all rights under the policy and at law. However, MedPro understands that a default was entered against the Insured on or about January 17, 2023. **Please be advised that MedPro has retained counsel on the Insured's behalf to seek to have the default judgment vacated while MedPro continues its coverage investigation.** In the interim, MedPro

FMG LAW Freeman Mathis & Gary LLP



continues to reserve all rights available under the policy, including the policy provisions discussed below, and at law.

This letter does not modify the terms and conditions of the policy identified below. Nothing contained in this letter, or any other communication issued by us or MedPro should be construed as an admission of coverage or liability by MedPro, or as a waiver, estoppel, or prejudice of any kind to MedPro's rights and defenses unless we expressly state otherwise.

**BACKGROUND**

Our understanding of the claim is based on information we have been provided to date. In providing you with a summary of the relevant facts and allegations in the Claim, we do not mean to suggest they are true, but rather, that they form the basis of the Claim and MedPro's coverage position.

On or about March 7, 2017, the Insured provided MedPro with a copy of the Notice of Intent Commence Action Against Health Care Provider ("Notice") from Dean Donnell as an individual and as personal representative of the Estate of Valerie Donnell (collectively, "Claimants") dated March 1, 2017. According to the Notice, the Claimants alleged that decedent Valerie Donnell died as a result of "diagnosis, treatment, surgery and/or care that occurred on or about, without limitation, May 1, 2016 to June 24, 2016 at the various offices and facilities of" several entities, including the Insured. On or about August 21, 2023, MedPro was provided with a copy of a default judgment entered against the Insured dated January 17, 2023.

According to the information MedPro has been provided, Claimants allege the Insured failed to provide decedent Valerie Donnell with proper care when she was discharged to the Insured's facility beginning on June 23, 2016. Claimants allege the decedent died on June 24, 2016 while in the Insured's care because of a cardiopulmonary arrest caused by physical abuse and neglect by the Insured. The Claimants allege the following causes of action against the Insured: (1) professional negligence; (2) negligence; (3) wrongful death; and (4) dependent abuse.

**THE POLICY**

MedPro issued Senior Care Liability Policy No. NSC100276 to Lighthouse Healthcare Center, LLC, which was in effect from March 1, 2017 to March 1, 2018 ("Policy"). The Policy provides in relevant part as follows:

***COMMON POLICY PROVISIONS AND CONDITIONS***

**III. EXCLUSIONS**

…



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER 

FMG LAW Freeman Mathis & Gary LLP



G. DEFAULT JUDGMENT

Damages that an **insured** becomes legally obligated to pay resulting from a default judgment or other **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**.

…

**V. <u>CONDITIONS</u>**

…

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.

2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditions upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses;

   d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

   e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

...

P. REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.

...

3. All such reports and documents shall be:

a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

b. in writing; and

c. include the following information:

(1) the identity of all **insureds** implicated;

(2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

(3) the nature and extent of the injury;

(4) the names and addresses of any injured persons;

(5) the names and addresses of available witnesses; and

(6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER LH_00009619

**COVERAGE ANALYSIS**

The Claim was first reported to MedPro on March 7, 2017 when MedPro received a copy of the Claimants' Notice. On August 21, 2023, MedPro received a copy of a default judgment entered against the Insured back on January 17, 2023, over eight (8) months earlier.

Pursuant to Policy Condition P., Reporting Requirements, and Condition C., Assistance and Cooperation, coverage under the Policy is conditioned upon the Insured timely reporting a claim and cooperating with MedPro in the investigation, defense, and/or settlement of any matter. Accordingly, MedPro reserves all rights under Policy Condition P., Reporting Requirements, and Condition C., Assistance and Cooperation, including the right to disclaim coverage for the Insured's breach of those provisions.

Additionally, the Policy's Exclusion F., Default Judgment bars coverage for any default judgment against the Insured when MedPro "was unable to timely investigate or defend due to the acts or omissions of any **Insured**." MedPro's appointed defense counsel will seek to vacate the default judgment against the Insured. However, if defense counsel is unsuccessful, MedPro reserves all rights to the extent Exclusion F. applies.

**CONCLUSION**

If you believe that MedPro has failed to understand all of the facts, or if you believe there is any additional information that MedPro should consider in connection with this claim, please provide us with such details as soon as possible. However, you should not construe our willingness to consider any additional information as anything other than our desire to be fair and reasonable. The coverage position outlined in this letter is MedPro's present coverage position unless we expressly advise you to the contrary in writing.

MedPro continues to reserve all of its rights. MedPro provides this letter without waiving any, but expressly reserving all of its rights. Neither this correspondence nor any investigation conducted by MedPro into the facts or circumstances of the claim is intended to be, or should be, construed as a waiver of any kind. MedPro expressly reserves the right to rely upon other grounds not specifically referenced in any communication. This correspondenceis not intended to be exhaustive of all coverage issues.

MedPro's coverage position in this letter is based on the information and documents provided to date and is subject to further evaluation if additional information or documents become available. MedPro expressly reserves all rights to modify its coverage position or deny coverage on alternative bases.

California law requires that you be advised that if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

FMG LAW Freeman Mathis & Gary LLP



**California Department of Insurance**
**Claims Service Bureau**
**300 S. Spring Street, 11th Floor**
**Los Angeles, California 90013**
**(213) 346-6523**
**(800) 927-4357**
**www.insurance.ca.gov**

Please do not hesitate to contact the undersigned should you have any questions regarding any aspect of this matter.

Very truly yours,

**FREEMAN MATHIS & GARY, LLP**

Albert K. Alikin

AKA: njd

cc: Louise Hensleigh (louise.hensleigh@medpro.com)

# Exhibit 35

EXHIBIT

No. 35

FMG LAW Freeman Mathis & Gary LLP

550 South Hope Street
Suite 2200
Los Angeles, CA 90071-2631

Tel: 213.615.7000

www.fmglaw.com

**Albert K. Alikin**

D: 213.615.7029
C: 626.215.1537

Albert.Alikin@fmglaw.com

July 31, 2024

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Lighthouse Healthcare Center, LLC
C/O Avi Wagner
The Wagner Firm
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Email: avi@thewagnerfirm.com

| | | |
|---|---|---|
| **RE:** | **Case Name:** | *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.* |
| | **Case No.:** | BC664101 |
| | **Venue:** | California Superior Court, County of Los Angeles |
| | **Claim No.:** | 1042085 |
| | **Insured:** | Lighthouse Healthcare Center, LLC |
| | **Policy No.:** | NSC100276 |
| | **Policy Type:** | **Professional Liability – Claims-Made and Reported** |
| | **Policy Limits:** | Professional Liability - $1,000,000 per event/$3,000,000 Aggregate; $25,000 per event deductible |
| | **Policy Period:** | 03/01/2017 to 03/01/2018 |
| | **Retroactive Date:** | 03/01/2007 |

**Supplemental Reservation Of Rights**

Dear Mr. Wagner:

As you know, we are coverage counsel for MedPro Group on behalf of National Fire & Marine Insurance Company Omaha, Nebraska, as administered by the Medical Protective Company ("MedPro") in connection with the above-referenced lawsuit against Lighthouse Healthcare Center, LLC ("Insured") and other defendants, entitled *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.*, that was filed in California Superior Court, County of Los Angeles, Case No. BC664101 ("Lawsuit"). This correspondence is directed to you in your capacity as an authorized representative of the Insured for insurance coverage purposes. To the extent that you are no longer acting on behalf of the Insured with respect to insurance matters, we request that you direct a copy of this letter to the appropriate

FMG LAW Freeman Mathis & Gary LLP



representative and advise the undersigned accordingly. This letter supplements MedPro's prior reservation of rights letter to you dated September 11, 2023.

**As you know, under a full reservation of all rights under the policy and at law, MedPro retained counsel on the Insured's behalf to seek to have vacated the default judgment that was entered against the Insured on or about January 17, 2023. However, as there have been no indication of any attempts at enforcement of judgment and no other activity in this case, please be advised that MedPro will be closing its file at this time and instructing defense counsel to do the same. Should it be warranted by a resumption of case activity in the future, this file can be reopened at that time. As such, going forward, please immediately notify MedPro of any new case activity by any parties or any communications or notices of any kind by plaintiff to any other parties in this matter.**

This letter does not modify the terms and conditions of the policy identified below. Nothing contained in this letter, or any other communication issued by us or MedPro should be construed as an admission of coverage or liability by MedPro, or as a waiver, estoppel, or prejudice of any kind to MedPro's rights and defenses unless we expressly state otherwise.

## BACKGROUND

Our understanding of the claim is based on information we have been provided to date. In providing you with a summary of the relevant facts and allegations in the Lawsuit, we do not mean to suggest they are true, but rather, that they form the basis of the Lawsuit and MedPro's coverage position.

On or about March 7, 2017, the Insured provided MedPro with a copy of the Notice of Intent Commence Action Against Health Care Provider ("Notice") from Dean Donnell as an individual and as personal representative of the Estate of Valerie Donnell (collectively, "Claimants") dated March 1, 2017. According to the Notice, the Claimants alleged that decedent Valerie Donnell died as a result of "diagnosis, treatment, surgery and/or care that occurred on or about, without limitation, May 1, 2016 to June 24, 2016 at the various offices and facilities of" several entities, including the Insured. According to the proof of service, the Notice was served on the Insured by mail on March 1, 2017.

According to the information MedPro has been provided, Claimants allege the Insured failed to provide decedent Valerie Donnell with proper care when she was discharged to the Insured's facility beginning on June 23, 2016. Claimants allege the decedent died on June 24, 2016 while in the Insured's care because of a cardiopulmonary arrest caused by physical abuse and neglect by the Insured. The Claimants allege the following causes of action against the Insured: (1) professional negligence; (2) negligence; (3) wrongful death; and (4) dependent abuse.

The entire course of the Lawsuit occurred without notice to MedPro until on or about August 21, 2023, when MedPro was provided with a copy of a default judgment entered against the Insured dated January 17, 2023. This was MedPro's first notice of the Lawsuit against the Insured.

FMG LAW Freeman Mathis & Gary LLP



Based on the court records, the following are examples of events in the Lawsuit that occurred without notice to MedPro and any opportunity for its involvement:

- On or about June 29, 2017, the summons and complaint in the Lawsuit was served on the Insured.
- On or about April 19, 2019, the summons and second amended complaint in the Lawsuit was served on the Insured by substituted service.
- On or about August 8, 2019, plaintiff's statement of damages was personally served on the Insured.
- On or about August 5, 2019, an initial default was entered against the Insured and served on the Insured by mail. This was subsequently set aside by plaintiff's request.
- On or about May 6, 2021, another default was entered against the Insured.
- On January 17, 2023, Linda Fera as successor-in-interest to the Estate of Dean Donnell, obtained a default judgment against the Insured for damages of $2,000,000 and $885 in costs, for a total judgment of $2,000,885. These represented Dean Donnell's damages for his wrongful death claim.

Accordingly, in the roughly 6 and a half years between on or about March 7, 2017 and August 21, 2023, MedPro had no further information about this matter ripening into a lawsuit against the Insured.[1] MedPro was not aware that a lawsuit had been filed against the Insured until nearly 7 months after the default judgment was entered.

**THE POLICY**

MedPro issued Senior Care Liability Policy No. NSC100276 to Lighthouse Healthcare Center, LLC, which was in effect from March 1, 2017 to March 1, 2018 ("Policy").

The Policy's Professional Liability Coverage Part provides, in relevant part:

**I. INSURING CLAUSES**

[1] Although the Insured's broker Steven Riss of Amwins forwarded to MedPro a copy of a default judgment against another party (unrelated to the Insured) in the Lawsuit by email on October 11, 2019, Mr. Riss then withdrew the tender, and asked MedPro to disregard the default on the same date. MedPro complied with the Insured's instructions. After that time, MedPro heard nothing from the Insured or Mr. Riss regarding the Lawsuit until August 21, 2023.

FMG LAW Freeman Mathis & Gary LLP



A. PROFESSIONAL LIABILITY

1. Claims-Made and Reported:

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date

FMG LAW Freeman Mathis & Gary LLP



of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

***

The Policy provides in relevant part as follows:

***COMMON POLICY PROVISIONS AND CONDITIONS***

***

**III. EXCLUSIONS**

***

D. CLAIM OR POTENTIAL CLAIM REPORTED OR WHICH SHOULD HAVE BEEN REPORTED TO OTHER INSURER

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **claim** or **potential claim** which has or which should have been reported to, or has or should have been accepted by any insurer, including through any self-insured or captive program, prior to the **policy period**.

***

G. DEFAULT JUDGMENT

Damages that an **insured** becomes legally obligated to pay resulting from a default judgment or other **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**.

***

FMG LAW Freeman Mathis & Gary LLP



X. POTENTIAL CLAIM FIRST DISCOVERED PRIOR TO POLICY PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured**, or was reported to, or should have been reported to, a prior insurer, self-insurance program or captive insurer prior to the **policy period**.

***

The Policy contains the following Definitions:

***COMMON POLICY PROVISIONS AND CONDITIONS***

**I. DEFINITIONS**

These definitions apply to all Coverage Parts:

***

C. **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company**.

***

G. **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged. Suit also includes an arbitration or other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent, [...].

***

H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim** or **potential claim**. Such costs and expenses:

1. shall only include:

FMG LAW Freeman Mathis & Gary LLP



a. attorneys' fees paid to the law firm selected to defend an **insured**;

b. court costs;

c. expert fees;

d. reporter fees;

e. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **company**;

f. post-judgment interest on that portion of the judgment that does not exceed the Limit of Liability available under the particular coverage provided; and

g. such other costs and expenses that the **company** determines to be reasonably related to the defense of a **claim** or **potential claim**.

2. shall not include:

a. **loss**;

b. attorneys' fees awarded to a claimant;

c. the salary of any **employee** of an **insured**; or

d. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

I. **Company** means the Issuing Company shown on the Declarations.

***

K. **Event** means an accident. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or

2. the continuous or repeated exposure to substantially the same harmful conditions;

will be considered one **event**. [...].

***

M. **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**.

***

P. **Insured** means:

1. the **first named insured**;

2. any **named insured**;

***

V. **Loss**

1. Means civil damages, including prejudgment interest, which an **insured** becomes legally obligated to pay through adjudication or settlement.

2. Does not include:

a. any damages that are greater than any applicable Limit of Liability;

b. any injunctive or other equitable relief;

c. **claims expense**;

d. attorneys' fees awarded to a claimant as a fine, penalty, or sanction based upon any **insured's** misconduct; however,

attorneys' fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;

e. the salary of any **employee**; or

f. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

***

Z. **Named insured** means any of the following, but only if listed by name on a Schedule of Named Insureds:

1. any organization, including any corporations, partnerships or joint ventures;

2. any individual person, but only to the extent that such person was acting in the course and scope of his or her duties of employment with the **first named insured** or another **named insured**; or

3. a **location**.

***

DD. **Potential claim** means an incident arising from, or in connection, with an **event** an **insured** knows or reasonably should know is likely to result in a **claim**.

***

FF. **Professional services** means **treatment**, administrative services, beautician's and barber's services, pastoral counseling services, peer review and utilization management not involving **managed care services**. As used in this definition:

1. "administrative services" means the planning, organizing, controlling or directing of the operations of an **insured**;

***

4. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written

procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and which results in a patient alleging damages arising from a **health care event**; and

5. "utilization management" means the process of evaluating **treatment** to a patient for its appropriateness or necessity which results in a patient alleging damages arising from a **health care event**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

***

HH. **Resident** means a person who lives or resides at a long-term care facility or other residential healthcare facility listed by name on a Schedule of Named Insureds.

***

KK. **Treatment** means:

1. medical, surgical, dental, mental health, or nursing services. This shall also include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises;

2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider;

3. the provision of home health, hospice, rehabilitation or social services and adult day care and home-based community operations, including a Program of All-inclusive Care for the Elderly (PACE), or any services related to the provision, or protection of **residents' rights**, provided such **insured** is licensed, trained and qualified to perform such services in the jurisdiction in which such **professional services** were rendered.

***

6. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, or nursing services:

   a. food and beverages;

   b. blood, blood products, medications, supplies, equipment, or appliances; or

   c. counseling or other social services.

***

The Policy contains the following defense and supplemental payments provisions, in relevant part, as follows:

**II.** <u>**DEFENSE AND SUPPLEMENTAL PAYMENTS**</u>

These provisions apply to all Coverage Parts:

A. DEFENSE

The **company** will have the exclusive right and duty to defend any **claim** or **potential claim** against an **insured** to which this policy applies, subject to the timely payment of any applicable Deductible or Self-Insured Retention. However, the **company** has no duty to:

1. defend an **insured** after the applicable Limits of Liability have been exhausted by the payment of **loss** or **claims expense**;

2. appeal any judgment, however, the **company** may appeal any judgment as it deems expedient; or

3. pay any **claims expense** incurred by an attorney not retained or approved by the company, in writing, to represent the **insured**.

Upon the exhaustion of the applicable Limit of Liability provided under this policy, the **insured** shall become responsible for all further **claims expense** arising from any **claim** or **potential claim** and the **company** has the right to withdraw from the further defense of such **claim** or **potential claim** by tendering such defense to the **insured**. If the **insured** cannot come to an agreement with the attorney assigned

FMG LAW Freeman Mathis & Gary LLP



by the **company** regarding the payment of future fees and costs, the **insured** shall take all steps necessary to allow the attorney to withdraw from the matter.

B. SUPPLEMENTAL PAYMENTS

The **company** shall also pay, in addition to the Limits of Liability:

1. all **claims expense** directly related to the defense of the **claim** or **potential claim**;

2. the premium on any bond required to proceed with an appeal approved by the **company** or to release attachments to an **insured's** property; however, the face value of the bond may not exceed the applicable Limit of Liability or the total **loss** payable under the policy, whichever is less; in addition, the **company** has no duty to apply for or furnish any such bond; and

***

C. DEFENSE OUTSIDE THE LIMITS/WITHIN THE LIMITS SHOWN ON DECLARATIONS

The **company** will pay **claims expenses** and other supplemental payments either:

1. in addition to the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments will not reduce or exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Outside Limits;" . . .

***

However, the **company** has not duty to pay any **claims expense**, premium, or other expense incurred after the **insured's** applicable Limit of Liability is exhausted.

The Policy contains the following conditions, in relevant part, as follows:

V. <u>CONDITIONS</u>

These conditions apply to all Coverage Parts:

A. ACTION AGAINST THE COMPANY

1. No action shall lie against the **company** unless each **insured** is in full compliance with all of the terms of this policy.

FMG LAW Freeman Mathis & Gary LLP



2. No person shall have the right to join the **company** as a party to a **claim** to determine an **insured's** liability under this policy. Further, an **insured** shall not interplead the **company** into a **claim**.

3. No action shall lie against the **company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **insured**, the claimant, and the **company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

B. ARBITRATION

1. The **company** and the **insureds** agree that in any dispute, **claim**, **potential claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of an **insured**, the **company** or any other party, the **company** may elect to submit any such dispute, **claim**, **potential claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq. (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

2. The arbitration shall be presided over by the three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as shown on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

3. The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

4. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state

FMG LAW Freeman Mathis & Gary LLP



or local court or before any administrative tribunal with respect to any dispute, **claim**, **potential claim** or controversy arising out of, relating to or in connection with this policy.

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.

2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses;

   d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

   e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

   f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **insured** shall promptly give notice to such other insurers. The **insured** shall also provide the **company** with copies of the applicable policies. The **insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

FMG LAW Freeman Mathis & Gary LLP



***

H. FIRST NAMED INSURED

1. The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds**. [...].

***

I. FRAUD WARNING

Any person, who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, which may include voiding of the policy if allowed by law.

***

L. MODIFICATIONS

Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

***

N. OTHER INSURANCE

Unless otherwise noted in a Coverage Part:

1. If any other valid and collectible insurance is available to any **insured** with respect to a liability covered by this policy, and such insurance is afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then the maximum

limits of liability under all policies shall not exceed the highest remaining applicable limit of liability under any one policy;

2. If any other valid and collectible insurance is available to any **insured** with respect to any liability arising from a **claim** or **potential claim** which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **company** will pay only the **company's** share of the **loss**, if any, that exceeds the sum of:

   a. the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

   b. the total of all deductible and self-insured amounts under all such other insurance; and

3. this condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

P. REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.

2. If the Retention Shown on the Declarations is a:

   a. Deductible, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim**;

***

3. All such reports and documents shall be:

a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

b. in writing; and

c. include the following information:

(1) the identity of all **insureds** implicated;

(2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

(3) the nature and extent of the injury;

(4) the names and addresses of any injured persons;

(5) the names and addresses of available witnesses; and

(6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.

***

Q. REPRESENTATIONS AND CHANGE

1. By acceptance of this policy, each **insured** agrees, represents, and warrants that the statements and particulars made in any and all documents, supplemental pages or other attachments for the purposes of any application, are true and correct. It is further understood and agreed that any application and attachments are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements hereto, and all applications and attachments, embody all agreements between the **company** and any of its authorized representatives, and all **insureds** relating to this insurance.

2. In the event any application was execution or endorsed by an **insured's** insurance producer, the **insured** acknowledges that the insurance producer has acted under the **insured's** express authority and that the

**insured** has thoroughly reviewed the information contained in any application. The representations made by an **insured** in the applications and attachments are the basis for the coverage provided, as well as the **company's** calculation of the applicable premium. Therefore, it is understood and agreed that, to the extent permitted by law, the **company** reserves the right to rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon any material misrepresentation made by any **insured**. As used in this condition, "material misrepresentation" means concealment, misrepresentation, omission or fraud which, if known by the **company**, would have led to refusal by the **company** to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions.

3. No knowledge or information possessed by any **insured** shall be imputed to any other **insured**, except for material facts or information known to the person or persons who signed the application. In the event of any material misrepresentation in connection with any of the particulars or statements in the application, this policy shall be void with respect to any **insured** who knew of such material misrepresentation or to whom such knowledge is imputed.

4. The company reserves all rights based upon any material misrepresentation by the **insured**.

***

S. SETTLEMENT

The **company** may only settle a **claim**, **potential claim** or other matter brought against an **insured** with the consent of the **first named insured**.

***

**COVERAGE ANALYSIS**

Pursuant to Policy Conditions P. Reporting Requirements, and Condition C. Assistance and Cooperation, coverage under the Policy is *strictly* conditioned upon the Insured timely reporting a claim and cooperating with MedPro in the investigation, defense, and/or settlement of any matter. Under these terms, the Insured must do nothing to prejudice MedPro's ability to investigate, defend and/or manage any matter. The Insured must also, as soon as practicable, report any **claim** or **potential claim**, demand,

suit, summons, or legal paper that the Insured receives. Moreover, Policy Condition A. Action Against The Company, requires that the Insured must be in full compliance with the Policy before any action against MedPro.

The claim was first reported to MedPro on March 7, 2017, when MedPro received a copy of the Claimants' pre-suit Notice. The Lawsuit against the Insured was filed on June 6, 2017. On August 21, 2023, MedPro received a copy of a default judgment entered against the Insured back on January 17, 2023, over seven months earlier. In the roughly 6 and a half years between MedPro receiving the pre-suit Notice and the default judgment, MedPro had no further information about this matter ripening into a lawsuit against the Insured. In that 6.5 years period, the court records indicate that the Insured had been served with a number of documents in the Lawsuit, none of which were timely forwarded MedPro; for example:

- On or about June 29, 2017, the summons and complaint in the Lawsuit was served on the Insured.
- On or about April 19, 2019, the summons and second amended complaint in the Lawsuit was served on the Insured by substituted service.
- On or about August 8, 2019, plaintiff's statement of damages was personally served on the Insured.
- On or about August 5, 2019, an initial default was entered against the Insured and served on the Insured by mail. This was subsequently set aside by plaintiff's request.
- On or about May 6, 2021, another default was entered against the Insured.
- On January 17, 2023, Linda Fera as successor-in-interest to the Estate of Dean Donnell, filed a default judgment against the Insured for damages of $2,000,000 and $885 in costs, for a total judgment of $2,000,885. These represented Dean Donnell's damages for his wrongful death claim.

The January 17, 2023 default judgment was first provided to MedPro on August 21, 2023, and the complaint on August 24, 2023. Based on the court records, plaintiff's counsel has represented to the court that plaintiff has settled with all defendants except the Insured.

Accordingly, the Insured's untimely notice to MedPro of the Lawsuit—including the pleadings and significant filings leading to the default judgment against the Insured—significantly prejudiced MedPro's ability to have any involvement in the case, to investigate, to defend the Insured, or to possibly negotiate a settlement as the other defendants have done. MedPro reserves all rights under Policy Conditions P. Reporting Requirements, C. Assistance and Cooperation, and A. Action Against The Company, including the right to disclaim coverage for the Insured's breach of those provisions.

FMG LAW Freeman Mathis & Gary LLP



Additionally, the Policy's Exclusion F. Default Judgment bars coverage for any default judgment against the Insured when MedPro "was unable to timely investigate or defend due to the acts or omissions of any **Insured**." As MedPro only received notice of the Lawsuit against the Insured seven months after the default judgment was entered, MedPro had no opportunity to timely investigate or defend the Insured. Accordingly, MedPro reserves all rights under Policy Exclusion F. Default Judgment, including the right to disclaim coverage for the default judgment.

Further, Policy Condition C. Assistance and Cooperation requires the Insured to give prompt notice to all other insurers under any other policies that might cover a **claim** or **potential claim**, to provide MedPro with a copy of all such other policies, and to fact in good faith to enforce any rights held under such policies including the right to a defense. In addition, Policy Condition N. Other Insurance provides that this Policy is excess to any other valid and collectible insurance available to any Insured with respect to liability arising from a **claim** or **potential claim** that is covered by this Policy. Moreover, the Policy's Exclusion X. Potential Claim First Discovered Prior To Policy Period precludes coverage for any **potential claim** that was first known about or discovered, or should have been known about or discovered, by an **authorized insured**, or was reported to or should have been reported to a prior insurer prior to the **policy period**. Finally, the Policy's Exclusion D. Claim Or Potential Claim Reported Or Which Should Have Been Reported To Other Insurer excludes coverage for any **claim** or **potential claim** which should have been reported or accept by any insurer prior to the **policy period**. We have no information indicating that the Insured has notified any other insurer, but we note that the decedent allegedly died on June 24, 2016 in the Insured's care, which was prior to this Policy's period. To the extent that any other insurance might have applied to the claims in this Lawsuit, MedPro reserves all rights under Policy Conditions C. Assistance and Cooperation and N. Other Insurance, including the right to disclaim coverage for all liability arising from this Lawsuit.

The Policy's Condition Q. Representations And Change provides that any material misrepresentations in the application for this Policy void coverage with respect to any Insured who knew of such material misrepresentation or to whom such knowledge is imputed. It also provides that this Policy's coverage is based on the representations in the policy application and attachments thereto. Again, we note that the decedent allegedly died on June 24, 2016 in the Insured's care, which was prior to this Policy's period. To the extent that the Insured had prior notice of plaintiff's potential claim regarding decedent's care and death, and that such information was required to be disclosed in the policy application was not, MedPro reserves all rights. More specifically, the Policy's Condition Q. Representations And Change provides, and MedPro reiterates in this letter, that MedPro reserves all rights based on Condition Q. Representations And Change, including the right to rescind the Policy or deny any coverage provided for a **claim** or **potential claim**, based on any material misrepresentation made by any insured or their insurance producer.

The claims in the Lawsuit do not appear to implicate the Policy's General Liability coverage part. Even if that coverage part is implicated, the General Liability Coverage Part, Exclusion 4. Professional Liability excludes "Any **claim** or **potential claim** arising out of, or in connection with, a **health care event**." MedPro reserves all rights accordingly.

FMG LAW Freeman Mathis & Gary LLP



The Policy's Exclusion U. Multi-Policy And Anti-Stacking excludes coverage such that if more than one policy, Coverage Part or Insuring Clause issued by MedPro applies to a loss, any duty of MedPro's to pay for that loss will be limited to the policy with the largest applicable Limit of Liability or the Coverage Part or Insuring Clause with the largest applicable Limit of Liability. MedPro reserves all rights under Policy Exclusion U. Multi-Policy And Anti-Stacking.

**CONCLUSION**

**As explained above, MedPro will be closing its file at this time and instructing defense counsel to do the same due to inactivity in this case.** If you believe that MedPro has failed to understand all of the facts, or if you believe there is any additional information that MedPro should consider in connection with this claim, please provide us with such details as soon as possible. However, you should not construe our willingness to consider any additional information as anything other than our desire to be fair and reasonable. The coverage position outlined in this letter is MedPro's present coverage position unless we expressly advise you to the contrary in writing.

MedPro continues to expressly reserve all of its rights, including the right to assert any other applicable exclusion or terms under any or all policies to further limit or disclaim coverage. In addition, the Policy provides that MedPro's duty to defend and pay for any loss is "strictly conditioned upon all insureds' cooperation with the company in the investigation, defense, and/or settlement of any matter" to which the Policy applies. MedPro further reserves all of its rights under the conditions, cooperation and mandatory arbitration provisions of its Policy.

Nothing in this letter nor the defense of the Insured by MedPro nor any investigation conducted by MedPro into the facts or circumstances of the claim is intended to be, or should be, should be construed as a waiver or estoppel of any rights or defenses afforded by the Policy, any other policies issued to the Insured, in law or in equity. The inclusion of any terms or exclusions in this letter is not intended as, and it is not, an exhaustive recitation of the terms or exclusions that may potentially apply to MedPro's coverage obligations under the Policy. MedPro reserves the right to assert all terms and exclusions contained in the Policy, even if those terms and exclusions are not set out herein. Moreover, no action taken in connection with the investigation, handling, defense, appeal or settlement of this matter should be deemed as an admission of coverage by MedPro under the Policy. MedPro's reservation of rights includes the right to withdraw from the defense, to decline to further pursue an appeal of the verdict, and to file an arbitration action to resolve any dispute arising from the Policy, including any fees disputes pursuant to the Policy's mandatory arbitration provisions.

MedPro expressly reserves the right to rely upon other grounds not specifically referenced in any communication. This correspondence is not intended to be exhaustive of all coverage issues. MedPro's coverage position in this letter is based on the information and documents provided to date and is subject to further evaluation if additional information, documents or legal authority become available. MedPro reserves the right to re-evaluate its entire coverage position, not merely those portions of its position that may be affected by such new or additional documentation, information or legal authority.

FMG LAW Freeman Mathis & Gary LLP



California law requires that you be advised that if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

**California Department of Insurance**
**Claims Service Bureau**
**300 S. Spring Street, 11th Floor**
**Los Angeles, California 90013**
**(213) 346-6523**
**(800) 927-4357**
**www.insurance.ca.gov**

Please do not hesitate to contact the undersigned should you have any questions regarding any aspect of this matter.

Very truly yours,

**FREEMAN MATHIS & GARY, LLP**

Albert K. Alikin

AKA: pbs

cc: Clients

# Exhibit 36

EXHIBIT
No. 36

FMG LAW
Freeman Mathis & Gary LLP

550 South Hope Street
Suite 2200
Los Angeles, CA 90071-2631

Tel: 213.615.7000

www.fmglaw.com

**Albert K. Alikin**

D: 213.615.7029
C: 626.215.1537

Albert.Alikin@fmglaw.com

January 13, 2025

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Lighthouse Healthcare Center, LLC
C/O Avi Wagner
The Wagner Firm
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Email: avi@thewagnerfirm.com

| | | |
|---|---|---|
| **RE:** | **Case Name:** | *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.* |
| | **Case No.:** | BC664101 |
| | **Venue:** | California Superior Court, County of Los Angeles |
| | **Claim No.:** | 1042085 |
| | **Insured:** | Lighthouse Healthcare Center, LLC |
| | **Policy No.:** | NSC100276 |
| | **Policy Type:** | **Professional Liability – Claims-Made and Reported** |
| | **Policy Limits:** | Professional Liability - $1,000,000 per event/$3,000,000 Aggregate; $25,000 per event deductible |
| | **Policy Period:** | 03/01/2017 to 03/01/2018 |
| | **Retroactive Date:** | 03/01/2007 |

**Disclaimer of Coverage**

Dear Mr. Wagner:

As you know, we are coverage counsel for MedPro Group on behalf of National Fire & Marine Insurance Company (collectively, "MedPro") in connection with the above-referenced lawsuit against Lighthouse Healthcare Center, LLC ("Insured" or "Lighthouse") and other defendants, entitled *Dean Donnell, et al. v. Four Seasons Healthcare & Wellness Center, LP, et al.*, that was filed in California Superior Court, County of Los Angeles, Case No. BC664101 ("Lawsuit"). This correspondence is directed to you in your capacity as an authorized representative of the Insured for insurance coverage purposes. To the extent that you are no longer acting on behalf of the Insured with respect to insurance matters, we request that you direct a copy of this letter to the appropriate representative and advise the undersigned

accordingly. This letter supercedes MedPro's prior reservation of rights letters to you dated September 11, 2023 and July 31, 2024.

As you know, under a full reservation of all rights under the policy and at law, MedPro retained defense counsel at the office of Fraser Watson & Croutch LLP ("Fraser Firm") on Lighthouse's behalf to seek to have vacated the $2,000,885 default judgment that was entered against the Insured on or about January 17, 2023. Counsel at the Fraser firm verbally opined that the Insured would not likely prevail on vacating the default judgment. Subsequently, with your consent and agreement, MedPro retained Gary Wax of the premier appellate firm Greines, Martin, Stein & Richland LLP ("GMSR Firm") to provide a second opinion. After thoroughly investigating the matter, Mr. Wax provided a detailed, lengthy written memorandum that opined the Insured would not prevail on vacating the default judgment. We attach the memorandum by the GMSR Firm to this letter.

We understand that you have reviewed that memorandum, considered the strategic considerations, and have agreed on the Insured's behalf not to pursue having the default judgment vacated in light of the dual opinions by the Fraser Firm and the GMSR Firm. In addition, there have been no indication of any attempts at enforcement of judgment and no other activity in this case. Accordingly, there is no further action to be taken in this matter.

**Please be advised that MedPro will be closing its file and instructing Mr. Wax to do the same (the Fraser firm previously closed its file already). MedPro respectfully declines to further defend Lighthouse and is disclaiming indemnity for the $2,000,885 default judgment against it, as discussed below.**

This letter does not modify the terms and conditions of the policy identified below. Nothing contained in this letter, or any other communication issued by us or MedPro should be construed as an admission of coverage or liability by MedPro, or as a waiver, estoppel, or prejudice of any kind to MedPro's rights and defenses unless we expressly state otherwise.

## BACKGROUND

Our understanding of the claim is based on information we have been provided to date. In providing you with a summary of the relevant facts and allegations in the Lawsuit, we do not mean to suggest they are true, but rather, that they form the basis of the Lawsuit and MedPro's coverage position.

On or about March 7, 2017, the Insured provided MedPro with a copy of the Notice of Intent Commence Action Against Health Care Provider ("Notice") from Dean Donnell as an individual and as personal representative of the Estate of Valerie Donnell (collectively, "Claimants") dated March 1, 2017. According to the Notice, the Claimants alleged that decedent Valerie Donnell died as a result of "diagnosis, treatment, surgery and/or care that occurred on or about, without limitation, May 1, 2016 to June 24, 2016 at the various offices and facilities of" several entities, including the Insured. According to the proof of service, the Notice was served on the Insured by mail on March 1, 2017.

FMG LAW Freeman Mathis & Gary LLP



According to the information MedPro has been provided, Claimants allege the Insured failed to provide decedent Valerie Donnell with proper care when she was discharged to the Insured's facility beginning on June 23, 2016. Claimants allege the decedent died on June 24, 2016 while in the Insured's care because of a cardiopulmonary arrest caused by physical abuse and neglect by the Insured. The Claimants allege the following causes of action against the Insured: (1) professional negligence; (2) negligence; (3) wrongful death; and (4) dependent abuse.

The entire course of the Lawsuit occurred without MedPro's involvement until on or about August 21, 2023, when MedPro was provided with a copy of a default judgment entered against the Insured dated January 17, 2023. This was the first time that the Insured tendered the Lawsuit to MedPro for coverage.

Based on the court records and GSMR memorandum, the following are examples of events in the Lawsuit that occurred prior to the August 21, 2023 tender to MedPro:

- On or about June 29, 2017, the summons and complaint in the Lawsuit was served on the Insured.
- On or about April 19, 2019, the summons and second amended complaint in the Lawsuit was served on the Insured by substituted service. The Insured received actual notice of the Lawsuit during this time period.
- On or about August 8, 2019, plaintiff's statement of damages was served on the Insured.
- On or about August 5, 2019, an initial default was entered against the Insured and served on the Insured.
- On or about May 6, 2021, the initial entry of default was vacated at plaintiff's request.
- On or about December 27, 2022, plaintiff files and serves another request for entry of default.
- On or about January 3, 2023, a prove-up hearing on the default is conducted.
- On or about January 17, 2023, Linda Fera as successor-in-interest to the Estate of Dean Donnell, obtained a default judgment against the Insured for damages of $2,000,000 and $885 in costs, for a total judgment of $2,000,885.

Accordingly, in the roughly 6 years between 2017 and 2023, the Insured did not tender the Lawsuit to MedPro for coverage. Further, the tender to MedPro for coverage was 7 months after the default judgment was entered against the insured.

Freeman Mathis & Gary LLP



**THE POLICY**

MedPro issued Senior Care Liability Policy No. NSC100276 to Lighthouse Healthcare Center, LLC, which was in effect from March 1, 2017 to March 1, 2018 ("Policy").

The Policy's Professional Liability Coverage Part provides, in relevant part:

I. **INSURING CLAUSES**

A. PROFESSIONAL LIABILITY

1. Claims-Made and Reported:

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential**

FMG LAW Freeman Mathis & Gary LLP



> **claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

***

The Policy provides in relevant part as follows:

***COMMON POLICY PROVISIONS AND CONDITIONS***

***

**III. EXCLUSIONS**

***

D. CLAIM OR POTENTIAL CLAIM REPORTED OR WHICH SHOULD HAVE BEEN REPORTED TO OTHER INSURER

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **claim** or **potential claim** which has or which should have been reported to, or has or should have been accepted by any insurer, including through any self-insured or captive program, prior to the **policy period**.

***

G. DEFAULT JUDGMENT

FMG LAW Freeman Mathis & Gary LLP



Damages that an **insured** becomes legally obligated to pay resulting from a default judgment or other **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**.

***

X. POTENTIAL CLAIM FIRST DISCOVERED PRIOR TO POLICY PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured**, or was reported to, or should have been reported to, a prior insurer, self-insurance program or captive insurer prior to the **policy period**.

***

The Policy contains the following Definitions:

***COMMON POLICY PROVISIONS AND CONDITIONS***

**I. <u>DEFINITIONS</u>**

These definitions apply to all Coverage Parts:

***

C. **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company**.

***

G. **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged. Suit also includes an arbitration or other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent, [...].

***

FMG LAW Freeman Mathis & Gary LLP



H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim** or **potential claim**. Such costs and expenses:

1. shall only include:

   a. attorneys' fees paid to the law firm selected to defend an **insured**;

   b. court costs;

   c. expert fees;

   d. reporter fees;

   e. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **company**;

   f. post-judgment interest on that portion of the judgment that does not exceed the Limit of Liability available under the particular coverage provided; and

   g. such other costs and expenses that the **company** determines to be reasonably related to the defense of a **claim** or **potential claim**.

2. shall not include:

   a. **loss**;

   b. attorneys' fees awarded to a claimant;

   c. the salary of any **employee** of an **insured**; or

   d. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

I. **Company** means the Issuing Company shown on the Declarations.

***

K. **Event** means an accident. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or

2. the continuous or repeated exposure to substantially the same harmful conditions;

will be considered one **event**. [...].

***

M. **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**.

***

P. **Insured** means:

1. the **first named insured**;

2. any **named insured**;

***

V. **Loss**

1. Means civil damages, including prejudgment interest, which an **insured** becomes legally obligated to pay through adjudication or settlement.

2. Does not include:

   a. any damages that are greater than any applicable Limit of Liability;

FMG LAW Freeman Mathis & Gary LLP



b. any injunctive or other equitable relief;

c. **claims expense**;

d. attorneys' fees awarded to a claimant as a fine, penalty, or sanction based upon any **insured's** misconduct; however, attorneys' fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;

e. the salary of any **employee**; or

f. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

***

Z. **Named insured** means any of the following, but only if listed by name on a Schedule of Named Insureds:

1. any organization, including any corporations, partnerships or joint ventures;

2. any individual person, but only to the extent that such person was acting in the course and scope of his or her duties of employment with the **first named insured** or another **named insured**; or

3. a **location**.

***

DD. **Potential claim** means an incident arising from, or in connection, with an **event** an **insured** knows or reasonably should know is likely to result in a **claim**.

***

FF. **Professional services** means **treatment**, administrative services, beautician's and barber's services, pastoral counseling services, peer review and utilization management not involving **managed care services**. As used in this definition:

1. "administrative services" means the planning, organizing, controlling or directing of the operations of an **insured**;

FMG LAW Freeman Mathis & Gary LLP



***

4. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and which results in a patient alleging damages arising from a **health care event**; and

5. "utilization management" means the process of evaluating **treatment** to a patient for its appropriateness or necessity which results in a patient alleging damages arising from a **health care event**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

***

HH. **Resident** means a person who lives or resides at a long-term care facility or other residential healthcare facility listed by name on a Schedule of Named Insureds.

***

KK. **Treatment** means:

1. medical, surgical, dental, mental health, or nursing services. This shall also include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises;

2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider;

FMG LAW Freeman Mathis & Gary LLP



3. the provision of home health, hospice, rehabilitation or social services and adult day care and home-based community operations, including a Program of All-inclusive Care for the Elderly (PACE), or any services related to the provision, or protection of **residents' rights**, provided such **insured** is licensed, trained and qualified to perform such services in the jurisdiction in which such **professional services** were rendered.

***

6. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, or nursing services:

   a. food and beverages;

   b. blood, blood products, medications, supplies, equipment, or appliances; or

   c. counseling or other social services.

***

The Policy contains the following defense and supplemental payments provisions, in relevant part, as follows:

**II. DEFENSE AND SUPPLEMENTAL PAYMENTS**

These provisions apply to all Coverage Parts:

A. DEFENSE

The **company** will have the exclusive right and duty to defend any **claim** or **potential claim** against an **insured** to which this policy applies, subject to the timely payment of any applicable Deductible or Self-Insured Retention. However, the **company** has no duty to:

1. defend an **insured** after the applicable Limits of Liability have been exhausted by the payment of **loss** or **claims expense**;

2. appeal any judgment, however, the **company** may appeal any judgment as it deems expedient; or

3. pay any **claims expense** incurred by an attorney not retained or approved by the company, in writing, to represent the **insured**.

Upon the exhaustion of the applicable Limit of Liability provided under this policy, the **insured** shall become responsible for all further **claims expense** arising from any **claim** or **potential claim** and the **company** has the right to withdraw from the further defense of such **claim** or **potential claim** by tendering such defense to the **insured**. If the **insured** cannot come to an agreement with the attorney assigned by the **company** regarding the payment of future fees and costs, the **insured** shall take all steps necessary to allow the attorney to withdraw from the matter.

B. SUPPLEMENTAL PAYMENTS

The **company** shall also pay, in addition to the Limits of Liability:

1. all **claims expense** directly related to the defense of the **claim** or **potential claim**;

2. the premium on any bond required to proceed with an appeal approved by the **company** or to release attachments to an **insured's** property; however, the face value of the bond may not exceed the applicable Limit of Liability or the total **loss** payable under the policy, whichever is less; in addition, the **company** has no duty to apply for or furnish any such bond; and

***

C. DEFENSE OUTSIDE THE LIMITS/WITHIN THE LIMITS SHOWN ON DECLARATIONS

The **company** will pay **claims expenses** and other supplemental payments either:

1. in addition to the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments will not reduce or exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Outside Limits;" . . .

***

However, the **company** has not duty to pay any **claims expense**, premium, or other expense incurred after the **insured's** applicable Limit of Liability is exhausted.

The Policy contains the following conditions, in relevant part, as follows:

FMG LAW Freeman Mathis & Gary LLP



V. **CONDITIONS**

These conditions apply to all Coverage Parts:

A. ACTION AGAINST THE COMPANY

1. No action shall lie against the **company** unless each **insured** is in full compliance with all of the terms of this policy.

2. No person shall have the right to join the **company** as a party to a **claim** to determine an **insured's** liability under this policy. Further, an **insured** shall not interplead the **company** into a **claim**.

3. No action shall lie against the **company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **insured**, the claimant, and the **company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

B. ARBITRATION

1. The **company** and the **insureds** agree that in any dispute, **claim**, **potential claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of an **insured**, the **company** or any other party, the **company** may elect to submit any such dispute, **claim**, **potential claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq. (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.

2. The arbitration shall be presided over by the three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as shown on the Declarations. The arbitration shall take place in the county that the capital of that state is located.

3. The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of

FMG LAW Freeman Mathis & Gary LLP



potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.

4. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim**, **potential claim** or controversy arising out of, relating to or in connection with this policy.

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.

2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:

   a. attendance at any deposition, hearing, or trial, as requested by the **company**;

   b. assistance in securing and giving evidence;

   c. obtaining the attendance of witnesses;

   d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

   e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

FMG LAW Freeman Mathis Gary LLP



f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **insured** shall promptly give notice to such other insurers. The **insured** shall also provide the **company** with copies of the applicable policies. The **insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

***

H. FIRST NAMED INSURED

1. The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds**. [...].

***

I. FRAUD WARNING

Any person, who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, which may include voiding of the policy if allowed by law.

***

L. MODIFICATIONS

Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

FMG LAW Freeman Mathis & Gary LLP



***

N. OTHER INSURANCE

Unless otherwise noted in a Coverage Part:

1. If any other valid and collectible insurance is available to any **insured** with respect to a liability covered by this policy, and such insurance is afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then the maximum limits of liability under all policies shall not exceed the highest remaining applicable limit of liability under any one policy;

2. If any other valid and collectible insurance is available to any **insured** with respect to any liability arising from a **claim** or **potential claim** which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **company** will pay only the **company's** share of the **loss**, if any, that exceeds the sum of:

   a. the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and

   b. the total of all deductible and self-insured amounts under all such other insurance; and

3. this condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

P. REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.

2. If the Retention Shown on the Declarations is a:

   a. Deductible, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim**;

***

3. All such reports and documents shall be:

   a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

   b. in writing; and

   c. include the following information:

      (1) the identity of all **insureds** implicated;

      (2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

      (3) the nature and extent of the injury;

      (4) the names and addresses of any injured persons;

      (5) the names and addresses of available witnesses; and

      (6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.

***

Q. REPRESENTATIONS AND CHANGE

1. By acceptance of this policy, each **insured** agrees, represents, and warrants that the statements and particulars made in any and all documents, supplemental pages or other attachments for the purposes of any application, are true and correct. It is further understood and agreed that any application and attachments are incorporated into, and shall

FMG LAW Freeman Mathis & Gary LLP



form a part of, this policy. Therefore, this policy and any endorsements hereto, and all applications and attachments, embody all agreements between the **company** and any of its authorized representatives, and all **insureds** relating to this insurance.

2. In the event any application was execution or endorsed by an **insured's** insurance producer, the **insured** acknowledges that the insurance producer has acted under the **insured's** express authority and that the **insured** has thoroughly reviewed the information contained in any application. The representations made by an **insured** in the applications and attachments are the basis for the coverage provided, as well as the **company's** calculation of the applicable premium. Therefore, it is understood and agreed that, to the extent permitted by law, the **company** reserves the right to rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon any material misrepresentation made by any **insured**. As used in this condition, "material misrepresentation" means concealment, misrepresentation, omission or fraud which, if known by the **company**, would have led to refusal by the **company** to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions.

3. No knowledge or information possessed by any **insured** shall be imputed to any other **insured**, except for material facts or information known to the person or persons who signed the application. In the event of any material misrepresentation in connection with any of the particulars or statements in the application, this policy shall be void with respect to any **insured** who knew of such material misrepresentation or to whom such knowledge is imputed.

4. The company reserves all rights based upon any material misrepresentation by the **insured**.

***

S. SETTLEMENT

The **company** may only settle a **claim**, **potential claim** or other matter brought against an **insured** with the consent of the **first named insured**.

**COVERAGE ANALYSIS**

Pursuant to Policy Conditions P. Reporting Requirements, and Condition C. Assistance and Cooperation, coverage under the Policy is *strictly* conditioned upon the Insured timely reporting a claim and cooperating with MedPro in the investigation, defense, and/or settlement of any matter. Under these terms, the Insured must do nothing to prejudice MedPro's ability to investigate, defend and/or manage any matter. The Insured must also, as soon as practicable, report any **claim** or **potential claim**, demand, suit, summons, or legal paper that the Insured receives. Moreover, Policy Condition A. Action Against The Company, requires that the Insured must be in full compliance with the Policy before any action against MedPro.

A notice of potential claim was first reported to MedPro on March 7, 2017, when MedPro received a copy of the Claimants' pre-suit Notice. The Lawsuit against the Insured was filed on June 6, 2017. On August 21, 2023, MedPro received a copy of a default judgment entered against the Insured back on January 17, 2023, over seven months earlier.

In the roughly 6 years between MedPro receiving the pre-suit Notice and the default judgment, court records indicate that the Insured had been served with a number of documents in the Lawsuit, none of which were timely forwarded MedPro, for example:

- On or about June 29, 2017, the summons and complaint in the Lawsuit was served on the Insured.
- On or about April 19, 2019, the summons and second amended complaint in the Lawsuit was served on the Insured by substituted service. The Insured received actual notice of the Lawsuit during this time period.
- On or about August 8, 2019, plaintiff's statement of damages was served on the Insured.
- On or about August 5, 2019, an initial default was entered against the Insured and served on the Insured.
- On or about May 6, 2021, the initial entry of default was vacated at plaintiff's request.
- On or about December 27, 2022, plaintiff files and serves another request for entry of default.
- On or about January 3, 2023, a prove-up hearing on the default is conducted.
- On or about January 17, 2023, Linda Fera as successor-in-interest to the Estate of Dean Donnell, obtained a default judgment against the Insured for damages of $2,000,000 and $885 in costs, for a total judgment of $2,000,885.

FMG LAW Freeman Mathis & Gary LLP



The January 17, 2023 default judgment was first provided to MedPro on August 21, 2023, and the complaint on August 24, 2023. Based on the court records, plaintiff's counsel has represented to the court that plaintiff has settled with all defendants except the Insured.

Accordingly, the Insured's untimely notice to MedPro of the Lawsuit—including the pleadings and significant filings leading to the default judgment against the Insured—significantly prejudiced MedPro's ability to have any involvement in the case, to investigate, to defend the Insured, or to possibly negotiate a settlement as the other defendants have done. **Accordingly, MedPro disclaims coverage for the default judgment due to the Insured's breach of Policy Conditions P. Reporting Requirements, C. Assistance and Cooperation, and A. Action Against The Company.**

Additionally, the Policy's Exclusion F. Default Judgment bars coverage for any default judgment against the Insured when MedPro "was unable to timely investigate or defend due to the acts or omissions of any **Insured**." As tender of the Lawsuit was given to MedPro seven months after the default judgment was entered, MedPro had no opportunity to timely investigate or defend the Insured. **Accordingly, MedPro further disclaims coverage for the default judgment under Policy Exclusion F. Default Judgment.**

Further, Policy Condition C. Assistance and Cooperation requires the Insured to give prompt notice to all other insurers under any other policies that might cover a **claim** or **potential claim**, to provide MedPro with a copy of all such other policies, and to fact in good faith to enforce any rights held under such policies including the right to a defense. In addition, Policy Condition N. Other Insurance provides that this Policy is excess to any other valid and collectible insurance available to any Insured with respect to liability arising from a **claim** or **potential claim** that is covered by this Policy. Moreover, the Policy's Exclusion X. Potential Claim First Discovered Prior To Policy Period precludes coverage for any **potential claim** that was first known about or discovered, or should have been known about or discovered, by an **authorized insured**, or was reported to or should have been reported to a prior insurer prior to the **policy period**. Finally, the Policy's Exclusion D. Claim Or Potential Claim Reported Or Which Should Have Been Reported To Other Insurer excludes coverage for any **claim** or **potential claim** which should have been reported or accept by any insurer prior to the **policy period**. We have no information indicating that the Insured has notified any other insurer, but we note that the decedent allegedly died on June 24, 2016 in the Insured's care, which was prior to this Policy's period.

The Policy's Condition Q. Representations And Change provides that any material misrepresentations in the application for this Policy void coverage with respect to any Insured who knew of such material misrepresentation or to whom such knowledge is imputed. It also provides that this Policy's coverage is based on the representations in the policy application and attachments thereto. Again, we note that the decedent allegedly died on June 24, 2016 in the Insured's care, which was prior to this Policy's period.

The claims in the Lawsuit do not appear to implicate the Policy's General Liability coverage part. Even if that coverage part is implicated, the General Liability Coverage Part, Exclusion 4. Professional Liability excludes "Any **claim** or **potential claim** arising out of, or in connection with, a **health care event**."

The Policy's Exclusion U. Multi-Policy And Anti-Stacking excludes coverage such that if more than one policy, Coverage Part or Insuring Clause issued by MedPro applies to a loss, any duty of MedPro's to pay for that loss will be limited to the policy with the largest applicable Limit of Liability or the Coverage Part or Insuring Clause with the largest applicable Limit of Liability.

**CONCLUSION**

**As explained above, MedPro will be closing its file and instructing the GSMR Firm to do the same. Further, MedPro disclaims coverage for the $2,000,885 default judgment against Lighthouse.**

If you believe that MedPro has failed to understand all of the facts, or if you believe there is any additional information that MedPro should consider in connection with this claim, please provide us with such details as soon as possible. However, you should not construe our willingness to consider any additional information as anything other than our desire to be fair and reasonable. The coverage position outlined in this letter is MedPro's present coverage position unless we expressly advise you to the contrary in writing. MedPro continues to expressly reserve all of its rights, including the right to assert any other applicable exclusion or terms under any or all policies to further limit or disclaim coverage.

Nothing in this letter nor the defense of the Insured by MedPro nor any investigation conducted by MedPro into the facts or circumstances of the claim is intended to be, or should be, should be construed as a waiver or estoppel of any rights or defenses afforded by the Policy, any other policies issued to the Insured, in law or in equity. The inclusion of any terms or exclusions in this letter is not intended as, and it is not, an exhaustive recitation of the terms or exclusions that may potentially apply to MedPro's coverage obligations under the Policy. MedPro reserves the right to assert all terms and exclusions contained in the Policy, even if those terms and exclusions are not set out herein. Moreover, no action taken in connection with the investigation, handling, defense, appeal or settlement of this matter should be deemed as an admission of coverage by MedPro under the Policy. MedPro's prior reservation of rights included the right to withdraw from the defense and to decline to further pursue an appeal of the verdict. MedPro reserves the right to file an arbitration action to resolve any dispute arising from the Policy, including any fees disputes pursuant to the Policy's mandatory arbitration provisions.

MedPro's coverage position in this letter is based on the information and documents provided to date and is subject to further evaluation if additional information, documents or legal authority become available. MedPro reserves the right to re-evaluate its entire coverage position, not merely those portions of its position that may be affected by such new or additional documentation, information or legal authority.

FMG LAW Freeman Mathis & Gary LLP



California law requires that you be advised that if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

**California Department of Insurance**
**Claims Service Bureau**
**300 S. Spring Street, 14th Floor**
**Los Angeles, California 90013**
**(213) 346-6464**
**(800) 927-4357**
**www.insurance.ca.gov**

Please do not hesitate to contact the undersigned should you have any questions regarding any aspect of this matter.

Very truly yours,

**FREEMAN MATHIS & GARY, LLP**

Albert K. Alikin

AKA: pbs

cc: Clients

Attachment: GMSR 12/13/24 Memorandum

GMSR
APPELLATE LAWYERS

**MEMORANDUM**

**TO:** Leah Nollenberger & Avi Wagner

**FROM:** Gary Wax & Kent W. Toland

**RE:** Follow-Up Legal Analysis of Options to Set Aside the Default Judgment in *Donnell v. Lighthouse Healthcare Center, LLC* // MedPro Claim No. 1042085 / Los Angeles Superior Court, Case No. BC664101

**DATE:** December 13, 2024

## I. Issue Presented and Short Answer.

This memorandum is a follow-up to our prior memorandum dated November 22, 2024. Based on new facts that we learned from the insured, Lighthouse Healthcare Center, LLC ("Lighthouse"), this memorandum provides an updated assessment of Lighthouse's likelihood of obtaining relief from default judgment.

We do not believe that Lighthouse will be able to obtain such relief. Through our recent conversation with Derek Cheung of Rockport, we learned that he was served with the summons and complaint as indicated by Plaintiff's process server. Our opinion is that Plaintiff's service on Mr. Cheung constitutes valid service of process. We also learned that these documents were transmitted by Rockport to Lighthouse. Accordingly, Lighthouse received actual notice of the litigation in April of 2019.

Thus, Lighthouse was served with the complaint and summons in this lawsuit, and it received actual notice of the lawsuit as well. Accordingly, we believe that Lighthouse's chances of obtaining relief from the default judgment are slim to none.

## II. Relevant Additional Background Facts.

### A. Service of process.

The background facts are set forth in our November 22 memorandum. We subsequently spoke with Derek Cheung on December 3, 2024, along with Avi Wagner, counsel for Lighthouse. Through our conversation with Mr. Cheung, we learned that the facts stated in the April 2019 POS and August 2019 POS are correct. Mr. Cheung was served on the dates shown in those proofs of service.

As set forth in the November 22 memorandum, Lighthouse's registered agent for service of process in April of 2019 was Steven Stroll. Through our recent conversation with Mr. Wagner and Mr. Cheung, we learned that Mr. Stroll did not reside in California in April of 2019. Instead, our understanding is that at all relevant times, Mr. Stroll was a resident of Israel.

### B. Actual notice.

Mr. Cheung's review of his records reflects that after he received the complaint and summons in April of 2019, he transmitted the documents the same day to Yalda Neil, Rockport's in-house counsel with a note that the "Party Served" was "Lighthouse Healthcare Center, LLC." Based on emails we reviewed from April of 2019, Ms. Neil then transmitted the documents to Laib Greenspoon. Our understanding is that Mr.

Greenspoon is an officer of Lighthouse. Thus, Lighthouse had actual notice of the litigation by April 2019.

## III. Methods for Setting Aside Default.

This follow-up memorandum revisits each method for setting aside default in light of the recently discovered facts set forth above.

### A. Motion to set aside default (CCP § 473.5).

Lighthouse will not be able to prevail on a motion to set aside the default judgment under CCP § 473.5. This is because Lighthouse received actual notice of the lawsuit in April of 2019. Lack of actual notice is required to set aside a default judgment under CCP § 473.5—the defendant must have lacked "actual notice" of the lawsuit "in time to defend against the action." (CCP § 473.5, subd. (a).)

### B. Motion to vacate void judgment (CCP § 473(d)).

As set forth in our November 22 memorandum, CCP § 473(d) provides that a court "may" vacate a judgment that is void on motion of either party. Where a defendant was not served with the summons, there is no personal jurisdiction, and the judgment is void. (*Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1444 (*Dill*).)

Our opinion is that the trial court will deem Lighthouse to have been served as shown in the April 2019 POS. Mr. Cheung confirmed that he was, in fact, served as the process server recorded in his declaration.

We do not believe the trial court will view the fact that Steven Stroll was listed as the registered agent for service of process for Lighthouse as a basis to rule that service

was invalid. This is because Lighthouse received actual notice of the lawsuit. The California Supreme Court has held that the statutes governing service of process and jurisdiction "should be liberally construed to effectuate service and uphold the jurisdiction of the court if actual notice has been received by the defendant." (*Pasadena Medi-Center Associates v. Superior Court* (1973) 9 Cal.3d 773, 778; see also *Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1436-1437 [citing *Pasadena Medi-Center Associates* and noting that "substantial compliance is sufficient"].)

Further, courts have found the requirement of service process satisfied when it is "highly probable" service upon the person served will result in actual notice to the defendant. (*Summers v. McClanahan* (2006) 140 Cal.App.4th 403, 413, citing *Warner Bros. Records, Inc. v. Golden West Music Sales* (1974) 36 Cal.App.3d 1012, 1018.)

Finally, as noted in the November 22 memorandum, substituted service need only be """reasonably calculated to give an interested party actual notice of the proceedings and an opportunity to be heard."""  (*Bein v. Brechtel-Jochim Group, Inc.* (1992) 6 Cal.App.4th 1387, 1392.) We are aware of *no* evidence that service on Mr. Cheung would *not* satisfy the "reasonably calculated" standard.[1]

[1] On a call on December 13, 2024, further information regarding the standard for substituted service was requested. We have updated this memorandum, originally transmitted on December 10, 2024, to include an **Appendix A**. Appendix A identifies cases that are relevant to the issue of substituted service and describes their holdings. These cases do not alter our opinions set forth in this memorandum.

**C. Other options to obtain relief from default.**

**1. Equitable relief from default.**

As noted previously, when a default *judgment* has been entered, "equitable relief may be given only in exceptional circumstances." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981.) Further, were Lighthouse to seek equitable relief on grounds of extrinsic mistake, it would be required to prove more than section 473.5 requires to obtain relief. It would be required to demonstrate that it has a "meritorious case," and that it acted with "diligence in seeking to set the default aside once . . . discovered." (*Bae v. T.D. Service Co. of Arizona, supra*, 245 Cal.App.4th at p. 100, quoting *Rappleyea,* at p. 982.)

For these reasons, we do not believe a motion for equitable relief will be viable.

**2. Collateral attack on the default judgment.**

A defaulting party may also raise a collateral attack on a void judgment by filing a separate lawsuit. There is no time limit for a collateral attack. (*Dill*, *supra*, 24 Cal.App.4th at p. 1444.) Here, because the judgment is not void, it is not susceptible to collateral attack.

**3. Motion for relief from default (CCP § 473(b)).**

For the reasons discussed in our previous memorandum, this relief is unavailable.

## IV. Conclusion.

For the reasons discussed above, we believe it is highly unlikely that Lighthouse will be able to obtain relief from the default judgment. Thus, we do not recommend filing a motion to challenge the default judgment, or raising a collateral attack.

**APPENDIX A**

***Bein v. Brechtel-Jochim Group, Inc.* (1992) 6 Cal.App.4th 1387 (*Bein*)**

- In this case, the process server attempted to serve a corporation and its officers at the officers' residence. After being denied entry, the process server effected substitute service on "the gate guard stationed at the community's entrance." (*Bein*, at pp. 1390-1391.)
- The corporation challenged service, claiming that the gate guard was not a "person apparently in charge of the business." (*Id.* at p. 1390.)
- The Court of Appeal disagreed. The court based its analysis on the "reasonably calculated" standard. (*Id.* at p. 1392.) As part of that analysis, the *Bein* court identified specific factors supporting such a finding:
    - "The evident purpose" of the applicable statute (Code of Civil Procedure section 425.10) "is to permit service to be completed upon a good faith attempt at physical service on a *responsible person*." (*Id.* at p. 1393, citing *Khourie, Crew & Jaeger v. Sabek, Inc.* (1990) 220 Cal.App.3d 1009, 1013, italics added.)
    - "Service must be made upon a person whose relationship with the person to be served makes it more likely than not that they will deliver process to the named party." (*Id.* at p. 1393, citation and quotation marks omitted.)
- With that in mind, *Bein* upheld the substituted service on the gate guard as valid. (*Id.* at p. 1393-1394.)

  - The court found that "the gate guard's relationship with appellants made it more likely than not that he would deliver process to appellants." (*Id*. at pp. 1393-1394.)

  - The fact that the defendants in fact received actual notice was relevant to the court's analysis. "We note that they [defendants] do not claim they failed to receive notice of service." (*Id*. at p. 1394.)

***Espindola v. Nunez* (1988) 199 Cal.App.3d 1389 (*Espindola*)**

- In this case, the process server left the complaint and summons with defendant's wife, who was also a co-defendant in the action. (*Espindola*, at p. 1391-1392.)

- The defendant in fact received actual notice as a result—a fact that was material to the *Espindola* court.

  - "Furthermore, from a practical standpoint this method of service was reasonably calculated to provide Jose with actual notice of the action. In fact, Jose does not deny he received the copy left for him." (*Id*. at p. 1392.)

- *Espindola* upheld this service as valid substituted service "[s]ince the actions of the process server were calculated to, and did, result in actual notice." (*Id*. at p. 1393.)

***Khourie, Crew & Jaeger v. Sabek, Inc.* (1990) 220 Cal.App.3d 1009 (*Khourie*)**

- In this case, the process server attempted to serve a corporation at its office. The door was locked, and a woman (not the corporation's agent) responded when the process server rang the bell. She refused to identify herself or accept the papers. The process server then left the documents just outside the door and stated to the woman that he was leaving them there. (*Khourie*, at p. 1012.)

- *Khourie* held that that was sufficient to constitute substituted service. It was permissible to serve the papers on 'the person apparently in charge of Sabek's office—i.e., the only person who responded to his attempt to enter." (*Id.* at p. 1013.) Such service complied with "the evident purpose of CCP section 425.10(a), which "is to permit service to be completed upon a good faith attempt at physical service on a *responsible person*." (*Ibid.*)

***Ellard v. Conway* (2001) 94 Cal.App.4th 540, 546–547**

- In this case, the plaintiff learned that defendants had moved to a new address. They then attempted service via the defendants' private post office box at the "Postal Annex." The process server left the summons and complaint with the Postal Annex Manager. (*Ellard*, at pp. 543-544.)

- *Ellard* upheld this as proper substituted service.
    - Although *Ellard* noted that no California case had addressed this issue, it found that it was valid service. "No facts suggest personal or substitute

service was available at any other address or on any other individual." As a result, service was proper.

- The Court of Appeal also dismissed the defendants' argument that the Postal Annex manager "was not 'apparently in charge' of their post office box[.]" (*Id.* at p. 546.)
  - *Ellard* agreed with defendants that service must be made on "a person whose 'relationship with the person to be served makes it more likely than not that they will deliver process to the named party. [Citation.]'" (*Id.* at p. 546, citing *Bein* at p. 1393.)
  - "But," as the court noted, "that is what happened." (*Ibid.*) "The Postal Annex manager knew" the defendants. (*Id.* at p. 547.) "It was the Postal Annex manager's duty to deliver mail to" the defendants since they leased a post office box there. (*Ibid.*)
  - *Ellard* then concluded: "Under these circumstances, it was more likely than not the manager would deliver the summons and compliant as well." (*Ibid.*)

# Exhibit 39

**From:** David Strother[/O=SHADIK TECHNOLOGIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DAVID_LHCARECENTER.COM]
**Sent:** Wed 3/8/2017 12:59:25 AM (UTC)
**To:** 'laibg@lspoon.com'[laibg@lspoon.com]
**Subject:** Notice of Legal Action
**Attachment:** Legal Intent to Commence Action - Valerie Donnell.pdf

Hi Laib,
I received this notice of legal action from a previous Resident who was under our care in June 2016.
The Resident was here for < 2 days and died without warning.
The family came upon notification of death and was upset Re: the matter.To my knowledge; they were planning to pay for a private autopsy.
The family requested a complete copy of the health record and filed a complaint with CDPH.However, CDPH was not able to substantiate any concern(s) R/T the care of this Resident.
Who would you like for me to contact – insurance / legally speaking..?
Respectfully,
David

EXHIBIT
Greenspoon 7/1/26
39

# Exhibit 96

07/16/26
GREENSPOON
86
SUSAN MYONG CSR 13365

JUD-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): Sebastian M. Medvei (SBN 285604)<br>Medvei Law Group, APC<br>655 N Central Ave, Ste 1700, Glendale, CA 91203<br>TELEPHONE NO.: 213-984-4013 FAX NO (Optional):<br>E-MAIL ADDRESS (Optional): smedvei@medveilaw.com<br>ATTORNEY FOR (Name): Linda Fera, successor to Estate of Dean Donnell | FOR COURT USE ONLY<br><br>FILED<br>Superior Court of California<br>County of Los Angeles<br>01/17/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: A. Dastaryan Deputy |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 6230 Sylmar Ave.<br>MAILING ADDRESS: Same<br>CITY AND ZIP CODE: Van Nuys, CA 91401<br>BRANCH NAME: Van Nuys Courthouse | |
| PLAINTIFF: Dean Donnell et al.<br>DEFENDANT: Four Seasons Healthcare et al. | |
| **JUDGMENT**<br>☐ By Clerk ☑ By Default ☐ After Court Trial<br>☐ By Court ☐ On Stipulation ☐ Defendant Did Not Appear at Trial | CASE NUMBER:<br>BC664101 |

## JUDGMENT

1. ☑ **BY DEFAULT**
   a. Defendant was properly served with a copy of the summons and complaint.
   b. Defendant failed to answer the complaint or appear and defend the action within the time allowed by law.
   c. Defendant's default was entered by the clerk upon plaintiff's application.
   d. ☐ **Clerk's Judgment** (Code Civ. Proc., § 585(a)). Defendant was sued only on a contract or judgment of a court of this state for the recovery of money.
   e. ☑ **Court Judgment** (Code Civ. Proc., § 585(b)). The court considered
      (1) ☐ plaintiff's testimony and other evidence.
      (2) ☑ plaintiff's written declaration (Code Civ. Proc., § 585(d)).

2. ☐ **ON STIPULATION**
   a. Plaintiff and defendant agreed (stipulated) that a judgment be entered in this case. The court approved the stipulated judgment and
   b. ☐ the signed written stipulation was filed in the case.
   c. ☐ the stipulation was stated in open court ☐ the stipulation was stated on the record.

3. ☐ **AFTER COURT TRIAL.** The jury was waived. The court considered the evidence.
   a. The case was tried on *(date and time)*:
      before *(name of judicial officer)*:
   b. Appearances by:
      ☐ Plaintiff *(name each)*:
      (1)
      (2)
      ☐ Continued on Attachment 3b.
      ☐ Plaintiff's attorney *(name each)*:
      (1)
      (2)
      ☐ Defendant *(name each)*:
      (1)
      (2)
      ☐ Continued on Attachment 3b.
      ☐ Defendant's attorney *(name each)*:
      (1)
      (2)
   c. ☐ Defendant did not appear at trial. Defendant was properly served with notice of trial.
   d. ☐ A statement of decision (Code Civ. Proc., § 632) ☐ was not ☐ was requested.

Electronically Received 01/10/2023 11:40 AM

| PLAINTIFF: Dean Donnell et al. | CASE NUMBER: |
|---|---|
| DEFENDANT: Four Seasons Healthcare et al. | BC664101 |

JUDGMENT IS ENTERED AS FOLLOWS BY: ☐ THE COURT ☐ THE CLERK

4. ☐ **Stipulated Judgment.** Judgment is entered according to the stipulation of the parties.

5. **Parties.** Judgment is

a. ☑ for plaintiff *(name each)*:
Linda Fera, as successor in interest to the Estate of Dean Donnell
and against defendant *(names)*:
Lighthouse Healthcare Center, LLC

☐ Continued on Attachment 5a.

b. ☐ for defendant *(name each)*:

c. ☐ for cross-complainant *(name each)*:

and against cross-defendant *(name each)*:

☐ Continued on Attachment 5c.

d. ☐ for cross-defendant *(name each)*:

6. **Amount.**

a. ☑ Defendant named in item 5a above must pay plaintiff on the complaint:

| | | | |
|---|---|---|---|
| (1) | ☑ | Damages | $ 2,000,000 |
| (2) | ☐ | Prejudgment interest at the annual rate of % | $ |
| (3) | ☐ | Attorney fees | $ |
| (4) | ☑ | Costs | $ 885 |
| (5) | ☐ | Other *(specify)*: | $ |
| (6) | | **TOTAL** | $ 2,000,885 |

c. ☐ Cross-defendant named in item 5c above must pay cross-complainant on the cross-complaint:

| | | | |
|---|---|---|---|
| (1) | ☐ | Damages | $ |
| (2) | ☐ | Prejudgment interest at the annual rate of % | $ |
| (3) | ☐ | Attorney fees | $ |
| (4) | ☐ | Costs | $ |
| (5) | ☐ | Other *(specify)*: | $ |
| (6) | | **TOTAL** | $ |

b. ☐ Plaintiff to receive nothing from defendant named in item 5b.
☐ Defendant named in item 5b to recover costs $
☐ and attorney fees $

d. ☐ Cross-complainant to receive nothing from cross-defendant named in item 5d.
☐ Cross-defendant named in item 5d to recover costs $
☐ and attorney fees $

7. ☐ Other *(specify)*:

Date: 01/17/2023 ☑ Virginia Keeny
JUDICIAL OFFICER

Date: ☐ Clerk, by ______________________, Deputy

**CLERK'S CERTIFICATE** *(Optional)*

(SEAL)

I certify that this is a true copy of the original judgment on file in the court.

Date:

Clerk, by ______________________, Deputy

# Exhibit 119

**Exhibit To Be Filed Under Seal**

# Exhibit 120

**Exhibit To Be Filed Under Seal**

# Exhibit 131

**From:** "Hopping, John" <John.Hopping@medpro.com>
**Sent:** Thu, 2 Mar 2017 06:57:55 -0800
**To:** "Steven Riss" <Steven.Riss@amwins.com>; "Eli Fogel" <Eli.Fogel@amwins.com>
**Subject:** FW: MED PRO: NSC100276-Lighthouse Healthcare Center Senior Care-BINDER
**Attachments:** 091-B9B2FFBD82E4.pdf, RM Contact Form.pdf, MedPro Senior Care Risk Management Resource Center Access.pdf

I was getting bounce backs sending this over yesterday. Hopefully it works now.

Thanks!

JH

**From:** Hopping, John
**Sent:** Wednesday, March 01, 2017 10:28 AM
**To:** 'Steven Riss' <Steven.Riss@amwins.com>; Eli Fogel <Eli.Fogel@amwins.com>
**Subject:** MED PRO: NSC100276-Lighthouse Healthcare Center Senior Care-BINDER

Hi Steve,

Thanks for the order on this one.

Attached is the binder. Also attached is the RM Contact page as we would like an onsite risk consultation completed on this one. Please have this returned as soon as possible so we can work on that.

Let me know if you have any questions or need anything further in the meantime.

Thanks!

JH



**John Hopping**
MedPro Group
Senior Care Division
5814 Reed Road
Fort Wayne, IN 46835

Office: 260.492.4020
Cell: 260.414.6070
john.hopping@medpro.com
www.medpro.com

*Please send submissions to:* seniorcare@medpro.com

Exhibit131
S. Riss
August 6, 2026
Rptr: D. Paholski

MedPro Group
a Berkshire Hathaway company

MedPro Group
*a Berkshire Hathaway company*

# National Fire & Marine Insurance Company

**Omaha, NE**

## Senior Care Binder

Actual terms, conditions, and pricing provided by a subsequent quote may differ from that provided herein as the result of additional information provided to us.

| | |
|---|---|
| **Named Insured:** | **Name of Insurer(s):** National Fire & Marine Insurance Company ("National Fire & Marine") |
| Lighthouse Healthcare Center, LLC dba Lighthouse Healthcare Center<br>5900 Wilshire Boulevard, Suite 1600<br>Los Angeles, CA 90036 | **Agent:** AmWins Insurance Brokerage of California, LLC<br>21550 Oxnard Street, Suite 1100<br>Woodland Hills, CA 91367 |

| | |
|---|---|
| **Policy Period:** | **March 1, 2017 – March 1, 2018** **Policy Number: NSC100276** |
| Policy Retro Date: | 3/1/2007 |
| Primary Premium: | $159,711 |
| Excess / Umbrella Premium: | $ |
| **Total Premium:** | **$159,711** |
| TRIA: | Primary - $167<br>Excess / Umbrella - $ |
| Patient's Compensation Fund Surcharge: | $ |
| Deductible: | $25,000 Per Event - Indemnity and Claims Expense / $0 Aggregate |
| SIR: | $0 Per Event / $0 Aggregate |
| **Schedule of Insured(s):** | Location Address:<br>2222 Santa Ana Boulevard South<br>Los Angeles, CA 90059 |
| **Policy Aggregate:** | **$** |

| Primary Professional Liability | |
|---|---|
| **Type:** | Claims-Made |
| **Limits of Liability:** | $1,000,000 Per Event / $3,000,000 Aggregate |
| Notes: | Disciplinary Proceedings are included within the limit |

| Primary General Liability | |
|---|---|
| **Type:** | Claims-Made |
| **Limits of Liability:** | $1,000,000 Per Event / $3,000,000 Aggregate |
| Products Liability: | $3,000,000 Aggregate Limit |
| Personal/Advertising Injury: | $1,000,000 Per Event / $1,000,000 Aggregate |
| Damage to Premises Rented: | $200,000 Per Event / $200,000 Aggregate |
| Medical Expense Limit: | $5,000 Per Event / $25,000 Aggregate |
| **<u>Limits in addition to those provided in the base form</u>** | |
| Emergency Evacuation: | $50,000 |
| Legal / Media / Public Relations: | $50,000 |
| Crisis Management: | $25,000 |
| Employee Benefits Liability Limits: | $1,000,000 Per Event Limit / $1,000,000Aggregate Limit<br>Retro Date: 3/1/2007 |
| Employee Benefits Liability Deductible: | $1,000 Per Event |
| Notes: | |

| Cyber-Liability / Regulatory Fines and Penalties / Crisis Management /Data Protection Reputational Harm | | | |
|---|---|---|---|
| **Type:** | Claims-Made | | |
| **Limits of Liability:** | $ | 100,000 | Coverage A – Multimedia Liability |
| | $ | 100,000 | Coverage B –Security and Privacy Liability |
| | $ | 100,000 | Coverage C –Privacy Regulatory Defense and Penalties |
| | $ | 100,000 | Coverages D – Privacy Breach Response Costs, Customer Notification Expenses, and Customer Support and Credit Monitoring Expenses |
| | $ | 100,000 | Coverages E – Network Asset Protection |
| | $ | 100,000 | Coverages F – Cyber Extortion |
| | $ | 100,000 | Coverages G – Cyber Terrorism |
| | $ | 100,000 | Coverages H – Regulatory Proceeding |
| | $ | 100,000 | Coverages I – Evacuation Expense Reimbursement |
| | $ | 100,000 | Coverages J – Disinfection Expense Reimbursement |

| | | | |
|---|---|---|---|
| | $ 100,000 | Coverages K – Public Relations Expense Reimbursement | |
| | $ 100,000 | Coverages L – E-Discovery Claim Expenses and E-Discovery Regulatory Investigation Expenses | |
| | $ 100,000 | Coverages M – Data Protection Reputational Harm | |
| | $ 100,000 | Aggregate Limit of Liability for this Insuring Agreement | |
| **Retention:** | $ Nil | Each Claim Coverages A-M | |
| **Time Retention:** | 8 hours | Coverages E(2) and G | |
| **Retroactive Date:** | March 1, 2017 | **Premium for Coverage:** | $ Included |
| **Schedule of Insureds:** | See Attached Schedule | | |

| | |
|---|---|
| ***Subject To The Following Conditions:*** | This binder is based upon a reliance on the information submitted prior to the date of this request and is contingent upon the underwriting of a completed National Fire & Marine application.<br>• This binder by National Fire & Marine is registered and delivered as surplus lines coverage under the surplus lines insurance law; such surplus lines coverage is not issued on an admitted basis in California.<br>• If Excess Coverage is requested, all underlying primary coverage must be provided by a company rated "A" or better by A.M. Best.<br>• Premiums shown are calculated on a Gross Premium basis.<br>• Acceptable collateral may be required for any deductible.<br>• Any quote or indication offered by National Fire & Marine Insurance Company herein is invalid if The Medical Protective Company has also made a quote or indication for the same account and effective date.<br>Please review carefully and advise us immediately if you have any questions. |
| ***Commission:*** | Primary – 15.50%<br>Excess / Umbrella - % |
| ***Notes:*** | **PLEASE CONTACT YOUR UNDERWRITER FOR ADDITIONAL PAYPLANS**<br>TRIA is Included in the Premiums<br><br>ADDITIONAL SUBJECTIVITIES:<br>1) Recently signed and dated Med Pro Supplemental Application<br>2) Risk Management Customer Contact Information Page for Onsite Visit<br>3) You are responsible for the collection and remittance of all Surplus Lines Taxes and Fees. Further, you are responsible for stamping the policy when required. |
| ***Payment:*** | Payment must be received by Medical Protective within 28 days from date of billing invoice or the offer of coverage is subject to withdrawal. |
| ***Payment Plans:*** | Full-Payment<br>***(Not applicable for Excess/Umbrella)*** |
| ***Expiration Date of Binder :*** | This binder is valid until [30 days from Quotation date or requested effective date (whichever is sooner) -- Binders should reflect effective date + 30 days]. |
| ***Excess & Surplus Lines Notification:*** | 1. This binder is issued by an Insurance Company that is not licensed by the State of California. These companies are called "non-admitted" or "surplus lines" insurers.<br>2. The Insurer is not subject to the financial solvency regulations and enforcement procedures, which apply to California licensed insurers.<br>3. The Insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets |

| | |
|---|---|
| | if the insurer becomes insolvent and is unable to make payments as promised.<br>4. For additional information about the insurer, you may contact the California Department of Insurance. Surplus lines taxes will be the responsibility of the agent to collect and remit and neither Medical Protective nor National Fire & Marine assume any responsibility whatsoever. It is the requirement of the State Insurance Department that we confirm collection and remittance of tax. |
| ***Significant Coverage Provisions:*** | In addition to the standard policy conditions and terms, the following are exclusions or endorsements, which will be added to the policy.<br>• |

| | | |
|---|---|---|
| Date: March 1, 2017 | Contact: John P. Hopping | Telephone: 260.492.4020 |

MedPro Group
a Berkshire Hathaway company

## *Fill out and return*

Please complete the form below for each contact you wish to receive risk management materials and return to Charles Colburn, 180 North LaSalle, Suite 2880, Chicago, IL 60601 or return to Charles.Colburn@medpro.com.

| Name | Contact Title | Phone | Business | Address | Email |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MedPro Group is the marketing name used to refer to the insurance operations of The Medical Protective Company, Princeton Insurance Company, PLICO, Inc. and MedPro RRG Risk Retention Group. Visit medpro.com/affiliates for more information. © 2016 MedProGroup. All Rights Reserved.

# Welcome to the
# MedPro Senior Care Risk Management Resource Center!

**Accessing the MedPro Senior Care Risk Management Resource Center is easy!**

**Step 1:**
Go to MedPro.com/SeniorCare and click on **Risk Management Resources** to access the Resource Center. Once there, simply enter your email address and submit:




**Step 2:** Begin exploring the MedPro Senior Care Risk Management Resource Center!

### Explore Resources
- Assessment forms/checklists
- Aging-related risk language
- Arbitration/mediation language
- Sample clinical policies and procedures
- Best practices
- Regulatory guidelines
- Survey management tools
- OSHA, HIPAA, and FDA guidelines
- Risk reduction recommendations

*Many of the tools are user-friendly Word documents that can be customized to meet a facility's needs*

### eAssist™
- Ask a clinician a question regarding risk management in the healthcare setting
- Check the FAQ section for questions on other risk management topics

### Follow Industry News
- Updated regularly
- News covers general healthcare to Senior Housing topics
- Go to the home page for the most recent news

### Track Legislation
- Watch important healthcare bills as they pass through Congress
- Bill widgets make it easy to see a status snapshot

### Industry Calendar
Find out when the next industry conference is happening with the monthly calendar feature

### Visit the MedPro Senior Care Risk Management Resource Center Often
The website is updated regularly to ensure users are viewing current information on issues and trends in the healthcare setting.

See the benefits for yourself by accessing the site.

MedPro Group
a Berkshire Hathaway company

# Exhibit 139

Message

| | |
|---|---|
| **From:** | Aboufadel, Andrea [/o=MEDPRO/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Aboufadel, Andreae27] |
| on behalf of | Aboufadel, Andrea |
| **Sent:** | 4/3/2017 11:55:17 AM |
| **To:** | eli.fogel@amwins.com |
| **CC:** | Hopping, John [/o=MEDPRO/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Hopping, John3d7] |
| **Subject:** | Healthcare Liability Coverage - Lighthouse Healthcare Center, LLC / Policy Number: NSC100276 |
| **Attachments:** | Policy Cover Letter.pdf; Primary.pdf |
| **Importance:** | High |

Eli,

I am pleased to attach the policy and cover letter issued to Lighthouse Healthcare Center, LLC. Please forward these documents to the insured and retain a copy for your files. If you have any questions about this policy or need additional service, please contact us as follows:

- Claims: reportaclaim@medpro.com or 800-4MEDPRO (800-463-3776)
- Underwriting: John Hopping, john.hopping@medpro.com, 260-492-4020
- Policy Service: Andrea Aboufadel, andrea.aboufadel@medpro.com, 260-492-4680
- Billing: SpecialtyBilling@medpro.com or 800-4MEDPRO (800-463-3776) ext. 3661

Thank you for your continued support.

**Andrea Aboufadel**
Associate Underwriter, Senior Care Division
Office: 260-492-4680
andrea.aboufadel@medpro.com
www.medpro.com

Please send submissions to seniorcare@medpro.com

MedPro Group
a Berkshire Hathaway company

Exhibit139
S. Riss
August 6, 2026
Rptr: D. Paholski

MedPro Group
a Berkshire Hathaway company

4/3/2017

Lighthouse Healthcare Center, LLC
5900 Wilshire Blvd Ste 1600
Los Angeles, CA 90036

**Re: Policy Number NSC100276**

Thank you for trusting us to protect your assets and reputation. Enclosed please find your policy underwritten by National Fire & Marine Insurance Company.

MedPro Group, a Berkshire Hathaway company, offers our insureds:

- Peace of Mind: Unsurpassed financial strength ratings of A++ (Superior) from A.M. Best and AA+ from Standard and Poor's combined with the strongest defense of claims
- Expertise: Innovative resident safety and risk solutions
- Choice: Customized insurance solutions across the healthcare continuum – nationwide

We encourage you to visit our Senior Care website and Risk Management Resource Center (www.medpro.com/seniorcare) to access information regarding the latest risk concerns and recommended strategies to help promote resident safety and satisfaction.

Please direct notice of claims in accordance with the reporting requirements of this policy as follows:

Via Email: reportaclaim@medpro.com

Via Mail: Medical Protective
Attn: First Claim Reports
5814 Reed Road
Fort Wayne, IN 46835

Our claim experts are prepared to work with you to resolve any claim-related issues. Please feel free to contact 800-4MedPro (800-463-3776) to be connected to your claims representative who will be able to address questions or concerns about a claim involving this policy.

Sincerely,

Tim Kenesey
President and CEO

A.M. Best rating as of 05/27/2015. S&P rating as of 08/06/2015. MedPro Group is the marketing name used to refer to the insurance operations of The Medical Protective Company, Princeton Insurance Company, PLICO, Inc. and MedPro RRG Risk Retention Group. All insurance products are administered by MedPro Group and underwritten by these and other Berkshire Hathaway affiliates, including National Fire & Marine Insurance Company, all of which have earned financial strength ratings of A++ from A.M. Best. Visit www.medpro.com/affiliates for more information. © 2016 MedPro Group Inc. All Rights Reserved.

polltrns-SC_20160405

## California Surplus Lines Warning Statement

**Notice:**

**1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the state of California. These companies are called "nonadmitted" or "surplus line" insurers.**

**2. The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.**

**3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.**

**4. The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the following toll-free telephone number (800) 927-4357, or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also contact the NAIC's internet web site at www.naic.org.**

**5. Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer.**

**6. For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.**

**7. California maintains a list of approved surplus line insurers. Ask your agent or broker if the insurer is on that list, or view that list at the internet web site of the California Department of Insurance:** www.insurance.ca.gov.

**8. If you, as the applicant, required that the insurance policy you have purchased be bound immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.**

This insurance is issued pursuant to the CA INS § 1760 through CA. INS § 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

## *SENIOR CARE LIABILITY POLICY DECLARATIONS*

**NOTICE:**
**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

**ISSUING COMPANY:** National Fire & Marine Insurance Company, as administered by The Medical Protective Company
Omaha, Nebraska

| | |
|---|---|
| **POLICY NUMBER:** | NSC100276 |

| | | | |
|---|---|---|---|
| ITEM 1 | **FIRST NAMED INSURED:**<br>**ADDRESS:** | Lighthouse Healthcare Center, LLC<br>5900 Wilshire Blvd Ste 1600<br>Los Angeles, CA 90036<br>☐ Administrative First Named Insured | |
| ITEM 2 | **POLICY PERIOD:** | From 03/01/2017 to 03/01/2018 both days at 12:01 a.m. at the address of the First Named Insured stated herein. | |
| ITEM 3 | **COVERAGE PARTS SELECTED:**<br>(please refer to the applicable Schedule of Named Insureds for detailed Retroactive Dates, Limits of Liability, Retentions, etc.) | | |
| | **Professional Liability:** | | Claims-Made and Reported |
| | **General Liability:** | | Claims-Made and Reported |
| | **Employee Benefits Liability:** | | Claims-Made and Reported |
| | **Cyber Liability and Breach Response:** | | Claims-Made and Reported |
| ITEM 4 | **RETROACTIVE DATE:** | | |
| | **Professional Liability:** | | 03/01/2007 |
| | **General Liability:** | | 03/01/2007 |
| | **Employee Benefits Liability:** | | 03/01/2007 |
| | **Cyber Liability and Breach Response:** | | 03/01/2017 |
| | All days at 12:01 a.m. at the address of the First Named Insured stated herein. | | |
| ITEM 5 | **LIMITS OF LIABILITY:** | | |
| | **Professional Liability:** | | |
| | Per Event Limit | | $1,000,000 |
| | Aggregate Limit | | $3,000,000 |
| | Claims Expenses | | Defense Outside Limits |
| | **General Liability:** | | |
| | Per Event Limit | | $1,000,000 |
| | General Aggregate Limit | | $3,000,000 |
| | Products Completed Operations Hazard Aggregate Limit | | $3,000,000 |
| | Personal and Advertising Injury Limit | | $1,000,000 Each Person |
| | Damage to Premises Rented to an Insured | | $200,000 Each Fire |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | | |
|---|---|---|
| | Medical Expense Limit | $5,000 Each Person |
| | Claims Expenses | Defense Outside Limits |
| | **Employee Benefits Liability:** | |
| | Employee Benefits Liability Per Event Limit | $1,000,000 |
| | Employee Benefits Liability Aggregate Limit | $1,000,000 |
| | Claims Expenses | Defense Outside Limits |
| | **Cyber Liability and Breach Response:** | |
| | Coverage A - Multimedia Liability | $100,000 each claim/aggregate |
| | Coverage B - Security and Privacy Liability | $100,000 each claim/aggregate |
| | Coverage C - Privacy Regulatory Defense and Penalties | $100,000 each claim/aggregate |
| | Coverage D - Privacy Breach Response Costs, Customer Notification Expenses, and Customer Support and Credit Monitoring Expenses | $100,000 each claim/aggregate |
| | Coverage E - Network Asset Protection | $100,000 each claim/aggregate |
| | Coverage F - Cyber Extortion | $100,000 each claim/aggregate |
| | Coverage G - Cyber Terrorism | $100,000 each claim/aggregate |
| | Coverage H - Regulatory Proceeding | $100,000 each claim/aggregate |
| | Coverage I - Evacuation Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage J - Disinfection Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage K - Public Relations Expense Reimbursement | $100,000 each claim/aggregate |
| | Coverage L - E-Discovery Claim Expenses and E-Discovery Regulatory Investigation Expenses | $100,000 each claim/aggregate |
| | Coverage M - Data Protection Reputational Harm | $100,000 each claim/aggregate |
| | Annual Aggregate Limit | $100,000 |
| | Claims Expenses | Defense Within Limits |
| ITEM 6 | **RETENTION:** | |
| | **Professional Liability:** | $25,000 Per Event / $Nil Aggregate<br>Deductible - Loss and Claims Expense |
| | **General Liability:** | $25,000 Per Event / $Nil Aggregate<br>Deductible - Loss and Claims Expense |
| | **Employee Benefits Liability:** | $1,000 Per Event / $Nil Aggregate<br>Deductible - Loss Only |
| | **Cyber Liability and Breach Response:** | $Nil Each Claim Self-Insured Retention<br>8 hours Time Retention (Coverages E.2. and G)<br>180 consecutive days Period of Indemnity (Coverage M) |
| ITEM 7 | **PREMIUM:** | |
| | Policy Premium | $159,544 |
| | Terrorism Premium (TRIA) | $ 167 |
| | Total Premium | $159,711 |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | | |
|---|---|---|
| | **(May be subject to audit. Does not include any applicable surplus lines taxes, which must be collected by the producer.)** | |
| ITEM 8 | **FORMS & ENDORSEMENTS:** | Refer to attached Schedule of Forms and Endorsements |
| ITEM 9 | **PRODUCER:**<br>**ADDRESS:** | AmWins Brokerage of California LLC<br>21550 Oxnard St Ste 1100<br>Woodland Hills, CA 91367 |

IN WITNESS WHEREOF, National Fire & Marine Insurance Company has caused this policy to be signed by its President (and countersigned by its duly Authorized Representative, where necessary).

President

Countersigned By: ______________________ Date: ______________________

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements attached to this Policy:

| FORM NAME | FORM NUMBER | ENDORSEMENT NUMBER |
|---|---|---|
| Senior Care Liability Policy - Declarations | NFM-SC-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 | |
| Schedule of Forms and Endorsements | NFM-SC-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 | |
| Trade, Fictitious and/or Business Names Endorsement | NFM-SC-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 | 1 |
| Schedule of Named Insureds - Insured Locations | NFM-SC-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 | |
| Service of Suit Clause | NFM-SC-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 | |
| Senior Care Liability Policy - Common Policy Provisions and Conditions | NFM-SC-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 | |
| Senior Care Liability Policy - Professional Liability Coverage Part | NFM-SC-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 | |
| Senior Care Liability Policy - General Liability Coverage Part | NFM-SC-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 | |
| Senior Care Liability Policy - Cyber Liability, Regulatory Proceeding, Crisis Management, Data Protection and Reputational Harm Coverage Part | NFM-SC-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 | |
| Blanket Additional Insured Endorsement (Professional Liability) | NFM-SC-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 | 2 |
| Crisis Response Costs Endorsement (General Liability) | NFM-SC-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 | 3 |
| Disease Contamination Clean-Up Expenses Endorsement (General Liability) | NFM-SC-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 | 4 |
| Emergency Evacuation Expenses Endorsement (General Liability) | NFM-SC-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 | 5 |
| Employee Benefits Liability Endorsement (Claims-Made and Reported) | NFM-SC-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 | 6 |
| Media Expenses Endorsement (General Liability) | NFM-SC-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 | 7 |
| Patient's Personal Property Endorsement (General Liability) | NFM-SC-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 | 8 |
| Blanket Additional Insured Endorsement (General Liability) | NFM-SC-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 | 9 |
| Cap on Losses From Certified Acts of Terrorism Endorsement (Purchased) | NFM-SC-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 | 10 |

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 1 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## TRADE, FICTITIOUS AND/OR BUSINESS NAMES ENDORSEMENT

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

Subject to all terms and conditions of the policy, any trade, fictitious, and/or business name listed in the Schedule of Trade, Fictitious and/or Business Names below and any other trade, fictitious and/or business name by which any **named insured** operates or trades as are by reference included in the coverage afforded to the associated **named insured**.

This endorsement shall not, however, in any way cause the **company's** total liability to exceed the applicable Limits of Liability for any Coverage Part, regardless of the number of **named insured(s)** scheduled below or on the policy.

| **SCHEDULE OF TRADE, FICTITIOUS AND/OR BUSINESS NAMES** | | |
|---|---|---|
| NAMED INSURED | ID NUMBER | TRADE, FICTITIOUS OR BUSINESS (D/B/A) NAME |
| Lighthouse Healthcare Center, LLC | 1267813 | Lighthouse Healthcare Center |

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SCHEDULE OF NAMED INSUREDS – INSURED LOCATIONS

In consideration of the premium due, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree the **locations** listed below are provided coverage subject to their Retroactive Dates also listed below, notwithstanding any Retroactive Date listed elsewhere in the policy.

| SCHEDULE OF NAMED INSUREDS - INSURED LOCATIONS | | | | | |
|---|---|---|---|---|---|
| LOCATION | ID NUMBER | RETROACTIVE DATE: PROFESSIONAL LIABILITY | RETROACTIVE DATE: GENERAL LIABILITY | RETROACTIVE DATE: CYBER LIABILITY | TERMINA-TION DATE |
| 2222 Santa Ana S, Los Angeles, CA 90059 | | 03/01/2007 | 03/01/2007 | 03/01/2017 | |

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

| | |
|---|---|
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Policy Period:** | From 03/01/2017 to 03/01/2018 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## SERVICE OF SUIT CLAUSE

Service of process in any lawsuit, or mandated alternative dispute resolution (ADR) proceeding instituted against the **company** shall be made upon:

**General Counsel**
**National Fire & Marine Insurance Company**
**1314 Douglas Street**
**Omaha, Nebraska 68102-1944**

The General Counsel is authorized and directed to accept service of process on behalf of the **company** in any suit or ADR proceeding and, upon the request of the **insured**, agrees to give a written acknowledgement to the **insured** that the **company** will retain counsel to enter an appearance upon the **company's** behalf should a lawsuit or ADR proceeding be instituted.

Further, pursuant to any law of any state, the District of Columbia, territory, or protectorate of the United States which makes provision therefore, the **company** hereby designates the Superintendent, Commissioner, Director of Insurance, deputy, or department employee specified as attorney or agent for receipt of lawful service of process or ADR proceeding, in the law, instituted by or on behalf of the **insured** or any beneficiary within this contract, the General Counsel is hereby authorized as the **company's** designee upon whom the service of process may be served.

Nothing contained herein shall limit or abridge the right to serve any process, notice or demand upon the **company** in any other manner permitted or required by law.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*
## *COMMON POLICY PROVISIONS AND CONDITIONS*

**NOTICE:**

**This policy may contain claims-made and reported coverage. Please read this policy carefully.**

In consideration of the payment of the premium due, and in reliance upon the representations of all **insureds**, the **company** and all **insureds** agree as follows, subject to the terms and conditions of this policy, including the applicable Limits of Liability:

## I. DEFINITIONS

These definitions apply to all Coverage Parts:

A. **Additional insured** means any person or organization listed on a Schedule of Additional Insureds.

B. **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about any **named insured's** goods, products, or services for the purpose of attracting customers or supporters. For the purposes of this definition:

1. notices that are published include material placed on the internet or on similar electronic means of communication; and
2. regarding websites, only that part of a website that is about any **named insured's** goods, products, or services for the purposes of attracting customers or supporters is considered an **advertisement**.

C. **Authorized insured** means any **insured** authorized by the **first named insured** to give notice of a **claim** or **potential claim** to the **company**.

D. **Automobile** or **auto** means:

1. any land motor vehicle, trailer or semi-trailer, including any attached machinery and equipment, designed for use on public roads; or
2. any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, **automobile** or **auto** does not include **mobile equipment**.

E. **Bodily injury** means any damage to the human body, including sickness or disease and any mental injury, shock, emotional distress, or death arising therefrom. In addition, it includes damages claimed for the cost of any care, loss of services, or loss of consortium arising therefrom.

F. **Case management** means identifying patients with specific health care needs and developing a plan to ensure an efficient use of resources to achieve the best outcome.

G. **Claim** means an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies, are alleged. Suit also includes an arbitration proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent, and any other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** submits with the **company's** consent. However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

H. **Claims expense** means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any **claim** or **potential claim**. Such costs and expenses:

1. shall only include:
    a. attorneys' fees paid to the law firm selected to defend an **insured**;

 © 2015 MedPro Group. All rights reserved.

b. court costs;

c. expert fees;

d. reporter fees;

e. the cost of any alternative dispute resolution ordered by a court, otherwise required by law, or pre-approved by the **company**;

f. post-judgment interest on that portion of the judgment that does not exceed the Limit of Liability available under the particular coverage provided; and

g. such other costs and expenses that the **company** determines to be reasonably related to the defense of a **claim** or **potential claim**.

2. shall not include:

a. **loss**;

b. attorneys' fees awarded to a claimant;

c. the salary of any **employee** of an **insured**; or

d. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

I. **Company** means the Issuing Company shown on the Declarations.

J. **Employee** means any person who is or was paid under a regular payroll schedule, whether hourly or salaried, including part-time and full-time employment, and has or had federal and state (if applicable) taxes withheld, and receives, received or will receive, a W-2 IRS tax form from any **named insured** that is an organization, and who was acting within the scope of his or her duties on behalf of that **named insured** at the time of the **event**, offense, **health care event** or any other act or omission that results in a **claim** or **potential claim** that is otherwise covered under this policy. **Employee** also includes any leased worker, volunteer or temporary worker so long as such person is or was acting within the scope of his or her duties on behalf of a **named insured** that is an organization.

As used in this definition:

1. "leased worker" means a person leased to, or used by, a **named insured** that is an organization through a labor leasing firm or a locum tenens or staffing organization under an agreement between a **named insured** and the labor leasing firm, or locum tenens or staffing organization, to perform duties related to the conduct of that **named insured's** business. Leased worker does not include a temporary worker;

2. "temporary worker" means a person who is furnished to a **named insured** that is an organization to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions. A temporary worker does not include a leased worker; and

3. "volunteer" means a person who provides his or her services or labor to a **named insured** that is an organization, without being paid by that **named insured**, under the supervision or direction of the **named insured**. Volunteer does not include any independent contractor or staff physician.

However, only with respect to the coverage provided under the Professional Liability Coverage Part, **employee** does not mean any physician, surgeon, podiatrist, chiropractor, dentist, certified registered nurse anesthetist, midwife, resident or intern. Additionally, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

K. **Event** means an accident. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or

2. the continuous or repeated exposure to substantially the same harmful conditions;

will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from

 © 2015 MedPro Group. All rights reserved.

conception through delivery shall constitute one **event**.

L. **Extended reporting period** means the period of time after the cancellation or nonrenewal of any Coverage Part shown on the Declarations or any endorsement as "Claims-Made and Reported" during which an **insured** may report a **claim** or **potential claim**.

M. **First named insured** means the person or organization shown as the First Named Insured on the Declarations.

N. **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury. All injuries arising out of, or in connection with, the same or related acts or omissions in furnishing **professional services** shall be considered one **health care event**.

O. **Impaired property** means tangible property, other than the **insured's product** or the **insured's work**, which cannot be used or becomes less useful because:

1. it incorporates the **insured's product** or **insured's work** that is known or thought to be defective, deficient, inadequate, or dangerous; or
2. an **insured** has failed to fulfill the terms of a contract or agreement if such property can be restored to use by:
   a. the repair, replacement, adjustment, or removal of the **insured's product** or **insured's work**; or
   b. an **insured's** fulfillment of the terms of the contract.

P. **Insured** means:

1. the **first named insured**;
2. any **named insured**;
3. any **employee**;
4. any administrator, partner, superintendent, director, officer, member, trustee, stockholder, medical director, department head or head of the medical staff, student, board or committee member or staff member, but only to the extent that he or she is acting within the scope of his or her duties on behalf of any **named insured**. As used to define **insured**, student means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by any **named insured** that is an organization relative to the delivery of **professional services**;
5. any spouse or domestic partner of any individual **insured**, but only with respect to the conduct of the business of a **named insured** that is an organization. As used in this definition, "domestic partner" means any person qualifying as such under any federal, state or local laws or under a **named insured's** employee benefit plans or employee benefits program;
6. any organization formed or acquired by a **named insured** that is an organization during the **policy period**, over which that **named insured** maintains at least majority ownership; however, coverage under this subparagraph is afforded only:
   a. after the **company** has received an application, and has agreed in writing to add the newly formed or acquired organization to the policy as an **insured**;
   b. for a **loss**, **event**, offense, **health care event**, **bodily injury**, **property damage** or **personal and advertising injury** or other **claim** or **potential claim** otherwise covered by this policy that occurred after the organization was formed or acquired by the **named insured**; and
   c. unless otherwise stated on a Schedule of Named Insureds, the newly formed or acquired organization will share Limits of Liability with the **named insured** that formed or acquired that newly formed or acquired organization;
7. the estate, heirs, executors, administrators, assigns and legal representatives of an **insured** in the event of such **insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **insured** would have been provided coverage under this policy; or
8. any organization, or any person other than an **employee**, while acting as a **named insured's** real estate

 © 2015 MedPro Group. All rights reserved.

manager.

Q. **Insured contract** means:

1. a contract for a lease of premises; however, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with permission of the owner is not an **insured contract**;
2. any easement or license agreement, except in connection with construction or demolition operations on, or within 50 feet of, a railroad;
3. an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or
4. an elevator maintenance agreement.

R. **Insured's product**

1. means:
   a. any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:
      (1) a **named insured**;
      (2) others trading under a **named insured's** name; or
      (3) a person or organization whose business or assets a **named insured** has acquired.
   b. containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.
2. includes:
   a. warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the goods or the **insured's products**; or
   b. the providing of, or the failure to provide, warnings or instructions.
3. does not include:
   a. vending machines; or
   b. other property rented to, or located for, the use of others, but not sold to others by a **named insured**.

S. **Insured's work**

1. means:
   a. work or operations performed by, or on behalf of, a **named insured**; or
   b. materials, parts, or equipment furnished in connection with such work or operations.
2. includes:
   a. warranties or representations made at any time with regard to the fitness, quality, durability, performance, or use of the work or operations; or
   b. the providing of, or the failure to provide, warnings or instructions.

T. **Loading or unloading** means the handling of property:

1. after it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft, or **auto**;
2. while it is in or on an aircraft, watercraft, or **auto**; or
3. while it is being moved from an aircraft, watercraft, or **auto** to the place where it is finally delivered.

It does not include the movement of property by means of a mechanical device, other than a hand truck, which is not attached to the aircraft, watercraft, or **auto**.

 © 2015 MedPro Group. All rights reserved.

U. **Location** means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

V. **Loss**

1. Means civil damages, including prejudgment interest, which an **insured** becomes legally obligated to pay through adjudication or settlement.

2. Does not include:

   a. any damages that are greater than any applicable Limit of Liability;

   b. any injunctive or other equitable relief;

   c. **claims expense**;

   d. attorneys' fees awarded to a claimant as a fine, penalty, or sanction based upon any **insured's** misconduct; however, attorneys' fees awarded as a part of the claimant's damages in a covered **claim** for any other purpose will be included as **loss**;

   e. the salary of any **employee**; or

   f. the forgiveness of any amounts owed for the cost of care or services rendered by an **insured**.

W. **Managed care services** means services provided to manage and/or administer a health care plan. Health care plan means a medical benefits plan administered by a health maintenance organization, preferred provider organization, or other similar managed care organization or self-insured managed care organization. These services can include any of the following acts provided on behalf of the health care plan:

1. the creation, sale, and marketing of a health care plan;

2. the selection, credentialing, and contracting of health care providers;

3. the evaluation of the cost, quality and proper utilization of **treatment** options available or being provided to participants;

4. the adjustment, investigation, and processing of claims for benefits; or

5. **case management**.

However, **managed care services** do not include **treatment** rendered, or which should have been rendered, to a patient.

X. **Medical expenses** means the reasonable cost of necessary:

1. first aid administered at the time of the accident;

2. medical, surgical, diagnostic, and dental services;

3. prosthetic devices; and

4. ambulance, hospital, professional nursing, and funeral services.

Y. **Mobile equipment**

1. Means any of the following types of land vehicles, including any attached machinery or equipment:

   a. bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

   b. vehicles maintained for use only on, or next to, premises owned or rented by a **named insured**;

   c. vehicles that travel on crawler treads;

   d. vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) power cranes, shovels, loaders, diggers, or drills; or

      (2) road construction or resurfacing equipment, such as graders, scrapers, or rollers;

 © 2015 MedPro Group. All rights reserved.

e. vehicles not described in subparagraphs 1.a, b, c, or d above, that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) air compressors, pumps, and generators, including spraying welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment; or

(2) cherry pickers and similar devices used to raise or lower workers; or

f. vehicles not described in subparagraphs 1.a, b, c, or d above, maintained primarily for purposes other than the transportation of persons or cargo.

2. Does not include self-propelled vehicles with the following types of permanently attached equipment, but will be considered **autos**:

a. equipment designed primarily for:

(1) snow removal,

(2) road maintenance (but not construction or resurfacing); or

(3) street cleaning;

b. cherry pickers and similar devices mounted on car or truck chassis and used to raise or lower workers; and

c. air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well-servicing equipment.

3. Does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos**.

Z. **Named insured** means any of the following, but only if listed by name on a Schedule of Named Insureds:

1. any organization, including any corporations, partnerships or joint ventures;

2. any individual person, but only to the extent that such person was acting in the course and scope of his or her duties of employment with the **first named insured** or another **named insured**; or

3. a **location**.

AA. **Personal and advertising injury** means injury, including consequential **bodily injury**, arising from one or more of the following offenses:

1. false arrest, detention, or imprisonment;

2. malicious prosecution;

3. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

4. oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

5. oral or written publication, in any manner, of material that violates a person's right of privacy; or the use of another's advertising idea in the **insured's advertisement**.

BB. **Pollutants** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleum, chemicals or waste. As used in this definition, "waste" means medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

CC. **Policy period** means the period of time shown on the Declarations as the Policy Period. However, if the policy is terminated before the later of the dates shown on the Declarations, **policy period** means the period between the first date shown on the Declarations and the date the policy was terminated.

DD. **Potential claim** means an incident arising from, or in connection with, an **event** an **insured** knows or reasonably

 © 2015 MedPro Group. All rights reserved.

should know is likely to result in a **claim**.

EE. **Products completed operations hazard**

1. Means all **bodily injury** and **property damage** occurring away from any premises an **insured** owns or rents, and arising out of the **insured's product** or **insured's work** except:

   a. products that are still in the physical possession of an **insured**; or

   b. work that has not yet been completed or has been abandoned. However, the **insured's work** will be deemed completed at the earliest of the following times:

      (1) when all of the work called for in the **insured's** contract has been completed;

      (2) when all of the work to be done at the job site has been completed if the contract calls for work at more than one job site; or

      (3) when that part of the work at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be deemed completed.

2. Does not include **bodily injury** or **property damage** arising out of, or in connection with:

   a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by an **insured** and that condition was created by the **loading or unloading** of the vehicle by an **insured**;

   b. the existence of tools, uninstalled equipment, or abandoned or unused materials; or

   c. products or operations for which the classification, shown on the Declarations or in a policy schedule, states that **products completed operations hazard** is subject to the General Aggregate Limit.

FF. **Professional services** means **treatment**, administrative services, beautician's and barber's services, pastoral counseling services, peer review and utilization management not involving **managed care services**. As used in this definition:

1. "administrative services" means the planning, organizing, controlling or directing of the operations of an **insured**;

2. "beautician's and barber's services" means the provision of grooming services to a **resident** by a licensed beautician or barber in his or her capacity as such, who is not employed by the **insured**, but who is invited to perform such services by the **insured** at a location operated by an **insured**;

3. "pastoral counseling services" means the provision of advice, guidance or other counseling sessions, without compensation, by an ordained member of the clergy;

4. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and which results in a patient alleging damages arising from a **health care event**; and

5. "utilization management" means the process of evaluating **treatment** to a patient for its appropriateness or necessity which results in a patient alleging damages arising from a **health care event**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

GG. **Property damage** means:

1. physical injury to tangible property, including any resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the

 © 2015 MedPro Group. All rights reserved.

time of the **event** that caused it.

However, this definition does not apply to coverage provided under the Cyber-Liability and Breach Response Coverage Part.

HH. **Resident** means a person who lives or resides at a long-term care facility or other residential healthcare facility listed by name on a Schedule of Named Insureds.

II. **Residents' rights** means any right granted to a **resident** under the Nursing Home Quality Reform Act of 1987, any federal regulations promulgated pursuant to such law, including 42 C.F.R. 483.10, or any similar state law or regulation regulating long-term care facilities or residential healthcare facilities.

JJ. **Superbug contamination** means the actual contamination of an **insured's** location with methicillin-resistant staphylococcus aureus, vancomycin intermediate sensitive staphylococcus aureus or vancomycin-resistant enterococcus. **Superbug contamination** does not include any contamination as a result of **pollutants**, war, an act of terrorism or a certified act of terrorism.

KK. **Treatment** means:

1. the rendering of medical, surgical, dental, mental health, or nursing services. This shall include first aid rendered at the scene of an accident without expectation of monetary compensation, unless such accident occurred on the premises;
2. the provision of medical examinations, opinions, or consultations regarding a person's medical condition within an **insured's** practice as a licensed health care provider;
3. the provision of home health, hospice, rehabilitation or social services and adult day care and home-based community operations, including a Program of All-inclusive Care for the Elderly (PACE), or any services related to the provision, or protection of **residents' rights**, provided such **insured** is licensed, trained and qualified to perform such services in the jurisdiction in which such **professional services** were rendered.
4. the handling of dead bodies, including autopsies, organ donation or harvesting or other procedures;
5. services in connection with a clinical trial; or
6. the furnishing of any of the following, but only as it relates to the rendering of medical, surgical, dental, or nursing services:
   a. food and beverages;
   b. blood, blood products, medications, supplies, equipment, or appliances; or
   c. counseling or other social services.
   d. As used in this definition, "clinical trial" means a structured study with predetermined protocols approved by an institutional review board, an independent ethics committee, an ethical review board or a research ethics board which has been formally designated to approve, monitor, and review research involving humans in order to develop effectiveness or safety data or treatment plans, pharmaceutical products or medical devices.

## II. DEFENSE AND SUPPLEMENTAL PAYMENTS

These provisions apply to all Coverage Parts:

A. DEFENSE

The **company** will have the exclusive right and duty to defend any **claim** or **potential claim** against an **insured** to which this policy applies, subject to the timely payment of any applicable Deductible or Self-Insured Retention. However, the **company** has no duty to:

1. defend an **insured** after the applicable Limits of Liability have been exhausted by the payment of **loss** or **claims expense**;
2. appeal any judgment; however, the **company** may appeal any judgment as it deems expedient; or
3. pay any **claims expense** incurred by an attorney not retained or approved by the **company**, in writing, to

 © 2015 MedPro Group. All rights reserved.

represent the **insured**.

Upon the exhaustion of the applicable Limit of Liability provided under this policy, the **insured** shall become responsible for all further **claims expense** arising from any **claim** or **potential claim** and the **company** has the right to withdraw from the further defense of such **claim** or **potential claim** by tendering such defense to the **insured.** If the **insured** cannot come to an agreement with the attorney assigned by the **company** regarding the payment of future fees and costs, the **insured** shall take all steps necessary to allow the attorney to withdraw from the matter.

B. SUPPLEMENTAL PAYMENTS

The **company's** duty to defend shall include a duty to pay:

1. all **claims expense** directly related to the defense of the **claim** or **potential claim**;
2. the premium on any bond required to proceed with an appeal approved by the **company** or to release attachments to an **insured's** property; however, the face value of the bond may not exceed the applicable Limit of Liability or the total **loss** payable under the policy, whichever is less; in addition, the **company** has no duty to apply for or furnish any such bond; and
3. reimbursement of reasonable expenses incurred by an **insured** at the **company's** request to assist in the investigation and defense of a **claim** or **potential claim**; payment for actual loss of earnings shall not exceed $500 for each day an individual **insured** is required to attend hearings, trials, or an **insured's** own deposition.

C. DEFENSE OUTSIDE THE LIMITS/WITHIN THE LIMITS SHOWN ON DECLARATIONS

The **company** will pay **claims expenses** and other supplemental payments either:

1. in addition to the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments will not reduce or exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Outside Limits;" or
2. as part of the applicable Limits of Liability such that payment of **claims expenses** and other supplemental payments reduce and can exhaust the applicable Limits of Liability, if shown on the Declarations as "Defense Within Limits."

However, the **company** has no duty to pay any **claims expense**, premium, or other expense incurred after the **insured's** applicable Limit of Liability is exhausted.

## III. EXCLUSIONS

The coverage provided under any Coverage Part of this policy does not apply to:

A. ADA

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** duty to comply with the Americans with Disabilities Act of 1990 (ADA). This also includes any amendment or regulation that applies thereto or any comparable federal, state, or local law.

B. ANTITRUST ACTIVITY

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** antitrust activity, except to the extent such **claim** or **potential claim** arises out of any **insured's** alleged rendering of or failure to render **professional services.** As used in this exclusion, "antitrust activity" means any actual or alleged price fixing, restraint of trade, price discrimination, predatory pricing, monopolization, unfair business practices, or violation of the Federal Trade Commission Act of 1914, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, any similar state, federal, or local antitrust statute or law, or any rule or regulation promulgated under the Act, statute, or law.

C. BUSINESS PRACTICES

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** billing practices or advertising activities. However, this exclusion does not apply to the coverage provided under the Personal and Advertising Injury Liability Insuring Clause.

 © 2015 MedPro Group. All rights reserved.

D. CLAIM OR POTENTIAL CLAIM REPORTED OR WHICH SHOULD HAVE BEEN REPORTED TO OTHER INSURER

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **claim** or **potential claim** which has or which should have been reported to, or has or should have been accepted by any insurer, including through any self-insured or captive program, prior to the **policy period**.

E. CRIMINAL ACTS

Any **claim** or **potential claim** arising out of, or in connection with, any criminal act committed by, or at the direction of, an **insured**.

F. CYBER AND PRIVACY

Any **claim** or **potential claim** arising out of, or in connection with, a cyber or privacy breach **loss** or **claims expense**, including, but not limited to, security and privacy liability, privacy regulatory defense and penalties, privacy breach response costs, customer notification expenses, customer support and credit monitoring expenses, network asset protection, cyber extortion, cyber terrorism, and data protection reputational harm.

This exclusion however does not apply to:

1. oral or written publication, in any manner, of material that violates a person's confidence, doctor-patient privilege or right of privacy, including, but not limited to, appropriation, intrusion, public disclosure of private facts, or false light; and
2. coverage provided under the Cyber Liability and Breach Response Coverage Part.

G. DEFAULT JUDGMENT

Damages that an **insured** becomes legally obligated to pay resulting from a default judgment or other **claim** or **potential claim** that the **company** was unable to timely investigate or defend due to the acts or omissions of any **insured**.

H. DISCRIMINATION BECAUSE OF RACE AND OTHER SIMILAR LAWS

Any **claim** or **potential claim** arising out of, or in connection with, the violation of any statute, law, ordinance or regulation prohibiting discrimination or humiliation because of race, creed, color, national origin, religion, age, gender or any other protected class as defined by statute, law, ordinance or regulation.

I. ELECTRONIC DATA

Any **claim** or **potential claim** arising out of, or in connection with, the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data. As used in this exclusion, "electronic data" means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or any other media that are used with electronically controlled equipment.

J. EMPLOYEE BENEFITS LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, any group benefits administered on behalf of a **named insured's employees**, including:

1. group insurance plans or programs, such as life, health, accident, dental, or legal advice;
2. Individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;
3. travel or vacation plans; or
4. workers' compensation, occupational disease, unemployment, Social Security, or disability benefits insurance.

K. EMPLOYER'S LIABILITY

Any **claim** or **potential claim** arising out of, or in connection with, **bodily injury** to:

 © 2015 MedPro Group. All rights reserved.

1. an **employee** of a **named insured** arising out of, or in connection with, and in the course of:
   a. employment by that **named insured**; or
   b. performing duties related to the conduct of that **named insured's** business; or
2. the spouse, child, parent, brother, or sister of that **employee** as a consequence of subparagraph 1 above.

This exclusion shall apply whether a **named insured** may be held liable as an employer, or in any other capacity, and to any obligation to share damages with, or repay someone else who must pay damages, because of the injury. This exclusion does not apply to liability assumed by an **insured** under an **insured contract.**

L. EMPLOYMENT PRACTICES

Any **claim** or **potential claim** brought by an **employee**, or applicant for employment, which alleges an **insured**:

1. breached an actual or implied contract of employment;
2. violated an anti-discrimination statute;
3. engaged in any form of harassment;
4. engaged in libel or slander related to an employment relationship;
5. retaliated for the exercise of a public right or duty;
6. engaged in intentional or negligent infliction of emotional distress arising out of, or in connection with, an employment relationship;
7. wrongfully failed to hire, promote, or grant tenure;
8. wrongfully demoted; or
9. wrongfully terminated employment.

M. ERISA

Any **claim** or **potential claim** seeking to impose liability under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto.

N. FINANCIAL SERVICES / VIOLATION OF SECURITIES LAWS

Any **claim** or **potential claim** arising out of, or in connection with, the failure of any stock or other form of investment to perform, or from the rendering of or the failure to render financial services by any **insured** to others. As used in this exclusion, "financial services" means:

1. planning, administering or advising on:
   a. any:
      (1) investment;
      (2) pension;
      (3) annuity;
      (4) savings;
      (5) checking; or
      (6) individual retirement account, plan, fund or account;
   b. the issuance or withdrawal of any bond, debenture, stock or other securities;
   c. the trading of securities, commodities, or currencies; or
   d. any acquisitions or mergers;
2. acting as a dividend disbursing agent, exchange agent, redemption or subscription agent, warrant or scrip agent, fiscal or paying agent, tax withholding agent, escrow agent, clearing agent, or electronic funds transfer agent;

 © 2015 MedPro Group. All rights reserved.

3. lending, or arranging for the lending of, money, including credit card, debit card, leasing or mortgage operations or activities or interbank transfers;
4. repossessing of real or personal property from a borrower or acting as an assignee for the benefit of creditors;
5. checking or reporting of credit;
6. maintaining of financial accounts or records;
7. tax planning, tax advising or the preparation of tax returns; or
8. selling or issuing travelers checks, letters of credit, certified checks, bank checks or money orders.

This exclusion includes any **claim** or **potential claim** arising out of, or in connection with, an **insured's** violation of any federal, state, or local securities law or regulation.

O. FRAUDULENT CLAIMS

Any **claim** or **potential claim** made by or against an **insured** who or that knows that the **claim** or **potential claim** is false or fraudulent, as regards to amount or otherwise; additionally, this policy shall become void and all **claims** and **potential claims** hereunder shall be forfeited.

P. GOVERNMENTAL IMMUNITY AND OTHER PROTECTIONS

Any **claim** or **potential claim**:

1. for which the **insured** has complete immunity as a volunteer or as an employee or contractor of a federal, state, or local government; or
2. involving an **insured** who has immunity, insurance, indemnity, or any other protection pursuant to any federal, state, or local laws, including but not limited to the Federal Tort Claims Act.

Q. INJUNCTIVE RELIEF, TAXES, FINES AND PENALTIES

Any **claim** or **potential claim** or other matter seeking:

1. injunctive relief;
2. any relief other than **loss**; or
3. the award of taxes, fines, penalties, or sanctions, including those imposed under the Internal Revenue Code, or any similar state or local law.

R. INSURED VERSUS INSURED

Any **claim** or **potential claim** arising out of, or in connection with, any **loss** or **claims expense** which is initiated, alleged, or caused to be brought about, by any **insured** covered by this policy against any other **insured** covered by this policy. This exclusion does not apply to the Professional Liability Coverage Part if the **claim** or **potential claim** arises out of an **insured** providing **professional services** to another **insured**.

S. MANAGED CARE SERVICES

Any **claim** or **potential claim** arising out of, or in connection with, any **managed care services**.

T. MEDICARE OR MEDICAID

Any **claim** or **potential claim** arising out of, or in connection with, any Medicare/Medicaid Claim. As used in this exclusion, a "Medicare/Medicaid Claim" means a claim based on or arising out of, or in connection with, any actual or alleged violation of law, regulation or rule with respect to Medicare, Medicaid, Tricare or any similar federal, state or local governmental program.

U. MULTI-POLICY AND ANTI-STACKING

If more than one policy, Coverage Part or Insuring Clause applies, the following multi-policy and anti-stacking exclusions apply:

1. if more than one policy issued by the **company** applies to the liability of an **insured**, the **company's** duty to pay

 © 2015 MedPro Group. All rights reserved.

for a **loss** will be confined to the policy containing the largest applicable Limit of Liability; or

2. if more than one Coverage Part or Insuring Clause under this policy applies to the liability of an **insured**, the **company's** duty to pay **loss** will be confined to the Coverage Part or Insuring Clause containing the largest applicable Limit of Liability.

V. NUCLEAR ENERGY LIABILITY

Any damages:

1. for which an **insured** has coverage under a nuclear energy liability policy issued by the:
   a. Nuclear Energy Liability Insurance Association;
   b. Mutual Atomic Energy Liability Underwriters;
   c. Nuclear Insurance Association of Canada; or
   d. any successor or assign of the entities set forth in the subparagraphs above.

   Additionally, this policy does not apply if such coverage did exist, but was terminated by the exhaustion of the **insured's** limit of liability under such coverage.
2. resulting from the hazardous properties of nuclear material for which an **insured**:
   a. was required to maintain financial protection under the Atomic Energy Act of 1954 or any amendment or regulation that applies thereto; or
   b. was entitled to indemnity by the United States government or any agency thereof or would have been entitled to had this policy not been issued.

W. OWNERSHIP OR MANAGEMENT OF NON-INSURED ENTITIES

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of any organization, partnership, joint venture, or other business enterprise that is not a **named insured**, but which is owned, managed or supervised by an **insured**.

X. POTENTIAL CLAIM FIRST DISCOVERED PRIOR TO POLICY PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," any **potential claim** that was first known about or discovered, or should reasonably have been known about or discovered by, an **authorized insured**, or was reported to, or should have been reported to, a prior insurer, self-insurance program or captive insurer prior to the **policy period**.

Y. RICO

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** violation of the Racketeer Influenced Corrupt Organizations Act (RICO), or any comparable federal, state or local laws or any amendment or regulation that applies thereto.

Z. WAR

Any **claim** or **potential claim** arising out of, or in connection with:

1. war, including undeclared or civil war;
2. warlike action by a military force, including action in hindering or defending against an actual or expected attack by any governmental, sovereign, or other authority using military personnel or other agents; or
3. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

AA. Workers' COMPENSATION AND OTHER SIMILAR LAWS

Any **claim** or **potential claim** arising out of, or in connection with, any obligation or damages arising under any law related to:

 © 2015 MedPro Group. All rights reserved.

1. workers' compensation;
2. occupational disease;
3. unemployment compensation;
4. disability benefits; or
5. other similar law that provides for scheduled benefits as a result of an injury or disease.

The exclusions for "EMPLOYMENT PRACTICES," "EMPLOYER'S LIABILITY," "WAR" and "WORKER'S COMPENSATION AND OTHER SIMILAR LAWS" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. Only with respect to the coverage provided under the General Liability Coverage Part, a separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

## IV. DEDUCTIBLES AND RETENTIONS

These provisions apply to all Coverage Parts:

A. LOSS AND CLAIMS EXPENSE

If a Deductible or Self-Insured Retention is shown on the Declarations, and is designated as "Loss and Claims Expense," it is agreed and understood that the **company's** duty to pay **loss** and **claims expense** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. the **company** shall have a duty to pay **loss** and **claims expense** only in excess of the Deductible or Self-Insured Retention. The Deductible or Self-Insured Retention shall be applied to **claims expense** first, then to **loss**;
2. the **first named insured** shall have a duty to pay all **loss** and **claims expense** up to the amount of the Deductible or Self-Insured Retention, payment of which shall not be unreasonably withheld;
3. unless otherwise required by law, the **company** has complete discretion to pay the entire **loss** and **claims expense** and seek reimbursement from the **first named insured** for the Deductible or Self-Insured Retention. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible or Self-Insured Retention amount;
4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** and **claims expense** for such **claims** or **potential claims**. The applicable Limits of Liability shall not be reduced by the amount of the Self-Insured Retention;
5. if a Deductible or Self-Insured Retention is shown on the Declarations, the Deductible or Self-Insured Retention shall apply to all **loss** and **claims expense** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss** and/or **claims expense**; and
6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

B. LOSS ONLY

If a Deductible is shown on the Declarations, and is designated as "Loss Only," it is agreed and understood that the **company's** duty to pay **loss** for any **claim** or **potential claim** thereunder will be limited in the following manner:

1. the **company** shall have a duty to pay only **loss** in excess of the Deductible;
2. the **first named insured** shall have a duty to pay all **loss** up to the amount of the applicable Deductible, payment of which shall not be unreasonably withheld;
3. unless otherwise required by law, the **company** has complete discretion to pay the entire **loss** and seek reimbursement from the **first named insured** for the Deductible. If this occurs, the **first named insured** shall reimburse the **company** within 30 days of the **company's** payment of the Deductible amount;
4. the applicable Limits of Liability shall be reduced by the amount of the Deductible payable as **loss** for such **claims** or **potential claims**;

 © 2015 MedPro Group. All rights reserved.

5. if a Deductible is shown on the Declarations, the Deductible shall apply to all **loss** arising from a single **event**, **health care event**, offense or other covered incident, regardless of the number of **insureds** found liable for the **loss**; and

6. if a Retention Aggregate is shown on the Declarations, the **first named insured's** duty to pay **loss**, regardless of the number of **claims** or **potential claims** made, shall not exceed the Retention Aggregate.

## V. CONDITIONS

These conditions apply to all Coverage Parts:

A. ACTION AGAINST THE COMPANY

1. No action shall lie against the **company** unless each **insured** is in full compliance with all of the terms of this policy.
2. No person shall have the right to join the **company** as a party to a **claim** to determine an **insured's** liability under this policy. Further, an **insured** shall not interplead the **company** into a **claim**.
3. No action shall lie against the **company** until the amount of **loss** has been finally determined by entry of judgment or written agreement between the **insured**, the claimant, and the **company**. Once the amount of **loss** has been finally determined, the claimant shall be entitled to recover under the terms of this policy.

B. ARBITRATION

1. The **company** and the **insureds** agree that in any dispute, **claim**, **potential claim** or controversy arising out of, relating to, or in connection with this policy, whether brought by or on behalf of an **insured**, the **company**, or any other party, the **company** may elect to submit any such dispute, **claim**, **potential claim** or controversy to binding arbitration, in accordance with Title 9 USC Sec. 1 et seq. (the Federal Arbitration Act) and shall be governed by the Commercial Arbitration Rules of the American Arbitration Association.
2. The arbitration shall be presided over by three arbitrators chosen from the Commercial Insurance Panel of the American Arbitration Association. The arbitrators shall be governed by the law of the state of the address of the **first named insured**, as shown on the Declarations. The arbitration shall take place in the county that the capital of that state is located.
3. The arbitrators shall have the discretion to order pre-arbitration discovery, including an exchange of documents and deposition of potential witnesses. Each party shall bear its own arbitration costs and expenses including attorneys' fees, unless otherwise provided by law.
4. Any arbitration award shall be in writing and shall specify the factual and legal bases of the award. Judgment on the award rendered by the arbitrator shall be final and may be entered in any court having jurisdiction thereof. Furthermore, this arbitration provision shall be a complete defense to any suit, action or proceeding in any federal, state or local court or before any administrative tribunal with respect to any dispute, **claim**, **potential claim** or controversy arising out of, relating to or in connection with this policy.

C. ASSISTANCE AND COOPERATION

1. After any **claim** is made, or any **potential claim** is first discovered, the **insured** shall not contract any expense, voluntarily assume any liability in any situation, nor make or contract any settlement of the **claim** or **potential claim**, except at the **insured's** own cost and responsibility, without the written authorization of the **company**.
2. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon all **insureds'** cooperation with the **company** in the investigation, defense, and/or settlement of any matter to which this policy applies. Such cooperation shall include, but is not limited to:
   a. attendance at any deposition, hearing, or trial, as requested by the **company**;
   b. assistance in securing and giving evidence;
   c. obtaining the attendance of witnesses;
   d. doing nothing to prejudice the **company's** ability to investigate, defend, and/or manage any matter to which this policy applies;

 © 2015 MedPro Group. All rights reserved.

e. submitting to recorded and/or sworn statements and to examinations under oath as requested by the **company**; and

f. promptly producing, at the **company's** request, any records, documents and other information in an **insured's** possession, custody or control.

3. If a **claim** or **potential claim** is, or might be, covered under any other policy of insurance, the **insured** shall promptly give notice to such other insurers. The **insured** shall also provide the **company** with copies of the applicable policies. The **insured** shall further act in good faith to enforce any rights held under such policies, including the right to a defense.

D. BANKRUPTCY OR INSOLVENCY

The bankruptcy or insolvency of an **insured** or an **insured's** estate, or the non-payment by an **insured** or by any other organization responsible for a Deductible or Self-Insured Retention, shall not act to modify any duty owed by an **insured** or the **company** under the policy. Under no circumstances will such bankruptcy, insolvency or non-payment require the **company** to assume or in any way be responsible for any Deductible or Self-Insured Retention, or otherwise assume any obligation owed by any **insured** under this policy. The **company** will have no duty to pay **loss** or **claims expense** for any **claim** or **potential claim** unless the **insured** or any other organization responsible for the Self-Insured Retention timely pays the Self-Insured Retention in full.

E. CANCELLATION, NONRENEWAL AND/OR TERMINATION OF COVERAGE

1. This policy may be canceled by the **first named insured**. The **first named insured** shall mail written notice to the **company** requesting cancellation. The cancellation shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

2. Any coverage contained within this policy may be terminated by the **first named insured**. The **first named insured** shall mail written notice to the **company** requesting the coverage termination. The termination shall be effective on the date requested by the **first named insured** or the date the notice is received by the **company**, whichever is later.

3. This policy, or any coverage contained therein, may also be canceled, terminated or nonrenewed by the **company**. The **company** will send notice to the **first named insured** at the last address on record with the **company**.

4. If the **first named insured** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed in accordance with the standard short rate tables and procedure. If the **company** cancels this policy, or terminates any coverage contained therein, earned premium shall be computed pro rata. Premium adjustments shall be made within a reasonable period of time after cancellation. However, payment or tender of unearned premium shall not be a condition of cancellation.

5. If the **company** cancels or nonrenews this policy for any reason other than non-payment of premium, the **company** shall provide written notice to the **first named insured** not less than 30 days prior to the effective date of such cancellation or nonrenewal. If the **company** cancels this policy for nonpayment of premium, the **company** shall provide written notice to the **first named insured** not less than 10 days prior to the effective date of such cancellation or nonrenewal.

6. If the **company** cancels or nonrenews this policy, coverage under the policy shall terminate on the earlier of:

   a. the date stated on the cancellation or nonrenewal notice; or

   b. the date an **insured** procures replacement coverage.

F. COVERAGE TERRITORY

1. This policy applies to **claims** or **potential claims** arising from acts or omissions, occurrences and offenses (including offenses that take place through the Internet or similar electronic means of communication) occurring anywhere in the world, with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America, provided that the **claim** or **potential claim** is made and any legal proceedings are pursued within the United States, its territories and possessions, including Puerto Rico.

 © 2015 MedPro Group. All rights reserved.

2. Payments under this policy shall be made only in full compliance with all United States economic or trade sanction laws or regulations including, but not limited to, sanctions, laws and regulations administered and enforced by the United States Treasury Department's Office of Foreign Assets Control.

G. EXTENDED REPORTING PERIOD

Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," the following provisions apply:

1. Automatic Limited Extended Reporting Period

   a. In the event that coverage under this policy is terminated for any reason, the **company** will provide an automatic limited **extended reporting period** of 30 days, starting with the end of the **policy period**, during which **claims** and **potential claims** arising out of any specific coverage(s) may be reported to the **company** in writing. However, the **claim** must have been first made against an **insured** during the **policy period**, or the **potential claim** must have been first discovered by an **insured** during the **policy period**.

   b. This automatic limited **extended reporting period** shall not extend the **policy period** or change the scope of the coverage provided. Any **claim** or **potential claim** first reported to the **company** during the automatic limited **extended reporting period** will be deemed to have been made on the last date on which this policy is in effect. The Limits of Liability that apply at the end of the **policy period** are not renewed or increased for **claims** or **potential claims** first reported during the automatic limited **extended reporting period**.

2. Optional Extended Reporting Period

   a. The **company** shall, upon written request by or on behalf of the **first named insured**, make an offer for an **extended reporting period** to the **first named insured** if coverage is or will be canceled or nonrenewed, subject to the following:

      (1) any such written request by or on behalf of the **first named insured** must be received by the **company** not later than 30 days after the cancellation or nonrenewal of the coverage;

      (2) the **company** shall be required to send the offer for an **extended reporting period** only to the **first named insured** or its authorized representative; and

      (3) the coverage has been or will be canceled or nonrenewed with respect to:

         a) the entire policy;

         b) a Coverage Part; or

         c) a **named insured** who:

            i) has Limits of Liability listed in the Limits of Liability column of a Schedule of Named Insureds – Professional Liability;

            ii) does not share Limits of Liability with another **named insured** with respect to the General Liability Coverage Part or the Cyber Liability and Breach Response Coverage Part; or

            iii) shares Limits of Liability with another **named insured**, but only when all coverage available under that shared limit is terminated.

   b. The **first named insured** may accept the **company's** offer of an **extended reporting period** by paying the premium due within 30 days from either the date on which the policy expires or the date on which the **company** receives the request for an **extended reporting period**, whichever is later. Failure to pay the full premium within this 30-day period will be deemed a rejection of the offer.

   c. In the event of the purchase of an **extended reporting period**, the entire premium for such **extended reporting period** shall be deemed earned at its commencement.

   d. If an **extended reporting period** is purchased, a **claim** or **potential claim** otherwise covered by this policy may be reported for the period of time set forth in the applicable **extended reporting period** endorsement issued after termination of the **policy period**. The **extended reporting period** will begin at the end of the **policy period**. However, the **extended reporting period** shall not:

 © 2015 MedPro Group. All rights reserved.

(1) extend the **policy period**;

(2) apply to any **claim** or **potential claim** arising from a **health care event**, **event**, offense, **bodily injury**, **property damage**, or **personal and advertising injury** that took place after the **policy period**; or

(3) otherwise expand the coverage provided under this policy.

H. FIRST NAMED INSURED

1. The **first named insured** shall be authorized to act on behalf of all **insureds** with respect to this policy, with full authority to bind all **insureds**. The **first named insured's** authority shall include, but is not limited to, the following actions:

   a. receipt of notices of cancellation or nonrenewal;

   b. requesting or receiving endorsements issued to form a part of this policy;

   c. payment of premiums due;

   d. receiving return premium; and

   e. receiving and/or responding to an offer for an **extended reporting period** for any **insured**.

2. The **first named insured** shall notify the **company** in writing of any changes that might affect the insurance provided under this policy, including cancellation and nonrenewal.

I. FRAUD WARNING

Any person, who knowingly and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties, which may include voiding of the policy if allowed by law.

J. GOVERNMENTAL ACCESS TO RECORDS

If required by section 952 of the Omnibus Reconciliation Act of 1980, and after receipt of written request from the **first named insured**, the **company** will allow the U.S. Secretary of Health and Human Services or the U.S. Comptroller General access to this policy as well as all books, documents and records necessary to verify the cost of this policy. The **company** will also allow access to subcontracts between the **company** and any of its related organizations, and to such organization's books, documents and other records to the extent required by law, and to the extent that the **company** has possession, custody or control of such books, documents and records. Access will be provided for up to 4 years after the services provided pursuant to this policy cease.

K. INSPECTION AND AUDIT

The **company** shall be permitted, at its own discretion and for its own benefit, to audit an **insured's** property, operations, and any business records. The **company** shall also have the right to obtain a copy of any current or prior insurance records. Any findings or recommendations made by the **company** as a result of an audit shall inure only to the **company's** benefit. As a result, they may not be used as evidence of the **insured's** compliance with any safety regulations or other industry standards.

L. MODIFICATIONS

Except as provided herein, this policy may not be modified except by written endorsement attached to and made a part of this policy by the **company**. The **company's** decision not to insist on an **insured's** compliance with any provision of this policy shall not operate to waive, modify, or void that provision, or any other provision, condition or term of this policy.

M. NON-ASSIGNABILITY

No interest of an **insured** under this policy shall be assignable without the prior written consent of the **company**.

 © 2015 MedPro Group. All rights reserved.

However, if the **insured** is a person and dies, the coverage afforded by this policy shall inure to the benefit of that **insured's** estate.

N. OTHER INSURANCE

Unless otherwise noted in a Coverage Part:

1. if any other valid and collectible insurance is available to any **insured** with respect to a liability covered by this policy, and such insurance is afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then the maximum limits of liability under all policies shall not exceed the highest remaining applicable limit of liability under any one policy;
2. if any other valid and collectible insurance is available to any **insured** with respect to any liability arising from a **claim** or **potential claim** which is covered by this policy, and such other insurance is not afforded under a policy or **extended reporting period** issued by a past, present or future parent, subsidiary or affiliate of the **company**, then this insurance will be excess over such other insurance even if such other insurance is stated to be primary, excess, contingent or otherwise. The **company** will pay only the **company's** share of the **loss**, if any, that exceeds the sum of:
   a. the total amount that all such other insurance would pay for the **loss** in the absence of this insurance; and
   b. the total of all deductible and self-insured amounts under all such other insurance; and
3. this condition shall not apply if such other valid insurance is written to be specifically excess of this policy.

O. PREMIUMS

1. The **company's** obligation to perform any duty under the policy is strictly conditioned upon the payment of the premium when due. Similarly, the **company's** obligation to perform any duty pursuant to a renewal of the coverage provided under the policy shall be strictly conditioned upon the payment of the renewal premium when due. Therefore, this policy shall not be deemed to have been issued, delivered, or renewed and shall not be applicable to any matter which would otherwise be covered herein, until:
   a. the premium has been paid in full; or
   b. if the **company** has agreed to finance the policy, the first installment has been paid in full.

   If payment is made by check, electronic transfer or money order, it shall not be considered "paid in full" until honored by the payor's bank.
2. Premiums for this policy shall be computed in accordance with the **company's** rules, rates, and rating plans.
3. Any premium designated as deposit premium is merely a deposit on the actual amount owed. At the close of the **policy period**, the **company** will compute the earned premium for that period. The deposit premium will then be credited to that amount. If the deposit premium exceeds the earned premium, the **company** will refund the difference to the **first named insured**. If the earned premium exceeds the deposit premium, the **company** will bill the **first named insured** for the difference.
4. The **first named insured** shall maintain records of the information necessary for premium computation. The **first named insured** shall send copies of these records to the **company** at the end of the **policy period** as directed by the **company**. Such information shall be subject to audit and verification by the **company**.

P. REPORTING REQUIREMENTS

1. The **company's** duty to defend and pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable and expressly subject to the reporting requirements of the applicable Insuring Clause, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper the **insured** receives.
2. If the Retention shown on the Declarations is a:
   a. Deductible, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential claim**;
   b. Self-Insured Retention, an **authorized insured** shall, as soon as practicable, report any **claim** or **potential**

 © 2015 MedPro Group. All rights reserved.

**claim** that:

(1) an **authorized insured** believes will results in damages that exceed the applicable Self-Insured Retention;

(2) has a loss reserve exceeding 50% of the applicable Self-Insured Retention;

(3) involves a claimant's demand which exceeds the applicable Self-Insured Retention;

(4) contains allegations of unfair claim practices or bad faith;

(5) involves a suit naming the **company** or its affiliates as defendants; or

(6) that caused:

a) neurological injury, such as brain injury, spinal cord injury or nerve injury resulting in paralysis;

b) injury during pregnancy or delivery;

c) significant limitation of daily activities, such as feeding, continence or sexual function;

d) loss of sight or hearing;

e) elopement;

f) decubitus ulcers;

g) severe disfigurement, such as burns, amputation or scarring;

h) loss of any organ; or

i) death.

3. All such reports and documents shall be:

a. directed to the **company** using the contact information listed on the contact sheet attached to this policy;

b. in writing; and

c. include the following information:

(1) the identity of all **insureds** implicated;

(2) all reasonably obtainable information with respect to the time, place and circumstances of the **health care event**, **event**, offense or other matter for which coverage is sought under this policy;

(3) the nature and extent of the injury;

(4) the names and addresses of any injured persons;

(5) the names and addresses of available witnesses; and

(6) the basis for the **insured's** belief that a **claim** is reasonably likely to be made, as well as the date the **insured** first came to this belief.

4. A **health care event**, **event**, offense, accident or other matter reported to the **company** as part of risk management or loss control services shall not constitute the report of a **claim** or **potential claim** for purposes of coverage under this policy.

Q. REPRESENTATIONS AND CHANGE

1. By acceptance of this policy, each **insured** agrees, represents, and warrants that the statements and particulars made in all applications, including any statements and particulars made in any and all documents, supplemental pages or other attachments for the purposes of any application, are true and correct. It is further understood and agreed that any application and attachments are incorporated into, and shall form a part of, this policy. Therefore, this policy and any endorsements hereto, and all applications and attachments, embody all agreements between the **company** and any of its authorized representatives, and all **insureds** relating to this insurance.

2. In the event any application was executed or endorsed by an **insured's** insurance producer, the **insured**

 © 2015 MedPro Group. All rights reserved.

acknowledges that the insurance producer has acted under the **insured**'s express authority and that the **insured** has thoroughly reviewed the information contained on any application. The representations made by an **insured** in the applications and attachments are the basis for the coverage provided, as well as the **company**'s calculation of the applicable premium. Therefore, it is understood and agreed that, to the extent permitted by law, the **company** reserves the right to rescind this policy, or deny any coverage provided for a **claim** or **potential claim**, based upon any material misrepresentation made by any **insured**. As used in this condition, "material misrepresentation" means concealment, misrepresentation, omission or fraud which, if known by the **company**, would have led to refusal by the **company** to make this contract or provide coverage, or to make this contract or provide coverage on different terms or conditions.

3. No knowledge or information possessed by any **insured** shall be imputed to any other **insured**, except for material facts or information known to the person or persons who signed the application. In the event of any material misrepresentation in connection with any of the particulars or statements in the application, this policy shall be void with respect to any **insured** who knew of such material misrepresentation or to whom such knowledge is imputed.

4. The **company** reserves all rights based upon any material misrepresentation by the **insured**.

R. SEPARATION OF INSUREDS

Except for any duties specifically assigned to the **first named insured** and Limits of Liability applicable to any **insured**, this policy applies:

1. separately to each **insured** against whom a **claim** or **potential claim** is made; and
2. as if each **insured** were the only **insured** under this policy.

S. SETTLEMENT

The **company** may only settle a **claim**, **potential claim** or other matter brought against an **insured** with the consent of the **first named insured**.

T. SUBROGATION

The **company** shall be subrogated to the rights of any **insured** to the extent of any payments made, or as allowed by law. **Insureds** shall do nothing to prejudice those rights. At the **company's** request, an **insured** shall bring suit or transfer those rights to the **company**. **Insureds** shall also help the **company** enforce its rights.

U. TERMS CONFORM TO STATUTE OR REGULATION

If any term of this policy, or any duty arising therefrom, would cause the **company** to violate any federal, state or local law or regulation, the policy is amended to bring the **company** into compliance with such statute or regulation.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*
# *PROFESSIONAL LIABILITY COVERAGE PART*

**NOTICE:**

**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

## I. INSURING CLAUSES

A. PROFESSIONAL LIABILITY

1. Claims-Made and Reported:

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence:

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that occurred during the **policy period**.

b. A **health care event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **health care event**. Additionally, if, prior to the **policy period**, an **authorized insured** knew that the **health care event** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **health care event** occurred, then any continuation, change, or resumption of such **health care event** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

B. DISCIPLINARY, LICENSING AND CREDENTIALING ACTIONS

The **company's** obligation to defend a **claim** includes the defense of any disciplinary, licensing, or credentialing action brought against an **insured** by (1) a state board of medical examiners or state dental board responsible for investigating and disciplining licensees, (2) a hospital or facility professional review board or committee through formally adopted, written procedures, or (3) the United States Drug Enforcement Administration, subject to the following:

1. If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

   a. the action must arise from the **insured's** rendering of, or failure to render, **professional services**, after the Retroactive Date, but before the end of the **policy period**, and for which there is no other insurance available; and

   b. the action must be first initiated against the **insured** during the **policy period**.

2. If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the action must arise from the **insured's** rendering, or failure to render, **professional services** during the **policy period,** and for which there is no other insurance available.

3. The payment of **claims expense** for such actions will be in addition to the applicable limit of liability. However, the **company** will not pay more than $25,000 in **claims expense** on behalf of an **insured** for any single action. Furthermore, the **company** will not pay more than $100,000 for **claims expense** on behalf of all **insureds** for all such actions covered under the policy.

4. If there is a deductible that is applicable to this Coverage Part, the deductible does not apply to the coverage provided herein.

5. The **company** has no duty to pay any fines, penalties, or other costs assessed against the **insured** as a result of any such action.

## II. EXCLUSIONS

The coverage provided under this Coverage Part does not apply to:

A. CONTRACTUAL LIABILITY

Liability for the acts of another assumed by an **insured** under any contract or agreement, whether written or oral, except as otherwise noted in this policy. This exclusion does not apply to liability for damages that the **insured** would have in the absence of the contract or agreement.

B. INTENTIONAL ACTS

Any **claim** or **potential claim** arising out of, or in connection with, any act listed in the subparagraphs below:

1. any criminal conduct or intentional tort;
2. any romantic relationship with a current, former or prospective patient or any actual or threatened sexual conduct;
3. any willful violation of any law, statute, or regulation; or
4. any dishonest or fraudulent act.

Under this exclusion, the **company's** duty to defend an **insured** for such a **claim** or **potential claim** will cease when it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission that the **insured** engaged in any act listed in the above subparagraphs.

This exclusion does not apply to any **claim** or **potential claim** arising from a **health care event** brought against any **insured** who did not direct or act in concert to commit, directly participate in, or direct another, in connection with any of the actions excluded from coverage under this exclusion.

 © 2015 MedPro Group. All rights reserved.

C. RESIDENTS' RIGHTS BROUGHT BY ANOTHER PERSON

Any **claim** or **potential claim** arising out of, or in connection with, any violation of any law relating to **residents' rights** brought by any person other than a **resident** or a **resident's** legal representative.

D. RESIDENTS' RIGHTS BROUGHT BY MULTIPLE RESIDENTS

Any **claim** or **potential claim** arising out of, or in connection with, any violation of any law relating to **residents' rights** laws brought by multiple claimants, groups of claimants, multi-party actions, potential class actions or certified classes that allege the same or similar violations.

E. TREATMENT BY AN ADMINISTRATOR OR COMMITTEE MEMBER

Any **claim** or **potential claim** arising out of, or in connection with, the rendering of, or failure to render, **treatment** by an administrator or committee member, unless it was provided in an emergency without an expectation of compensation. As used in this exclusion:

1. "administrator" means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head, or faculty member of a **named insured**; and
2. "committee member" means a person serving as a member of a committee or board formed or controlled by a **named insured**. It also includes any person executing the directives of such a committee or board.

## III. LIMITS OF LIABILITY

A. PER EVENT LIMIT

The Per Event Limit shown on the Declarations is the most the **company** will pay for any **health care event** regardless of the number of:

1. **insureds**;
2. **claims** made or **potential claims** first discovered;
3. persons or organizations making **claims** or **potential claims**; or
4. policies issued by the **company**.

B. AGGREGATE LIMIT

The Aggregate Limit shown on the Declarations is the most the **company** will pay for all **health care events** regardless of the number of:

1. **health care events**;
2. **insureds**;
3. **claims** made or **potential claims** first discovered;
4. persons or organizations making **claims** or **potential claims**; or
5. policies issued by the **company**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

# *SENIOR CARE LIABILITY POLICY*
## *GENERAL LIABILITY COVERAGE PART*

**NOTICE:**

**This Coverage Part may contain claims-made and reported coverage. Please read this Coverage Part carefully.**

## I. INSURING CLAUSES

A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Claims-Made and Reported

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with, **bodily injury** to the same person, including damages claimed by any person or organization for care, loss of services, or death resulting at any time from **bodily injury**, will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Additionally, all **claims** and **potential claims** for damages because of **property damage** causing **loss** to the same person or organization will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of the **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** resulting in **bodily injury** or **property damage** that occurred during the **policy period**.

b. An **event** will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the **event**. Additionally, if, prior to the **policy period**, an **authorized insured** knew

 © 2015 MedPro Group. All rights reserved.

that the **bodily injury** or **property damage** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **bodily injury** or **property damage** occurred, then any continuation, change, or resumption of such **bodily injury** or **property damage** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. Claims-Made and Reported

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

(1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

(2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** for damages arising out of, or in connection with the same **personal and advertising injury** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **company** will pay on behalf of an **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an offense resulting in **personal and advertising injury** that occurred during the **policy period**.

b. An offense will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the offense. Additionally, if, prior to the **policy period**, an **authorized insured** knew that an offense resulting in **personal and advertising injury** had occurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that an offense resulting in **personal and advertising injury** occurred, then any continuation, change, or resumption of such as offense resulting in **personal and advertising injury** during or after the **policy period** will be deemed to have been known prior to the **policy period**.

C. MEDICAL PAYMENTS

1. Claims-Made and Reported

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

 © 2015 MedPro Group. All rights reserved.

a. The **company** will pay on behalf of any **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must have been caused by an accident that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **medical expenses** must:

(1) arise from a **claim** that was first made against, and received by, a **named insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period**;

(2) arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3) result from the operations of a **named insured**.

b. for damages arising out of, or in connection with the same accident will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

2. Occurrence

If "Occurrence" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. the **company** will pay on behalf of a **named insured**, **medical expenses** for **bodily injury** caused by an accident, regardless of fault, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause. However, the **medical expenses** must be caused by an accident that occurred during the **policy period**. Moreover, to be covered under this policy, the **medical expenses** must:

(1) be submitted to the **company**, in writing, within one year of the accident;

(2) arise from an accident that occurred on a premises owned or occupied by, or on the ways next to premises owned or occupied by, a **named insured**; and

(3) result from the operations of a **named insured**.

b. An accident will be deemed to have occurred on the earliest date of any related acts or omissions that gave rise to or contributed to the accident. Additionally, if, prior to the **policy period**, an **authorized insured** knew that the **medical expenses** had been incurred, in whole or in part, no coverage exists under this policy. Moreover, if an **authorized insured** knew prior to the **policy period** that the **medical expenses** had been incurred, then any additional **medical expenses** incurred during or after the **policy period** will be deemed to have been known prior to the **policy period**.

However, payments for **medical expenses** shall not be subject to any Deductible or Self-Insured Retention.

## II. EXCLUSIONS

A. EXCLUSIONS APPLICABLE TO THIS COVERAGE PART

The coverage provided under this Coverage Part does not apply to:

1. Contractual Liability

Any **claim** or **potential claim** arising out of, or in connection with, an **insured's** obligation to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

a. that the **insured** would have in the absence of the contract or agreement; or

b. assumed in a contract or agreement that is an **insured contract**, provided the **bodily injury**, **property**

 © 2015 MedPro Group. All rights reserved.

**damage**, **personal and advertising injury** or **medical expenses** occurred subsequent to the execution of the contract or agreement. Only for the purposes of liability assumed in an **insured contract**, reasonable attorneys' fees and necessary litigation expenses incurred by or for a party, other than an **insured**, are deemed to be damages because of **bodily injury**, **property damage**, **personal and advertising injury** or **medical expenses**, provided:

(1) liability to or for that party's defense has also been assumed in the same **insured contract**; and

(2) attorneys' fees and litigation expenses are for the defense against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

2. Contamination

Any **claim** or **potential claim** arising out of, or in connection with, a **superbug contamination**.

3. Employees

Any **claim** or **potential claim** arising out of, or in connection with, the acts or omissions of an **employee**, involving:

a. **bodily injury**, **personal and advertising injury** or **medical expenses**:

(1) to another **employee** or agent of a **named insured**;

(2) to the spouse, relative or dependent as a consequence of subparagraph a.(1), above; or

(3) for which there is any duty to share damages or loss with, or repay, another party liable for the loss as a consequence of subparagraphs a.(1) and a.(2), above.

b. **property damage** to property:

(1) owned, occupied, or used by an **insured**;

(2) rented to an **insured**; or

(3) in the care, custody, or control of an **insured**.

4. Professional Liability

Any **claim** or **potential claim** arising out of, or in connection with, a **health care event**.

5. Recording And Distribution Of Material Or Information In Violation Of Law

Any **claim** or **potential claim** arising out of, or in connection with, any action or omission that violates or is alleged to violate:

a. the Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

b. the CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. the Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act; or

d. any federal, state or local statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

6. Residents Rights

Any **claim** or **potential claim** arising out of, or in connection with, a violation of any law relating to **residents' rights**.

7. Sexual Acts

Any **claim** or **potential claim** arising from, or in connection with, any actual or threatened sexual act, behavior or conduct, including, but not limited to, assault, exploitation, harassment or molestation, by any person of another person while in the care, custody, or control of any **insured**.

 © 2015 MedPro Group. All rights reserved.

Under this exclusion, the **company's** duty to defend an **insured** for such **claim** or **potential claim** will cease when it is established by trial or arbitration verdict, court ruling, regulatory ruling or legal admission that an **insured** engaged in any act excluded in this exclusion.

This exclusion does not apply to any **claim** or **potential claim** arising from an **event** or offense brought against any **insured** who did not direct or act in concert to commit, directly participate in, or direct another, in connection with any of the actions excluded from coverage under this exclusion.

B. EXCLUSIONS APPLICABLE TO THE BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURING CLAUSE AND THE MEDICAL PAYMENTS INSURING CLAUSE

The coverage provided under the Bodily Injury and Property Damage Liability Insuring Clause and the Medical Payments Insuring Clause does not apply to:

1. Aircraft, Auto Or Watercraft

   **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft owned or operated by or rented to or loaned to any **insured**. Use includes operation and **loading or unloading**.

   a. This exclusion applies even if the **claims** or **potential claims** against any **insured** allege negligence or other wrongdoing in the supervision, hiring, employment, training, or monitoring of others by that **insured** if the **event** or accident which caused the **bodily injury**, **property damage** or **medical expenses** involved the ownership, maintenance, use, or entrustment to others of any aircraft, **auto**, or watercraft that is owned or operated by or rented or loaned to any **insured**.

   b. This exclusion does not apply to:

      (1) **loading or unloading**;

      (2) a watercraft while on shore on premises owned or rented by the **insured**;

      (3) a watercraft that is:

         a) not owned by an **insured**;

         b) less than 26 feet long; and

         c) not being used to carry persons or property for a charge.

      (4) parking an **auto** on or next to a site owned or occupied by an **insured**, but only if the **auto** is not owned, rented, or being used by an **insured**;

      (5) liability assumed under an **insured contract** for the ownership, maintenance, or use of an aircraft or watercraft; or

      (6) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

         a) the operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

         b) the operation of any of the machinery or equipment listed in subparagraph 2.a or 2.b of the definition of **mobile equipment**.

2. Asbestos

   Any **claim** or **potential claim** arising out of, or in connection with, asbestos, or any materials containing asbestos in whatever form or quantity.

3. Damage To Impaired Property Or Property Not Physically Injured

   **Property damage** to **impaired property** or property that has not been physically injured arising out of, or in connection with:

 © 2015 MedPro Group. All rights reserved.

a. a defect, deficiency, inadequacy, or dangerous condition in the **insured's product** or **insured's work**; or

b. a delay or failure by an **insured** to perform under the terms of a contract or agreement.

This exclusion does not apply to the loss of use of other property arising out of, or in connection with, sudden and accidental physical injury to the **insured's product** or the **insured's work** after it has been put to its intended use.

4. Damage To The Insured's Product

**Property damage** to the **insured's product** arising out of, or in connection with, it or any part of it.

5. Damage To The Insured's Work

**Property damage** to the **insured's work** arising out of, or in connection with, the **insured's work** or any part of it, and included in the **products completed operations hazard**. This exclusion does not apply if the damaged work, or the work out of which the damage arises, was performed by a subcontractor on behalf of the **insured**.

6. Damage To Property

**Property damage** to:

a. property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. premises an **insured** sells, gives away, or abandons if the **property damage** arises out of, or in connection with, any part of those premises;

c. property loaned to an **insured**;

d. personal property in the care, custody, or control of an **insured**;

e. that particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of an **insured**, are performing operations if the **property damage** arises out of those operations; or

f. that particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a, c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an Insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the **insured's work** and were never occupied, rented, or held for rental by an **insured**.

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard**.

7. Expected Or Intended Injury

**Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any act expected or intended by an **insured** to cause **bodily injury**, **property damage** or **medical expenses**. This exclusion applies even if an **insured's** act causes **bodily injury**, **property damage** or **medical expenses**:

a. of a different type or degree than expected or intended; or

b. to a different person or organization than expected or intended.

However, this exclusion does not apply to **bodily injury** or **medical expenses** arising out of, or in connection with, an **insured's** use of reasonable force to protect persons or property.

 © 2015 MedPro Group. All rights reserved.

8. Fungi And Bacteria

   a. **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged or threatened inhalation of, injection of, contact with, exposure to, existence of, or presence of any fungi or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

   b. Any **loss**, cost or expense arising out of, or in connection with, the abating, testing, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, remediating, or disposing of, or in any way responding to, or assessing the effects of, fungi or bacteria, by any **insured** or by any other person or organization.

   This exclusion shall not apply to any fungi or bacteria contained in a good or product intended for bodily consumption. For the purposes of this exclusion, the term fungi includes any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents, or byproducts produced or released by fungi.

9. Liquor Liability

   **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, any **insured's** liability by reason of:

   a. causing or contributing to the intoxication of any person;

   b. the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

   c. any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

   This exclusion applies only if the **insured** is in the business of manufacturing, distributing or selling alcoholic beverages.

10. Mobile Equipment

   **Bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with:

   a. the transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to an **insured**; or

   b. the use of **mobile equipment** in, while in practice for, or while being prepared for any prearranged racing, speed, demolition, or stunting activity.

11. Personal And Advertising Injury

   **Bodily injury** arising out of, or in connection with, **personal and advertising injury**.

12. Pollution

   a. Any **bodily injury, property damage** or **medical expenses** arising out of, or in connection with, the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **pollutants**:

      (1) at or from any premises, site, or location that is or was at any time owned or occupied by or rented or loaned to any **insured**. However, this does not apply to:

         a) **bodily injury** if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originated from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use by the building's occupants or guests;

         b) **bodily injury**, **property damage** or **medical expenses** for which an **insured** may be held liable, if it is a contractor, and the owner or lessee of such premises, site, or location has been added to the policy as an **additional insured** with respect to an **insured's** ongoing operations performed for that **additional insured** at that premises, site, or location, and such premises, site, or location is not or never was owned or occupied by or rented or loaned to any **insured**, other than that **additional insured**; or

         c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat,

 © 2015 MedPro Group. All rights reserved.

smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(2) at or from any premises, site, or location that is or was at any time used by or for any **insured** or others for the handling, storage, disposal, processing, or treatment of waste.

(3) which are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for any **insured** or any other person or organization for whom an **insured** may be legally responsible.

(4) at or from any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if the **pollutants** were brought on or to the premises, site, or location in connection with such operations by such **insured**, contractor, or subcontractor. However, this subparagraph does not apply to:

a) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, the escape of fuels, lubricants, or other operating fluids, which are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants, or other operating fluids escape from a vehicle part designed to hold, store, or receive them. This exception does not apply if the **bodily injury**, **property damage** or **medical expenses** arises out of the intentional discharge, dispersal, or release of fuels, lubricants, or other operating fluids or if such fuels, lubricants, or other operating fluids are brought on or to the premises, site, or location with the intent that they be discharged, dispersed, or released as part of the operations being performed by such **insured**, contractor, or subcontractor;

b) **bodily injury**, **property damage** and **medical expenses** sustained within a building and caused by the release of gases, fumes, or vapors from materials brought into the building in connection with operations being performed by an **insured**, or on its behalf by a contractor or subcontractor; or

c) **bodily injury**, **property damage** or **medical expenses** arising out of, or in connection with, heat, smoke, or fumes from a fire that becomes uncontrollable or breaks out from where it was intended to be.

(5) arising out of, or in connection with, any premises, site, or location on which any **insured** or any contractors or subcontractors, working directly or indirectly on any **insured's** behalf, are performing operations if such operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any other way respond to or assess the effects of, **pollutants**.

Subparagraphs (a)(1) and (a)(4) do not apply with respect to the application or storage of fertilizers, fungicides, herbicides, or pesticides in the normal maintenance of an **insured's** location, but only if:

i. the storage and application of such fertilizers, fungicides, herbicides, or pesticides complies with all applicable federal, state or local government laws;

ii. the **insured** meets all license or certification requirements under any federal, state or local laws in order to perform the application of any such fertilizers, fungicides, herbicides, or pesticides;

iii. the fertilizers, fungicides, herbicides, or pesticides does not include mercury or any mercury compounds; and

iv. the **pollutants** related to such fertilizers, fungicides, herbicides, or pesticides emanate from the **insured's** location.

b. Any damages, **loss**, cost, or expense arising out of, or in connection with, any:

(1) request, demand, order, or statutory or regulatory requirement that any **insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize , or in any way respond to or assess the effects of, **pollutants**; or

(2) **claim** or **potential claim** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to or assessing the effects of **pollutants**.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

However, this subparagraph does not apply to liability for damages because of **property damage** that an **insured** would have in the absence of such request, demand, order, or statutory or regulatory requirement, or such **claim** or **potential claim** by or on behalf of a governmental authority.

13. Recall Of Products, Work, Or Impaired Property

Any **claim** or **potential claim** arising out of, or in connection with, any **loss**, cost, or expense incurred by an **insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal, or disposal of:

a. the **insured's product**;

b. the **insured's work**; or

c. **impaired property**

if such product, work, or property is withdrawn or recalled from the market or from use due to a known or suspected defect, deficiency, inadequacy, or dangerous condition to it.

14. Silica

Any **claim** or **potential claim** arising out of, or in connection with, silica, including, but not limited to:

a. inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

b. the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

c. the use or presence of silica in any good, product, structure, real estate or land, or any component part of any good, product, structure, real estate or land; or

d. the manufacture, sale, transportation, handling, storage or disposal of silica or any goods, products, structures, real estate or land containing silica;

e. any disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis, cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

f. any costs of medical or other testing, monitoring or diagnosis arising out of, or in connection with, any actual, alleged, threatened or feared **bodily injury** arising in whole or in part, directly or indirectly, out of silica; or

g. any costs of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products structures, real estate or land.

As used in this exclusion, "silica" means silica in any form and any of its derivatives, including but not limited to silica dust, silicon dioxide ($SiO_2$), crystalline silica, quartz, or non-crystalline (amorphous) silica.

The exclusions for "AIRCRAFT, AUTO OR WATERCRAFT," "DAMAGE TO IMPAIRED PROPERTY OR PROPERTY NOT PHYSICALLY INJURED," "DAMAGE TO THE INSURED'S PRODUCT," "DAMAGE TO THE INSURED'S WORK," "DAMAGE TO PROPERTY," "LIQUOR LIABILITY," "MOBILE EQUIPMENT," "POLLUTION," and "RECALL OF PRODUCTS, WORK, OR IMPAIRED PROPERTY" do not apply to damage by fire to premises while rented to an **insured** or temporarily occupied by an **insured** with the permission of its owner. A separate limit of liability applies to Damage to Premises Rented to an Insured as described in the Limits of Liability.

C. EXCLUSIONS APPLICABLE TO PERSONAL AND ADVERTISING INJURY LIABILITY INSURING CLAUSE

The coverage provided under the Personal and Advertising Injury Liability Insuring Clause does not apply to:

1. Breach Of Contract

**Personal and advertising injury** arising out of, or in connection with, a breach of contract, except an implied contract to use another's advertising idea in an **insured's advertisement**.

 © 2015 MedPro Group. All rights reserved.

2. Electronic Chatrooms Or Bulletin Boards

   **Personal and advertising injury** arising out of, or in connection with, an electronic chatroom or bulletin board an **insured** hosts, owns, or over which an **insured** exercises control.

3. Infringement Of Copyright, Patent, Trademark, Or Trade Secret

   **Personal and advertising injury** arising out of, or in connection with, the infringement of copyright, patent, trademark, trade secret, or other intellectual property rights. However, this exclusion shall not apply to the infringement of copyright, trade, dress, or slogan in an **insured's advertisement**.

4. Insureds In Media And Internet Type Businesses

   **Personal and advertising injury** committed by an **insured** whose business is:

   a. advertising, broadcasting, publishing, or telecasting;

   b. designing or determining content for the websites of others; or

   c. an internet search, access, content, or service provider.

   However, this exclusion does not apply to **claims** arising from false arrest, detention or imprisonment, malicious prosecution, or the wrongful eviction from, or wrongful entry into, or invasion of the private occupancy of a room dwelling or premises occupied by, or on behalf of, its owner, landlord, or lessor.

   For the purposes of this exclusion, the placing of frames, borders, or links, or advertising for an **insured** or others is not considered, by itself, to be the business of advertising, broadcasting, publishing, or telecasting.

5. Knowing Violation Of Rights Of Others

   **Personal and advertising injury** caused by, or at the direction of, an **insured** with the knowledge that the act would violate the rights of another and would inflict **personal and advertising injury**.

6. Material Published Prior To Policy – Claims-Made and Reported Only

   Only with respect to any Coverage Part shown on the Declarations as "Claims-Made and Reported," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took place before the applicable retroactive date shown on the Declarations.

7. Material Published Prior To Policy – Occurrence Only

   Only with respect to any Coverage Part shown on the Declarations as "Occurrence," **personal and advertising injury** arising out of, or in connection with, oral or written publication of material whose first publication took prior to the **policy period**.

8. Material Published With Knowledge Of Falsity

   **Personal and advertising injury** arising out of, or in connection with, oral or written publication of material if done by, or at the direction of, an **insured** with knowledge of its falsity.

9. Quality Or Performance Of Goods – Failure To Conform To Statements

   **Personal and advertising injury** arising out of, or in connection with, the failure of goods, products, or services to conform to any statement of quality or performance in an **insured's advertisement**.

10. Unauthorized Use Of Another's Name Or Product

    **Personal and advertising injury** arising out of, or in connection with, the unauthorized use of another's name or product in an **insured's** email address, domain name, or metatag, or other similar tactics to mislead another's potential customers.

11. Wrong Description Of Prices

    **Personal and advertising injury** arising out of, or in connection with, the wrong description of the price of the goods, products, or services in an **insured's advertisement**.

 © 2015 MedPro Group. All rights reserved.

D. EXCLUSIONS APPLICABLE TO MEDICAL PAYMENTS INSURING CLAUSE

1. Medical Expenses

The coverage provided under Medical Payments Insuring Clause does not apply to **medical expenses** arising out of, or in connection with, **bodily injury**:

a. to an **insured**, except volunteers;

b. to a person hired to do work for, or on behalf of, an **insured** or tenant of an **insured**;

c. to a person injured on that part of a premises owned or rented by an **insured** that the injured person normally occupies;

d. to any person, whether or not an **employee**, who is eligible for benefits under a workers' compensation, occupational disease, disability benefits, or similar law;

e. to a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests;

f. covered as a **products completed operations hazard**; or

g. to any inmate, patient, or prisoner, who is being treated, cared for, detained, or imprisoned by any **insured** or in any **insured business**.

## III. LIMITS OF LIABILITY

A. GENERAL RESTRICTIONS

The Limits of Liability shown on the Declarations is the most the **company** will pay regardless of the number of:

1. **insureds**;
2. **claims** made or **potential claims** first discovered;
3. persons or organizations making **claims** or **potential claims**; or
4. policies issued by the **company**.

B. GENERAL AGGREGATE LIMIT

The General Aggregate Limit shown on the Declarations is the most the **company** will pay for **loss, claims expense**, and **medical expenses** under this Coverage Part except for **loss** and **claims expense** included in the **products completed operations hazard**.

C. PRODUCTS COMPLETED OPERATIONS HAZARD AGGREGATE LIMIT

The Products Completed Operations Hazard Aggregate Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** and **claims expense** because of **bodily injury** and **property damage** included in the **products completed operations hazard.**

D. PERSONAL AND ADVERTISING INJURY LIABILITY LIMIT

Subject to subparagraph B. above, the Personal and Advertising Injury Liability Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expense** under the Personal and Advertising Injury Liability Insuring Clause because of **personal and advertising injury** sustained by any one person or organization.

E. PER EVENT LIMIT

Subject to subparagraphs B. or C. above, whichever applies, the Per Event Limit shown on the Declarations is the most the **company** will pay for:

1. **loss** and **claims expense** under the Bodily Injury and Property Damage Liability Insuring Clause; and
2. **medical expenses** under the Medical Payments Insuring Clause;

because of all **bodily injury** and **property damage** arising out of any one **event**.

 © 2015 MedPro Group. All rights reserved.

F. DAMAGE TO PREMISES RENTED TO AN INSURED LIMIT

Subject to subparagraph E. above, the Damage to Premises Rented to an Insured Limit shown on the Declarations is the most the **company** will pay under the Bodily Injury and Property Damage Liability Insuring Clause for **loss** or **claims expense** because of **property damage** to any one premises, while rented to a **named insured** or temporarily occupied by a **named insured** with permission of the owner.

G. MEDICAL EXPENSE LIMIT

Subject to subparagraph E. above, the Medical Expense Limit shown on the Declarations is the most the **company** will pay under the Medical Payments Insuring Clause for **medical expenses** because of **bodily injury** sustained by any one person.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

Issuing Company:
National Fire & Marine Insurance Company
Omaha, Nebraska

## *SENIOR CARE LIABILITY POLICY*
## *CYBER LIABILITY AND BREACH RESPONSE COVERAGE PART*

**NOTICE:**

**This Coverage Part contains Claims-Made and Reported coverage. If designated as "Claims-Made" in the title of the particular Insuring Clause, the coverages provided by that Insuring Clause will only cover claims first made against an insured during the policy period, and reported to the company during the policy period or during any applicable extended reporting period. All claims are subject to the applicable Limits of Liability and the applicable Retention(s) as set forth in the Declarations. Note that the Limits of Liability for Coverages A, B, C and H include claim expenses. Please read this Coverage Part carefully.**

### I. INSURING CLAUSES

A. COVERAGE A - MULTIMEDIA LIABILITY - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages**, including liability **assumed under contract,** and related **claim expenses**, resulting from a **claim** for a **multimedia peril** committed by an **insured**, provided that:

1. the **multimedia peril** is committed on or after the **retroactive date**;
2. the **claim** is first made against an **insured** during the **policy period**; and
3. the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

B. COVERAGE B - SECURITY AND PRIVACY LIABILITY - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **damages** and related **claim expenses**, resulting from a **claim** for a **security and privacy wrongful act** committed by an **insured** resulting from a **security breach**, **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** and the resulting **security and privacy wrongful act** takes place on or after the **retroactive date**;
2. the **claim** is first made against an **insured** during the **policy period**; and
3. the **claim** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

C. COVERAGE C - PRIVACY REGULATORY DEFENSE AND PENALTIES - CLAIMS-MADE

The **company** will pay on behalf of an **insured** all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as a **regulatory compensatory award** or **regulatory fines and penalties** (to the extent insurable by law), and related **claim expenses**, resulting from a **privacy regulatory proceeding** instituted against an **insured** for a **security breach**, **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** takes place on or after the **retroactive date;**
2. the **privacy regulatory proceeding** is first instituted against an **insured** during the **policy period**; and
3. the **privacy regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

 © 2015 MedPro Group. All rights reserved.

D. COVERAGE D - PRIVACY BREACH RESPONSE COSTS, CUSTOMER NOTIFICATION EXPENSES, AND CUSTOMER SUPPORT AND CREDIT MONITORING EXPENSES

The **company** will indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs during the **policy period** as **privacy breach response costs, customer notification expenses** and/or **customer support and credit monitoring expenses** resulting from a **security breach**, a **privacy breach** or **breach of privacy regulations**, provided that:

1. the **security breach**, **privacy breach** or **breach of privacy regulations** takes place during the **policy period**;
2. the **security breach**, **privacy breach** or **breach of privacy regulations** is reported to the **company**, in writing, no later than 60 days after the date the **security breach, privacy breach** or **breach of privacy regulations** is discovered; and
3. the **privacy breach response costs**, **customer notification expenses** and/or **customer support and credit monitoring expenses** are incurred with the **company's** consent.

E. COVERAGE E - NETWORK ASSET PROTECTION

1. Loss of Digital Assets

   The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **digital assets loss** and **special expenses** due to damage, alteration, corruption, distortion, theft, misuse or destruction of an **insured business's digital assets** directly caused by a **covered cause of loss**, provided that:

   a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and

   b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered.

   **Digital assets loss** and **special expenses** will be reimbursed for a period of up to 12 months following the discovery of the damage, alteration, corruption, distortion, theft, misuse or destruction of **digital assets**, unless specified otherwise by endorsement. **Digital assets loss** and **special expenses** will only be paid where there is clear evidence provided by an **insured business** that such **digital assets loss** and **special expenses** resulted from a **covered cause of loss.**

2. Non-Physical Business Interruption and Extra Expense

   The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss**, **interruption expenses**, and **special expenses** resulting from the total or partial interruption, degradation in service or failure of the **insured business's computer system** directly caused by a **covered cause of loss**, provided that:

   a. the **covered cause of loss** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period;**

   b. the **covered cause of loss** is reported to the **company**, in writing, no later than 60 days after the date the **covered cause of loss** is discovered;

   c. the **income loss**, **interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and

   d. the total or partial interruption, degradation in service or failure of the **insured business's computer system** exceeds the **time retention**.

 © 2015 MedPro Group. All rights reserved.

F. COVERAGE F - CYBER EXTORTION

The **company** will indemnify an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** pays as **cyber extortion expenses** and/or **cyber extortion monies** directly caused by a **cyber extortion threat** or series of **cyber extortion threats**, including a demand for **cyber extortion monies**, provided that:

1. the **cyber extortion threat** is first made against an **insured business** during the **policy period**; and
2. the **cyber extortion threat** is reported to the **company**, in writing, no later than 60 days after the date the **cyber extortion threat** is received by an **insured**.

**Cyber extortion expenses** and **cyber extortion monies** shall not be paid without prior consultation with the **company** and the **company's** express agreement. An **insured business** must make every reasonable effort to notify the local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

G. COVERAGE G - CYBER TERRORISM

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **income loss**, **interruption expenses** and **special expenses** resulting from the total or partial interruption, degradation in service or failure of an **insured business's computer system** directly caused by an **act of terrorism**, provided that:

1. the **act of terrorism** takes place during the **policy period**;
2. the **act of terrorism** is reported to the **company**, in writing, no later than 60 days after the date the **act of terrorism** is discovered;
3. the **income loss**, **interruption expenses** and/or **special expenses** are incurred during the **period of restoration**; and
4. the total or partial interruption, degradation in service or failure of an **insured business's computer system** exceeds the **time retention.**

H. COVERAGE H - REGULATORY PROCEEDING - CLAIMS-MADE

The **company** will reimburse an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** becomes legally obligated to pay as **regulatory fines and penalties** (to the extent insurable by law) and **claims expenses** and/or **shadow audit expenses** (where applicable) resulting from a **regulatory proceeding**, provided that:

1. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;
2. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and
3. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

The **company** shall have no duty to defend an **insured** under Coverage H, but only to reimburse an **insured** for covered **claim expenses**, **shadow audit expenses**, and/or **regulatory fines and penalties**. An **insured** shall have complete freedom of choice with respect to the selection of the licensed attorney who provides legal services in connection with any **regulatory proceeding** triggering coverage under Coverage H. Upon receiving notice from an **insured** of a **regulatory proceeding**, the **company** or its authorized agent will provide the **insured** with the name(s) of panel counsel. If an **insured** retains panel counsel, the **company** will, subject to all other provisions of this Coverage Part, pay 100% of covered **claim expenses**, **shadow audit expenses**, and/or **regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H. If an **insured** retains non-panel counsel, the **insured** must pay a co-payment of 25%, and the **company** will pay the remaining 75% of covered **claim expenses**, **shadow audit expenses**, and/or

 © 2015 MedPro Group. All rights reserved.

**regulatory fines and penalties** in excess of the **retention**, up to the applicable Limits of Liability under Coverage H.

I. COVERAGE I - EVACUATION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **evacuation expense** directly caused by an **evacuation**, provided that:

1. the **evacuation** occurs during the **policy period**;
2. the **evacuation** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. written notice to the **company** includes details regarding the time, date and place of the **evacuation**; description of the **evacuation expense** incurred by an **insured business**; and documented proof of such **evacuation expense**; and
4. no other valid and collectible insurance providing **evacuation expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

J. COVERAGE J - DISINFECTION EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **disinfection expense** directly caused by a **disinfection event**, provided that:

1. the **disinfection event** occurs during the **policy period**;
2. the **disinfection event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. written notice to the **company** includes details regarding the time, date and place of the **disinfection event**; description of the **disinfection expense** incurred by an **insured business**; and documented proof of such **disinfection expense**; and
4. no other valid and collectible insurance providing **disinfection expense** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

K. COVERAGE K - PUBLIC RELATIONS EXPENSE REIMBURSEMENT

The **company** will reimburse an **insured business** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured business** incurs as **public relations expenses** directly caused by a **public relations event**, provided that:

1. the **public relations event** occurs during the **policy period**;
2. the **public relations event** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter;
3. the **public relations expenses** are incurred with the **company's** consent;
4. written notice to the **company** includes details regarding the time, date and place of the **public relations event**; description of the **public relations expenses** incurred by an **insured business**; and documented proof of such **public relations expenses**; and
5. no other valid and collectible insurance providing **public relations expenses** coverage is available to any **insured business**, whether that other insurance is provided on a primary, excess, contingent or any other basis.

 © 2015 MedPro Group. All rights reserved.

L. COVERAGE L - E-DISCOVERY CLAIM EXPENSES AND E-DISCOVERY REGULATORY INVESTIGATION EXPENSES - CLAIMS-MADE

The **company** will:

1. indemnify an **insured** for all amounts in excess of the **retention** and within the applicable Limits of Liability that such **insured** incurs as **e-discovery claim expenses** and/or **e-discovery regulatory investigation expenses** resulting from a **regulatory proceeding**; and

2. provide **e-discovery consulting services** to an **insured** during the **policy period**, provided that:

   a. the wrongful act, error or omission giving rise to the **regulatory proceeding** is committed on or after the **retroactive date**;

   b. the **regulatory proceeding** is first instituted against an **insured** during the **policy period**; and

   c. the **regulatory proceeding** is reported to the **company**, in writing, during the **policy period**, or within 30 days thereafter.

M. COVERAGE M - DATA PROTECTION REPUTATIONAL HARM

The **company** will reimburse an **insured business**, in excess of the **retention** and within the applicable Limits of Liability, for the net ascertained loss of value to such **insured business's reputation**, being the loss of **net profit** suffered by the **insured business** during the **period of indemnity** and/or any **recoverable costs** and/or any **increase in cost of working** incurred by the **insured business** during the **period of indemnity**, solely and directly caused by a **data protection breach**, provided, that:

1. the **data protection breach** first occurs and is discovered by the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** during the **policy period**; and

2. the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** reports the **data protection breach** to the **company**, in writing, within 60 days of any **adverse media report**.

## II. ADDITIONAL EXCLUSIONS

This insurance does not apply to:

A. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;
2. any **security and privacy wrongful act** under Coverage B;
3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;
4. any **covered cause of loss** under Coverage E;
5. any **cyber extortion threat** under Coverage F;
6. any **act of terrorism** under Coverage G;
7. any acts, errors or omissions under Coverages H and L;
8. any **evacuation** under Coverage I;
9. any **disinfection event** under Coverage J;
10. any **public relations event** under Coverage K; or
11. any **data protection breach** under Coverage M;

committed, allegedly committed or that occurred, in whole or in part, prior to the applicable retroactive date.

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

B. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any **multimedia peril** under Coverage A;
2. any **security and privacy wrongful act** under Coverage B;
3. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverages C or D;
4. any **covered cause of loss** under Coverage E;
5. any **cyber extortion threat** under Coverage F;
6. any **act of terrorism** under Coverage G;
7. any acts, errors or omissions under Coverages H and L;
8. any **evacuation** under Coverage I;
9. any **disinfection event** under Coverage J;
10. any **public relations event** under Coverage K; or
11. any **data protection breach** under Coverage M;

that any **insured** knew, or could have reasonably foreseen, prior to the effective date of this Coverage Part, could be the basis of a **claim**.

C. any **claim** or circumstance involving the Coverages available under this Coverage Part notified to a previous insurer prior to the effective date of this Coverage Part.

D. any **claim** made by or on behalf of an **insured** against another **insured**; however, this exclusion shall not apply to:

1. an otherwise covered **claim** under Coverage B made by any past, present or future **employee** for a **security and privacy wrongful act**, but only if such **employee** did not commit, participate in or contribute to such **security and privacy wrongful act** or a **security breach**, **privacy breach**, or **breach of privacy regulations**; or
2. any **billing errors proceeding** instituted by an **insured** against an **insured** as a **qui tam plaintiff** or brought by an **insured** under the United States False Claims Act.

E. any **claim** alleging or arising out of any willful, deliberate, malicious, fraudulent, dishonest or criminal act, error or omission, or any intentional violation of the law or of an **insured business's** privacy policy, or the gaining of any profit or advantage to which any **insured** is not legally entitled, if any of the aforementioned is committed by an **insured**, whether acting alone or in collusion with other persons. However, the insurance afforded by this Coverage Part shall apply to **claims expenses** incurred in defending any such **claim**, but shall not apply to any **damages, regulatory fines and penalties** or other loss that an **insured** might become legally obligated to pay. The **company** will have the right to recover those **claims expenses** incurred from those parties found to have committed criminal, dishonest, fraudulent or malicious acts, errors or omissions by a court, jury or arbitrator. This exclusion shall not apply to a **claim** under Coverage E for **employee** sabotage.

F. any **claim** arising out of any **insured's** activities as a trustee, partner, officer, director, or employee of any employee trust, charitable organization, corporation, company, or business other than that of an **insured business**.

G. any **claim** arising out of an **insured's** insolvency or bankruptcy or the insolvency or bankruptcy of any other entity including, but not limited to, the failure, inability, or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

H. **bodily injury**, except that this exclusion shall not apply to negligent infliction of emotional distress or mental anguish arising out of any actual or alleged **multimedia peril**, **security and privacy wrongful act**, **privacy breach**, **security breach** or **breach of privacy regulations**.

 © 2015 MedPro Group. All rights reserved.

I. any **claim** for **property damage**.

J. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. satellite failures;
2. electrical or mechanical failures and/or interruption, including, but not limited to, electrical disturbance, spike, brownout, or blackout; or
3. outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under an **insured business's** operational control and unless such **claim** otherwise triggers coverage under Coverage E or G.

K. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the wear and tear, drop in performance, progressive deterioration or aging of electronic equipment and other property or **computer hardware** used by an **insured**.

L. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to failure of overhead transmission and distribution lines.

M. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gradual deterioration of subterranean insulation.

N. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure, or any other physical event however caused, unless such **claim** otherwise triggers coverage under Coverages E or G.

O. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to coupons, prize discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

P. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products, or services.

Q. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** cost guarantees, cost representations, contract price or cost estimates being exceeded.

R. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any economic or trade sanctions by the United States government including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control ('OFAC').

S. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise. This exclusion shall not apply to:

1. any liability or obligation that any **insured** would have in the absence of such contract or agreement;
2. unintentional breach of contract; or
3. a breach of an **insured business's** privacy policy.

T. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the liability of others assumed by an **insured** under any contract or agreement, either oral or written. This exclusion shall not apply:

1. to the extent such **insured** would have been liable in the absence of such contract or agreement; or
2. with respect to any **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy**

 © 2015 MedPro Group. All rights reserved.

**breach** or **breach of privacy regulations**, to the extent an **insured business** has assumed such liability in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy breach** or **breach of privacy regulations**.

U. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any presence of pollutants or contamination of any kind;
2. any actual, alleged, or threatened discharge, dispersal, release, or escape of pollutants or contamination of any kind including, but not limited to, solid, liquid, gaseous, or thermal irritants or contaminants including asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (waste includes materials to be recycled, reconditioned, or reclaimed), wherever such occurs, whether or not such results from an **insured's** activities or the activities of others, is sudden or gradual, and is accidental, intended, foreseeable, expected, fortuitous, or inevitable;
3. any governmental or regulatory directive or request that an **insured business** or anyone acting under an **insured business's** direction or control test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize said 'pollutants'; or
4. any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants or in any way respond to or assess the effects of pollutants or contamination of any kind.

V. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged loss of value of any securities.

W. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to caused by or resulting from unauthorized trading. "Unauthorized trading" means trading by an **insured**, which at the time of the trade is:

1. in excess of permitted financial limits; or
2. outside of permitted product lines.

X. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged purchase, sale, offer of, or solicitation of an offer to purchase or sell securities, or violation of any securities law including, but not limited to, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002, or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including 'Blue Sky' laws, whether such law is statutory, regulatory, or common law.

Y. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the actual or alleged government enforcement of any state or federal regulation including, but not limited to, regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Exchange Commission. This exclusion does not apply to any **claim** triggering coverage under Coverage C.

Z. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any employer-**employee** relations, policies, practices, acts or omissions; any actual or alleged refusal to employ any person; or any misconduct with respect to **employees**.

AA. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged harassment or discrimination of any kind including, but not limited to, age, color, race, gender, creed, national origin, marital status, sexual preferences, disability or pregnancy.

BB. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the violation of any pension, healthcare, welfare, profit sharing, mutual, or investment plans, funds, or trusts; or any violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling, or order issued

 © 2015 MedPro Group. All rights reserved.

pursuant thereto.

CC. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. strikes or similar labor actions;
2. war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of, or amounting to, a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;
3. confiscation or nationalization or requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or
4. any action taken in controlling, preventing, suppressing or in any way relating to any of 1. through 3. Above.

This exclusion shall not apply to an **act of terrorism**.

DD. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to an **insured's** commercial decision to cease providing a particular product or service, but only if the **insured** is contractually obligated to continue providing such products or services.

EE. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to gambling or pornography or the sale or provision of prohibited, restricted or regulated items including, but not limited to, alcoholic beverages, tobacco or drugs.

FF. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any fine or penalty arising out of any agreement by an **insured** to comply with or follow the Payment Card Industry Standard or any Payment Card Company Rules; or
2. the implementation, maintenance, or compliance with any security measures or standards relating to any payment card data including, but not limited to, any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an **insured** has paid or agreed to reimburse or indemnify.

This exclusion shall not apply to civil penalties and fines to the extent insurable by law arising out of an otherwise covered **claim** under Coverage C.

GG. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged unfair competition, price fixing, antitrust violations, deceptive trade practices, or restraint of trade or antitrust statute, legislation, or regulation.

HH. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any actual or alleged infringement of any patent or the misappropriation, theft, copying, display or publication of any trade secret by, or with the active cooperation, participation or assistance of any **insured**.

II. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to:

1. any wear or tear, latent or time-delayed damage arising from services an **insured** provided prior to the **policy period**;
2. gradual deterioration of an **insured business's computer system**; or
3. an **insured business's** failure, or the failure of those acting on an **insured business's** behalf, to maintain any **computer system** or network, computer software or any other equipment.

JJ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the manufacturing, mining, use, sale, installation, removal, distribution of, or exposure to, asbestos, materials or products containing asbestos or asbestos fibers or dust or any **claim** alleging **bodily injury** or **property damage** arising out of asbestos or asbestos containing materials including, but not limited to:

1. inhaling, ingesting, or being physically exposed to asbestos or goods or products containing asbestos;

 © 2015 MedPro Group. All rights reserved.

2. the use of asbestos in constructing or manufacturing any goods, products, or structures;
3. the removal of asbestos from any goods, products or structures;
4. the manufacture, encapsulation, transportation, storage, handling, distribution, sale, application, mining, consumption, or disposal of asbestos or goods or products containing asbestos;
5. any governmental direction or request that the **insured** or any other party, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize asbestos or asbestos containing products; or
6. manufacturing or mining or the use, sale, installation, removal, distribution of or exposure to asbestos, materials, or products containing asbestos, asbestos fibers or dust.

KK. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **operational programs**.

LL. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the use of programs that are not **delivered programs.**

MM. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any **insured's** intentional use of illegal or unlicensed programs that are in violation of the provisions or laws referring to software protection.

NN. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the confiscation, commandeering, requisition, destruction of, or damage to, **computer hardware** by order of a government de jure or de facto, or by any public authority for whatever reason.

OO. any **claim** alleging **bodily injury** or **property damage** resulting from exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description, including:

1. any cost, expense, or charge to test, monitor, clean up, remediate, remove contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to or assess the effects of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro organisms of any type, nature, or description; or
2. any resulting cost, expense, charge, fine or penalty, incurred, sustained, or imposed by order, direction, request, or agreement of any court, governmental agency, or any civil, public, or military authority.

With respect to this exclusion, 'organic pathogens' means any organic irritant or contaminant including, but not limited to, mold, fungus, bacteria, virus, or their byproducts such as mycotoxins, mildew, or biogenic aerosol. 'Organic pathogens' include, but are not limited to, Aspergillus, Penicillium, Stachybotrys Chartarum, Stachybotrys Atra, Trichodema, and Fusarium Memnoniella.

PP. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to the existence, emission or discharge of any electromagnetic field, electromagnetic radiation, or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

QQ. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any legal liability directly or indirectly caused by, involving, attributed to, arising from:

1. ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel; or
2. the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

RR. any **claim** based upon, arising out of, directly or indirectly resulting from, in any way involving or attributable to any criminal prosecution against an **insured**. For purposes of this exclusion, "criminal prosecution" shall mean any governmental action for enforcement of criminal laws, including those offenses for which conviction could

 © 2015 MedPro Group. All rights reserved.

result in imprisonment and/or criminal fine.

SS. with respect to Coverage E.1. Loss of Digital Assets:

1. any amount incurred in restoring, updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
2. physical damage to the **computer hardware** or data center, other than that covered under **covered cause of loss**, under paragraph E.1.a.;
3. contractual penalties or consequential damages;
4. any liability to third parties for whatever reason, including legal costs and expenses of any type;
5. fines or penalties imposed by law;
6. the economic or market value of **digital assets**, unless the **company** has agreed by endorsement to reimburse an **insured business** based upon an agreed value amount for defined categories or specific **digital assets**;
7. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. any losses paid under Coverage E.2. Non-Physical Business Interruption and Extra Expense.

TT. with respect to Coverage E.2. Non-Physical Business Interruption and Extra Expense:

1. any loss arising out of a physical cause or natural peril, including, but not limited to fire, wind, water, flood, subsidence or earthquake, which results in physical damage to **computer hardware** and/or any **data** center;
2. any loss expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
3. contractual penalties or consequential damages;
4. any liability to third parties for whatever reason, including legal costs and expenses of any type;
5. fines or penalties imposed by law;
6. costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
7. loss of goodwill and reputational harm;
8. costs to upgrade, redesign, reconfigure or maintain an **insured business's computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. any losses paid under Coverage E.1. Loss of Digital Assets.

UU. with respect to Coverage H:

1. any amounts incurred in connection with a **shadow audit** not previously approved by the **company**;
2. **restitution** or repayment of monies received by an **insured**, to which the **insured** was not entitled as a result of billing errors made by such **insured**;
3. any amounts incurred by a consulting professional whose services were not previously approved by the **company**; or
4. billing errors for medical services or items which are not provided or prescribed by the **First Named**

 © 2015 MedPro Group. All rights reserved.

**Insured** or any subsidiary.

W. with respect to Coverage M:

1. any loss, cost, liability or expense incurred by the **insured business** in an effort to re-establish the **reputation** of the **insured business**, other than **public relations expenses**;
2. any loss, cost, liability or expense incurred in any **claim** that is insured by any other insurance, except excess insurance;
3. any loss, cost, liability or expense incurred in connection with an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry or specific competitors of an **insured business**, without any specific allegations regarding an **insured business's** breach of data protection of its customers;
4. any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;
5. contractual penalties or consequential damages;
6. **customer notification expenses**;
7. fines or penalties imposed by law or regulation; or
8. any losses paid under Coverage D.

## III. LIMITS OF LIABILITY AND RETENTIONS

A. The Limits of Liability applicable to each Coverage of this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for each **claim** first made during the **policy period** under each Coverage and in the aggregate for all **claims** first made during the **policy period** under each Coverage, regardless of the number of:

1. claimants;
2. **claims**; or
3. **insureds** involved.

B. The Annual Aggregate Limit for this Coverage Part is the **company's** maximum Limit of Liability, including **claim expenses** where applicable, for all **claims** first made during the **policy period** under this Coverage Part, regardless of the number of:

1. claimants;
2. **claims**;
3. **insureds** involved; or
4. Coverages under this Coverage Part.

C. All payments made under this Coverage Part will reduce the Annual Aggregate Limit for this Coverage Part. In no event will the **company** pay more than the Annual Aggregate Limit for this Coverage Part.

D. All **claims** made under any one Coverage, which arise out of the same, related or continuing acts, facts, events or circumstances, without regard to the number of **insureds**, **claims**, or claimants, shall be considered a single **claim** and only one Limit of Liability and **retention** will apply to such **claim**. Such **claim** shall be deemed to be first made at the earliest of the following times:

1. the time at which the earliest **claim** arising out of the same, related or continuing acts, facts, events or circumstances is first made; or
2. the time at which the **claim** arising out of the same, related or continuing acts, facts, events or

 © 2015 MedPro Group. All rights reserved.

circumstances shall be deemed to have been made pursuant to Section IV., A.2. of this Coverage Part.

E. In the event that any **claim** shall be covered, in whole or in part, under two or more Coverages of this Coverage Part, the total applicable Limit of Liability shall not exceed the single largest applicable Limit of Liability. Such largest applicable Limit of Liability shall apply only once to such **claim**. The **company** has the sole discretion to allocate **claims** paid, if any, against the appropriate Limit of Liability.

F. The Limits of Liability for the **extended reporting period**, if exercised, shall be part of, and not in addition to, the Limits of Liability applicable to this Coverage Part. The exercise of the **extended reporting period** shall not in any way increase or reinstate the Limits of Liability applicable to this Coverage Part.

G. The applicable **retention** amount for each Coverage of this Coverage Part shall apply separately to each **claim**. The **retention** shall be satisfied by an **insured's** monetary payments of any amounts covered under this Coverage Part, including **claim expenses** where applicable. If a **claim** attaches to more than one Coverage of this Coverage Part, only the highest **retention** applies.

H. An **insured's** payment of the applicable **retention** is a condition precedent to payment by the **company** of any amounts covered under this Coverage Part, and the **company** shall only be liable for the amount in excess of such **retention**, not to exceed the total applicable Limit of Liability. The **insured** shall make direct payments within the **retention** to the appropriate parties designated by the **company**.

I. With respect to Coverages E.1. and G, the **time retention** shall apply to each **period of restoration**. Once the **time retention** is met, the **insured** will be responsible to pay any co-insurance percentage or **retention** applicable to Coverages E.1. and G.

## IV. ADDITIONAL CONDITIONS

In addition to the terms contained in the Conditions section of the Common Policy Provisions and Conditions, the following conditions apply to this Coverage Part:

A. NOTICE PROVISIONS

1. Notice of Claim.

   Except as otherwise provided in any Coverage of this Coverage Part, the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** shall give to the **company** written notice of any **claim** during the **policy period**, but in no event later than 30 days after expiration of the **policy period**.

2. Notice of Potential Claim.

   If, during the **policy period**, an **insured** first becomes aware of any acts, facts or circumstances that could reasonably be the basis for a **claim**, and if the Chief Information Officer, Chief Technology Officer, Chief Security Officer, Risk Manager or General Counsel of the **insured business** gives the **company** written notice during the **policy period**, of:

   a. specific details of the acts, facts or circumstances that could reasonably be the basis for a **claim**;

   b. possible **damages**, penalties or other amounts potentially covered under this Coverage Part that may result or that have resulted from the acts, facts or circumstances; and

   c. details regarding how the **insured** first became aware of the acts, facts or circumstances,

   then any **claim** made subsequently arising out of such acts, facts or circumstances shall be deemed to have been made at the date the written notice complying with the above requirements was first given to the **company**.

B. LOSS DETERMINATION UNDER COVERAGE E

1. Loss Determination under Coverage E.1.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

For any and all coverage(s) provided under Coverage E.1., **digital assets loss** will be determined as follows:

a. if the impacted **digital asset** was purchased from a third party, the **company** will pay only the lesser of the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**; or

b. if it is determined that the **digital assets** cannot be replaced, restored or recreated, then the **company** will only reimburse the actual and necessary **digital assets loss** incurred up to such determination.

2. Loss Determination under Coverage E.2.

For any and all coverage(s) provided under Coverage E.2., **income loss** will be determined as the reduction of the **insured business's income** during the **period of restoration**, which is:

a. an **insured business's** net **income** (**net profit** or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of total or partial interruption, degradation in service or failure of the **insured business's computer system** caused directly by a **covered cause of loss**. The revenue projection will take into account the prior experience of the **insured business's** business during the previous 12 months immediately before the date of the **covered cause of loss** and the probable experience had no **covered cause of loss** occurred. Revenues include the amount of money paid or payable to the **insured business** for goods, products or services sold, delivered or rendered in the normal course of the **insured business's** business. Revenue projection will be reduced by the extent to which the **insured business** uses substitute methods, facilities or personnel to maintain its revenue stream. The **company** will take into consideration the **insured business's** documentation of the trends in the business and for variations in or other circumstances affecting the business before or after the **covered cause of loss**, which would have affected the **insured business's** business had no **covered cause of loss** occurred; and

b. any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

C. LOSS DETERMINATION UNDER COVERAGE M

For any and all coverage(s) provided under Coverage M, the net loss of value suffered by the **insured business** during a **period of indemnity** shall be assessed and ascertained by auditors or adjusters appointed by the **company**. Their assessment in respect of the loss of **net profit** shall be based upon the difference between the anticipated **net profit** for the **period of indemnity**, as established during the pre-bind underwriting process, and the actual **net profit** for the **period of indemnity**. An **insured business** will provide accounting information to identify the potential loss of the **insured business's reputation** insured hereunder following an **adverse media report**.

D. EXTENDED REPORTING PERIOD

1. If this Coverage Part is cancelled or non-renewed by the **First Named Insured** or if the **company** refuses to renew the policy for reasons other than non-payment of premium or noncompliance with the terms and conditions of this Coverage Part, then the **First Named Insured** shall have the right, upon payment of an additional premium, to an extension of the coverage granted by this Coverage Part with respect to any **Claim** first made during the period of time elected after the effective date of such cancellation or, in the event of such refusal to renew, after the policy's expiration date, but only with respect to:

a. any **multimedia peril** under Coverage A;

b. any **security and privacy wrongful act** under Coverage B;

c. any **security breach**, **privacy breach** or **breach of privacy regulations** under Coverage C;

d. any **covered cause of loss** under Coverage E;

e. any **cyber extortion threat** under Coverage F;

f. any **act of terrorism** under Coverage G;

 © 2015 MedPro Group. All rights reserved.

g. any acts, errors or omissions under Coverages H and L;

h. any **evacuation** under Coverage I;

i. any **disinfection event** under Coverage J;

j. any **public relations event** under Coverage K; or

k. any **data protection breach** under Coverage M;

committed before the effective date of cancellation or, in the event of a refusal to renew, before the policy's expiration date.

2. The quotation of a different premium, **retention** or Limits of Liability for renewal does not constitute a cancellation or refusal to renew.

3. As a condition precedent to the right to purchase the **extended reporting period**, the total premium for the policy must have been paid. The right to purchase the **extended reporting period** shall terminate unless written notice, together with full payment of the premium for the **extended reporting period**, is received by the **company** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to the **company**, there shall be no right to purchase the **extended reporting period**.

4. In the event of the purchase of the **extended reporting period**, the entire premium therefore shall be deemed earned at its commencement.

5. The exercise of the **extended reporting period** shall not in any way increase the **company's** Limits of Liability under this Coverage Part.

## V. ADDITIONAL DEFINITIONS

Only with respect to coverage provided under this Coverage Part, the following additional definitions apply:

A. **Act of terrorism** means an act, including but not limited to, the use of force or violence and/or the threat thereof, by any person or group(s) of persons, whether acting alone or on behalf of, or in connection with any organization(s) or government(s), which is committed for political, religious, ideological, or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

B. **Administrator** means an owner, partner, stockholder, director, trustee, executive officer, medical director, department head or faculty member of an **insured business**.

C. **Adverse media report** means:

1. with respect to Coverage D, any unpredictable report or communication of an actual or potential **security breach**, **privacy breach** or **breach of privacy regulations**, which has been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that threatens material damage to an **insured business's reputation** and which results in the incurring of **privacy breach response costs**;

2. with respect to Coverage M, extracts or completed versions of communications, which have been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail, that cause negative perception or harm to an **insured business's reputation**, leading to **income loss**.

D. **Assumed under contract** means liability for **damages** resulting from a **multimedia peril** where such liability has been assumed by an **insured** in the form of a written hold harmless or indemnity agreement that predates the first **multimedia peril**.

E. **Billing errors proceeding** means:

1. civil or administrative investigations or other civil or administrative proceedings instituted against an **insured**

 © 2015 MedPro Group. All rights reserved.

by a **qui tam plaintiff**, **government entity** or **commercial payer** alleging the presentation of, causing or allowing to be presented, or being liable for the presentation of any actual or alleged erroneous billings by an **insured** to a government health benefit payer or **commercial payer** from which the **insured** seeks and/or has received payment or reimbursement for medical services or items provided or prescribed by the **insured**; or

2. any of 1. above instituted against an **insured** as a result of **voluntary self disclosure**.

F. **BPO service provider** means any third party independent contractor that provides business process outsourcing services for the benefit of an **insured business** under a written contract with the **insured business**, including, but not limited to, call center services, fulfillment services, and logistical support.

G. **Breach of privacy regulations** means a breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of any of the following regulations as well as similar statutes and regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191), known as HIPAA, and related state medical privacy laws;
2. Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999;
3. state and Federal statutes and regulations regarding the security and privacy of consumer information;
4. governmental privacy protection regulations or laws associated with the control and use of personal information;
5. privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;
6. Children's Online Privacy Protection Act or similar laws; and
7. the EU Data Protection Act or other similar privacy laws worldwide.

H. **Claim** means:

1. with respect to Coverages A or B:

   a. a written demand received by an **insured** for monetary damages or non-monetary relief against any **insured**;

   b. a written request to toll or waive a statute of limitations relating to a potential **claim** against an **insured**;

   c. the service of a civil suit or the institution of arbitration proceedings against an **insured** seeking **damages** or a temporary restraining order or a preliminary or permanent injunction against an **insured**

   A **claim** under Coverages A or B will be deemed to be first made when notice of any of the foregoing is first received by an **insured**.

2. with respect to Coverage C, a **privacy regulatory proceeding** instituted against an **insured**. A **claim** under Coverage C will be deemed to be first made when it is first received by an **insured**.
3. with respect to Coverage D, a written report by an **insured** to the **company** of an **adverse media report**, **security breach**, **privacy breach** or **breach of privacy regulations**. A **claim** under Coverage D will be deemed to be first made when such written report is received by the **company**;
4. with respect to Coverage E, a written report by an **insured** to the **company** of the occurrence of a **covered cause of loss**. A **claim** under Coverage E will be deemed to be first made when such written report is received by the **company**.
5. with respect to Coverage F, a written report by an **insured** to the **company** of a **cyber extortion threat**. A **claim** under Coverage F will be deemed to be first made when such written report is received by the

 © 2015 MedPro Group. All rights reserved.

**company.**

6. with respect to Coverage G, a written report by an **insured** to the **company** of an **act of terrorism**. A **claim** under Coverage G will be deemed to be first made when such written report is received by the **company**.
7. with respect to Coverages H and L, a **regulatory proceeding** instituted against an **insured**. A **claim** under Coverage H will be deemed to be first made when it is first received by an **insured**.
8. with respect to Coverages I, J, K and M, a written report by an **insured** to the **company** of an **evacuation**, a **disinfection event**, a **public relations event** or **data protection breach**. A **claim** under Coverages I, J, K and M will be deemed to be first made when such written report is received by the **company**.

I. **Claims expenses** means:

1. reasonable and necessary fees incurred with the **company's** consent and charged by an attorney(s) designated by the **company** to defend a **claim**; and
2. all other reasonable and necessary fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a **claim**, if incurred by the **company**, or by an **insured** with the **company's** prior written consent.

**Claims expenses** do not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any **insured** for any time spent in cooperating in the defense and investigation of any **claim** or any circumstance which might lead to a **claim** notified under this Coverage Part. With respect to Coverage H, **claim expenses** do not include the costs associated with the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of an **insured's** business, negotiated as part of a settlement with or by order of a **government entity**.

J. **Commercial payer** means ay private health insurance company.

K. **Committee member** means a person serving as a member of a committee or board formed or controlled by an **insured business**. **Committee member** also includes any person executing the directives of such a committee or board.

L. **Computer hardware** means the physical components of any computer system including CPU's, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cable, connectors, fiber optics, wire, power supply units, keyboards, display monitors and audio speakers.

M. **Computer program(s)** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. **Computer program(s)** include, but are not limited to, communications, networking, operating system and related **computer programs** used to create, maintain, process, retrieve, store and/or transmit electronic **data**.

N. **Computer system(s)** means interconnected electronic, wireless, web or similar systems (including all **computer hardware** and software) used to process and store **data** or information in an analogue, digital, electronic or wireless format including, but not limited to, computer programs, electronic data, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

O. **Computer virus** means a program that possesses the ability to create replicas of its self (commonly known as 'auto-reproduction' program) within other programs or operating system areas or which is capable of spreading copies of its self wholly or partly to other **computer systems.**

P. **Counseling** means formal therapy rendered to a patient by a licensed professional approved and credentialed by the **insured** to provide such therapy.

 © 2015 MedPro Group. All rights reserved.

Q. **Covered causes of loss** means:

1. Accidental Damage or Destruction

   a. accidental physical damage or destruction of **electronic media**, so that stored **digital assets** are no longer machine-readable;

   b. accidental damage or destruction of **computer hardware**, so that stored **data** is no longer machine-read-able;

   c. failure in power supply or under/over voltage only if such power supply is under the direct operational control of an **insured business**. Direct operational control includes back-up generators;

   d. **programming error** of **delivered programs**; or

   e. electrostatic build-up and static electricity.

2. Administrative or Operational Mistakes

   An accidental, unintentional or negligent act, mistake, error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in:

   a. the entry, or modification of an **insured business's** electronic **data**, which causes damage to such **data**;

   b. the creation, handling, development, modification or maintenance of an **insured business's digital assets**; or

   c. on-going operation or maintenance of an **insured business's computer system**, excluding the design, architecture, or configuration of an **insured business's computer system**;

3. Computer Crime and Computer Attacks

   An act, mistake, negligent error or omission by an **insured**, a **BPO service provider** or **outsourced IT service provider** in the operation of an **insured business's computer system** or in the handling of an **insured business's digital assets**, which fails to prevent or hinder any of the following attacks intended to maliciously cause harm to an **insured business's computer system**:

   a. a **denial of service attack**;

   b. **malicious code**;

   c. **unauthorized access**; or

   d. **unauthorized use**.

R. **Customer notification expenses** means those reasonable and necessary legal expenses, forensic and investigation fees, **public relations expenses**, postage expenses, and related advertising expenses an **insured** incurs, with the **company's** prior written consent, to comply with governmental privacy legislation mandating customer notification in the event of a **security breach**, **privacy breach**, or **breach of privacy regulations**.

S. **Customer support and credit monitoring expenses** means those reasonable and necessary expenses an **insured** incurs, with the **company's** prior written consent, for the provision of customer support activity, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of 12 months from the date of enrollment in such credit file monitoring services, in the event of a **privacy breach**.

T. **Cyber extortion expenses** means all reasonable and necessary costs and expenses an **insured business** incurs, with the **company's** prior written consent, as a direct result of a **cyber extortion threat**, other than **cyber extortion monies**.

U. **Cyber extortion monies** means any funds or property paid by an **insured business**, with the **company's**

 © 2015 MedPro Group. All rights reserved.

prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat**, for the purpose of terminating such a **cyber extortion threat**.

V. **Cyber extortion threat** means a credible threat or series of related credible threats, including, but not limited to, a demand for **cyber extortion monies**, directed at an **insured business** to:

1. release, divulge, disseminate, destroy or use the confidential information of a third party taken from an **insured** as a result of **unauthorized access** to, or **unauthorized use** of, an **insured business's computer system**;
2. introduce **malicious code** into an **insured business's computer system**;
3. corrupt, damage or destroy an **insured business's computer system**;
4. restrict or hinder access to an **insured business's computer system**, including, but not limited to, the threat of a **denial of service attack**; or
5. electronically communicate with an **insured business's** customers and falsely claim to be the **insured business** or to be acting under the **insured business's** direction in order to falsely obtain personal confidential information of the **insured business's** customers (also known as "pharming," "phishing," or other types of false communications).

W. **Damages** mean a monetary judgment, award or settlement, including prejudgment and post judgment interest and punitive **damages** to the extent insurable under the law pursuant to which this Coverage Part is construed.

**Damages** do not include:

1. any **insured's** future profits or royalties, restitution or disgorgement of any **insured's** profits;
2. the costs to comply with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;
3. loss of any **insured's** fees or profits, return or offset of any **insured's** fees or charges or any **insured's** commissions or royalties provided or contracted to be provided;
4. taxes, fines or penalties or sanctions;
5. the multiple portion of any multiplied **damages**;
6. liquidated **damages**;
7. any amount which an **insured** is not financially or legally obligated to pay;
8. disgorgement of any remuneration or financial advantage to which an **insured** was not legally entitled;
9. settlements negotiated without the **company's** consent; or
10. monetary judgments, awards, settlements or any other amounts which are uninsurable under the law pursuant to which this Coverage Part is construed or any legal fees and costs awarded pursuant to such judgments, awards or settlements.

X. **Data** means any machine readable information, including ready for use programs, applications, account, customer, health and medical information or electronic information subject to back up procedures, irrespective of the way it is used and rendered including, but not limited to, text or digital media.

Y. **Data protection breach** means the appearance of any **adverse media report** that there has been a failure, error, omission, neglect or breach of duty by an **insured**, a **BPO service provider** or **outsourced IT service provider** to protect the security and confidentiality of non-public proprietary corporate information, personally identifiable non-public information of customers or other personal or confidential paper records of customers.

Z. **Delivered programs** means programs, applications, and software where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

 © 2015 MedPro Group. All rights reserved.

AA. **Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a **computer system** by sending an excessive volume of electronic **data** to such **computer system** in order to prevent authorized access to such **computer system**.

BB. **Digital assets** mean **data** and **computer programs** that exist in a **computer system**. **Digital assets** do not include **computer hardware**.

CC. **Digital assets loss** means reasonable and necessary expenses and costs an **insured business** incurs to replace, recreate or restore **digital assets** to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused or stolen, including expenses for materials and machine time as well as costs associated with restoration, recreation and replacement. **Digital Assets Loss** also includes amounts representing **employee** work time to replace, recreate or restore **digital assets** which shall be determined on a predefined billable hours or per hour basis as based upon the **first named insured's** schedule of **employee** billable hours.

DD. **Disinfection event** means any case or series of cases of hospital-borne infectious bacteria, virus or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

EE. **Disinfection expense** means reasonable fees and costs incurred by an **insured business** to clean and disinfect such **insured business** as a result of any **disinfection event**. **Disinfection expense** includes costs to:

1. engage third party providers of cleaning/disinfection services; and
2. notify patients, visitors or other potentially affected persons.

**Disinfection expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured** or the cost of cleaning and/or disinfecting supplies or products.

FF. **E-Discovery claim expenses** means **claim expenses** relating to the collection, processing, converting, reviewing and producing electronically stored information, which is performed solely by an e-discovery service provider designated by the **company** in connection with the investigation and defense of any **regulatory proceeding**.

GG. **E-Discovery consulting services** means e-discovery readiness assessment and consulting services rendered solely by an e-discovery service provider designated by the **company** in connection with the investigation and defense of any **regulatory proceeding**.

HH. **E-Discovery regulatory investigation expenses** means **claim expenses** incurred by an **insured business** for services rendered solely by an e-discovery service provider designated by the **company** in the collection, processing, converting, reviewing and producing electronically stored information in connection with any **regulatory proceeding**.

II. **Electronic media** means floppy disks, CD ROMs, hard drives, magnetic tapes, magnetic discs, or any other media on which electronic **data** is recorded or stored.

JJ. **Employee(s)** means any person employed by, or under contract with, an **insured business** at the time of a **claim**. **Employees** include:

1. any authorized volunteer worker;
2. any physician or dentist, including residents; and
3. any certified registered nurse anesthetist, nurse midwife, nurse practitioner, physician's assistant, podiatrist or surgical assistant.

**Employees** do not include any **administrator, committee member** or **student**.

 © 2015 MedPro Group. All rights reserved.

KK. **EMTALA proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violations of the Emergency Medical Treatment and Labor Act (EMTALA).

LL. **Evacuation** means:

1. the removal of 25% or more of an **insured business's** patients away from the **insured business's** premises to any other premises as a result of any natural or man-made occurrence that, in the reasonable judgment of the **insured business's** management staff, causes or could potentially cause such **insured business** to be unsafe for such patients; and
2. solely with respect to an **insured business's** patients as described in 1. above, the return of such patients to the **insured business's** premises when such premises are deemed safe for occupancy.

MM. **Evacuation expense** means reasonable costs incurred in connection with an **evacuation**, including the costs of transporting and lodging patients. **Evacuation expense** does not include any salaries, overhead, fees, loss of earnings or benefit expenses incurred by, or paid to, any **insured**.

NN. **Firmware** means the fixed programs that internally control basic low-level operations in a device.

OO. **Government entity** means:

1. any department, agency, task force or other organization created by any U.S. federal or state law, regulation, rule or executive order;
2. any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the U.S. federal government or any state government; or
3. any organization operating as a Medicare Integrity Program Contractor.

PP. **Income** means all income of an **insured business** within any given period which is derived from the exploitation of the **insured business's reputation** and/or from the **insured business's** business activities, products or services.

QQ. **Income loss** means financial loss sustained by an **insured business**, as determined in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra Expense.

RR. **Increase in cost of working** means the additional expenditure (other than any advertising or marketing costs or the like undertaken to rehabilitate an **insured business's reputation** and/or any legal costs or expenses) necessarily and reasonably incurred by an **insured business** for the sole purpose of avoiding or minimizing a net trading loss or a reduction in **net profit** which would otherwise have occurred during the **policy period** as a consequence of a **data protection breach**. The amount of such additional expenditure recoverable hereunder shall in no case exceed the amount of the net trading loss or reduction in **net profit** thereby avoided.

SS. **Insured business** means any corporation, entity, partnership or professional association listed as an Insured Business in the Declarations or on a Schedule of Named Insureds.

TT. **Insured business's computer system** means:

1. a **computer system** operated by and either owned by, or leased to an **insured business**;
2. with respect to Coverage B only, a **computer system** operated by a **BPO service provider** or **outsourced IT service provider** and used for the purpose of providing hosted computer application services to an **insured business** or for processing, maintaining, hosting or storing an **insured business's** electronic **data**, pursuant to a written contract with the **insured business** for such services.

UU. **Internet** means the worldwide public network of computers which enables the transmission of electronic **data** between different users, including a private communications network existing within a shared or public network platform.

VV. **Interruption expenses** means those expenses, excluding **special expenses**, incurred by an **insured business**, in accordance with the provisions of Coverage E.2., Non-Physical Business Interruption and Extra

 © 2015 MedPro Group. All rights reserved.

Expense, to:

1. avoid or minimize the suspension of business as a result of the total or partial interruption, degradation in service or failure of an **insured business's computer system** caused directly by a **covered cause of loss**, which the **insured business** would not have incurred had no **covered cause of loss** occurred. **Interruption expenses** include, but are not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services or additional staff expenditures or labor costs; and/or
2. minimize or avoid a **covered cause of loss** and continue an **insured business's** business.

The amount of **interruption expenses** recoverable under subparagraph 1 above shall in no case exceed the amount by which the covered **income loss** is reduced by such incurred **interruption expenses.**

WW. **Malicious code** means software intentionally designed to insert itself and damage a **computer system** without the owner's informed consent by a variety of forms including, but not limited to, virus, worm, Trojan horses, spyware, dishonest adware, and crime-ware.

XX. **Multimedia perils** means the release of, or display of, any electronic media on an **insured business's internet** site or **print media** for which an **insured business** is solely responsible, which directly results in any of the following:

1. any form of defamation or other tort related to the disparagement or harm to the **reputation** or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;
2. invasion, infringement or interference with an individual's right of privacy or publicity, including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;
3. plagiarism, piracy or misappropriation of ideas under an implied contract;
4. infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or
5. domain name infringement or improper deep-linking or framing.

YY. **Net profit** means an **insured business's** net trading profit (exclusive of all capital receipts and accretions and all outlay improperly chargeable to capital) within any given period generated from an **insured business's income** after due provision has been made for all standing and other charges including depreciation, but before the deduction of any taxation chargeable on profits.

ZZ. **Operational programs** means programs and software which are ready for operational use, having been fully developed, tested, and accepted by an **insured business**.

AAA. **Outsourced IT service provider** means a third party independent contractor that provides information technology services for the benefit of an **insured business** under a written contract with the **insured business**. Outsourced services include, but are not limited to, hosting, security management, co-location, and **data** storage.

BBB. **Period of indemnity** means the period of time elected by an **insured business** which both begins and ends within the period commencing with the date of the first **adverse media report** of a **data protection breach** and continuing thereafter for the time period specified in the policy schedule and not limited by the expiration date of the policy. During the **period of indemnity**, coverage against any further occurrence of any **data protection breach** shall continue only until the expiration date of this policy.

CCC. **Period of restoration** means the period of time that commences on the date when the interruption, degradation or failure of an **insured business's computer system** began and ends on the later of:

1. the date when an **insured business's computer system** is restored or could have been repaired or

 © 2015 MedPro Group. All rights reserved.

restored with reasonable speed to the same condition, functionality and level of service that existed prior to a **covered cause of loss** plus no more than 30 consecutive days after the restoration of an **insured business's computer system** to allow for restoration of the business; or

2. 120 consecutive days after notice of a **covered cause of loss** is received by the **company**.

DDD. **Print media** means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials, including packaging, photographs, and digital images.

EEE. **Privacy breach** means a common law breach by an **insured**, a **BPO service provider** or **outsourced IT service provider** of confidentiality, infringement or violation of any right to privacy including, but not limited to, a breach of an **insured business's** privacy policy, breach of a person's right of publicity, false light, intrusion upon a person's seclusion or public disclosure of a person's private information. A series of continuing **privacy breaches** or related or repeated **privacy breaches** shall be considered a single **privacy breach** and shall be deemed to have occurred at the time of the first such **privacy breach**.

FFF. **Privacy breach response costs** means those reasonable and necessary fees an **insured** incurs, with the **company's** prior written consent, for the employment of a public relations consultant if an **insured** reasonably considers that action is needed in order to avert or mitigate any material damage to an **insured business's reputation** that results or reasonably will result from an **adverse media report** that has been notified to the **company**.

GGG. **Privacy regulatory proceeding** means a formal civil administrative proceeding or regulatory action instituted against an **insured** by a federal, state or local governmental regulatory body for a **security breach**, **privacy breach** or **breach of privacy regulations**.

HHH. **Programming error** means an error which occurs during the development or encoding of a computer program, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

III. **Property damage** means physical injury to, impairment, destruction, or corruption of any tangible property, including the loss thereof. **Data** is not considered tangible property.

JJJ. **Public relations event** means:

1. any event in which an **insured business** has paid any:
   a. **evacuation expense**; or
   b. **disinfection expense**;
2. any event that results in the publication or broadcast of information which can reasonably be expected to damage an **insured business's reputation**, if such event is caused by:
   a. an actual or alleged act, error or omission in the furnishing or failure to furnish **treatment**;
   b. an abusive act; or
   c. workplace violence or threat of workplace violence.

KKK. **Public relations expenses** means:

1. with respect to Coverage D, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of an **adverse media report**.
2. with respect to Coverage K, reasonable fees and costs incurred by an **insured business** in the investigation and mitigation of a **public relations event** including the costs:
   a. of attorneys, experts and consultants, including third-party media consultants and security consultants;
   b. to notify third parties directly affected by such **public relations event**;

 © 2015 MedPro Group. All rights reserved.

c. incurred in the management of public relations with respect to such **public relations event**; and

d. employee counseling expenses.

3. with respect to Coverage M, reasonable and necessary expenses incurred by an **insured business** to re-establish its **reputation**, which was damaged as a direct result of a **data protection breach**.

However, **public relations expenses** do not include:

1. any salaries, overhead, fees, loss of earnings, or benefit expenses incurred by, or paid to, any **insured**; or

2. **disinfection expense** or **evacuation expense**.

LLL. **Qui tam plaintiff** means a private plaintiff under the U.S. False Claims Act.

MMM. **Recoverable costs** mean, within any period in which an **insured business's net profit** is nil, any standing and other charges incurred by an **insured business** in excess of its **income**, up to, but not exceeding, 20% of its anticipated **net profit** for such period.

NNN. **Regulatory compensatory award** means a sum of money which an **insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party due to an adverse judgment or settlement arising out of a **privacy regulatory proceeding**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

OOO. **Regulatory fines and penalties** mean civil fines or penalties imposed against an **insured** by a **government entity** as a result of a **privacy regulatory proceeding** triggering coverage under Coverage C or a **regulatory proceeding** triggering coverage under Coverage H.

PPP. **Regulatory proceeding** means:

1. With respect to Coverage H, any of the following instituted against an **insured** during the **policy period**:

   a. **billing errors proceeding**;

   b. **EMTALA proceeding**; or

   c. **Stark proceeding**.

2. With respect to Coverage L, any of the following instituted against an **insured** during the **policy period**:

   a. any investigation or request for information by the Office for Human Research Protection (OHRP) under Title 45, Part 46, Code of Federal Regulations (45 CFR part 46);

   b. any request for information by the Office of Inspector General (OIG) as part of its audits, investigations, inspections and evaluations; or

   c. any request for information by the Food and Drug Administration (FDA) as part of its audits, investigations, inspections and evaluations.

QQQ. **Reputation** means the estimation of trust that patients, customers or clients have in doing business with an **insured business** or in purchasing the products or services of an **insured business**.

RRR. **Restitution** means repayment of fees, reimbursement, profits, charges or other benefit payments:

1. received by an **insured** from:

   a. a governmental health benefit payer or program, carrier or intermediary making payments as part of, or in connection with, any such program;

   b. a **commercial payer**; or

   c. any patient.

 © 2015 MedPro Group. All rights reserved.

2. to which such **insured** was not legally entitled by reason of a billing error or errors, the return of which is sought in a **billing errors proceeding**.

SSS. **Retention** means the amount stated in the Declarations applicable to this Coverage Part, which must be borne by the **insureds** uninsured and at their own risk in respect to **damages**, **claim expenses** and any other amounts covered under this Coverage Part. The **company** has no liability to pay **damages**, **claim expenses** or any other amounts covered under this Coverage Part until the **retention** has been fully paid and satisfied by the **insureds**, unless otherwise provided in this Coverage Part. The **retention** shall apply separately to each **claim** under each of the Coverages of this Coverage Part. If a **claim** attaches to more than one of the Coverages of this Coverage Part, only the highest **retention** applies.

TTT. **Retroactive date** means the date stated in the Declarations applicable to this Coverage Part that an **insured** has no coverage under Coverages A, B, C, H or L.

UUU. **Security and privacy wrongful act** mean any of the below, whether actual or alleged, but only if committed or alleged committed by an **insured** in their capacity as such:

1. the failure to prevent or hinder **unauthorized access** to or **unauthorized use** of an **insured business's computer system**; security failures; or social engineering techniques devised to trick the user into surrendering personal information ('phishing' or 'pharming') that in turn results in:
   a. the alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on an **insured business's computer system**;
   b. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of an **insured business**;
   c. theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a **BPO service provider** or **outsourced IT service provider** that is holding, processing or transferring such information on behalf of an **insured business**; provided, however, that the theft, loss or unauthorized disclosure occurs while an **insured business's** written contract with such **BPO service provider** or **outsourced IT service provider** is still in effect; or
   d. **unauthorized use** of or **unauthorized access** to a **computer system** other than an **insured business's computer system**.
2. an **insured business's** failure to timely disclose a **security breach** affecting personally identifiable, non-public information, or the failure to dispose of personally identifiable information within the required time period, in **breach of privacy regulations** in effect now or in the future;
3. the failure to prevent the transmission of **malicious code** or **computer virus** from an **insured business's computer system** to the **computer system** of a third party;
4. a **privacy breach** or **breach of privacy regulations**;
5. the failure to prevent or hinder participation by an **insured business's computer system** in a **denial of service attack** directed against **internet** sites or the **computer system** of any third party; or
6. loss of **employee** information.

VVV. **Security breach** means:

1. **unauthorized access** to or **unauthorized use** of an **insured business's computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from an **insured business's computer system** or from any **insured**;
2. a **denial of service attack** against an **insured business's computer system**; or

 © 2015 MedPro Group. All rights reserved.

3. infection of an **insured business's computer system** by **malicious code** or the transmission of **malicious code** from an **insured business's computer system**,

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security, shall be considered a single **security breach** and be deemed to have occurred at the time of the first such **security breach**.

WWW. **Shadow audit** means an audit performed by a qualified professional, which examines the same billing records and related documents as those subject to an ongoing **billing errors proceeding**, with the intent of providing an **insured** with a private expert opinion. Such **shadow audits** are subject to the **company's** prior approval.

XXX. **Shadow audit expenses** means the fees for the services of a qualified audit professional and associated expenses incurred by an **insured** in the course of a **shadow audit**.

YYY. **Social services** means programs provided by an **insured** to help maintain or improve the quality of life for the patient, including family counseling and educational programs. These programs do not include therapy for the direct benefit of anyone other than the patient.

ZZZ. **Special expenses** means reasonable and necessary costs and expenses an **insured business** incurs to:

1. prevent, preserve, minimize, or mitigate any further damage to an **insured business's digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts an **insured business** retains;
2. preserve critical evidence of any criminal or malicious wrongdoing;
3. purchase replacement licenses for **computer programs** because the copy protection system and/or access control software was damaged or destroyed by a **covered cause of loss**; or
4. notify customers of a total or partial interruption, degradation in service or failure of an **insured business's computer system** resulting from a **covered cause of loss**.

AAAA. **Stark proceeding** means proceedings instituted against an **insured** by a **government entity** alleging violation of any federal, state or local anti-kickback or self-referral laws.

BBBB. **Student** means an unlicensed person, other than a resident, enrolled in a licensed or accredited training program operated by an **insured business** relative to the delivery of **treatment**.

CCCC. **Time retention** means the number of hours that must elapse, as provided in the Declarations applicable to this Coverage Part before the recovery of loss under Coverage E.2., Non-Physical Business Interruption and Extra Expense, or Coverage G, can be considered.

DDDD. **Unauthorized access** means the gaining of access to a **computer system** by an unauthorized person or persons.

EEEE. **Unauthorized use** means the use of a **computer system** by an unauthorized person or persons or an authorized person in an unauthorized manner.

FFFF. **Voluntary self disclosure** means an **insured** discloses information, without inquiry, to any **government entity** or **commercial payer**, which may serve as grounds for a **billing errors proceeding** against an **insured**. Such information must have become known to the **insured** fortuitously and subsequent to the initial effective date of this insurance.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 2 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET ADDITIONAL INSURED ENDORSEMENT (PROFESSIONAL LIABILITY)

Only with respect to coverage provided under this endorsement and under the Professional Liability Coverage Part, and in consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The definition of **additional insured** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

**Additional insured** means any person or organization with which the **insured** has entered into a written contract or agreement prior to the **loss** agreeing:

a. to add the person or organization as an **additional insured**; or

b. to hold harmless or indemnify such person or organization.

However, such person or organization is not an **additional insured** with respect to **losses** arising from, or in connection with, any acts or omissions alleged to have been committed by that **additional insured**.

The following subparagraph is added to all Insuring Clauses of the Professional Liability Coverage Part:

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an **insured** is required by written contract or agreement to provide to that **additional insured**. Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured**.

The following provision is added to the Limits of Liability section of the Professional Liability Coverage Part:

ADDITIONAL INSUREDS

All **additional insureds** share the Limits of Liability applicable to any **claim** with any **insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 3 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CRISIS RESPONSE COSTS ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

CRISIS RESPONSE COSTS LIMIT

The Crisis Response Costs Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Crisis Response Costs Insuring Clause for **crisis response costs** because of a **crisis event**:

Crisis Response Costs Aggregate Limit: $25,000

The Crisis Response Costs Aggregate Limit shown above is the most the **company** will reimburse for all **crisis response costs** for all **crisis events** regardless of the number of **insureds** or **crisis events**. The Crisis Response Costs Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

CRISIS RESPONSE COSTS

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **crisis response costs** paid by the **named insured** in connection with a single **crisis event** that occurs during this **policy period**, subject to the Crisis Response Costs Aggregate Limit. The **crisis response costs** must be incurred by a **named insured** within 30 days after the commencement of the **crisis event**. The end of the policy will not cut short this 30 day period.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR CRISIS EVENTS

The **company's** duty to reimburse a **named insured** for any **crisis response costs** is conditioned upon:

1. an **authorized insured** providing notice of a **crisis event** to the **company** via telephone call to (800) 463-3776 or electronic message no later than 24 hours after the **crisis event**;
2. an **authorized insured** notifying the **company** in writing as soon as possible:
   a. how, when and where the **crisis event** took place;
   b. the names and addresses of any witnesses or **affected persons**; and,

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

c. the nature and location of any injury or damage arising out of the **crisis event**.

3. the **insured** taking all reasonable steps to prevent a **crisis event** and to mitigate any **crisis response costs**; and,
4. a request for reimbursement of **crisis event costs**, along with all invoices or receipts support such **crisis response costs** in excess of $50, must be submitted to the **company** within 90 days after incurring such **crisis response costs**.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Affected persons** means those individuals who suffer direct **bodily injury** or **property damage**, or directly experience **imminent injury**.

**Crisis event** means a man-made emergency situation, including but not limited to, arson, bombing, the taking of hostages, a mass shooting, terrorism, intentional contamination of food, drink or pharmaceuticals that results in **bodily injury**, **property damage**, or **imminent injury** to multiple persons and significant adverse regional or national news media coverage. A **crisis event** does not include a certified act of terrorism.

**Crisis response costs** means:

1. reasonable and necessary fees and expenses incurred by a **crisis management firm** or by an **named insured** in order to provide public relations and media management services for the purposes of maintaining an **insured's** reputation;
2. printing, advertising, or mailing costs incurred in order to manage the reputational risk of an **insured**;
3. reasonable and necessary **emergency psychology expenses**, **emergency travel expenses**, funeral expenses, travel expenses, and temporary living expenses for **affected persons**;
4. reasonable and necessary travel expenses and hotel accommodations for immediate family members of **affected persons**; or,
5. expenses to secure the scene of a **crisis event**.

**Crisis response costs** do not include **claims expense** or salaries paid by an **insured**.

**Crisis management firm** means a public relations firm assigned or approved by the **company** in writing that is hired by a **named insured** to perform services to protect and maintain the reputation of an **insured**.

**Emergency psychology expenses** means reasonable and necessary expenses for psychological or counseling services provided to **affected persons** and incurred within the first 14 days after a **crisis event**. This does not include the costs of any medications or hospitalizations. Such **emergency psychology expenses** must be approved by the **crisis management firm**, if hired, or in the alternative, by the **company**.

**Emergency travel expenses** means reasonable and necessary expenses occurring within 24 hours after a **crisis event** to transport an **affected person** sustaining **bodily injury** in a **crisis event** to a medical treatment facility.

**Imminent injury** means the actual and immediate threat of **bodily injury** or **property damage**.

Only with respect to coverage provided under this endorsement, the definitions of **event** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced by the following:

**Event** means an accident and a **crisis event**. All injuries arising out of, or in connection with:

1. the same or related acts or omissions; or,
2. the continuous or repeated exposure to substantially the same harmful conditions;

 © 2015 MedPro Group. All rights reserved.

will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event**.

Only with respect to coverage provided under this endorsement, the following exclusions are added to the Exclusions Applicable To This Coverage Part section of the General Liability Coverage Part:

Infections Disease Or Illness

Any request for reimbursement of **crisis response costs** related to a **crisis event** that was caused by any infectious disease or illness caused by any bacterium, virus or fungus.

Crisis Response Costs

Any element of damages that have been paid by the **company** as **crisis response costs** under this endorsement which arises in any other **claim** or **potential claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 4 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## DISEASE CONTAMINATION CLEAN-UP EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

DISEASE CONTAMINATION CLEAN-UP EXPENSE LIMIT

The Disease Contamination Clean-up Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Disease Contamination Clean-Up Expenses Insuring Clause for **clean-up expenses** because of **a superbug contamination**:

Disease Contamination Clean-up Expense Aggregate Limit: $25,000

The Disease Contamination Clean-up Expense Aggregate Limit shown above is the most the **company** will reimburse for all **clean-up expenses** for all **superbug contaminations** regardless of the number of **insureds** or **superbug contaminations**. The Disease Contamination Clean-up Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

DISEASE CONTAMINATION CLEAN-UP EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **clean-up expenses** paid by the **named insured** in connection with a **superbug contamination** that occurs during this **policy period**, subject to the Disease Contamination Clean-up Expense Aggregate Limit.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Clean-up expenses** means reasonable costs and expenses incurred by a **named insured** to hire a third party to disinfect an **insured's** location as a result of a **superbug contamination**. **Clean-up expenses** shall not include any salaries, benefits, remuneration or overhead of a **named insured**.

Only with respect to coverage provided under this endorsement, the Contaminations exclusion in the Exclusions Applicable to this Coverage Part section of the General Liability Coverage Part is deleted.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 5 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## EMERGENCY EVACUATION EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

EMERGENCY EVACUATION EXPENSE LIMIT

The Emergency Evacuation Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Emergency Evacuation Expenses Insuring Clause for **emergency evacuation expenses** because of an **emergency evacuation**:

Emergency Evacuation Expense Aggregate Limit: $50,000

The Emergency Evacuation Expense Aggregate Limit shown above is the most the **company** will reimburse for all **emergency evacuation expenses** for all **emergency evacuations** regardless of the number of **insureds** or **emergency evacuations**. The Emergency Evacuation Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

EMERGENCY EVACUATION EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **emergency evacuation expenses** paid by the **named insured** in connection with an **emergency evacuation** that occurs during this **policy period**, subject to the Emergency Evacuation Expense Aggregate Limit.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR EMERGENCY EVACUATIONS

The **company's** duty to reimburse a **named insured** for any **emergency evacuation expense** is conditioned upon:

1. an **authorized insured** forwarding notice of an **emergency evacuation** to the **company** no later than 60 days after the **emergency evacuation**;
2. an **authorized insured** notifying the **company** of any other insurance policy, prepaid legal service contract or legal practitioner retainer agreement available with respect to such **emergency evacuation**;
3. the **insured** taking all reasonable steps to prevent an **emergency evacuation** and to mitigate any **emergency evacuation expenses**; and,

 © 2015 MedPro Group. All rights reserved.

4. an **insured** not taking any action, or failing to take any action, without the written consent of the **company**, which would otherwise prejudice the **company's** rights under this policy.

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Emergency evacuation** means an evacuation of a **named insured's** location because a determination is made by the **named insured** that imminent danger exists arising from an external event or a condition in the **named insured's** location which would cause loss of life or harm to patients or **residents**. **Emergency evacuation** does not include an evacuation arising from:

1. a strike, bomb threat or false fire alarm, unless vacating is ordered by a civil authority;
2. a planned vacating drill;
3. the vacating of one or more patients or **residents** that is due to, and confined to, an individual's medical condition;
4. a governmental action;
5. a nuclear hazard; or,
6. war or military action.

**Emergency evacuation expenses** means reasonable costs and expenses incurred by a **named insured** to perform an **emergency evacuation**. **Emergency evacuation expenses** do not include:

1. **claims expense**;
2. any other expenses incurred by an **employee**, volunteer, or other person providing assistance with, in any part of, or included in, the **emergency evacuation**; or,
3. the remuneration, salaries, overhead or benefit expenses of an **insured**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 6 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## EMPLOYEE BENEFITS LIABILITY ENDORSEMENT (GENERAL LIABILITY)
## (CLAIMS-MADE AND REPORTED COVERAGE)

**NOTICE:**

**This endorsement contains claims-made and reported coverage. Please read this endorsement carefully.**

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Insuring Clauses section of the General Liability Coverage Part:

EMPLOYEE BENEFITS LIABILITY

1. Claims-Made and Reported

   If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

   a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Insuring Clause, arising from an **event** related to the **administration** of **employee benefits** that took place on or after the applicable retroactive date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

      (1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or,

      (2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

   b. All **claims** and **potential claims** for damages arising out of, or in connection with, the same **event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to all related **claims** and **potential claims**, no matter when those related **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to that **claim** or **potential claim**, nor to any related **claim** or **potential claim** made during this **policy period** or any

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

**extended reporting period.**

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Administration** means:

1. providing information to **employees**, including their dependents and beneficiaries, with respect to eligibility for or scope of an **employee benefits** program;
2. handling records in connection with an **employee benefits** program; or,
3. effecting, continuing, or terminating any **employee's** participation in any **employee benefits** program.

**Administration** does not include handling payroll deductions.

**Employee benefits** means any group benefits administered on behalf of a **named insured's employees**, including:

1. group insurance plans or programs, such as life, health, accident, dental, or legal advice;
2. Individual retirement accounts, salary reduction plans under I.R.S. Code 401(k), or any amendment thereto, savings plans, or employee stock subscription plans;
3. travel or vacation plans; or,
4. workers' compensation, occupational disease, unemployment, Social Security, or disability benefits insurance.

Only with respect to coverage provided under this endorsement, the following exclusion is deleted from the Exclusions section of the Common Policy Provisions and Conditions:

EMPLOYEE BENEFITS LIABILITY

The following provisions are added to the Exclusions section of the General Liability Coverage Part:

EXCLUSIONS APPLICABLE TO THE EMPLOYEE BENEFITS LIABILITY INSURING CLAUSE

The coverage provided under the Employee Benefits Liability Insuring Clause does not apply to:

1. BODILY INJURY, PROPERTY DAMAGE AND PERSONAL AND ADVERTISING INJURY

   Any **claim** arising from, or in connection with, **bodily injury**, **property damage**, or **personal and advertising injury.**

2. CLAIM FOR BENEFITS WHERE FUNDS AVAILABLE WITH REASONABLE COOPERATION

   Any **claim** for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the **insured**, from the applicable funds accrued or other collectible insurance.

3. COLLECTIVE BARGAINING

   Any **claim** arising from, or in connection with, the breach of any collective bargaining agreement.

4. ERISA

   Any **claim** arising from, or in connection with, an **insured's** duty as a sponsor of an employee benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment or regulation that applies thereto. However, this exclusion is limited to:

   a. an **insured's** failure or inability to fund the plan in accordance with the plan document or any applicable law

 © 2015 MedPro Group. All rights reserved.

or regulation; and

b. liability for the payment of benefits owed to a participant or beneficiary of the plan that have been paid or may lawfully be paid from the plan's funds or those of other employee programs.

5. FAILURE TO PERFORM UNDER A CONTRACT

Damages arising out of the failure of an insurer to perform under a contract.

6. HEALTH CARE EVENT

Any **claim** arising from, or in connection with, any **health care event**.

7. PERFORMANCE OF INVESTMENTS AND ADVICE GIVEN REGARDING EMPLOYEE BENEFITS

Any **claim** arising from, or in connection with:

a. errors in providing information on past performance of investment vehicles; or

b. advice given to any person with respect to that person's decision to participate or not to participate in any **employee benefits** plan.

8. UNPAID OBLIGATIONS UNDER EMPLOYEE BENEFIT PLAN

Any **claim** arising from, or in connection with, damages arising out of an insufficiency of funds to meet any obligations under any plan included as an **employee benefit.**

The following provisions are added to the Limits of Liability Section of the General Liability Coverage Part:

EMPLOYEE BENEFITS LIABILITY PER EVENT LIMIT

The Employee Benefits Liability Per Event Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expenses** under the Employee Benefits Liability Insuring Clause because of **bodily injury** arising out of any one **event**.

EMPLOYEE BENEFITS LIABILITY AGGREGATE LIMIT

The Employee Benefits Liability Aggregate Limit shown on the Declarations is the most the **company** will pay for **loss** and **claims expenses** because of **bodily injury** included in the Employee Benefits Liability Insuring Clause.

Only with respect to the Employee Benefits Liability Insuring Clause, the Settlement condition in the Conditions section of the Common Policy Provisions and Conditions is deleted and replaced by the following:

SETTLEMENT

The **company** may settle any **claim**, **potential claim,** or other matter brought against an **insured** as the **company** deems expedient. However, the **company** shall first provide written notice to the **first named insured**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 7 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## MEDIA EXPENSES ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following new provision is added to the Limits of Liability section of the General Liability Coverage Part:

MEDIA EXPENSE LIMIT

The Media Expense Aggregate Limit shown below is the most the **company** will reimburse a **named insured** under the Media Expenses Insuring Clause for all **formal proceedings**:

Media Expense Aggregate Limit: $50,000

The Media Expense Aggregate Limit shown above is the most the **company** will reimburse for all **media expenses** for all **formal proceedings** regardless of the number of **insureds** or **formal proceedings.** The Media Expense Aggregate Limit is not part of, and does not erode, the Limits of Liability applicable to other Insuring Clauses under this Coverage Part.

The following insuring clause is added to the Insuring Clause section of the General Liability Coverage Part:

MEDIA EXPENSES

The **company** will reimburse a **named insured**, upon satisfactory proof of payment, for **media expenses** paid by the **named insured** in connection with a **formal proceeding** that occurs during this **policy period**, subject to the Aggregate Medial Expense Limit. The **media expense** must be incurred by a **named insured** within 6 months following the discovery of a **formal proceeding**.

Only with respect to coverage provided under this endorsement, the following condition is added to the Conditions section of the Common Policy Provisions and Conditions:

REPORTING REQUIREMENTS FOR FORMAL PROCEEDINGS

The **company's** duty to reimburse a **named insured** for **media expenses** is conditioned upon:

1. an **authorized insured** forwarding notice of a **formal proceeding** to the **company** no later than 60 days after the first discovery of the **formal proceeding**;
2. an **authorized insured** notifying the **company** of any other insurance policy, prepaid legal service contract or legal practitioner retainer agreement available with respect to such **formal proceeding**;
3. the **insured** taking all reasonable steps to prevent a **formal proceeding** and to mitigate any **media expenses**; and,
4. an **insured** not taking any action, or failing to take any action, without the written consent of the **company**, which would otherwise prejudice the **company's** rights under this policy.

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

Only with respect to coverage provided under this endorsement, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Media expenses** means reasonable costs and expenses incurred by a **named insured** to manage a **formal proceeding** or other public relations expenses incurred to hire public relations experts and consultants. **Media expenses** do not include any reimbursement of salaries, overhead, fees, loss of earnings, or reimbursement of benefit expenses of an **insured**.

**Formal proceeding** means a criminal or civil investigation, complaint or formal administrative proceeding initiated against an **insured** relating to an actual or alleged violation or infringement if any federal, state or local law designed to protect **resident's rights**.

The following exclusion is added to the Exclusions Applicable To This Coverage Part section of the General Liability Coverage Part:

Prior Known Formal Proceedings

Any request for reimbursement of **media expenses** related to a **formal proceeding** of which any **authorized insured** knew or should have known of prior to the occurrence of such **formal proceeding.**

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 8 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## PATIENT'S PERSONAL PROPERTY ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

PATIENTS PERSONAL PROPERTY

| | |
|---|---|
| Patient's Property Per Person Per Event Limit: | $5,000 |
| Patient's Property Aggregate Limit: | $25,000 |
| Patient's Property Deductible: | $250 |

Subject to the General Aggregate Limit and the Per Event Limit, the Patient's Property Per Person Per Event Limit shown above is the most the **company** will pay, subject to the Patient's Property Deductible set forth above, under the Bodily Injury and Property Damage Insuring Clause for **loss** and **claims expense** because of **property damage** to a **patient's** personal property sustained by any one person or arising out of one **event**.

Subject to the General Aggregate Limit, the Patient's Property Aggregate Limit shown above is the most the **company** will pay under the Bodily Injury and Property Damage Insuring Clause for **loss** and **claims expense** because of **property damage** to a **patient's** personal property.

Only with respect to coverage provided under this endorsement, the Damage to Property exclusion in the Exclusions section of the General Liability Coverage Part is deleted and replaced with the following:

Damage to Property

**Property damage** to:

a. property an **insured** owns, rents, or occupies, including any costs or expenses incurred by an **insured**, or any other person or organization for repair, replacement, enhancement, restoration, or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

b. premises an **insured** sells, gives away, or abandons if the **property damage** arises out of, or in connection with, any part of those premises;

c. property loaned to an **insured**;

d. personal property in the care, custody, or control of an **insured**, except that the **company** agrees to reimburse the **insured** for damages they become legally obligated to pay to a **patient** for **property damage** to the **patient's** personal property, which occurred while such property was in the care, custody, or control of the **insured**. The reimbursement for each such **patient** shall not exceed the Patient's Property Per Person Limit, minus the Patient's Property Deductible;

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

e. that particular part of real property on which an **insured** or any contractors or subcontractors, working directly or indirectly on behalf of the **insured**, are performing operations if the **property damage** arises out of those operations; or

f. that particular part of any property that must be restored, repaired, or replaced because the **insured's work** was incorrectly performed on it.

Subparagraphs a, c, and d of this exclusion do not apply to **property damage** (other than damage by fire) to a premises, including the contents of such premises, rented to an **insured** for a period of 7 or fewer consecutive days. A separate limit of liability applies to the Damage to Premises Rented to an Insured as described in the Limits of Liability provision.

Subparagraph b of this exclusion does not apply if the premises are the **insured's work** and were never occupied, rented, or held for rental by the **insured**.

Subparagraph f of this exclusion does not apply to **property damage** included in the **products completed operations hazard.**

Only with respect to coverage provided under this endorsement, the following definition applies:

**Patient** means a person receiving **treatment** at an **insured's** facility.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 9 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## BLANKET ADDITIONAL INSURED ENDORSEMENT (GENERAL LIABILITY)

Only with respect to coverage provided under this endorsement and under the General Liability Coverage Part, and in consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The definition of **additional insured** in the Definitions section of the Common Policy Provisions and Conditions is deleted and replaced with the following:

**Additional insured** means any person or organization with which the **insured** has entered into a written contract or agreement prior to the **loss** agreeing:

a. to add the person or organization as an **additional insured**; or

b. to hold harmless or indemnify such person or organization.

However, such person or organization is not an **additional insured** with respect to **losses** arising from, or in connection with, any acts or omissions alleged to have been committed by that **additional insured.**

The following subparagraph is added to all Insuring Clauses of the General Liability Coverage Part:

The **company's** duty to defend and pay **losses** or **claims expense** on behalf of any **insured** shall extend to any **additional insured** meeting the terms and conditions of this policy, but only with respect to any **loss** or **claims expense** payable as the result of the **additional insured's** vicarious liability for the acts or omissions of an **insured** otherwise covered under this Coverage Part.

However, the coverage provided to an **additional insured** shall not be broader than that which an **insured** is required by written contract or agreement to provide to that **additional insured.** Additionally, coverage shall not apply to structural alterations, new construction or demolition operations performed by or on behalf of an **additional insured.**

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

ADDITIONAL INSUREDS

All **additional insureds** share the Limits of Liability applicable to any **claim** with any **insured** for which the **additional insured** is alleged to be vicariously liable with respect to that same **claim**.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

MedPro Group
a Berkshire Hathaway company

**Issuing Company:**
**National Fire & Marine Insurance Company**
**Omaha, Nebraska**

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

| | |
|---|---|
| **Endorsement No.:** | 10 |
| **Forming Part of Policy No.:** | NSC100276 |
| **Issued to:** | Lighthouse Healthcare Center, LLC |
| **Effective Date of Endorsement:** | 03/01/2017 at 12:01 a.m. at the address of the First Named Insured stated herein. |

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT (GENERAL LIABILITY)

In consideration of the payment of the additional premium due, if any, and in reliance upon the representations of all **insureds**, the **company** and the **insureds** agree to amend the policy as follows:

The following provision is added to the Limits of Liability section of the General Liability Coverage Part:

CERTIFIED ACTS OF TERRORISM

If losses covered by insurance that are attributable to **certified acts of terrorism** in a calendar year exceed $100 billion in the aggregate, and the **company** has met its deductible amount under the **TRIA Act** for that calendar year, the **company** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, the losses are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

Only with respect to coverage provided under the General Liability Coverage Part, the following definitions are added to the Definitions section of the Common Policy Provisions and Conditions:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury in accordance with the provisions of the **TRIA Act**, to be an act of terrorism pursuant to the **TRIA Act**. The **TRIA Act** sets forth the following criteria for a **certified act of terrorism**:

1. The act resulted in losses covered by insurance in excess of $5,000,000 in the aggregate, attributable to all types of insurance subject to the **TRIA Act**;
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. The act must have resulted in damage within the United States including its territories and possessions and Puerto Rico, or outside the United States in cases of an air carrier or vessel meeting the definitions of such as provided in the **TRIA Act**, or the premises of a United States mission; and
3. No act of terrorism shall be certified if the act is committed as a part of the course of a war declared by Congress.

**TRIA Act** means the federal Terrorism Risk Insurance Act of 2002, as extended on December 22, 2005, and amended on December 31, 2007 and January 12, 2015.

**All other terms and conditions of the policy remain unchanged.**

 © 2015 MedPro Group. All rights reserved.

# Exhibit 140

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Lighthouse Healthcare Center, LLC, a California Limited Liability Company,

Plaintiff,

vs.

National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. And DOES 1-100,

Defendants.

CIVIL ACTION NO. 2:25-CV-01651

Videotaped 30(b)(6) Deposition of MEDICAL PROTECTIVE GROUP, INC., taken through LEAH M. NOLLENBERGER, taken by counsel for the Plaintiff, pursuant to notice and by agreement of counsel, under the Federal Rules of Civil Procedure, reported by Tamela G. Sheeler, RPR, CLR, CCR-6537-8261-3701-4272, at Regus, 22 Bull Street, Savannah, Georgia, on Tuesday, June 23, 2026, commencing at 9:09 a.m.

Transcript Prepared By:

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF:

AVI WAGNER, ESQUIRE
The Wagner Firm
1925 Century Park East
Suite 2100
Los Angeles, California 90067
310-491-7949
avi@thewagnerfirm.com

FOR THE DEFENDANTS:

JON T. NEUMANN, ESQUIRE
Greenberg Traurig, LLP
2375 East Camelback Road
Suite 800
Phoenix, Arizona 85016
602-445-8000
neumannj@gtlaw.com

ALSO PRESENT:

DANA ROSE, VIDEOGRAPHER

I N D E X


| EXAMINATION | PAGE |
|---|---|
| By Mr. Wagner | 6 |
| Signature of Deponent | 293 |
| Certificate of Reporter | 294 |

(The Reporter's Disclosure Statement is attached at the back of the transcript.)

* * * * * * * * * * * *

E X H I B I T S

(Asterisk denotes nonsequential numbering)

| Plaintiff's Exhibit | Description | Page |
|---|---|---|
| * 2 | Claim Processes and Procedures; MP-NFM-LH 008897-8971 | 59 |
| 3 | Notice of Intent; MP-NFM-LH 8429-8434 | 192 |
| * 5 | Case Summary Report; MP-NFM-LH 008390-8391 | 100 |
| * 7 | Loss Summary Report; MP-NFM-LH 8197-8200 | 209 |
| 8 | Email, 6/13/18; MP-NFM-LH 9121 | 211 |
| 9 | Emails, 6/13/18-6/15/18; MP-NFM-LH 9131-9132 | 211 |
| *11 | Emails, 6/13/18-10/11/19; 1688-1689 | 213 |
| 12 | Declaration of Dean Donnell; MP-NFM-LH 1690-1694 | 214 |
| 13 | Declaration of Sebastian Medvei; MP-NFM-LH 1695-1698 | 218 |
| 14 | Form CIV-100; MP-NFM-LH 1701-1702 | 218 |

E X H I B I T S   C O N T I N U E D


| | | |
|---|---|---|
| 15 | Form CIV-100; MP-NFM-LH 1703-1704 | 218 |
| 16 | Declaration of Sebastian Medvei; MP-NFM-LH 1705-1708 | 218 |
| 17 | Form CIV-050; MP-NFM-LH 1709-1712 | 218 |
| 18 | Form CIV-050; MP-NFM-LH 1713-1716 | 218 |
| 19 | Email, 10/11/19; MP-NFM-LH 1717 | 222 |
| 20 | Email, 10/11/19; MP-NFM-LH 9166 | 219 |
| *31 | Policy; MP-NFM-LH 8054-8140 | 19 |
| 32 | 1042085 Diary; MP-NFM-LH 10285 | 164 |
| 33 | Notice of Deposition | 233 |
| 34 | Letter, 9/11/23; MP-NFM-LH 9616-9621 | 269 |
| 35 | Letter, 7/31/24; MP-NFM-LH 8718-8739 | 274 |
| 36 | Letter, 1/15/25; MP-NFM-LH 0018-0050 | 287 |

- - -

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. This begins the video 30(b)(6) deposition of Leah Nollenberger in the matter of Lighthouse Healthcare Center, LLC, et al. versus National Fire & Marine Insurance, et al. in the United States District Court, Central District of California.

Today is June 23rd, 2026, and the time is 9:09 a.m.

This deposition is being taken at Regus at 22 Bull Street in Savannah, Georgia, at the request of the Wagner Firm.

The videographer is Dana Rose of Magna Legal Services and the court reporter is Tammy Sheeler of Magna Legal Services.

Will counsel and all parties present state their appearances and who they represent?

MR. WAGNER: Good morning, my name is Avi Wagner and I'm here for the plaintiff Lighthouse Healthcare Center, LLC.

MR. NEUMANN: My name is Jon Neumann with Greenberg Traurig, I'm here on behalf of the defendants.

Just to be clear, though, this is the 30(b)(6) deposition of Medical Protective Group. And the witness's name is Leah Nollenberger, and she is the designee for the 30(b)(6) deposition.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

- - -

LEAH M. NOLLENBERGER,

being first duly sworn, testified as follows:

- - -

EXAMINATION

BY MR. WAGNER:

Q. Good morning, Miss Nollenberger.

A. Good morning.

Q. You're here as the designee for MedPro Group, Inc.; correct?

A. MedPro Group, Inc., yes.

Q. And that's pursuant to the Federal Rule of Civil Procedure 30(b)(6)?

A. Yes.

Q. We'll go through the topics at a certain point, but I guess my first question would be is have you had your deposition taken before?

A. No.

Q. Have you participated in depositions

of who that is, that's fine, but she is not going to get into the relationship with AmWINS at all.

MR. WAGNER: Okay. I'll save that -- to make that clean, I'll deal with that in her percipient -- and if her answer -- if she is not being a designee, I'll just clarify that, but I can deal with whatever personal knowledge in her percipient depo.

BY MR. WAGNER:

Q. So Miss Nollenberger, you agree with your counsel that you're not being designated to talk about the relationship between MedPro Group, Inc., and AmWINS, and its affiliates?

A. Correct.

MR. NEUMANN: Did you receive my email yesterday on that?

MR. WAGNER: I did, there were two, and I didn't have a chance to crosscheck it against -- but, yeah.

MR. NEUMANN: I'll just tell you the other one right now, just for your reference, is with respect to communications between AmWINS and MedPro with regard to the policy, which we understood to be an underwriting-related question. And if that's correct, there will be a

Q. And that was something that MedPro -- when I refer to the entity for which you're designated today, are you okay if I refer to it as to MedPro?

A. Yes.

Q. I mean, I know there is MedPro Group, there's a whole relevant -- that's why I'm not going to use MedPro Group. If I say MedPro, I'll be referring to the defendant for which you're designated today. MedPro Group, I'll use to refer to the broader conglomerate.

So MedPro understood at the time in March 2017 that it was provided initial notice of the Donnell file that there was a preservation obligation that potentially applied; correct?

MR. NEUMANN: Objection to form, calls for legal conclusion.

A. I don't think I'm following your question.

Q. MedPro -- MedPro was first provided notice of the Donnell file in 2017; correct?

A. MedPro received a notice of intent in March of 2017, yes.

Q. At the time that it received that notice of intent, MedPro understood that such a notice of intent could trigger an obligation to preserve documents and information; correct?

MR. NEUMANN: Objection to form, calls for

enter -- did not send a full declination of coverage until a later date.

Q. Now, 2023 was not the first notice on the Donnell file that MedPro received; correct?

MR. NEUMANN: Objection to form.

A. Correct.

Q. It received a notice of intent in 2017; correct?

A. Yes.

Q. It received a follow-up inquiry in 2018; correct?

A. I don't -- you would need to show me the follow-up in 2018.

Q. Do you recall that Miss Ballester received outreach in 2018 about the status of Donnell?

A. I don't recall all of the dates when she received the request for update.

Q. And in 2019 Miss Ballester received notices indicating Donnell's intent to seek a default judgment; correct?

A. She received an email from Steven Riss that had attachments to it, yes.

Q. Those attachments included sufficient documentation to indicate that Mr. Donnell was seeking a default judgment against Lighthouse at or around that

not limited to -- Section D states, doing nothing to prejudice the company's ability to investigate, defend and/or manage any matter to which this policy applies.

MR. NEUMANN: Mr. Wagner, can I just have an ongoing reservation with respect to ongoing discovery, as I said earlier?

MR. WAGNER: Yeah, you can -- that will apply to all -- discovery is ongoing in this case and it is understood that discovery is not yet completed.

MR. NEUMANN: Thank you.

MR. WAGNER: Yeah.

BY MR. WAGNER:

Q. But we already reviewed that there was no investigation of Donnell, of the Donnell file, apart from the limited investigation in 2023; correct?

MR. NEUMANN: Objection to form.

A. We were unable to investigate -- well, we didn't investigate because we were not put on notice -- we were not provided with a complaint and we were not put on notice of the fact that the complaint had been filed.

Q. But MedPro was, in fact, able to investigate the Donnell file; right?

MR. NEUMANN: Objection to form. What time

period are you talking about?
BY MR. WAGNER:
Q. From 2017 and on, MedPro was able to investigate the Donnell file; correct?
MR. NEUMANN: Objection to form.
A. We were able to, but we were not aware that we needed to.
Q. Right. But awareness of needing to is a different matter, I'm just talking about ability.
MedPro has been able and remains able to investigate the Donnell file since 2017; correct?
MR. NEUMANN: Same objections.
A. We could have attempted to undertake investigation.
Q. And there was nothing of obstructed -- there was nothing obstructing that ability in 2017; correct?
MR. NEUMANN: Same objections.
A. The ability to investigate depends on the insured providing information, so I don't know what information the insured would or would not have provided had they been asked.
Q. Did Miss Ballester ever ask Lighthouse for even one piece of information about the Donnell file?
A. I don't have anything in writing about

A. So in August of 2023 we received the default judgment. When we received the default judgment, we asked for a copy of the complaint, the suit. We were provided then with a copy of the second amended complaint, I think it was the second amended complaint. So that was not provided prior to -- it was not -- suit was not provided when it was received. And so neither was the summons nor all of the legal papers that the insured received.

Q. And MedPro was provided with copies of some documents from the Donnell suit in 2019; correct?

MR. NEUMANN: Objection to form.

A. Yes.

Q. And it never asked for the complaint or any other document at the time; correct?

A. Correct.

Q. It was not until 2023 that MedPro first asked for any documents from the Donnell lawsuit; correct?

MR. NEUMANN: Objection to form.

A. Correct.

Q. Apart from the provisions you reviewed, are there any other provisions that you maintain that Lighthouse breached or would otherwise bar coverage under this policy?

a file; right?
A. Yes.
Q. It doesn't, by its terms, say that it's limited to suits; right?
A. No.
Q. How would someone know that these provisions only apply to suits?
A. We learn that during training, or during the course of onboarding.
Q. But you agree with me that these provisions are pretty ambiguous as to whether they apply to suits or not; right?
MR. NEUMANN: Objection to form.
A. They don't state one way or the other what kind of files they apply to other than to the point -- other than the ones that apply -- or state that they are for files with or without payment.
Q. Right. And Donnell was closed without payment in 2017?
A. Yes.
Q. And to this date no payment has been paid on Donnell; correct?
A. No indemnity payment has been made, we have made payments for legal expenses.
Q. Do you know why Miss Ballester did not

A. Well, it also states as information is gathered, so information would be gathered on open files.

Q. Well, in this case at the time the file was opened, Miss Ballester didn't gather any information; right?

MR. NEUMANN: Objection to form.

A. Some of the information in here was in the file, yes.

Q. But in terms of the information being gathered, the information given in the notice of intent to sue was processed to be included in OASIS; correct?

A. Yes.

Q. But apart from that, in 2017, no information was gathered; correct?

A. I don't believe so.

Q. In 2018, no information was gathered; correct?

A. Correct.

Q. In 2019, no information was gathered; correct?

MR. NEUMANN: Objection to form.

A. Correct.

Q. In 2023, no information was gathered; correct?

knowledge, Miss Ballester did not do anything to make an evaluation of the notice of intent that was received from Donnell; correct?
A. I don't know.
Q. The next paragraph it talks about confirmation of coverage; do you see that?
A. Yes.
Q. Are you aware of Miss Ballester's testimony that she confirmed coverage before opening the Donnell file in OASIS?
A. No.
Q. Do you have knowledge one way or another whether she confirmed coverage before opening the Donnell file in 2017 in OASIS?
A. I believe she would have, because if we didn't confirm coverage, we wouldn't have opened a file.
Q. So to the extent she testified that she did confirm coverage in 2017, you, sitting here today, have no reason to dispute that?
A. Correct.
I can answer one of your earlier questions.
Q. Sure, go ahead.
A. You asked earlier what RCOR refers to.
Q. Yes.
A. It is defined on this page as regional

because you were paraphrasing Miss Ballester's prior communication to that effect; correct?

A. Yes.

Q. And that assertion by Miss Ballester is inaccurate; correct?

MR. NEUMANN: Objection to form.

A. I know now that the email that she -- that the -- yes, that that was incorrect.

Q. And it wouldn't take more than a minute reviewing the 2019 materials to be clear that that was incorrect; correct?

A. I didn't have the 2019 materials in 2023 other than the email.

Q. And that's because Miss Ballester never included those in OASIS; correct?

A. They wouldn't be included in OASIS, but she did not save them in OnBase, no.

Q. They weren't saved anywhere in the claims file as of 2023; correct?

A. Correct.

Q. So not in OASIS; correct?

A. Documents don't get saved in OASIS.

Q. But summaries of documents or notations of documents can be saved in OASIS; right?

A. Yes.

Q. OASIS includes progress notes?
A. Yes.
Q. And progress notes can be used and at times are used to paraphrase documents; correct?
A. To summarize, yes.
Q. And Miss Ballester did not summarize in OASIS in the progress notes any information she received in 2019; correct?
A. Correct.
Q. And OASIS also includes a diary function; correct?
A. Yes.
Q. And Miss Ballester did not, in 2019, use the diary function to summarize anything she received in 2019 about Donnell; correct?
MR. NEUMANN: Objection to form.
A. The diary function is not used for summaries.
Q. Miss Ballester did not calendar any follow-up in the diary function in 2019 relative to what she received about Donnell; correct?
A. Correct.
Q. Why not?
A. Because the file wasn't open.
Q. Why not?

A. Because the file wasn't open.
Q. Because she didn't open it; right?
A. She did not ask for it to be reopened, no.
Q. And she was the one in 2019 who had been tasked with that; right?
MR. NEUMANN: Objection to form.
A. In 2019 she was still listed as the file manager. So, yes, she would be the one to ask for the file to be reopened if it needed to be reopened.
Q. Do you have an understanding as to whether or not Miss Ballester had any oral communications with Steven Riss in 2019 about Donnell?
MR. NEUMANN: Objection to form.
A. Yes, I believe she did.
Q. What's the basis of that belief?
A. The email that she sent him stating that it was in follow-up to their discussion.
Q. Apart from that email do you have any other information that shapes the contents -- strike that.
Apart from that email, is there any other information you reviewed that informs the contents of that conversation or those conversations?
MR. NEUMANN: Just to be clear, are you talking about reviewed in preparation for deposition?

what's been marked as Exhibit 3. Are you familiar with this document?

Sorry, that's a six-page document with the first page Bates labeled ending in the four numbers 8429 continuing to Bates label 8434.

Are you familiar with this document?

A. Yes.

Q. This is the notice of intent regarding Donnell that MedPro received in and about March of 2017; correct?

A. Yes.

Q. The notice in its caption says, notice of intent to commence action against healthcare provider. And it says in parentheses, California Code of Civil Procedure Section 364.

What is California Code of Civil Procedure 364?

A. I don't know.

Q. Is that -- are you familiar generally with statutes that some states require before certain kinds of claims are brought against healthcare providers?

A. Yes.

Q. What is your understanding generally of those kinds of statutes?

MR. NEUMANN: Objection to form.

Q. Miss Ballester never asked any questions about this document; correct?
MR. NEUMANN: Objection to form.
A. None in writing that I'm aware of, but again, I don't know if she had any telephone conversations in 2017 regarding this document.
Q. There is nothing in the claim file to reflect that Miss Ballester asked any questions or sought any information about this notice; correct?
A. Correct.
Q. Do you know who Eli Fogel from AmWINS is?
A. I don't know his title, I just know that he works at AmWINS in California in one of their Los Angeles offices.
Q. He was involved in the underwriting of the MedPro policy at issue; correct?
MR. NEUMANN: Again, this, I think, falls into a category where she is not designated for -- as a 30(b)(6), you can ask her individually, I think.
BY MR. WAGNER:
Q. But you're not prepared to testify about the question I just asked today; correct?
A. Correct.
Q. Did you look at any claims involving MedPro

review of this document on OnBase; correct?
A. Correct.
Q. In fact, there is nothing from 2019 at all about Donnell in OnBase; correct?
MR. NEUMANN: Objection to form.
A. Yes, there is.
Q. What is there in OnBase about Donnell in 2019?
A. The subsequent email exchange in which Steven Riss asks Christina Ballester to please disregard, and then she sends the summary of their telephone communication, and he writes back and says confirmed, that email chain is saved in OnBase.
Q. Is there anything else from 2019 saved?
A. I believe that is the only document from 2019 that is saved in OnBase.
Q. So none of these -- this document that we are just reviewing now, this document marked as Exhibit 12, is not in OnBase?
A. Correct. Nor is the email that it was attached to.
Q. Correct. And then the next one...
MR. WAGNER: I'll read these, Jon, I'll read it quickly, I know it will take you a minute to go through it.

I don't know if it was accurate -- it may have been an accurate representation of their phone discussion even though it was an inaccurate representation of what the documents show.

Q. Meaning the reality is other than this statement; right?

The reality is that the default judgment materials which were provided were, in fact, brought against Lighthouse Healthcare Center; correct?

MR. NEUMANN: Objection to form.

A. Yes.

Q. And they were not, in fact, brought against Four Seasons; correct?

A. Not the ones that were provided, I don't know if there was ever a default judgment against Four Seasons.

Q. And even a cursory review of the materials that Mr. Riss said, did and would reflect that they were brought against Lighthouse Healthcare Center, not Four Seasons; correct?

MR. NEUMANN: Objection to form.

A. If you read the body beyond the caption, yes.

Q. And when you get legal documents, you can't just read the caption; right?

Especially when the caption says the words et al?

A. Correct.

Q. Et al means amongst others; right?

A. I believe so.

Q. So if it says Four Seasons, et al, that means that there are others besides Four Seasons; right?

MR. NEUMANN: Objection to form.

A. Other defendants, yes.

Q. And then you look in the body of the documents and it's abundantly clear that the documents are brought against Lighthouse Healthcare Center; correct?

A. The documents do refer to Lighthouse Healthcare Center, yes.

Q. Did MedPro ever inform Lighthouse that the assertions in this email are inaccurate?

MR. NEUMANN: Objection to form.

A. I don't know. I don't know if we ever had a conversation with Lighthouse about this, this particular email.

Q. Have you reviewed all of the reservations of rights letters that MedPro has issued to Lighthouse in connection with Donnell?

A. Yes.

Q. Yeah.

A. Well, we received the documentation, and then Steve Riss says as discussed, please disregard. So whatever submission was provided was withdrawn. And we were told to disregard. So we had no notice even at this time that Lighthouse was seeking coverage from us for the Donnell -- for this.

Q. But the assertions related to that alleged withdrawal are materially misleading; right?

MR. NEUMANN: Objection to form.

A. Steve Riss's initial withdrawal when he asked us -- when he asks Christina to please disregard, I don't know the substance of their discussion.

Q. You have no reason to dispute that Miss Ballester, in her October 11th, 2019, email at 3:08 p.m., accurately reflected the substance of her conversation with Mr. Riss; right?

MR. NEUMANN: Sorry. Can you read that back?

(The record was read back as follows: You have no reason to dispute that Miss Ballester, in her October 11th, 2019, email at 3:08 p.m., accurately reflected the substance of her conversation with Mr. Riss; right?)

A. No, I have no reason to dispute that this

familiar with this document?
A. Yes.
Q. And you're here for all topics listed -- strike that.
The topics in this document are listed beginning in the middle of Page 3 through Page 8; correct?
Page 3 Line 22 through Page 8 Line 2; do you see that?
A. Yes.
Q. And you're here on all topics -- you're here as MedPro's designee on all topics except for Nos. 40 and 43; correct?
A. Correct.
Q. If you could turn to topic No. 9, which is on Page 4 of this. And that's about any conduct or investigation into the Donnell notice or Donnell suit following the Donnell tender.
MedPro did not make any investigation into the Donnell notice; correct?
MR. NEUMANN: Objection to form.
A. At the time it was submitted in 2017, no.
Q. And it did not make any investigation into either the Donnell notice or the Donnell suit until 2023; correct?

A. Correct.
Q. What was its investigation after 2023?
A. As it pertains to the Donnell suit, we asked for a copy of the complaint. I don't think there was any additional -- any investigation into the Donnell notice.
Q. And apart from requesting the complaint, was there any other investigation into the Donnell suit?
A. Not the underlying facts of it, no.
Q. Topic 10 relates to any checking of dockets relating to the Donnell notice, Donnell tender, Donnell suit after October 11th, 2019.
MedPro made no efforts to check any docket related to Donnell; correct?
A. Correct, we did not check the docket.
Q. Topic 11, any of your policies governing the handle of a tender, potential tender of claim or presuit notice by insurance agents.
What are MedPro's policies in regard to this subject?
A. Other than what may be in the claims manual, we don't have any written policies.
Q. I'll represent to you there is nothing in the claims manual about this; do you disagree with that?
A. No, I have no reason to disagree with that.

A. I can't answer that.

Q. I have no further questions. I reserve the right to redirect.

MR. NEUMANN: Okay. I have no questions at this time, we'll read and sign.

The instruction to the court reporter, there is a protective order in this case which allows us 30 days after receiving the transcript to designate portions of the deposition as confidential, so we'll ask you to treat the entire transcript as confidential until you receive notice from us as to what, if anything, will go in as confidential in the deposition.

I think I already said we are going to read and sign.

THE VIDEOGRAPHER: Ending time is 5:30 p.m.; we are off the record.

(Deposition ended at 5:30 p.m.)

ERRATA SHEET

I, the undersigned, Leah M. Nollenberger, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE LINE CHANGE REASON

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

__________________________________

Leah M. Nollenberger Date

TGS

CERTIFICATE

GEORGIA:

CHATHAM COUNTY:

I, Tamela G. Sheeler, Certified Court Reporter for the State of Georgia, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the witness was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed by computer-aided transcription; that the foregoing deposition, as typed, is a true, accurate and complete record of the testimony of the witness and of all objections made at the time of the examination.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 7th day of July, 2026, at Savannah, Chatham County, Georgia.

Tamela G. Sheeler
___________________________

TAMELA G. SHEELER, RPR, CLR,

CCR-6537-8261-3701-4272

COURT REPORTER DISCLOSURE

Pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as an employee of McKee Court Reporting, Inc.

I am not disqualified for a relationship of interest under the provisions of O.C.G.A. Section 9-11-28 (c).

McKee Court Reporting, Inc. was contacted by Magna Legal Services to provide court reporting services for this deposition.

McKee Court Reporting will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

McKee Court Reporting, Inc. has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover the deposition.

McKee Court Reporting, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation, except in circumstances as agreed on a case by case basis.

___________________________ Date: July 7, 2026
TAMELA G. SHEELER, RPR, CLR,
CCR-6537-8261-3701-4272

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

MAGNA LEGAL SERVICES, is not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

MAGNA LEGAL SERVICES, was contacted by the offices of The Wagner Firm to provide court reporting services for this deposition.

MAGNA LEGAL SERVICES, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

MAGNA LEGAL SERVICES, has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

MAGNA LEGAL SERVICES, will charge its usual and customary rate to all parties in the case and a financial discount will not be given to any party to this litigation.

This, the 7th day of July, 2026.

__________________________
FIRM REPRESENTATIVE
MAGNA LEGAL SERVICES

# Exhibit 141

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Lighthouse Healthcare Center, LLC, a
California Limited Liability Company,
Plaintiff,

vs. No. 2:25-cv-01651

National Fire & Marine Insurance
Company, a Nebraska Corporation;
MedPro Group, Inc. and DOES 1-100,
Defendants.

/

The videotaped deposition of CHRISTINA BALLESTER, Esq., taken in the above-entitled case on behalf of the plaintiff, on the 17th day of June, 2026, at 10:16 o'clock a.m., remotely via Zoom teleconferencing and at the Marriott Courtyard, 1505 Lake-Cook Road, Highland Park, Illinois, pursuant to agreement of counsel.

Stenographically reported by:
Karyn H. Chalem, RPR, CSR
License No.: 084-004167
MAGNA LEGAL SERVICES
866-624-6221
www.magnaLS.com

A P P E A R A N C E S

THE WAGNER FIRM
1925 Century Park East
Suite 2100
Los Angeles, California 90067
BY: AVI WAGNER (via Zoom)
(310) 491-7949
avi@thewagnerfirm.com
On behalf of the Plaintiff;

GREENBERG TRAURIG
2375 East Camelback Road
Suite 800
Phoenix, Arizona 85016
BY: JON T. NEUMANN
(602) 445-8411
neumannj@gtlaw.com
On behalf of the Defendants.

Also Present:

CHUCK ANDERSON, videographer

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| CHRISTINA BALLESTER, Esq. | |
| Examination by Mr. Wagner | 5 |

| EXHIBITS: | PAGE: |
|---|---|
| Exhibit 1 | 44 |
| Exhibit 2 | 87 |
| Exhibit 3 | 111 |
| Exhibit 4 | 124 |
| Exhibit 5 | 140 |
| Exhibit 6 | 153 |
| Exhibit 7 | 156 |
| Exhibit 8 | 163 |
| Exhibit 9 | 165 |
| Exhibit 10 | 169 |
| Exhibit 11 | 170 |
| Exhibit 12 | 172 |
| Exhibit 13 | 175 |
| Exhibit 14 | 175 |
| Exhibit 15 | 175 |
| Exhibit 16 | 175 |
| Exhibit 17 | 175 |
| Exhibit 18 | 175 |
| Exhibit 19 | 179 |
| Exhibit 20 | 188 |

THE VIDEOGRAPHER: We are now on the record. This begins video one in the deposition of Christina Ballester in the matter of Lighthouse Healthcare Center, LLC, et al., versus National Fire & Marine Insurance, et al., in the United States District Court, Central District of California. Today's date is June 17th, 2026, and the time is 10:16 a.m. This deposition -- excuse me. Today's date is June 17th, 2026. The time is 10:16.

This deposition is being taken at Courtyard by Marriott, 1505 Lake-Cook Road, Highland Park, Illinois, 60035, at the request of The Wagner Firm. The videographer is Chuck Anderson of Magna Legal Services, and the court reporter is Karyn Chalem of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent.

MR. WAGNER: Morning. This is Avi Wagner for the plaintiff.

MR. NEUMANN: Sorry, could we go off the record for just a second.

THE VIDEOGRAPHER: We are going to go off the record. The time is 10:17.

Can I read it for a moment, please?
Q. Sure.
A. Thank you.
It changed as described in the summary, just as it says.
Q. Let me ask this. You were handling the Donnell matter while you were senior claims counsel initially. Right?
A. Initially in 2017, yes.
Q. And then in October 2019, you were handling the Donnell matter as a divisions claims manager. Correct?
A. Incorrect.
Q. How -- what's incorrect about that statement?
A. That matter had closed. There was --
Q. Well, October 2019, you were taking actions in respect to Donnell. You were emailing with Steven Riss. You were checking prior stuff in the file. You were taking some actions vis-a-vis Donnell in October of 2019. Correct?
A. Prior to that --
MR. NEUMANN: Objection to form. Go ahead.

much more specific than that.

My question is: Did you inform him in writing that the claim was reported outside the policy's reporting period?)

THE WITNESS: I did not send another letter outside of the email conversation, email confirmation with Steven Riss.

BY MR. WAGNER:

Q. So there was one email, one email only, and the contents of that are what they are, and that's the sum total of the written communication about coverage between you and Lighthouse?

A. I just answered the question.

Q. You answered -- well, you didn't answer my question. You gave something that was nonresponsive and that's why I'm asking a different question.

A. I think I just said there is no other letter outside of the email.

Q. Right. So that one email to Steven Riss, whether with you or Mr. Riss or you or anyone else in Lighthouse, that represented the total of your communication with Lighthouse about coverage for this Donnell claim. Correct?

A. In written form. There was also communication verbally.
Q. Are you familiar with a document called Claims Processes & Procedures that MedPro uses?
A. I don't recall a specific document with this title, but I may have looked at it during training.
Q. Do you know generally what a claims manual is?
A. Yes.
Q. What's a claims manual?
A. It's a document that outlines processes within the claims department.
Q. Did MedPro have a written claims manual that applied to claims such as the Donnell -- again, I'll call it "file" because I understand you're going to talk about "claim" versus "notice," but did MedPro have a claims process and procedures manual that applied to the Donnell file?
A. I believe MedPro had a claims processes and procedures that would apply to any incident in Oasis, generally -- not specifically to Donnell, but generally speaking.
Q. But it would include Donnell as well. Correct?

Q. Was it ever discussed with you that this document might contain trade secrets?
A. I don't recall a conversation like that.
Q. Have you ever had trainings where you've been given manuals for which you were required to sign a confidentiality attestation?
A. I don't recall.
Q. Do you recall being given a confidentiality attestation before being given this document?
A. I don't recall.
Q. What do you recall, apart from the fact that you got this or a like document in training, what else do you recall of this document?
A. What else do I recall? I don't understand the question.
Q. Do you have any recollection of this document apart from the fact that you might have gotten it in training?
A. I do not.
Q. And do you recall having had any discussions about how this document was prepared or how it should be utilized?
A. I recall having a general discussion about it, but nothing specific. It would -- as part and

parcel of my training.

Q. But as far as any specific substance in it, do you recall that?

A. I don't recall.

Q. If you could turn to the page with the Bates stamp ending 8919. This is, I think, the 22nd page of the document.

A. Yes.

Q. And these -- this appears to articulate procedures about closing a file?

A. No. This one says claims against the company. Sorry. What number is the Bate? I was looking at page 22.

Q. Bates -- Bates page 8919.

A. Okay. It's the next one.

Okay. I'm here.

Q. And the heading on that page is "closing a file."

Do you see that?

A. Yes.

Q. Does this page and the subsequent couple pages reflect procedures in force in 2017 relative to closing a file?

A. Yes, I believe so. I don't have a personal

recollection, but if this was the document in '17, then that would have been the document.

Q. And you had mentioned that, earlier, that when a notice is received and no claim is filed for a year, that's generally when it's closed?

A. Okay. I said -- you're -- sorry. This was not a notice of a claim. It was a notice of intent. That's different. This was an incident, so that would be closed within a year.

Q. All right. And in this section, which is procedures for closing a file, there's no reference to that.

Do you have an understanding as to why?

A. No.

Q. Do you know if this one-year closure period you've referenced is memorialized anywhere in a policy or procedure?

A. It might be. I don't recall.

Q. And then on the next page of the manual, it gives some closure definitions.

Do you see that?

This is the Bates page ending in 8920.

A. I see it. Let me -- do you want me to look at it for a minute?

A. At what point in time?
Q. In 2017.
A. I likely spoke with Steve Riss. I don't have a personal recollection, but given the information that I had, it was a notice of an incident, so that typically wouldn't require significant investigation. As I mentioned, it's not yet potentially a compensable claim, so it would be just an incident.
Q. But so to be clear, I understand you're saying that you might have spoken to Steven Riss.
Do you recall in 2017 talking to Steven Riss to find out information about the Donnell notice?
A. I don't have a personal recollection in 2017.
Q. Do you recall in 2017 reaching out to anyone associated with Lighthouse to get information about Donnell?
A. I don't have a personal recollection.
Q. When you received the notice -- the next paragraph talks about confirmation of coverage.
Do you see that?
A. Yes.
Q. You have no reason to dispute that that paragraph applied to the Donnell notice in 2017.

Correct?
A. Actually, I do dispute it because it's not a complaint. It's a notice. It's an incident. It's not a claim.
Q. Okay.
A. So what's your -- I don't understand.
The coverage -- well, let me -- let me restate.
You're asking me whether coverage should be confirmed for the incident. It had already been confirmed by the time it came to me as an incident.
Q. Okay.
A. Then the next sentence talks about if a complaint has been filed. This, in 2017, was just an incident, so I just want to clarify. There's two different things being talked about there.
Q. So when the Donnell notice was sent to MedPro in 2017, coverage was confirmed for that as an incident. Correct?
A. Correct.
Q. But was there any reservation of rights sent in 2017 in respect to that notice?
A. No.
Q. Should any have been sent?

MR. NEUMANN: Yeah. Lunch will be here in like five minutes.

THE WITNESS: Okay.

I really have to go to the bathroom. Is it possible, before we start this --

MR. NEUMANN: Sure.

THE WITNESS: -- we can just take the break and I can go to the bathroom?

MR. NEUMANN: Yep. We can go off the record.

THE VIDEOGRAPHER: We're going to go off the record. The time is 1:05.

(Recess taken from 1:05 to 1:47.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:47.

BY MR. WAGNER:

Q. Ms. Ballester, you've been handed what's been marked as Exhibit 4, which is a two-page email thread, with the first page the last four Bates number is 9010.

Have you had a chance to review this document?

A. I have not had a chance yet, but I can look through it.

Q. Please.
A. Okay. I've reviewed it.
Q. So this is an email thread that includes the original notice of the -- of the Donnell notice of intent. Correct?
A. It looks like it's an email thread from Lety to me, with an additional set of emails below, and so I assume that is the starting point for that incident.
Q. So in terms of -- let's first deal with the top email. The top email, first email, in terms of appearance in this, on the top of page one of this document, this is an email from Leticia Press to yourself, dated March 30th, 2017.
Do you see that?
A. Yes.
Q. And that email address, christina.ballester@medpro.com, that was the email you were using in 2017?
A. Correct.
Q. And you used that email in the ordinary course of your business activities?
A. Yes.
Q. And so you received this thread in the

ordinary course of your business activities?

A. Yes.

Q. Now, going back to the bottom, in terms of first-in-time email, the first email on this thread is a March 7th, 2017 email from Steven Riss to Alysha Olsen, with a cc of Eli Fogel.

Do you see that?

A. Yes.

Q. Who is Alysha Olsen?

A. I think it's "Alysha," and she was a claims handler out of the West Coast, which, before I came over, she was like managing incidents and claims for MedPro.

Q. Did she remain with MedPro after you came over?

A. Yes, but I believe she was only then doing med-mal types of claims, professional negligence involving doctors and hospitals, not the long-term care area. Senior care, I should say.

Q. And this Donnell -- Lighthouse is a long-term care facility. Correct?

A. I believe it's a senior care organization. I don't know if it's long-term care or short-term rehab, I don't remember, but something in the vein

the management company?
A. I -- I don't recall which management company she's referring to. I can only speculate and I don't want to do that.
Q. Okay. And nonetheless at this point in time, you decided not to send the matter out to defense counsel. Correct?
A. Well, that doesn't say which management company. It could have been Rockport that she was referring to, so...
Q. Right, but my question -- that's a little different than my question.
My question was, irrespective of which management company she was referring to, I understand you said you don't know, but my question is: Irrespective, you made the decision not to send the matter out to defense counsel at this time. Correct?
A. Based on MedPro's process, we do not assign incidents to defense counsel. So that decision was made based on MedPro's process, if it's an incident only, unless there's some reason that requires -- that's the process. We don't assign it out. And when I say "what reason," I mean, I can't tell you

right now. It would not be our --

MR. NEUMANN: Okay. Let him --

THE WITNESS: -- custom and practice to do that.

MR. NEUMANN: -- let him ask the whole question.

BY MR. WAGNER:

Q. I'm sorry, can you repeat the last bit? I think someone's --

A. I would not assign an incident only to defense counsel, as it's stated here.

Q. And --

A. So I did not based on the process.

Q. But that's not -- that's not what's stated here. My question, though, is: You referenced that it was MedPro's process -- or procedure, excuse me, not to assign defense counsel on the basis of an incident. Where's that procedure articulated?

A. Well, I didn't finish -- that's not my full statement.

Q. Go ahead. I didn't mean to interrupt you.

A. As a standard practice, we don't assign incidents to defense counsel unless there's some --

something happening, like, for example, if there was an event or somebody needed like a witness to talk to somebody, we might do that like in realtime of an event, but this is an example of a regular incident only. It would not be assigned to defense counsel. That was just a standard practice.

If it had been changed to a claim or a real claim for money damages and there was a need for defense counsel or a lawsuit and there was a suit filed, that's when we would assign a defense attorney.

So it wasn't necessarily my decision. It was my decision within the context of the custom and practice of how we handle incidents versus claims.

Q. And where is that custom and practice memorialized?

A. If it's a custom and practice, that was my custom and practice based on my training. I don't have a recollection -- because I told you earlier when we looked at the management manual, I don't recall exactly what was in the manual, but I'm sharing with you my custom and practice based on recollection and training of managing incidents versus claims at MedPro.

Q. Objective standards, you know, that an insurance company would follow.
A. Yes, I understand that.
Q. Okay. And then when you closed the Donnell claim in 2017, you didn't notify Steven Riss. Correct?
A. Not in 2017.
Q. And you didn't notify David Nollenberger [sic] in 2017 either. Correct?
A. I did not, nor would that be a standard practice for incidents.
MR. WAGNER: Did the next one come through, Jon?
MR. NEUMANN: Not yet.
MR. WAGNER: Okay.
BY MR. WAGNER:
Q. Are you familiar with a document that MedPro uses called a loss summary report?
A. Not off the top of my head.
Q. Are you familiar with any type of log that MedPro maintains about the number of claims in a given policy period?
A. No.
MR. NEUMANN: Okay. The next email

answer about why I did what I did. I don't have a personal recollection right now of this claimant.

Q. Okay. Let's move on.

MR. WAGNER: Jon, do you have Exhibits 11 to 18?

MR. NEUMANN: Do you want me to open them all at once?

MR. WAGNER: Well, let's go one by one. We're going to go through them together because, as you'll see, this is a -- let's start with Exhibit 11.

MR. NEUMANN: Well, I don't -- they're not individually marked, so you'll have to give me a Bates number.

MR. WAGNER: For the first attachment, the Bates number 1688, first attachment to the email.

MR. NEUMANN: Okay.

BY MR. WAGNER:

Q. Ms. Ballester, you've been handed an email chain, two pages long, with the first Bates -- page Bates number 1688. The first page includes an email from Steven Riss to yourself from October 11, 2019.

Do you see that?
A. Yes.
Q. And we've been referring to an update in 2019 -- and strike that.
And do you see in the attachments section of that first email, it lists a number of attachments. Correct?
A. It looked like there were several attachments.
Q. Okay. And then we'll go through these, but Exhibits 12 through 18 are the various attachments to this email. You'll see they run in consecutive Bates pages after this email.
A. Okay.
Q. Do you recall this -- this email?
A. Yes, I actually do recall this exchange.
Q. When you got this email, did you review the attachments to it, which is Exhibits 12 through 18? And if you need to review each one, you know, take your time, but my question is: When you received this Exhibit 11, did you review the attachments in Exhibits 12 through 18?
A. Would that be all seven subsequent attachments to this email that you're asking me

about?
Q. Correct. One, two, three, four, five, six -- seven, correct, seven attachments.
A. All right. We're going to open them one by one just to make sure I know what we're talking about.
Q. Sure.
A. Okay. Yes, that -- yes.
Q. So turning to the first attachment --
MR. NEUMANN: Well, you're going to have to identify it.
MR. WAGNER: Yeah, I will. That's what I was about to do.
BY MR. WAGNER:
Q. The first attachment to Exhibit 11, which is marked as Exhibit 12, is a document whose first Bates page ends 1690. It's a five-page document.
Do you have that in front of you?
A. I do.
Q. And that document is entitled declaration of Dean Donnell in support of request for default judgment of Dean Donnell, comma, an individual.
Do you see that?
A. I do.

Q. And in the caption of that document, it refers to one defendant plus et al. Correct?
A. Correct.
Q. But in the body, it refers to Lighthouse Healthcare Center. Right?
A. In the third paragraph, it says Lighthouse Healthcare Center.
Q. Correct. And then it refers to Lighthouse again in the fourth paragraph and again in the fifth and again in the sixth and seventh. Correct?
A. It refers to them, yes, in those four paragraphs.
Q. And so this document makes reference to Lighthouse no fewer than four times. Correct?
A. I'd have to look through the rest of the document. No fewer than four in the -- it references them in the third paragraph, the fourth paragraph, the fifth paragraph and the sixth paragraph and the seventh paragraph on this first and second page.
Q. Right. And then it makes further references to it as well. Correct?
A. Well, let me go to the third page. Just a minute.

It is referenced on the third page as well.
Q. And so even just taking 10 seconds to review this document, it's plain that this document relates to Lighthouse. Correct?
A. Yes.
Q. And it's plain that this document was brought by Dean Donnell. Correct?
A. Yes, I believe so. He's at the top. Yes.
Q. And that's true of the balance of Exhibits 12 through 18. Correct?
A. Okay. We have to open them because I don't see -- I don't have them all in front of me, so just a minute.
Q. Sure.
A. Whether it was brought by Dean Donnell, is that the question?
Q. Whether -- whether it's plain that Exhibits 13 through 18 all refer -- each and all refer to Lighthouse.
A. Can we stipulate?
MR. NEUMANN: So can we -- yeah, can we identify what they are?
MR. WAGNER: Sure. We can do it one by one. I was trying to -- you know, you're telling

me I got to stop in 30 minutes --

MR. NEUMANN: Well, no, I'm just -- just for the record, if you just want to run through the Bates numbers. We don't have to look at each one right now. She can do that, but...

MR. WAGNER: Fine.

BY MR. WAGNER:

Q. Exhibit 13 begins Bates page 1695, Exhibit 14 begins Bates page 1701, Exhibit 15 begins Bates page 1703, Exhibit 16 begins Bates page 1705, Exhibit 7 [sic] begins Bates page 1709, and Exhibit 18 begins Bates page 1713.

And my question is: Each and every of these documents refer to Lighthouse. Correct?

A. I'd -- we have to open them only because I can only look at one at a time.

Q. Yeah, check -- go, take your time.

A. Yeah.

THE WITNESS: So do you want to navigate --

MR. WAGNER: Take your time.

THE WITNESS: -- on the email? Did you open all of them, if I just click on each of those entries?

MR. NEUMANN: Yeah, so you can just click on -- yeah, just click. This is --

THE WITNESS: So all seven are here?

MR. NEUMANN: 1701 is 14.

THE WITNESS: Why don't we take them in order. Is -- that's the email.

MR. NEUMANN: No, this -- they go back to --

THE WITNESS: They go here. Okay. That's the one we looked at. Okay.

So the next one I'm looking at is?

MR. NEUMANN: 1695.

THE WITNESS: 1695. This is Sebastian Medvei declaration.

I see Lighthouse referenced in the body of the document.

Okay. I'm going to move on to the next one. This is 1701.

MR. NEUMANN: It's Exhibit 14.

THE WITNESS: I see Lighthouse named, as you said.

And then the next one is 1703.

MR. NEUMANN: Exhibit 15.

THE WITNESS: And I see Lighthouse

referenced.

I don't know if I covered all the exhibits, but that's...

MR. NEUMANN: There's one more.

THE WITNESS: There's one more?

MR. NEUMANN: Yeah.

THE WITNESS: Okay. Is it this one?

MR. NEUMANN: Yep.

THE WITNESS: Okay. Exhibit 1709, on the first page, I see Lighthouse referenced, and on subsequent pages.

BY MR. WAGNER:

Q. So, again, even from -- even from a cursory review, it's obvious that each of these Exhibits 12 through 18 relate to defendant Light -- relate to Lighthouse. Correct?

A. Yes.

MR. NEUMANN: Objection to form.

THE WITNESS: Sorry. Yes.

BY MR. WAGNER:

Q. And so then any statement that these documents somehow do not relate to Lighthouse would be inaccurate. Correct?

MR. NEUMANN: Objection to form.

THE WITNESS: No. Any statement -- I'd need more information about the statement being made, to what context.

BY MR. WAGNER:

Q. My question is any statement. Meaning these documents relate to Lighthouse, so any statement that these documents somehow do not relate to Lighthouse would be materially inaccurate. Correct?

MR. NEUMANN: Objection to form.

THE WITNESS: It depends on the context in which the statement is being made, if it's for consideration of coverage or -- or not, so I don't agree -- I don't agree with the statement. I think it's too broad.

BY MR. WAGNER:

Q. In what sense could these documents fairly be construed as not directed against Lighthouse?

A. Well, when you make the statement they're not directed against Lighthouse, that could be within the context of considering whether coverage applies, not necessarily that they just don't reference Lighthouse.

Q. Meaning so they plainly reference

Lighthouse. Right?

A. They plainly reference Lighthouse, correct.

Q. And they're plainly -- and they're plainly directed against Lighthouse?

A. Yes, in the context of do they state Lighthouse's name and that there's a request for default judgment against Lighthouse.

MR. WAGNER: If you can turn to -- Jon, did you get Exhibit 19?

MR. NEUMANN: Not yet.

MR. WAGNER: Let me know when you've received Exhibit 19.

MR. NEUMANN: Yep.

Oops. I have it. I'm opening it.

THE WITNESS: Okay.

BY MR. WAGNER:

Q. You've been handed what's been marked as Exhibit 19, which is a one-page document ending Bates numbers 1717. It's a chain, an email chain, from October 11th, 2019, between yourself and Steven Riss. Correct?

A. Correct.

Q. And in the 3:08 email from October 11th, you write: Hi, Steve. Please confirm that per our

MR. WAGNER: I'll hold off on the video, but I'll take the transcript at this time.

MR. NEUMANN: I'll take the transcript at this time.

(Deposition concluded at 3:23.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Lighthouse Healthcare Center, LLC
vs.
National Fire & Marine Insurance
Company
2:25-cv-01651

I hereby certify that I have read the foregoing transcript of my deposition, given on June 17, 2026, consisting of pages through , inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid, as it now appears.

Please check one:
I have no corrections
Number of errata sheets enclosed

(signed)
CHRISTINA BALLESTER, Esq.

SUBSCRIBED AND SWORN TO
before me this day
of , A.D., 2026.

NOTARY PUBLIC

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, KARYN H. CHALEM, a Certified Shorthand Reporter of the State of Illinois, CSR License No. 084-004167, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was thereafter reduced to typewriting under my personal direction and constitutes a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I interested directly or

indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 29th day of June, 2026.

KARYN CHALEM, CSR, RPR

CSR No: 084-004167

# Exhibit 142

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lighthouse Healthcare Center, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-110,<br><br>Defendants. | Case No. 2:25-cv-01651-ODW (AYPx) |

DEPOSITION OF STEVEN DAVID RISS

August 6, 2026

Los Angeles, California

STENOGRAPHICALLY REPORTED BY:
DENISE PAHOLSKI, CSR 10742, RPR

Job No. 10196757

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lighthouse Healthcare Center, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-110,<br><br>Defendants. | Case No. 2:25-cv-01651-ODW (AYPx) |

DEPOSITION OF STEVEN DAVID RISS, taken at 1840 Century Park East, Suite 1900, in Los Angeles, California, on Thursday, August 6, 2026, at 10:03 a.m., before Denise Paholski, Certified Shorthand Reporter, in and for the State of California.

-oOo-

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF, LIGHTHOUSE HEALTHCARE CENTER, LLC:

THE WAGNER FIRM
BY: AVI WAGNER, ESQ.
1925 Century Park East, Suite 2100
Los Angeles, California 90067
310.491.7949
avi@thewagnerfirm.com

FOR THE DEFENDANTS, NATIONAL FIRE & MARINE INSURANCE COMPANY and MEDPRO GROUP, INC.:

GREENBERG TRAURIG, LLP
BY: JON T. NEUMANN, ESQ.
2375 East Camelback Road, Suite 800
Phoenix, Arizona 85016
602.445.8411
NeumannJ@gtlaw.com

FOR AMWINS INSURANCE BROKERAGE, LLC:

WINGET SPADAFORA SCHWARTZBERG LLP
BY: TIMOTHY FREDRICKS, ESQ.
1800 Century Park East, Suite 205
Los Angeles, California 90067
310.836.4800
fredricks.t@WSSLLP.com

INDEX

WITNESS: Steven David Riss


| EXAMINATION | PAGE |
|---|---|
| By Mr. Neumann | 10 |
| By Mr. Wagner | 107 |
| By Mr. Fredricks | 132 |


E X H I B I T S


| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 121 | Subpoena to Testify at a Deposition in a Civil Action | 13 |
| Exhibit 122 | Email string dated 12/9/2016; 2017 Submission for Lighthouse | 27 |
| Exhibit 123 | Clearance confirmation email from MedPro dated 12/9/2016 | 40 |
| Exhibit 124 | Correspondence from MedPro's underwriter to Eli Fogel dated 2/16/17 | 41 |
| Exhibit 125 | Correspondence dated 1/17/17; AmWINS quote cover page | 43 |
| Exhibit 126 | Email from Steven Riss to Aaron Zolonz dated 2/17/17; AmWINS quotation attachment | 48 |
| Exhibit 127 | Email string Bates stamped Amwins_0000912 and 0000913; Lighthouse financial enclosure | 51 |
| Exhibit 128 | Email from Steven Riss to John Hopping Bates stamped Amwins_0000940; Lighthouse financial enclosure | 52 |

INDEX (Continued):

EXHIBITS


| DEFENDANTS' | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 129 | Email string Bates stamped Amwins_0000943 and 0000950; Order to bind coverage from Shomer Insurance | 52 |
| Exhibit 130 | Email from Steven Riss dated 2/28/17; Order to bind from AmWins Insurance to MedPro | 53 |
| Exhibit 131 | Email string Bates stamped Amwins_0000959 and 0000966; Binder issued by MedPro to AmWins confirming coverage bound | 54 |
| Exhibit 132 | Email string Bates stamped Amwins_0001030 through 0001046; Completed MedPro application and d1 | 56 |
| Exhibit 133 | Email string Bates stamped Amwins_0001001; Binder and invoice issued by AmWins to Shomer Insurance | 59 |
| Exhibit 134 | Email from Eli Fogel to John Hopping; Binding docs attached | 60 |
| Exhibit 135 | Email Bates stamped Amwins_1057; Notice of Intent to Commence Action Against Health Care Provider | 61 |
| Exhibit 136 | Email Bates stamped Amwins_1086; Notice of Intent to Commence Action Against Health Care Provider | 63 |
| Exhibit 137 | Email Bates stamped Amwins_1077 Notice of Intent to Commence Action Against Health Care Provider | 64 |
| Exhibit 138 | Email string dated 3/2017; RM Contact From attachment | 66 |


///

INDEX (Continued):

E X H I B I T S


| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 139 | Email string sent 4/3/2017; Formal policy issued by MedPro to AmWins | 67 |
| Exhibit 140 | Standard renewal solicitation by MedPro to AmWins email sent 12/19/17 | 68 |
| Exhibit 141 | Renewal bind order from AmWins to MedPro email sent 2/2018 | 69 |
| Exhibit 142 | Email string Bates stamped Amwins_0004128 through 0004130, update request | 69 |
| Exhibit 143 | Email from Steven Riss sent 6/13/18 Bates stamped Amwins_4136, -37 and -38 | 70 |
| Exhibit 144 | Email string Bates stamped Amwins_0004140 through 0004145 | 71 |
| Exhibit 145 | Email Bates stamped Amwins_0004196 | 74 |
| Exhibit 146 | Email string Bates stamped Amwins_0004197 and 0004198 | 75 |
| Exhibit 147 | Email string Bates stamped Amwins_0004199 and 0004200 | 76 |
| Exhibit 148 | Email string Bates stamped Amwins_0004377 and 0004378 Re: Notice of Non-Renewal | 77 |
| Exhibit 149 | Email string Bates stamped Amwins_0004387 through 0004390 | 77 |
| Exhibit 150 | Email string Bates stamped Amwins_0004685 through 0004688; Complaint RE: Donnell v. Four Seasons attachment Bates stamped Amwins_0004689 through Amwins_0004706 | 81 |


///

INDEX (Continued):

E X H I B I T S



| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 151 | Email string Bates stamped Amwins_0004707 through 0004711 | 81 |
| Exhibit 152 | Email string Bates stamped Amwins_0004664 through 0004666; Complaint RE: Donnell v. Four Seasons attachment Bates stamped Amwins_0004667 through Amwins_0004684 | 83 |
| Exhibit 153 | Email string Bates stamped Amwins_0004684 through 0004817; Attachments enclosed Bates stamped Amwins_0004818 through 0004846 | 84 |
| Exhibit 154 | Email string Bates stamped Amwins_0004716 and 0004717; Attachments enclosed Bates stamped Amwins_0004718 through 000744 | 86 |
| Exhibit 155 | Email string Bates stamped Amwins_0004848 through 0004851 | 87 |
| Exhibit 156 | Email from Christina Ballester to Steven Riss sent 10/11/2019 Bates stamped Amwins_0004852 | 89 |
| Exhibit 157 | Email between Christina Ballester and Steven Riss dated 10/11/2019 | 91 |
| Exhibit 158 | Email string Bates stamped Amwins_0004853 through 0004857; Attachments enclosed Bates stamped Amwins_0004849 through 0004887 | 92 |
| Exhibit 159 | Email string Bates stamped Amwins_0007204 through 0007206; Attachment Judgment Bates stamped Amwins_0007207 and 0007208 | 94 |



///

INDEX (Continued):

EXHIBITS


| DEFENDANTS' | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 160 | Email from Steven Riss to Matt Mains Bates stamped Amwins_0007213; Donnell Judgment attachment Bates stamped Amwins_0007214 and -15 | 95 |
| Exhibit 161 | Email string Bates stamped Amwins_0007280 through 7282; Donnell Judgment attachment Bates stamped Amwins_0007283 and Amwins_0007284 | 96 |
| Exhibit 162 | Email string Bates stamped Amwins_0007325 through 0007328 | 98 |
| Exhibit 163 | Email string Bates stamped Amwins_0007463 through 0007466 | 99 |
| Exhibit 164 | Email string Bates stamped Amwins_0012559 | 100 |
| Exhibit 165 | Email string Bates stamped Amwins_0012564 through 0012569; Multiple attachments Bates stamped Amwins_0012571 through 0012678 | 101 |
| Exhibit 166 | Email from Aaron Zolonz to Steven Riss sent 3/15/2024 Bates stamped Amwins_0010602 | 102 |
| Exhibit 167 | Email string Bates stamped Amwins_0011444 through 0011455 | 103 |
| Exhibit 168 | Insurance Broker Agreement Cover Sheet - Wholesale; Insurance Broker Agreement | 106 |

| PLAINTIFF'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 169 | Email string Bates stamped Amwins_0004189 through 004195 | 130 |


///

INDEX (Continued):

E X H I B I T S

(Previously marked)


| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 39 | Email from David Strother to Laib Greenspoon Bates stamped LH_00000001 | 65 |
| Exhibit 117 | Insurance Producer Agreement | 106 |


QUESTIONS INSTRUCTED NOT TO ANSWER:

(None.)

INFORMATION REQUESTED:

(None.)

LOS ANGELES, CALIFORNIA;
THURSDAY, AUGUST 6, 2026, 10:03 A.M.
-oOo-

THE STENOGRAPHER: Good morning. For the record, my name is Denise Paholski. I am a certified shorthand reporter licensed by the State of California. My certification number is 10742.

STEVEN DAVID RISS,
having been duly administered an oath,
was examined and testified as follows:

EXAMINATION

BY MR. NEUMANN:

**Q Good morning, Mr. Riss.**
A Good morning.
**Q Could you please state your full name for the record.**
A Steven David Riss.
**Q And are you currently employed?**
A Yes.
**Q By whom?**
A AmWINS Insurance Brokers.
**Q And are you okay if we refer to AmWINS**

MR. NEUMANN: Objection to form. Calls for a legal conclusion.

MR. FREDRICKS: Go ahead.

THE WITNESS: Not aware.

BY MR. WAGNER:

**Q To the best of your knowledge, no such authority was given, correct?**

MR. NEUMANN: Same objections.

MR. FREDRICKS: Go ahead.

THE WITNESS: Correct.

BY MR. WAGNER:

**Q We heard about Christina Ballester. You understand that she's an attorney by trade, right?**

MR. NEUMANN: Foundation.

THE WITNESS: I didn't know. I didn't know at the time.

BY MR. WAGNER:

**Q Well, she has JD in her signature line.**

A I don't know what that means. Junior something?

**Q I think all three of us are all trying to figure out what it means.**

A You know, I wasn't aware.

**Q Okay. But you knew she was a claims professional at the time you first interacted with**

**her, correct?**
A Yes.
**Q Would you expect a claims professional to review materials submitted for coverage?**
MR. NEUMANN: Form and foundation.
MR. FREDRICKS: Go ahead.
THE WITNESS: Yes.
BY MR. WAGNER:
**Q Would you expect a claims professional, in particular an attorney, to rely on your determinations about potential coverage?**
MR. NEUMANN: Form and foundation. Calls for speculation.
MR. FREDRICKS: Go ahead.
THE WITNESS: Yes.
BY MR. WAGNER:
**Q Why would you expect them to rely on your determinations?**
A Because they're insurance and legal professionals.
**Q And so for that reason you would expect them to make independent determinations in coverage, correct?**
MR. NEUMANN: Objection to form.
THE WITNESS: As a representative of their

carrier, yes.

MR. FREDRICKS: Sorry. Could I have that last like three questions ago read back where he said would you expect the claims professional to rely on Mr. Riss's coverage? It was something to that effect.

(Record was read as follows:

"Q Would you expect a claims professional, in particular an attorney, to rely on your determinations about potential coverage?")

MR. FREDRICKS: And what was the answer?

(Record was read as follows:

"A Yes.")

MR. FREDRICKS: Sorry. Go ahead, Mr. Wagner.

MR. WAGNER: Sure.

BY MR. WAGNER:

**Q Are you familiar with something called a default judgment exclusion?**

A I am not.

**Q Do you typically familiarize yourself with the policy forms that you place?**

A Yes.

**Q And are you aware that the MedPro policy in issue, when it was issued, has something called the default judgment exclusion?**

A I was not. Or I'm not aware. I don't

**policies that insurance policies sometimes have called cooperation provisions?**

A I'm not aware.

**Q Regardless of the label of policy provision, are you familiar with the concept that insureds generally are expected to cooperate with their insurance companies?**

MR. NEUMANN: Foundation.

MR. FREDRICKS: Go ahead.

THE WITNESS: Yes.

BY MR. WAGNER:

**Q And what's your understanding of that idea?**

A Simply that by binding a policy with the carrier, you have to be transparent and forthcoming with documentation and inquiries and inspections and anything that the carrier may ask of you.

**Q And is that something --**

**You had some discussions with MedPro about this claim. Is the issue of cooperation something you discussed with MedPro about the Donnell claim?**

A No.

**Q Did anyone at MedPro ever say to you, hey, Lighthouse is not cooperating with us?**

A No.

**Q And, independently, you have no reason to**

**believe that Lighthouse was not cooperating with MedPro, correct?**

MR. NEUMANN: Objection. Form and foundation.

MR. FREDRICKS: Speculation.

Go ahead.

THE WITNESS: Correct.

BY MR. WAGNER:

**Q Do you believe you had any telephone conversations with Ms. Ballester about the Donnell claim?**

A I believe I did.

**Q What's your recollection of that --**

**Well, do you have a recollection as to how many conversations that was?**

A I don't.

**Q And what's your best recollection of the substance of that conversation or those conversations?**

A It was a conversation I believe regarding the documentation that was tendered, let's call it subsequently in this claim.

**Q Is that a conversation that occurred in 2019 or prior?**

A I would have to -- I'd have to go back into the documentation. But it was just that one

MR. NEUMANN: Agreed.
MR. WAGNER: Agreed.
MR. FREDRICKS: Okay.
MR. NEUMANN: And were you in agreement also with my statement?
MR. WAGNER: Yes, I agree with both your statements.
MR. NEUMANN: Okay.
MR. FREDRICKS: Okay.
MR. NEUMANN: Do you want to read and sign?
MR. FREDRICKS: Yeah, probably.
MR. NEUMANN: Okay.
THE STENOGRAPHER: Counsel, would you like to order a copy of this transcript?
MR. FREDRICKS: No, not right now. I'll take your card.
THE STENOGRAPHER: Okay.
Mr. Wagner, would you like to order a copy?
MR. WAGNER: Yes.
THE STENOGRAPHER: Thank you very much.
(The deposition adjourned at 1:50 p.m.)
///
///
///
///

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, DENISE PAHOLSKI, Certified Shorthand Reporter, License No. 10742, for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, Steven David Riss, was by me duly administered the oath under penalty of perjury;

That the testimony of the witness, the questions propounded, ambiguous all objections ambiguous statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That before completion of the proceeding, pursuant to F.R.C.P. 30(e)(2):

(X) Reading and signing was requested.

( ) Reading and signing was waived.

( ) Reading and signing was not requested.

Should the signature of the witness not be affixed to this transcript, the witness shall not have availed himself/herself of the opportunity to sign, or the signature has been waived.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

DATED: August 12, 2026

DENISE PAHOLSKI, RPR, CSR #10742
in and for the State of California

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Lighthouse Healthcare Center, LLC
vs. National Fire and Marine Insurance Company
Date of Deposition: 08/06/2026

Job No.: 10196757

I, STEVEN DAVID RISS, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________
STEVEN DAVID RISS

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

DEPOSITION ERRATA SHEET
Case Name: Lighthouse Healthcare Center, LLC
vs. National Fire and Marine Insurance Company
Name of Witness: Steven David Riss
Date of Deposition: 08/06/2026
Job No.: 10196757
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________

# Exhibit 143

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_________________

| | |
|---|---|
| Lighthouse Healthcare Center, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-110,<br><br>Defendants. | ) Case No.: 2:25-cv-01651 |

DEPOSITION OF BARRY ZALMA, ESQ., CFE

Thursday, September 24, 2026

9:10 a.m. - 1:54 p.m.

Los Angeles, California

Kathy Mannlein, CSR NO. 13153

Job No. 10201423

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

_________________

| | |
|---|---|
| Lighthouse Healthcare Center, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-110,<br><br>Defendants. | ) Case No.: 2:25-cv-01651 |

The deposition of BARRY ZALMA, ESQ., CFE, taken on behalf of the Defendants at 1840 Century Park East, Suite 1900, Los Angeles, California; commencing at 9:10 a.m. and ending at 1:54 p.m., on Thursday, September 24, 2026, before Kathy Mannlein, a Certified Shorthand Reporter in the State of California, License No. 13153.

APPEARANCES OF COUNSEL:

For the Plaintiff Lighthouse Healthcare Center, LLC:

THE WAGNER FIRM
BY: AVI WAGNER, Attorney at Law
1925 Century Park East, Suite 2100
Los Angeles, California 90067
310-491-7949
310-694-3967 Fax
avi@thewagnerfirm.com

For the Defendants National Fire & Marine Insurance Company and MedPro Group, Inc.:

GREENBERG TRAURIG, LLP
BY: JON T. NEUMANN, Attorney at Law
2375 East Camelback Road, Suite 800
Phoenix, Arizona 85016
602-445-8411
NeumannJ@gtlaw.com

# I N D E X


| Examinations | Page |
|---|---|
| BY MR. NEUMANN | 5 |


## E X H I B I T S


| No. | Description | Page |
|---|---|---|
| Exhibit 218 | Notice Of Deposition Of Barry Zalma And Request For Production Of Documents | 9 |
| Exhibit 219 | Expert Report Of Barry Zalma | 27 |
| Exhibit 220 | Zalma on Insurance publication | 61 |
| Exhibit 221 | Senior Care Liability Policy Declarations | 71 |
| Exhibit 222 | Zalma on Insurance publication | 119 |
| Exhibit 223 | The Lawyer as an Insurance Claims Expert by Barry Zalma | 120 |
| Exhibit 224 | Failure to Advise Insurer of Service of Suit Voids Coverage by Barry Zalma | 121 |
| Exhibit 225 | Property Investigation Checklist: Uncovering Insurance Fraud by Barry Zalma | 125 |
| | PREVIOUSLY MARKED EXHIBITS | |
| Exhibit 3 | Notice Of Intent To Commence Action Against Health Care Provider | 77 |
| Exhibit 4 | E-mail thread | 63 |
| Exhibit 16 | E-mail thread | 114 |

MedPro set up a claim file when they got the notice.
BY MR. NEUMANN:
**Q. Well, isn't it true that MedPro, in fact, opened a potential claim, rather than an actual claim, on their system?**
A. Well, on their system, they set up -- they said it was just an incident rather than a claim. But what was set up in the claims department was a claim file with a supervisor attached and an adjuster attached. That's a claim. It requires the adjuster to do what adjusters do.
**Q. Do you -- are you aware of an industry custom and practice as to how long a potential claim, that does not become an actual claim, must be maintained in an open file?**
A. It depends on the potential claim. There's so many different ways that -- but once it's recognized as a potential claim, then certain minimum things have to be done. They have to contact the insured, to find out what he thinks, or she thinks, or it thinks, and you have to start an investigation. If it never becomes a lawsuit, you thank the insurance Gods, and you tell your client, your insured, you don't need us, so we're going to close our file.
**Q. So is it your testimony that insurance company**

**plaintiffs to discuss whether the matter can be resolved?**

A. As far as I know, neither did so, mainly because they were -- the insurance was not contacted by the insurance company.

**Q. Well, aren't you making an assumption that they would have asked that if they had been contacted, sir?**

A. Whether they were asked or not, you know. People who run businesses, like my son who operates a massage business in the bottom of my office building, get people angry with them. And they'll -- he'll report it to his insurance company as a possibility, and they will take care of it. And he doesn't know anything about insurance any more than I know anything about how to do a massage. But he at least knows somebody's threatening him.

Now, an insurance company is designed to deal with people threatening their insurance. So I would expect the -- if the insured didn't call this person, Mr. Donnell, himself, and say, why -- why would you want to sue us? Then he would expect his insurance company to do so.

**Q. Okay. Do you have any evidence, sir, that anyone from Lighthouse ever expected MedPro or**

**National Fire & Marine to contact Donnell in an effort to settle the matter before a lawsuit was filed?**

A. I have no idea what they thought. But they did report it to their insurance company. And their insurance company understands its obligation, once it receives a report of a claim or a potential claim, to do whatever is necessary to protect the insured. The least they could have done was call the people at Lighthouse and, say, what happened to this little old lady?

**Q. There's nothing in Section 364, again, that requires anyone to respond to the notice; correct?**

A. No, but there is in 790.03 in the Fair Codes Practices Regulations.

**Q. There's something that requires a 364 notice to be responded to?**

A. There's something that requires, once you have notice of a claim, to conduct a thorough investigation. It's not only in the regulations. It's in the manual of MedPro.

**Q. All right.**

A. Oh, my God, big packages.

**Q. This has been previously marked -- I don't recall what the number is, but I will -- well, we'll just mark it, for the sake of the record.**

MR. WAGNER: I think you're up to 221.

**potential claims for the reason we discussed before because it impacts the insure's ability to report a claim after the policy period expires?**

A. Yes. We didn't -- you didn't misquote me.

**Q. And, in fact, MedPro set this matter up as a potential claim.**

A. There's not a word in the communications as a potential claim. They set it up as a claim. They describe it, before they set it up as a claim, as an incident. And I have no idea, and I've never seen that in any claim file I've looked at. But then they set up a claim file within a couple of weeks of doing this as a potential claim. And then they did nothing.

**Q. So would your opinions change if, in fact, MedPro -- if the evidence is that MedPro, in fact, set this up as a potential claim, would that change any of your opinions?**

A. No.

**Q. Why not?**

A. Because a potential claim still requires the insurer to conduct a thorough investigation to determine whether or not that potential claim is a real claim, to determine what defenses are available to the insured, if it turns into a lawsuit. That's part and parcel of the minimum standards with regard to notices of claim,

whether the notice of a actual, ongoing claim, or a notice of a potential claim, the insured is exposed. And the insured needs to protect him or it.

**Q. So going, now, to definition (h) for claims expense.**

A. Yep.

**Q. And that definition says, "Claims expense means all costs and expenses incurred in connection with the investigation, adjustment, and defense of any claim, or potential claim. Such costs and expense shall include attorneys' fees paid to the law firm selected to defend an insured."**

**Did I read that correctly?**

A. I believe you did.

**Q. So does that confirm that claims expensed, as used in the declarations page we looked at earlier, includes attorneys' fees paid to defense counsel?**

A. Yes, it does.

**Q. Okay. Let's go to the Bates number ending in 68.**

A. Okay, I'm there.

**Q. And at the bottom, there's a definition of potential claim. Do you see that? Subsection (d)(d).**

A. I see it.

**Q. And it says, "Potential claim means the**

**there any additional work you're doing on this matter?**

A. Well, I'm just going to try and find those documents for you. But other than that, no.

**Q. Okay. Subject to any potential reopening, based on additional documents you provide, I don't have any further questions at this time.**

A. Bless your soul.

THE COURT REPORTER: Any questions, Counsel?

MR. WAGNER: No questions.

THE COURT REPORTER: And would you like a copy of this transcript?

MR. WAGNER: Yes, please.

THE COURT REPORTER: Okay. Thank you.

MR. NEUMANN: And I would, too. I think we asked for it to be expedited.

THE COURT REPORTER: Yes, you did.

(Off the record.)

(The proceedings adjourned at 1:54 p.m.)

State of California )
County of LOS ANGELES )

I, Kathy Mannlein, Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceeding was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any parties to said proceedings, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: September 25, 2026

*Kathy Mannlein*

Kathy E. Mannlein
CSR No. 13153

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Lighthouse Healthcare Center, LLC
vs. National Fire and Marine Insurance Company
Date of Deposition: 09/24/2026

Job No.: 10201423

I, BARRY ZALMA, ESQ., CFE, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________
BARRY ZALMA, ESQ., CFE

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__,
by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

# Exhibit 144

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Lighthouse Healthcare Center, )
LLC, a California Limited )
Liability Company, ) NO. 2:25-cv-01651
)
Plaintiff, )
)
vs. )
)
National Fire & Marine )
Insurance Company, a Nebraska )
Corporation; MedPro Group, Inc.)
and DOES 1-100, )
)
)
Defendants. )
_______________________________)

VIDEO-TAPED STENOGRAPHIC DEPOSITION OF
ROBERT M. ANDERSON
FRIDAY, SEPTEMBER 25, 2026

STENOGRAPHIC REPORTER:
Monica Chieffo , CSR NO. 15267

APPEARANCES:

FOR PLAINTIFF:

The Wagner Firm
BY: AVI WAGNER, ATTORNEY-AT-LAW
1925 Century Park East, Suite 2100
Los Angeles, California 90067
310-491-7949
Avi@thewagnerfirm.com

FOR DEFENDANTS:

Greenberg Traurig
BY: JON T. NEUMANN, ATTORNEY-AT-LAW
1840 Century Park East Suite 1900
Los Angeles, California 90067
602-445-8411
Neumannj@gtlaw.com

VIDEOGRAPHER: Sean Keane

--oOo--

INDEX


| EXAMINATION | PAGE |
| --- | --- |
| EXAMINATION BY MR. WAGNER | 5 |


PLAINTIFF'S EXHIBITS


| No. | Description | |
| --- | --- | --- |
| 225 | NOTES | 9 |
| 226 | NOTICE OF DEPOSITION | 56 |
| 227 | ANDERSON LINKEDIN PROFILE | 61 |
| 228 | GUIDEONE SUPPLEMENTAL APPLICATION | 74 |
| 229 | CALIFORNIA SURPLUS LINES WARNING STATEMENT | 79 |
| 39 | DAVID STROTHER EMAIL | 89 |
| 230 | RISK MANAGEMENT ASSESSMENT REPORT | 97 |
| 231 | EXPERT REPORT ANDERSON | 104 |
| 232 | SENIOR CARE LIABILITY SUPPLEMENTAL | 117 |

BE IT REMEMBERED that on Friday, the 25th day of September, 2026, at the hour of 11:16 AM, of said day, with all parties and myself, Monica Chieffo , California CSR No. 15267, appeared at Greenberg Traurig, 1840 Century Park East Suite 1900, Los Angeles, California. The witness, Robert M. Anderson, was examined in said cause.

--oOo--

THE VIDEOGRAPHER: Good morning. We are 11:16:07AM
now on the record. This begins meeting number one 11:16:07AM
in the video-taped deposition of Robert M. Anderson 11:16:11AM
in the matter of Lighthouse Healthcare Center, LLC 11:16:13AM
v. National Fire and Marine Inc. et. al. Today is 11:16:18AM
September 25th, 2026. The time is 11:16 AM. This 11:16:27AM
deposition is being taken at 1925 Century Park East 11:16:28AM
Suite 2100 Los Angeles, California ZIP Code 90067. 11:16:31AM
The videographer today is Sean Keane of Magna Legal 11:16:41AM
Services and the court reporter tag today is Monica 11:16:46AM
Chieffo of Magna Legal Services. I just want to 11:16:48AM
state that the time that we're starting on the 11:16:49AM
record is 11:16AM. Will counsel and all parties 11:16:51AM
please state their appearances and who they 11:16:56AM
represent. 11:16:58AM

MR. WAGNER: Good morning. Avi Wagner for 11:16:58AM
Plaintiff Lighthouse Healthcare Center. Also the 11:17:03AM

A. No. 01:19:09PM
Q. If I told you that the three-year 01:19:09PM
mortality rate exceeded 30 percent for residence at 01:19:11PM
nursing comes, would that -- would you have any 01:19:14PM
reason to dispute that? 01:19:16PM
A. No. 01:19:21PM
Q. And would that suggest to you that 01:19:21PM
30 percent of residents are likely to make claims? 01:19:23PM
A. No. 01:19:26PM
Q. What is the claims rate on average for 01:19:26PM
nursing homes on claims relative to residents? 01:19:28PM
A. I don't know. 01:19:31PM
Q. But it's substantially, substantially 01:19:36PM
below the rate of death; right? 01:19:37PM
A. I don't know. 01:19:39PM
Q. Okay. And again, as far as any 01:19:47PM
documentation of the timing or nature of the 01:19:48PM
interactions to CDPH, is there any document apart of 01:19:51PM
this that you can identify? We'll get to your 01:19:53PM
report in a second -- 01:19:56PM
A. Yeah. Yeah. 01:19:56PM
Q. I understand you want to get there. But 01:19:56PM
sitting here today, is there a single shred of 01:19:59PM
documentation beyond this that sheds light on 01:19:59PM
whether and the extent and nature of a complaint 01:20:03PM

Please be advised I have read the foregoing deposition, pages 4 through 133, inclusive. I hereby state there are:

(Check one)____________ no corrections

____________ corrections per attached

______________________________

Robert M. Anderson

--o0o--

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition, was by me duly sworn to testify to the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly-certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereto set my hand this 12th day of October, 2026.

Monica Chieffo

Monica Chieffo , CSR NO. 15267

# Exhibit 145

Avi Wagner (SBN #226688)
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949
Facsimile: (310) 694-3967
Email: avi@thewagnerfirm.com

*Attorneys for Plaintiff*
*Lighthouse Healthcare Center, LLC*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Lighthouse Healthcare Center, LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>National Fire & Marine Insurance Company, a Nebraska Corporation; MedPro Group, Inc. and DOES 1-100,<br><br>Defendant(s). | **Case No.: 2:25-cv-01651-ODW**<br>**Hon. Otis Wright**<br><br>**PLAINTIFF'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**<br><br>Original Complaint Filed: 2/26/25 |

**INTERROGATORY NO. 19**

Identify how and on what date You became aware of the Default Judgment.

**RESPONSE TO INTERROGATORY NO. 19**

Plaintiff objects to this Interrogatory to the extent it seeks documents or communications that are protected by the attorney–client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds that it became aware of the Default Judgment on or about August 21, 2023.

**AMENDED RESPONSE TO INTERROGATORY NO. 19**

Plaintiff objects to this Interrogatory to the extent it seeks documents or communications that are protected by the attorney–client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds that it became aware of the Default Judgment on or about August 21, 2023 when it received the court-filed document as an attachment to a privileged e-mail sent by its counsel.

**INTERROGATORY NO. 20**

Identify each action You took to defend against the *Donnell* Suit.

**RESPONSE TO INTERROGATORY NO. 20**

Plaintiff objects to this Interrogatory to the extent it seeks documents or communications that are protected by the attorney–client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

Subject to and without waiving the foregoing general and specific objections, the answer to this Interrogatory may be determined by examining Plaintiff's business records produced concurrently herewith. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Plaintiff refers to those documents and incorporates them by reference. Plaintiff further responds that, Plaintiff further responds that, through AmWINS, it

named as a defendant, Responding Party responds as follows: (1) on or about April 22, 2019, Responding Party learned that Rockport had received a copy a Complaint filed in the *Donnell* Suit that named Responding Party as a defendant; (2) on or about October 4, 2019, Responding Party learned the *Donnell* plaintiff had filed a request for default judgment; (3) on or about August 21, 2023 Responding Party learned that a default judgment had been entered against it in the *Donnell* Suit; (4) on or about August 22, 2023 Responding Party learned about a number of other filings in the *Donnell* Suit, as documented in LH_00004163; (5) on or about August 23, 2023, Responding Party learned about additional filings in the *Donnell* Suit, as documented in LH_00004340.

**INTERROGATORY NO. 24**

Identify the name, address, and telephone number of all individuals acting on Your behalf who were involved in the receipt, service, investigation, evaluation, or handling of the *Donnell* Suit.

**RESPONSE TO INTERROGATORY NO. 24**

Plaintiff objects to the terms "receipt", "service", "investigation", "evaluation", and "handling" as vague and ambiguous in this context. Plaintiff further objects to the phrase "acting on Your behalf" as vague and ambiguous; Defendants had certain legal duties to Plaintiff with respect to the "investigation", "evaluation", and "handling" of the *Donnell* Suit, but it is unclear that they were acting on Plaintiff's behalf. Plaintiff objects to this Interrogatory to the extent it seeks documents or communications that are protected by the attorney–client privilege, the attorney work-product doctrine, or any other applicable privilege or immunity.

Subject to and without waiving the foregoing general and specific objections, Plaintiff responds as follows: Ari Baer; Steven Riss; Yalda Neil; and Derek Cheung. Each can be contacted through counsel.

DATED: April 10, 2026 THE WAGNER FIRM

By: *__/s/ Avi Wagner________________*
Avi Wagner
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949
Facsimile: (310) 694-3967
Email: avi@thewagnerfirm.com

*Attorneys for Plaintiff Lighthouse Healthcare Center, LLC*

# PROOF OF SERVICE

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On April 10, 2026 I served true and correct copies of the foregoing documents,

- **PLAINTIFF'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES; and**
- **PLAINTIFF'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION**

by via e-mail from my e-mail address used for business purposes, addressed to the following:

GREENBERG TRAURIG, LLP
Jon T. Neumann (CA SBN 277331)
NeumannJ@gtlaw.com
2375 E. Camelback Road, Ste. 800
Phoenix, AZ 85016
*Attorneys for Defendants National Fire & Marine Insurance Company and MedPro Group, Inc.*

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 10, 2026, at Los Angeles, California.

*/s/ Charissa Morningstar*

Charissa Morningstar

# Exhibit 146

JAMDA 23 (2022) 1403–1408

JAMDA

journal homepage: www.jamda.com

Original Study

# Risk Prediction Model for 6-Month Mortality for Patients Discharged to Skilled Nursing Facilities

Anupam Chandra MD [a,b,*], Paul Y. Takahashi MD [a,b], Rozalina G. McCoy MD, MS [a,b,c], Bjoerg Thorsteinsdottir MD [a], Gregory J. Hanson MD [a,b], Rajeev Chaudhry MBBS, MPH [a,d], Parvez A. Rahman MIH [c], Curtis B. Storlie PhD [e], Dennis H. Murphree Jr. PhD [d]

[a] Division of Community Internal Medicine, Mayo Clinic, Rochester, MN, USA
[b] Division of Geriatric Medicine and Gerontology, Mayo Clinic, Rochester, MN, USA
[c] Robert D. and Patricia E. Kern Center for the Science of Health Care Delivery, Mayo Clinic, Rochester, MN, USA
[d] Department of Artificial Intelligence and Informatics, Mayo Clinic, Rochester, MN, USA
[e] Division of Clinical Trials and Biostatistics, Mayo Clinic, Rochester, MN, USA

*Keywords:*
Mortality
post-acute SNF
risk prediction

A B S T R A C T

*Objective:* Hospitalized patients discharged to skilled nursing facilities (SNFs) for post-acute care are at high risk for adverse outcomes. Yet, absence of effective prognostic tools hinders optimal care planning and decision making. Our objective was to develop and validate a risk prediction model for 6-month all-cause death among hospitalized patients discharged to SNFs.
*Design:* Retrospective cohort study.
*Setting and Participants:* Patients discharged from 1 of 2 hospitals to 1 of 10 SNFs for post-acute care in an integrated health care delivery system between January 1, 2009, and December 31, 2016.
*Methods:* Gradient-boosting machine modeling was used to predict all-cause death within 180 days of hospital discharge with use of patient demographic characteristics, comorbidities, pattern of prior health care use, and clinical parameters from the index hospitalization. Area under the receiver operating characteristic curve (AUC) was assessed for out-of-sample observations under 10-fold cross-validation.
*Results:* We identified 9803 unique patients with 11,647 hospital-to-SNF discharges [mean (SD) age, 80.72 (9.71) years; female sex, 61.4%]. These discharges involved 9803 patients alive at 180 days and 1844 patients who died between day 1 and day 180 of discharge. Age, comorbid burden, health care use in prior 6 months, abnormal laboratory parameters, and mobility status during hospital stay were the most important predictors of 6-month death (model AUC, 0.82).
*Conclusion and Implications:* We derived a robust prediction model with parameters available at discharge to SNFs to calculate risk of death within 6 months. This work may be useful to guide other clinicians wishing to develop mortality prediction instruments specific to their post-acute SNF populations.

© 2022 AMDA – The Society for Post-Acute and Long-Term Care Medicine.

More than 15% of US adults aged ≥65 years are hospitalized annually.[1] Increasingly, they require placement in a skilled nursing facility (SNF) after discharge. In 2013, nearly 25% of hospitalized Medicare beneficiaries were discharged to an SNF.[2,3] Patients discharged to an SNF for post-acute care differ in their clinical complexity, care needs, and prognosis. Some patients may need only rehabilitation and temporary support. Other patients may have greater debilitation because of multiple comorbidities and active clinical issues that require frequent monitoring and interventions and also place them at risk for adverse outcomes. Understanding the heterogeneity of this patient population is necessary for optimal patient-centered care because knowledge of the patient's risk of

Rozalina G. McCoy received support from the National Institutes of Health (NIH) National Institute of Diabetes and Digestive and Kidney Diseases, grant K23DK114497. The content is solely the responsibility of the authors and does not necessarily represent the official views of the NIH.
The authors declare no conflicts of interest.
* Address correspondence to Anupam Chandra, MD, Division of Community Internal Medicine, Mayo Clinic, 200 First St SW, Rochester, MN 55905, USA.
*E-mail address:* chandra.anupam@mayo.edu (A. Chandra).

https://doi.org/10.1016/j.jamda.2022.01.069
1525-8610/© 2022 AMDA – The Society for Post-Acute and Long-Term Care Medicine.

adverse health outcomes can inform care monitoring and decisions at SNF admission.

Additionally, nursing homes are the place of death for nearly 24.7% of US adults aged ≥65 years.[2] Patients receiving post-acute care at SNFs may have multiple comorbidities and ongoing acute clinical problems compounded by poor functional status, which together increase their risk of early, 6-month death. This risk is corroborated by the fact that one-third of Medicare beneficiaries use an SNF in their final 6 months of life.[4]

Studies on the end-of-life care transitions pattern of Medicare beneficiaries have shown that one-third of beneficiaries had 4 or more transitions during the final 6 months of the life, not including hospice.[5] Hospice criteria are stringent, and many patients receiving post-acute SNF care do not meet these criteria. However, they may have conservative care goals and could benefit from a discussion of their health care preferences. Documentation of a patient's wishes for life-sustaining measures is mandated at each change of care facility. However, in the absence of an understanding of the patient's prognosis and risk at the time of SNF admission, this may be limited to documentation of preferences for cardiopulmonary resuscitation. Without appropriate prognostication at hospital discharge to an SNF, the patient, their surrogates, and their care clinicians may make care decisions about future hospitalizations and other clinical interventions that are not aligned with the patient's underlying wishes and, ultimately, may contribute to unplanned and unwanted health care use.[3] To make decisions about optimal care at the time of patient transfer to an SNF, they need reliable prognostic information on the patient's risk of acute deterioration and death.

Early discussions of the desired goals of care and a palliative care consultation have been shown to reduce inappropriate health care use in the SNF setting.[6–8] Availability of a risk instrument that identifies a patient's risk of 6-month death at the time of SNF admission could contextualize meaningful conversations and shared decision-making among clinicians, hospitalized patients, and caregivers; guide prioritization of discussions of care goals and patient's preferences for their care; and inform care management strategies to improve management of symptoms and health care use.

Most currently available and commonly used prediction tools to identify older patients with increased risk of death were developed for and validated among broader patient populations. These tools evaluate longer-term outcomes, and limited data are available that would generalize to 6-month mortality rate in the post-acute SNF population.[9] We previously developed and validated a risk prediction model for 30-day hospital readmissions, with the goal of supporting proactive, data-driven risk stratification of SNF residents.[1] We now build on that work to develop and validate a risk prediction model for 6-month all-cause death among patients discharged from a hospital to an SNF for post-acute care.

## Methods

The institutional review board approved the present study. This retrospective cohort analysis conforms to the TRIPOD (Transparent Reporting of a Multivariable Prediction Model for Individual Prognosis or Diagnosis) Statement.[10]

### *Patient Population*

Study patients were aged ≥55 years and were dismissed from either of 2 hospitals of our institution to 1 of 10 local SNFs between January 1, 2009, and December 31, 2016. The included patients were discharged from medical, surgical, and specialty hospital services. Palliative care services were available for consultations. This consultation service uses an interdisciplinary team approach in conjunction with the primary service to deliver care. We excluded the patients who did not authorize review of their health records for research. We also excluded patients whose SNF admission date was different from the hospital dismissal date.

### *Setting*

The institution's Department of Family Medicine and Division of Community Internal Medicine provide post-acute care to patients dismissed from the 2 hospitals to the 10 area SNFs. The SNFs included in the study were defined as institutions with 24 hours per day nursing coverage and licensed as SNFs in our state. Two SNFs with the same ownership merged during the study period and were treated as one in the analyses. One nonprofit SNF is affiliated with our institution.

### *Data Sources*

At hospital discharge, data were ascertained from the administrative and electronic health records (EHRs) from the institution. Our institution maintains a unified EHR for hospital, ambulatory, and SNF clinical visits. Predictor assessments were made without knowledge of the outcome data. Demographic information included age, sex, race, and marital status at hospital discharge. Medical comorbidity was quantified as the Charlson Comorbidity Index (CCI).[11] We used *International Classification of Diseases*, *Ninth Revision* (*ICD-9*) and *Tenth Revision* (*ICD-10*), diagnosis codes to determine comorbid conditions from billing data. We initially constructed *ICD-9* codes on the basis of expert reviews of a condition-specific list of the *ICD-9* codes. For diagnosis data from October 1, 2015, onward, we further reviewed a condition-specific list of *ICD-10* codes and reconstructed the pertinent value sets. The crosswalk mapping was based on manual expert reviews of the codes.

The primary discharge diagnoses were determined with Clinical Classification Software.[12] Prior health care use was defined as the numbers of hospital stays and emergency department (ED) visits in the previous 6 months. We cross-matched hospital billing encounters with the dismissal summary in the EHR to determine hospital admissions.

Factors related to the index hospitalization were also included—specifically, the length of stay, dismissing service, and need for intensive care unit care. Intensive care unit care was defined as a stay in critical care units of any medical, surgical, or subspecialty (eg, cardiology, neurology) departments. The included clinical parameters from the index hospital stay were the score from the Braden Scale for Predicting Pressure Sore Risk,[13] the score from the Hendrich Fall Risk Model,[14] and the presence of delirium with use of the Confusion Assessment Method.[15] These ratings were ascertained from nursing flowsheets included in the EHR. Mobility status was retrieved from physical therapy flowsheets. Included in the analysis were laboratory values (ie, hemoglobin, creatinine, sodium, potassium) during the index hospital stay closest to SNF admission from the EHR.

### *Primary Outcome*

The primary outcome was 6-month all-cause death after discharge to an SNF. The Department of Health Sciences Research at our institution obtained mortality data from the patient registration system. This system acquires data from the EHR, which are updated when death occurs in our health care system. Additionally, the record is updated with family reports, local death announcements, and newspaper obituaries.

*Statistical Analysis*

To build a prediction model that would perform robustly in typical clinical settings, we considered approaches that could accommodate missing data.[16] We used the gradient-boosting machine (GBM) method[17] analogous to our earlier risk prediction model for 30-day hospital readmission after discharge from a hospital to an SNF.[1] The GBM combines an ensemble of multiple simple, tree-based models to form a strong classifier.[17] It handles missing values by creating a third node for "missing" whenever a split is made on that variable. We chose tuning parameters (ie, N for number of trees in the ensemble and S for shrinkage) through a grid search using 10-fold cross-validation. A 20-point grid was used for N, equally spaced from 100 to 800. A 20-point grid also was used for S, from 0.0001 to 0.1, equally spaced on log-scale. This methodology, which repeats the training-validation split 10 different times, results in a markedly more effective assessment of model performance than the traditional split-sample validation methods. We compared the area under the receiver operating characteristic curve (AUC) constructed from sample cross-validation results to select the best model.

Variables were selected on the basis of clinical relevance, literature review, and information available at hospital discharge. To assess the variable importance, we used standard approaches, including permutation importance and GBM-specific metrics. However, we concluded that in the most informative approach, similar variables were grouped and group importance assessed similar to an earlier technique.[1] Thus, we evaluated model performance (ie, AUC) under conditions where only a given group was included and when all variables were included except those from the given group. Variable groupings were chosen to aid in interpretability and were selected through intuition. They do not affect model fit or model performance.

*Performance Measures*

To assess the GBM model, we compared its predictive performance with the CCI (ie, count of diseases).[11] Both the GBM model and CCI were evaluated for predictive performance with a 10-fold cross-validated AUC. A random sample from the data comprised the holdout sets chosen during this cross-validation. They were not used to fit the model. To provide a more clinically relevant measure than AUC for assessment of the model performance in practice, we further compared model performances at a point on the receiver operating characteristic curve that is the rate of detected death for a given false-positive rate that is 1 − specificity.

In the fitting of a GBM model, all patient encounters were treated implicitly as independent (even those for the same patient are treated as conditionally independent). We considered this the most appropriate approach because we sought to prioritize the predictive performance through cross-validation over inferential modeling, in the interest of clinical applicability.

## Results

We identified 11,647 hospital discharges of 9803 unique patients from the 2 hospitals to the 10 SNFs served by our community primary care practice between January 1, 2009, and December 31, 2016. Overall, 1844 patients (18.8%) died within 6 months of discharge to an SNF. The average age of the cohort was 82.7 years, 61.4% were women, and 96.7% were White.

Table 1 outlines the univariate differences among patients who did and did not die within 6 months of hospital discharge to an SNF for post-acute care.

The patients who died within 6 months of discharge to an SNF were older [mean (SD) age, 82.92 (9.66) years] and more likely to be men (46.4%) than the patients alive in that period [mean (SD) age,

**Table 1**
Baseline Characteristics of the Study Population

| Characteristic | Patient Survival Status at Time After Discharge to SNF | |
|---|---|---|
| | Alive at 180 d (n=9803) | Death within 180 d (n=1844) |
| Age, y, mean (SD) | 78.52 (9.77) | 82.92 (9.66) |
| Male sex | 3644 (37.2) | 856 (46.4) |
| Marital status | | |
| Divorced | 1133 (11.6) | 150 (8.1) |
| Other | 52 (0.5) | 10 (0.5) |
| Married | 4674 (47.7) | 808 (43.8) |
| Single | 828 (8.4) | 153 (8.3) |
| Widowed | 3116 (31.8) | 723 (39.2) |
| Prior 6-mo health care use, mean (SD) | | |
| Inpatient stays | 0.50 (0.91) | 1.08 (1.40) |
| ED stays | 0.64 (1.18) | 1.28 (1.56) |
| CCI | 5.13 (3.75) | 8.06 (3.71) |
| Hospital parameters | | |
| Length of stay, mean (SD), d | 6.18 (5.86) | 7.68 (6.19) |
| ICU admission | 2753 (28.1) | 813 (44.1) |
| Laboratory parameters, mean (SD) | | |
| Creatinine, mg/dL | 1.07 (0.77) | 1.40 (1.05) |
| Hemoglobin, g/dL | 10.43 (1.56) | 10.29 (1.62) |
| Potassium, mEq/L | 4.22 (0.45) | 4.25 (0.52) |
| Sodium, mEq/L | 138.04 (3.62) | 138.35 (4.42) |
| Delirium | | |
| Negative | 8726 (89.0) | 1439 (78.0) |
| No record | 71 (0.7) | 16 (0.9) |
| Positive | 1006 (10.3) | 389 (21.1) |
| Braden score | | |
| At risk | 5397 (55.1) | 1551 (84.1) |
| Low risk | 4344 (44.3) | 279 (15.1) |
| No record | 62 (0.6) | 14 (0.8) |
| Advance directives* | | |
| Anatomical bequest | 113 (1.2) | 19 (1.0) |
| Autopsy Alzheimer's disease | 196 (2.0) | 48 (2.6) |
| Autopsy neurology | 3 (0) | 0 (0.0) |
| General | 591 (6) | 109 (5.9) |
| Outside | 2750 (28.1) | 679 (36.8) |
| POLST | 91 (0.9) | 49 (2.7) |
| Psychiatric | 8 (0.1) | 0 (0.0) |
| Use of ambulatory assistance device | 6696 (68.3) | 830 (45.0) |
| Ambulatory assistance | | |
| Independent | 25 (0.3) | 2 (0.1) |
| Moderately independent | 144 (1.5) | 12 (0.7) |
| Supervise | 1347 (13.7) | 151 (8.2) |
| Minimal assistance | 5219 (53.2) | 690 (37.4) |
| Moderate assistance | 906 (9.2) | 178 (9.7) |
| Maximal assistance | 224 (2.3) | 67 (3.6) |
| Total assistance | 20 (0.2) | 3 (0.2) |
| Did not occur | 468 (4.8) | 129 (7.0) |
| NA | 1450 (14.8) | 612 (33.2) |
| Sit-to-stand transfer | | |
| Independent | 77 (0.8) | 9 (0.5) |
| Moderately independent | 370 (3.8) | 28 (1.5) |
| Supervise | 1890 (19.3) | 228 (12.4) |
| Minimal assistance | 4302 (43.9) | 548 (29.7) |
| Moderate assistance | 1272 (13.0) | 262 (14.2) |
| Maximal assistance | 403 (4.1) | 117 (6.3) |
| Total assistance | 84 (0.9) | 36 (2.0) |
| Did not occur | 115 (1.2) | 41 (2.2) |
| NA | 1290 (13.2) | 575 (31.2) |
| Stand-to-pivot transfer | | |
| Independent | 39 (0.4) | 5 (0.3) |
| Moderately independent | 212 (2.2) | 17 (0.9) |
| Supervise | 1449 (14.8) | 145 (7.9) |
| Minimal assistance | 3691 (37.7) | 449 (24.3) |
| Moderate assistance | 915 (9.3) | 152 (8.2) |
| Maximal assistance | 287 (2.9) | 81 (4.4) |
| Total assistance | 81 (0.8) | 29 (1.6) |
| Did not occur | 217 (2.2) | 71 (3.9) |
| NA | 2912 (29.7) | 895 (48.5) |
| Supine-to-sit transfer | | |
| Independent | 227 (2.3) | 41 (2.2) |
| Moderately independent | 550 (5.6) | 57 (3.1) |

(*continued on next page*)

**Table 1** (*continued*)

| Characteristic | Patient Survival Status at Time After Discharge to SNF | |
|---|---|---|
| | Alive at 180 d (n=9803) | Death within 180 d (n=1844) |
| Supervise | 1347 (13.7) | 233 (12.6) |
| Minimal assistance | 3667 (37.4) | 387 (21.0) |
| Moderate assistance | 1672 (17.1) | 274 (14.9) |
| Maximal assistance | 507 (5.2) | 146 (7.9) |
| Total assistance | 79 (0.8) | 46 (2.5) |
| Did not occur | 183 (1.9) | 52 (2.8) |
| NA | 1571 (16.0) | 608 (33.0) |
| Death in 180 d, mean (SD) | 0.00 (0.00) | 1.00 (0.00) |

ICU, intensive care unit; NA, data not available; POLST, provider orders of life-sustaining treatment.
Values are presented as number (percentage) of discharges unless specified otherwise.
*The numbers reflect the available data in the various sections.

78.52 (9.77) years; male sex, 37.2%] (Table 1). The patients who died had more inpatient and ED visits in the prior 6 months and a greater comorbid disease burden. During their initial hospital stay, those who died were more likely to have needed intensive care unit care, to have screened positive for delirium and were at risk for pressure ulcers, and to have abnormal laboratory and mobility parameters.

### *Predictive Model Development and Performance*

The most informative covariates in the GBM model to predict 6-month death rate were patient age, comorbidity level, abnormal laboratory parameters and mobility status during the index hospital stay, and level of health care use (ie, ED visits and hospitalizations) in the 6 months preceding the index stay. Figure 1 illustrates the improvement in concordance to the full model when a given group's variables are included. The GBM model had an AUC of 0.81, which represented 12% relative improvement in performance, compared with CCI alone (AUC, 0.72) (Figure 2). For perspective and clinical relevance, we calculated sensitivities (with 95% CIs) for GBM and CCI for false-positive rates of 0.2 and 0.3 (Table 2). These results correspond to GBM predicted risk cutoffs at 0.22 and 0.16 and show 40.9% and 26.7% improvement, respectively, when the GBM model is used as compared to comorbidity at those values.




**Fig. 1.** Comparison of individual concordance (AUC) with additional concordance across covariates. For each group, the data point in red depicts the AUC with consideration of only variables in the group; the data points in blue depict any change in concordance to the full model when a given group's variables are considered. Adv_Dir, advance directive; Braden, score from Braden Scale for Predicting Pressure Sore Risk; ICU, intensive care unit; labs, laboratory testing; LOS, length of stay.




**Fig. 2.** Comparison of model performance between GBM model and CCI.

## Discussion

We validated a robust prediction tool to determine the 6-month mortality risk of patients discharged to SNFs after hospitalization. The tool uses electronically extracted, discrete data widely available at hospital discharge, making this approach generalizable to any health system with an EHR. Advanced age, comorbid burden, health care use in the prior 6 months, and impaired mobility and abnormal laboratory parameters during hospitalization were the strongest predictors of 6-month death in this cohort. Our tool also showed vigorous discriminative performance (AUC, 0.81), on par with other, widely used prognostic indices.[18]

This prognostic instrument offers advantages compared with other tools for predicting death. It is available at admission to the SNF, allowing for proactive care planning, and informs early patient-centered discussions on goals of care. Predictive variables in this model are derived from administrative data, hospital EHR, and flowsheets that do not require manual chart reviews or the input of data or patient interviews. The methodology allows for electronic computation, and its calculation can occur despite missing data, which is a frequently encountered situation in clinical practice.

Use of a machine learning method (gradient-boosted trees) addresses the issue of potential collinearity among variables about overfitting and model interpretation that can occur with classical regression. This method naturally includes regularization, thus directly addressing the potential to overfit. Second, our method of assessing variable importance applies a novel grouping method and does not depend on model parameters that might be sensitive to collinearity. Compared with other predictive instruments in the SNF setting, its calculation is not dependent on SNF data such as the Minimum Data Set, a nursing home document neither available at hospital discharge nor readily usable early during SNF stay.[19–21] This tool therefore can serve as a vital bridge between the initial SNF assessment and care plan development.

**Table 2**
AUC and Sensitivities for Gradient-Boosting Machine and CCI Models

| Model | AUC (95% CI) | Sensitivity, % (95% CI) | |
|---|---|---|---|
| | | At 20% FPR | At 30% FPR |
| Gradient-boosting machine | 0.81 (0.80-0.82) | 0.62 (0.59-0.65) | 0.76 (0.74-0.79) |
| CCI | 0.72 (0.71-0.73) | 0.44 (0.41-0.46) | 0.60 (0.57-0.62) |

FPR, false-positive rate.

The present study fills an important gap in current literature because it focuses on short-term (6-month) mortality risk in the high-risk population of patients discharged to SNF from all medical, surgical, and specialty services of the hospital. Compared with other instruments for prognostication among older adults, neither the Carey score, developed to predict 1- and 3-year mortality rate in community-living frail older persons enrolled in the program for all-inclusive care, nor the Lee score, which used patient surveys to predict 4-year mortality rate among community-dwelling adults, were tested in the post-acute SNF setting.[22,23] Similarly, the CCI, a commonly used instrument with evaluation of comorbid burden and disease severity, was originally designed to predict a longer term, 1-year mortality rate.[24] Other prognostic studies among hospitalized patients have also evaluated the 1-year mortality rate and included selected patients.[9,25,26] It is unclear whether these study results can be generalized to patients with medical circumstances that require post-acute SNF care. They may have limitations for clinicians and caregivers aiming to affect short-term outcomes in this patient population. Specifically, the studies focus on longer-term mortality rates than may be pertinent for just-in-time decision making at SNF admission.

Studies evaluating mortality risk in the nursing home setting also differ on their time to the studied outcome and patient participants.[9] One study that evaluated 1-year mortality risk included patients with short- and long-term SNF stays.[19] Another study that prognosticated 6-month mortality risk of SNF patients selectively included patients with long-term stays.[20] Other researchers have evaluated this risk in selected SNF patients, such as those with dementia.[27] The results of these studies may not be generalizable to shorter-term (6-month) outcomes among patients with post-acute SNF care because, compared with long-term residents, they may have additional acute clinical or psychosocial, or both, complexity and functional dependence necessitating facility rehabilitation, monitoring, and skilled care and may be at greater risk for adverse outcomes. Additionally, many of these studies have used the Minimum Data Set for prognostication, a clinical and administrative data set generated during nursing home stay and hence not available immediately at admission to an SNF.

In the construction of a model to predict 6-month mortality in this highly heterogeneous and medically complex patient population, a wide range of covariates needed to be considered to predict death. Similar to other studies among older adults and as expected, we found that age and baseline comorbid status were important predictors of 6-month mortality rate in this post-acute population.[24,28,29] In addition, we learned that abnormal laboratory parameters and impaired mobility during the preceding hospital stay and increased health care use in the form of hospitalization or ED use in the previous 6 months were also important predictors of 6-month mortality risk. Comparing the GBM model performance with the CCI, we found that our model had a 12.5% improvement (overall AUC, 0.81). At GBM-predicted risk cutoffs of 0.22 and 0.16, this improvement was more remarkable at 40.9% and 26.7%, respectively. These results show the value of adding to the comorbid burden those variables that indicate clinical instability (eg, abnormal laboratory parameters, mobility impairment) and complexity (eg, greater prior health care use), thereby improving the predictive power over that of the CCI, which many other indices have struggled to do.[30]

### *Limitations*

The study has the limitations of a retrospective design and use of administrative data. It analyzed the post-acute practice of a single integrated health care delivery system in the US Midwest with a largely White patient population. Nevertheless, the 10 SNFs differed in ownership, quality ratings, and bed capacity, thereby improving the study's generalizability. We could not capture health care use events that occurred outside our care delivery system. Some outcomes may have been missed if they occurred outside our health system. However, our institution's mortality data have reported high concordance.[31] We did not have data on the socioeconomic status, nutritional status, medications, or preferences for cardiopulmonary resuscitation for included patients.

We selected patients who were directly discharged from the hospital to the SNF and hence were "post-acute." Yet, we cannot confirm whether these patients had short- or long-term SNF admissions. A potential limitation is the use of CCI as a reference tool, which may overweigh for conditions for which there are now better treatments. We did not consider facility quality or care processes, length of stay, or health care use during SNF stay. These characteristics may have important bearing on the outcomes; however, in prioritizing a pragmatic approach, we wished to create an instrument that could predict these outcomes early—at SNF admission—to plan preemptive interventions.

## Conclusions and Implications

We developed and validated a robust prognostic tool that uses clinical and administrative data routinely available at hospital discharge to accurately predict the 6-month mortality rate of patients discharged from the hospital to an SNF. Timely knowledge of this risk may enhance the quality of post-acute care by facilitating timely and individualized care planning, improving symptom management, and guiding informed discussion of patients' preferences for their care. This knowledge also allows health care clinicians and systems to evaluate their outcomes and plan health care delivery and to support risk adjustment when comparing different care processes and performance of health care facilities. These results should be confirmed in other health care systems and different geographic locations.

## References

1. Chandra A, Rahman PA, Sneve A, et al. Risk of 30-Day Hospital Readmission Among Patients Discharged to Skilled Nursing Facilities: Development and Validation of a Risk-Prediction Model. J Am Med Dir Assoc 2019;20:444–450.e442.
2. National Center for Health Statistics (US). Health, United States, 2019. 2021. https://www.ncbi.nlm.nih.gov/books/NBK569306/. Accessed May 17, 2021.
3. Centers for Medicare & Medicaid Services, Department of Health and Human Services. Medicare program; prospective payment system and consolidated billing for skilled nursing facilities (SNFs) for FY 2016, SNF value-based purchasing program, SNF quality reporting program, and staffing data collection. Final rule. Fed Regist 2015;80:46389–46477.
4. Aragon K, Covinsky K, Miao Y, et al. Use of the Medicare posthospitalization skilled nursing benefit in the last 6 months of life. Arch Intern Med 2012;172:1573–1579.
5. Wang SY, Aldridge MD, Gross CP, et al. End-of-life care transition patterns of Medicare beneficiaries. J Am Geriatr Soc 2017;65:1406–1413.
6. Gozalo P, Teno JM, Mitchell SL, et al. End-of-life transitions among nursing home residents with cognitive issues. N Engl J Med 2011;365:1212–1221.
7. Kim LD, Kou L, Hu B, et al. Impact of a connected care model on 30-day readmission rates from skilled nursing facilities. J Hosp Med 2017;12:238–244.
8. Miller SC, Lima JC, Intrator O, et al. Palliative care consultations in nursing homes and reductions in acute care use and potentially burdensome end-of-life transitions. J Am Geriatr Soc 2016;64:2280–2287.
9. Thomas JM, Cooney LM Jr, Fried TR. Systematic review: Health-related characteristics of elderly hospitalized adults and nursing home residents associated with short-term mortality. J Am Geriatr Soc 2013;61:902–911.
10. Collins GS, Reitsma JB, Altman DG, et al. Transparent Reporting of a multivariable prediction model for Individual Prognosis or Diagnosis (TRIPOD): the TRIPOD statement. Ann Intern Med 2015;162:55–63.
11. Singh B, Singh A, Ahmed A, et al. Derivation and validation of automated electronic search strategies to extract Charlson comorbidities from electronic medical records. Mayo Clin Proc 2012;87:817–824.
12. Agency for Healthcare Research and Quality. Prevention quality indicators. https://www.qualityindicators.ahrq.gov/modules/pqi_resources.aspx. Accessed May 17, 2021.
13. Bergstrom N, Braden BJ, Laguzza A, et al. The Braden Scale for Predicting Pressure Sore Risk. Nurs Res 1987;36:205–210.
14. Hendrich A, Nyhuis A, Kippenbrock T, et al. Hospital falls: development of a predictive model for clinical practice. Appl Nurs Res 1995;8:129–139.

15. Inouye SK, van Dyck CH, Alessi CA, et al. Clarifying confusion: the confusion assessment method. A new method for detection of delirium. Ann Intern Med 1990;113:941–948.
16. Storlie CB, Therneau TM, Carter RE, et al. Prediction and inference with missing data in patient alert systems. 2017. https://arxiv.org/abs/1704.07904. Accessed May 17, 2021.
17. Friedman JH. Greedy function approximation: a gradient boosting machine. Ann Stat 2001;29:1189–1232.
18. Yourman LC, Lee SJ, Schonberg MA, et al. Prognostic indices for older adults: a systematic review. JAMA 2012;307:182–192.
19. Flacker JM, Kiely DK. Mortality-related factors and 1-year survival in nursing home residents. J Am Geriatr Soc 2003;51:213–221.
20. Porock D, Oliver DP, Zweig S, et al. Predicting death in the nursing home: development and validation of the 6-month Minimum Data Set mortality risk index. J Gerontol A Biol Sci Med Sci 2005;60:491–498.
21. Burke RE, Hess E, Baron AE, et al. Predicting potential adverse events during a skilled nursing facility stay: a skilled nursing facility prognosis score. J Am Geriatr Soc 2018;66:930–936.
22. Chen LK, Chen YM, Hwang SJ, et al. Effectiveness of community hospital-based post-acute care on functional recovery and 12-month mortality in older patients: a prospective cohort study. Ann Med 2010;42:630–636.
23. Hanson LC, Zimmerman S, Song MK, et al. Effect of the goals of care intervention for advanced dementia: a randomized clinical trial. JAMA Intern Med 2017;177:24–31.
24. Charlson ME, Pompei P, Ales KL, et al. A new method of classifying prognostic comorbidity in longitudinal studies: development and validation. J Chronic Dis 1987;40:373–383.
25. Walter LC, Brand RJ, Counsell SR, et al. Development and validation of a prognostic index for 1-year mortality in older adults after hospitalization. JAMA 2001;285:2987–2994.
26. Drame M, Novella JL, Lang PO, et al. Derivation and validation of a mortality-risk index from a cohort of frail elderly patients hospitalised in medical wards via emergencies: the SAFES study. Eur J Epidemiol 2008;23:783–791.
27. Mitchell SL, Miller SC, Teno JM, et al. The advanced dementia prognostic tool: a risk score to estimate survival in nursing home residents with advanced dementia. J Pain Symptom Manage 2010;40:639–651.
28. Lee SJ, Lindquist K, Segal MR, et al. Development and validation of a prognostic index for 4-year mortality in older adults. JAMA 2006;295:801–808.
29. Carey EC, Covinsky KE, Lui LY, et al. Prediction of mortality in community-living frail elderly people with long-term care needs. J Am Geriatr Soc 2008;56:68–75.
30. Anderson WG, Flint LA, Horton JR, et al. Update in hospital palliative care. J Hosp Med 2013;8:715–720.
31. Takahashi PY, Haas LR, Quigg SM, et al. 30-day hospital readmission of older adults using care transitions after hospitalization: a pilot prospective cohort study. Clin Interv Aging 2013;8:729–736.

# Exhibit 147

PLOS ONE

RESEARCH ARTICLE

# Mortality in nursing home residents: A longitudinal study over three years

**Corinna Vossius**[1,2☯*], **Geir Selbñk**[2,3,4☯], **Jurate Šaltytė Benth**[2,5,6☯], **Sverre Bergh**[2,3☯]

**1** Centre for Age-related Medicine, Stavanger University Hospital, Stavanger, Norway, **2** Centre for Old Age Psychiatry Research, Innlandet Hospital Trust, Brumunddal, Norway, **3** Norwegian National Advisory Unit on Ageing and Health, Vestfold Hospital Trust, Tønsberg, Norway, **4** Institute of Health and Society, University of Oslo, Oslo, Norway, **5** Institute of Clinical Medicine, University of Oslo, Oslo, Norway, **6** Health Services Research Unit, Akershus University Hospital, Lørenskog, Norway

☯ These authors contributed equally to this work.
* c.vossius@hotmail.com

Check for updates

## Abstract

### Objective

Nursing home (NH) stay is the highest level of formal care. With the expected demographic changes ahead, the need for NH placement will put an increasing socioeconomic strain on the society. Survival in NHs and factors predicting survival are important knowledge in order to evaluate NH admission policies and plan future NH capacity.

### Methods

We followed 690 NH residents included at admission to NH over a period of three years. Participants were examined at baseline (BL) and every six months. Demographic and clinical data were collected, including comorbidity, severity of cognitive impairment, dependency in activities of daily living (ADL) and neuropsychiatric symptoms. Median survival was calculated by the Kaplan-Meier analysis, and factors associated with mortality were identified by Cox models with baseline and time-dependent covariates.

### Results

Median survival in NH was 2.2 years (95% confidence interval [CI]: 1.9±2.4). Yearly mortality rate throughout the three-year observation period was 31.8%. Mortality was associated with higher age and comorbidity at BL, and more severe dementia, higher ADL-dependency, less severe psychotic symptoms, and a lower BMI throughout the study period. Of the organizational variables, living on a ward with more residents resulted in a higher risk of mortality.

### Conclusion

In conclusion, the NH mortality rate remained stable throughout the three-year study period with about one third of the residents deceasing each year. Individual resident characteristics appeared to be more important than organizational variables for predicting mortality risk.

OPEN ACCESS

**Citation:** Vossius C, Selbæk G, Šaltytė Benth J, Bergh S (2018) Mortality in nursing home residents: A longitudinal study over three years. PLoS ONE 13(9): e0203480. https://doi.org/10.1371/journal.pone.0203480

**Editor:** Antony Bayer, Cardiff University, UNITED KINGDOM

**Received:** April 24, 2018

**Accepted:** August 21, 2018

**Published:** September 18, 2018

**Copyright:** © 2018 Vossius et al. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Data Availability Statement:** Due to restrictions by The Regional Committee for Medical Research Ethics – South East Norway, the data will be available from the Recearch centre for age-related functional decline and diseases (https://sykehuset-innlandet.no/avdelinger/alderspsykiatrisk-forskningssenter) for researchers who meet the criteria for access to confidential data. The authors did not have special privileges for data access.

**Funding:** The project Resource Use and Disease Course in Dementia - Nursing Home (REDIC-NH) was performed according to a request from and

with funding by the Norwegian Directorate of Health. The Directorate of Health played no role in the design, execution, analysis and interpretation of data, or the writing of the study.

**Competing interests:** The authors have declared that no competing interests exist.

The finding of an association between ward size and mortality risk deserves further investigation in future studies.

## Introduction

Population projections predict an increase in the share of elderly in developed countries, and thereby an increase in the number of frail persons in need of informal and formal care. In Norway, the highest level of formal care is nursing home (NH) stay, where care and supervision are provided on a 24/7 basis. Projections estimate that due to demographic trends the number of nursing home beds will have to be increased by 50% by 2030 if the criteria for NH admission and the levels of home care remain unchanged [1].

Mortality in NH residents and the patient characteristics or environmental factors at the NHs associated to mortality are important figures for health authorities and decision makers in order to estimate future need for NH capacity and survey the effect of NH admission policies over time. A previous Norwegian study found a median survival time of 2.1 years, while in other studies median survival was 2.3 years in an Irish cohort and a US cohort, and 2.6 years in an Icelandic cohort [2±5]. Studies with shorter follow-up have reported one-year mortality rates between 17.4% and 35.0% [6±8]. Higher age, male gender, low functioning in activities of daily living (ADL), poorer physical health, and low nutrition status are patient characteristics associated with mortality [3, 5, 6, 9,10].

The project Resource Use and Disease Course in DementiaÐNurs ing Home (REDIC-NH) included 696 persons at admission to NH. They were followed over a period of 36 months or until death, with clinical examinations at baseline (BL) and every six months thereafter. The aim of this study was to evaluate mortality rates in Norwegian NH residents over time and to identify the demographic, clinical and organizational factors associated with mortality.

## Material and methods

The REDIC-NH study is an observational longitudinal study including patients from a convenience sample of 47 NHs in four Norwegian counties, representing small and large NHs located in urban and rural areas [11]. Inclusion was at admission to the NH, with residents followed over an observation period of 36 months or until death. Inclusion took place between January 2012 and August 2014. Four NHs withdrew from the study during the observation period.

Inclusion criteria were: the participant should be 65 years of age or older or have dementia irrespective of age. In addition, expected survival should be six weeks or more. Only residents that completed the baseline (BL) assessment were included in the study. BL assessment was aimed to be completed within four weeks after inclusion, but the mean interval between admission and the completed BL assessment was 10.5 weeks (SD10.6). The participants were monitored with a clinical follow-up (FU) every six months, at FU6, FU12, FU18, FU24, FU30 and FU36.

Data collection was performed by trained healthcare workers at the NH, mainly registered nurses (74%) under supervision of 10 research nurses. The research nurses completed a five-day training prior to study start, while the data collectors completed a two-day training. Data were collected through structured interviews with the patient and a caregiver.

Organizational data about the NHs were collected at the beginning of the study period. As about 26% of the residents moved to a new ward at least once during the NH stay, we chose to

analyse the impact of organizational variables on mortality with data from the ward where the patients stayed at the last FU examination before study end or death.

All rating scales and inventories were applied in established Norwegian versions applied in a number of previous studies [12±19]. The following demographic and clinical data were collected:

Demographic data, including gender, age, and living status before admission to NH, were collected by reviewing the patient's journal.

Diagnosis of dementia at BL was set according to the criteria of ICD-10 [20]. The diagnosis of dementia was set independently by two of the authors (SB and GS), both specialists in psychiatry and experienced in old age psychiatry and research, based on all available information about the participants. When no consensus was reached, a third psychiatrist was consulted.

Clinical Dementia Rating Scale (CDR) was applied to assess the severity of dementia. The rating scale comprises six items [12,13,14]. For statistical purposes we calculated the CDR-sum of boxes (CDR-SOB) that offers an extended range of values and is calculated by adding the item scores (range 0±18), where higher scores indicate more severe dementia [21].

Neuropsychiatric Inventory nursing home version (NPI-NH) assesses neuropsychiatric symptoms. The instrument contains 12 items and is conducted as an interview with a caregiver. Severity (scored 0±3) was multiplied by frequency (scored 0±4), giving an item score from 0±12, where higher scores indicate more severe symptoms [15, 16]. Based on a previous principal component analysis, we created the following sub-syndromes: NPI-Agitation (agitation/aggression, disinhibition and irritability), NPI-Psychosis (delusions and hallucinations) and NPI-Affective (depression and anxiety) [11].

Physical Self-Maintenance Scale (PSMS) consists of six items (scored 1±5) and assesses personal activities of daily living (PADL) function. The overall score ranges from 6 to 30, where higher scores indicate higher PADL dependency [17].

General Medical Health Rating (GMHR) rates physical health. It consists of one item, with the four categories excellent, good, fair or poor [18].

Charlson's comorbidity index was applied to establish comorbidity at BL [19].

Body mass index (BMI) relates a person's weight to her height.

The following organizational data were collected at the last FU examination before study end or death: number of inhabitants in the municipality, number of beds in the nursing home, type of ward (general ward, special care unit [SCU]), short-time stay, other), number of residents at the ward, staff/resident ratio at the ward during daytime and evening shift, physician time (expressed as minutes per patient and week) and number of times a resident moved from one ward to another related to the time of observation.

The staff/resident ratio was calculated by applying the following formula:

$$\frac{5 * (number\ of\ staff\ daytime + evening\ weekdays) + 2 * (number\ of\ staff\ daytime + evening\ weekend)}{Number\ of\ residents\ on\ the\ ward}$$

## Statistics

Demographic factors and clinical symptoms were described by means and standard deviations (SD) or frequencies and percentages. The group differences were analysed by Student's t-test for continuous variables and by $\chi^2$-test for categorical variables. Missing values for PSMS items were imputed for cases with fewer than 50% missing among all items by generating an empirical distribution based on non-missing cases for each item and drawing a random number from it. Kaplan-Meier analysis was performed to estimate median survival time. Mortality rates were calculated by dividing the number of participants dying by the number of person-years in 6-month and 1-year periods. A Cox regression model was estimated to assess the

impact of demographic variables (measured at baseline), and clinical and organizational variables (time-dependent and measured at baseline only) on mortality. Ward level was entered into the model as random effect to control for possible intra-ward correlations. Bivariate and multiple models were estimated. The multiple model was further reduced by applying Akaike's Information Criteria (AIC), where the smaller value means a better model.

Results with p-values below 0.05 were considered statistically significant. The analyses were performed in SPSS v25 and SAS v9.4.

### Ethics

The resident's capacity to consent in the study was considered by the NH staff, including the physician. Written informed consent was obtained from those participants with full capacity to consent or from the next-of-kin on behalf of the participant in case of reduced capacity to consent. The Regional Committee for Medical Research Ethics±South East Norway approved the study (2011/1378a).

## Results

### Study sample

A total of 696 participants were included in the REDIC-NH study. We included 690 participants where the date of admission to NH could be established. Mean age of the participants was 84.4 years (range 49 to 105, SD = 7.5), 63.9% were female, and 83.9% had dementia at BL. Table 1 shows demographic and clinical characteristics at BL and organizational characteristics at the last FU carried out for the whole study sample and according to whether or not the participant died during the observation period. At FU36, 188 participants (27.2%) were still in the study, while 410 participants (59.4%) had died and 92 participants (13.3%) had dropped out for various reasons. Fig 1 presents a flow chart describing attrition from BL to FU36. In addition, the number of participants failing to complete an FU assessment is indicated as ªNot analysed due to protocol violationº.

### Mortality rates and mean survival

Mortality rates between the 6-month FU examinations shown in Table 2, varied between 14.4% (FU6 to FU12) and 18.4% (FU30 to FU36). The mortality rate throughout the observation period is also illustrated in the Kaplan-Meier analysis as shown in Fig 2.

The yearly mortality rate throughout the observation period was 31.8., while the median survival was 2.2 years (95% confidence interval (CI) 1.9±2.4 years).

### Demographic, clinical and organizational variables related to mortality

Table 3 shows the results of the bivariate Cox regression models, the multiple model with all covariates included, and the AIC-reduced multiple model. Higher age, higher comorbidity, more severe dementia, higher PADL-dependency, less severe psychotic symptoms, and a lower BMI were associated with higher mortality. Of the organizational variables, living on a ward with a more residents resulted in a higher risk of mortality.

## Discussion

The REDIC-NH study comprises 696 participants, of which 690 were included in this longitudinal study that assessed mortality rates and factors associated with mortality. We found that median survival was 2.2 years, while the yearly mortality rate was 31.8%. Factors associated with mortality were higher age, higher comorbidity, more severe dementia, higher PADL-

**Table 1. Demographic and clinical characteristics at BL and organizational characteristics at the last FU carried out for the whole study population and according to whether the participant survived until the end of the study or dropped out, or died during the observation period.**

| | All participants (n = 690) | Alive at FU36 or dropped out during observation period (n = 280) | Deceased during observation period (n = 410) | *p*-value |
|---|---|---|---|---|
| Observation period in years, median (min/max) | 1.9 (0.1/3.9) | 3.0 (0.1/3.9) | 1.1 (0.7/3.8) | <0.001 |
| **Demographic and clinical variables at BL** | | | | |
| Age, mean (SD) | 84.4 (7.5) | 82.5 (8.0) | 85.7 (6.8) | <0.001 |
| Gender, female (%) | 441 (64) | 191 (68) | 250 (61) | 0.052 |
| Living with partner before admission (%) | 207 (30) | 80 (29) | 127 (31) | 0.522 |
| Dementia (%) | 574 (84) | 234 (85) | 340 (84) | 0.797 |
| CDR-SOB, mean (SD) | 10.3 (4.3) | 9.9 (4.2) | 10.5 (4.4) | 0.078 |
| PSMS, mean (SD) | 15.3 (4.5) | 14.3 (4.4) | 16.0 (4.5) | <0.001 |
| NPI-sum, mean (SD) | 13.7 (16.5) | 13.1 (16.3) | 14.1 (16.6) | 0.446 |
| NPI-sub-syndromes, mean (SD): | | | | |
| Agitation | 4.1 (7.0) | 4.1 (7.3) | 4.0 (6.8) | 0.927 |
| Psychosis | 1.7 (3.9) | 1.5 (3.7) | 1.8 (4.0) | 0.458 |
| Affective | 3.7 (6.0) | 3.5 (5.4) | 3.8 (5.9) | 0.441 |
| GMHR (%) | | | | |
| Poor or fair | 345 (52) | 117 (43) | 228 (58) | <0.001 |
| Charlson's comorbidity index, mean (SD) | 3.0 (2.4) | 2.4 (1.8) | 3.3 (2.7) | <0.001 |
| BMI, mean (SD) | 23.9 (4.5) | 24.4 (4.4) | 23.6 (4.5) | 0.041 |
| **Organizational variables at last FU carried out** | | | | |
| Inhabitants of municipality, mean (SD) | 49 484 (91 556) | 55 448 (98 168) | 45 440 (86 593) | 0.166 |
| Number of beds in NH, mean (SD) | 75.8 (43.4) | 74.5 (41.8) | 76.7 (44.4) | 0.516 |
| Type of ward (%) | | | | 0.383 |
| Short-time stay | 72 (10) | 33 (12) | 39 (10) | |
| General | 393 (57) | 151 (54) | 245 (60) | |
| SCU | 217 (31) | 93 (33) | 124 (30) | |
| Other | 5 (1) | 3 (1) | 2 (1) | |
| Number of residents on ward, mean (SD) | 12.3 (7.0) | 11.8 (7.4) | 12.6 (6.7) | 0.156 |
| Staff/resident ratio, mean (SD) | 3.7 (1.1) | 3.7 (1.1) | 3.6 (1.0) | 0.267 |
| Times moved per observation time, mean (SD) | 0.19 (0.52) | 0.21 (0.61) | 0.17 (0.45) | 0.256 |

BL = baseline; FU = follow-up; SD = standard deviation; CDR-SOB = Clinical dementia rating scale±sum of boxes; PSMS = Physical self-maintenance scale; NPI = Neuropsychiatric inventory; NPI-Agitation = NPI sub-syndromes agitation/aggression, disinhibition and irritability, NPI-Psychosis = NPI sub-syndromes delusions and hallucinations; NPI-Affective = NPI sub-syndromes depression and anxiety; GMHR = General medical health rating; BMI = Body mass index; NH = nursing home; SCU = special care unit.

https://doi.org/10.1371/journal.pone.0203480.t001

dependency, less severe psychotic symptoms, and a lower BMI. Of the organizational variables, living on a ward with more residents resulted in a higher risk of mortality.

Mortality was predicted by reduced overall health as indicated by more severe dementia and higher comorbidity, and a higher PADL-dependency. As in previous studies, we found that higher age was associated with higher mortality. However, contrary to previous studies, we found no gender differences [5, 8, 22]. Likewise, our finding that more severe psychosis was associated with a lower mortality risk is in contradiction to previous findings [23]. As psychosis was a predictor for NH admission in a Norwegian study [24], these residents might be younger and have better somatic health as confounding factors regarding mortality. Lower




* Indicating number of participants failing to complete a FU assessment

**Fig 1. Flow chart.** Flow chart describing attrition from baseline (BL) to 36 months follow-up (FU36).

https://doi.org/10.1371/journal.pone.0203480.g001

**Table 2. Number of participants and number of deceased persons during the study period.**

| | BL | FU6 | FU12 | FU18 | FU24 | FU30 | FU36 |
|---|---|---|---|---|---|---|---|
| Participants | 690 | 537 | 440 | 365 | 301 | 247 | 188 |
| Deceased (%) | | 114 (17.0) | 76 (14.4) | 71 (16.2) | 60 (16.5) | 45 (15.2) | 44 (18.4) |

BL = baseline; FU = follow-up.

https://doi.org/10.1371/journal.pone.0203480.t002

BMI was related to higher mortality, indicating that weight loss may be part of the pre-terminal stage in a person's life [9, 10]. We also found that wards with more residents had higher mortality rates. This is probably due to the fact that small wards are often SCUs, with a special focus on persons with dementia and neuropsychiatric symptoms, while residents where physical diseases and ADL-dependency are the main reasons for admission, live in larger general wards [1]. Worse somatic health and higher ADL-dependency may again explain our finding of higher mortality on these wards.

There are few studies evaluating mortality in NH residents, and results from different health systems might be difficult to compare to each other due to varying criteria for admission to an NH. However, studies from the US, Ireland and Iceland report median survival times between 2.3 and 2.8 years, which are higher but still in the same range as our finding of 2.2 years. [3±5; 8; ]. The reported annual mortality rates in two US studies match our finding of 31.8%, with 25.6% and 35.0%, respectively [7, 8]. However, a French study reports a significantly lower mortality rate of 17.4% [6]. Median survival time is a marker for changes in admission policies over time, reflecting the severity of the patients' overall frailty. A register-based Norwegian study conducted between 1994 and 2004 found a median survival of 2.1 years, as compared to 2.2 years in the present study, indicating similar NH admission criteria despite an important health care reform in 2012 that is said to result in NH residents with a higher morbidity than before [2].




**Fig 2. Kaplan-Meier analysis of survival for the whole study population.**

https://doi.org/10.1371/journal.pone.0203480.g002

**Table 3. Results of the Cox model.**

| Variable | Unadjusted model | | Adjusted model | | Adjusted model, AIC-reduced | |
|---|---|---|---|---|---|---|
| | HR (95% CI) | p-value | HR (95% CI) | p-value | HR (95% CI) | p-value |
| ***Patient characteristics*** | | | | | | |
| Age | 1.03 (1.01; 1.05) | **0.004** | 1.04 (1.01; 1.06) | **0.003** | 1.04 (1.01; 1.06) | **0.002** |
| Gender | | | | | | |
| - Female | 1 | | 1 | | | |
| - Male | 1.10 (0.81; 1.49) | 0.563 | 1.16 (0.82; 1.64) | 0.399 | | |
| Living alone | | | | | | |
| - No | 1 | | 1 | | | |
| - Yes | 0.91 (0.66; 1.25) | 0.545 | 0.83 (0.58; 1.19) | 0.315 | | |
| Dementia at BL | | | | | | |
| - No | 1 | | 1 | 0.915 | | |
| - Yes | 1.22 (0.75; 1.97) | 0.425 | 0.97 (0.55; 1.72) | | | |
| Charlson's comorbidity index at BL | 1.11 (1.04; 1.18) | **0.001** | 1.13 (1.06; 1.21) | **<0.001** | 1.13 (1.06; 1.21) | **<0.001** |
| *Time-dependent* | | | | | | |
| CDR-SOB | 1.08 (1.03; 1.12) | **<0.001** | 1.07 (1.01; 1.14) | **0.022** | 1.05 (1.00; 1.11) | **0.040** |
| PSMS | 1.09 (1.06; 1.13) | **<0.001** | 1.08 (1.03; 1.13) | **0.001** | 1.07 (1.03; 1.12) | **0.001** |
| NPI-Affective | 1.02 (0.99; 1.04) | 0.172 | 1.04 (1.01; 1.07) | **0.014** | 1.03 (1.00; 1.05) | 0.051 |
| NPI-Psychosis | 0.97 (0.93; 1.01) | 0.102 | 0.95 (0.90; 0.99) | **0.040** | 0.94 (0.89; 0.98) | **0.005** |
| NPI-Agitation | 0.98 (0.96; 1.01) | 0.173 | 0.99 (0.96; 1.02) | 0.544 | | |
| GMHR | | | | | | |
| - Poor/fair | 1.21 (0.88; 1.67) | 0.244 | 0.79 (0.56; 1.12) | | | |
| - Good/excellent | 1 | | 1 | 0.192 | | |
| BMI | 0.94 (0.91; 0.98) | **0.001** | 0.96 (0.93; 0.99) | **0.032** | 0.96 (0.93; 0.99) | **0.030** |
| ***Organizational variables*** | | | | | | |
| Inhabitants in municipality | 1.00 (1.00; 1.00) | 0.256 | 1.00 (1.00; 1.00) | 0.115 | | |
| Beds in NH | 1.00 (0.99; 1.01) | 0.170 | 1.00 (0.99; 1.01) | 0.498 | | |
| Times moved | 1.11 (0.80; 1.55) | 0.538 | 0.91 (0.63; 1.33) | 0.635 | | |
| Type of ward | | | | | | |
| - General | 1 | | 1 | | | |
| - SCU | 0.81 (0.58; 1.13) | 0.217 | 0.89 (0.61; 1.31) | 0.570 | | |
| - Short-time | 0.81 (0.44; 1.48) | 0.488 | 0.82 (0.44; 1.53) | 0.530 | | |
| - Other | 0.66 (0.16; 2.68) | 0.559 | 0.67 (0.16; 2.74) | 0.572 | | |
| Patients on ward | 1.04 (1.01; 1.06) | **0.002** | 1.03 (1.00; 1.06) | **0.031** | 1.03 (1.01; 1.05) | **0.016** |
| Staff/ resident ratio | 0.96 (0.83; 1.11) | 0.586 | 0.99 (0.86; 1.16) | 0.992 | | |

AIC = Akaike's Information Criteria; HR = Hazard ratio; CI = Confidence interval; BL = baseline; CDR-SOB = Clinical dementia rating scale±sum of boxes; PSMS = Physical self-maintenance scale; NPI = Neuropsychiatric inventory; NPI-Agitation = NPI sub-syndromes agitation/aggression, disinhibition and irritability, NPI-Psychosis = NPI sub-syndromes delusions and hallucinations; NPI-Affective = NPI sub-syndromes depression and anxiety; GMHR = General medical health rating; BMI = Body mass index; NH = nursing home, SCU = special care unit.

https://doi.org/10.1371/journal.pone.0203480.t003

## Strengths and limitations of the study

We followed a large cohort of 690 participants from 47 NHs in a longitudinal design over three years, with clinical examinations twice a year. High quality of the data collection was secured by a standardized interview carried out by healthcare workers with adequate training under the supervision of research nurses. Furthermore, the Norwegian health and social system provides a rather homogenous environment for health service research as there are hardly any private actors on the market. Almost all care services are rendered by the municipalities

with comparable criteria for admission of residents, staff/resident ratios, medical services and refund systems.

The main weakness of the study is that our sample might not be representative of the general NH population in Norway. Only participants that completed the BL examination were included, and mean time from admission to BL was 10.5 weeks. We thus excluded some participants who were eligible for the study but who died shortly after admission to NH. In a former register-based study, we found that 7% of NH residents died within the first three months of their NH stay [1]. Thus, the mortality rate for the first year and hence the overall mortality rate will be underestimated, and a median survival at NH with 2.2 years is consequently slightly overestimated. In addition, many of the NHs eligible for this study did not choose to participate, and not all patients eligible were included in the study. There might be a bias between residents willing to participate in the study and those who declined. As shown in a previous study only 38 of the 47 participating NHs collected data about age and gender of the residents eligible for inclusion but not consenting to participate. Of 1331 eligible residents in these 38 NHs, 607 were included and 724 excluded (205 declined inclusion, 191 died before inclusion took place, and 328 for reasons unknown). Residents included were slightly older (84.5 versus 83.6 years, $p = 0.048$), and there were also more women in the included sample compared to the group who did not participate (64.4% versus 56.6%, $p = 0.004$) [11]. Inter-rater reliability was not established and may thus have led to reduced data quality. However, the data collectors were under supervision of research nurses throughout the whole study period to diminish this effect. Moreover, the study sample included participants admitted to short-term as well as long-term wards, and this inclusion protocol may have resulted in a more heterogeneous study sample and a higher number of dropouts due to residents moving home again.

## Conclusion

In conclusion, the NH mortality rate remained stable throughout the three-year study period with about one third of the residents deceasing each year. Individual resident characteristics appeared to be more important than organizational variables for predicting mortality risk. The finding of an association between ward size and mortality risk deserves further investigation in future studies.

## Author Contributions

**Conceptualization:** Corinna Vossius, Geir Selbñk, Jurate S̆altytė Benth, Sverre Bergh.

**Data curation:** Corinna Vossius, Sverre Bergh.

**Formal analysis:** Corinna Vossius, Geir Selbñk, Jurate S̆altytė Benth.

**Funding acquisition:** Sverre Bergh.

**Investigation:** Sverre Bergh.

**Methodology:** Corinna Vossius, Geir Selbñk, Jurate S̆altytė Benth, Sverre Bergh.

**Project administration:** Sverre Bergh.

**Resources:** Geir Selbñk.

**Software:** Jurate S̆altytė Benth.

**Writing ± original draft:** Corinna Vossius, Jurate S̆altytė Benth, Sverre Bergh.

**Writing ± review & editing:** Corinna Vossius, Geir Selbñk, Jurate S̆altytė Benth, Sverre Bergh.

## References


1. Vossius C, Selbñk G, Ydstebo A, Benth JS, Godager G, Luraas H. Ressursbruk og sykdomsforløp ved demens (REDIC). Sykehuset Innlandet, Report. 2015:1±155.
2. Vossius C, Nilsen O, Larsen J. Parkinson's disease and nursing home placement: the economic impact of the need for care. European journal of neurology. 2009; 16(2):194±200. https://doi.org/10.1111/j.1468-1331.2008.02380.x PMID: 19146640
3. McCann M, O'Reilly D, Cardwell C. A census-based longitudinal study of variations in survival amongst residents of nursing and residential homes in Northern Ireland. Age and ageing. 2009; 38(6):711±7. Epub 2009/09/16. https://doi.org/10.1093/ageing/afp173 PMID: 19752201
4. Wieland D, Boland R, Baskins J, Kinosian B. Five-year survival in a program of all-inclusive care for elderly compared with alternative institutional and home- and community-based care. The journals of gerontology Series A, Biological sciences and medical sciences. 2010; 65(7):721±6. Epub 2010/04/01. https://doi.org/10.1093/gerona/glq040 PMID: 20354065
5. Hjaltadottir I, Hallberg IR, Ekwall AK, Nyberg P. Predicting mortality of residents at admission to nursing home: a longitudinal cohort study. BMC Health Serv Res. 2011; 11:86. Epub 2011/04/22. https://doi.org/10.1186/1472-6963-11-86 PMID: 21507213
6. Tabue-Teguo M, Kelaiditi E, Demougeot L, Dartigues JF, Vellas B, Cesari M. Frailty index and mortality in nursing home residents in France: Results from the INCUR Study. J Am Med Dir Assoc. 2015; 16 (7):603±6. Epub 2015/03/15. https://doi.org/10.1016/j.jamda.2015.02.002 PMID: 25769962
7. Li S, Middleton A, Ottenbacher KJ, Goodwin JS. Trajectories over the first year of long-term care nursing home residence. J Am Med Dir Assoc. 2018; 19(4):333±41. Epub 2017/11/08. https://doi.org/10.1016/j.jamda.2017.09.021 PMID: 29108886
8. Gambassi G, Landi F, Lapane KL, Sgadari A, Mor V, Bernabei R. Predictors of mortality in patients with Alzheimer's disease living in nursing homes. Journal of Neurology, Neurosurgery & Psychiatry. 1999; 67(1):59±65.
9. Cereda E, Pedrolli C, Zagami A, Vanotti A, Piffer S, Opizzi A, et al. Body mass index and mortality in institutionalized elderly. J Am Med Dir Assoc. 2011; 12(3):174±8. Epub 2011/02/22. https://doi.org/10.1016/j.jamda.2010.11.013 PMID: 21333917
10. Veronese N, De Rui M, Toffanello ED, De Ronch I, Perissinotto E, Bolzetta F, et al. Body mass index as a predictor of all-cause mortality in nursing home residents during a 5-year follow-up. J Am Med Dir Assoc. 2013; 14(1):53±7. Epub 2012/11/13. https://doi.org/10.1016/j.jamda.2012.09.014 PMID: 23141123
11. Røen I, Selbñk G, Kirkevold Ø, Engedal K, Testad I, Bergh S. Resource use and disease course in dementia-nursing home (REDIC-NH): a longitudinal cohort study; design and patient characteristics at admission to Norwegian nursing homes. BMC health services research. 2017; 17(1):365. https://doi.org/10.1186/s12913-017-2289-x PMID: 28532443
12. Hughes CP, Berg L, Danziger WL, Coben LA, Martin R. A new clinical scale for the staging of dementia. British journal of psychiatry. 1982; 140(6):566±72.
13. [cited 24.7.2018] Washington University in St Loius. Clinical Dementia Rating Assessment Protocol, Norwegian version. https://knightadrc.wustl.edu/cdr/PDFs/Translations/Norwegian%20Norway.pdf
14. Selbaek G, Kirgevold Ø, Engedal K. The orevalence of psychiatric symptoms and behavioural disturbances and the use of psychotropic drugs in Norwegian Nursing Homes. International Jornal of Geriatric Psychiatry. 2007. 22 (9): 843±9
15. Cummings JL, Mega M, Gray K, Rosenberg-Thompson S, Carusi DA, Gornbein J. The Neuropsychiatric Inventory comprehensive assessment of psychopathology in dementia. Neurology. 1994; 44 (12):2308±. PMID: 7991117
16. Selbaek G, Kirkevold O, Sommer OH, Engedal K. The reliability and validity of the Norwegian version of the Neuropsychiatric Inventory, nursing home version (NPI-NH). Int Psychogeriatr. 2008; 20(2):375±82 https://doi.org/10.1017/S1041610207005601 PMID: 17559707
17. Lawton MP, Brody EM. Assessment of older people: self-maintaining and instrumental activities of daily living. Nursing Research. 1970; 19(3):278.
18. Lyketsos CG, Galik E, Steele C, Steinberg M, Rosenblatt A, Warren A, et al. The General Medical Health Rating: a bedside global rating of medical comorbidity in patients with dementia. Journal of the American Geriatrics Society. 1999; 47(4):487±91. PMID: 10203127
19. Charlson ME, Pompei P, Ales KL, MacKenzie CR. A new method of classifying prognostic comorbidity in longitudinal studies: development and validation. Journal of chronic diseases. 1987; 40(5):373±83. PMID: 3558716
20. Organization WHO. The ICD-10 classification of mental and behavioural disorders: clinical descriptions and diagnostic guidelines. World Health Organization; 1992.

21. O'Bryant SE, Waring SC, Cullum CM, Hall J, Lacritz L, Massman PJ, et al. Staging dementia using Clinical Dementia Rating Scale Sum of Boxes scores: a Texas Alzheimer's research consortium study. Archives of neurology. 2008; 65(8):1091±5. https://doi.org/10.1001/archneur.65.8.1091 PMID: 18695059

22. Dale MC, Burns A, Panter L, Morris J. Factors affecting survival of elderly nursing home residents. International journal of geriatric psychiatry. 2001; 16(1):70±6. Epub 2001/02/17. PMID: 11180488

23. Cohen-Mansfield J, Marx MS, Lipson S, Werner P. Predictors of mortality in nursing home residents. Journal of clinical epidemiology. 1999; 52(4):273±80. PMID: 10235167

24. Wergeland JN, Selbñ k G, Bergh S, Soederhamn U, Kirkevold Ø. Predictors of nursing home admission and death among community-dwelling people 70 years and older who receive domilicary care. Dement Geriatr Cogn Dis Extra. 2015 Sep 4; 5(3):320±9. https://doi.org/10.1159/000437382 eCollection 2015 Sep-Dec. PMID: 26483831

# Exhibit 148

**From:** Laib Greenspoon[/O=SHADIK TECHNOLOGIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LAIBG_LSPOON.COM]
**Sent:** Mon 8/21/2023 9:52:18 PM (UTC)
**To:** Ari Baer[ari@shomerinsurance.com]
**Subject:** FW: Donnell - Default Judgment Against Lighthouse
**Attachment:** Donnell Judgment.pdf

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Mark A. Johnson" <mjohnson@hooperlundy.com>
Date: 8/21/23 2:37 PM (GMT-08:00)
To: Laib Greenspoon <laibg@lspoon.com>
Subject: Fwd: Donnell - Default Judgment Against Lighthouse

See below.

**Mark**

he/him/his

**HOOPER,**

DIRECT:619.744.7301 MAIN:619.744.7300 MOBILE:858.699.5843

mjohnson@hooperlundy.comwww.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

Begin forwarded message:

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Date:** August 17, 2023 at 11:24:30 AM PDT
**To:** "Mark A. Johnson" <mjohnson@hooperlundy.com>, davidzweldler <davidzweldler@gmail.com>
**Subject: Fwd: Donnell - Default Judgment Against Lighthouse**

**EXTERNAL EMAIL MESSAGE**

Here is the default judgment.

---------- Forwarded message ---------
From: **Gemma Bateman** <GBateman@rockporthc.com>
Date: Thu, Aug 17, 2023 at 11:21 AM
Subject: Re: Donnell - Default Judgment Against Lighthouse
To: Lee, Jonathan <Jonathan.Lee2@chubb.com>, avi@thewagnerfirm.com <avi@thewagnerfirm.com>

Thanks, Jonathan. I'm looping in Avi here as we discussed. Avi - please see the Lighthouse judgment attached.

---

**From:** Lee, Jonathan <Jonathan.Lee2@Chubb.com>
**Sent:** Thursday, August 17, 2023 11:19 AM
**To:** Gemma Bateman <GBateman@rockporthc.com>
**Subject:** Donnell - Default Judgment Against Lighthouse

CAUTION: This email originated from outside of the organization. DO NOT click links or open attachments unless you recognize the sender and know the content is safe. If you are unsure about an attachment or have questions, please contact IT Support.

**Jonathan C. Lee, Esq.**
Senior Claims Specialist, Medical Risk

10 Exchange Place, Jersey City, NJ 07302, United States
O (201) 356-5189
E jonathan.lee2@chubb.com

---

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or

other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

---

The materials in this message are private and may contain information that is privileged and confidential, Protected Health Information within the meaning of the Health Insurance Portability and Accountability Act (HIPAA) and/or Medical Information within the meaning of the Confidentiality of Medical Information Act (CMIA). If you are not the intended recipient, be advised that any unauthorized review, use, disclosure, copying, forwarding, printing, distribution or the taking of any action in reliance on the contents of this information is STRICTLY PROHIBITED and may be unlawful. If you have received this message by error, or have reason to believe that you are not authorized to receive it, please notify the sender immediately to arrange for return or destruction of these documents and delete this message.

---

The materials in this message are private and may contain information that is privileged and confidential, Protected Health Information within the meaning of the Health Insurance Portability and Accountability Act (HIPAA) and/or Medical Information within the meaning of the Confidentiality of Medical Information Act (CMIA). If you are not the intended recipient, be advised that any unauthorized review, use, disclosure, copying, forwarding, printing, distribution or the taking of any action in reliance on the contents of this information is STRICTLY PROHIBITED and may be unlawful. If you have received this message by error, or have reason to believe that you are not authorized to receive it, please notify the sender immediately to arrange for return or destruction of these documents and delete this message.

# Exhibit 149

**From:** Avi Wagner[avi@thewagnerfirm.com]
**Sent:** Tue 1/30/2024 11:02:39 PM (UTC)
**To:** Laib Greenspoon[laibg@lspoon.com]
**Cc:** Marijana Q. Kral[mkral@fwcllp.com]; Eva Moreno[emoreno@fwcllp.com]; Kristen J. Heim[kheim@fwcllp.com]; Stephen C. Fraser[sfraser@fwcllp.com]
**Subject:** Re: Donnell
**Attachment:** 3699 Wilshire #1000_Rockport_Temporary Space Agreement.pdf

All,
I am still trying to pinpoint the exact date that Rockport left 5900 Wilshire. This is the lease on the premises they were in when they left; working to get the exact

Best,

Avi

On Wed, Jan 24, 2024 at 9:16 AM Laib Greenspoon <laibg@lspoon.com> wrote:

Today and tomorrow will not work for me.I can do Friday morning or early afternoon.

On Jan 24, 2024, at 8:31 AM, Marijana Q. Kral <mkral@fwcllp.com> wrote:

Laib and Avi:
Let's aim for 5p. My direct dial is 714-502-3312.Talk with you then.
Be well,
Marijana.

Sent from my iPhone

On Jan 24, 2024, at 8:22 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do after 4:45.

On Wed, Jan 24, 2024 at 7:46 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

This afternoon, I am open 1:15 to 2:15 or after 4:45. Please let me know what works for you.Thank you!

Sent from my iPhone

On Jan 23, 2024, at 7:09 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do this afternoon 2-3:30 or after 4:30.
Tomorrow afternoon is wide open.

On Tue, Jan 23, 2024 at 7:05 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Avi:
My afternoon was booked yesterday.Do you have any availability this afternoon or tomorrow?
Thank you,
Marijana

Sent from my iPhone

On Jan 22, 2024, at 12:06 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:

Sorry, how about 1?

On Fri, Jan 19, 2024 at 6:43 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Yes.Does 11a work for you?

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Friday, January 19, 2024 10:15 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno

# Exhibit 150

| | |
|---|---|
| **From:** | Avi Wagner[avi@thewagnerfirm.com] |
| **Sent:** | Mon 12/11/2023 7:50:46 PM (UTC) |
| **To:** | Marijana Q. Kral[mkral@fwcllp.com] |
| **Cc:** | Laib Greenspoon[laibg@lspoon.com]; Christopher L. Smith[CSmith@fwcllp.com]; Eva Moreno[emoreno@fwcllp.com] |
| **Subject:** | Re: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status |

Thanks. When do we anticipate getting the Superior Court records?

On Fri, Dec 8, 2023 at 6:11 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Chris finished going through the Court of Appeals records and will have details for me to share on Monday afternoon.The Superior Court records are still in the works.

Have a peaceful weekend.

Be well,

Marijana

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Thursday, December 7, 2023 8:05 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Laib Greenspoon <laibg@lspoon.com>; Christopher L. Smith <CSmith@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>
**Subject:** Re: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status

Any update?

On Tue, Nov 28, 2023 at 3:46 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Avi and Laib:

This email provides you with a brief update.

The records from the Court of Appeals arrived and we are in the process of reviewing them.We expect to be through them by the end of the week with an update to you on their content and how it impacts next steps early next week.

Thank you and be well,

Marijana

**From:** Marijana Q. Kral
**Sent:** Wednesday, November 22, 2023 4:25 PM

**To:** Avi Wagner <avi@thewagnerfirm.com>
**Cc:** Christopher L. Smith <csmith@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>
**Subject:** RE: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status

Hello:
We are waiting for Court files and will update you after receipt. Have a happy Thanksgiving.

Thank you and be well,

Marijana

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Wednesday, November 22, 2023 8:37 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Christopher L. Smith <CSmith@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>
**Subject:** Re: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status

What is the status?

On Tue, Oct 31, 2023 at 9:53 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Good Morning:

We are still waiting for the Court files.We will update you when we have those documents.

Thank you,

Marijana

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Monday, October 30, 2023 10:44 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Christopher L. Smith <CSmith@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>
**Subject:** Re: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status

Any update on this?

On Wed, Oct 18, 2023 at 11:16 AM Avi Wagner <avi@thewagnerfirm.com> wrote:

Dear Marijana and Chris,

Per our call last week, I wanted to check on the status of this? Do you have any update?

Best,

Avi

On Thu, Oct 5, 2023 at 7:57 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello All:

This week is slammed.I can be available for a call next week after 9:30a on Monday or Friday; or after 12p on Tuesday or Wednesday.Please let me know a good date, time, and number to call.

Thank you and be well,

Marijana

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Thursday, October 5, 2023 3:45 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Laib Greenspoon <laibg@lspoon.com>
**Subject:** Re: Donnell v. Four Seasons Healthcare, et al. [Lighthouse Healthcare Center, LLC: Status

Dear Marijana,

I'm following up on the below email.

On Mon, Oct 2, 2023 at 1:50 PM Avi Wagner <avi@thewagnerfirm.com> wrote:

Dear Maijana,

Do you have time for a status call with Mr. Greenspoon later this week on Wednesday before 10:30 or Thursday before 1?

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,Suite2100

Los Angeles,CA90067

avi@thewagnerfirm.com

310.491.7949 x1

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,Suite2100

Los Angeles,CA90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

# Exhibit 151

**From:** Avi Wagner[avi@thewagnerfirm.com]
**Sent:** Tue 1/30/2024 11:02:39 PM (UTC)
**To:** Laib Greenspoon[laibg@lspoon.com]
**Cc:** Marijana Q. Kral[mkral@fwcllp.com]; Eva Moreno[emoreno@fwcllp.com]; Kristen J. Heim[kheim@fwcllp.com]; Stephen C. Fraser[sfraser@fwcllp.com]
**Subject:** Re: Donnell
**Attachment:** 3699 Wilshire #1000_Rockport_Temporary Space Agreement.pdf

All,
I am still trying to pinpoint the exact date that Rockport left 5900 Wilshire. This is the lease on the premises they were in when they left; working to get the exact

Best,

Avi

On Wed, Jan 24, 2024 at 9:16 AM Laib Greenspoon <laibg@lspoon.com> wrote:

Today and tomorrow will not work for me.I can do Friday morning or early afternoon.

On Jan 24, 2024, at 8:31 AM, Marijana Q. Kral <mkral@fwcllp.com> wrote:

Laib and Avi:
Let's aim for 5p. My direct dial is 714-502-3312.Talk with you then.
Be well,
Marijana.

Sent from my iPhone

On Jan 24, 2024, at 8:22 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do after 4:45.

On Wed, Jan 24, 2024 at 7:46 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

This afternoon, I am open 1:15 to 2:15 or after 4:45. Please let me know what works for you.Thank you!

Sent from my iPhone

On Jan 23, 2024, at 7:09 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do this afternoon 2-3:30 or after 4:30.
Tomorrow afternoon is wide open.

On Tue, Jan 23, 2024 at 7:05 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Avi:
My afternoon was booked yesterday.Do you have any availability this afternoon or tomorrow?
Thank you,
Marijana

Sent from my iPhone

On Jan 22, 2024, at 12:06 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:

Sorry, how about 1?

On Fri, Jan 19, 2024 at 6:43 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Yes.Does 11a work for you?

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Friday, January 19, 2024 10:15 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno

<emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Can we havecall on Monday sometime after 10:30?

On Fri, Jan 12, 2024 at 10:30 AM Avi Wagner <avi@thewagnerfirm.com> wrote:

I apologize my calendar reminder didn't go off.

Would 12 or work?

On Fri, Jan 12, 2024 at 10:24 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Laib and Avi:

For your review, attached please find documents from the Court file relative to this matter.

Since 10a did not work out for Avi this morning, we can easily find a new time for a conference call today or Please let me know what works for you and we will reschedule.

Thank you and be well,

Marijana

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Thursday, January 11, 2024 11:06 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>;

---

Stephen C. Fraser
<sfraser@fwcllp.com>
**Subject:** Re: Donnell

Let's use:

Dial-in number: +1 (267) 9304000

Participant access: 894 272

On Thu, Jan 11, 2024 at 11:03 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Great.What number shall we call?

Sent from my iPhone

> On Jan 11, 2024, at 10:57 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:
>
> How is 10?
>
> On Thu, Jan 11, 2024 at 10:42 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:
>
> Hello
>
> I was in court all day and home late.Yes, a call on Friday morning will work.
>
> Thank you
>
> Marijana
>
> Sent from my iPhone
>
>> On Jan 11, 2024, at

10:09 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:

Marjiana,

I am following up on this. Can we have the requested call tomorrow?

On Wed, Jan 10, 2024 at 3:08 PM Avi Wagner <avi@thewagnerfirm.com> wrote:

How is Friday morning?

On Wed, Jan 10, 2024 at 2:54 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Laib and Avi:

I hope all is well with you!

We write to provide a further update and to follow up on our request for a telephone conferenc e.

After reading the informatio n below, please let us know your availability for a call or Zoom.

We have completed our review of the Superior Court records in this matter and provide the following updated timeline of informatio n contained with the Court file which includes

documents with proofs of service.

If you believe any of the information contained within the Court's file as set forth below, in particular with regard to service of documents on Lighthouse, is incorrect, please let us know right away.

To assist your review, please note the information in bold is new/updated from our prior email to you below.

**-- There is a**

**Secretary of State Statement of Information for Lighthouse Healthcare Center, LLC, filed on December 12, 2016.**

**The street address is 2222 Santa Ana Boulevard South, Los Angeles, California 90059.**

**The mailing address is 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.**

**The manager entity name is identified as Brius**

**Management Co.,** 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

**The agent for service of process is identified as Steven Stroll, CPA,** 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.**Type of business: skilled nursing facility.**

**The document is dated December 1, 2016, and signed by legal counsel Chaena Date.**

-- There is

a proof of service showing that the summons, complaint, and notice of case assignment were served on Lighthouse Healthcare Center, LLC.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on James Vallon, Legal Assistant, on June 27, 2017, at 3:06 p.m.The proof of service

indicates that the documents were also mailed to the Wilshire Boulevard address.

There are also proofs of service for Rockport Healthcare and Four Seasons Healthcare on the same date and individuals.

-- An August 18, 2018, notice of ruling noted that, because all parties had not appeared in the action, the case management conference was continued to

October 30, 2018.

-- On August 21, 2018, plaintiffs filed and served their second amended complaint. It was not served on Lighthouse Healthcare Center.

-- A November 9, 2018, minute order indicates that plaintiffs' counsel represented that the case was not at issue (presumably because all parties had not been served).

The court set a January 8, 2019 order to show

cause re the failure to file proofs of service as to unnamed or unserved parties.

-- A January 8, 2019, minute order indicates that plaintiffs' counsel informed the court that Lighthous e Healthcar e Center, LLC, was the only defendant that had not been served.

The court ordered plaintiffs' counsel to serve Lighthous e Healthcar e no later than March 29, 2019.A status

conference regarding service was scheduled for April 5, 2019.Trial was scheduled for September 16, 2019.

-- At an April 5, 2019, status conference regarding service, plaintiffs' counsel represented to the court that he was still trying to serve Lighthouse Healthcare Center, LLC, with summons and complaint.

-- There is a proof of service showing that the summons and

complaint were served on Lighthouse Healthcare Center, LLC, on April 19, 2019.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on Derek Cheung, Legal Assistant/ authorized to accept service, on April 19, 2019, at 1:43 p.m.The proof of service indicates that the document

s were also mailed to the Wilshire Boulevard address.

-- On April 30, 2019, the Four Seasons defendants served a notice of ruling regarding motions to compel and a motion for summary judgment on Steven Stroll, Esq., for Lighthouse Healthcare Center, at 5900 Wilshire Boulevard, Suite 1600, Los Angeles, CA 90036.

-- An August 1, 2019, minute order from the Four

Season defendants' motion for summary judgment.

Rockport's motion for summary judgment was granted.

Four Seasons was granted summary adjudication as to all causes of action except wrongful death.The hearing on the wrongful death cause of action was continued to September 27, 2019.

The court, on its own motion, advanced and vacated the trial date.

Dismissal was to be filed as to Lighthouse Healthcare Center, LLC.

-- In a notice of ruling from the August 1, 2019, motion for summary judgment, defendants indicated that there was an order to show cause re dismissal of defendant Lighthouse Healthcare Center, LLC, set for September 27, 2019.

-- A request for entry of default as to Lighthouse Healthcare Center, LLC, was

mailed to Lighthouse at 5900 Wilshire Boulevard, Suite 1600,Los Angeles, California 90036.The default was entered as requested on August 5, 2019.

-- A proof of personal service of a statement of damages indicates that the statement of damages was served on Lighthouse Healthcare Center, LLC, on Derek Cheung/Agent for Service, at 3699 Wilshire Boulevard, Suite 1000, Los Angeles,

California 90010, on August 8, 2019, at 1:25 p.m.There is a descriptio n of Mr. Chung.

-- A September 27, 2019, minute order indicates that default had been entered as to defendant Lighthous e Healthcar e Center, LLC.Plain tiffs were to submit a default judgment package and an order to show cause re entry of judgment as to Lighthous e was scheduled for November 14, 2019.

-- Plaintiffs' counsel's declaration in support of the request for default as to Lighthouse indicates non-economic damages of $20,000,000 (which is "explained" in the lengthy declaration).

-- A request for entry of default (judgment) against Lighthouse was mailed on October 2, 2019, to Lighthouse at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, to agent

Derek Cheung.The attached statement of damages indicates that plaintiffs' damages were $100,993,775.

-- A November 14, 2019, minute order noted an order to show cause regarding entry of judgment as to Lighthouse.A default prove up hearing was set for January 3, 2020.

-- There is a January 3, 2020, minute order for the default prove up hearing.

Default was entered against Lighthouse on August 5, 2029.

Plaintiff Dean Donnell testified on his own behalf.

Plaintiff was to submit a supplemental brief regarding the lack of necessity of expert opinion and then the court would take the matter under submission and notify counsel.

Plaintiff filed the supplemental brief arguing that expert testimony was not

required to establish damages on default.

-- There is a minute order and statement of decisions following the default prove up.

According to the court, Code of Civil Procedure section 425.11(c) requires that the statement of damages be served prior to entry of default.Be cause the statement of damages here was served several days after the entry of default, it cannot serve as a basis for a judgment

for damages. Because no amount was set forth in the complaint, apprising the defendant s of the amount of damages claimed, plaintiffs may not obtain a judgment for damages at this time as to this defendant (Lighthou se).

-- A January 29, 2021, court of appeal opinion reversed the order granting summary adjudicati on of the wrongful death claim in favor of Four Seasons.

-- A May 6, 2021, minute order from a status conference indicates that, pursuant to plaintiffs' counsel's request, the court ordered that the October 2, 2019, default entered as to Lighthouse vacated.

-- On May 6, 2021, a request for entry of default, with default entered on May 6, 2021, was mailed to Agent Derek Cheung at 3699 Wilshire Boulevard, Suite 100, Los Angeles, California 90010.

-- Plaintiff Dean Donnell died on July 8, 2021.Plaintiffs' application to substitute plaintiff Dean Donnell for his successor in interest (Linda Fera) was ultimately granted.

-- Trial set for December 12, 2022.

**-- There is a May 11, 2022, minute order from the superior court, denying Four Seasons' second motion for summary judgment on the wrongful death cause of action.**

**-- On November 3, 2022, successor plaintiff filed a notice of partial settlement, indicating that all of plaintiffs' claims against Four Seasons Healthcare had settled.**

**As a result of the settlement, the only active defendant remaining is Lighthouse Healthcare Center, LLC, which party is in default and has been cut off from appearing in the action.**

**Therefore, the parties request that the final status conference and trial be vacated and a default as to Lighthouse be set on a date 60 days out or another date convenient for the court.**

**The document was served only on counsel for Four Seasons.**

**-- On November 4, 2022, the superior court noticed an order to show cause hearing as to dismissal**

**(settlement).An order to cause hearing re dismissal (settlement) was set for January 3, 2023.All previous hearings were advanced and vacated.To avoid an appearance on January 3, 2023, the court indicated a request for dismissal should be filed five days before the hearing.**

**The clerk was directed to give notice to plaintiffs' counsel, who was directed to give**

**notice to all other parties.Nonetheless, the clerk served Four Seasons Healthcare at 555 South Flower Street, 24th Floor, Los Angeles, California 90071, counsel for Four Seasons, counsel for Sherman Oaks Hospital, and counsel for plaintiffs.**

**-- On November 15, 2022, plaintiffs' request for dismissal of Four Seasons Healthcare was filed and entered.**

**-- On December 27, 2022, plaintiffs' counselfiled his declaration in support of the request for default judgment as to Lighthouse.**

**Plaintiffs sued, among others, Lighthouse, in connection with the death of Valerie Donnell. On April 19, 2019, Lighthouse was served with summons and operative complaint.On August 8, 2019, plaintiffs' statement of damages**

**was served on Lighthouse.The default entered on August 5, 2019, was subsequently set aside at the request of plaintiff Donnell. On May 6, 2021, the default of Lighthouse was entered again.**

**On August 8, 2021, plaintiff Dean Donnell died and all his claims passed to his successor in interest, Linda Fera and on March 22, 2022, Dean Donnell and the estate**

**were substituted for plaintiff (Linda Fera).Since then, plaintiff has settled with all remaining defendants except Lighthouse.**

**Plaintiff now submits this default judgment package as to Lighthouse.**

**Prior to his death, plaintiff Donnell provided written and oral testimony to the court as part of a default prove up against Lighthouse.The default judgment**

**request was denied because the initial default of Lighthouse was entered prior to service of the statement of damages on Lighthouse.The instant judgment request is based on that testimony, which included the declaration of Dean Donnell (Exhibit "1"), oral testimony of Dean Donnell testimony at the January 3, 2020, default prove up hearing (Exhibit "2"), and Dean Donnell's**

**death certificate (Exhibit "3").**

**At the time of his death, Mr. Donnell was suffering from depressio n related to his wife's death.Mr s. Donnell died on June 24, 2016, while under the supervisi on of Lighthou se.Damag es include $20,000,0 00 for wrongful death and $100,000 for the estate.(At torney declaratio n elaborate s on these purporte d damages at paragrap**

**hs 10 and 11.)MICRA does not apply.(Attorney declaration at paragraph 12.)**

**Exhibit "2", Dean Donnell transcript from the January 3, 2020, default prove up hearing against Lighthouse.**

**Plaintiff Donnell will be the only witness.**

**Preliminary question from the court to plaintiffs' counsel: is there any expert testimony you intend to provide about the**

**quality of care Mrs. Donnell received at Lighthouse?**

**Not at this time.We believe the complaint as alleged objectively fits all the requisite standards needed. We don't believe we need expert testimony.**

**Plaintiff Dean was recently in an accident and is in a wheelchair.But, he is of sound mind and can certainly testify as to everything he**

**needs to today.**

**The Court: okay, then we will go forward with this matter and give you the time you need to present your prove up.**

**Mr. Donnell: They put stuff on the death certificate because they wanted it to go through. They put down that she had a heart condition and she didn't.She died of a heart attack.That is what he was told.Believes she was in pain and**

**suffering the whole time she was at the facility.Mr. Donnell starts crying and the court advises that it has read Mr. Donnell's declaration, which will also go into evidence. The court accepts as credible and unrefuted that Mr. Donnell's wife's death has had a huge emotional impact on him.**

**The Court examines Mr. Donnell:**

**Mr. Donnell doesn't understand why**

**they discharged Ms. Donnell from the hospital.She looked worse than when admitted to the hospital.She also complained of back pain.It was at least 90 degrees in the facility.His wife was in a room with a few other beds.No fan.Mr. Donnell did not observe nursing staff trying to assist to cool his wife or bring her water.She complained she was not feeling well on**

**multiple occasions. She was very, very dehydrated, which was what had taken her to the hospital in the first place.She was a diabetic and mentally ill.Mr. Donnell never got any feedback about his wife's prognosis.**

**Back to plaintiffs' counsel questioning Mr. Donnell:**

**Mrs. Donnell was not hooked up to any devices at Lighthouse.There was no way to call a doctor or**

**nurse.No buzzer.**

**Back to the Court.Questions on legal issues:**

**Damages include pain and suffering and elder abuse for the estate and wrongful death for plaintiff.**

**The Court asks the attorney to explain why he thinks the Court can dispense with expert testimony in this claim against Lighthouse.**

**Plaintiff's testimony is uncontested and weighed**

**accordingly by the Court was substandard especially if this is a care facility for the elderly or people discharged from a hospital.If the conditions are as plaintiff described, it is our opinion that those are objectively substandard conditions that the court could infer from that the facility is liable.**

**The Court asks for authority.**

**Plaintiffs' counsel**

**will brief the issue and submit by 5:00 p.m.He can certainly find case law to support the contentio n that expert testimony is not required. The Court would like suppleme ntal briefing.P laintiffs' counsel will submit it by next Friday, January 10, 2020, and the Court will deem the matter submitte d at that time.Plai ntiffs' counsel can submit a suppleme**

**ntal declaration from plaintiff is anything is missing.The matter will be submitted on January 10, 2020.**

**Exhibit "3", Dean Donnell death certificate.Died from cardiopulmonary arrest (minutes), congestive heart failure (years), and hypertension (years).**

**--**

**Request for entry of default (judgment) against Lighthouse.**

**$120,000,**

**885 – general damages and costs ($885).**

**Mailed on December 27, 2022, to Lighthouse Healthcare Center, LLC (Agent: Derek Cheung), <u>3580 Wilshire Boulevard, Suite 600, Los Angeles, California 90010</u>.**

**-- Minute order, dated January 3, 2023.**

**Order to show cause re dismissal/ default judgment.**

**Linda Fera cannot pursue any**

**claims on behalf of the estate.As establishe d by the court of appeal, plaintiff Dean could not pursue any claims on behalf of the estate.No r can his successor in interest, Linda Fera.**

**Plaintiff Dean's wrongful death cause of action survived his death.Pla intiff has presented uncontro verted evidence that Mrs. Donnell's treatment while at Lighthou se caused her death.She was**

**released from the hospital in good condition and transported to Lighthouse.The facility had no air, no fans, and the temperature was 90 degrees in her room when she arrived.The temperature remained at this dangerous level until the next day when she died.There were no buzzers to summon help.She quickly became dehydrated and complained repeatedl**

**y to her husband. As a diabetic, she needed water and proper attention. For approximately 24 hours before her death, she was given no water, was forced to endure temperatures of over 90 degrees, and received inadequate attention. The court finds this evidence sufficient to establish that these conditions caused her death.**

**While the court is certain**

**that Mr. Donnell was emotionally devastated, the court cannot award damages for the emotional distress he experienced based on his wife's passing or any punitive damages. (Citations.)**

**At the time of her death, Mrs. Donnell was Mr. Donnell's only surviving friend and family member. Married for nearly 40 years.Although Mrs. Donnell**

**had been ill for some time and was suffering from mental illness, she was nonetheless Mr. Donnell's only companion and only person he could talk to.She provided emotional support to him and gave him companionship that he received from no one else.The court finds the pecuniary value of this companionship to be $2 million.**

**Plaintiffs' counsel is ordered to**

**prepare a judgment in accordance with this opinion and file it within 15 days.**

**Mailed to plaintiffs' counsel.**

**-- Judgment by default.**

**Filed January 17, 2023.**

**For successor in interest plaintiff against Lighthouse Healthcare Center, LLC.**

**$2,000,885.**

**Signed by Judge Virginia Keeny on January 17, 2023.**

**[On a**

**sidenote, in an interrogatory plaintiff Dean Donnell was asked for facts upon which he bases his contention that Rockport owns and operates Lighthouse as alleged in the complaint.Plaintiff's response was that it appears that Rockport Healthcare Services, Lighthouse Healthcare Services, and Four Seasons are all affiliate companies owned under various**

**management and holding companies owned by Shlomo Rechnitz and his primary holding company, Brius Healthcare Services.]**

We look forward to hearing from you this week.

Thank you and be well,

Marijana

---

**From:** Marijana Q. Kral
**Sent:** Friday, December 29, 2023 10:43 AM
**To:** Avi Wagner <avi@thewagnerfirm.com>; Laib Greenspoon <laibg@lspoon.com

>
**Cc:** Stephen C. Fraser <sfraser@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>
**Subject:** RE: Donnell

Good Morning Laib and Avi:

We have been combing through the Superior Court records and based on the records reviewed thus far, we have the following timeline:

-- There is a proof of

service showing that the summons, complaint, and notice of case assignment were served on Lighthouse Healthcare Center, LLC.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on James Vallon,

Legal Assistant, on June 27, 2017, at 3:06 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

The are also proofs of service for Rockport Healthcare and Four Seasons Healthcare on the same date and individuals.

-- An August 18, 2018, notice of ruling noted that, because all parties

had not appeared in the action, the case manage ment conferen ce was continue d to October 30, 2018.

-- On August 21, 2018, plaintiffs filed and served their second amended complain t.It was not served on Lighthou se Healthca re Center.

-- A Novemb er 9, 2018, minute order indicates that plaintiffs' counsel represen ted that the case

was not at issue (presumably because all parties had not been served.

The court set a January 8, 2019 order to show cause re the failure to file proofs of service as to unnamed or unserved parties.

-- A January 8, 2019, minute order indicates that plaintiffs' counsel informed the court that Lighthouse Healthcare Center,

LLC, was the only defendant that had not been served.

The court ordered plaintiffs' counsel to serve Lighthouse Healthcare no later than March 29, 2019.A status conference regarding service was scheduled for April 5, 2019.Trial was scheduled for September 16, 2019.

-- At an April 5, 2019, status conference regarding service,

plaintiffs' counsel represented to the court that he was still trying to serve Lighthouse Healthcare Center, LLC, with summons and complaint.

-- There is a proof of service showing that the summons and complaint were served on Lighthouse Healthcare Center, LLC, on April 19, 2019.

The agent for service is identified as Steven

Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on Derek Cheung, Legal Assistant /authorized to accept service, on April 19, 2019, at 1:43 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

-- On April 30, 2019, the

Four Seasons defendants served a notice of ruling regarding motions to compel and a motion for summary judgment on Steven Stroll, Esq., for Lighthouse Healthcare Center, at 5900 Wilshire Boulevard, Suite 1600, Los Angeles, CA 90036.

-- An August 1, 2019, minute order from the Four Season defendants' motion for

summary judgment.

Rockport's motion for summary judgment was granted.

Four Seasons was granted summary adjudication as to all causes of action except wrongful death.The hearing on the wrongful death cause of action was continued to September 27, 2019.

The court, on its own motion, advanced and vacated the trial date.

Dismissal was to be filed as to Lighthouse Healthcare Center, LLC.

-- In a notice of ruling from the August 1, 2019, motion for summary judgment, defendants indicated that there was an order to show cause re dismissal of defendant Lighthouse Healthcare Center, LLC, set for September 27, 2019.

-- A request

for entry of default as to Lighthouse Healthcare Center, LLC, was mailed to Lighthouse at 5900 Wilshire Boulevard, Suite 1600,Los Angeles, California 90036.The default was entered as requested on August 5, 2019.

-- A proof of personal service of a statement of damages indicates that the statement of damages was served on Lighthou

se Healthcare Center, LLC, on Derek Cheung/ Agent for Service, at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, on August 8, 2019, at 1:25 p.m.There is a description of Mr. Chung.

-- A September 27, 2019, minute order indicates that default had been entered as to defendant Lighthouse Healthcare Center,

LLC.Plaintiffs were to submit a default judgment package and an order to show cause re entry of judgment as to Lighthouse was scheduled for November 14, 2019.

-- Plaintiffs' counsel's declaration in support of the request for default as to Lighthouse indicates non-economic damages of $20,000,000 (which is "explained" in the lengthy

declaration).

-- A request for entry of default (judgment) against Lighthouse was mailed on October 2, 2019, to Lighthouse at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, to agent Derek Cheung. The attached statement of damages indicates that plaintiffs' damages were $1000,993,775.

-- A November 14, 2019,

minute order noted an order to show cause regarding entry of judgment as to Lighthouse.A default prove up hearing was set for January 3, 2020.

-- There is a January 3, 2020, minute order for the default prove up hearing.

Default was entered against Lighthouse on August 5, 2029.

Plaintiff Dean Donnell testified on his own behalf.

Plaintiff was to submit a supplemental brief regarding the lack of necessity of expert opinion and then the court would take the matter under submission and notify counsel.

Plaintiff filed the supplemental brief arguing that expert testimony was not required to establish damages on default.

-- There is a minute order and statement of

decisions following the default prove up.

According to the court, Code of Civil Procedure section 425.11(c) requires that the statement of damages be served prior to entry of default.Because the statement of damages here was served several days after the entry of default, it cannot serve as a basis for a judgment for damages.Because no amount

was set forth in the complaint, apprising the defendants of the amount of damages claimed, plaintiffs may not obtain a judgment for damages at this time as to this defendant (Lighthouse).

-- A January 29, 2021, court of appeal opinion rever4sed the order granting summary adjudication of the wrongful death claim in favor of Four Seasons.

-- A May 6, 2021, minute order from a status conference indicates that, pursuant to plaintiffs' counsel's request, the court ordered that October 2, 2019, default entered at to Lighthouse vacated.

-- On May 6, 2021, a request for entry of default, with default entered on May 6, 2021, was mailed to Agent Derek Cheung at 3699 Wilshire Boulevar

d, Suite 100, Los Angeles, California 90010.

-- Plaintiff Dean Donnell died on July 8, 2021.Plaintiffs' application to substitute plaintiff Dean Donnell for his successor in interest (Linda Fera) was ultimately granted.

-- Trial set for December 12, 2022.

We continue to review the Court documents and will update this as additiona

I information is learned.

I am out of the office today and our office is closed on Monday for the holiday, so please let me know your availability for a call next week.

Happy New Year to you and yours!

Be well,

Marijana

---

**From:** Marijana Q. Kral
**Sent:** Wednesday, December 20, 2023 3:10 PM
**To:** Avi Wagner

<avi@thewagnerfirm.com>; Laib Greenspoon <laibg@lspoon.com>
**Cc:** Stephen C. Fraser <sfraser@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>
**Subject:** Donnell

Hello All:

Finally, all the Superior Court records have arrived, and we are going through them now.We will have an update for you by end of week.

Apologies for the delays we encountered acquiring these records – frustrating for all of us, but we are told we now have them all._

Thank you and be well,

Marijana Kral

<image001.png>

1100 West Town and Country Road

Suite 1030

Orange, California 92868

Direct Dial (714) 502-3312

Facsimile(714) 543-3374
mkral@fwcllp.com

https://link.edgepilot.com/s/4a5fde06/Hw8Z5wFha06b8Y3Ijp9RYA?u=http://www.fwcllp.com/

THIS ELECTRONIC MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOY

EE OR
AGENT
RESPON
SIBLE
FOR
DELIVE
RING
THE
MESSAG
E TO
THE
INTEND
ED
RECIPIE
NT, YOU
ARE
HEREBY
NOTIFIE
D THAT
ANY
DISSEMI
NATION,
DISTRIB
UTION
OR
COPYIN
G OF
THIS
COMMU
NICATIO
N IS
STRICTL
Y
PROHIBI
TED. IF
YOU
HAVE
RECEIVE
D THIS
TRANSM
ISSION
IN
ERROR,
PLEASE
NOTIFY
US

IMMEDI
ATELY
BY
REPLY E-
MAIL OR
BY
TELEPH
ONE AT
(818) 543-
1380,
AND
DESTRO
Y THE
ORIGINA
L
TRANSM
ISSION
AND ITS
ATTACH
MENTS
WITHOU
T
READIN
G OR
SAVING
THEM
TO DISK.
NO
WAIVER
OF
PRIVILE
GE OR
CONFID
ENTIALI
TY
SHOULD
BE
INFERRE
D FROM
ANY
ERROR
IN
TRANSM
ITTAL.

Please consider the environment before printing this email.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,2100

Los Angeles,90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you

will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,2100

Los Angeles,90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,2100

Los Angeles,CA90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--
Avi Wagner

THE WAGNER FIRM

1925 Century Park East,2100

Los Angeles,CA90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--
Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

# Exhibit 152

**From:** Avi Wagner[avi@thewagnerfirm.com]
**Sent:** Thur 7/11/2024 1:16:00 AM (UTC)
**To:** Marijana Q. Kral[mkral@fwcllp.com]
**Cc:** Laib Greenspoon[laibg@lspoon.com]; Eva Moreno[emoreno@fwcllp.com]; Kristen J. Heim[kheim@fwcllp.com]; Stephen C. Fraser[sfraser@fwcllp.com]
**Subject:** Re: Donnell

Any update? Can you please give me the adjuster's name and contact too so I have it? Thanks,
Avi

On Fri, Jun 28, 2024 at 10:44 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Avi and Laib:
No, I have not and I expected an update from MedPro.I am out of the office until Tuesday, and will follow up with MedPro on my return, then relay that information to you.

Thank you and be well,

Marijana

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Tuesday, June 25, 2024 8:52 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Laib Greenspoon <laibg@lspoon.com>; Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Marjiana, any update fromCan you pleaseme a name of the adjuster and contact info?

On Mon, Jun 17, 2024 at 5:29 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Thank you!

---

**From:** Laib Greenspoon <laibg@lspoon.com>
**Sent:** Monday, June 17, 2024 12:50 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>; Avi Wagner <avi@thewagnerfirm.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** RE: Donnell

1. No
2. No
3. Lighthouse is the Operating entity and licensee engaged in a lease agreement with Eretz operate the premises as a Skilled Nursing Facility.

---

**From:** Marijana Q. Kral <mkral@fwcllp.com>

**Sent:** Monday, June 17, 2024 11:12 AM
**To:** Laib Greenspoon <laibg@lspoon.com>; Avi Wagner <avi@thewagnerfirm.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** RE: Donnell

Hello Laib and Avi:

Following up on this matter.

Please let me know the following:

1. Have you had any indication that anyone has attempted to collect on the judgment?
2. To your knowledge, has anyone made any attempt to file a lien?
3. I understand the property is owned by a company called Eretz LHC Properties LLC.What is the relationship between Eretz LHC Properties and Lighthouse?

MedPro needs this information as soon as feasible.I look forward to your response.

Thank you and be well,

Marijana

---

**From:** Marijana Q. Kral
**Sent:** Friday, April 26, 2024 5:04 PM
**To:** Avi Wagner <avi@thewagnerfirm.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** RE: Donnell

Hello Laib and Avi:

I do not have a substantive response from MedPro and I reached out to them again today.I will follow up with them next week and, hopefully, they will have a response.

Have a wonderful weekend.

Be well,

Marijana

---

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Friday, April 26, 2024 4:52 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>

**Subject:** Re: Donnell

Following up ...

On Wed, Apr 3, 2024 at 9:40 AM Avi Wagner <avi@thewagnerfirm.com> wrote:

Following up. Who are we dealing with at Medpro?

On Mon, Apr 1, 2024 at 8:33 AM Avi Wagner <avi@thewagnerfirm.com> wrote:

Thanks, when have you last heardthem? Who is the current contact?

On Mon, Apr 1, 2024 at 7:30 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Good morning Laib and Avi:

MedPro let me know they are still evaluating and will provide me with a substantive response as soon as they can.

Be well,

Marijana

Sent from my iPhone

On Apr 1, 2024, at 5:08 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

Good morning. Any update?

On Fri, Feb 23, 2024 at 4:30 PM Avi Wagner <avi@thewagnerfirm.com> wrote:

Marjiana,

We think it makes sense to discuss with Merlot whether they are amenable to providing some form of a carrot to plaintiffs' counsel before approaching the counsel.

Best,

Avi

On Fri, Feb 23, 2024 at 8:24 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

That works.

Sent from my iPhone

On Feb 23, 2024, at 7:49 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

How about 12?

On Fri, Feb 23, 2024 at 7:17 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

I can be available after 11a today.Please confirm a time that works on your end. Thank you!

Sent from my iPhone

On Feb 22, 2024, at 3:56 PM, Laib Greenspoon <laibg@lspoon.com> wrote:

Works for me

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Thursday, February 22, 2024 12:59 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Hi about tomorrow morning after 9?

On Thu, Feb 22, 2024 at 12:20 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Laib and Avi:

Circling back for your availability for a follow up call.

Thank you and be well,

Marijana

**From:** Marijana Q. Kral
**Sent:** Friday, February 16, 2024 7:45 AM

**To:** Avi Wagner <avi@thewagnerfirm.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Hello All:

I can be available this afternoon or Tuesday. Please let me know what works for you.

Thank you,

Marijana

Sent from my iPhone

> On Feb 12, 2024, at 11:07 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:
>
> How about Wednesday late morning or early afternoon?
>
> On Mon, Feb 12, 2024 at 7:43 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:
>
> > Please let me know your availability for a call this week.
> >
> > Thank you and be well,
> >
> > Marijana
> >
> > **From:** Avi Wagner <avi@thewagnerfirm.com>
> > **Sent:** Thursday, February 1, 2024 11:40 AM
> > **To:** Laib Greenspoon <laibg@lspoon.com>
> > **Cc:** Marijana Q. Kral <mkral@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>;

Stephen C. Fraser
<sfraser@fwcllp.com>
**Subject:** Re: Donnell

All,

The Rockport move out commenced in advance of this date and from April Rockport was in this new facility. There was no formal understanding between Stroll and Cheung re: Stroll as agent.Please let me know when we should discuss further.

On Tue, Jan 30, 2024 at 3:02 PM Avi Wagner <avi@thewagnerfirm.com> wrote:

All,

I am still trying to pinpoint the exact date that Rockport left 5900 Wilshire. This is the lease on the premises they were in when they left; working to get the exact

Best,

Avi

On Wed, Jan 24, 2024 at 9:16 AM Laib Greenspoon <laibg@lspoon.com> wrote:

Today and tomorrow will not work for me.I can do Friday morning or early afternoon.

On Jan 24, 2024, at 8:31 AM, Marijana Q. Kral <mkral@fwcllp.com > wrote:

Laib and Avi:

Let's aim for 5p. My

direct dial is 714-502-3312.Talk with you then.

Be well,

Marijana.

Sent from my iPhone

On Jan 24, 2024, at 8:22 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do after 4:45.

On Wed, Jan 24, 2024 at 7:46 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

This afternoon, I am open

1:15 to 2:15 or after 4:45. Please let me know what works for you.Thank you!

Sent from my iPhone

On Jan 23, 2024, at 7:09 AM, Avi Wagner <avi@thewagnerfirm.com> wrote:

I can do this afternoon 2-3:30 or after 4:30.

Tomorrow afternoon is wide open.

On Tue, Jan 23, 2024 at 7:05 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Avi:

My afternoon was booked yesterday.Do you have any availability this afternoon or tomorrow?

Thank you,

Marijana

Sent from my iPhone

On Jan 22, 2024, at 12:06 PM, Avi Wagner <avi@thewagnerfirm.com> wrote:

Sorry, how about 1?

On Fri, Jan 19, 2024 at 6:43 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Yes.Does 11a work for you?

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Friday, January 19, 2024 10:15 AM
**To:** Marijana Q. Kral <mkral@fwcllp.com>
**Cc:** Eva Moreno <emoreno@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Laib Greenspoon <laibg@lspoon.com>; Stephen C. Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Can we havecall on Monday sometime after 10:30?

On Fri, Jan 12, 2024 at 10:30 AM Avi Wagner <avi@thewagnerfirm.com> wrote:

I apologize my calendar reminder didn't go off.

Would 12 or work?

On Fri, Jan 12, 2024 at 10:24 AM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Laib and Avi:

For your review, attached please find documents from the Court file relative to this matter.

Since 10a did not work out for Avi this morning, we can easily find a new time for a conference call today or Please let me know what works for you and we will reschedule.

Thank you and be well,

Marijana

**From:** Avi Wagner <avi@thewagnerfirm.com>
**Sent:** Thursday, January 11, 2024 11:06 PM
**To:** Marijana Q. Kral <mkral@fwcllp.com>

**Cc:** Eva Moreno <emoreno@fwcllp.com>;
Kristen J. Heim <kheim@fwcllp.com>; Laib
Greenspoon <laibg@lspoon.com>; Stephen C.
Fraser <sfraser@fwcllp.com>
**Subject:** Re: Donnell

Let's use:

Dial-in number: +1 (267) 9304000

Participant access: 894 272

On Thu, Jan 11, 2024 at 11:03 PM Marijana
Q. Kral <mkral@fwcllp.com> wrote:

Great.What number shall we call?

Sent from my iPhone

On Jan 11, 2024, at 10:57 PM, Avi
Wagner <avi@thewagnerfirm.com>
wrote:

How is 10?

On Thu, Jan 11, 2024 at 10:42 PM
Marijana Q. Kral <mkral@fwcllp.com>
wrote:

Hello

I was in court all day and home
late.Yes, a call on Friday morning will
work.

Thank you

Marijana

Sent from my iPhone

On Jan 11, 2024, at 10:09 PM,
Avi Wagner
<avi@thewagnerfirm.com>
wrote:

Marjiana,

I am following up on this. Can we have the requested call tomorrow?

On Wed, Jan 10, 2024 at 3:08 PM Avi Wagner <avi@thewagnerfirm.com> wrote:

How is Friday morning?

On Wed, Jan 10, 2024 at 2:54 PM Marijana Q. Kral <mkral@fwcllp.com> wrote:

Hello Laib and Avi:

I hope all is well with you!

We write to provide a further update and to follow up on our request for a telephone conference.

After reading the information below, please let us know your availability for a call or Zoom.

We have completed our review of the Superior Court records in this matter and provide the following updated timeline of information contained with the Court file which includes documents with proofs of service.

If you believe any of the information contained within the Court's file as set forth below, in particular with regard to service of documents on Lighthouse, is incorrect, please let us know right away.

To assist your review, please note the information in bold is

new/updated from our prior email to you below.

**-- There is a Secretary of State Statement of Information for Lighthouse Healthcare Center, LLC, filed on December 12, 2016.**

**The street address is 2222 Santa Ana Boulevard South, Los Angeles, California 90059.**

**The mailing address is 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.**

**The manager entity name is identified as Brius Management Co., 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.**

**The agent for service of process is identified as Steven Stroll, CPA, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.Type of business: skilled nursing facility.**

**The document is dated December 1, 2016, and signed by legal counsel Chaena Date.**

-- There is a proof of service showing that the summons, complaint, and notice of case assignment were served on Lighthouse Healthcare Center, LLC.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on James Vallon, Legal Assistant, on June 27, 2017, at 3:06 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

There are also proofs of service for Rockport Healthcare and Four Seasons Healthcare on the same date and individuals.

-- An August 18, 2018, notice of ruling noted that, because all parties had not appeared in the action, the case management conference was continued to October 30, 2018.

-- On August 21, 2018, plaintiffs filed and served their second amended complaint.It was not served on Lighthouse Healthcare Center.

-- A November 9, 2018, minute order indicates that plaintiffs' counsel represented that the case was not at issue (presumably because all parties had not been served).

The court set a January 8, 2019 order to show cause re the failure to file proofs of service as to unnamed or unserved parties.

-- A January 8, 2019, minute order indicates that plaintiffs' counsel informed the court that Lighthouse Healthcare Center, LLC, was the only defendant that had not been served.

The court ordered plaintiffs' counsel to serve Lighthouse

Healthcare no later than March 29, 2019.A status conference regarding service was scheduled for April 5, 2019.Trial was scheduled for September 16, 2019.

-- At an April 5, 2019, status conference regarding service, plaintiffs' counsel represented to the court that he was still trying to serve Lighthouse Healthcare Center, LLC, with summons and complaint.

-- There is a proof of service showing that the summons and complaint were served on Lighthouse Healthcare Center, LLC, on April 19, 2019.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on Derek Cheung, Legal Assistant/authorized to accept service, on April 19, 2019, at 1:43 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

-- On April 30, 2019, the Four Seasons defendants served a notice of ruling regarding motions to compel and a motion for summary judgment on Steven Stroll, Esq., for Lighthouse Healthcare Center, at 5900 Wilshire Boulevard, Suite 1600, Los Angeles, CA 90036.

-- An August 1, 2019, minute

order from the Four Season defendants' motion for summary judgment.

Rockport's motion for summary judgment was granted.

Four Seasons was granted summary adjudication as to all causes of action except wrongful death.The hearing on the wrongful death cause of action was continued to September 27, 2019.

The court, on its own motion, advanced and vacated the trial date.

Dismissal was to be filed as to Lighthouse Healthcare Center, LLC.

-- In a notice of ruling from the August 1, 2019, motion for summary judgment, defendants indicated that there was an order to show cause re dismissal of defendant Lighthouse Healthcare Center, LLC, set for September 27, 2019.

-- A request for entry of default as to Lighthouse Healthcare Center, LLC, was mailed to Lighthouse at 5900 Wilshire Boulevard, Suite 1600,Los Angeles, California 90036.The default was entered as requested on August 5, 2019.

-- A proof of personal service of a statement of damages indicates that the statement of damages was served on Lighthouse Healthcare Center, LLC, on Derek Cheung/Agent for Service,

at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, on August 8, 2019, at 1:25 p.m.There is a description of Mr. Chung.

-- A September 27, 2019, minute order indicates that default had been entered as to defendant Lighthouse Healthcare Center, LLC.Plaintiffs were to submit a default judgment package and an order to show cause re entry of judgment as to Lighthouse was scheduled for November 14, 2019.

-- Plaintiffs' counsel's declaration in support of the request for default as to Lighthouse indicates non-economic damages of $20,000,000 (which is "explained" in the lengthy declaration).

-- A request for entry of default (judgment) against Lighthouse was mailed on October 2, 2019, to Lighthouse at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, to agent Derek Cheung.The attached statement of damages indicates that plaintiffs' damages were $100,993,775.

-- A November 14, 2019, minute order noted an order to show cause regarding entry of judgment as to Lighthouse.A default prove up hearing was set for January 3, 2020.

-- There is a January 3, 2020, minute order for the default prove up hearing.

Default was entered against Lighthouse on August 5, 2029.

Plaintiff Dean Donnell testified on his own behalf.

Plaintiff was to submit a supplemental brief regarding the lack of necessity of expert opinion and then the court would take the matter under submission and notify counsel.

Plaintiff filed the supplemental brief arguing that expert testimony was not required to establish damages on default.

-- There is a minute order and statement of decisions following the default prove up.

According to the court, Code of Civil Procedure section 425.11(c) requires that the statement of damages be served prior to entry of default.Because the statement of damages here was served several days after the entry of default, it cannot serve as a basis for a judgment for damages.Because no amount was set forth in the complaint, apprising the defendants of the amount of damages claimed, plaintiffs may not obtain a judgment for damages at this time as to this defendant (Lighthouse).

-- A January 29, 2021, court of appeal opinion reversed the order granting summary adjudication of the wrongful death claim in favor of Four Seasons.

-- A May 6, 2021, minute order from a status conference indicates

that, pursuant to plaintiffs' counsel's request, the court ordered that the October 2, 2019, default entered as to Lighthouse vacated.

-- On May 6, 2021, a request for entry of default, with default entered on May 6, 2021, was mailed to Agent Derek Cheung at 3699 Wilshire Boulevard, Suite 100, Los Angeles, California 90010.

-- Plaintiff Dean Donnell died on July 8, 2021.Plaintiffs' application to substitute plaintiff Dean Donnell for his successor in interest (Linda Fera) was ultimately granted.

-- Trial set for December 12, 2022.

**-- There is a May 11, 2022, minute order from the superior court, denying Four Seasons' second motion for summary judgment on the wrongful death cause of action.**

**-- On November 3, 2022, successor plaintiff filed a notice of partial settlement, indicating that all of plaintiffs' claims against Four Seasons Healthcare had settled.**

**As a result of the settlement, the only active defendant remaining is Lighthouse Healthcare Center, LLC, which party is in default and has been cut off from appearing in the action.**

**Therefore, the parties request**

**that the final status conference and trial be vacated and a default as to Lighthouse be set on a date 60 days out or another date convenient for the court.**

**The document was served only on counsel for Four Seasons.**

**-- On November 4, 2022, the superior court noticed an order to show cause hearing as to dismissal (settlement).An order to cause hearing re dismissal (settlement) was set for January 3, 2023.All previous hearings were advanced and vacated.To avoid an appearance on January 3, 2023, the court indicated a request for dismissal should be filed five days before the hearing.**

**The clerk was directed to give notice to plaintiffs' counsel, who was directed to give notice to all other parties.Nonetheless, the clerk served Four Seasons Healthcare at 555 South Flower Street, 24th Floor, Los Angeles, California 90071, counsel for Four Seasons, counsel for Sherman Oaks Hospital, and counsel for plaintiffs.**

**-- On November 15, 2022, plaintiffs' request for dismissal of Four Seasons Healthcare was filed and entered.**

**-- On December 27, 2022, plaintiffs' counselfiled his declaration in support of the request for default judgment as**

**to Lighthouse.**

**Plaintiffs sued, among others, Lighthouse, in connection with the death of Valerie Donnell.On April 19, 2019, Lighthouse was served with summons and operative complaint.On August 8, 2019, plaintiffs' statement of damages was served on Lighthouse.The default entered on August 5, 2019, was subsequently set aside at the request of plaintiff Donnell.On May 6, 2021, the default of Lighthouse was entered again.**

**On August 8, 2021, plaintiff Dean Donnell died and all his claims passed to his successor in interest, Linda Fera and on March 22, 2022, Dean Donnell and the estate were substituted for plaintiff (Linda Fera).Since then, plaintiff has settled with all remaining defendants except Lighthouse.**

**Plaintiff now submits this default judgment package as to Lighthouse.**

**Prior to his death, plaintiff Donnell provided written and oral testimony to the court as part of a default prove up against Lighthouse.The default judgment request was denied because the initial default of Lighthouse was entered prior to service of the statement of damages on Lighthouse.The instant judgment request is based on that testimony, which included the declaration of Dean Donnell (Exhibit "1"),**

**oral testimony of Dean Donnell testimony at the January 3, 2020, default prove up hearing (Exhibit "2"), and Dean Donnell's death certificate (Exhibit "3").**

**At the time of his death, Mr. Donnell was suffering from depression related to his wife's death.Mrs. Donnell died on June 24, 2016, while under the supervision of Lighthouse.Damages include $20,000,000 for wrongful death and $100,000 for the estate.(Attorney declaration elaborates on these purported damages at paragraphs 10 and 11.)MICRA does not apply.(Attorney declaration at paragraph 12.)**

**Exhibit "2", Dean Donnell transcript from the January 3, 2020, default prove up hearing against Lighthouse.**

**Plaintiff Donnell will be the only witness.**

**Preliminary question from the court to plaintiffs' counsel: is there any expert testimony you intend to provide about the quality of care Mrs. Donnell received at Lighthouse?**

**Not at this time.We believe the complaint as alleged objectively fits all the requisite standards needed.We don't believe we need expert testimony.**

**Plaintiff Dean was recently in an accident and is in a wheelchair.But, he is of sound**

**mind and can certainly testify as to everything he needs to today.**

**The Court: okay, then we will go forward with this matter and give you the time you need to present your prove up.**

**Mr. Donnell: They put stuff on the death certificate because they wanted it to go through.They put down that she had a heart condition and she didn't.She died of a heart attack.That is what he was told.Believes she was in pain and suffering the whole time she was at the facility.Mr. Donnell starts crying and the court advises that it has read Mr. Donnell's declaration, which will also go into evidence.The court accepts as credible and unrefuted that Mr. Donnell's wife's death has had a huge emotional impact on him.**

**The Court examines Mr. Donnell:**

**Mr. Donnell doesn't understand why they discharged Ms. Donnell from the hospital.She looked worse than when admitted to the hospital.She also complained of back pain.It was at least 90 degrees in the facility.His wife was in a room with a few other beds.No fan.Mr. Donnell did not observe nursing staff trying to assist to cool his wife or bring her water.She complained she was not feeling well on multiple occasions.She**

**was very, very dehydrated, which was what had taken her to the hospital in the first place.She was a diabetic and mentally ill.Mr. Donnell never got any feedback about his wife's prognosis.**

**Back to plaintiffs' counsel questioning Mr. Donnell:**

**Mrs. Donnell was not hooked up to any devices at Lighthouse.There was no way to call a doctor or nurse.No buzzer.**

**Back to the Court.Questions on legal issues:**

**Damages include pain and suffering and elder abuse for the estate and wrongful death for plaintiff.**

**The Court asks the attorney to explain why he thinks the Court can dispense with expert testimony in this claim against Lighthouse.**

**Plaintiff's testimony is uncontested and weighed accordingly by the Court was substandard especially if this is a care facility for the elderly or people discharged from a hospital.If the conditions are as plaintiff described, it is our opinion that those are objectively substandard conditions that the court could infer from that the facility is liable.**

**The Court asks for authority.**

**Plaintiffs' counsel will brief the**

**issue and submit by 5:00 p.m.He can certainly find case law to support the contention that expert testimony is not required.The Court would like supplemental briefing.Plaintiffs' counsel will submit it by next Friday, January 10, 2020, and the Court will deem the matter submitted at that time.Plaintiffs' counsel can submit a supplemental declaration from plaintiff is anything is missing.The matter will be submitted on January 10, 2020.**

**Exhibit "3", Dean Donnell death certificate.Died from cardiopulmonary arrest (minutes), congestive heart failure (years), and hypertension (years).**

**-- Request for entry of default (judgment) against Lighthouse.**

**$120,000,885 – general damages and costs ($885).**

**Mailed on December 27, 2022, to Lighthouse Healthcare Center, LLC (Agent: Derek Cheung), 3580 Wilshire Boulevard, Suite 600, Los Angeles, California 90010.**

**-- Minute order, dated January 3, 2023.**

**Order to show cause re dismissal/default judgment.**

**Linda Fera cannot pursue any claims on behalf of the estate.As established by the**

**court of appeal, plaintiff Dean could not pursue any claims on behalf of the estate.Nor can his successor in interest, Linda Fera.**

**Plaintiff Dean's wrongful death cause of action survived his death.Plaintiff has presented uncontroverted evidence that Mrs. Donnell's treatment while at Lighthouse caused her death.She was released from the hospital in good condition and transported to Lighthouse.The facility had no air, no fans, and the temperature was 90 degrees in her room when she arrived.The temperature remained at this dangerous level until the next day when she died.There were no buzzers to summon help.She quickly became dehydrated and complained repeatedly to her husband.As a diabetic, she needed water and proper attention.For approximately 24 hours before her death, she was given no water, was forced to endure temperatures of over 90 degrees, and received inadequate attention.The court finds this evidence sufficient to establish that these conditions caused her death.**

**While the court is certain that Mr. Donnell was emotionally devastated, the court cannot award damages for the emotional distress he experienced based on his wife's passing or any punitive damages.(Citations.)**

**At the time of her death, Mrs.**

**Donnell was Mr. Donnell's only surviving friend and family member.Married for nearly 40 years.Although Mrs. Donnell had been ill for some time and was suffering from mental illness, she was nonetheless Mr. Donnell's only companion and only person he could talk to.She provided emotional support to him and gave him companionship that he received from no one else.The court finds the pecuniary value of this companionship to be $2 million.**

**Plaintiffs' counsel is ordered to prepare a judgment in accordance with this opinion and file it within 15 days.**

**Mailed to plaintiffs' counsel.**

**-- Judgment by default.**

**Filed January 17, 2023.**

**For successor in interest plaintiff against Lighthouse Healthcare Center, LLC.**

**$2,000,885.**

**Signed by Judge Virginia Keeny on January 17, 2023.**

**[On a sidenote, in an interrogatory plaintiff Dean Donnell was asked for facts upon which he bases his contention that Rockport owns and operates Lighthouse as alleged in the complaint.Plaintiff's response was that it appears that Rockport Healthcare Services, Lighthouse Healthcare**

**Services, and Four Seasons are all affiliate companies owned under various management and holding companies owned by Shlomo Rechnitz and his primary holding company, Brius Healthcare Services.]**

We look forward to hearing from you this week.

Thank you and be well,

Marijana

**From:** Marijana Q. Kral
**Sent:** Friday, December 29, 2023 10:43 AM
**To:** Avi Wagner <avi@thewagnerfirm.com>; Laib Greenspoon <laibg@lspoon.com>
**Cc:** Stephen C. Fraser <sfraser@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>
**Subject:** RE: Donnell

Good Morning Laib and Avi:

We have been combing through the Superior Court records and based on the records reviewed thus far, we have the following timeline:

-- There is a proof of service showing that the summons, complaint, and notice of case assignment were served on Lighthouse Healthcare Center, LLC.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on James Vallon, Legal Assistant, on June 27, 2017, at 3:06 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

The are also proofs of service for Rockport Healthcare and Four Seasons Healthcare on the same date and individuals.

-- An August 18, 2018, notice of ruling noted that, because all parties had not appeared in the action, the case management conference was continued to October 30, 2018.

-- On August 21, 2018, plaintiffs filed and served their second amended complaint.It was not served on Lighthouse Healthcare Center.

-- A November 9, 2018, minute order indicates that plaintiffs' counsel represented that the case was not at issue (presumably because all parties had not been served.

The court set a January 8, 2019 order to show cause re the failure to file proofs of service as to unnamed or unserved parties.

-- A January 8, 2019, minute order indicates that plaintiffs' counsel informed the court that Lighthouse Healthcare Center, LLC, was the only

defendant that had not been served.

The court ordered plaintiffs' counsel to serve Lighthouse Healthcare no later than March 29, 2019.A status conference regarding service was scheduled for April 5, 2019.Trial was scheduled for September 16, 2019.

-- At an April 5, 2019, status conference regarding service, plaintiffs' counsel represented to the court that he was still trying to serve Lighthouse Healthcare Center, LLC, with summons and complaint.

-- There is a proof of service showing that the summons and complaint were served on Lighthouse Healthcare Center, LLC, on April 19, 2019.

The agent for service is identified as Steven Stroll, 5900 Wilshire Boulevard, Suite 1600, Los Angeles, California 90036.

The proof of service indicates substituted service on Derek Cheung, Legal Assistant/authorized to accept service, on April 19, 2019, at 1:43 p.m.The proof of service indicates that the documents were also mailed to the Wilshire Boulevard address.

-- On April 30, 2019, the Four Seasons defendants served a notice of ruling regarding motions to compel and a

motion for summary judgment on Steven Stroll, Esq., for Lighthouse Healthcare Center, at 5900 Wilshire Boulevard, Suite 1600, Los Angeles, CA 90036.

-- An August 1, 2019, minute order from the Four Season defendants' motion for summary judgment.

Rockport's motion for summary judgment was granted.

Four Seasons was granted summary adjudication as to all causes of action except wrongful death.The hearing on the wrongful death cause of action was continued to September 27, 2019.

The court, on its own motion, advanced and vacated the trial date.

Dismissal was to be filed as to Lighthouse Healthcare Center, LLC.

-- In a notice of ruling from the August 1, 2019, motion for summary judgment, defendants indicated that there was an order to show cause re dismissal of defendant Lighthouse Healthcare Center, LLC, set for September 27, 2019.

-- A request for entry of default as to Lighthouse Healthcare Center, LLC, was mailed to Lighthouse at 5900 Wilshire Boulevard, Suite

1600,Los Angeles, California 90036.The default was entered as requested on August 5, 2019.

-- A proof of personal service of a statement of damages indicates that the statement of damages was served on Lighthouse Healthcare Center, LLC, on Derek Cheung/Agent for Service, at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, on August 8, 2019, at 1:25 p.m.There is a description of Mr. Chung.

-- A September 27, 2019, minute order indicates that default had been entered as to defendant Lighthouse Healthcare Center, LLC.Plaintiffs were to submit a default judgment package and an order to show cause re entry of judgment as to Lighthouse was scheduled for November 14, 2019.

-- Plaintiffs' counsel's declaration in support of the request for default as to Lighthouse indicates non-economic damages of $20,000,000 (which is "explained" in the lengthy declaration).

-- A request for entry of default (judgment) against Lighthouse was mailed on October 2, 2019, to Lighthouse at 3699 Wilshire Boulevard, Suite 1000, Los Angeles, California 90010, to agent Derek Cheung.The

attached statement of damages indicates that plaintiffs' damages were $1000,993,775.

-- A November 14, 2019, minute order noted an order to show cause regarding entry of judgment as to Lighthouse.A default prove up hearing was set for January 3, 2020.

-- There is a January 3, 2020, minute order for the default prove up hearing.

Default was entered against Lighthouse on August 5, 2029.

Plaintiff Dean Donnell testified on his own behalf.

Plaintiff was to submit a supplemental brief regarding the lack of necessity of expert opinion and then the court would take the matter under submission and notify counsel.

Plaintiff filed the supplemental brief arguing that expert testimony was not required to establish damages on default.

-- There is a minute order and statement of decisions following the default prove up.

According to the court, Code of Civil Procedure section 425.11(c) requires that the statement of damages be served prior to entry of default.Because the statement of damages here

was served several days after the entry of default, it cannot serve as a basis for a judgment for damages.Because no amount was set forth in the complaint, apprising the defendants of the amount of damages claimed, plaintiffs may not obtain a judgment for damages at this time as to this defendant (Lighthouse).

-- A January 29, 2021, court of appeal opinion rever4sed the order granting summary adjudication of the wrongful death claim in favor of Four Seasons.

-- A May 6, 2021, minute order from a status conference indicates that, pursuant to plaintiffs' counsel's request, the court ordered that October 2, 2019, default entered at to Lighthouse vacated.

-- On May 6, 2021, a request for entry of default, with default entered on May 6, 2021, was mailed to Agent Derek Cheung at 3699 Wilshire Boulevard, Suite 100, Los Angeles, California 90010.

-- Plaintiff Dean Donnell died on July 8, 2021.Plaintiffs' application to substitute plaintiff Dean Donnell for his successor in interest (Linda Fera) was ultimately granted.

-- Trial set for December 12, 2022.

We continue to review the Court documents and will update this as additional information is learned.

I am out of the office today and our office is closed on Monday for the holiday, so please let me know your availability for a call next week.

Happy New Year to you and yours!

Be well,

Marijana

**From:** Marijana Q. Kral
**Sent:** Wednesday, December 20, 2023 3:10 PM
**To:** Avi Wagner <avi@thewagnerfirm.com>; Laib Greenspoon <laibg@lspoon.com>
**Cc:** Stephen C. Fraser <sfraser@fwcllp.com>; Kristen J. Heim <kheim@fwcllp.com>; Eva Moreno <emoreno@fwcllp.com>
**Subject:** Donnell

Hello All:

Finally, all the Superior Court records have arrived, and we are going through them now.We will have an update for you by end of week.

Apologies for the delays we encountered acquiring these records – frustrating for all of us, but we are told we now have them all._

Thank you and be well,

Marijana Kral

<image001.png>

1100 West Town and Country Road

Suite 1030

Orange, California 92868

Direct Dial (714) 502-3312

Facsimile(714) 543-3374
mkral@fwcllp.com

https://link.edgepilot.com/s/4a5fde06/Hw8Z5wFha06b8Y3Ijp9RYA?u=http://www.fwcllp.com/

THIS ELECTRONIC MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY REPLY E-MAIL OR BY TELEPHONE AT (818) 543-1380, AND DESTROY THE ORIGINAL

TRANSMISSION AND ITS ATTACHMENTS WITHOUT READING OR SAVING THEM TO DISK. NO WAIVER OF PRIVILEGE OR CONFIDENTIALITY SHOULD BE INFERRED FROM ANY ERROR IN TRANSMITTAL.

Please consider the environment before printing this email.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,2100

Los Angeles,90067

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

Links contained in this email have been replaced. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

--

Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

--
Avi Wagner

THE WAGNER FIRM

1925 Century Park East,

Los Angeles,

avi@thewagnerfirm.com

310.491.7949 x1

# Exhibit 153

FWC ATTORNEYS | FRASER WATSON CROUTCH

Stephen C. Fraser
Alexander M. Watson
Todd E. Croutch
Michael A. O'Flaherty 1947-2012

Daniel K. Dik*
Louise M. Douville
Evan A. Guzé
David A. Koester*
Rachael C. Kogen*
Marijana Kral
Susan E. Shube
Melissa E. Timoshchik*
Matthew A. Yarvis
Megan P. Best*
Evan R. Garcia
Kristen J. Heim
Tracy C. Hertstein
Grace P. Kadahjian
Megan J. Lane
Michael D. Laughlin
Cherie L. Lieurance
Anna M. Wosnik

Nancy K. Brownell, MD, JD
Of Counsel

*Also admitted in other states

1100 West Town and Country Road, Suite 1030
Orange, California 92868-4687
(714) 533-3373 • Fax (714) 543-3374

Writer's Email:
mkral@fwcllp.com

Please refer to file:
MPC438

August 2, 2024

ATTORNEY-CLIENT PRIVILEGED MATERIALS.
THIS DOCUMENT CONTAINS MATERIALS PREPARED
BY COUNSEL INVOLVED IN LITIGATION.

**VIA E-MAIL AND CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Laib Greenspoon
Lighthouse Healthcare Center, LLC

Email: laibg@lspoon.com

Re: Dean Donnell, etc. v. Four Seasons Healthcare & Wellness Center, LP, et al.
MedPro Claim No: 1042085

Dear Mr. Greenspoon:

Enclosed please find a letter dated July 31, 2024, from Albert K. Alikin of Freeman Mathis & Gary, LLP, coverage counsel for MedPro Group on behalf of National Fire & Marine Insurance Company Omaha, Nebraska, as administered by the Medical Protective Company ["MedPro"]. As you can see, that letter is addressed to Lighthouse Healthcare Center, LLC ["Lighthouse"] c/o Avi Wagner of The Wagner Firm. We trust you received a copy of that letter and have reviewed it with Mr. Wagner.

As you know, in September 2023, MedPro assigned us to represent Lighthouse for the sole purpose of reviewing the underlying case and evaluating any possible attempt to set aside the default judgment entered against Lighthouse on January 17, 2023. We shared with you and with MedPro a summary of our review of the available materials in the underlying case as well as our thoughts on any attempt to set aside the default judgment. On July 31, 2024, MedPro instructed us to close our file in this matter.

As a reminder, California Code of Civil Procedure Section 473.5 provides relief from a default judgment to those defendants who, despite proper service, never received "actual notice" of the

lawsuit in time to defend against it. (*See* § 473.5, subd. (a).) To obtain such relief, the defaulted defendant must submit an affidavit showing the lack of actual notice was not due to its avoidance of service or inexcusable neglect. (*Id*., subd. (b).) There is also a time limitation on such a motion. It must be served and filed "within a reasonable time" but before the **earlier** of: (1) 180 days after service of written notice of the default or default judgment on the defendant or (2) two years after entry of the default judgment. (*Id*., subd. (a).) The trial court may set aside the default or default judgment if it finds the moving defendant has met the timeliness requirement and has shown the lack of actual notice was not due to avoidance of service or inexcusable neglect. (*Id*., subd. (c).)

As you know, this matter was assigned to our firm more than 180 days after the default judgment was entered. If you plan to attempt to set aside the default judgment, it must be done before two years from the date of entry of the default judgment [i.e. before January 17, 2025]. We were not instructed nor authorized by MedPro to attempt to set aside the default judgment and we are not making any representation as to whether any such attempt would be successful or considered timely by the Court.

As instructed by MedPro, we will now close our file in this matter. Accordingly, we are no longer the attorneys for Lighthouse. If you want to attempt to set aside the default judgment, you will need to retain new counsel and you will need to comply with all statutory deadlines.

If you have any questions, please feel free to contact the undersigned or MedPro. We wish you all the best.

Very truly yours,

FRASER WATSON & CROUTCH, LLP

Stephen C. Fraser

STEPHEN C. FRASER
MARIJANA KRAL

SCF:mqk
Enclosure

cc: Avi Wagner, counsel for Lighthouse Healthcare Center, LLC and Avi Greenspoon
Email: avi@thewagnerfirm.com

13785675.1