# Exhibit 5

EXHIBIT
No. 5
exhibitsticker.com

## Case Summary Report

| Name | Donnell v. Lighthouse Healthcare Center, | File Manager | Regional Claim Manager | Status | Type |
|---|---|---|---|---|---|
| Case # | 1042085 | Nollenberger, Leah | | Closed | Suit |

| Patient | Name | Age | Sex | Reinsurance Date |
|---|---|---|---|---|
| | Donnell, Valerie | | F | |

| | |
|---|---|
| Description of Main Deft Claim | |
| Condition of Main Deft Claim | Post-hospitalization |
| Treatment of Main Deft Claim | Rehabilitation |
| Allegation of Main Deft Claim | Failure to provide care |
| Result of Main Deft Claim | Death 6/24/2016 due to cardiopulmonary arrest. |

| | | | |
|---|---|---|---|
| Plaintiff Atty | Medvei, Sebastian M | Docket # | BC664101 |
| Venue | Los Angeles | Date Filed | 08/22/2018 |
| Court | State Superior | Trial Date | |

| Claim No | Insured Name | Insured Policy # | Policy Limits | Ind Res | Ind Paid | Exp Res | Exp Paid | Open Date | Type | Status Date | Disposition |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1042085-01 | Lighthouse Healthcare Center, LLC | NSC100276 | 1M/3M | $0.00 | $0.00 | $57,831.69 | $57,831.69 | 04/07/2017 | Suit | 05/07/2025 | No Coverage for Loss |
| | Agent of Insured | | Defense Atty | | Treatment Date | Rpt to Insured | Rpt. to MP | Inception | Status | Excess Limit | Reservation of Rights Sent |
| | Lighthouse Healthcare Center | | Wax, Gary | | 05/01/2016 | 03/07/2017 | 03/08/2017 | | Closed | | N |

| Totals for Case #: 1042085 | $0.00 | $0.00 | $57,831.69 | $57,831.69 | Loss Reserve Code | Reserve adequate |
|---|---|---|---|---|---|---|

All notes for Case

| Mode | Created By | Created Date/Time | Note |
|---|---|---|---|
| Official | Nollenberger, Leah | 01/24/2025 11:02:17 AM | CLOSING NOTE After back and forth with insured's personal counsel, agreement was reached that we would not be pursuing a motion to open the default judgment based on the recommendation of Gary Wax. A final DOC was issued to the insured advising them that we would not be making any indemnity payments due to the default judgment exclusion in the policy. We have advised DC to close their file and advised insured that we are closing ours. |
| Official | Nollenberger, Leah | 12/17/2024 04:06:51 PM | UPDATED APPELLATE COUNSEL RECOMMENDATION Since meeting with counsel and the insured on 12/9, DC Gary Wax had a call with Avi Wagner and Derek Cheung, the individual who received service of the complaint per the return of service. In that meeting, Gary learned that Cheung was, in fact, served with the complaint and in turn forwarded it to his employer's GC, who emailed same to the insured Laib Greenspoon that day. As such, there is now confirmation that the insured received actual notice of the complaint in April 2019. Although Cheung was not Lighthouse's agent for service at the time, its registered agent was not living in the country and Cheung later became their registered agent. Given this development and evidence of actual notice, Gary recommends we do NOT move to open the default judgment as he believes it has essentially no chance of being granted. We discussed same with Avi and coverage counsel on 12/13; Avi asked some questions about substituted service, and Gary provided an updated memo on 12/15 re same. We are waiting for written confirmation from Avi that the insured agrees not to pursue the motion. Diary one week for f/u. |
| Official | Hubert, Sarah | 12/10/2024 01:30:16 PM | Update DC per email from CDM: From: Nollenberger, Leah <Leah.Nollenberger@medpro.com> Sent: Tuesday, December 10, 2024 1:22 PM To: Hubert, Sarah <Sarah.Hubert@medpro.com> Subject: Add DC- 1042085 Donnell v. Lighthouse Healthcare Center Hi Sarah, Please add Gary Wax from Greines Martin Stein and Richland to claim 1042085 as DC effective 11/1/24 (info below). Please expire Stephen Fraser and Fraser Watson & Croutch as DC effective 12/1/24. Thanks, Leah Leah M. Nollenberger, J.D., LL.M Claims Division Manager- Senior Care MedPro Group Phone: 912.223.5898 Fax: 866.552.9906 leah.nollenberger@medpro.com medpro.com |
| Official | Nollenberger, Leah | 12/09/2024 09:57:29 AM | UPDATE/PHONE CONFERENCE WITH INSURED, COUNSEL Appellate counsel Gary Wax provided his memo regarding the options for setting aside the default judgment, a copy of which is saved in OnBase. At my request, he also provided a bullet point list of the questions that still need to be answered to include in affidavits on behalf of the insured and Derek Cheung, the person who purportedly received service of filings. Many of these are the same questions that prior DC was asking and never got answers to, which is why she did not provide a CTW a motion to set aside. Following receipt of the memo and list of questions, I met with the insured's personal/coverage counsel (Avi Wagner and Charissa Morningstar), appellate counsel (Gary Wax and Kent Toland), and MPG's outside coverage counsel (Albert Alikin and Betty Su) on 12/3 to discuss next steps. During this call, Avi advised that Cheung is not a Lighthouse employee, but has made himself available to discuss the circumstances of service, and Avi and Gary will meet with him to try and get some of the questions answered. The insured still needs to answer the questions directed to them, which Avi is also working on. Gary has advised that this information is needed by 12/16 in order for him to start drafting a motion to set aside (if that is what we do) given the mid-January deadline and the intervening holidays. I advised Avi that MPG is willing to proceed with the motion to set aside if the questions can be answered and affidavits provided to Gary. Gary did advise that his firm, as a rule, doesn't appear at the trial court level, but he would instead ghost write the motion for nursing home DC. We are meeting again on 12/13 to determine if the necessary information has been received from Cheung and the insured, and to get the final determination from Gary as to the viability of the motion to set aside. At that time, if we are going to proceed with the motion, we will also discuss DC assignment. |
| Official | Nollenberger, Leah | 11/22/2024 06:16:05 PM | APPELLATE COUNSEL REVIEW Former DC Marijana Kral provided her entire file to appellate counsel Gary Wax, who has now completed his review. He is providing a written memo, but advised today via telephone call that we may be able to set aside the default, but it depends on what information the insured is able to provide about whether their agent for service received the variety of documents allegedly served by PC during the life of the case, and when they actually received notice of suit, etc. Although the insured's personal counsel, Avi Wagner, was able to provide some information, there is other pertinent information still outstanding. Gary is going to provide a detailed written memo to me and Avi that includes the information we would have to be able to provide in order to potentially be successful in vacating the judgment of default. Upon receipt of same I will further note the file. In any event, the deadline to file the motion would be in January, so the insured will have to move quickly in their ongoing investigation regarding the service and notice issues. Diary set for f/u. |
| Official | Nollenberger, Leah | 10/23/2024 05:57:22 PM | UPDATE I had a call with DC Marijana Kral regarding this matter on 10/14 to determine her opinion on the likelihood of prevailing in a motion to set aside the default judgment. She advised that she couldn't provide a CTW the motion because she doesn't have sufficient information about the agent for service and whether the person in his office who was served had authority to accept service in his absence (the actual agent was out of the country). She acknowledged that she had not provided a written opinion on the options for the default judgment, but advised that they would be: 1. moving to set aside the judgment; 2. do nothing and see if PC pursues the default; 3. talk to PC to see if they would set aside the judgment voluntarily and prosecute the case on the merits; and 4. negotiate a settlement with PC in order to get a satisfaction of judgment filed. In light of Kral's inability to provide an analysis and CTW on the motion to set aside the default, and after discussion with coverage and D. Zielinski, we elected to retain appellate counsel to review since this is a purely legal issue. I contacted Gary Wax at Greines Martin in Los Angeles and after he cleared conflicts I advised that we were looking for a legal analysis of the statute/practice book and case law as applied to the facts in this case in order to get an opinion on CTW a motion to open. He asked whether we would want just an analysis at the trial court level, or if we also wanted an evaluation of chances at an appellate level. I advised both would be helpful. I spoke with M. Kral and advised her of the plan to get a second look and put her and G. Wax in touch so she can send him her file, which she agreed to do. I asked M. Kral to provide her |

| | | | |
|---|---|---|---|
| | | | file to G. Wax by 10/30 as we are looking at a January 2025 deadline to file the motion to set aside. Diary set for f/u. |
| Official | Nollenberger, Leah | 09/26/2024 05:39:11 PM | TRANSFER NOTE I am taking over handling of this matter from prior FM. As previously noted, coverage is complicated by the entry of judgment against the insured in January 2023, which was not reported until August 2023. Prior filing of suit was not reported. Coverage letters have been sent to the insured regarding default judgment exclusion. Insured's coverage counsel Avi Wagner recently sent a letter requesting reconsideration of our position, which is being reviewed with coverage for a response. I have left a VM for DC Marijana Kral advising her that I am taking over handling and asked for more information about the viability of opening the judgment as discussions with prior FM were verbal and not reduced to writing, though notes reflect likelihood that such a motion is not viable because everything from the insured indicates proper service. To date, PC has not made any attempts to execute the judgment. Diary set for f/u with DC. |
| Official | Bevans, Sandra | 07/10/2024 01:04:49 PM | To date, it appears that PC has not made efforts to collect on the default judgment. The insured is unaware of any such efforts. After consulting with coverage counsel, we have decided to wait to determine if PC attempts to collect on the judgment before taking further action. |
| Official | Bevans, Sandra | 06/17/2024 11:39:13 AM | After discussing options internally, we have requested more information from the insured via DC regarding any efforts to collect the outstanding judgment by PC and how Lighthouse relates to the LLC that owns the property the facility sits on. I will diary 30 days. |
| Official | Bevans, Sandra | 03/19/2024 02:33:35 PM | CALL WITH DC: I spoke with Marijana Krol today regarding the status of this matter. She indicated that she spoke with Avi Wagner last week, but that no real progress has been made. Wagner confirmed that the address served was correct but has been unable to produce any further information with which we may be able to open the judgment. Apparently the agent for service himself lived outside the country at the time service was made, but his office assistant was served and the certificates of service indicate as such. DC noted that PC has not attempted to execute the judgment yet. She also noted that Wagner told her that the facility has reported that it has no records from this patient because the patient was never actually admitted to the facility. |
| Official | Bevans, Sandra | 02/14/2024 09:26:21 AM | DCM REVIEW: I am monitoring this matter as the prior FM is no longer handling the case. I have f/u with DC to determine whether Laib Greenspoon and/or Avi Wagner have agreed to provide a declaration attesting that the documents described below were not in fact served on Lighthouse. Once we have that answer, I will raise this to the coverage unit for further consideration. |
| Official | Hanson, Thomas | 01/17/2024 07:11:25 PM | DC recently provided a summary of the Superior Court's records to MPG and the Insured, Laib Greenspoon, and his personal counsel, Avi Wagner, and requested a conference call with the Insured to determine if they believe any information contained in the Court's file [particularly as to proof of service] is inaccurate. DC is awaiting their response and will advise on her opinion about opening the default judgment |
| Official | Mains, Matt | 01/16/2024 10:41:21 AM | UPDATE: DC provided a lengthy summary of service issues, DC advises that the judgment may be reopened but the insured needs to sign an affidavit that they were never served. To date, the insured has drugged their heels on answering DC's request. A summary of the email's important points is below: 1. Service of Documents: There were multiple instances of service of documents to Lighthouse, primarily through an agent, Steven Stroll. This includes a summons, complaint, and notices of case assignments and rulings, with dates ranging from June 2017 to April 2019. 2.Case Developments: - A second amended complaint filed in August 2018 wasn't served on Lighthouse. - In January 2019, Lighthouse was identified as an unserved defendant, and the court ordered its service by March 2019. - Default judgment against Lighthouse was entered in August 2019 but was later set aside in May 2021. - Trial was scheduled for December 2022. 3.Statements and Orders: - A proof of personal service on Lighthouse and a request for entry of default were noted in 2019. - In January 2020, a default prove up hearing took place, where Dean Donnell testified about his wife's treatment at Lighthouse. - The court found insufficient basis for damages in January 2020 due to procedural issues with the service of the statement of damages. 4. Damages and Settlements: - The plaintiffs sought damages for wrongful death and estate-related claims. - Settlements with other defendants were noted, leaving Lighthouse as the remaining defendant in default. - In January 2023, the court found evidence sufficient to establish Lighthouse's liability for Mrs. Donnell's death due to substandard care and awarded $2,000,885. 5. Affiliation Allegations: - Plaintiff Dean Donnell alleged in an interrogatory that Lighthouse is affiliated with Rockport Healthcare Services and Four Seasons, all potentially owned by Shlomo Rechnitz and Brius Healthcare Services. I have requested DC push the insured to make a decision as timeliness is important for the subject motion to reopen the judgment. |
| Official | Mains, Matt | 12/20/2023 09:40:31 AM | UPDATE: DC has been unresponsive to providing updates and DCM is aware. To date, DC advises that they've obtained copies of some records but need additional records. I have expressed, repeatedly that time is of the essence in this matter. |
| Official | Mains, Matt | 10/17/2023 03:36:50 PM | OPENING NOTE: In March 2017, the broker for Lighthouse tendered notice of intent to file a lawsuit, which MedPro accepted as an incident. MedPro did not receive any lawsuit so they closed the matter in May 2017.In 2019, the broker sent MedPro a default judgment for another defendant. MedPro did not receive plaintiff's Complaint and did not receive any notice of intent to seek default judgment. On 8/24/2023, MedPro received a copy of the 1/2023 default judgment from Lighthouse. MedPro has issued a contigent DOC based on the default judgment exclusion. MedPro has retained attorney Marijana Kral and Stephen Fraser to investigate and determine whether the judgment can be set aside. DC reports that, to date, it has not found proof of service, but intends to get the actual court records to review. Attempts to contact PC has been unsuccessful. I will continue to follow up on 15 day intervals as to the status of the investigation. |
| Official | Ballester, Christina | 05/09/2017 01:12:43 PM | No further activity, matter will be closed. |

Printed Date: 08/12/2025 02:02 PM

# Exhibit 119

**To Be Filed Under Seal**

# Exhibit 120

**To Be Filed Under Seal**

# Exhibit 136

**From:** "Steven Riss" <Steven.Riss@amwins.com>
**Sent:** Wed, 8 Mar 2017 02:34:52 +0000
**To:** "Alysha.Olsen@medpro.com" <Alysha.Olsen@medpro.com>
**Cc:** "Eli Fogel" <Eli.Fogel@amwins.com>
**Subject:** Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
**Attachments:** Legal Intent to Commence Action - Valerie Donnell.pdf, ATT00001.htm

Hi alysha. Pl process attached. The point of contact is

David Strother
Administrator2@lighthousehealthcenter.com

323) 564-4461

**Mailing address:** 2222 Santa Ana Blvd South Los Angeles CA 90059

Please send acknowledgment.

Thanks

**Steven Riss**
Senior Vice President | AmWINS Insurance Brokerage of California, LLC
**T** 818.772.3819
**F** 818.773.6000
steven.riss@amwins.com
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367
*An AmWINS Group Company*
License #0C01319

Exhibit136
S. Riss
August 6, 2026
Rptr: D. Paholski

MEDVEI LAW GROUP, APC
Sebastian M. Medvei (SBN 285604)
3055 Wilshire Blvd, Ste 900
Los Angeles, CA 90010
Telephone: (213) 984-4013
Facsimile: (213) 386-9074
Email: smedvei@medveilaw.com

Attorney for Plaintiffs DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

| | |
|---|---|
| DEAN DONNELL, an individual; DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL,<br><br>Plaintiff,<br><br>vs.<br><br>HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, a business organization of unknown type; HOLLYWOOD PRESBYTERIAN MEDICAL GROUP, INC., a California corporation; HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC., a California corporation; HOLLYWOOD PRESBYTERIAN MEDICAL BUILDING LLC, a California limited liability company; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation; FOUR SEASONS | **NOTICE OF INTENT TO COMMENCE ACTION AGAINST HEALTH CARE PROVIDER**<br>**(California Code of Civil Procedure § 364)** |

HEALTHCARE & WELLNESS CENTER, a business organization of unknown type; SHERMAN OAKS HOSPITAL, a business organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, a business organization of unknown type; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive,

Defendants.

TO:

HOLLYWOOD PRESBYERIAN MEDICAL CENTER
1300 North Vermont Avenue
Los Angeles, CA 90027

HOLLYWOOD PRESBYERIAN MEDICAL GROUP, INC.
Agent: Benjamin Behroozan
660 W Broadway Blvd
Glendale, CA 91204

HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC.
Agent: Mark R. Bell
111 N Sepulveda Blvd, #210
Manhattan Beach, CA 90266

HOLLYWOOD PRESBYERIAN MEDICAL BUILDING, LLC
Agent: Barbara B. Hines
950 S Grand Ave, 2nd Floor South
Los Angeles, CA 90015

FOUR SEASONS HEALTHCARE &
WELLNESS CENTER, LP
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

FOUR SEASONS HEALTHCARE &
WELLNESS CENTER
5335 Laurel Canyon Blvd
Los Angeles, CA 91607

SHERMAN OAKS HOSPITAL
4929 Van Nuys Blvd
Sherman Oaks, CA 91403

PRIME HEALTHCARE SERVICES, INC.
Agent: Troy Schell
3300 E Gausti Rd, 3rd Floor
Ontario, CA 91761

LIGHTHOUSE HEALTHCARE CENTER
2222 Santa Ana S
Los Angeles, CA 90059

ROCKPORT HEALTHCARE SUPPORT
SERVICES, LLC
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

YOU ARE HEREBY NOTIFIED that DEAN DONNELL, an individual, and DEAN DONNELL, as personal representative of the ESTATE OF VALERIE DONNELL, intend to commence a legal action against you.

The legal basis for the action, without limitation, is that HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, a business organization of unknown type; HOLLYWOOD PRESBYTERIAN MEDICAL GROUP, INC., a California corporation; HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC., a California corporation; HOLLYWOOD PRESBYTERIAN MEDICAL BUILDING LLC, a California limited liability company; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP, a California corporation; FOUR SEASONS HEALTHCARE & WELLNESS CENTER, a business organization of unknown type; SHERMAN OAKS HOSPITAL, a business

organization of unknown type; PRIME HEALTHCARE SERVICES, INC., a Delaware corporation; LIGHTHOUSE HEALTHCARE CENTER, a business organization of unknown type; ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC, a California limited liability company; DOES 1 THROUGH 100, inclusive (collectively "Defendants"), were negligent, reckless, and/or engaged in intentional malfeasance, or other wrongful conduct, in the diagnosis, care and/or treatment of VALERIE DONNELL, and that DEAN DONNELL, VALERIE DONNELL, and DEAN DONNELL, as the personal representative of the ESTATE OF VALERIE DONNELL (collectively, "Plaintiffs"), suffered injury and damages as a result of diagnosis, treatment, surgery and/or care that occurred on or about, without limitation, May 1, 2016 to June 24, 2016, at the various offices and facilities of Defendants.

As a result of such negligence, Plaintiffs sustained injuries, damages and losses, to the extent presently known, including but not limited to the following: death, physical injuries, medical and related expenses, pain, suffering, inconvenience, grief, and inconvenience, emotional distress, impaired enjoyment of life, loss of consortium, loss of society and companionship, funeral expenses, future contributions, and the value of personal service, advice, or training. Plaintiffs intend to seek, without limitation, general damages, special damages, statutory damages, as well as punitive damages, attorneys' fees, and costs as appropriate.

This notice is based upon the facts as presently known. There may be other or additional injuries, damages and expenses still to be ascertained, which may be included in the complaint for professional negligence. To the extent any individual DOE that is subsequently identified through discovery is a medical provider, this notice shall serve as notice to said DOE.

Dated: March 1, 2017

Respectfully Submitted,

**MEDVEI LAW GROUP, APC**

By: ______________________

Sebastian M. Medvei

Attorney for Plaintiffs

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
COUNTY OF LOS ANGELES )

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 3055 Wilshire Blvd., Suite 900, Los Angeles, CA 90010. On August 4, 2015, I served on the interested parties in this action, the foregoing documents described as:

**NOTICE OF INTENT TO COMMENCE ACTION AGAINST HEALTH CARE PROVIDER (Code of Civil Procedure § 364)**

[X] by placing a true copy thereof enclosed in a sealed envelope, with postage prepaid, addressed as follows:

HOLLYWOOD PRESBYERIAN MEDICAL CENTER
1300 North Vermont Avenue
Los Angeles, CA 90027

HOLLYWOOD PRESBYERIAN MEDICAL GROUP, INC.
Agent: Benjamin Behroozan
660 W Broadway Blvd
Glendale, CA 91204

HOLLYWOOD PRESBYTERIAN EMERGENCY MEDICAL ASSOCIATES, INC.
Agent: Mark R. Bell
111 N Sepulveda Blvd, #210
Manhattan Beach, CA 90266

HOLLYWOOD PRESBYERIAN MEDICAL BUILDING, LLC
Agent: Barbara B. Hines
950 S Grand Ave, 2nd Floor South
Los Angeles, CA 90015

FOUR SEASONS HEALTHCARE & WELLNESS CENTER, LP
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600

FOUR SEASONS HEALTHCARE & WELLNESS CENTER
5335 Laurel Canyon Blvd
Los Angeles, CA 91607

Los Angeles, CA 90036

SHERMAN OAKS HOSPITAL
4929 Van Nuys Blvd
Sherman Oaks, CA 91403

PRIME HEALTHCARE SERVICES, INC.
Agent: Troy Schell
3300 E Gausti Rd, 3rd Floor
Ontario, CA 91761

LIGHTHOUSE HEALTHCARE CENTER
2222 Santa Ana S
Los Angeles, CA 90059

ROCKPORT HEALTHCARE SUPPORT SERVICES, LLC
Agent: Steven Stroll
5900 Wilshire Blvd, Ste 1600
Los Angeles, CA 90036

[X] (BY MAIL) I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party of service, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit.

[ ] (PERSONAL SERVICE) I delivered such envelope by hand to the office of the addressee

[ ] (BY FACSIMILE TRANSMISSION) I caused such document to be sent by Facsimile Transmission to the addressee

[X] I declare that I am employed in the office of a member of the board of this Court at whose direction service was made.

[X] I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 1, 2017, at Los Angeles, California

Ali Zamora

Sent from my iPhone

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIGHTHOUSE HEALTHCARE CENTER, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL FIRE & MARINE INSURANCE COMPANY, a Nebraska corporation; MEDPRO GROUP, INC.,; and DOES 1-110,<br><br>Defendants. | Case No. 2:25-cv-01651-ODW (AYPx) |

Deposition of DAVID ALLEN STROTHER, taken on behalf of the Defendants, at 1840 Century Park East, Suite 1900, Los Angeles, California, commencing at 10:45 A.M., on Monday, August 10, 2026, before Andrew T. Ha, CSR No. 14537, appearing remotely.

Job No. 10197700

APPEARANCES:

For Plaintiff:
THE WAGNER FIRM
BY: AVI WAGNER, ESQ.
1925 CENTURY PARK EAST
SUITE 2100
LOS ANGELES, CALIFORNIA 90067
310.491.7949
AVI@THEWAGNERFIRM.COM

For Defendants:
GREENBERG TRAURIG, LLP
BY: JON T. NEUMANN, ESQ.
1840 CENTURY PARK EAST
SUITE 1900
LOS ANGELES, CALIFORNIA 90067
310.586.7700
NEUMANNJ@GTLAW.COM

I N D E X



| DEPONENT: | EXAMINED BY: | PAGE |
|---|---|---|
| David Allen Strother | Mr. Neumann | 5 |
| | Mr. Wagner | 67 |



E X H I B I T S



| | | PAGE |
|---|---|---|
| Exhibit 200 | Lighthouse Authorization for Use or Disclosure of Medical Information, LH_00010504-00010664 | 50 |
| Exhibit 201 | Shomer Email Chain, LH_00009622-00009624 | 61 |



E X H I B I T S
(PREVIOUSLY MARKED)



| | | PAGE |
|---|---|---|
| Exhibit 39 | Email with Subject "Notice of Legal Action," LH_00000001 | 40 |
| Exhibit 71 | Rockport Professional Services Agreement, ROCKPORT 000239-000262 | 33 |
| Exhibit 122 | Documents Bates labeled MP-NFM-LH 007814-007860 | 35 |
| Exhibit 132 | Documents Bates labeled Amwins_0001030-0001046 | 39 |

I N D E X
(CONTINUED)

INFORMATION TO BE SUPPLIED

(NONE)

MARKED BY COUNSEL

(NONE)

QUESTIONS INSTRUCTED NOT TO ANSWER

(NONE)

Los Angeles, California; Monday, August 10, 2026

10:45 A.M.

* * *

THE COURT REPORTER: Good morning. My name is Andrew Ha. I am a certified shorthand reporter for the State of California. My CSR number is 14537.

DAVID ALLEN STROTHER,

having declared under penalty of perjury to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. NEUMANN:

**Q. Could you please state your full name for the record.**

A. David Allen Strother.

**Q. And what is your business address?**

A. My business address where I work?

**Q. Yes.**

A. 2222 Santa Ana Boulevard South, Los Angeles, California 90059.

**Q. And who is your employer?**

A. Lighthouse Healthcare Center.

**Q. And what is your position with Lighthouse Healthcare Center?**

A. Nursing home administrator.

A. I do.
**Q. And you know that she was admitted in -- around June 23rd of 2016?**
MR. WAGNER: Objection. Lacks foundation.
THE WITNESS: I don't recall the specifics.
BY MR. NEUMANN:
**Q. When was the first time you became aware of Ms. Donnell?**
A. I'm not sure.
**Q. Was it after Ms. Donnell's death that you became aware of her?**
A. I don't recall.
**Q. Do you recall that Ms. Donnell died in the Lighthouse facility in June of 2017 -- I'm sorry. Strike that.**
**Do you recall Ms. Donnell died in the Lighthouse facility in June of 2016?**
A. I know that she died, but I don't recall if she died inside or outside.
**Q. And do you recall the family coming into the Lighthouse facility after her death?**
A. I recall family coming to the facility.
**Q. And was that -- and you say here, "The family came upon notification of her death and was upset"; do you see that?**

A. Yes.
**Q. Did you talk to them when they came into the facility?**
A. I don't recall.
**Q. Do you recall ever talking to any family member of Ms. Donnell's death?**
A. Again, I don't recall.
**Q. How did you know that the family had come into -- had come in after the notification of the death and was upset?**
A. Well, I -- I am informed of things of that nature.
**Q. So when were you informed that the family had come into the facility upon notification of her death and was upset?**
A. I don't recall the timing.
**Q. Would that have been around the time that they came in?**
MR. WAGNER: Objection. Calls for speculation. He said he doesn't recall.
Don't speculate. If you recall, answer.
BY MR. NEUMANN:
**Q. Would you -- was that something that you would expect to be told about upon it happening?**
A. I would expect to be informed, yes.

**Q. And you'd expect to be informed shortly after the event?**

A. Yes.

**Q. So if they came in 2016, you would certainly expect to be informed in 2016 that they had come in and were upset?**

A. I would expect that, yes.

**Q. If they came in June of 2016 and were upset, you would expect to be informed of that same month of 2016; correct?**

A. I would expect it.

**Q. Is that a yes?**

A. Yes.

**Q. And you said, "To my knowledge, they were planning to pay for a private autopsy." How did you know that?**

A. Well -- (unintelligible).

THE COURT REPORTER: Wait, wait, wait. Repeat your answer.

MR. NEUMANN: Can you repeat your answer for the Court Reporter, please.

MR. WAGNER: Can you repeat your question, please.

BY MR. NEUMANN:

**Q. My question is -- you wrote, "To my knowledge,**

**they were planning to pay for a private autopsy." My question is how did you know that?**

A. I don't remember.

**Q. Okay. Did you -- you previously said that the family must have requested it; is that correct?**

MR. WAGNER: Objection. Calls for speculation.

BY MR. NEUMANN:

**Q. Is that what you said previously, sir?**

A. I -- again, I -- I surmised that, yes.

**Q. And when you wrote this email -- well, you wrote this email; correct?**

A. Correct.

**Q. And you wrote this email on March 8, 2017?**

A. According to the email.

**Q. Any reason to believe that you didn't write it on that date?**

A. No.

**Q. You wrote this to Mr. Greenspoon?**

MR. WAGNER: Actually, belated objection. Misstates the document. Says the time is --

MR. NEUMANN: I didn't say a time. March 8, 2017.

MR. WAGNER: Says "UTC." That's all.

MR. NEUMANN: That doesn't have anything to do with the date.

**Q. You said that -- in the next line, you said, "The family requested a complete copy of the health record and filed a complaint with the CDPH"; did I read that correctly?**

A. That's what it says.

**Q. And what is the CDPH?**

A. California Department of Public Health.

**Q. And how did you know the family filed a complaint with the CDPH?**

MR. WAGNER: Objection. Assumes facts.

THE WITNESS: I don't know specifically that they did.

BY MR. NEUMANN:

**Q. But that's what you wrote back in March 8th 2017; correct? That they "filed a complaint with CDPH"; am I reading that wrong?**

A. Well, I --

MR. WAGNER: Answer his question.

THE WITNESS: I'm sorry. Say the question again.

BY MR. NEUMANN:

**Q. Sure. On March 8, 2017, you wrote the family had filed a complaint with the CDPH; correct?**

A. I wrote that, yes.

**Q. And you must have had a basis for writing that**

**back in March of 2017; correct?**

MR. WAGNER: Objection. Lacks foundation. Calls for speculation.

THE WITNESS: I have no -- I don't know that they did.

BY MR. NEUMANN:

**Q. Okay. And so are you -- do you normally tell Mr. Greenspoon things that are not true?**

MR. WAGNER: Objection. Argumentative.

THE WITNESS: I do not intentionally tell him things that are not true.

BY MR. NEUMANN:

**Q. And as of the time you wrote this email, you believed that the family had written -- had filed a complaint with the CDPH; correct?**

A. I thought that to be the case, but I had no way to verify that. It's just...

**Q. That was your understanding as of that date?**

A. Correct. That's the thought I had.

**Q. Where did that thought originate?**

A. In my mind.

**Q. Okay. And then you go on to say, "However, CDPH was not able to substantiate any concerns"; did I read that correctly?**

A. That's correct.

BY MR. NEUMANN:
**Q. Medical Records department reports to you; correct?**
A. Correct.
**Q. And so who in the Medical Records department, if you were going to have documents, if you were going to ask for Valerie Donnell's file from the Medical Records department, who would you talk to?**
A. The Medical Records director.
**Q. And who is that?**
A. That's Marinela Duarte.
**Q. Can you spell that for the reporter, please.**
A. M-A-R-I-N-E-L-A, last name, Duarte, D-U-A-R-T-E.
MR. NEUMANN: I don't have any further questions, so you can redirect.

EXAMINATION

BY MR. WAGNER:
**Q. Good afternoon, Mr. Strother. I'm just going to ask you a couple questions. We talked about testimony about when there's an unusual occurrence or unusual circumstance about death; do you remember that testimony?**
A. Yes.
**Q. And we talked about also giving notice to**

**Shomer when you receive legal notices; do you recall that testimony?**

A. Yes.

**Q. Other than when there is unusual circumstances or a legal notice, have you given notice to Shomer?**

MR. NEUMANN: Objection. Vague. Incomplete hypothetical.

THE WITNESS: Can you repeat one more time.

BY MR. WAGNER:

**Q. Other than when there is an unusual circumstance or when you have received a legal notice, have you given notice to Shomer?**

MR. NEUMANN: Same objections.

THE WITNESS: No.

MR. WAGNER: No further questions. No further questions.

THE COURT REPORTER: Then, before we go off the record, Mr. Wagner, will you be ordering a certified copy of the transcript?

MR. WAGNER: Yes. And also you can send that -- but before we get to the certified, let's send the witness a copy immediately, 30 days read and sign.

MR. NEUMANN: I'd like the transcript expedited, please.

THE COURT REPORTER: Understood. How soon do

you need it by?
MR. NEUMANN: How fast can you get it to me?
THE COURT REPORTER: With the current length, one to two days from today.
MR. NEUMANN: Okay. That's fine.
THE COURT REPORTER: May we go off the record.
MR. NEUMANN: Yup.
THE COURT REPORTER: Mr. Wagner?
MR. WAGNER: Yes.
THE COURT REPORTER: We're off the record.
(Concluded. Ending time: 1:12 P.M.)

CERTIFICATE OF REPORTER

I, ANDREW T. HA, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

In witness thereof, I have hereunto subscribed my name.

Dated: 11th day of August, 2026

Andrew T. Ha

Andrew T. Ha
Certified Shorthand Reporter No. 14537

# Exhibit B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIGHTHOUSE HEALTHCARE Center, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL FIRE & MARINE INSURANCE COMPANY, a Nebraska corporation; MEDPRO GROUP, INC.; and DOES 1 - 110,<br><br>Defendants. | CASE NO. 2L25-cv-01651 |

REMOTE DEPOSITION OF AARON ZOLONZ

PERSON MOST KNOWLEDGEABLE of SHOMER INSURANCE SERVICES, an ALERA GROUP AGENCY

August 17, 2026, 12:09 p.m.

Job No. 10198498
Reported By:
SUSAN GALLAGHER, California CSR 14498, CVR-CM

APPEARANCES
(All parties appearing remotely via Zoom)

For the Plaintiff:

AVI WAGNER, ESQ.
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 491-7949
avi@thewagnerfirm.com

For the Defendant:

JON T. NEUMANN, ESQ.
GREENBERG TRAURIG
1840 Century Park East, Suite 1900
Los Angeles, California 90067
(602) 445-8411
neumannj@gtlaw.com

For the Witness:

ANDREW SERVAIS, ESQ.
ROSING LAW
770 First Avenue, Suite 200
San Diego, California 92101
(619) 387-3149
aservais@rosinglaw.com

REMOTE DEPOSITION OF AARON ZOLONZ, PERSON MOST KNOWLEDGEABLE SHOMER INSURANCE SERVICES, an ALERA GROUP AGENCY, a witness called before SUSAN GALLAGHER, California CSR 14498, CVR-CM, on Monday the 17th of August, 2026, commencing at 12:09 p.m.

## EXAMINATION INDEX



| Examination By Whom | Page |
|---|---|
| Mr. Neumann | 5 |
| Mr. Wagner | 77 |



## EXHIBIT INDEX



| Exhibit | Description | Page |
|---|---|---|
| Exhibit 208 | Subpoena to Shomer Insurance Services to produce documents | 10 |
| Exhibit 209 | Notice of Deposition | 10 |
| Exhibit 210 | E-mail correspondence with attachment Bates Shomer 000295 through 302 | 35 |
| Exhibit 211 | E-mail correspondence, Bates Shomer 000303 through 305 | 39 |
| Exhibit 212 | E-mail correspondence, Bates Shomer 000306 through 308 | 41 |
| Exhibit 213 | E-mail correspondence, Bates Shomer 00287 through 288 | 42 |
| Exhibit 214 | E-mail correspondence, Bates Shomer 000309 to 310 | 45 |
| Exhibit 215 | E-mail correspondence, Bates Shomer 000311 | 46 |
| Exhibit 216 | E-mail correspondence with attachment Bates Shomer 000322 through 337 | 60 |
| Exhibit 217 | GuideOne Insurance policy issued to Lighthouse Healthcare, policy period 03/01/16 through 03/01/17, Bates Shomer 000086 through 170 | 75 |

PREVIOUSLY MARKED EXHIBIT INDEX


| Exhibit | Description | Page |
|---|---|---|
| Exhibit 122 | 12/09/16 e-mail correspondence with attachments, Bates MP-NFM-LH007814 through 7860 | 63 |
| Exhibit 129 | 02/2017 e-mail correspondence with attachments, Bates Amwins_0000943 through 950 | 70 |
| Exhibit 132 | E-mail correspondence with attachments Bates Amwins_0001030 throuh 1046 | 72 |
| Exhibit 135 | 03/07/17 e-mail with attachment, Notice of Intent to Commence Action Against Health Care Provider | 28 |
| Exhibit 142 | E-mail correspondence, Bates Amwins_0004128 through 4130 | 47 |
| Exhibit 144 | E-mail correspondence, Bates Amwins_0004140 through 4145 | 48 |
| Exhibit 145 | E-mail correspondence, Bates Amwins_4196 | 54 |
| Exhibit 147 | E-mail correspondence, Bates Amwins_4199 through 4200 | 55 |
| Exhibit 149 | E-mail correspondence, Bates Amwins_4387 through 4390 | 56 |
| Exhibit 166 | 03/15/24 e-mail, Bates Amwins_0010602 | 61 |


---oOo---

P R O C E E D I N G S

---oOo ---

THE REPORTER: Good afternoon. My name is Susan Gallagher. I am a California Certified Shorthand Reporter, license number 14498. I am a code-compliant reporter.

---oOo---

AARON ZOLONZ,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. NEUMANN:

**Q Good afternoon, Mr. Zolonz. My name is Jon Neumann. I represent the defendants in this action. Will you start off by stating your full name for the record?**

A Sure. Aaron Zolonz.

**Q And can you please spell your last name, please?**

A Z-O-L-O-N-Z.

**Q And where are you currently employed?**

A Alera Group.

**Q And what is your position?**

A Executive director.

**Q And how does Alera Group relate to Shomer Insurance Services?**

A Alera Group is the parent company that owns Shomer.

**to Amwins, and then Amwins submitted it to MedPro?**

A It's common practice.

**Q What do you mean by standard practice?**

A You submit to the wholesaler, the wholesaler submits it to the carrier.

**Q And what's the purpose of submitting an application -- what was the purpose of submitting this application to MedPro?**

MR. WAGNER: Lacks foundation.

THE WITNESS: Liability insurance, to get a quote.

BY MR. NEUMANN:

**Q Okay. So was it intended that MedPro would rely upon -- well, strike that.**

**Did Shomer intend when it provided this application to Amwins that MedPro was ultimately going to rely upon the information in this application to underwrite a policy or -- and provide a quote for Lighthouse?**

MR. WAGNER: Foundation; assumes facts; speculation.

Go ahead and answer if you can.

THE WITNESS: Yeah, I can't really say.

BY MR. NEUMANN:

**Q Well, why else would Shomer provide this application to -- to Amwins?**

MR. SERVAIS: Same objection.

Go ahead and answer.

MR. WAGNER: Join.

THE WITNESS: Yeah, I couldn't really say. It's a summary.
BY MR. NEUMANN:
**Q What do you mean "it's a summary"?**
A It has basic information such as applicant information, facility information, points of contact.
**Q Well, then there's a number of questions about the facility; correct?**
A Correct.
**Q And that information is intended to provide -- to be provided to ultimately the insurance company; correct?**
MR. WAGNER: Lacks foundation.
THE WITNESS: Yeah. The insurance underwriters are reviewing the application.
BY MR. NEUMANN:
**Q And so the -- Shomer is providing this information in this application to Amwins so that Amwins can provide it to the insurance company for the insurance company to review and rely upon; correct?**
MR. WAGNER: Lacks foundation.
THE WITNESS: Yeah, I really couldn't say that. I don't work for the carriers.
BY MR. NEUMANN:
**Q Okay. Well, why is it -- why did Shomer provide this application to Amwins?**
A Because it's customary.

**Q What's the purpose behind it?**
A There's certain requirements, such as copies of license, which you can just pull online. Just a requirement. We just deliver it.
**Q Well, you -- you expect that when this application is filled out, that the information in it is -- is truthful; correct?**
A To the best of everyone's ability.
**Q And you'd expect that the witnesses provided to the insurance company, you know that the insurance company is going to use this information as part of its underwriting process; correct?**
MR. WAGNER: Lacks foundation.
THE WITNESS: Yeah. I mean, I can't -- I've never -- I don't work for them, so I can't.
BY MR. NEUMANN:
**Q So why do you provide this -- I mean, you provide this to the insurance company with the expectation that the insurance company is going to read the document; correct?**
MR. WAGNER: Asked and answered.
THE WITNESS: Yeah, I really couldn't say.
BY MR. NEUMANN:
**Q So if you're an insurance broker, you provide the applications to the insurance company, you don't know -- you don't know why? Is that what you're telling the jury?**

THE REPORTER: Thank you.
And, Mr. Servais, would you like to order a transcript?
MR. SERVAIS: Not at this time. Thank you.
THE REPORTER: Okay. Thank you.
(Deposition concluded at 2:58 p.m.)

---oOo---

CERTIFICATE OF REPORTER

---oOo ---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using voice stenography, which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I'm neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ X ] was not requested.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: August 26, 2026

Susan Gallagher

Susan Gallagher, California CSR 14498, CVR-CM

# Exhibit C

# EXPERT REPORT OF ROBERT M. ANDERSON, CPCU

**AUGUST 31, 2026**

IN THE MATTER OF:

United States District Court
Central District of California

CASE NO.
2:25-cv-01651-ODW-MAA

Lighthouse Healthcare Center, LLC,

Plaintiffs,

v.

National Fire & Marine Insurance Company,
a Nebraska corporation; and
MedPro Group, Inc., an Indiana corporation,

Defendants.

BY: ROBERT M. ANDERSON, CPCU

## TABLE OF CONTENTS


**A. QUALIFICATIONS** .......... **3**

**B. MY RETENTION** .......... **5**

**C. METHODOLOGIES** .......... **5**

1. *Selection of Industry Authorities* .......... 5
2. *Temporal Relevance to 2017* .......... 6
3. *Cross-Carrier and Cross-Product Applicability* .......... 6
4. *Weighing Authorities Against the Record* .......... 7
5. *Generally Accepted Practice, Not Examples of Practice* .......... 7

**D. CASE BACKGROUND** .......... **8**

**E. SUMMARY OF OPINIONS** .......... **11**

**F. THE FUNCTION AND PURPOSE OF AN INSURANCE APPLICATION** .......... **14**

**G. SUBJECTIVITIES AND THE UNDERWRITING ARCHITECTURE ON THIS ACCOUNT** .......... **15**

**H. USE OF ANOTHER CARRIER'S APPLICATION BEFORE BINDING** .......... **19**

**I. REQUIRING THE INSURER'S OWN APPLICATION AS A SUBJECTIVITY TO ISSUANCE.** .......... **22**

**J. RELIANCE, MATERIALITY, AND THE RANGE OF UNDERWRITING RESPONSES.** .......... **24**

**K. INCIDENT-LEVEL INFORMATION AND COMPARISON TO EXPECTED DISCLOSURE** .......... **27**

**L. THE PRIOR-KNOWLEDGE PRINCIPLE UNDERLYING SECTION III.X** .......... **32**

**M. RESERVATIONS AND CONTINUING DUTY.** .......... **34**

**N. CONCLUSION** .......... **34**

**Appendix A – Curriculum Vitae**

**Appendix B – List of Prior Cases**

**Appendix C – Materials and Information Reviewed or Considered**

the number of complaints made against and investigated by the Applicant in the preceding three years, and that on this record a CDPH complaint concerning Ms. Donnell was investigated and closed without substantiation within that three-year window; that the "n/a" answer given on Section IV.F accordingly did not capture information the question was drafted to elicit; and that this is an independent basis, apart from Ex. 113 Question 6, for the opinions I have expressed in this section.

The responsive-answer comparison as to Ex. 114 Section II.C is reserved. Section II.C was answered "Yes" and referenced a supplemental incident schedule; the completed schedule is a documented record gap, and its production may change or refine my Section II.C comparison. That reservation is preserved in Section L below. Consistent with my assignment, I express no opinion as to what particular underwriting action MedPro or NF&M would have taken.

## L. The Prior-Knowledge Principle Underlying Section III.X

Section III.X of NSC100276 is a known-circumstance policy provision. That kind of provision is not an idiosyncratic feature of this policy; it reflects a foundational principle of insurance practice. IRMI defines the known loss rule as "the principle of insurance practice that states that coverage may not be obtained against a loss that has already occurred and that is known to the person seeking to obtain the coverage." A "known loss provision" is "language commonly included in the insuring agreement of a liability policy that stipulates that the policy does not apply to losses of which the insured was aware prior to the policy period."[66] The underlying insurance-theory rationale is fortuity: insurance is a mechanism for financing fortuitous losses, not losses the applicant already knows are on the horizon.[67]

---

[66] IRMI Glossary, "known loss rule;" "known loss provision."
[67] IRMI Expert Commentary, "Elements of Insurance" and "Known Injury or Damage," https://www.irmi.com/articles/expert-commentary.

The opinions expressed in this report are to a reasonable degree of professional certainty based on prevailing industry standards and the record available to me as of the date of this report.



Robert M. Anderson, CPCU

Insurance Industry Expert

Date: 08/31/2026

# Exhibit D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

* * * * * * * * * * * * * * * * *

LIGHTHOUSE HEALTHCARE CENTER, LLC, a California Limited Liability Company,

Plaintiff,

-vs-

NATIONAL FIRE & MARINE INSURANCE COMPANY, a Nebraska Corporation; MEDPRO GROUP, INC. and DOES 1-100,

Defendants.

Case No.: 2:25-cv-01651
Hon. Otis Wright

* * * * * * * * * * * * * * * * *

---

ALL PARTICIPANTS APPEARED VIA ZOOM

---

PMK MEDPRO GROUP, INC.

DEPOSITION OF: DAVID PULLEY

DATE: AUGUST 5, 2026

WITNESS LOCATION: HARTFORD, CONNECTICUT

Reporter: Bethany A. Carrier, RMR, CRR, CSR #071

A P P E A R A N C E S

Representing the Plaintiff:

THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
By: AVI WAGNER, ESQ.
avi@thewagnerfirm.com
(310) 491-7949

Representing the Defendants:

GREENBERG TRAURIG, LLP
2375 E. Camelback Road, Suite 800
Phoenix, Arizona 85016
By: JON T. NEUMANN, ESQ.
neumannj@gtlaw.com

Also Present:

MATTHEW DiBUDUO, Videographer

S T I P U L A T I O N S

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the commissioner before whom this deposition is taken is waived.

It is further stipulated that any defects in the notice are waived.

It is further stipulated that the deposition may be signed before any notary public.

TRANSCRIPT LEGEND

(--) - Break in speech continuity and/or interrupted sentence.

(sic) - Exactly as said.

(phonetic) - Exact spelling not provided.

(...) - Indicates omission of word(s) when reading or trailing off and not finishing sentence.

INDEX

EXAMINATION

| Witness Name | Page |
| --- | --- |
| DAVID PULLEY | |
| Direct By MR. WAGNER ............................ | 6 |

EXHIBITS

For Identification


| Exhibit | Description | Page No. |
| --- | --- | --- |
| Exhibit 112 | Notice of 30(b)(6) Deposition . | 11 |
| Exhibit 113 | Senior Living Community ....... Supplemental Application | 30 |
| Exhibit 114 | California Surplus Lines ...... Warning Statement | 31 |
| Exhibit 115 | Email exchange ................ | 63 |
| Exhibit 116 | Email exchange ................ | 68 |
| Exhibit 117 | Insurance Producer Agreement .. Location Signature Sheet | 73 |
| Exhibit 118 | Email exchange ................ | 95 |
| Exhibit 119 | Risk Management Assessment .... Report | 96 |
| Exhibit 120 | Risk Assessment Tool for ...... Lighthouse Care Center | 102 |


Original exhibits retained by Mr. Wagner.

(The deposition commenced: 12:29 p.m.)

THE VIDEOGRAPHER: We are now on the record. This begins the continued deposition of the defendant MedPro Group, Incorporated, pursuant to Rule 30(b)(6) -- 30(b)(6) -- excuse me -- in the -- of the Federal Rules of Civil Procedure in the matter of -- in the matter of Lighthouse Healthcare, LLC -- Lighthouse Healthcare Center, LLC, et al., versus National Fire & Marine Insurance, et al., in the U.S. District Court, Central District of California.

Today is Wednesday, August 5, 2026, and the time is 12:29 p.m. Eastern Time. This deposition is being taken of -- the witness and the videographer are at the Regus, 100 Pearl Street in Hartford, Connecticut at the request of the Wagner Firm.

The videographer is Matthew DiBuduo of Magna Legal Services and the court reporter is Bethany Carrier of Magna Legal Services. Will counsel and all parties present state their appearances and whom they represent for the record.

MR. WAGNER: Morning. Avi Wagner

for plaintiff, Lighthouse Healthcare Center, LLC.

MR. NEUMANN: Jon Neumann on behalf of the witness and the defendants MedPro Group, Inc. and National Fire & Marine Insurance Company.

THE VIDEOGRAPHER: Thank you. Will the court reporter please swear in the witness.

DAVID PULLEY, Deponent, appearing remotely before me from the location of Hartford, Connecticut, being first duly sworn by Bethany A. Carrier, a notary public within and for the State of Connecticut, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. WAGNER:

Q Good morning, Mr. Pulley.

A Morning.

Q Off the record you saw my name is Avi Wagner. I'm here to take your deposition today.

Have you ever had your deposition taken before?

A I have.

Q Approximately how many times?

MedPro Group, Inc.'s -- and if I use the term "MedPro," you understand I'm referring to the defendant MedPro Group, Inc. -- you understand you're here as one of their designees?

A Yes.

Q And you understand you're here to give testimony about the underwriting, we'll go through the topics with specificity, but generally these are topics related to the underwriting of a policy that MedPro issued to my client, Lighthouse Healthcare Center, LLC?

A Yes.

Q So I won't belabor the admonitions, but just a few things: If you don't understand a question that I'm asking, ask me to rephrase. If a term is ambiguous or uses terminology that's unfamiliar to you, just ask me to rephrase and I'll do so; otherwise, if you go ahead, I'm going to assume you understand my question.

You may at time to time hear counsel object. But unless there's a specific instruction not to answer, I would ask you to still give your best testimony understanding that you're doing so under oath.

Does that make sense so far?

A Yes.

Q Last one -- and this is one we're all guilty of often -- is to make sure that even if you think I'm done

accounts.
Q Did you work at all for -- on any Lighthouse files during that '17 to '19 time period?
A I did not.
Q Prior to beginning to prepare for this deposition, were you familiar with a company called Lighthouse Healthcare Center, LLC?
A Yes, I was.
Q How were you familiar with it?
A In my role as VP, I was included on some documentation -- once some of these legal matters were initiated against MedPro and National Fire & Marine, I was included on those emails in my role as VP.
Q And prior to -- separate from some involvement with this litigation, did you have any other familiarity with Lighthouse?
A I did not.
Q Do you know the name John Hopping?
A I do.
Q Who is John Hopping?
A John Hopping is an underwriter currently at MedPro Group.
Q And what's his title?
A I don't know exactly, but he's on the underwriting team for the senior care division.

Q Is he lateral to you? Or report to you? Senior to you?

A He would report up through me.

Q So are you his boss?

A I don't know if I -- let's see. Let me think about it. I have one manager that reports to me and he reports to that manager.

Q Okay. So he's -- is he like an assistant vice president level or a level below that?

A I believe he's a level below that. So, like, I think we call it like a senior underwriter or executive senior underwriter or something like that.

Q Okay. And that is -- was that his role between '17 and '19?

A I don't recall.

Q Did you talk -- to prepare for this deposition, did you talk to Mr. Hopping?

A I did not.

Q Did you talk to anyone in MedPro's underwriting team?

A On the underwriting team, no, I did not.

Q Apart from reviewing the documents that you mentioned, did you do anything else to prepare for this deposition today?

A I consulted with counsel for -- on a couple of

Lighthouse directly, but rather from AmWINS; is that correct?

A That is correct. Yes.

Q And so when I say they're "involved in underwriting," they're involved facilitating MedPro's underwriting; is that a fair statement?

MR. NEUMANN: Objection to form.

THE WITNESS: I would say they provide necessary information for MedPro to conduct its own underwriting.

BY MR. WAGNER:

Q You agree that AmWINS provides necessary information for MedPro to conduct its own underwriting?

A Yes.

Q And that information was provided at MedPro's request?

A Generally speaking, yes.

Q And in the case of these files, the '17 and '18, '18-'19 files, information that AmWINS provided it was done pursuant to MedPro's request; correct?

A The initial submission was done at I would imagine Shomer's request, Shomer Insurance Agency's request to AmWINS and then they submitted it to us. We didn't request specifically that AmWINS submit Lighthouse account files to us directly. So the initial submission

was sent at AmWINS's request and that was directed to MedPro.

Q And then once the initial request for quotations or expression of interest was made, then MedPro followed up and requested certain information from Lighthouse and it requested for that information through AmWINS; correct?

A Correct.

Q And so turning back to this Exhibit 112, and specifically Topic 40. The page -- numbered page is number 12, but it's 14 of the PDF. Do you see that Topic 40?

A I do.

Q All communications between MedPro and AmWINS and any other insurance broker relating to the Donnell claim.

Pursuant to this topic, you reviewed all the correspondence you could identify between AmWINS and MedPro?

A Yes.

Q And that was not just underwriting files but also stuff after the claim transpired or was it limited to underwriting files?

A I don't recall seeing any claim information in the files that I reviewed. It was mainly underwriting information.

Lighthouse Healthcare Center, LLC?

A Yes.

Q Thank you. And then we talked about AmWINS. So I assume you've reviewed -- and the documents you've reviewed, that included communications between MedPro and AmWINS; correct?

A Yes.

Q Were there any other correspondences -- strike that.

Apart from communications between AmWINS and MedPro, did you review internal communications by MedPro about underwriting?

A As respects the Lighthouse policy, no, I did not.

Q And did you review any communications between MedPro and any other third party apart from AmWINS with regard to the Lighthouse policy or policies?

A I don't recall seeing any other correspondence from an outside party.

Q Okay. So as we sit here today, the correspondence you recall reviewing was strictly between MedPro and AmWINS?

A Yes.

MR. NEUMANN: And this is -- just to be clear for the record, Mr. Pulley was

was from Lighthouse.

Q So this is an application that -- this is a supplemental application that AmWINS received from Lighthouse and then sent to MedPro?

A Yes.

Q And that was sent by AmWINS to MedPro pursuant to MedPro's request; correct?

A I believe this one was sent, like I said before, when AmWINS submitted it to us. We did not ask for it initially. That was just sent with the initial submission. And then I don't know if that's an important distinction, but...

Q So meaning the initial submission included the supplemental application?

A I believe it did.

Q And then turning then to Exhibit 114, which ends with the Bates number 941, is this something that was included with the initial submission?

A I don't recall, but I don't think it was.

Q This was something that MedPro asked for afterwards?

A I believe so.

Q Now, turning back to 113, do you know if MedPro asked AmWINS or anyone else any questions about this Exhibit 113?

A I'm not aware of any questions that were asked.

Q So then you have no reason to dispute that MedPro did not ask any questions about this Exhibit 113?

MR. NEUMANN: Object to the form.

THE WITNESS: I would have to look at the correspondence more closely again to determine for sure the answer to that question, but -- so it could be, but it might not be.

BY MR. WAGNER:

Q So is it fair, then, that you don't recall?

A I don't recall. Correct.

Q Do you recall, whether about this Exhibit 113 or any other document, do you recall any specific questions that MedPro asked about any submissions by Lighthouse?

A If there were, I think we would have them in the correspondence documentation.

Q You're not aware of any telephonic discussions on that subject?

A I did not interview the underwriter, so I don't know if there was any telephone conversations or not. I'm unsure of that.

Q And did you have any discussions about the subject of whether there were any telephone

conversations?

A No. As I stated previously, I did not interview Mr. Hopping, who was the underwriter on this file.

Q My question is a little different one. I understand that -- and you're correct. You testified you did not interview him. Did you talk with anyone, whether counsel or anyone else to prepare for this document -- for this deposition to have an understanding about whether there were any oral communications in the underwriting process between AmWINS and MedPro?

MR. NEUMANN: Well, I'm going to instruct him not to answer to the extent he is being asked to reveal attorney-client communications. So anything that you and I talked about, Mr. Pulley, that you not testify about.

But you can answer the question generally about whether you had a conversation with anyone with respect to telephone conversations between AmWINS and MedPro with regard to the underwriting.

THE WITNESS: All right. I do not recall any conversations regarding that -- that question.

BY MR. WAGNER:

carrier, that should be the responsibility of the previous carrier to defend and indemnify rather than the current carrier.

Q Turning to, in that same section, Question 6. The question is, "Is the undersigned, or any person who is given the responsibility by the applicant to give or receive notice of a claim," and it continues essentially asking is this person the one responsible for giving notice of claims. Is that a fair characterization of the question?

A Let me read it so I understand it. Hold on one second.

MR. NEUMANN: Just going to object to the form. The document speaks for itself.

THE WITNESS: Yes, I think that speaks to the insurance persons within their organization, is there any knowledge of any claims and that they have made the proper reporting. Again, it speaks for itself.

BY MR. WAGNER:

Q And then in response to Question 6, Lighthouse checked the box no, meaning that the person signing is not responsible for giving notice of claims; correct?

MR. NEUMANN: Objection to form. Misstates the document.

THE WITNESS: That is one way to interpret it. I think there's another way to interpret that they're maybe not aware of any potential future claims, not that they're not responsible.

BY MR. WAGNER:

Q Ambiguous?

A I'm sorry?

(Court Reporter asked for clarification.)

BY MR. WAGNER:

Q So the question is ambiguous?

MR. NEUMANN: Objection to form. Calls for legal conclusion.

THE WITNESS: To me, it's not ambiguous because I read it the way I answered it.

BY MR. WAGNER:

Q And so what's your read of this question? What's it asking?

A That the insured is not aware of any potential incidents that need to be reported to a carrier.

Q And then it defines potential incidents as stuff like slip and falls, elopements, facility-acquired pressure sores. Do you see that?

A I do.

Q Do you know how those examples were selected in preparing this questionnaire?

A I don't.

Q And then on the next page, "Remarks" -- this is the fifth page of the document -- that page it says the word, "Section VII: Remarks," then it's blank; correct?

A Correct.

Q Did MedPro ever follow up about why that was left blank?

A I don't recall seeing any questions about that in the correspondence.

Q So you have no reason to dispute if I were to say that you agree that MedPro did not follow up on Section VII being blank, you have no reason to dispute that; correct?

A Not in a written format, no.

Q And you have no basis to believe that it followed up in an oral format; correct?

A I'm not aware of any oral follow-up.

Q Then now turning to Exhibit 114, which again that has -- it's a 13-page document with Bates numbers ending 7941. Do you see that?

A I do.

Q This is a form or series of forms that MedPro requested AmWINS obtain completion of from Lighthouse?

Q Are you aware of any follow-up questions that MedPro asked about this application?
A I don't recall any.
MR. NEUMANN: Mr. Wagner, I just want to make sure I understand your question. Are you confining your question just to this page or the entire application?
MR. WAGNER: This entire application, meaning not the application we talked -- we talked about, you know, the first application a moment ago. I'm talking about this. And, you know, let me ask it more clearly.
BY MR. WAGNER:
Q Starting on the third page of this document, it's Bates number with the last four numbers 7943, there's a document heading National Fire & Marine Insurance Company, Omaha, Nebraska, Senior Care Application. Are you aware -- and the document continues for approximately 10 pages.
Are you aware of MedPro having asked any follow-up questions about this application of Lighthouse or of AmWINS?
A Come to think of it, I do think there were some follow-up questions in regards to maybe loss runs or some

claim history, maybe some other information. But about a specific question, I don't recall.

Q And there were no questions about answers to specific questions. The answers were confined to providing additional documents; correct?

A Correct.

Q And there was also a discussion about potentially having an on-site visit at the facility?

A I believe there was, yes.

Q Do you know whether such an on-site visit occurred?

A It's my recollection I think there was one conducted.

Q When was that conducted?

A I don't recall the dates.

Q Are there any notes summarizing the findings of that on-site visit?

A I believe there are.

Q And what -- were there any issues identified in those notes?

A Yes. I think there were some general concerns.

Q And what were those concerns?

A You probably have the document. So if you could refresh my memory by pulling that up, I could certainly look at it.

THE WITNESS: I'm sorry. You were cutting out there for a second.

MR. WAGNER: Okay. Is that what you were going to say, Ms. Reporter?

THE COURT REPORTER: Yes.

MR. WAGNER: Let me speak up.

BY MR. WAGNER:

Q Did MedPro -- in this Question B on the top of 7945, did MedPro make any follow-up into the disclosed ages of Lighthouse residents?

A I don't think so. I don't recall for sure, but I don't think so.

Q Why not?

A I don't know.

Q And then continuing along in that classification section under Question M -- strike that.

Under L2, and then M, those questions were left blank. The responses were left blank. Do you see that?

A I do.

Q Did MedPro follow up about those blanks?

A I don't recall seeing any follow-up on those.

Q Why not?

A Why was follow-up not done?

Q Yes.

A I don't know. Well, I think with L, kind of the

Part 1 of the question, it's already answered no. And then I think it kind of leans into the fact that because Part 1 of Question L is answered no, that Part 2 doesn't really apply.

Part M, that's not the case. I don't know why that was not followed up.

Q It's common for MedPro not to follow up about blanks in insurance applications; correct?

MR. NEUMANN: Objection to form.

THE WITNESS: I would -- that's not a fair characterization. There are some questions that are more important than others. So we would follow up on some, but maybe not others.

BY MR. WAGNER:

Q And then continuing along this page under Section VI Administrator, you see Mr. Strother, who we saw his signature before, he's identified as the administrator of the facility; correct?

A Correct.

Q And there's nothing here identifying him as a principal; correct?

A Other than as the administrator, which I might -- one might say is a principal. But I don't -- I don't know where they were on the org chart on the entity

something that's been set up by the federal government to provide ongoing care for elderly people.

Q And in this application, that question was left blank; correct?

A It was.

Q Did MedPro follow up on that blank?

A Not that I'm aware of.

Q Why not?

A PACE programs are actually fairly rare. We see them at MedPro not even once a year. And I think an exposure like that, the broker would have informed us if there was any exposure like that.

Q Then turning to G, Rehabilitation Services, that was also left blank; right?

A It was.

Q And most nursing homes do provide, you know, some in-house rehabilitation services; correct?

A Some do, yes.

Q And MedPro didn't follow up on that blank in G; correct?

A Not that I'm aware of.

Q Why not?

A I think, like you said, sometimes that would fall under the classification of healthcare services that a skilled nursing facility might typically provide. So

that's not going to change the premium necessarily. So it's a little bit of information that's not as important, at least for generating a premium.

Q Then on Section XI, there's a list of a whole bunch of consultants and independent contractors and services. This is continuing on to Bates page ending 7948. Do you see that Section XI?

A I do.

Q And there's answers regarding the first question about physicians, and one about three quarters of the way down for barber/beautician, which are identified as yes. But the rest for the physicians' row the answers are complete, and for everything else there's no answers one way or another other than that one box on barber/beautician; correct?

A That's the way it shows, yes.

Q Did MedPro follow up on nonanswers to those questions?

A Not that I'm aware of.

Q Why not?

A It's -- I don't know.

Q Then continuing along, Section XIII[sic], Volunteers, all those questions were left blank; correct?

A Except for Question A, it says "none."

A That's correct.
Q Why is that?
A I think you can refer to my previous testimony. If it's a federally mandated thing, we expect and understand that most if not all facilities follow the law.
Q Then turning along back to 7948 on this Exhibit 113, XIII B, there's a question, Does the applicant employ a full-time, dedicated risk manager? And the answer is no. Do you see that?
A Yes, I do.
Q Did MedPro follow up about that answer?
A Not that I'm aware of.
Q And then on the balance of this Section XIII, did MedPro follow up on any other answers in this Section XIII?
A Not that I'm aware of.
Q And to be clear, you're aware that Section XIII continues not just for the Bates page ending 7948, it starts at the 7948 and then it continues on to 7949. Do you see that?
A I do.
Q And MedPro did not follow up about the answers to any of these matters; correct?
A Not that I'm aware of.

Q Continuing on page ending 7951. There's a Section XV about commercial automobile. And the first answer to that question is left blank.
Did MedPro ever follow up about that nonanswer?
A Not that I'm aware of.
Q Why not?
A Generally -- well, not generally. We do not offer primary commercial automobile liability insurance. And unless it's requested to be on the excess policies on an underlying basis, we generally don't ask those questions.
Q And in this case, there was no request to be in an excess position on an underlying policy; correct?
THE COURT REPORTER: I'm sorry. Can you repeat that question?
BY MR. WAGNER:
Q In this case, there was no request by AmWINS or Lighthouse for MedPro to be in an excess position?
A That's correct.
Q And then on Section XVI, it references attachments. And I'll represent to you I saw that there were requests for follow-up on some of these items, you know, for instance the loss history and then financials. But apart from loss history and financials, are you aware

of any follow-up requests that MedPro made in respect to these questions in Section XVI?

A I'm not aware of any more.

Q And so specifically Section XVI B, MedPro made no follow-up requests for these documents; correct?

A That's the resumes, the state survey reports, and if I can read that correctly, complaints?

Q Correct.

A I don't recall seeing anything about those.

Q And then in XVI B3, it requests for a survey of any substantiated complaint. What's meant here by "substantiated complaint"?

A Each state conducts a survey at skilled nursing facilities and sometimes they make those surveys, those visits from the compliance officers as a result of complaints made by residents or their family members. So the surveyors will go out and if a complaint is substantiated; in other words, the complaint is verified that something did actually occur, a report will be made. And in many states it's made public.

Q And in California -- strike that.

So meaning some complaints are substantiated. A number of complaints are not substantiated; correct?

A That's correct.

Q And so for a number of complaints the state may

come in, but they're going to say, Hey, there's not enough there, you know, for us to proceed on this complaint, meaning there's no indication that there's probable liability or probable breach; correct?

MR. NEUMANN: Objection to form.

THE WITNESS: That's a question for the state on how they determine that.

BY MR. WAGNER:

Q So regardless of how the state determines it, you agree with me the state does often determine that complaints are not substantiated; correct?

MR. NEUMANN: Objection to form.

THE WITNESS: Correct.

BY MR. WAGNER:

Q And that's why here you're only asking for substantiated complaints. You're not interested in unsubstantiated complaints; right?

MR. NEUMANN: Objection to form.

THE WITNESS: Correct.

BY MR. WAGNER:

Q Why is that?

A As you stated, sometimes the unsubstantiated complaints, there's maybe not enough evidence. There's not enough -- maybe someone changed their mind about following through with a complaint. There could be a

number of reasons why it's unsubstantiated. But the substantiated ones seem to have a little bit more meat on the bones, so to speak.

Q And so those were the ones that MedPro was interested in; correct?

MR. NEUMANN: Objection to form.

THE WITNESS: Potentially.

BY MR. WAGNER:

Q It was not interested in the unsubstantiated complaints?

MR. NEUMANN: Objection to form.

THE WITNESS: Probably not.

BY MR. WAGNER:

Q Then continuing on this Section XVI, there's Section C, this additional documents including CMS Form 671 and 672. Do you see that?

A I do.

Q Did MedPro follow up requesting any of these attachments?

A I don't recall seeing anything about a follow-up for those.

Q So you have no reason to dispute that, in fact, MedPro did not follow up on anything in response to this Section XVI C?

A No.

Q And you have no reason to dispute that MedPro did not follow up requesting anything responsive to Section XVI B?

A No.

Q Apart from anything we've covered already, is there anything else in terms of follow up in respect to this application that you're familiar with MedPro having made?

A That's a pretty broad question. I do remember seeing follow-up questions about at the time of the policy was issued, perhaps, for additional information to make sure that we issue the policy correctly and things like that. But as respects the application, I don't remember any other follow-up.

MR. WAGNER: Jon, we've been going about an hour and change. Why don't we take a ten-minute break.

MR. NEUMANN: Sounds good.

THE WITNESS: Sounds great.

THE VIDEOGRAPHER: Off the record, 1:46 p.m.

(Recess: 1:46 p.m. to 1:59 p.m.)

THE VIDEOGRAPHER: We are now on the record. It is 1:59 p.m.

(Exhibit 115, Email exchange:

completed contact page for this policy?

A I believe I did see one.

Q And did -- that identified Mr. Strother as the contact; correct?

A Yes. I believe so.

Q And did MedPro ever reach out to Mr. Strother either before or after receiving this RM contact page?

A If I recall correctly, there was a reach-out for an on-site visit.

Q And so then I was going to continue along this email. There was a discussion about an on-site risk consultation. Do you see that?

A Yes.

Q Is that the on-site visit you were referring to a moment ago?

A Yes.

Q And so MedPro requested an on-site risk consultation?

A Correct.

Q But it did so only after issuing a binder on the policy; right?

A I believe -- at least at that point, yes.

Q Why did it bind first and then ask for consultation second as opposed to the other way?

A That's just typically what we do.

Q So you issue the policy and then afterwards you can ask other questions about risk?
A Ask further questions and just get some eyes and ears on the facility. Yeah.
Q And did MedPro, in fact, conduct an on-site risk consultation for Lighthouse in 2017?
A I believe they did, yes.
Q Who conducted that for MedPro?
A If I remember correctly, it was one of our risk managers named Arlene Luu.
Q And that's L-i-u?
A L-u-u.
Q Did anyone else apart from Ms. Luu participate in an on-site visit at Lighthouse on behalf of MedPro?
A Not that I'm aware of.
Q And what's Ms. Luu's title?
A I don't know for sure, but she's one of our risk management consultants.
Q And is she employed by MedPro -- the defendant MedPro Group, Inc.?
A Yes, she is.
Q Is she still presently employed by MedPro?
A Yes, she is.
Q And she was employed by them in 2017?
A Correct.

Q And is her role strictly limited to conducting on-site risk consultations?

A I don't know for sure. That's not my department. But it's not limited to senior care division. She has other responsibilities with other divisions as well.

Q And what date did she conduct an on-site risk consultation of Lighthouse?

A I don't recall. I don't recall the exact date.

Q Did she discuss the results of her on-site risk consultation with anyone at MedPro?

A "Discuss" meaning? What do you mean by discussion?

Q Did she have any discussions with anyone at MedPro about her on-site risk consultation at Lighthouse?

A I believe there was a written report, but I don't know if she had any oral communication with anybody.

Q And do you have any estimate as to what date she conducted an on-site risk consultation?

A Other than in the few months after we bound the policy in 2017, other than that I don't -- I don't recall the date.

Q Do you know if her consultation was before or after the final policy was issued?
A I don't know.
Q And apart from any email report, do you know if a search was made of her records to look into any notes she might have had about the on-site risk consultation?
A By whom?
Q By anyone.
A I don't know.
Q Did you talk to her in preparation for today?
A I did not.
MR. WAGNER: Jon, you have 116 as well?
MR. NEUMANN: I do.
(Exhibit 116, Email exchange: Marked for identification.)
BY MR. WAGNER:
Q Mr. Pulley, you've been shared what's been marked as Exhibit 116.
A Okay. Give me a second here. Okay.
Q And this is a cover email. This is issuing the final policy on April 3, 2017?
A Yes.
Q See that on this document?
Who is Andrea Aboufadel?

document?

A Yes. Correct. Yep.

Q Is that date, April 28, 2017, in fact when a risk assessment was conducted?

A It must be.

Q Well, do you have any information suggesting a risk assessment was conducted on any other day?

A No.

Q And do you know why it took several weeks to issue the report about the risk assessment?

A I don't know. That's not surprising to me. Just takes some time.

Q And in terms of the information referenced here, are these independent findings Ms. Luu made or is this information that was communicated to her by Lighthouse?

A These would have been information that she gleaned from the on-site visit.

Q Well, I know some of that might be the case, but I'll give you an example. You look on the page -- second page of the document, which has the Bates numbers ending 8148, and the second paragraph, it identifies Lighthouse Healthcare Center is 149 beds skilled nursing facility. That's not something that Ms. Luu reached an independent conclusion on; correct?

MR. NEUMANN: Objection to form;

foundation.

THE WITNESS: I don't know how she reached that conclusion. But it seems to be generally understood that that's the case.

BY MR. WAGNER:

Q Right. I get it. I'm just trying to understand the extent to which this reflects personal knowledge of the author.

So, for instance, it says, you know, that Mr. Strother is with the facility and he's been there for three years.

Do you know how she reached that conclusion?

MR. NEUMANN: Form and foundation.

THE WITNESS: I don't know specifically.

BY MR. WAGNER:

Q And then it goes through -- in the third paragraph it talks about the age, you know, some of the age breakdown of residents.

A I see that.

Q Do you know how that determination was made?

MR. NEUMANN: Form and foundation.

THE WITNESS: I don't know for certain.

BY MR. WAGNER:

Q And then she identifies a number of risk reduction practices that were noted. Do you see that?
A I do.
Q Do you know if that's something that MedPro looked at further beyond this report?
A I don't know if they did or not.
Q And turning on page 8149. There's a discussion about privacy officer training. Do you see that?
A I do.
Q Who was Lighthouse's privacy officer during this period?
A I don't know.
Q Who did Ms. Luu interview, if anyone, to make the determinations in this section?
MR. NEUMANN: Form and foundation.
THE WITNESS: I don't know. It's not stated.
BY MR. WAGNER:
Q Did she interview anyone?
MR. NEUMANN: Form and foundation.
THE WITNESS: I know typically the risk consultants typically interview the administrator at least.
BY MR. WAGNER:
Q And do you know if she did in this case?

A Not for certain.

Q Continuing on with the next section of the report. This continues also on the Bates page ending 8149, then continues onto the next page after that, which is 8150. This is Section 2.

Do you know if Ms. Luu interviewed anyone to reach these conclusions?

MR. NEUMANN: Form and foundation.

THE WITNESS: I don't know.

BY MR. WAGNER:

Q So you don't know who, if anyone, she interviewed; correct?

A Correct.

Q Then on page 8150, continuing under heading 3, it states, "The facility does not currently conduct a culture of safety survey but should consider it."

What's a "culture of safety survey"?

A A culture of safety survey I would say is a reflection of how the staff is mindful of safety for all of the residents and the employees and any visitors that are there.

Q And did MedPro ever communicate to Lighthouse a recommendation that it should conduct a culture of safety survey?

A I don't know for sure, but I believe that

Ms. Luu would have communicated that to the facility.

Q Move to strike as nonresponsive.

What's the basis of your belief that she communicated that to the facility?

A It's generally a business practice of ours that the risk consultant, that when they visit a facility, that they share their findings with the facility leadership.

Q But in terms of actual communications and if they, in fact, occur, you don't know one way or the other; correct?

A Correct.

Q And then in Section 4 there's a suggestion the facility does not have a current -- does not have a current compliance program.

A That's what it states. Correct.

Q Do you know how Ms. Luu reached that conclusion?

A I don't know.

Q Do you know if she shared the findings in Section 4 with anyone at Lighthouse?

A I would give the same response for Section 3.

Q Which is you expect she might have, but you don't know one way or another?

A Correct.

Q And then on page 8152, there's a place for a

risk management assessment response or action plan. And Ms. Luu left this one blank; right?

A Yes.

Q And so that suggests there was no action plan for any of the issues identified in this document in respect to Lighthouse; correct?

MR. NEUMANN: Objection to form. Calls for speculation.

THE WITNESS: Yeah. I don't know.

BY MR. WAGNER:

Q Do you know whether -- you have no awareness of any action plan that was ever submitted for risk management purposes from MedPro to Lighthouse; correct?

A That's correct. I'm not aware. There may have been, but I don't know for sure.

MR. WAGNER: Turn to 118, Jon.

MR. NEUMANN: Bates number 1853?

MR. WAGNER: Yes. I think, Bethany, we're up to 118; right?

MR. NEUMANN: 120.

MR. WAGNER: Excuse me. 120.

(Exhibit 120, Risk Assessment Tool for Lighthouse Care Center: Marked for identification.)

BY MR. WAGNER:

Q You've been handed what's been marked Exhibit 120. Are you familiar with this document?

A It's not in the chat yet. Oh, there it is. Let me pull it up. One second.

Q And this is -- for the record, this is an 18-page document with the beginning Bates numbers last four numbers 8153. A document titled Risk Assessment Tool for Lighthouse Care Center and it has its address.

A Okay.

Q My question is: Are you familiar with this document?

A I've got it pulled up now.

Q So my question is: Are you familiar with this document?

A I'm sorry?

Q My question is: Are you familiar with this document?

A Yes.

Q Was this document generated by Ms. Luu following her visit to the facility?

A Yes.

Q Was this document ever shared with Lighthouse?

A Yes. It actually refreshes my memory that there is some evidence that it was shared with Lighthouse.

Q And what's that evidence?

A I do not.
Q And, again, apart from sharing this document and the email we saw with underwriting, are you aware of any other steps Ms. Luu took in respect to this on-site visit?
A I'm not aware of any.
Q Are you aware of any steps MedPro took in respect to this on-site visit beyond noting the documentation that we've already looked at?
A I am not aware.
Q Then if you turn to 8167, there's a discussion that as of January 1, 2017, MedPro was no longer managed by Rockport. Do you see that?
A I do.
Q What's that referring to?
A I think that's referring to the fact that Lighthouse was no longer managed by an organization called Rockport as of 2017, January 1st of 2017.
Q And was that significant to MedPro?
A Not necessarily. May have been.
Q Do you know why that was noted here?
A I don't.
Q Do you know any follow up about that issue that MedPro made apart from noting it in this document?
A I'm not aware of any.

STATE OF CONNECTICUT

I, Bethany A. Carrier, RMR, CRR, CSR #071, a Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me via ZOOM on the 5th of August, 2026, the following-named person remotely appeared, to wit: DAVID PULLEY, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 14th day of August, 2026.

Bethany A. Carrier

---------------------------------------

Bethany A. Carrier, RMR, CRR, CSR #071

Notary Public

My Commission Expires:

October 31, 2028

# Exhibit E

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LIGHTHOUSE HEALTHCARE
CENTER, LLC, A CALIFORNIA
LIMITED LIABILITY COMPANY

PLAINTIFF

V. Case No. 2:25-cv-01651-ODW (AYPx)

NATIONAL FIRE & MARINE
INSURANCE COMPANY, A
NEBRASKA CORPORATION;
MEDPRO GROUP, INC. AND
DOES 1-110

DEFENDANTS

***************************************************
30(b)(6) VIDEO DEPOSITION OF NATIONAL FIRE &
MARINE INSURANCE COMPANY
REPRESENTATIVE: ADAM KARNIK
***************************************************

Taken via Zoom
August 13, 2026
beginning at approximately 10:06 a.m.

(Appearances Noted Herein)

Reported By:

Kelly M. Powell, CCR, #1692

APPEARANCES:

AVI WAGNER, ESQ.
The Wagner firm
1925 Century Park East, Suite 2100
Los Angeles, California 90067
avi@thewagnerfirm.com
310.491.7949

COUNSEL FOR PLAINTIFF

JON T. NEUMANN, ESQ.
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 800
Phoenix, Arizone 85016
NeumannJ@gtlaw.com
602.445.8411

COUNSEL FOR DEFENDANTS, NATIONAL FIRE & MARINE INSURANCE COMPANY AND MEDPRO GROUP, INC

VIDEOGRAPHER: Roger Speakman



TABLE OF CONTENTS

Title Page.................................1
Appearance Page............................2
Table of Contents.........................3-4
Certificate of Court Reporter .............74
Certificate of Deponent ..................75
Errata Sheet ..............................76

EXAMINATIONS

Examination By Mr. Wagner .................6

EXHIBITS

Exhibit 202 National Fire & Marine ......19
Insurance Company's Objections to Plaintiffs' Notice 30(b)(6) Deposition and Requests for Production of Documents
Exhibit 203 National Fire & Marine ......46
Insurance Company Claims Summary, All Business Segments, October 2, 2018
Exhibit 204 National Fire & Marine ......51
Insurance Company Claim Summary, All Business



Segments, January 1, 2019
Exhibit 205 National Fire & Marine ......53
Insurance Company Excess and Surplus Lines Premium Bordereau Senior Care Professional Liability
Exhibit 206 State of Nebraska's .........60
Financial Examination Report of National Fire & Marine Insurance Company as of 12/31/20
Exhibit 207 National Fire & Marine ......67
Insurance Company for Portions of 2023 and 2024



VIDEOGRAPHER: We are on the video record. This begins video clip number one -- This is video clip number one in the deposition of Adam Karnik in the matter of Lifehouse Healthcare Center LLC, a California limited liability company, plaintiff versus National Fire & Marine Insurance Company, a Nebraska Corporation, MedPro Group Inc., and Does 1-100, defendants. The case number is 2:25-CV-01651. The plaintiff notice of FED.R.CIV.P 30(b)(6) deposition of defendant, National Fire & Marine Insurance Company, and request for production of documents thereto, and this is on behalf of Avi Wagner, SBN#226688 the Wagner Firm in Century Park, or on 1925 Century Park East, Suite 2100, Los Angeles, California, 90067.

And the appearances now.

MR. WAGNER: This is Avi Wagner for the plaintiff.

MR. NEUMANN: And this is Jon Neumann on behalf of the defendants and the witness, National Fire & Marine Insurance Company.

With me in the room also are Susan Carstens, who is in-house counsel on behalf of National Fire & Marine, and also Abby Burbridge,



MAGNA LEGAL SERVICES

A. We pulled up the report and filtered on the specific policy and claim in question, yes.
Q. And which report is that?
A. There were two reports in question that covered the policy and claim. One is a premium report, where MedPro was reporting the premiums and various other premium-related information for policies that MedPro wrote on National Fire & Marine Insurance Company paper. We filtered that report to the policy in question. There was additionally a claims report, which we filtered on the claim in question, which contained claim-related information that MedPro had reported to us.
Q. And what in substance was the claim-related information that MedPro reported?
A. It contained financial and statistical information, which the company would be required to report to its regulators as part of its financial reporting responsibilities. So it covered the amounts of the loss, the amount of the various claim-related expenses paid, and it covered the existence of a deductible.
Q. And no claim-related expenses were in fact paid by National Fire & Marine, correct?



MR. NEUMANN: Objection to the form.
THE WITNESS: Answer it?
MR. NEUMANN: You can answer.
A. That is incorrect.
Q. (By Mr. Wagner) Which claim expenses were paid by National Fire & Marine?
A. The report indicated that there was a positive amount paid, but it was not zero. It did not specify the nature of the expenses paid.
Q. Does National -- beyond that report, does National Fire & Marine have any information about expenses that they paid?
A. No.
Q. National Fire & Marine tasked handling the underwriting of the policy and issue to MedPro Group, correct?
A. Yes, that is correct.
Q. Did it exercise any oversight over that underwriting?
MR. NEUMANN: Objection to form.
A. Under the terms of the agreement between National Fire & Marine and MedPro, MedPro is responsible for the underwriting of the policies.
MR. WAGNER: Move to strike as



nonresponsive.
Q. (By Mr. Wagner) My question is not about, I mean, I did ask you first about responsibility. I'm asking a different question. One person can be responsible for something, you understand, but then another person might supervise that responsible person's activities. Is that a familiar concept?
A. I believe I understand what you are saying, yes.
Q. So my question is, in this context, it's National Fire & Marine's policy, it's National Fire & Marine's money. They tasked certain services, including underwriting, to MedPro. I understand that. You were quite clear on that. My question is what they did to oversee that activity?
MR. NEUMANN: Objection to form. Go ahead.
A. National Fire & Marine Insurance Company met its end of the agreement by handling financial-reporting related matters. It did not oversee the underwriting of the policies.
Q. (By Mr. Wagner) In any respect?
A. I am not aware of any respects.



Q. National Fire & Marine also tasked MedPro with handling claims made under the policy; is that correct?
A. Yes, National Fire & Marine tasked MedPro with handling the claims under the policy.
Q. What kind of oversight did National Fire & Marine exercise over MedPro's claims handling?
MR. NEUMANN: Objection. Form. You can answer.
A. Similar to underwriting, National Fire & Marine tasked MedPro with handling the claims of the policy and did not provide additional oversight.
Q. (By Mr. Wagner) In any respect?
A. I am not aware of any respects.
Q. Are you able to see the chat box?
A. Partially. And if I -- may I click?
Q. Of course. Well, there's two documents in there. It's a little hard to read the names because of the length, but you see one is 815 kilobytes and one is 642 kilobytes?
A. Okay. I see a chat. I do not see the documents. Let's see.
MR. NEUMANN: I don't see the



MAGNA LEGAL SERVICES

documents in the chat either, Avi.
MR. WAGNER: Let me retry that. Maybe that was because of the early send.
Q. (By Mr. Wagner) How about now?
A. I see two documents there.
Q. And do you see that they're in two separate lines, and the bottom line, again toward the bottom of your screen is 815 kilobytes.
A. I see two slightly different numbers for the kilobytes. I see 627 and I see 796.
Q. Okay. If you could click on the one that's 796, please, and download that.
MR. NEUMANN: Mr. Wagner, I am not able to pull it up on the chat so is that --
MR. WAGNER: The document title is 2026-08-10 MFMI. Let me get the rest of the title to you -- 2026.08.10 MFMICOBJ2PL 30(b)(6). It has the OBJ 30(b)(6) in there.
MR. NEUMANN: Thank you.
Q. (By Mr. Wagner) Mr. Karnik, were you able to download that document?
A. I missed the name of the document, but I've opened the one that is 796 kilobytes. And I do have that open and it was called 2026.08.10 MFMICOBJ2PL 30(b)(6) depo and RFP docs.



Q. Okay. It's a 20-page document?
A. Yes, it is.
MR. WAGNER: Let's mark this, madam reporter, as Exhibit 202.
(Exhibit 202 marked for identification.)
Q. (By Mr. Wagner) Mr. Karnik, you should be viewing what's been marked as Exhibit 202, which is a document entitled "National Fire & Marine Insurance Company's Objections to Plaintiffs' Notice 30(b)(6) Deposition and Requests for Production of Documents." Is that the document in front of you and it's 20 pages long?
A. Yes.
Q. Are you familiar with this document?
A. No.
Q. Did you reviewed this document in preparation for today?
A. No, I did not review this document.
Q. The document on page 4, at lines 5 through 7 represents that "National Fire & Marine has no responsive information within its independent knowledge, possession, custody or control regarding individuals involved in underwriting the policy." And that's referring



to the policy at issue in this case. Do you see that?
A. So you said page 4. Which lines?
Q. Lines 5 through 7. You see there is a line numbering on the sides?
A. Yes.
Q. It begins -- it's one sentence. It begins about two-thirds of the way through line 5 and continues through the end of the text on line 7. You see that sentence that I just read?
A. Yes.
Q. And I represent to you, NF and M stands for National Fire & Marine Insurance Company. The policy is a reference to the policy at issue. My question is, do you believe that that's an accurate statement?
A. Yes, that is an accurate statement.
Q. And there is a reference to "independent knowledge." What's meant there by independent knowledge?
A. I do not know.
Q. Do you agree with that? That it lacks independent knowledge?
A. I do agree with that in the colloquial sense of the term "independently." I don't want



to represent that it doesn't mean something to which I'm not aware, but yes.
Q. Well, what's your colloquial understanding of what independent means in this context and why do you agree with that?
A. Yes. Under the terms of the agreement between National Fire & Marine and MedPro, MedPro is responsible for the underwriting of the policy. National Fire & Marine is not separately doing its own underwriting of the policies.
Q. And continuing on that page, it goes through a second topic which is the terms of the policy. Again, policy at issue. And there is a representation down there in line 22 to 23 that the policy was drafted by MedPro Group Inc. Do you see that?
A. I'm looking at line 22. It says "substantially and materially," but I'm not seeing the reference to --
Q. The sentence begins, "subject to and without waiving foregoing objections, NF and M affirmatively states that the insurance policy at issue was drafted, issued and administered by MedPro Group Inc."
Do you see that?



MAGNA LEGAL SERVICES

CERTIFICATE OF COURT REPORTER

I, Kelly M. Powell, Court Reporter and Notary Public, in and for the State of Mississippi, hereby certify that the foregoing contains a true and correct transcript of the testimony of the witness, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in the matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this matter.

Witness my signature and seal this the 13th day of August 2026.

__________________________
Kelly M. Powell, CSR
CSR #1692

My Commission Expires:
June 2027



UNITED STATES DISTRICT COURT
\FOR THE CENTRAL DISTRICT OF CALIFORNIA

LIGHTHOUSE HEALTHCARE CENTER, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY
PLAINTIFF

V. Case No. 2:25-cv-01651-ODW (AYPx)

NATIONAL FIRE & MARINE INSURANCE COMPANY, ET AL.
DEFENDANTS

CERTIFICATE OF DEPONENT

I, ADAM KARNIK, do hereby certify that the foregoing testimony is true and accurate to the best of my knowledge and belief, as originally transcribed, or with the changes as noted on the attached Correction Sheet.

This the ____ day of _________, 2026,

____________________
ADAM KARNIK

State of Mississippi
County of ______________

Subscribed and sworn to before me, this the _____ day of _____________, 2026.

My Commission Expires:

_____________________ _______________________
Notary Public



ERRATA SHEET

| PAGE | LINE | CORRECTIONS (IF ANY) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |



MAGNA LEGAL SERVICES

# Exhibit F

report? 11:18:57AM
A. No. There's many citations on the report and we didn't probably send you every thing was there because some were production provided to us. 11:18:57AM 11:19:00AM 11:19:05AM
Q. So beyond the cited materials, the materials listed as considered, and what you produced today, is there anything else that you considered and relied upon in preparing your report? 11:19:14AM 11:19:14AM 11:19:17AM 11:19:20AM
A. No. 11:19:24AM
Q. Did you conduct any fact interviews in connection with your report? 11:19:24AM 11:19:25AM
A. No. 11:19:29AM
Q. For instance, did you speak to anyone involved in the underwriting of the policy at issue? 11:19:29AM 11:19:32AM
A. No. 11:19:35AM
Q. Did you ask to speak to anyone involved in the underwriting policy at issue? 11:19:35AM 11:19:37AM
A. No, I didn't. It was an extremely short time frame. It was about all I could do was to get the report done. 11:19:41AM 11:19:43AM 11:19:46AM
Q. And how much of a time frame were you given to complete your report? 11:19:47AM 11:19:49AM
A. I believe Kathy downloaded the information that I started reading on August 19th and the report was due on the 31st. 11:19:52AM 11:19:54AM 11:19:58AM

A. No. 12:08:01PM
Q. In the materials that you produced this morning, you also had an article about rescission under California law. 12:08:01PM 12:08:02PM 12:08:08PM
A. Yes. 12:08:09PM
Q. Why did you review that article? 12:08:09PM
A. Well, it's been involved in another case that I'm working on right now and it might of, sort of, just slopped into there. I know there was no rescission involved in this particular case, but one of the things about rescission is the materiality and the things that are involved and why you can rescind a policy. Didn't have direct bearing in this case, but it had an over all flavor of what materiality is all about. 12:08:14PM 12:08:17PM 12:08:20PM 12:08:21PM 12:08:26PM 12:08:29PM 12:08:29PM 12:08:33PM 12:08:39PM
Q. So the utility when it goes to rescission would be about the analysis of materiality which, in your view, is relevant in this case? 12:08:45PM 12:08:46PM 12:08:49PM
A. Yes. 12:08:51PM
Q. Any other purpose? 12:08:51PM
A. No. 12:09:02PM
Q. As far as the Department of Public Health, we talked about it a little but to kind of put a pin in it, does the Department of Public Health retain investigations of skilled nursing facilities? 12:09:02PM 12:09:05PM 12:09:08PM 12:09:12PM

know anything about the frequency of deficiencies in the process of substantiation? 01:24:00PM 01:24:04PM

A. Yes. 01:24:26PM

MR. WAGNER: We'll mark this 230. 01:24:26PM

(WHEREUPON, EXHIBIT 230 WAS MARKED FOR IDENTIFICATION.) 01:24:26PM 01:24:28PM

Q. BY MR. WAGNER: You've been handed, sir, what's been marked Exhibit 230, which is a risk management assessment report. Are you familiar with this document? 01:24:54PM 01:24:55PM 01:24:57PM 01:25:00PM

A. I am not. I was not given this document to read. 01:25:04PM 01:25:04PM

Q. It's cited in your report. 01:25:08PM

A. I know it's cited, we cited about it, but I didn't read the detail. I do not remember seeing this at all. 01:25:08PM 01:25:10PM 01:25:15PM

Q. So did you get a copy of this document or not? 01:25:16PM 01:25:19PM

A. I never saw it. 01:25:19PM

Q. So you did not receive this from counsel? 01:25:20PM

A. I don't believe so. 01:25:23PM

Q. So if it was cited in your report, someone else did it? 01:25:26PM 01:25:26PM

A. No. I think I was reading from deposition testimony and so forth about the fact the report had 01:25:28PM 01:25:30PM

been done; so I was citing the indication from the deposition. 01:25:32PM 01:25:38PM

Q. So is it fair to say that this document did not inform your report? 01:25:38PM 01:25:40PM

A. The characterization -- this is the document that was done by MedPro as one of the conditions of writing the new policy that was done shortly after that. That's the one we're talking about; right? That's what this is? 01:25:45PM 01:25:51PM 01:25:57PM 01:26:01PM 01:26:03PM

Q. Yeah. Let's clarify that. One of the subjectivities in connection with the policies issuance was an on-site investigation; right? 01:26:06PM 01:26:08PM 01:26:11PM

A. Yes. 01:26:14PM

Q. And then following that -- and that was conducted by Arlene Luu? 01:26:15PM 01:26:15PM

A. I remember that name. Yes. 01:26:18PM

Q. And that's who authored this report; right? 01:26:20PM 01:26:24PM

A. Right. 01:26:27PM

Q. And so this report was the report that was issued in fulfillment of one of the subjectivities of the policy's issuance; is that correct? 01:26:27PM 01:26:31PM 01:26:31PM

A. That would be my understanding. Yes. 01:26:35PM

Q. And yet you chose not to review this report in connection with issuance of your report? 01:26:37PM 01:26:38PM

A. I don't remember seeing this and as I went through the depositions of everything else that was there, I didn't see it. 01:26:42PM 01:26:45PM 01:26:48PM

Q. So if you didn't see it, it's fair to surmise you did not review it? 01:26:50PM 01:26:54PM

A. Well, I did not review it, but I reviewed the characterizations of the report and then it was necessary to write the application. It was one of the subjectivities. 01:26:54PM 01:26:57PM 01:26:58PM 01:27:04PM

Q. I understand. And, sir, I'm not trying to suggest that the on-site examination was not a subjectivity. I think we're all in agreement on that. I'm just asking a much more specific question which is you didn't review this document in connection with your report; right? 01:27:04PM 01:27:06PM 01:27:09PM 01:27:11PM 01:27:13PM 01:27:17PM

A. I did not. 01:27:19PM

Q. Okay. And do you think that was, frankly, irresponsible? 01:27:28PM 01:27:28PM

MR. NUEMANN: Objection. Form. 01:27:34PM

THE WITNESS: No. 01:27:37PM

Q. BY MR. WAGNER: Because this is -- we talked about with you have as far as actual underwriting and this is a subjectivity. This is something that's actually part of the underwriting; right? 01:27:37PM 01:27:37PM 01:27:39PM 01:27:41PM 01:27:45PM

deposition? 01:48:41PM

MR. NUEMANN: Well, Mr. Anderson has some ongoing work with respect potentially to a rebuttal report, which is currently trial preparation privilege; so he's not going to get into that. So you can ask him questions about the finality of this report and the opinions expressed herein, but he can't -- he's not going to get into what he's doing because he may or may not issue another report. 01:48:43PM 01:48:44PM 01:48:47PM 01:48:52PM 01:48:54PM 01:48:56PM 01:49:00PM 01:49:02PM

MR. WAGNER: Okay. 01:49:07PM

MR. NUEMANN: Let me finish real quick. I'm sorry. But obviously, you'll be able to depose him at that point, if you want. 01:49:07PM 01:49:08PM 01:49:10PM

MR. WAGNER: Understood. 01:49:14PM

Q. BY MR. WAGNER: But just a "Yes" or "No," unless your counsel objects, are you presently working on a possible additional report or a possible report? 01:49:15PM 01:49:16PM 01:49:19PM 01:49:22PM

A. "Yes." 01:49:24PM

Q. Apart from that, are you doing any other work in this matter? 01:49:24PM 01:49:27PM

A. No. 01:49:28PM

Q. So you're not in the process, for instance, of supplementing your report? 01:49:28PM 01:49:30PM

A. At this point, no. 01:49:33PM

MR. WAGNER: Transcript, yes. No video. So both of us transcripts, neither of us video.

THE VIDEOGRAPHER: We're now going off the 02:36:58PM
record. Time is 2:37 PM. 02:36:59PM

(WHEREUPON, THE PROCEEDING CONCLUDED AT 2:37 PM.)

Please be advised I have read the foregoing deposition, pages 4 through 133, inclusive. I hereby state there are:

(Check one)____________ no corrections

____________ corrections per attached

______________________________

Robert M. Anderson

--o0o--

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition, was by me duly sworn to testify to the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly-certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereto set my hand this 12th day of October, 2026.

Monica Chieffo
_______________________________________

Monica Chieffo , CSR NO. 15267

# Exhibit G

Gmail **Charissa Morningstar <charissa.morningstar@gmail.com>**

# LIghthouse v. MedPro: Plaintiffs Responses to Discovery, Set One

**Charissa Morningstar** <charissa.morningstar@gmail.com> Fri, Dec 5, 2025 at 8:49 PM
To: neumannj@gtlaw.com, Zach.Levy@gtlaw.com, RC.Eckert@gtlaw.com, "Diane.Linn@gtlaw.com" <diane.linn@gtlaw.com>
Cc: Avi Wagner <avi@thewagnerfirm.com>

Counsel:

Attached please find the following:

- PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES;
- PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION; and
- PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION

Plaintiff's production is available at the following link:

| | |
|---|---|
| Download Link: | https://na01mft.innovativedriven.com/WebClientNew/index.html/?ShareToken=CC961CD0E47E7050F9DAC3F22872C0B1D59D78CB |
| Password: | gnWHe0c05kLW6kxg |

Regards,

Charissa Morningstar

**4 attachments**

**LH Prod 001_XREF.xlsx**
32K

**25.12.05 Pl. Resp RFPs, Set One.pdf**
161K

**25.12.05 Pl. Resp. ROGs, Set One.pdf**
242K

**25.12.05 Pl. Resp. RFA, Set One.pdf**
181K

# Exhibit H

---

**From:** David Strother[/O=SHADIK TECHNOLOGIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DAVID_LHCARECENTER.COM]
**Sent:** Wed 3/8/2017 12:59:25 AM (UTC)
**To:** 'laibg@lspoon.com'[laibg@lspoon.com]
**Subject:** Notice of Legal Action
**Attachment:** Legal Intent to Commence Action - Valerie Donnell.pdf

Hi Laib,
I received this notice of legal action from a previous Resident who was under our care in June 2016.
The Resident was here for < 2 days and died without warning.
The family came upon notification of death and was upset Re: the matter.To my knowledge; they were planning to pay for a private autopsy.
The family requested a complete copy of the health record and filed a complaint with CDPH.However, CDPH was not able to substantiate any concern(s) R/T the care of this Resident.
Who would you like for me to contact – insurance / legally speaking..?
Respectfully,
David

# Exhibit I

# United States District Court
# Central District of California

Lighthouse Healthcare Center, LLC,

Plaintiff(s),

v.

National Fire & Marine Insurance Company et al.,

Defendant(s),

Case CV 25-01651-ODW(MAAx)

**SCHEDULING AND CASE MANAGEMENT ORDER**

**(JURY TRIAL)**

**FOR CASES ASSIGNED TO JUDGE OTIS D. WRIGHT, II**

This Order is to advise the parties and counsel of the schedule that will govern this case. **SEE THE LAST PAGE OF THIS ORDER FOR THE SPECIFIED DATES.** These dates and requirements are firm. The Court is unlikely to grant continuances unless the parties establish good cause through a concrete showing. Failure to complete discovery in a timely manner does not constitute good cause, nor does the fact that a settlement conference is pending. Each side is limited to five motions in limine unless the Court orders otherwise.

/ / /

/ / /

**IT IS HEREBY ORDERED:**

1. To secure the just, speedy, and inexpensive determination of every action, all counsel are ordered to familiarize themselves with and follow the Federal Rules of Civil Procedure and the Local Rules of the Central District of California. This Court follows these rules and they will govern this litigation unless otherwise provided in this Order.

2. Because this Order in some respects modifies or adds to the Local Rules, counsel are advised to read it carefully. Counsel are advised to pay particular attention to the requirements of the Court with respect to the filing of motions for summary judgment and documents to be submitted at the Final Pretrial Conference and Trial.

3. The attorney attending any proceeding before this Court must be an attorney who is thoroughly knowledgeable about the case, responsible for the conduct of the litigation, and who has authority to enter into stipulations and to make admissions regarding all matters that the participants reasonably anticipate may be discussed. Lead counsel who will actually try the case must attend the Pretrial Conference. A party who is not represented must attend all proceedings in person.

**4.** **Courtesy Copies**: The Court requires courtesy copies only for Motions for Summary Judgment, motions necessitating a substantial evidentiary record, and pretrial documents. **FOR THESE FILINGS ONLY**, the Court requires one mandatory chambers copy of all related filed documents. USB flash drives should be submitted in lieu of compact discs. Chambers copies shall be delivered to and placed in the Judge's courtesy box, located outside of the Clerk's office on the 4th floor. Chambers copies of under seal documents shall be placed together in a manilla envelope labeled "UNDER SEAL." **Courtesy copies DO NOT need to be blue-backed. All courtesy copies of pretrial documents (e.g. witness lists, exhibit lists, pretrial conference orders, jury instructions, etc.) shall be three-hole punched and placed in a three-ring binder as described below.**

/ / /

5. **Discovery Cut-Off**: Percipient and expert discovery shall be completed by the discovery cut-off dates specified on the last page of this Order. **THIS IS NOT THE DATE BY WHICH DISCOVERY REQUESTS MUST BE SERVED; IT IS THE DATE BY WHICH ALL DISCOVERY IS TO BE COMPLETED.**

Any motion challenging the adequacy of responses to discovery must be heard sufficiently in advance of the discovery cut-off date to permit the responses to be obtained before that date if the motion is granted. In an effort to provide further guidance to the parties, the Court notes the following:

a. **Depositions**: All depositions shall be scheduled to commence sufficiently in advance of the discovery cut-off date to permit their completion and to permit the deposing party enough time to bring any discovery motions concerning the deposition prior to the cut-off date.

b. **Written Discovery**: All interrogatories, requests for production of documents, and requests for admissions shall be served sufficiently in advance of the discovery cut-off date to permit the discovering party enough time to challenge (via motion practice) responses deemed to be deficient.

c. **Discovery Motions**: Whenever possible, the Court expects the parties to resolve discovery issues among themselves in a courteous, reasonable, and professional manner. The Magistrate Judge assigned to this case will rule on discovery motions. (The Magistrate Judge's initials follow the district judge's initials next to the case number on the first page of this Order.) Counsel are directed to contact the Magistrate Judge's courtroom deputy clerk (CRD) to schedule a hearing on any discovery related matters. Counsel should **NOT** deliver courtesy copies of these discovery documents to this Court.

d. **Expert Discovery**: If expert witnesses are to be called at trial, the parties shall designate affirmative experts to be called at trial and provide reports required by Federal Rule of Civil Procedure 26(a)(2)(B) **not later than eight weeks**

**prior to the expert discovery cut-off date**. Rebuttal expert witnesses shall be designated and reports provided as required by Rule 26(a)(2)(B) **not later than five weeks prior to the expert discovery cut-off date**. Failure to timely comply with deadlines may result in the expert being excluded as a trial witness.

6. **Motions and Motion Cut-Off Date**

a. **General Provisions**: All law and motion matters, except for motions in limine, must be set for hearing (not filing) by the motion cut-off date specified on the last page of this Order. This Court hears motions in civil matters on **Mondays at 1:30 p.m.** The parties must adhere to the requirements of the Local Rules. *See* Local Rules 6-1 & 7-1 *et seq*. If any party does not oppose a motion, that party shall submit a written statement that it does not oppose the motion in accordance with Local Rule 7-9. The parties should note that failure to meet the time limits for filing an opposition set forth in Local Rule 7-9 shall be deemed consent to the granting of the motion. *See* Local Rule 7-12.

The title page of all motions must state the Pretrial Conference date and the Trial date. **Counsel must comply with Local Rule 7-3**, which requires counsel to engage in a pre-filing conference seven days in advance of filing any motion, "to discuss thoroughly . . . the substance of the contemplated motion and any potential resolution." Counsel must also comply with Local Rule 11-6, which requires counsel to include a certificate that the document complies with the type-volume limitation of Local Rule 11-6.1 and this Court.

Issues left undetermined after the passage of the motion cut-off date should be listed as issues for trial in the Final Pretrial Conference Order. As an exception to the above, motions in limine dealing with evidentiary matters may be heard pursuant to the schedule specified on the last page of this Order.

b. **Meeting and Conferring**: The Parties are required to meet and confer with opposing counsel prior to the filing of a motion or ex parte application under Local Rule 7-3. The Court notes that it is the responsibility of both parties to meet and

confer in good faith on any disputed issues. The Court will impose sanctions, including monetary sanctions and/or the summary denial of a motion, if *either* party fails to meet and confer in good faith or fails to reasonably narrow the issues in dispute.

c. **<u>Ex Parte Applications</u>**: Ex parte practice is **discouraged**. *See Mission Power Eng'g v Co. v. Continental Cas. Co.*, 883 F. Supp. 488 (C.D. Cal. 1995). The Court will require strict adherence to proper ex parte procedures for any ex parte application filed with the Court. *Id.* at 492; *see also* Judge Wright's Standing Order and Local Rule 7-19. **Any opposition to an ex parte application must be filed within 24 hours.** Failure to submit a timely opposition constitutes consent to the granting of the application. *See* Local Rule 7-12. No party may file a reply unless expressly authorized by the Court. All ex parte applications will be decided on the papers and without a hearing unless the Court orders otherwise.

d. **<u>Applications and Stipulations to Extend Time</u>**: Applications to extend the time to file any required document or to continue any hearing, Pretrial Conference, or Trial date must set forth the following:

(i) The existing due date or hearing date, as well as the discovery cut-off date, the Pretrial Conference date, and the Trial date;

(ii) Specific, concrete reasons supporting good cause for granting the extension; and

(iii) Whether there have been prior requests for extensions, and whether these requests were granted or denied by the Court.

The parties are cautioned that the Court will not necessarily grant an extension or continuance simply because all parties have stipulated to it.

e. **<u>Joinder of Parties and Amendment of Pleadings</u>**: The deadline for joining parties and amending pleadings is set forth on the last page of this Order. Any motions to join other parties or for leave to amend the pleadings shall be set for hearing on or before this date. If any party moves to amend a pleading after this date, they must address the propriety of amendment under *Johnson v. Mammoth Recreations,*

Case 2:25-cv-01650-DDW-AYP Document 20 Filed 05/12/25 Page 6 of 25 Page ID #:78

*Inc.*, 975 F.2d 604 (9th Cir. 1992).

In addition to the requirements of Local Rule 15-1, all motions to amend the pleadings shall: (1) state the effect of the amendment; (2) be serially numbered to differentiate the amendment from previous amendments; and (3) state the page, line number(s), and wording of any proposed change or addition of material. The parties shall deliver to Chambers a redlined version of the proposed amended pleading indicating all additions and deletions of material. The failure to comply with the above may result in denial of a motion to amend.

f. **Summary Judgment Motions**: Parties need not wait until the motion cutoff to bring motions for summary judgment or partial summary judgment. Early completion of non-expert discovery and filing of motions for summary judgment may eliminate or reduce the need for expensive expert depositions that are normally conducted in the last stages of discovery. **However, the Court requires that the party moving for summary judgment will provide no less than thirty-five (35) days' notice for such motions.** Because summary judgment motions are fact-dependent, parties should prepare papers in a fashion that will assist the Court in absorbing the mass of facts (e.g., generous use of tabs, tables of contents, headings, indices, etc.). **The parties are to comply precisely with Local Rule 56-1 through 56-4.** The Court will also require adherence to the following requirements:

(i) Statement of Uncontroverted Facts and Statement of Genuine Issues of Material Fact

The movant's Separate Statement of Uncontroverted Facts is to be prepared in a two-column format. The left-hand column should set forth the allegedly undisputed fact. The right-hand column should set forth the evidence that supports the factual statement. The factual statements should be set forth in sequentially numbered paragraphs. Each paragraph should contain a narrowly focused statement of fact. Each numbered paragraph should address a single subject in as concise a manner as possible.

The opposing party's Statement of Genuine Issues of Material Fact must be in

two columns and track the movant's Separate Statement exactly as prepared. The document must be in two columns; the left-hand column must restate the allegedly undisputed fact, and the right-hand column must indicate either undisputed or disputed. *See* Local Rule 56-2. The opposing party may dispute all or only a portion of the statement, but if disputing only a portion, must clearly indicate what part is being disputed. Where the opposing party is disputing the fact in whole or part, the opposing party must, in the right-hand column, label and restate the moving party's evidence in support of the fact, followed by the opposing party's evidence controverting the fact. Where the opposing party is disputing the fact on the basis of an evidentiary objection, the party must cite the evidence alleged to be objectionable and state the ground of the objection and nothing more. **No argument should be set forth in this document.**

The opposing party may submit additional material facts that bear on or relate to the issues raised by the movant, which shall follow the format described above for the moving party's Separate Statement. These additional facts shall follow the movant's facts, <u>shall continue in sequentially numbered paragraphs</u> (i.e., if movant's last statement of fact was set forth in paragraph 30, then the first additional statement of fact will be set forth in paragraph 31), and shall set forth in the right-hand column the evidence that supports that statement.

The moving party, in its reply, shall respond to the additional facts in the same manner and format that the opposing party is required to adhere to in responding to the Statement of Uncontroverted Facts, as described above. Additional material facts left unaddressed will be deemed undisputed. *See* Local Rule 56-4.

The Court is not obligated to look any further in the record for supporting evidence other than what is actually and specifically referenced in the Statement of Uncontroverted Facts, the Statement of Genuine Disputes of Material Fact, and the Response to Statement of Genuine Disputes. *See* Local Rule 56-4.

**The following conduct in connection with a motion for summary judgment shall be grounds for sanctions under Federal Rule of Civil Procedure 11:**

**(1) disputing a material fact without any reasonable basis for doing so; (2) identifying additional facts in opposition to the motion without any reasonable basis for believing that the additional facts will materially affect the outcome of the motion.**

(ii) Supporting Evidence

No party should submit any evidence other than the specific items of evidence or testimony necessary to support or controvert a proposed statement of undisputed fact. Thus, for example, the entire transcripts of depositions and/or entire sets of interrogatory responses should generally not be submitted in support of or in opposition to a motion for summary judgment.

Evidence submitted in support of or in opposition to a motion for summary judgment should be submitted either by way of stipulation or as exhibits to a declaration sufficient to authenticate the proffered evidence, and should not be attached to the memorandum of points and authorities. The Court will accept counsel's authentication of deposition transcripts, written discovery responses, and the receipt of documents in discovery if the fact that the document was in the opponent's possession is of independent significance. Documentary evidence as to which there is no stipulation regarding foundation must be accompanied by the testimony, either by declaration or properly authenticated deposition transcript, of a witness who can establish its authenticity.

**All evidence in support of or in opposition to a motion for summary judgment, including declarations and exhibits to declarations, shall be separated by a tab divider on the bottom of the page**. If evidence in support of or in opposition to a motion for summary judgment exceeds twenty pages, the evidence must be in a separately bound volume and include a Table of Contents. If the supporting evidence exceeds fifty pages, the documents shall be placed in a Slant D-Ring binder with each item of evidence separated by a tab divider on the right side. All documents contained in the binder should be three-hole-punched. **Alternatively, parties may submit USB**

**flash drives with supporting evidence in portable document format (PDF) files.** The PDF files must be named in accordance with each exhibit's nomenclature (i.e., Ex. A, Ex. B, etc.). If a PDF file contains more than one exhibit, that PDF must include a Table of Contents and each exhibit must be bookmarked with the exhibit nomenclature.

(iii) Objections to Evidence

If a party disputes a fact based in whole or in part on an evidentiary objection, the ground for the objection, as indicated above, should be stated in the Separate Statement, but not argued in that document. **Evidentiary objections should be addressed in a separate memorandum** to be filed with the opposition or reply brief of the party. This memorandum should be organized **to track the paragraph numbers of the Separate Statement in sequence**. It should identify the specific item of evidence to which objection is made, the ground for the objection, and a very brief argument with citation to authority as to why the objection is well taken. The following is an example of the format contemplated by the Court:

Separate Statement Paragraph 1: Objection to the supporting deposition transcript of Jane Smith at 60:1–10 on the grounds that the statement constitutes inadmissible hearsay and no exception is applicable. To the extent it is offered to prove her state of mind, it is irrelevant since her state of mind is not in issue. Fed. R. Evid. 801, 802.

**DO NOT SUBMIT BLANKET OR BOILERPLATE OBJECTIONS TO THE OPPONENT'S STATEMENTS OF UNDISPUTED FACT. THESE WILL BE DISREGARDED AND OVERRULED.**

(iv) Memorandum of Points and Authorities

The movant's memorandum of points and authorities should be in the usual form required under Local Rule 7 and should contain a narrative statement of facts as to those aspects of the case that are before the Court. All facts should be supported with citations to the paragraph number in the Separate Statement that supports the factual assertion.

Unless the case involves some unusual twist, the motion need only contain a brief statement of the Federal Rule of Civil Procedure 56 standard; the Court is familiar with the Rule and with its interpretation under *Celotex* and its progeny. If at all possible, the argument should be organized to focus on the pertinent elements of the claim(s) for relief or defense(s) in issue, with the purpose of showing the existence or non-existence of a genuine issue of material fact for trial on that element of the claim or defense.

Likewise, the opposition memorandum of points and authorities should be in the usual form required by Local Rule 7. Where the opposition memorandum sets forth facts, the memorandum should cite to paragraphs in the Separate Statement if they are not in dispute, to the evidence that contravenes the fact where the fact is in dispute, or, if the fact is contravened by an additional fact in the Statement of Genuine Issues of Material Fact, the citation should be to such fact by paragraph number.

g. **Avoid Composite Motions**: Unless clearly justified under the circumstances of the case, "motions to dismiss or in the alternative for summary adjudication" are discouraged. These composite motions tend to blur the distinctions between the two motions.

h. **Motions in Limine**: Before filing any motion in limine, counsel for the parties shall confer pursuant to Local Rule 7-3 in a good faith effort to eliminate the necessity for hearing the motion in limine or to eliminate as many of the disputes as possible. It shall be the responsibility of counsel for the moving party to arrange for this conference. The motion papers must include a declaration showing a good faith meet and confer effort. The conference shall take place **in person** within 10 calendar days of service upon opposing counsel of a letter requesting such a conference, but in no event later than twenty-one days before the Pretrial Conference. The conference may take place by via video conference call or telephone **only if** both counsel are not located in the same county in the Central District.

If counsel are unable to resolve their differences, they shall prepare a separate, sequentially-numbered Motion in Limine for each issue in dispute which contains a

clear caption that identifies the moving party and the nature of the dispute (i.e., "Plaintiff's Motion in Limine #1 to exclude the testimony of Defendant's expert"). **Neither party may file more than five (5) Motions in Limine absent leave of Court upon a showing of good cause, and leave of Court will be granted sparingly. Motions in Limine in excess of a party's first five will be stricken.** Each Motion in Limine shall contain a clear identification of the testimony, exhibits, or other specific matters alleged to be inadmissible and/or prejudicial and a statement of the specific prejudice that will be suffered by the moving party if the motion is not granted. The identification of the matters in dispute shall be followed by the moving party's contentions and memorandum of points and authorities. The title page of the Motion in Limine must state the Pretrial Conference date, hearing date for the motions in limine, and the Trial date.

Motions in Limine made for the purpose of precluding the mention or display of inadmissible and/or prejudicial matter in the presence of the jury shall be accompanied by a declaration that includes the following: (1) a clear identification of the specific matter alleged to be inadmissible and/or prejudicial; (2) a representation to the Court that the subject of the motion in limine has been discussed with opposing counsel, and that opposing counsel has either indicated that such matter will be mentioned or displayed in the presence of the jury before it is admitted in evidence or that counsel has refused to stipulate that such matter will not be mentioned or displayed in the presence of the jury unless and until it is admitted in evidence; and (3) a statement of the specific prejudice that will be suffered by the moving party if the motion in limine is not granted. A motion to bifurcate trial may be filed as a motion in limine.

**All evidence in support of or in opposition to a motion in limine, including declarations and exhibits to declarations, shall be separated by a tab divider on the bottom of the page**. If evidence in support of or in opposition to a motion in limine exceeds twenty pages, the evidence must be in a separately bound volume and include a Table of Contents. Though strongly discouraged, if by necessity the supporting

evidence exceeds fifty pages, the documents shall be placed in a Slant D-Ring binder with each item of evidence separated by a tab divider on the right side. All documents contained in the binder should be three-hole-punched. For items not conducive to paper format, USC drives should be submitted in lieu of compact discs.

Unless otherwise ordered by the Court, motions in limine will be heard on the date specified on the last page of this Order. The moving party shall file with the Court and serve its Motion in Limine on the responding party on or before the date for filing of motions in limine indicated in the Schedule of Trial and Pretrial Dates. The responding party shall then file with the Court and serve an opposition to the Motion in Limine on the moving party on or before the date specified on the last page of this Order. **Neither party's submissions with respect to a Motion in Limine shall exceed eight (8) pages. Unless ordered otherwise, the Court will only consider the moving papers and any opposition thereto; no replies are necessary or invited.**

i. **Motions for Class Certification**: All motions for class certification must be filed according to Local Rule 23-3 and on or before the date specified on the last page of this Order. The Court will rarely grant stipulations or applications to extend that deadline. Specifically, the failure to complete class discovery before the deadline does not constitute good cause to extend the deadline, unless the parties show specific and concrete reasons why, despite their diligence, the failure to complete discovery was **unavoidable**. The Court will consider extensions based on the ordering of issues (e.g., if the defendant seeks to file a dispositive motion before class certification) on a case-by-case basis. Any stipulations or applications for relief must include a specific date by which the plaintiff will move for class certification (**the Court will not grant an open-ended extension**).

j. **Oral Argument**: The Court, in its discretion, may dispense with oral argument on a motion. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. However, the Court also encourages law firms to contribute to the professional development of new attorneys by allowing them to present oral argument to the Court on motions. To that

end, if any party to a motion files a notice with the Court stating that an attorney with **less than four years' experience** will present oral argument, the Court will hold a hearing on that motion. This notice must be filed no later than **fourteen days** before the hearing. The Court will take into account the attorney's inexperience when considering their oral arguments.

7. **<u>Final Pretrial Conferences and Local Rule 16 Filings</u>**

Please read this portion carefully, as there are some differences between the Court's requirements and the Local Rules.

**a. General Provisions**

The Final Pretrial Conference ("PTC") will be held on the date specified on the last page of this Order, unless the Court expressly waived the PTC at the Scheduling Conference. (In the rare cases where the Court waives a PTC, the parties must follow Local Rule 16-10.) If adjustments in the Court's calendar to accommodate congestion become necessary, the Court may re-schedule the PTC instead of the trial date. Therefore, the parties should assume that if the PTC goes forward, the trial will go forward without continuance, although some brief period of trailing may prove necessary.

The lead trial attorney on behalf of each party shall attend both the PTC and all meetings of the parties in preparation for the PTC, unless excused for good cause shown in advance of the PTC.

A continuance of the PTC at the parties' request or by stipulation is <u>highly unlikely</u>. **Specifically, failure to complete discovery is not a ground for continuance.** In the unlikely event that the Court agrees to continue the PTC, the trial date is likely to be delayed as a result. If a change to the trial date is necessitated or likely because of the Court's calendar or otherwise, modifications of that date will be discussed at the PTC.

At the PTC, the parties should be prepared to discuss means of streamlining the trial, including, but not limited to the following: bifurcation; presentation of

Case 8:25-cv-01651-DOC-ADS Document 20 Filed 05/12/25 Page 14 of 28 Page ID #:85

foundational and non-critical testimony and direct testimony by deposition excerpts; narrative summaries and/or stipulations as to the content of testimony; presentation of testimony on direct examination by affidavit or by declaration subject to cross-examination; and qualification of experts by admitted resumes. The Court will also discuss settlement.

b. **Courtesy Copies**

The parties must submit courtesy copies of all PTC documents, to be prepared and delivered to chambers as follows:

(i) **One copy** of all PTC documents (i.e., both plaintiff's documents and defendant's documents) shall be delivered to the Court in **one three-ring binder**;

(ii) Each document shall be separated by numerical side-tabs, and shall be placed in the following order: (1) Proposed Pretrial Conference Order; (2) Plaintiff's Memorandum and Contentions of Facts and Law; (3) Defendant's Memorandum and Contentions of Facts and Law; (4) Joint Witness List; (5) Joint Exhibit List and Stipulation; (6) Plaintiff's Proposed Verdict Form; (7) Defendant's Proposed Verdict Form; (8) Joint Proposed Jury Instructions; (9) Plaintiff's Disputed Jury Instructions; (10) Defendant's Disputed Jury Instructions; (11) Joint Statement of the Case; (12) Proposed Voir Dire Questions; (13) Joint Report re: Settlement; and (14) Other Pretrial documents; and

(iii) The binder shall include a Table of Contents.

c. **Final Pretrial Conference Order ("PTCO")**

The proposed PTCO shall be lodged seven calendar days before the PTC, unless the Court specifically orders otherwise. Adherence to this time requirement is necessary for in-chambers preparation of the matter. The form of the proposed PTCO shall comply with **Appendix A to the Local Rules** and the following:

(i) Place in "**ALL CAPS AND BOLD**" the separately numbered headings for each category in the PTCO (e.g., "**1. <u>THE PARTIES</u>**" or "**7. <u>CLAIMS AND DEFENSES OF THE PARTIES</u>**").

(ii) Include a Table of Contents at the beginning.

(iii) In specifying the surviving pleadings under section 1, state which claims or counterclaims have been dismissed or abandoned, e.g., "Plaintiff's second cause of action for breach of fiduciary duty has been dismissed." Also, in multiple party cases where not all claims or counterclaims will be prosecuted against all remaining parties on the opposing side, please specify to which party each claim or counterclaim is directed.

(iv) In specifying the parties' claims and defenses under section 7, each party shall closely follow the examples set forth in Appendix A of the Local Rules.

(v) In drafting the PTCO, **the Court expects that the parties will attempt to agree on and set forth as many non-contested facts as possible.** The Court will usually read the uncontested facts to the jury at the start of trial. A carefully drafted and comprehensively stated stipulation of facts will reduce the length of trial and increase jury understanding of the case. **It is unacceptable for the parties to indicate in the Proposed Pretrial Conference Order that they are not able to stipulate to any facts whatever.**

(vi) In drafting the factual issues in dispute for the PTCO, the parties should attempt to state issues in ultimate fact form, not in the form of evidentiary fact issues. The issues of fact should track the elements of a claim or defense on which the jury will be required to make findings.

(vii) Issues of law should state legal issues on which the Court will be required to rule during the trial, and should not list ultimate fact issues to be submitted to the trier of fact.

(viii) The Court may submit fact issues to the jury in the form of findings on a special verdict. The issues of fact should track the elements of a claim or defense on which the jury will be required to make findings.

(ix) If expert witnesses are to be called at trial, each party must list and identify its respective expert witnesses, both retained and non-retained. Failure of a party to list and identify an expert witness in the PTCO could result in a court order which precludes the party from calling that expert witness at trial.

(x) The parties shall submit only ONE proposed PTCO. **It is unacceptable to submit multiple or competing proposed PTCOs.** *See* Local Rule 16-7.

d. **Rule 16 Filings; Memoranda; Witness Lists; Exhibit Lists**

Unless otherwise indicated, the parties must comply fully with the requirements of Local Rule 16. See the last page of this Order for applicable dates.

Memoranda and Contentions of Fact and Law

Memoranda of Contentions of Fact and Law shall be filed by the date listed in this Scheduling Order, and shall comply with the requirements set forth in Local Rule 16-4. The parties are strongly encouraged to submit one joint Memorandum where possible.

Joint Witness List

Counsel shall prepare a **joint** list of their witnesses, including a brief summary (two to three paragraphs) of each witness's expected testimony, **what makes the testimony unique** from any other witness testimony, **an estimate of the length of time** needed for direct examination of each side's own witnesses and an estimate for the cross

examination of opposing witnesses, and whether the witness will testify by deposition or in person. The joint witness list shall be filed at the same time counsel lodge the PTCO. If a party intends to offer deposition testimony into evidence at trial, the party shall designate the relevant portions of the deposition testimony to be read at trial and advise opposing counsel of same. Opposing counsel shall then designate any additional portions of such deposition testimony which counsel intends to offer in evidence. **All objections to any such designated deposition testimony shall be made in writing and filed at the same time counsel lodge the PTCO** so that the Court may consider whether ruling on the objections will facilitate trial or result in the disposition of evidentiary matters that may assist continuing settlement negotiations.

If expert witnesses are to be called at trial, each party shall list and identify their respective expert witnesses. Failure of a party to list and identify an expert witness may preclude a party from calling that expert witness at trial. If expert witnesses are to be called at trial, the parties shall exchange at the PTC short narrative statements of the qualifications of the expert and the testimony expected to be elicited at trial. Previously prepared and exchanged expert reports shall not substitute for the narrative statements required.

**On the first day of trial, the parties must lodge with the Court three (3) copies of the witness list**, which shall include the names of the witness in the approximate order in which they may be called to testify.

<u>Joint Exhibit List and Exhibit Stipulation</u>

The parties shall prepare a joint Pretrial Exhibit Stipulation that shall contain each party's numbered list of all trial exhibits, with objections, if any, to each exhibit including the basis of the objection and the offering party's response. All exhibits to which there is no objection shall be deemed admitted. The parties shall stipulate to the authenticity of exhibits whenever possible, and the Pretrial Exhibit Stipulation shall identify any exhibits for which authenticity has not been stipulated and the specific reasons for the parties' failure to stipulate.

The Pretrial Exhibit Stipulation shall be substantially in the following form:

**<u>Pretrial Exhibit Stipulation</u>**

**<u>Plaintiff(s)'/Defendant(s)' Exhibits</u>**

| **<u>Number</u>** | **<u>Description</u>** | **<u>If Objection, State Grounds</u>** | **<u>Response to Objection</u>** |
|---|---|---|---|

The Pretrial Exhibit Stipulation shall be filed at the same time counsel lodge the proposed PTCO. Failure to comply with this paragraph could be deemed to constitute a waiver of all objections. However, **do not submit** blanket or boilerplate objections to the opposing party's exhibits. These will be disregarded and overruled. **NOTE**: Counsel are instructed not to bring excessive exhibits to trial, but only those exhibits that are reasonably expected to actually be used.

All counsel are to meet not later than ten (10) days before trial and to stipulate so far as is possible as to authenticity, foundation, waiver of the best evidence rule, and to those exhibits which may be received into evidence at the start of trial. The exhibits to be so received will be noted on the copies of the exhibit lists.

**On the first day of trial, the parties must lodge with the Court Clerk three (3) copies of the of the final exhibit list.**

<u>Jury Instructions/Special Verdict Forms</u>

The parties shall make every attempt to agree upon the jury instructions before submitting them to the Court. **It is expected that counsel will agree on the substantial majority of jury instructions.** This is in addition to the standard cautionary and introductory instructions regarding duties of the jury, the order of the trial, etc. found in Chapters 1, 2 & 3 of the *9th Circuit Manual of Model Jury Instructions*. The Court requires little or no assistance in the preparation of these standard instructions. Counsel's attention should be focused on reaching agreement on the instructions covering the substantive legal issues. It is anticipated that working diligently and cooperatively counsel will be able to reach agreement on the vast majority of the

substantive instructions. **Judicial involvement will be limited to resolving disputes on only a few instructions on which the parties are unable to agree.**

On the date listed in this Scheduling Order, counsel shall file with the Court a **JOINT** set of jury instructions on which there is agreement. Defendant's counsel has the burden of preparing the joint set of jury instructions. At the same time, each party shall file its proposed jury instructions which are objected to by any other party, accompanied by points and authorities in support of those instructions.

When the parties disagree on an instruction, the party opposing the instruction must attach a short statement (one to two paragraphs) supporting the objection, and the party submitting the instruction must attach a short reply supporting the instruction. Each statement should be on a separate page and should follow directly after the disputed instruction.

The parties ultimately must submit one document, or if the parties disagree over any proposed jury instructions, three documents. The three documents shall consist of: (1) a set of Joint Proposed Jury Instructions; (2) Plaintiff's Disputed Jury Instructions; and (3) Defendant's Disputed Jury Instructions. Any disputed Jury Instructions shall include the reasons supporting and opposing each disputed instruction in the format set forth in the previous paragraph.

**The parties are encouraged to consider whether the Court should give preliminary instructions to the jury on the substantive issues they will be called upon to decide. Should the parties elect to give preliminary instructions, those substantive instructions should be produced to the Court on the first day of trial.**

The Court directs counsel to use the instructions from the *Manual of Model Jury Instructions for the Ninth Circuit* where applicable. Where California law is to be applied and the above instructions are not applicable, the Court prefers counsel to use the California Jury Instructions in CACI. If none of these sources is applicable, counsel are directed to use the instructions in Devitt, Blackmar and Wolff, *Federal Jury Practice and Instructions*. Modifications of instructions from the foregoing sources (or any other

form instructions) must specifically state the modification made to the original form instruction and the authority supporting the modification. **The Court will consider special jury instructions not derived from these sources only in exceptional circumstances.**

Each requested instruction shall be in the format specified by Local Rule 51-2 and shall be set forth in full; be on a separate page with the caption "COURT'S INSTRUCTION NUMBER ___"; be numbered; cover only one subject or principle of law; not repeat principles of law contained in any other requested instructions; and cite the authority for a source of the requested instruction. In addition to the foregoing, each party shall file with the Courtroom Deputy Clerk (CRD) on the first day of trial a "clean set" of the aforesaid requested duplicate jury instructions. The "clean set" shall not cite the authority for a source of the requested instruction.

An index page shall accompany all jury instructions submitted to the Court. The index page shall indicate the following:

- the number of the instruction;
- a brief title of the instruction;
- the source of the instruction and any relevant case citation; and
- the page number of the instruction.

***EXAMPLE:***

| NO. | TITLE | SOURCE | PAGE NO. |
|---|---|---|---|
| 5 | Evidence for Limited Purpose | 9th Cir. 1.5 | 9 |

During the trial and again before argument, the Court will meet with counsel and settle the instructions. Strict adherence to time requirements is necessary for the Court to examine the submissions in advance so that there will be no delay in starting the jury trial, or the final instructions to the jury and the closing arguments of counsel. **Failure of counsel to strictly follow the provisions of this section may subject the**

**non-complying party and/or its attorney to sanctions and SHALL CONSTITUTE A WAIVER OF JURY TRIAL in all civil cases.**

Joint Statement of the Case and Requests for Voir Dire

At the PTC, the parties shall file their proposed voir dire questions and their joint Statement of the Case which the Court will read to all prospective jurors prior to the commencement of voir dire. The statement should not be longer than two or three paragraphs, and should not contain any argument nor an excessive amount of information. The Statement of the Case is merely to advise the prospective jurors of the general nature of the case, i.e. securities law violations, bank robbery, copyright infringement, etc.

The Court conducts voir dire of all prospective jurors. The parties need not submit requests for standard voir dire questions such as education, current occupations, marital status, prior jury service, etc., but should include only proposed questions specifically tailored to the parties and issues of the case.

**e. First Day of Trial**

Trial Exhibits

Counsel must deliver two sets of exhibits to the Court Clerk (one for witnesses and one for the Judge) on the morning of the first day of trial as follows:

(i) Judge's Copy: Counsel are to prepare the Judge's copy of the exhibits by placing them in 3-ring binders. The holes are to be 3/8" in diameter. The notebooks are to be tabbed down the right side with numeric tabs separating each exhibit.

(ii) Witnesses' Copy: Counsel are to prepare the Witnesses' copy of the exhibits by placing each exhibit in its own separate manilla folder. Each manilla folder should have a tab on the right side with the exhibit number written on it. The manilla folders should be put in a box in numerical order, with the tabs facing upward. The exhibits used in this folder should be the original exhibits, and should be

tagged with Court-approved tags. Court-approved exhibit tags can be obtained from the window on the 4th Floor of the U.S. Courthouse, Los Angeles, CA 90012.

The exhibits are to be numbered sequentially, with Plaintiff's exhibits numbered 1, 2, 3, etc. and Defendant's exhibits numbered 1000, 1001, 1002, etc. Exhibit numbering must further comply with Local Rule 26-3.

<u>Deposition Transcripts</u>

The complete original transcript of any depositions to be used at trial shall be lodged with the Court on the first day of trial.

<u>First Day of Trial</u>

The Court requires that the following be submitted to the Courtroom Deputy Clerk on the first day of trial (which is **in addition to any other documents** referenced above):

(i) Judge's copy of exhibits (as described above).

(ii) Witnesses' copy of exhibits (as described above).

(iii) Any preliminary instructions the parties have agreed may be read to the jury before the presentation of evidence.

(iv) Three (3) copies of the exhibit list.

(v) Three (3) copies of the witness list, which shall include the names of the witness in the approximate order in which they may be called to testify.

All counsel are to meet not later than ten (10) days before trial and to stipulate so far as possible as to foundation, waiver of the best evidence rule, and to those exhibits which may be received into evidence at the start of trial. The exhibits so received will be noted on the copies of the exhibit lists.

**Any items that have not been admitted into evidence and are left in the courtroom overnight <u>without prior approval</u> will be discarded.**

/ / /

Real-Time Reporting Requirement

Each party must file with the Court, at the same time counsel lodges the PTCO, a document for the Court Reporter that contains proper names, unusual or scientific terms, or any other foreign or uncommon words that are likely to be used by the parties during the PTC and the Trial.

8. **Settlement**

This Court will not conduct settlement conferences in non-jury cases unless counsel for all parties and their respective clients agree either in writing or on the record. In jury cases, the Court will conduct a settlement conference at the parties' joint request if three conditions exist:

(a) The parties are satisfied that the fact issues in the case will be tried by a jury;

(b) All significant pre-trial rulings which the Court must make have been made; and

(c) The parties desire the Court to conduct the conference, understanding that if settlement fails, the Court will preside over trial of the case.

The parties must file a Status Report regarding settlement at the time they lodge the proposed PTCO. This Report shall not disclose the parties' settlement positions, i.e. the terms of any offers or demands. It shall merely describe the efforts made by the parties to resolve the dispute informally, i.e. the occasions and dates when the parties participated in mediation or settlement conferences. The Status Report shall also include the name and phone number of the Settlement Officer who assisted the parties with their settlement conference.

**Caveat: If counsel fail to file the required Pretrial documents or fail to appear at the Pretrial Conference and such failure is not otherwise satisfactorily explained to the Court: (a) the cause shall stand dismissed for failure to prosecute if such failure occurs on the part of the plaintiff; (b) default judgment shall be**

**entered if such failure occurs on the part of the defendant; or (c) the Court may take such action as it deems appropriate.**

**IT IS SO ORDERED.**

May 29, 2025

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

# U.S. District Judge Otis D. Wright, II
## Schedule of Trial and Pretrial Dates

**CASE NO.:** **CV 25-1651**

**PARTIES:** **Lighthouse Healthcare Center, LLC**
**-v-**
**National Fire & Marine Insurance Company et al.**

**COMPLAINT FILED:** **02/26/25**

**Estimated Length of Trial:** **7 days**

**TRIAL TYPE:** **Jury**

**<u>SETTLEMENT CHOICE:</u>**
Magistrate Judge
Court Mediation Panel
**Outside ADR**

| DATE | MATTER |
|---|---|
| **08/18/26** | Trial at 9:00 a.m. |
| **08/13/26** | Deadline to File:<br>Final Trial Exhibit Stipulation |
| **08/10/26** | Hearing on Motions in Limine at 1:30 p.m. |
| **07/29/26** | Deadline to File:<br>Oppositions to Motions in Limine |
| **07/27/26** | Final Pretrial Conference at 1:30 p.m. |
| **07/22/26** | Deadline to File:<br>Motions in Limine (not to exceed 8 pages) |
| **07/20/26** | Deadline to File:<br>Proposed Pretrial Conference Order<br>Memoranda and Contentions of Fact and Law<br>Joint Witness List<br>Joint Exhibit List and Exhibit Stipulation<br>Proposed Verdict Form(s)<br>Proposed Jury Instructions / Disputed Jury Instructions<br>Proposed Voir Dire Questions<br>Joint Statement of the Case<br>Joint Status Report re: Settlement |
| **05/26/26** | Deadline for Hearing Motions* |
| **05/19/26** | Deadline to Conduct Settlement Conference |
| **04/28/26** | Expert Discovery Cutoff |
| **04/07/26** | Percipient/Fact Discovery Cutoff |
| **08/13/25** | Deadline to Hear Motion to Amend Pleadings or Add Parties<br>(must comply with FRCP 15(a)(2)) |

* This does not apply to motions for class certification, which must be filed within 120 days after the date the Scheduling Order issues, unless otherwise ordered by the Court.

# Exhibit J

Message

**From**: Hopping, John [John.Hopping@medpro.com]
on behalf of Hopping, John <John.Hopping@medpro.com> [John.Hopping@medpro.com]
**Sent**: 3/16/2017 6:31:37 AM
**To**: Olsen, Alysha [Alysha.Olsen@medpro.com]
**Subject**: RE: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276
**Attachments**: AE0-F5B292A8D039.pdf

We haven't issued the policy yet as an onsite assessment was required as a subjectivity.

I've attached the binder-this one just became effective 3/1. I've attached the binder.

Thanks!

JH

-----Original Message-----
From: Olsen, Alysha
Sent: Wednesday, March 15, 2017 12:14 PM
To: Hopping, John <John.Hopping@medpro.com>
Subject: FW: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

John,
Can you help me out? I can't find this account in On Base. Does the broker have the policy number wrong?

Alysha A. Olsen
Claims Specialist
MedPro Group
direct (559) 578-3328
mobile (559) 326-6658
Email: Alysha.Olsen@medpro.com
www.medpro.com

-----Original Message-----
From: Steven Riss [mailto:Steven.Riss@amwins.com]
Sent: Tuesday, March 07, 2017 6:35 PM
To: Olsen, Alysha <Alysha.Olsen@medpro.com>
Cc: Eli Fogel <Eli.Fogel@amwins.com>
Subject: Lighthouse Healthcare Center, LLC - Dean Donnell - NSC100276

This message originated from outside your organization

Hi alysha. Pl process attached. The point of contact is

David Strother
Administrator2@lighthousehealthcenter.com<mailto:Administrator2@lighthousehealthcenter.com>

323) 564-4461

Mailing address: 2222 Santa Ana Blvd South Los Angeles CA 90059

Please send acknowledgment.

Thanks

Steven Riss
Senior Vice President | AmWINS Insurance Brokerage of California, LLC T 818.772.3819 F 818.773.6000
steven.riss@amwins.com<mailto:steven.riss@amwins.com>
21550 Oxnard Street | Suite 1100 | Woodland Hills, CA 91367 An AmWINS Group Company License #0C01319
03/07/17 Steven.Riss@amwins.com

This e-mail and any attachments may contain information that is privileged or confidential and is meant solely for the use of person(s) to whom it was intended to be addressed. If you have received this e-mail by mistake, or you are not the intended recipient, you are not authorized to read, print, keep, copy or distribute this message, attachments, or any part of the same. If you have received this email in error, please immediately inform the author and permanently delete the original, all copies and any attachments of this email from your computer. Thank you